IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROY LANGBORD, DAVID LANGBORD, and   :
JOAN LANGBORD,   :
  :
        Plaintiffs,   :
  :
        v.   :     Civil Action No. 06-5315
  :
UNITED STATES DEPARTMENT OF THE   :
TREASURY; UNITED STATES BUREAU OF   :
THE MINT; HENRY M. PAULSON, JR.,   :
Secretary of the United States Department of the   :
Treasury; STEPHEN LARSON, Acting General   :
Counsel of the United States Department of the   :
Treasury; EDMUND C. MOY, Director of the   :
United States Mint; DANIEL P. SHAVER, Chief   :
Counsel, United States Mint; DAVID A. LEBRYK,   :
Deputy Director of the United States Mint; and   :
the UNITED STATES OF AMERICA,   :
  :
        Defendants.   :


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS, OR IN THE ALTERNATIVE,**
**FOR SUMMARY JUDGMENT**

PATRICK L. MEEHAN
United States Attorney

VIRGINIA A. GIBSON
Assistant United States Attorney
Chief, Civil Division

JOEL M. SWEET
Assistant United States Attorney

JACQUELINE ROMERO
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476
Tel. (215) 861-8581
Fac. (215) 861-8349

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.     PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    SUMMARY OF THE COMPLAINT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A.    THE COURT SHOULD DISMISS OR ENTER SUMMARY
             JUDGMENT IN FAVOR OF THE UNITED STATES ON
             PLAINTIFF'S REPLEVIN CLAIM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

             1.    Procedural Legal Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

             2.    Substantive Legal Principles Applicable to
                   Plaintiffs' Replevin Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

             3.    Facts About Which There Are No Genuine Disputes. . . . . . . . . . . . . . . 6

             4.    The 1933 Double Eagles Are Chattel Owned By
                   The United States Because They Never Were
                   Lawfully Issued And Circulated As Coinage. . . . . . . . . . . . . . . . . . . 8

             5.    Plaintiffs Do Not Own The 1933 Double Eagles. . . . . . . . . . . . . . . . 10

       B.    THE UNITED STATES IS NOT REQUIRED TO
             INITIATE FORFEITURE PROCEEDINGS AGAINST
             THE 1933 DOUBLE EAGLES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

             1.    Forfeiture Is Not Applicable to The 1933 Double Eagles. . . . . . . . . . . . 14

             2.    Plaintiffs' Reliance Upon CAFRA's Notice and Claim
                   Rules Is Misplaced. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

             3.    Plaintiffs Lacked Standing to File a Claim for the
                   Return of Purportedly Seized 1933 Double Eagles. . . . . . . . . . . . . . . . 18

             4.    The 1933 Double Eagles are Not Subject to
                   Administrative Forfeiture Because Plaintiffs
                   Contend that Each is Worth At Least $500,000. . . . . . . . . . . . . . . . . . 18

5.      CAFRA's Notice and Claim Rules Do Not Apply
        Here Because Plaintiffs Voluntarily Transferred the
        1933 Double Eagles to the Possession of the United States. . . . . . . . . . 19

6.      Plaintiffs Are Not Entitled to the Return of the
        1933 Double Eagles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.  PLAINTIFFS' REMAINING CLAIMS SHOULD BE DISMISSED. . . . . . . . . 21

1.      The Court Should Dismiss Plaintiffs' Fourth
        Amendment and Fifth Amendment Claims. . . . . . . . . . . . . . . . . . . . . . . 21

2.      Plaintiffs' APA and Declaratory Judgment Act
        Claims Must Be Dismissed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

3.      The Court Should Deny Plaintiffs' Request for
        Mandamus Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

**CASES**

Acheampong v. United States,
   2000 WL 1262908 (S.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Blossom Prod. Corp. v. Nat'l Underwear Co.,
   191 A. 40 (Pa. 1937). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Brower v. County of Inyo,
   489 U.S. 593 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Brown v. Brierley,
   438 F.2d 954 (3d Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

Conley v. Gibson,
   355 U.S. 41, 45-46 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Cospito v. Heckler,
   742 F.2d 72 (3d Cir. 1984), cert. denied, 471 U.S. 1131 (1985). . . . . . . . . . . . . . . . . . . 22

Dowling v. City of Philadelphia.,
   855 F.2d 136 (3d Cir.1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Hammoud v. Woodard,
   2006 WL 381642 (E.D. Mich. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Heckler v. Ringer,
   466 U.S. 602 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Infante v. Drug Enforcement Administration,
   938 F. Supp. 1149, 1152 (E.D.N.Y. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

In re Matthews,
   395 F.3d 477 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

In re Patenaude,
   210 F.3d 135 (3d Cir.), cert. denied, 531 U.S. 1011 (2000). . . . . . . . . . . . . . . . . . . . . . 24

In re Roberts,
   178 F.3d 181 (3d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Johnson v. West,
      2004 WL 4986628 (D. Md. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Kadonsky v. United States,
      216 F.3d 499 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

L.B. Foster Co. v Charles Caracciolo Steel & Metal Yard, Inc.,
      777 A.2d 1090 (Pa. Super. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12

Linwood Harvestore, Inc. v. Cannon,
      235 A.2d 377 (Pa. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Longenette v. Krusing,
      322 F.3d 758 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Malia v. General Elec. Co.,
      23 F.3d 828 (3d Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Mallard v. United States Dist. Court for the S. Dist. of Iowa,
      490 U.S. 296 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Mantilla v. United States,
      302 F.3d 182 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

Mendoza v. U.S. Customs and Border Protection,
      2006 WL 2627925 (D. N.J. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

Naporano Metal & Iron Company v. Sec. of Labor of the United States,
      529 F.2d 537 (3d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Norton v. Southern Utah Wilderness Alliance,
      542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Penn. ex rel. Zimmerman v. PepsiCo., Inc.,
      836 F.2d 173 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

S.E. First Nat'l Bank v. Sec. Peoples Trust Co.,
      480 F. Supp. 1345 (W. D. Pa. 1979), aff'd, 639 F.2d 775 (3d Cir. 1980) . . . . . . . . . . 6, 11

United Auto Workers v. Chao,
      361 F.3d 249 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Three Thousand Seven Hundred and Eighty Six Dollars in U.S. Currency,
    1991 WL 148775 (E.D. Pa. Jul. 31, 1991)............................................ 23

United States v. $9,630 in U.S. Currency,
    2006 WL 3813590 (D. Utah 2006). ........................................ 21

United States v. $746.198 in U.S. Currency, More or Less,
    299 F. Supp.2d 923 (S.D. Iowa 2004). ...................................... 18

United States v. Eight Thousand Eight Hundred and Fifty Dollars in United States Currency,
    461 U.S. 555 (1983)................................................... 22, 23

United States v. 98 $20 United States Gold Coins,
    20 F. Supp. 354 (E.D. Pa. 1937). ........................................... 7

United States v. Barnard,
    72 F. Supp. 531 (W.D. Tenn. 1947)...................................... 9, 13

United States v. California,
    332 U.S. 19 (1947)....................................................... 5

United States v. Howell,
    425 F.3d 971 (11th Cir. 2005). ........................................ 15, 22

United States v. Jacobsen,
    466 U.S. 109 (1984)..................................................... 21

United States v. Kim,
    738 F. Supp. 1002 (E.D. Va. 1990). ....................................... 16

United States v. Messina,
    507 F.2d 73 (2d Cir. 1974), cert. denied, 420 U.S. 993 (1975).................. 20, 22

United States v. Steinmetz,
    973 F.2d 212 (3d Cir. 1992), cert. denied, 507 U.S. 984  (1993). .............. 5, 6, 10

Yskamp v. Drug Enforcement Agency,
    163 F.3d 767 (3d Cir. 1998)................................................ 19

# UNITED STATES CONSTITUTION

U.S. Const., art. I, § 8, cl. 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

U.S. Const., art. IV, § 3, cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

# STATUTES

5 U.S.C. § 706(1) and (2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 18

18 U.S.C. § 983(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 983(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18 U.S.C. § 983(a)(1)(A)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 983(a)(1)(F). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 983(a)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 983(a)(3)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 983(a)(3)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 983(d)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 983(h)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

19 U.S.C. §1607(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19

28 U.S.C. §1361. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 2201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. §2671. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

31 U.S.C. § 304. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

31 U.S.C. § 321(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

44 Stat. cmxcvi (1927). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

44 Stat. miv (1927). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

20 Pa. C.S. § 301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

20 Pa. C.S. § 3301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

20 Pa. C.S. § 3302. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

20 Pa. C.S. § 3303. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**FEDERAL RULES**

Federal Rule of Civil Procedure 11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Federal Rule of Civil Procedure 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13

Federal Rule of Civil Procedure 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13

Federal Rule of Civil Procedure G(5)(a)(i)(B)-(C). . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Federal Rule of Evidence 803(16). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

# I.
## PRELIMINARY STATEMENT

More than 70 years ago, an insider at the United States Mint in Philadelphia stole an unknown number of 1933 Double Eagle gold pieces that were never lawfully issued and put into circulation as United States coinage.  The rest of the 1933 Double Eagles in the Mint's vaults – the ones that were not stolen  – were melted in 1937, none ever having been issued and put into circulation.  In 1944, Mint officials learned that a 1933 Double Eagle somehow reached the hands of a coin dealer.  The United States Secret Service investigated and concluded that any 1933 Double Eagles in public hands had to have been stolen from the Mint, as none had been lawfully issued and circulated as coinage.  The Secret Service recovered nine 1933 Double Eagles, which were all that were known to the United States, except for one specimen that had escaped overseas to the collection of Egyptian King Farouk, and two specimens that had been transferred to the Smithsonian Institution as part of the National Numismatic Collection.

Every single one of the recovered 1933 Double Eagles tracked back to Israel Switt, a gold scrap and antiques dealer doing business on Jewelers' Row in Philadelphia.  Switt admitted to the Secret Service that he had sold nine 1933 Double Eagles to coin dealers.  On his oath, however, Switt denied knowing from whom he obtained the 1933 Double Eagles.  Switt also expressly denied having obtained any 1933 Double Eagles directly from the Mint, or having any more 1933 Double Eagles in his possession or under his control.  See Exhibit ("Exh.") E.

Plaintiffs in this case are Joan Langbord, Switt's daughter, and Roy and David Langbord, Switt's grandsons.  In August 2004, plaintiffs informed the United States that they were in possession of ten 1933 Double Eagles that they contend had been in Switt's possession since the 1930s.  Plaintiffs voluntarily transferred the 1933 Double Eagles to the possession of the United

States and sought some type of reward.  <u>See</u> Compl. at ¶62;  Exh. R.  When the United States

declined to pay a reward, the Langbords brought this lawsuit.

## II.
## SUMMARY OF THE COMPLAINT

The Complaint is premised on plaintiffs' contention that they own the ten 1933 Double

Eagles at issue in this action.  According to plaintiffs, Switt "came into possession of specimens"

of the 1933 Double Eagles in the 1930s.  Compl. at ¶58.  Plaintiffs contend that upon Switt's

death in 1990, all of Switt's property "passed" to plaintiffs, including the contents of a "number

of family safe deposit boxes."  Compl. at ¶59.

In 2003 – 13 years after Switt's death – plaintiff Joan Langbord allegedly opened one of

the family safe deposit boxes and "found" ten 1933 Double Eagles.  Compl. at ¶60.  In August

2004, plaintiffs' counsel disclosed to officials of the Mint that plaintiffs had in their possession

the ten 1933 Double Eagles.  Compl. at ¶61.  On September 22, 2004, plaintiff Roy Langbord

opened a safe deposit box in a Philadelphia bank and transferred possession of the 1933 Double

Eagles to the United States.  Compl. at ¶¶62-65.  A day earlier, plaintiffs had delivered a letter to

Mint officials reiterating their request for the parties to "reach an amicable resolution of any

issues that might be raised by the United States," and further asserting unspecified rights to the

1933 Double Eagles.  Compl. at ¶5;  Exhibit ("Exh.") A.  The United States declined plaintiffs'

requests for a reward.  Compl. at ¶67.

Plaintiffs' eight count complaint raises claims in law and in equity based upon the

Administrative Procedures Act ("APA"), 5 U.S.C. § 706(1) and (2), the Declaratory Judgment

Act, 28 U.S.C. § 2201, the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. §

983, the Fourth and Fifth Amendments to the United States Constitution, mandamus jurisdiction under 28 U.S.C. §1361, and replevin and conversion under the Federal Tort Claims Act, 28 U.S.C. §2671 et seq. All of plaintiffs' claims hinge on their erroneous contentions that: (1) plaintiffs own the 1933 Double Eagles; and (2) forfeiture is required and the notice and claims provisions of CAFRA are applicable to the facts in this case. As relief, plaintiffs seek the return of the 1933 Double Eagles, an order requiring the United States to commence a forfeiture action, or damages up to $40 million.[1]

## III.
## ARGUMENT

This case turns on a small number of indisputable facts and bedrock principles of law – all of which require that the Court enter judgment for the United States and against plaintiffs.

**A.   THE COURT SHOULD DISMISS OR ENTER SUMMARY JUDGMENT IN FAVOR OF THE UNITED STATES ON PLAINTIFF'S REPLEVIN CLAIM.**

Resolution of plaintiffs' replevin claim – and, as we shall explain below, the entire action – turns on whether plaintiffs can establish that they own the ten 1933 Double Eagles. To prevail on their replevin claim, plaintiffs must establish as a threshold matter that the 1933 Double Eagles were lawfully issued and circulated to the public as coinage. Once plaintiffs prove that the 1933 Double Eagles were lawfully issued and circulated, plaintiffs then must establish provenance of the gold pieces. Specifically, plaintiffs must establish that they own the gold pieces through inheritance from Switt, and that Switt lawfully obtained them.

---

[1] Plaintiffs have named as defendants the United States of America, the United States Department of the Treasury, the United States Bureau of the Mint, five officials of the United States in their official capacities only, and 10 "John Does" about whom the Complaint is silent. For purposes of this motion, the defendants will be referred to collectively as the "United States."

1.      **Procedural Legal Standards.**

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal for "failure to state a

claim upon which relief can be granted."  Dismissal under Rule 12(b)(6) is appropriate when it

clearly appears that the plaintiff can prove no set of facts in support of the claim which would

entitle him to relief.  See Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  In deciding a motion to

dismiss pursuant to Rule 12(b)(6), all facts alleged in the complaint must be accepted as true.

Malia v. General Elec. Co., 23 F.3d 828, 830 (3d Cir.1994).  A claim may be dismissed when the

facts alleged and the reasonable inferences therefrom are legally insufficient to support the relief

sought.  See Penn. ex rel. Zimmerman v. PepsiCo., Inc., 836 F.2d 173, 179-80 (3d Cir. 1988).

Federal Rule of Civil Procedure 56(f) provides for the entry of summary judgment when

"there is no genuine issue as to any material fact and [where] the moving party is entitled a

judgment as a matter of law."  A party opposing summary judgment may not rest on mere denials

of the movant's evidence, but rather "must set forth facts showing that there is a genuine issue

for trial."  Fed.R.Civ.P. 56(e).  Where an opposing party argues that further discovery is needed,

that party must "submit an affidavit specifying, for example, what particular information is

sought; how, if uncovered, it would preclude summary judgment; and why it has not been

previously obtained."  Dowling v. City of Philadelphia, 855 F.2d 136,139-40 (3d Cir.1988).

2.      **Substantive Legal Principles Applicable to Plaintiffs' Replevin Claim.**

Resolution of plaintiffs' replevin claim is governed by a few fundamental legal principles

of law:

- Only Congress and those persons authorized by Congress have authority to mint and issue

   coins.  See U.S. Const., art. I, § 8, cl. 5 ("The Congress shall have Power . . . . To coin

4

Money, regulate the Value thereof . . . .").

- Only Congress and those persons authorized by Congress may dispose of property belonging to the United States.  See U.S. Const., art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States. . . .").

- The United States cannot be divested of its property by negligence, delay, laches, mistake or unauthorized actions by subordinate officials.  See United States v. California, 332 U.S. 19, 39-40 (1947).  The United States holds its interests in property "in trust for all the people" and cannot be "deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act."  United States v. Steinmetz, 973 F.2d 212, 222 (3d Cir. 1992) (citation omitted), cert. denied, 507 U.S. 984  (1993) (holding that ship's bell recovered from Confederate vessel sunk off the coast of France belongs to the United States).

- A thief cannot convey good title to stolen property.  See L.B. Foster Co. v Charles Caracciolo Steel & Metal Yard, Inc., 777 A.2d 1090, 1093 (Pa. Super. 2001) (one who purchases goods from a thief obtains no right to property as against claims of true owner, even if he is good faith purchaser for value);  Linwood Harvestore, Inc. v. Cannon, 235 A.2d 377, 380 (Pa. 1967) (bona fide purchaser from a thief gets nothing).

- An action in replevin is confined to the questions of title and the exclusive right to possession.  Blossom Prod. Corp. v. Nat'l Underwear Co., 191 A. 40, 41 (Pa. 1937).  A

5

plaintiff "must recover on the strength of its own title" and not the weakness of a

defendant's title.  S.E. First Nat'l Bank v. Sec. Peoples Trust Co., 480 F. Supp. 1345,

1346 (W. D. Pa. 1979), aff'd, 639 F.2d 775 (3d Cir. 1980).

These legal principles drive the analysis of ownership of the 1933 Double Eagles.  Applied to the

undisputed facts, they require that the Court enter judgment for the United States and against

plaintiffs.

### 3.        Facts About Which There Are No Genuine Disputes.

Upon his inauguration in early 1933, President Franklin Delano Roosevelt implemented a

new monetary policy as one of many measures designed to bring the nation out of the Great

Depression.  On March 6, 1933, President Roosevelt issued a Proclamation declaring a "Bank

Holiday" closing banks and prohibiting payment of gold coin.  See Exh. B at 2.  The Roosevelt

administration issued numerous additional Executive Orders and Regulations of the Secretary of

the Treasury, and Congress passed statutes, all essentially prohibiting banks from paying out gold

coin and gold certificates and requiring under penalty of criminal prosecution the return to banks

of all gold and gold certificates.  See generally Roosevelt, Franklin D., The Public Papers and

Addresses of Franklin D. Roosevelt Volume Two, The Year of Crisis 1933 (1938).[2]

As the nation's new monetary policies unfolded, the Mint struck 445,500 Double Eagles

bearing the year 1933.  None of the 1933 Double Eagles were lawfully issued and circulated to

---

[2] In disputes arising out of historical events, courts may rely upon documents admissible
into evidence pursuant to Federal Rule of Evidence 803(16) (hearsay exception for statements in
ancient documents) and historical texts.  See Steinmetz, 973 F.2d at 214 n.2.

the public as coinage.[3]  On August 4, 1934, pursuant to Treasury Department orders, the Mint

Director authorized the melting of the Mint's stock of domestic gold pieces to proceed.  See Exh.

C.  This included the entire production of 1933 Double Eagles in the vaults of the Mint.

Eleven years after President Roosevelt prohibited the payout, issuance, circulation and

holding of gold coins, on or about March 22, 1944, the Secret Service learned that a New York

coin dealer was offering at auction a 1933 Double Eagle.  Mint records revealed, however, that

no 1933 Double Eagles had been lawfully issued and circulated as coinage.  See Exh. D.  The

Secret Service commenced an investigation to determine whether the 1933 Double Eagles had

been stolen from the Mint.  Secret Service agents identified nine 1933 Double Eagles in the

hands of the dealers and collectors.  Every single one of the 1933 Double Eagles traced back to

Israel Switt.  On March 30, 1944, Switt admitted to Secret Service agents that he had sold nine of

the 1933 Double Eagles.  See Exh. E.  Switt professed to have no recollection where or from

whom he got the gold pieces, and claimed to have no records regarding their acquisition.  Id.  At

the conclusion of the Secret Service's investigation, the United States Attorney's Office declined

to prosecute Switt because of the passing of the statute of limitations.[4]  See Exh. F.

---

[3]  In 2002, a single 1933 Double Eagle with a unique factual and legal history was sold at public auction to a private collector following a legal settlement in which the United States' ownership of the gold piece was acknowledged.  As a condition to the sale – which coincidentally was negotiated by Barry Berke, Esq., plaintiffs' counsel here – it was necessary for the United States to formally issue the gold piece as coinage.

[4]  Israel Switt had already been convicted for illegal possession of gold in connection with another scheme.  In United States v. 98 $20 United States Gold Coins, 20 F. Supp. 354 (E.D. Pa. 1937),  Judge Maris found that Switt knowingly violated the Gold Reserve Act of 1934 by holding and transporting gold coins that he knew it was illegal for him to possess.  Id.  Switt was arrested in Philadelphia as he was about to board a train to Baltimore where he intended to sell gold coins to another dealer, or to stash them in a safe deposit box.  Id.  As a consequence of Switt's conviction, the United States revoked Switt's gold dealing license.

Swift died in 1990.  No 1933 Double Eagles were disclosed during the administration of Swift's estate – or to tax authorities – and none were distributed from Swift's estate to any of the plaintiffs.  See Exh. G at 20-21, 25-30.

4.      **The 1933 Double Eagles Are Chattel Owned By The United States Because They Never Were Lawfully Issued And Circulated As Coinage.**

The 1933 Double Eagles at issue in this case are mere chattel owned by the United States because they were not lawfully issued and circulated as coinage.  Congress is empowered to coin money and to decide what is legal tender.  See U.S. Const., art. I, § 8, cl. 5.  Before 1933, Congress had delegated to the Secretary of the Treasury the power to issue coins as currency, see 44 Stat. cmxcvi (1927) (now 31 U.S.C. § 321(a)(4)), and the Secretary is empowered with authority over the Mint.  Id. at miv (now 31 U.S.C. § 304).  Unless authorized by the Secretary, struck metal pieces may not be issued and circulated as coinage of the United States.

Mint records reflect that no 1933 Double Eagles were lawfully issued as coinage.  The last delivery and issue of gold coins ever made by the Mint in Philadelphia occurred on March 5, 1933.  See Exh. H.  The next day, March 6, 1933, President Roosevelt proclaimed a Bank Holiday and forbade the payout of any gold coins.  See Exh. B.  On the same day, Secretary of the Treasury William H. Woodin directed Mint officials not to issue any gold in any form absent a license issued by the Secretary of the Treasury.  See Exh. I.  Mint records reveal, however, that the first time the Mint Coiner delivered any 1933 Double Eagles to the Mint Cashier was March 15, 1933 – more than a week after the Presidential Proclamation forbidding the payout of gold coins, and Secretary Woodin's directive to the Mint not to pay gold coins, except under license.  See Exh. J.  The Annual Report of the Director of the Mint (for the year ended June 30, 1934)

8

confirms that no 1933 Double Eagle was ever lawfully issued and circulated.  <u>See</u> Exh. K at 4.

Similarly, Department of the Treasury records "do not show that any payments of 1933 Double

Eagles were authorized to be made by the United States Mint, Philadelphia, to any Federal

Reserve Bank or Branch."  <u>See</u> Exh. D.

 Another federal court already has addressed this very same issue.  In <u>United States v.</u>

<u>Barnard</u>, 72 F. Supp. 531 (W.D. Tenn. 1947), the court considered whether a private collector

lawfully owned a 1933 Double Eagle – indeed, one of the same 1933 Double Eagles that had

been sold by Switt.  The <u>Barnard </u>court concluded that to determine ownership of the 1933

Double Eagle, the "decisive question" was whether the 1933 Double Eagle had been "issued as

money or currency of the United States, or whether the status of the same was that of a chattel, or

an article of virtu."  <u>Id.</u> at 531-32.  After a trial, that court concluded that 1933 Double Eagles

"could only be issued and circulated legally by the Philadelphia Mint, upon receipt by said Mint

of an order from the Treasurer of the United States," and that "the Mint did not, at any time,

receive such an order except one to deliver two of these coins to the Smithsonian Institute."  <u>Id.</u>

at 532.  The <u>Barnard</u> court further concluded that the 1933 Double Eagle "did not leave the Mint

as regularly and lawfully issued money," and that it "was not, at any time, money or currency, but

was chattel, or an article of virtu."  <u>Id.</u> at 532 (citing supporting cases).  Based on the Mint's

"strict practices" for issuing coins, the <u>Barnard</u> court concluded that the gold piece had been

"stolen or, through fraudulent breach of trust, taken from the Philadelphia Mint."  <u>Id.</u> at 532.

 Plaintiffs do not allege – nor is there any evidence to establish – that the ten 1933 Double

Eagles at issue in this action were lawfully issued and circulated as coinage.  As a matter of law,

therefore, the Court should find that the 1933 Double Eagles at issue in this action are chattel

owned by the United States, and like all of the property of the United States, are held "in trust for

all the people."  See Steinmetz, 973 F.2d at 222.

**5.       Plaintiffs Do Not Own The 1933 Double Eagles.**

Assuming arguendo that the 1933 Double Eagles did not belong to the United States,

plaintiffs still cannot prove that they are lawful owners.  Plaintiffs allege that in 2003 – thirteen

years after Israel Switt's death – Joan Langbord "found" the ten 1933 Double Eagles in a family

safe deposit box.[5]  Compl. at ¶60.  Plaintiffs further allege: "All of the property of Mr. Switt . . .

passed to ROY, DAVID, and JOAN LANGBORD, including the contents of a number of family

safe deposit boxes."  Compl. at ¶59.  In connection with their tort claim filed against the Mint,

plaintiffs asserted more specifically, "[t]he Coins are the property of Joan, Roy and David

Langbord, by virtue of their being the ultimate beneficiaries under the wills of Elizabeth and

Israel Switt."  See Exh. M at 1.  Plaintiffs claim ownership therefore through inheritance.

Contrary to the allegations in the Complaint, none of the plaintiffs inherited any 1933

Double Eagles.  Roy Langbord and David Langbord each executed a "Renunciation and

Disclaimer" in which they "irrevocably and unqualifiedly" refused to accept any property from

Switt's estate.  Exhs. N and O.  These documents were filed in the Philadelphia Court of

Common Pleas in connection with the administration of Switt's estate.  Consistent with the

renunciations, estate filings reflect that Joan Langbord inherited 100 percent of Switt's

---

[5]  Plaintiffs allege that Joan Langbord "found" the 1933 Double Eagles in 2003 in a
Wachovia Bank safe deposit box, implying that Switt had used the box to store the gold pieces.
Compl. at ¶60.  Documents received from Wachovia, however, show that Switt never had a safe
deposit box at Wachovia (or its predecessors).  The Langbords did not register a safe deposit box
at Wachovia Bank until 1996.  See Exh. L, passim.  Plaintiffs have not alleged where the 1933
Double Eagles were kept from the time of Switt's death in 1990, until they were transferred to
the Wachovia box, who transferred the gold pieces to the Wachovia Bank box, or when.

10

distributed estate.  See Exh. G at 34.  Roy and David Langbord therefore do have not have any

legal interest in the 1933 Double Eagles, and on this ground alone the Court should dismiss all of

their claims.

Moreover, as a matter of law none of the plaintiffs inherited the 1933 Double Eagles from

Swift because the gold pieces were never disclosed in – or distributed from – Swift's estate.  At

the time of death, a decedent's personal property passes to his personal representative.  See 20

Pa. C.S. § 301.  Swift's personal representative was Stanton Langbord, plaintiff Joan Langbord's

husband.[6]  See Exh. G at 40.  As Swift's personal representative, Stanton Langbord was required

to file with the Register of Wills an inventory of "all real and personal estate" belonging to Swift

(except for real estate outside of Pennsylvania), including the appraised value of the property.

See 20 Pa. C.S. §§ 3301, 3302.  The inventory Stanton Langbord filed with the Register of Wills

in 1990 did not disclose any 1933 Double Eagles.  See Exh. G, passim.  Nor did Stanton

Langbord file a supplemental inventory within 30 days of learning of the 1933 Double Eagles.

See 20 Pa. C.S. § 3303.  Nor did the Commonwealth of Pennsylvania Inheritance Tax Return he

filed reveal Swift's purported ownership of any 1933 Double Eagles.  Id.  As a consequence, no

1933 Double Eagles were distributed from Swift's estate to any of the plaintiffs.[7]

To prevail on their replevin claim, plaintiffs must recover on the strength of their own

title or right.  See S.E First Nat'l Bank, 480 F. Supp. at 1346-47.  Plaintiffs fail, however, to

plead any fact to support their implication that Swift legally obtained the 1933 Double Eagles.

---

[6]  Stanton Langbord died in October 2006, weeks before plaintiffs filed this lawsuit.

[7]  The estate inventory includes Swift's share of Swift & Silver, the business Swift
operated in Philadelphia.  According to an inventory and appraisal by Samuel T. Freeman & Co.
in 1998-2000, Swift & Silver had no 1933 Double Eagles, or any other coins.  See Exhs. P and Q.

Conspicuously absent from the complaint are any allegations concerning how, when, or from

whom Switt obtained the 1933 Double Eagles, which is essential information to establish

provenance, and absolutely necessary if plaintiffs seek to establish their own ownership of the

gold pieces.  Plaintiffs allege merely that Switt "came into possession" of the 1933 Double

Eagles in the 1930's – not even suggesting that Switt obtained the 1933 Double Eagles in a bona

fide transaction.  Compl. at ¶58.  In fact, Switt could not have legally obtained the 1933 Double

Eagles because, as described above, no 1933 Double Eagle was ever lawfully issued and

circulated.  Regardless how Switt obtained the 1933 Double Eagles, however, Switt did not own

them because, as a matter of law, a thief cannot convey good title to stolen property.  See L.B.

Foster Co., 777 A.2d at 1093 (one who purchases goods from a thief obtains no right to property

as against claims of true owner, even if he is good faith purchaser for value).[8]

---

[8]  The Court does not need to conclude that Switt committed a crime for it to grant the
United States' motion.  Plaintiffs have failed to plead facts essential to their claim of ownership
because they have not pleaded how, when, and from whom, Switt obtained the 1933 Double
Eagles.  Moreover, plaintiffs' failure in pleading supports a reasonable inference that Switt
obtained the 1933 Double Eagles knowing that they were stolen property.  In 1944, Switt
provided the following written statement to Secret Service agents investigating the theft of the
1933 Double Eagles:

> I never had any conversation about or obtained any gold coins from
> or through any employees of the U.S. Mint at Philadelphia or
> elsewhere.

> I have been questioned as to the existence of any records in my
> possession covering the purchase and sale of the gold coins
> disposed of to [others identified to have had 1933 Double Eagles
> originating from Switt] and state on my oath that I do not have any
> records which will show the time, place, and identity of the persons
> from whom I obtained these coins, nor do I have any of these coins
> in my possession or under my control at this time.

See Exh. E.  Switt's statement directly contradicts plaintiffs' allegation that Switt obtained the

Plaintiffs did not inherit the 1933 Double Eagles, as they allege in the Complaint, and their allegations of ownership are transparently contrived.[9]  Assuming <u>arguendo</u> that plaintiffs had inherited the 1933 Double Eagles, they still have failed to plead provenance because they have not alleged (nor can they prove) how Switt obtained the gold pieces, or facts sufficient for the Court to reasonably infer that he may have obtained good title.  <u>See</u> <u>United States v. Barnard</u>, 72 F. Supp. at 532-33 (purchaser of 1933 Double Eagle once owned by Switt  "took the same subject to the defects in its title" even if purchased in good faith).  The Court therefore should dismiss plaintiffs' replevin and conversion claims pursuant to Rule 12(b)(6), or in the alternative enter judgment for the United States and against plaintiffs pursuant to Rule 56, Fed.R.Civ.P.

**B.    THE UNITED STATES IS NOT REQUIRED TO INITIATE FORFEITURE PROCEEDINGS AGAINST THE 1933 DOUBLE EAGLES.**

Plaintiffs base much of their claim on the assumption that the United States was required to commence a forfeiture action against the 1933 Double Eagles.  Based on that assumption, they argue that because the United States did not commence a forfeiture action in accordance with the provisions of the CAFRA, which imposed various deadlines on the United States once it seizes property for forfeiture, plaintiffs have the right to the return of the 1933 Double Eagles.

For the reasons explained above, plaintiffs' argument regarding the application of CAFRA to this case would be without merit even if the facts of this case mandated forfeiture.

---

ten 1933 Double Eagles at issue in this case in the 1930s.

[9]  At the outset of this controversy, plaintiffs did not contend that they owned the 1933 Double Eagles.  In a letter dated July 25, 2005, plaintiffs' counsel sought to articulate all of the reasons why plaintiffs deserved a reward for having returned the gold pieces to the United States.  Plaintiffs' purported ownership of the 1933 Double Eagles is not one of the reasons described in the letter.  <u>See</u> Exh. R at 1-3..

13

Among other things, plaintiffs lack standing to contest the forfeiture of property in which they have no legal interest, the deadlines governing the commencement of an administrative forfeiture proceeding have no application in a case involving property that cannot, by law, be administratively forfeited, and there has been no violation of any deadline regarding the commencement of a judicial forfeiture proceeding.

But this Court need not reach any of those issues because plaintiffs' underlying assumption is wrong:  this is not a forfeiture case, and none of the procedures, deadlines and sanctions imposed by CAFRA has any application to this case whatsoever.

### 1.      Forfeiture Is Not Applicable to The 1933 Double Eagles.

There are three types of forfeiture under federal law – administrative forfeiture, civil forfeiture, and criminal forfeiture.  See Stefan D. Cassella, Asset Forfeiture Law in the United States, JurisNet (New York, 2007) at 9.  "Administrative forfeiture" refers to the forfeiture of property by an administrative agency in a non-judicial proceeding, without the involvement of the court; it is essentially a summary proceeding in which the United States obtains title to property by default if no one makes a timely claim to the property.  Id. at 9-10.  "Criminal forfeiture" is an in personam proceeding against the defendant in a criminal case, and is imposed upon conviction as part of the defendant's sentence.  Id. at 12 (citation omitted).  Civil forfeiture is an in rem proceeding in which the United States commences a civil action in a district court to obtain title to the defendant res.  Cassella, supra at 15.

Plaintiffs totally misapprehend the nature and purpose of a forfeiture action.  Forfeiture is fundamentally an exercise of the power of the sovereign to divest a person of his title to property. See In re Matthews, 395 F.3d 477, 481 (4th Cir. 2005) (purpose of in rem forfeiture action is to

14

conclusively determine ownership rights in seized property); <u>Mendoza v. U.S. Customs and Border Protection</u>, 2006 WL 2627925, *2 (D. N.J. 2006) (forfeiture is the "divestiture without compensation of specific property used in a manner contrary to the sovereign."). More than 100 different statutes authorize forfeiture, with the most common basis being that the property is the proceeds of a criminal offense, or was used to commit such an offense. But in all events, the purpose of the forfeiture is to transfer title to the property <u>from</u> another party <u>to</u> the United States to achieve a public policy goal reflected in the authorizing statute. Cassella, <u>supra</u>, at 2-3 (discussing public policy rationales for federal forfeiture statutes).

The United States does not have to bring a forfeiture action to recover its own property. It would be absurd to suggest that if a robber stole a federal agent's United States vehicle while he was eating lunch, or broke into an army base and stole a jeep, the United States would have to bring an action under the forfeiture laws to recover its property. Forfeiture is used to divest a third party of property and transfer title to the United States, not to recover property to which the United States already has title. <u>See generally</u>, <u>id.</u> at 29-37 (discussing history of civil forfeiture).

Courts have recognized this point in a variety of contexts. In <u>United States v. Howell</u>, 425 F.3d 971, 975 (11th Cir. 2005), for example, the Eleventh Circuit held that the United States was not required to bring a forfeiture action to recover $140,000 in "sting money" that was used in an undercover drug investigation because the drug dealer never acquired any property interest in the money. Similarly, in <u>Johnson v. West</u>, 2004 WL 4986628, at *2 (D. Md. 2004), a district court dismissed an action filed by a plaintiff for the return of sting money because the plaintiff could not establish that he had acquired an ownership interest in money given to him by undercover officer in exchange for heroin.

15

Conversely, if a person voluntarily transfers his property to the United States – as a bribe, as a payment for drugs in a "reverse sting" operation, or for any other reason – the United States acquires title to the property by virtue of the transfer; and because the United States already has title to the property, it does not need to commence a forfeiture action against it to maintain its custody.  See  Mantilla v. United States, 302 F.3d 182, 187 (3d Cir. 2002) (government not required to forfeit sting money that is voluntarily turned over to undercover agents); Acheampong v. United States, 2000 WL 1262908, at *5 (S.D.N.Y. 2000) (sting money belongs to United States and forfeiture not required);  United States v. Kim, 738 F. Supp. 1002, 1004-05 (E.D. Va. 1990) (same).

The 1933 Double Eagles are the property of the United States, as they were taken from the Mint without permission, or through fraudulent breach of trust.  They are stolen goods, the title to which always has been in the United States.  Plaintiffs may conceivably have grounds outside of the forfeiture laws for asserting a right to the property – though it is hard to imagine what those grounds might be – but the forfeiture laws have no application to this dispute.[10]

## 2.      Plaintiffs' Reliance Upon CAFRA's Notice and Claim Rules Is Misplaced.

If the Court agrees with the United States that it is not required to forfeit its own property, the Court need not consider the applicability of CAFRA's notice and claim provisions to the facts in this case.  Should the Court find that the United States was required to forfeit the 1933

---

[10]  Establishing ownership of the subject res is a statutory threshold for claimants challenging forfeiture.  Under CAFRA's "innocent owner" defense, the claimant carries the burden of proving that he or she has a qualifying ownership interest in the res.  See 18 U.S.C. § 983 (d)(1),(6).  Moreover, if the United States prevails in a forfeiture challenge and the court determines that the "claimant's assertion of an interest in the property was frivolous," the court may impose a civil fine on the claimant in addition to sanctions under Federal Rule of Civil Procedure 11.  See 18 U.S.C. § 983(h)(1) and (2).

16

Double Eagles, however, it is nonetheless clear that CAFRA's notice and claim provisions do not apply to this case, as no administrative forfeiture action has occurred, nor could it have.[11]

The notice and claim requirements of 18 U.S.C. § 983(a) are applicable only in administrative forfeiture proceedings.  Under CAFRA,  a federal seizing agency must send written notice to interested parties within 60 days after the seizure.  18 U.S.C. § 983(a)(1)(A)(i). If the agency does not send timely notice, the agency must return the property (as long as the property is not contraband and may be legally possessed by the claimant), without prejudice to its rights to commence a forfeiture proceeding.  18 U.S.C. § 983(a)(1)(F).  A person claims property seized in a nonjudicial forfeiture proceeding under a civil forfeiture statute by filing a claim with the appropriate official after the seizure has occurred.  18 U.S.C. § 983(a)(2)(A).  The United States has 90 days following such a claim to file a forfeiture complaint in district court, see 18 U.S.C. § 983(a)(3)(A), and the matter transforms from an administrative forfeiture to a judicial forfeiture.  If the United States does not file a timely forfeiture complaint or include the property in an indictment, CAFRA's "death penalty" applies requiring the United States return the property pursuant to the Attorney General's rules, and barring the United States from using civil forfeiture against the property.  18 U.S.C. § 983(a)(3)(B).  As the 1933 Double Eagles were never the subject of an administrative forfeiture action, none of these statutory obligations are applicable here.

---

[11]  Six of the eight counts in the Complaint are based upon plaintiff's contention that the United States administratively seized the 1933 Double Eagles, and failed to comply with CAFRA's notice and claim provisions.  Resolution of plaintiffs' Declaratory Relief claim (Count Three) is dispositive of plaintiffs' claims under the Administrative Procedures Act (Counts One and Two) and Mandamus (Count Six).

3.      **Plaintiffs Lacked Standing to File a Claim for the Return of Purportedly Seized 1933 Double Eagles**.

To establish standing to challenge a forfeiture, plaintiffs must show that they have a "colorable ownership or possessory interest" in the disputed property.  Mantilla, 302 F.3d at 185. The showing must be more than a bald claim – "[a] claimant needs to provide some explanation of the interest for it to qualify as a colorable possessory interest sufficient to establish standing." United States v. $746,198 in U.S. Currency, More or Less, 299 F. Supp.2d 923, 929 (S.D. Iowa 2004).  Here, plaintiffs lack standing to file a claim against the United States because plaintiffs did not inherit the 1933 Double Eagles from Switt, as explained above, and therefore they have no ownership interest in them.  Moreover, any lawful possessory interest plaintiffs may have had in the 1933 Double Eagles terminated at the moment plaintiffs voluntarily transferred the gold pieces to the possession to the United States.  Plaintiffs therefore lacked standing to file a claim under CAFRA.  See Mantilla, 302 F.3d at 185 (dismissing forfeiture challenge in part for lack of standing where reasonable trier of fact could not discern colorable interest in property); Kadonsky v. United States, 216 F.3d 499, 508 (5th Cir. 2000) (no standing to challenge forfeiture absent facially colorable interest in property); see also Fed.R.Civ.P. G (5)(a)(i)(B)-(C) (requiring claimant to state, under penalty of perjury, his interest in subject property).

4.      **The 1933 Double Eagles are Not Subject to Administrative Forfeiture Because Plaintiffs Contend that Each is Worth At Least $500,000.**

The 1933 Double Eagles are not subject to administrative forfeiture and the procedural requirements of 18 U.S.C. § 983 because the value of each gold piece exceeds $500,000, which is the statutory cap for property subject to administrative forfeiture (other than merchandise that may not be imported, vehicles used to transport drugs, and monetary instruments).  See 19 U.S.C.

18

§1607(a);  Yskamp v. Drug Enforcement Agency, 163 F.3d 767, 771 (3d Cir. 1998)

(summarizing categories of property subject to administrative forfeiture);  Mendoza, 2006 WL

2627925 at *3 (only property worth up to $500,000 subject to administrative forfeiture);  Infante

v. Drug Enforcement Administration, 938 F. Supp. 1149, 1152 (E.D.N.Y. 1996) (same).

By plaintiffs' own admission, each 1933 Double Eagle is worth more than $500,000.  In

their verified administrative tort claim submitted to the Mint, plaintiffs asserted a loss of $40

million, or $4 million for each 1933 Double Eagle.  See Exh. S at 3.  Accordingly, the 1933

Double Eagles are not subject to administrative forfeiture, and CAFRA does not apply.

**5.     CAFRA's Notice and Claim Rules Do Not Apply Here Because Plaintiffs Voluntarily Transferred the 1933 Double Eagles to the Possession of the United States.**

Plaintiffs voluntarily transferred the 1933 Double Eagles to the possession of the United

States in the hope of securing a reward.  Plaintiffs admit that they voluntarily notified the United

States of the existence of the 1933 Double Eagles, Compl. at ¶61, knowing that since the 1940s

the United States has consistently maintained that the 1933 Double Eagles were stolen property

that belonged to the United States.  Compl. at ¶5.  Plaintiffs' counsel engaged in discussions with

the United States concerning "issues" raised by the United States.  Compl. at ¶62.  These so-

called "issues" were nothing more than plaintiffs' effort to secure a reward or other financial

benefit for having returned the 1933 Double Eagles to their owners, namely the United States.

Plaintiffs readily relinquished the 1933 Double Eagles to the possession of the United States, and

indeed the parties mutually agreed to a time and place for the transfer of possession.  The day

before plaintiffs transferred the 1933 Double Eagles, plaintiffs delivered a letter to the Mint

purporting to qualify the transfer and reserving unspecified legal rights to the gold pieces.

Compl. at ¶63; see Exh. A.  On September 22, 2004, Roy Langbord removed the gold pieces

from a safe deposit box and transferred possession to the United States.  Compl. at ¶65.

Plaintiffs voluntarily transferred the 1933 Double Eagles to the possession of the United

States and thereby ended any legitimate possessory interest they may have had.  There was no

seizure subject to Fourth Amendment protection, and no forfeiture statute was utilized to gain

possession of the 1933 Double Eagles, and therefore CAFRA's notice and claim procedures have

not been triggered.  See Brown v. Brierley, 438 F.2d 954, 957-60 (3d Cir. 1971) (holding no

Fourth Amendment seizure where party voluntarily relinquished gun to investigator; absence of

coercion relevant in determining Fourth Amendment violation);  United States v. Messina, 507

F.2d 73, 76 (2d Cir. 1974), cert. denied, 420 U.S. 993 (1975) (agent's receipt of voluntarily

produced stolen property did not constitute Fourth Amendment violation).

### 6.      Plaintiffs Are Not Entitled to the Return of the 1933 Double Eagles.

CAFRA's so-called "death penalty" requires the return of property where an

administrative seizure has occurred, a claimant properly files a claim challenging forfeiture, and

the United States fails to commence a timely judicial forfeiture action.  18 U.S.C. § 983 (a)(3).

In such a situation, a court shall order the United States to release the seized property pursuant to

regulations promulgated by the Attorney General, and take no further action to effect a civil

forfeiture of such property in connection with the underlying offense.  Id.  This provision is not

applicable here because, for the reasons stated above, CAFRA's notice and claim procedures are

not applicable.[12]

_____

[12]  The United States respectfully submits that, if the Court were to conclude that the
United States should have commenced a forfeiture action, any deadlines should be equitably
tolled until such time as plaintiffs have established a lawful ownership interest in the 1933

C.      **PLAINTIFFS' REMAINING CLAIMS SHOULD BE DISMISSED.**

The Court should dismiss plaintiffs' remaining claims because they are premised upon

the United States having seized property to which plaintiffs have a legal title or right, or upon

CAFRA's notice and claim rules being applicable to this case.

1.      **The Court Should Dismiss Plaintiffs' Fourth Amendment and Fifth Amendment Claims.**

Plaintiffs' Fourth Amendment claim is based upon the premise that the United States

seized the 1933 Double Eagles.  To prove a claim under the Fourth Amendment, a plaintiff must

show that defendants' actions: (1) constituted a "seizure" within the meaning of the Fourth

Amendment, and (2) were "unreasonable" in light of the surrounding circumstances.  See, e.g.,

Brower v. County of Inyo, 489 U.S. 593, 595-600 (1989) (affirming two-fold analysis).  The

Fourth Amendment protects a person's expectation to property, and a seizure occurs within the

meaning of the Fourth Amendment when "there is some meaningful interference with an

individual's possessory interests" in property.  United States v. Jacobsen, 466 U.S. 109, 113

(1984) (describing two types of expectations protected by the Fourth Amendment).

Plaintiffs' Fourth Amendment claim should be dismissed because, as discussed above,

plaintiffs have no ownership interest in the 1933 Double Eagles.  Moreover, any protectable

---

Double Eagles.  Equitable tolling would be appropriate here given the bona fide dispute as to
whether forfeiture was required in this case.  See Hammoud v. Woodard, 2006 WL 381642, at *4
(E.D. Mich. 2006) (seizing agency's mistake in believing that it did not have to refer case to U.S.
Attorney for judicial forfeiture if claimant appeared to lack standing was "good cause" for
extending the 90-day deadline);  United States v. $9,630 in U.S. Currency, 2006 WL 3813590, at
*3 (D. Utah 2006) (where DEA believed initial claim was insufficient and gave claimant time to
perfect it, and claimant filed a second claim, 90 days runs from the filing of the second claim,
even if the original claim turns out to have been valid).  Cf. Longenette v. Krusing, 322 F.3d 758,
768 (3d Cir. 2003) (in pre-CAFRA case, court tolled statute of limitations under section 1621 to
allow United States to file judicial forfeiture action where United States acted in good faith).

possessory interest in the 1933 Double Eagles that plaintiffs may have had ended when plaintiffs

voluntarily transferred the gold pieces to the possession of the United States in an attempt to

exact a reward.  Under these circumstances, and absent a reasonable expectation that plaintiffs

would one day recover possession of the 1933 Double Eagles, there has been no seizure subject

to Fourth Amendment protection.  See Brown, 438 F.2d at 957-60 (holding no Fourth

Amendment seizure where party voluntarily relinquished gun to investigator; absence of coercion

relevant in determining Fourth Amendment violation);  Messina, 507 F.2d at 76  (agent's receipt

of voluntarily produced stolen property did not constitute Fourth Amendment violation).

　　　To establish a claim for a Fifth Amendment violation, plaintiffs must prove that: (1) they

were deprived of a protectable interest; (2) the deprivation was due to some governmental action,

and (3) the deprivation was without due process.  Cospito v. Heckler, 742 F.2d 72, 80 (3d Cir.

1984), cert. denied, 471 U.S. 1131 (1985).  Plaintiffs' Fifth Amendment claim must be dismissed

because, as explained above, plaintiffs did not have a protectable interest in 1933 Double Eagles.

See Howell, 425 F.3d 971 at 975 (no Fifth Amendment right to due process when, among other

reasons, defendant "had no ownership right to the funds").

　　　Plaintiffs' Fifth Amendment claim also fails under the applicable Supreme Court test.  In

United States v. Eight Thousand Eight Hundred and Fifty Dollars in United States Currency, 461

U.S. 555 (1983) ("$8,850 in Currency"), the Supreme Court established the following factors to

analyze a Fifth Amendment claim based upon alleged delay in initiating forfeiture proceedings.

A court must consider: the length of delay;  the reason for the delay; the defendants' assertion of

his rights;  and, any prejudice to the defendants.  Id. at 564.  Here, assuming arguendo that the

United States had been required to commence a forfeiture action, the length of the delay has not

been unreasonable.  According to plaintiffs, the United States should have commenced an action

about 16 months ago – on December 9, 2005, which is 90 days after plaintiffs filed their claim.

Compl. at ¶72.  In $8,850 in Currency, the Supreme Court found that an 18-month delay did not

violate the claimant's due process rights.  Id. at 569; see also United States v. Three Thousand

Seven Hundred and Eighty Six Dollars in U.S. Currency, 1991 WL 148775, at * 3 (E.D. Pa. Jul.

31, 1991) (approximately two-year delay did not violate due process).  Given the legal authority

supporting the United States' ownership of the 1933 Double Eagles, the law and evidence

directly contradicting plaintiffs' claim of ownership, the fact that plaintiffs are in no way harmed

by any delay, and plaintiffs' access to the courts to assert their replevin claim, plaintiffs have not

been denied due process by the United States.

       **2.**       **Plaintiffs' APA and Declaratory Judgment Act Claims Must Be Dismissed.**

Plaintiffs invoke this Court's jurisdiction under the APA on the ground that the United

States has "unreasonably delayed or unlawfully withheld" an agency action, and that it has failed

to meet statutory, procedural and Constitutional requirements.  Where, as here, an agency action

is challenged as "unreasonably delayed or unlawfully withheld," agency decisions are

"scrutinized at the most deferential end of the arbitrary and capricious spectrum."  United Auto

Workers v. Chao, 361 F.3d 249, 254-55 (3d Cir. 2004).

The crux of plaintiffs' APA claim is that the Mint allegedly failed to comply with

CAFRA's notice and claim rules.  A claim under Section 701(1) of the APA "can proceed only

where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to

take."  Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 64 (2004).  Because

CAFRA's notice and claims rules are not applicable here, as described above, the Mint did not

fail to take a discrete action that it is required to take.  Similarly, for the reasons set forth above, the United States has not breached any statutory, procedural or Constitutional rules or requirements.

**3.     The Court Should Deny Plaintiffs' Request for Mandamus Relief.**

Mandamus relief is intended to provide a remedy for a petitioner only if he has exhausted all other avenues of relief and if the respondent owes him a clear nondiscretionary duty to perform, Heckler v. Ringer, 466 U.S. 602, 616-17 (1984), or where there has been action taken by government officials contrary to law and so plainly prohibited as to be free from doubt. Naporano Metal & Iron Company v. Sec. of Labor of the United States, 529 F.2d 537, 542 (3d Cir. 1976).  Mandamus is an extraordinary remedy, Mallard v. United States Dist. Court for the S. Dist. of Iowa, 490 U.S. 296, 309 (1989), and a drastic remedy that is seldom issued and its use is discouraged.  In re Patenaude, 210 F.3d 135, 140 (3d Cir.), cert. denied, 531 U.S. 1011 (2000). At all times, the party seeking mandamus relief bears the burden of demonstrating "a clear and indisputable right to the Writ."  In re Roberts, 178 F.3d 181, 183 (3d Cir. 1999).

Plaintiffs have not demonstrated a clear and indisputable right to mandamus relief.  They have not established clearly and indisputably that Mint officials of the United States had a clear and nondiscretionary duty to commence a forfeiture action, or to comply with CAFRA's notice and claims rules.  Accordingly, the Court should deny plaintiffs' request for mandamus relief.

## IV.
## CONCLUSION

For the reasons set forth above, the Court should enter summary judgment for the United

States and against plaintiffs on plaintiffs' replevin claim, and dismiss all of the remaining claims.

Respectfully,

PATRICK L. MEEHAN
United States Attorney

_____

VIRGINIA A. GIBSON
Assistant United States Attorney
Chief, Civil Division

_____

JOEL M. SWEET
Assistant United States Attorney

_____

JACQUELINE ROMERO
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476
Tel. (215) 861-8581
Fac. (215) 861-8349

*For All Defendants*

Of Counsel:

Daniel P. Shaver, Chief Counsel
Greg M. Weinman, Senior Counsel
United States Mint
801 9th Street NW
Washington, DC 20220

March 9, 2007