LAW OFFICES OF ARMEN R. VARTIAN
Armen R. Vartian
805 Duncan Place
Manhattan Beach, CA 90266
(310) 372-1355
(310) 372-1555 (fax)
Legal Counsel, Amicus Professional Numismatists Guild

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

-------------------------------------------------x
ROY LANGBORD et al.,         :      06 Civ. 5315
        Plaintiffs,              :
                                 :      BRIEF OF AMICUS CURIAE
v.                           :      PROFESSIONAL NUMISMATISTS
                                 :      GUILD, INC. IN OPPOSITION TO
UNITED STATES DEPARTMENT OF  :      DEFENDANTS' MOTION FOR
THE TREASURY, et al.,        :      SUMMARY JUDGMENT
                                 :
        Defendants               :      Hon. Legrome D. Davis
-------------------------------------------------x

The Professional Numismatists Guild ("PNG"), by its Legal Counsel Armen R. Vartian, respectfully submits this brief as *amicus curiae* in opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment before this Court.

**ABOUT THE PNG**

PNG is the leading association of rare coin and currency dealers and auction houses in the United States, and was incorporated in 1955 as a non-profit organization under section 501(c)(6) of the Internal Revenue Code. PNG's 250+ members include nearly all major specialists in rare coins, and PNG's regular activities include holding two conventions annually, publishing consumer-oriented materials regarding the purchase of coins, and providing mandatory mediation and arbitration remedies to consumers who do business with PNG member

dealers. PNG's current programs include a joint project with the U.S. Mint to distribute "Quarterboards" for collectors of U.S. State Quarters.

## PNG'S INTEREST IN THESE PROCEEDINGS

PNG submits this brief, as it did in prior litigation relating to the 1933 Double Eagle[1] because it believes that a decision in favor of the Government on this Motion might have a substantial negative impact on all participants in numismatics, from individual collectors to large auction houses. PNG and its members believe in the beauty and historical significance of all coins minted by the U.S., regardless of whether such coins were "issued" for circulation as U.S. legal tender or left the Mint by other means. Throughout its history, the U.S. has manufactured literally thousands of special or unusual coins which from a numismatic standpoint are rarities and, in some cases, one-of-a-kind items. These include pattern coins, presentation pieces, special proofs, and experimental coins, which passed from the Mint as presentations to a domestic or foreign dignitary, or by outright sale or trade with collectors. Such pieces were not intended to circulate as U.S. legal tender, and were not issued for circulation by the Mint. Nevertheless, they have been bought and sold historically for many years without Government intervention and, in the case of pattern coins, with the Government's blessing. Moreover, there are numerous other coins, including some pattern coins, which were not issued as legal tender but nevertheless ended up in the hands of private collectors under unusual circumstances and without any authorization from the Government. These unauthorized coins have historically been freely and openly

---

[1] PNG submitted an amicus curiae brief in February 2000 in the case of United States of America v. A $20 Gold Coin etc., 96 Civ. 02527 (S.D.N.Y., Hellerstein, J.), a case presenting the same issue of concern to PNG here. The Court did not rule on the issue in that case as a result of a settlement between the parties.

-2-

collected and sold without any intervention by the Government. Indeed, many of these coins are the most valued coins sold at auctions and privately today.

The Government's theory in this case, however, is that the 1933 Double Eagle cannot be owned and sold by private collectors because it was not issued and circulated as legal tender by the Mint, and must therefore have been stolen. If all coins that were not issued into circulation as legal tender, but left the Mint through known or unknown means were illegal to own, and the Government could proceed decades later to reclaim the coins, then a large number of the most interesting coins minted during U.S. history – currently residing peacefully in public and private collections across the country -- would be at risk. Individual collectors and museums who own such coins would fear loss of their prized pieces and their substantial investments in them, dealers and auction houses would fear being prosecuted for dealing in illegal or "stolen" property, and a significant portion of America's history would either be confiscated by the Government, or go "underground" to escape that fate. Either way, these special coins would be lost to numismatists and the public.

PNG believes that these dire consequences are not, in any way, justified by a compelling interest on the Government's part in recovering the coins at issue in this case, or any other "non-issued" coin. The Government has nothing to fear from knowlegable collectors studying, enjoying and displaying these rare coins. There is no danger of U.S. coinage being subverted by a few pieces out of the billions manufactured each year. Numerous coins of the types previously described – *indeed, all such coins except the 1933 Double Eagle* – have been actively traded for over 100 years in the numismatic marketplace, without any adverse effect on the Mint and its operations. Indeed, the Government has historically passed laws, regulations and rules at the behest of collectors to ensure that the crisis for the numismatic community that the Government's

actions in this case threaten to create is avoided. When the U.S. banned the private ownership of certain gold coin and bullion beginning in 1933, the numismatic community successfully persuaded the Government to include an exception for coins of value to collectors, and that exception permitting the collection and sale of all coins valued by collectors is reflected in all subsequent U.S. laws and policies relating to gold ownership, and ownership of coins in general.

PNG submits this brief to provide the Court with background information regarding numismatics, as well as evidence which PNG believes justifies the Court in rejecting the Government's theory in this case and allowing the 1933 Double Eagle to join all other unusual Mint products as an item which can be freely owned and traded.

## I.    THE GOVERNMENT'S RECOGNITION OF COIN COLLECTING AND THE 1933 DOUBLE EAGLE

It is estimated that over 20 million Americans collect coins. Over the years, collections have consisted of everything from groups of circulated Lincoln cents in blue "Whitman" albums to collections which have rivaled – even surpassed – the National Numismatic Collection displayed at the Smithsonian Institution. Coins tell many stories about U.S. history, and numismatists have enjoyed studying, displaying and trading U.S. coins almost since the U.S. Mint opened in 1792. As will be shown in Part II, *infra*, in the early 19th century the Government freely sold so-called "pattern" coins – coins never issued as legal tender and having value only to collectors – and even went so far as to *restrike* patterns from prior decades for the benefit of collectors. For many years, the Mint had specific regulations for selling such non-legal tender coins, recognizing the public and private benefits of collecting, and anticipating the enormous collector-oriented educational and marketing programs carried on by the Mint today.

It is not, therefore, surprising that President Franklin Roosevelt's April 5, 1933 Executive Order forbidding the private ownership of gold contained a specific exception for collectors. Then-Secretary of Treasury William H. Woodin was an avid coin collector (with a famous collection of non-legal tender "patterns"), see E. Adams and W. Woodin, United States Pattern, Trial and Experimental Pieces (1913); "William H. Woodin's Collection", *The Numismatist* (November 1933), and Roosevelt's executive order, and subsequent regulations issued by the Treasury Department excepted "[g]old coin having a recognized special value to collectors of rare and unusual coin....." These exceptions demonstrate the Government's recognition that the objective of stopping the issuance of gold coin and restricting the hoarding of gold – considered significant enough to "nationalize" American's private property -- did not require interference with private coin collections. In addition to this general exception allowing the private ownership of gold coin, the Government also authorized coin collectors to possess any specific coin for which the Treasury Department issued a license.

By 1954, the Treasury Department amended the gold regulations to declare that "all gold coin made prior to April 5, 1933" would be deemed to fall within the "special value" exception and could be legally owned. The amendment very explicitly noted the passage of time since 1933, and the fact that the 1933 objectives had been fully met by Americans' general compliance with the original regulations. Because the amendment defined those coins which were legal to own in terms of the date they were physically made, these regulations authorized the possession of the 1933 Double Eagle just as they settled any doubt as to whether the 1933 $10 Eagle, 1932 Double Eagle, *etc.* had "special value" to collectors for purposes of the regulations. Subsequent regulations and legislation – notably the Coinage Act of 1965 --have legalized ownership of any coins "coined or issued" by the United States by making those coins U.S. legal tender.

It seems clear that even the 1933 regulations – issued during a period of national emergency – recognized the existence and importance of coin collecting in the United States, and were carefully crafted to avoid undue interference with collectors who owned gold coins. Today, the 1933 restrictions on private ownership of gold and the actions of individual collectors that may have violated those restrictions and other laws in connection with certain gold coins have no bearing whatsoever on the legal status of any particular gold coin, particularly a coin such as the 1933 Double Eagle, which has strong collector value given its position as the last gold coin minted by the United States for the purpose of circulating as legal tender.

## II.   THE GOVERNMENT'S TREATMENT OF NON-LEGAL TENDER COINS

Central to the Government's position in this case is the assumption that there are only two categories of coins: (1) those that are "issued" as legal tender; and (2) those which are not issued and therefore remained the property of the Government and cannot be held by coin collectors. *See* Defendants' Memorandum of Law In Support of Motion to Dismiss etc. pp. 8-10. This is simply incorrect, as thousands of coins minted by or for the U.S. Mint that were never "issued" as legal tender are widely collected and purchased and sold by coin collectors and dealers today. There exist such coins that were actually passed out by the Mint itself, as well as coins that left the Mint under unknown circumstances.

### a.   "Pattern" Coins

One such example of a coin not issued as legal tender is what numismatists call "pattern" coins. A pattern coin is defined as "an experimental piece which either illustrates a proposed coinage design, or which embodies a proposed innovation of composition, size or shape." A. Pollack, United States Patterns and Related Issues 1 (1994). *See also* Coin World Almanac 715

(5th ed. 1987)("Coin-like pieces designed to test proposed coin designs, mottoes or denominations proposed for adoption as a regular issue, struck in the metal to be issued for circulation and which were not adopted, at least in the year of pattern issue.")  Although more than two thousand varieties of pattern coins were produced by the U.S. Mint since 1792, and most varieties are available in from 2 to over 1,250 specimens, A. Pollock, *supra*, at 1-2, what all patterns have in common is that they were not issued as legal tender, at least not in the year the coins were made.

Throughout U.S. history, pattern coins have been desired by collectors because of their "window" to U.S. history.  For example, although Americans are familiar with the "In God We Trust" motto on U.S. coins, through patterns numismatists know that "God and Country", "God Our Trust", and even "Deo Est Gloria" had also been proposed.  Abraham Lincoln, though appearing for the first time on legal tender coins – "Lincoln" cents – in 1909, appears on a pattern 5-cent piece as early as 1866.  Specimens of the Saint Gaudens Double Eagle, the type of coin at issue in this case, were originally produced in 1907 at President Theodore Roosevelt's direction in what is termed an "extremely high relief" form through a tedious series of strikes of the minting press interspersed with annealing (heating and acidic cooling) treatments.  It is said that when Mint Chief Engraver Charles Barber complained to President Roosevelt about the inefficiency of producing coins this way, the President was said to have replied "I don't care if it takes all day to produce one coin."  Practicality prevailed, however, and the extremely high relief 1907 Double Eagle, never issued as legal tender, became a stirring – and extremely valuable – pattern.

For many years the U.S. Mint met collector demand for patterns by offering them for sale, even to the point of producing extra copies solely for that purpose, as was done in 1858 and 1859 using older dies preserved at the Mint. On July 1, 1866, for example, the Mint issued a "circular letter" regarding the sale of patterns, which included the following:

> 4. The price of a pattern coin, in any but precious metal, will be three dollars in currency; if in gold or silver, the value of the metal is to be added....The Director reserves the right to send a pattern piece, without charge, to any incorporated Numismatic Society in the United States. In such cases, if the pattern is in gold or silver, the value of the metal will be expected.

reprinted in A. Pollack, *supra*, at 475. Subsequent U.S. Mint rules adopted in 1874, 1881 and January 1887 reiterated that patterns could be sold at prices to be determined by the Mint Superintendent, and thousands were sold in this manner. The beauty and curiosity value of patterns also resulted in their wide distribution to Congressmen, members of the U.S. Assay Commission and U.S. Mint officials. For example, in February 1857 the Mint Director sent four examples of the 1856 Flying Eagle cent to President Pierce, and another 300 to Rep. S.D. Campbell and Treasury Secretary James Guthrie, probably for distribution among Congressmen and Treasury officials. W. Breen, Walter Breen's Encylcopedia of United States Colonial and Proof Coins 1722-1977 245 (1977); A. Pollock, *supra*, at 479. Another sizable distribution of pattern coins occurred in 1879-80. The Mint had produced 25 three-piece sets including an 1879 metric (25 grams) dollar, 1879 goloid (gold-silver-copper alloy) dollar, and 1879 "Stella" $4 gold piece, but following strong demand from Congressmen, added an additional 400 sets in 1880, which could be purchased by members of Congress at the Mint's cost of $6.10 apiece.

The Mint issued directives in the 1880's requiring patterns to be destroyed after their purpose had been served -- apparently to prevent debasement of U.S. coinage through circulation of gold and silver patterns of different weights and fineness from those specified by Congress. *See* A. Pollock, *supra*, at 476-78. Nevertheless, the Mint allowed patterns to be released to

-8-

important officials. One famous example of this is the so-called "extremely high relief" 1907 Saint Gaudens Double Eagle described above, which was never intended to circulate but specimens of which were, in the words of then-Mint Director Frank Leach, "given to mint and Washington officials connected with the work", including Treasury Secretary George Cortelyou. *See* A. Pollock, *supra*, at 479. One of the 18 known specimens of this particular coin sold for over $1.2 million in June 1999 and others for reported higher prices. *See* "Ultra High Relief Hits $1.21 Million", *Coin World* (June 21, 1999); www.coinfacts.com/double_eagles /saint_gaudens_double_eagles/1907_double_eagle_ultra_lettered_edge.htm. Dozens of other pattern coins apparently left the Mint without authorization despite the regulations, and several Mint officials, including Chief Engraver Charles Barber, Director H.R. Linderman, and Chief Coiner O.C. Bosbyshell, amassed large and important personal collections of pattern pieces. *See* A. Pollock, *supra*, at 479.

The U.S. Government placed no restrictions whatever on persons who acquired pattern coins, regardless of how they left the Mint. The coins became the recipient's property and could – and were – sold without any objection by the Government. Interestingly, as with the 1933 Double Eagle, the Government did make an unjustified attempt to seize a group of pattern coins on the grounds that the coins were not issued as legal tender and belonged to the Government. In March 1910 the Government seized a group of pattern coins belonging to a Captain Haseltine of Philadelphia on grounds that they were Government property, but the Government subsequently withdrew its claim on those coins and returned them to Haseltine. See "Pattern Question Settled", *American Journal of Numismatics* (1911), cited in A. Pollock, *supra*, at 482:

> For the first time in a number of years the right of collectors to possess United States pattern pieces may be said to be settled for all time, as the United States Government has returned to Mr. J.W. Haseltine of Philadelphia the pattern pieces

> seized last year, and has also withdrawn its suit against him for illegally possessing the same.
>
> This is a very gratifying settlement of a matter which for a time threatened to disturb the many holders of pattern pieces throughout the country. That the patterns may now be legitimately classified with the regular United States series of coins is beyond question, for the Government authorities, we are assured, have viewed the question from every angle and have thoroughly considered every aspect of the title of such pieces before taking final action and returning the pieces to Mr. Haseltine....

Patterns now constitute a sizable and frequent component of rare coin auctions, with no interference by the Government. Given that patterns, unlike the 1933 Double Eagle at issue in this case, were never even *intended* for circulation as legal tender when made, the Government's deliberate distribution of patterns in some instances, and its lack of interest in recovering pattern coins, even when they were taken from the Mint in violation of specific directives to the contrary, negates the Government's rationale for seizing the 1933 Double Eagle in this case.

### b.  Other Non-Legal Tender Numismatic Rarities

In addition to patterns, many of the most important and well-known numismatic rarities are coins which left the Mint under unusual circumstances and were never intended to circulate as U.S. legal tender.

*The 1913 Liberty Nickel*

Probably the most sought-after U.S. coin ever made is the 1913 Liberty nickel. The U.S. Mint was not authorized to strike any Liberty nickels with a 1913 date, the Indian Head "Buffalo" nickel design having been adopted for use on all 1913 nickels. No official record of any 1913 Liberty nickels exists at the Mint or anywhere else. However, in the December 1919 issue of *The Numismatist*, a former Mint employee named Samuel Brown advertised that he was willing to pay $500 for any 1913 Liberty nickel. Five years later, a Philadelphia coin dealer,

apparently on Brown's behalf, advertised for sale "Five (5) Five Cent Liberty Head 1913 Coins...The only Five-Cent Liberty Head coins of this design and year in existence." Throughout the 1930's, the famous dealer B. Max Mehl ran advertisements nationwide in popular Sunday newspaper comics sections offering $50 apiece for 1913 Liberty nickels, though it is now believed that the five coins sold by Brown himself were the only ones surreptitiously struck by a Mint employee using 1913-dated Liberty dies. *See* W. Breen, *supra*, at 266. Of these five specimens three are currently in private hands, and these have sold periodically, in very highly publicized transactions, for huge sums. In fact, the so-called "Eliasberg" specimen sold just two weeks ago for $5 million.

*The 1804 Dollar*

One of the most famous U.S. coins, nicknamed the "King of Coins", is the class I 1804 silver dollar. While U.S. Mint records show nearly 20,000 silver dollars having been produced in 1804, they do not indicate that these coins were actually dated "1804". It is now believed that all of the silver dollars produced that year carried earlier dates, the result of the Mint's then practice of using coinage dies until they broke or wore out. No silver dollars were made in 1805, and authority to make them was terminated in 1806.

In 1834, the Department of State asked the Mint to provide coins as part of a series of gifts the U.S. planned to present to the Sultan of Muscat and the King of Siam. Mint employees found silver dollar dies dated 1804, but did not realize that no coins had ever been struck from those dies previously. Apart from the two 1804 dollars provided to the State Department, at least six others were made (apparently intended to be used as gifts to other dignitaries) but left the Mint as part of various unauthorized trades and sales by Mint employees. *See* W. Breen, *supra*, at 251. These coins are among the most valuable of all U.S. coins, the finest known specimen of

which sold for $4.14 million in August 1999, breaking the then-all-time record held by another 1804 dollar, which had sold for over $1.8 million in 1997. *See* "$4.14 Million!", *Coin World* (Sept. 20, 1999).

### *The 1894-S Dime*

Another celebrated, yet unauthorized, rarity is the 1894-S dime. The San Francisco Mint was not authorized to make any dimes in 1894, and it remains uncertain how at least 11 1894-S dimes were produced and left the Mint. It has been suggested that Mint Superintendent Daggett made the coins at the request of some visiting bankers, distributing as many as 24 to himself and seven others. Decades later, Mr. Daggett's daughter Hallie claimed to have received her father's allotment, and to have spent one of the rare dimes on the way home from the Mint for ice cream. *See* W. Breen, *supra*, at 237; www.coinfacts.com/dimes/barber_dimes/1894s_barber_dime.htm. An 1894-S dime sold in March 2005 for $1,322,500. Id.

### *The 1943 "Copper" Cent*

A more recent unauthorized rarity is the 1943 "copper" cent. It is well known that to conserve copper for use in the U.S. war effort, the Mint suspended production of bronze cents at the end of 1942, minting only steel cents officially bearing the year 1943. There is no official record of any bronze cents being made in 1943. Nevertheless, a number of such coins – called "copper" cents because of their color – have surfaced and caused many Americans to search their pocket change, with a specimen selling in February 2003 for $212,750. See S. Travers, www.pocketchangelottery.com/pocketchange.htm; American Numismatic Association Press Release "Facts About 1943 Copper Cent" (Jan. 12, 2000). These coins may have been struck inadvertently from blanks which had had remained in hoppers as of the first minting run of 1943,

or some may have been struck deliberately as in the case of the 1913 Liberty nickel. In any event, these coins were not intended to leave the Mint but apparently did.

### *The Fenton 1933 $20 Double Eagle*

Of course, no discussion of coins which are freely-traded but were never issued for circulation is complete without the only other publicly-known specimen of the 1933 Double Eagle. This coin, which surfaced in 1996 when it was seized from coin dealer Stephen Fenton in a Government "sting" operation, was the subject of lengthy and contentious forfeiture proceedings in New York. See United States of America v. A $20 Gold Coin etc., 96 Civ. 02527 (S.D.N.Y., Hellerstein, J.). Ultimately, the Government agreed to drop its forfeiture claim in return for an agreement that Fenton and the Government would share equally the proceeds of the coin's sale.

In 2002, in what was probably the most anticipated single coin sale in history, Sotheby's auctioned the Fenton specimen of the 1933 double eagle for $7.5 million, the most ever paid for a U.S. coin.

Apart from their interesting stories, each of these coins is of direct relevance to this case. Clearly, none of them was officially issued for circulation as U.S. legal tender when made, and none was ever intended to circulate. Under the Government's theory, all of these coins would be considered Government property, subject to forfeiture. Nevertheless, despite the highly-publicized sales of every one of the above types of coins, and the huge sums being paid for individual specimens, the Government has made no attempt whatsoever to make claim to any of them, except for Fenton's 1933 Double Eagle. But in that latter case, the Government eventually relented and agreed to a settlement whereby the coin was sold for a staggering sum, the

Government keeping half. This Court must consider all this both in evaluating the credibility of the Government's position, as well as in understanding the consequences of a decision in favor of the Government in this case.

### III. THE IMPLICATIONS OF THIS COURT'S DECISION ON COLLECTORS

PNG will not attempt to prove that the particular 1933 Double Eagles at issue in this case were -- or were not -- stolen from the Mint in 1933. There is strong evidence in Mint precedent and procedure to indicate that such coins were available for sale or exchange for an appropriate amount of cash or gold at the Mint itself, and that there was ample opportunity for this to have occurred. PNG's purpose in coming before the Court is to explain the consequences of ratifying the Government's broader theory that the Government may claim title to any coin not issued as legal tender, regardless of the value or historical significance of that coin within the numismatic community.

Without doubt, this is a radical position on the Government's part. The Government has made no effort to reclaim or recover any of the thousands of other non-legal tender coins produced by the Mint and, as described above, for some of these coins even has used the sale and distribution of such coins to generate revenue, curry political favor, and reward Mint personnel. No attempt has ever been made to reclaim or recover any of the notorious U.S. Mint rarities described in Part II, *supra*, except in the case of the Fenton 1933 double eagle, which was seized only to be sold for the Government's benefit. To rule in favor of the Government on this issue, this Court would provide the Government with the legal basis to commence forfeiture

proceedings against some of the most valued coins in the numismatic community, whether found in a public or private collection, or offered for sale.

Such a circumstance would be a disaster for numismatists and the public generally. Collectors who acquired patterns and other non-legal tender coins in good faith from dealers, auction houses or other collectors, or as inheritances from other collectors in their families could be arrested -- as was Mr. Fenton in the earlier 1933 Double Eagle case -- and forced to prove that they are entitled to retain their coins. As indicated above, under the Government's theory, the legal status of patterns and certain other coins are even more suspect than the 1933 Double Eagle, which was at least *intended* to be circulated as a U.S. legal tender coin. In many cases, collectors would be unable to overcome the Government's presumption that their coins were "stolen" because records relating to specific coins that left the Mint decades or even a century ago are not available. Great pattern collections such as that owned by the City of Omaha, Nebraska and displayed at the Western Heritage Museum there would be subject to seizure, although the Museum's benefactor, Byron Reed, was a member of the U.S. Assay Commission and presumably acquired his patterns with the Mint's blessing.

The Government's successful recovery of these 1933 Double Eagles would place a cloud over all non-legal tender coins because it would permit future seizures without warning or further justification. Inevitably, fear of such action would cause many important and historic coins to be exported or simply hidden, depriving numismatists and Americans generally of their beauty and educational value.

PNG asks this Court to consider whether the Government has presented any compelling need to seize coins of unique and special value to collectors. The Government itself has recognized the importance of coin collecting in everything from the Mint's own programs to the

Treasury Department's specific exceptions in 1933 for collectors of gold coins. PNG urges the Court to reject the Government's attempt to obtain the legal basis to confiscate some of the most important, and most valuable, U.S. coins.

Dated: May 10, 2007

LAW OFFICES OF ARMEN R. VARTIAN

By: _____
Armen R. Vartian
Attorney for amicus curiae Professional
Numismatists Guild, Inc.
805 Duncan Place
Manhattan Beach, CA 90266
(310) 372-8557
