# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROY LANGBORD, et al.,                          :
                                               :
                    Plaintiffs,                :
                                               :
          v.                                   :    Civil Action No. 06-5315 (LDD)
                                               :
UNITED STATES DEPARTMENT OF THE                :
TREASURY, et al.,                              :
                                               :
                    Defendants.                :

REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS, OR IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT

In the absence of genuine disputes of material facts concerning the provenance of the

1933 Double Eagles at issue in this case, and because defendants are entitled to judgment as a

matter of law, the Court should enter judgment in favor of the defendants and against plaintiffs

on the replevin claim.  Once established that the plaintiffs do not own the 1933 Double Eagles,

their remaining claims should be dismissed, also as a matter of law.  As further discussed below,

by misapplying civil forfeiture rules to property in which they have no ownership interest,

plaintiffs seek to undermine long-settled and fundamental legal principles arising out of the

Property Clause of the United States Constitution.  Moreover, even if the Court first considers

whether forfeiture is mandated in the circumstances before the Court, plaintiffs' forfeiture claims

should be dismissed on the grounds that the government should not be made to forfeit property

that it already owns or may own, and CAFRA's administrative forfeiture rules cannot be applied

to the 1933 Double Eagles, each of which is valued at over $500,000.[1]

A.      **Plaintiffs Have Not Established a Genuine Dispute Concerning the Fact That 1933 Double Eagles Were Not Issued to the Public as Coinage or Otherwise Authorized for Released to the Public and Therefore Belong to the United States.**

Judgment must be entered in favor of the defendants on plaintiffs' replevin claim because there is no genuine dispute that the ten 1933 Double Eagles at issue in this case were never issued as coinage of the United States, or otherwise authorized for release to the public. Plaintiffs admit that: (1) on March 6, 1933, the President issued a Proclamation declaring a Bank Holiday and prohibiting payment of gold coin; (2) on the same day, the Secretary of the Treasury directed the Director of the Mint not to issue any gold in any form absent a license; and (3) no license was issued for the 1933 Double Eagles at issue in this case. See Plaintiffs' Counter-Statement of Facts, ¶¶13-16.[2] No genuine dispute exists concerning these material facts and – consistent with United States v. Barnard, 72 F. Supp. 531, 531-32 (W.D. Tenn. 1947) – the 1933 Double Eagles are chattel that belong to the United States and the Court should enter judgment

---

[1] Plaintiffs urge the Court to ignore defendants' exhibits on the ground that they were submitted without a supporting declaration or affidavit. Plaintiffs' Br. at n.8. To eliminate this issue so that the Court can focus on the merits of the briefing, defendants submit the Declaration of Jacqueline Romero, Esq., attached as Exhibit A hereto. Defendants further note that any document maintained by National Archives and Records Administration ("NARA") that includes an official seal is required to be admitted into evidence equally with the original from which it is made. See 44 U.S.C. § 2116(b).

[2] Plaintiffs dispute several of the facts that defendants contend are not disputed on the ground that the defendants purportedly have not identified sufficient record support for the facts. Defendants respectfully disagree and further note that the Court's rules also require the party opposing summary judgment to state explicitly the material facts that they contend create a genuine dispute. Plaintiffs have repeatedly failed to comply. For example, in response to defendants' assertion that no license was issued for the 1933 Double Eagles at issue in this case, plaintiffs dispute the fact but fail to offer a record citation to establish the dispute. See, e.g., Plaintiffs' Counter-Statement of Facts at ¶16; see also Plaintiffs' Counter-Statement of Facts at ¶¶12, 17, 19, 20, 21, 22, 23 and 25.

2

for the defendants and against plaintiffs on the replevin claim.

In the absence of any evidence that any 1933 Double Eagle was issued as coinage or otherwise authorized to be released to the public, the plaintiffs have fabricated a false factual dispute to defeat summary judgment. Plaintiffs offer the Court a series of documents relating generally to public inquiries about gold in the immediate aftermath of the President's "Bank Holiday" proclamations, and Secretary Woodin's directive forbidding the Mint from issuing gold without a license. See generally Plaintiffs' Exhibits R-CC. Based on these documents, plaintiffs invite the Court to infer that it was theoretically possible for a private collector to obtain a coin from the Mint after March 5, 1933, and from there to leap to the conclusion that someone at the Mint with adequate authority dispensed ten or more 1933 Double Eagles. None of plaintiffs' documents, however, comes close to establishing that after March 5, 1933: (1) any person at the Mint had authority to dispense 1933 Double Eagles; (2) any person obtained any gold coin from the Mint; or, much less, (3) Israel Switt obtained ten 1933 Double Eagles from the Mint. Plaintiffs' documents, therefore, do not establish a genuine dispute about whether any 1933 Double Eagles were issued as coinage of the United States, or otherwise were authorized for release to the public or left the Mint legally.

Plaintiffs' documents are merely fuel for their speculative theory that 1933 Double Eagles could have left the Mint through a channel other than theft or misappropriation. The documents – none of which reflect a 1933 Double Eagle actually having been distributed from the Mint, or an inquiry from Israel Switt about obtaining such a gold piece – at most establish only that for a short period of time following the Presidential proclamations and Secretary Woodin's directive, some Mint officials provided written responses to general public inquiries about gold coins, and

3

that they did not expressly state in response to each inquiry that no 1933 Double Eagles had been issued as coinage.[3] Showing that some Mint employees may have responded incompletely or incorrectly to public inquiries about gold coins is a far cry from proving with evidence that any official of the Mint, with lawful authority to do so, actually issued 1933 Double Eagle as coinage, or that the Mint or any of its officials had any legal authority to otherwise dispense them to the public.

Plaintiffs' documents are no substitute for probative evidence that any 1933 Double Eagles actually was issued as coinage, and they do not support a reasonable inference that Israel Switt legally obtained the ten 1933 Double Eagles at issue here. Plaintiffs cannot avert summary judgment with mere speculation, and they cannot defeat summary judgment absent competent evidence from which a jury could reasonably find in his favor. See Ridgewood Board of Education v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); Woods v. Bentsen, 889 F. Supp. 179, 184 (E.D. Pa. 1995); Anderson v. Liberty Lobby, 447 U.S. 242, 249-50 (1986) (evidence that is "merely colorable" or "not significantly probative" will not defeat summary judgment). A jury could not reasonably find, based upon plaintiffs' documents, that the 1933 Double Eagles at issue in this case were issued as coinage of the United States, or otherwise released to the public under proper authority.[4] Even if plaintiffs' documents established that someone at the Mint gave

---

[3] Plaintiffs have not provided the underlying inquiries, and so the meaning and context of the Mint's responses cannot fully be examined.

[4] Defendants' contention that no 1933 Double Eagles were authorized to be issued to the public is further supported by a letter by the Acting Director of the Mint, dated October 26, 1933, that specifically addresses the legal status of gold pieces minted in 1933. The letter states:

> Reference is made to your letter of October 21st, in which
> you inquire about gold coins which were minted in 1933 . . . Gold

4

Israel Switt ten 1933 Double Eagles, as a matter of law, that fact would not be material.

Assuming <u>arguendo</u> that – as a consequence of ignorance, negligence or malfeasance – someone

at the Mint passed 1933 Double Eagles to the public after March 6, 1933, such action would have

been unauthorized and the action <u>ultra vires</u>.  In the government's opening brief, we set forth

controlling case law for the proposition that the United States cannot be divested of its property

by negligence, delay, laches, mistake or unauthorized actions by subordinate officials.  <u>See</u>

<u>United States v. California</u>, 332 U.S. 19, 39-40 (1947);  <u>United States v. Steinmetz</u>, 973 F.2d

212, 222 (3d Cir. 1992), <u>cert. denied</u>, 507 U.S. 984  (1993) (holding that ship's bell recovered

from Confederate vessel sunk off the coast of France belongs to the United States); <u>see also</u>

<u>Yunis v. United States</u>, 188 F. Supp.2d 1024, 1032 (C.D. Cal. 2000) (under Property Clause of

the Constitution, absent federal government action to dispose of property, "title does not pass

under the laws of the United States"; without congressional consent, private individuals cannot

act to take away property of the federal government); <u>United States v. Mallery</u>, 53 F. Supp. 564,

568-69 (W.D. Wash. 1944) (government property may be disposed of only in accordance with

"very comprehensive procedure set up by Congress"; government property cannot be forfeited

through "oversight, carelessness, negligence, or even intentional conduct of any of the agents of

the government").

   In <u>Federal Crop Ins. Corp. v. Merrill</u>, 332 U.S. 380 (1947), the United States Supreme

---

>        coins which were minted in the early part of the calendar year 1933
>        are <u>held as assets of the government</u>.  Under the present gold
>        regulations which have been effected in accordance with the
>        Executive Order of the President, <u>no gold coins are being issued</u>
>        <u>for circulation</u>.

Exhibit B (emphasis added).

Court directly addressed situations in which a government employee – perhaps acting innocently – acts outside his or her legal authority, as plaintiffs suggest may have happened here. The Supreme Court explained: "[A]nyone entering into a relationship with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority . . . And this is so even though . . . the agent himself may have been unaware of the limitations upon his authority. Id. at 384. This legal proposition is deeply imbedded in our legal system, and historically has been applied to protect the United States' interest in its property even in circumstances where the property has been transferred to private parties under the cloak of authorized conduct. See United States v. Nicoll, 1 Paine 646 (1826) (the United States Constitution prohibits disposition of government property absent authority of Congress, even by official with presumed authority); Kern Copters, Inc. v. Allied Helicopter Serv., Inc., 277 F.2d 308, 313 (9th Cir. 1960) (in the absence of lawful authority to dispose of public property, a private party "can claim nothing by [a] certificate or any other declaration" by a government official who may think he has the authority to dispose of it); Johnson v. Frisbie, 1868 WL 3134, *6 (Md.) (in connection with sale of government-owned horse, holding that "bare possession" of the horse with consent of government agent could not operate as a transfer of title where sale of horse not authorized by Congress; sale made "without the authority or assent of the Government, could not operate as a transfer of title against the latter").[5] Thus, even

---

[5] Plaintiffs imply that the agreement to dispose of the Fenton Coin in 2002 is somehow precedential here. As mentioned briefly in our opening brief, the facts in the Fenton case differ significantly from the facts here. In that case, without knowing that no 1933 Double Eagles had been issued as coinage, Treasury officials issued a license to permit King Farouk of Egypt to export a gold coin, which turned out to be a 1933 Double Eagle, for his personal collection. A key legal issue in that case was the legal significance of the government's issuance of a license for the export of that gold piece – an issue that does not arise in this case. In resolving that

if a Mint employee dispensed a 1933 Double Eagle to a member of the public after March 5,

1933 – a contention that the government denies and for which there is no evidentiary support –

the action of the Mint employee was outside of his authority and the 1933 Double Eagle remains

the property of the United States.[6]

Plaintiffs have failed to provide the Court with any evidence that anyone acting on behalf

of the United States government was authorized to issue any 1933 Double Eagle as coinage, or

that any 1933 Double Eagles left the Mint through an alternative authorized channel.  In the

absence of such evidence, the controlling legal authority mandates that the 1933 Double Eagles

_____

dispute, the parties explicitly agreed: "This settlement shall not be deemed to have any precedential significance or effect, legal or otherwise, on any other coin or property of the United States, including any other 1933 Double Eagle that may exist, other than the In-Rem 1933 Double Eagle."  See Plaintiffs' Exhibit C at p. 4.  Ironically, Barry Berke, Esq., plaintiffs' counsel in this case, signed that agreement.

[6]  Plaintiffs challenge the precedential significance of Barnard on the ground that it is based in part upon a stipulation.  In that action, Barnard had precisely the same interests as do plaintiffs here, i.e., to prove that the 1933 Double Eagles are not the property of the United States.  The Court may reasonably conclude that Barnard's counsel entered the stipulation fully aware of its accuracy and significance, and that if evidence existed in the 1940s to support the claim of ownership of a private holder of a 1933 Double Eagle, such evidence would have been presented to the Barnard court.  Barnard differed from this case only in that the United States was the replevin plaintiff and thus had the burden of establishing ownership of a 1933 Double Eagle.

Another 1933 Double Eagle decision, namely Stack v. Strang, 94 F. Supp. 54 (S.D.N.Y. 1950), provides further support for the conclusion that the 1933 Double Eagles never were issued as coinage and therefore remain the property of the United States.  In that case – which, like Barnard, was litigated when witnesses still were alive and the evidence was fresh in comparison to today – the private holder of a 1933 Double Eagle surrendered under protest a 1933 Double Eagle to a Secret Service agent.  The private holder then sued the agent in state court.  That court "held the action to be one in replevin" and dismissed the case as one against the United States.  Id. at 56.  The court's decision discusses the government's argument that the 1933 Double Eagle had been embezzled or stolen from the Mint.  Id. at 55-56.  The plaintiff in that case was in precisely the same legal posture as the plaintiffs here.  There is no evidence from the available decisions that the plaintiff elected to dispute the government's contention that the 1933 Double Eagle had been improperly taken from the Mint.

7

at issue in this case are the property of the people of the United States, despite decades of

concealment.

**B.      There is No Genuine Dispute That None of the Plaintiffs Has Obtained Legal
         Ownership of the 1933 Double Eagles.**

Assuming arguendo that a private party could have owned a 1933 Double Eagle, plaintiffs

still have failed to prove that Israel Switt obtained legal ownership of any 1933 Double Eagles.

Plaintiffs admit that they have no evidence, and are not aware of evidence, to prove that Israel

Switt obtained the 1933 Double Eagles from the Mint, or any legal source.  Joan Langbord

testified that she does not have and is not aware of the existence of any books, records,

appraisals, receipts, journal entries, checks – or any paper whatsoever – reflecting when, how, or

from whom Israel Switt obtained the 1933 Double Eagles.  See Deposition Transcript of Joan

Langbord ("Langbord Dep. Tr."), excerpts attached as Exhibit C, at 70-78.  Joan Langbord

testified that she does not know how Switt obtained the gold pieces, and that she is not aware of

anyone who has such information.  Id.  She further testified that she never discussed the 1933

Double Eagles with her father.  Id. at 112, 140.   Nor does Joan Langbord have any firsthand

knowledge with which to deny the facts set forth in the sworn statement of Israel Switt taken by

the Secret Service in 1944 (in which Switt evidently lied when he claimed that he did not have

possession or control of any more 1933 Double Eagles).  Id. at 165; Exhibit E.  Indeed,

notwithstanding plaintiffs' theory that Switt may have obtained the 1933 Double Eagles at the

Mint, Joan Langbord testified that she is not aware whether her father obtained any gold coins

from the Mint.  Id. at 176; see also Plaintiffs' Counter-Statement of Facts at ¶25 (denying that no

documents exist to prove that Switt lawfully obtained the 1933 Double Eagles, but nonetheless

8

failing to cite to any evidence proving that he did).

Indeed, the testimony of the only person known to the parties to have discussed 1933 Double Eagles with Israel Switt – namely Harry J. Forman – does not support plaintiffs' speculation that Switt obtained 1933 Double Eagles during one of his purported visits to the Mint. Forman, a rare coin dealer, testified that in the 1970s Switt inquired whether Forman had a buyer for a 1933 Double Eagle. See Deposition of Harry J. Forman ("Forman Dep. Tr."), excerpts attached as Exhibit D, at 13-19. Forman testified that he "distinctly remember[ed]" Switt's claim that he had obtained the 1933 Double Eagles – not from the Mint – but from the Federal Reserve. Id. at 18. Forman stated: "I remember the conversation like it took place yesterday. That he told me he traded a guy at the Federal Reserve 1931 Double Eagles for the 1933s." Id. at 45.[7] Just as there is no evidence that Switt obtained the 1933 Double Eagles from the Mint, there is no documentary or corroborative evidence that he obtained them from the Federal Reserve, or that any 1933 Double Eagles ever were transferred from the Mint to the Federal Reserve.

Plaintiffs' treatment of the 1933 Double Eagles in connection with Israel Switt's estate further supports the conclusion that Switt never legally owned the 1933 Double Eagles. Under Pennsylvania law, property listed in an estate inventory is presumptive evidence that the property belongs to the decedent and should be included in the decedent's estate. See In re Rogers Estate,

---

[7] Forman remembers that Switt insisted that the sale take place overseas, which Forman understood to be Switt's effort to evade confiscation by the government. Forman Dep. Tr. at 58. Referring to a conversation with Switt, Forman testified: "And he seemed to feel that the Government was wrong in seizing the coins from the people that he sold them to. But still, in order to shield himself and me, he didn't want to sell me the coin unless I had a customer overseas." Id.

108 A.2d 924, 924-25 (Pa. 1954).  Where property believed to be owned by a decedent is later

identified, an estate administrator is required to file a supplemental inventory.  See 20 Pa. C.S.A.

§3303; Riblet's Estate, 7 Erie 10 (1925) (where administrator fails to include assets of decedent's

estate in inventory, court requires filing of supplemental inventory and account).  Here, plaintiffs

admit that Switt's estate inventory did not include any 1933 Double Eagles, and that no

supplemental inventory ever was filed (even after the 2003 discovery of the 1933 Double Eagles

by Joan Langbord).  Plaintiffs' Counter-Statement at ¶¶9-10.  In the absence of any evidence that

Switt's acquisition of the 1933 Double Eagles was even facially legal, and given that the gold

pieces were omitted from the inventory of Switt's estate and therefore were not presumptively

part of his estate, plaintiffs have failed to establish a genuine dispute of material fact concerning

the provenance of the 1933 Double Eagles.  The Court can and should conclude that because

Switt was not the legal owner of the gold pieces, he could not have passed them to anyone,

including his wife Elizabeth, his daughter Joan, or his grandsons Roy and David.[8]

Plaintiffs also have failed to set forth any evidence – or even a cogent explanation – to

support their claim that the 1933 Double Eagles passed to them under the wills of Israel Switt

and Elizabeth Switt, as averred in the Complaint and in written statements to the government.

See Compl. at ¶ 59; Exhibit M (¶1).  In her deposition testimony, Joan Langbord further

explained how she purportedly came to own the 1933 Double Eagles.  Her explanation, however,

raises questions about the accuracy of plaintiffs' averments and prior written statements to the

government, and eliminates entirely any possibility that either Roy or David Langbord have any

---

[8] No estate taxes were paid to the Commonwealth of Pennsylvania or to the United States
Treasury in connection with the 1933 Double Eagles.

legal interest in the gold pieces.[9]

Joan Langbord testified that her mother, Elizabeth Switt, told her that everything in a particular safe deposit box belonged to Joan. Langbord Dep. Tr. at 119, 223-24. According to Langbord, the safe deposit box measured 14" x 12" x 6" inches and was packed with diamond and gold jewelry, among other treasures – quite literally, some of the Switt/Langbord family jewels. Id. at 219-228. According to Joan Langbord, she examined the contents of the safe deposit box at least 8-12 times from the time of her mother's death in 1985 until 2003 and never noticed a paper bag filled with the ten 1933 Double Eagles and tissue paper. Id. at 118-30.[10] Joan Langbord claims not to know who put the ten 1933 Double Eagles into the safe deposit box. Id. at 141.

Contrary to plaintiffs' allegations in the Complaint and their argument in the brief in opposition to the defendants' motion, Elizabeth and Israel Switt's respective wills are irrelevant here. If Joan Langbord's testimony is accurate – the Court should deem Joan Langbord to be credible for purposes of deciding only this motion – Elizabeth Switt conveyed the 1933 Double Eagles to Joan Langbord as a gift. Joan Langbord's testimony, along with plaintiffs' admission that Israel Switt left 100 percent of his estate to Joan Langbord, is conclusive and undisputed proof that neither Roy nor David Langbord have an ownership interest in the 1933 Double

_____

[9] Inconsistencies between Joan Langbord's deposition testimony and the allegations in the Complaint may be the consequence of Joan Langbord not having reviewed the Complaint before it was filed. See Langbord Dep. Tr. at 275-77.

[10] Joan Langbord admitted that her family did not comply with 72 Pa. C.S. §9192(b), which requires the presence of a representative of the Commonwealth of Pennsylvania when removing the contents of a decedent's safe deposit box, and there is no evidence of compliance with any of the alternative statutory procedures, all of which are intended to ascertain a decedent's property for estate administration purposes. See Langbord Dep. Tr. at 137-38.

Eagles. See Plaintiffs' Counter Statement at ¶7.[11]

In the absence of evidence that the 1933 Double Eagles were issued as coinage or otherwise authorized to be dispensed to the public, as a matter of law the gold pieces still belong to the United States. Assuming arguendo that the 1933 Double Eagles left the Mint under proper authority, there still is no evidence whatsoever that Israel Switt obtained them legally, or that they were conveyed legally to all of the plaintiffs.

C.    **Plaintiffs' Constitutional Due Process Rights Are Satisfied by a Merits-based Determination of Their Replevin Action, and a Forfeiture Proceeding Is Neither Necessary Nor Appropriate.**

The government acknowledges that plaintiffs are entitled as a matter of due process to a judicial determination of their claim that they own the 1933 Double Eagles. The process that is due to them, however, is resolution of their replevin claim. The Court should address the replevin issue first as it is the keystone issue dispositive of this entire controversy: if the plaintiffs' do not own the 1933 Double Eagles, they have neither standing to compel a forfeiture proceeding, nor a property interest sufficient to support their due process claims based upon purported seizure.

A court-ordered forfeiture proceeding is not due the plaintiffs. Plaintiffs seek to maneuver this dispute into the forfeiture arena for one obvious reason: they want to benefit from the various statutory deadlines and burden-shifting provisions in CAFRA to gain an

---

[11] When asked if she had discussed with her sons their purported ownership of the 1933 Double Eagles, Joan Langbord explained plaintiffs' basis for claiming they own the 1933 Double Eagles: "It's – I found them, which would mean they would be mine. And what's mine is my childrens [sic]." Dep. Tr. at 215.

extraordinary, unfair, and entirely unprecedented procedural advantage that they would not otherwise have if this were a dispute between private parties over the ownership of the 1933 Double Eagles. Plaintiffs' effort to force this case into the forfeiture framework is a classic effort at trying to fit the round peg into the square hole for an improper purpose.

The forfeiture laws are designed to allow the government to <u>obtain</u> title to property that belongs to another. The entire statutory scheme – including the provisions allowing the government to take temporary custody of property pending trial, the short statutory deadlines for commencing a forfeiture proceeding, and the right to a trial by jury at which the government must establish the basis for the forfeiture – makes no sense where, as here, the plaintiffs have not established that they are the legal owners of the property at issue. At the outset of a forfeiture case, title to the property belongs to a third party (or is contraband belonging to no one but in a third party's possession). At the conclusion of a forfeiture case, if the government prevails, a court issues an order transferring title of the property from the third party to the government. Thus, at every step in the process the due process and property rights of a legitimate property owner are rigorously protected.

The Court should not require the government to bring a forfeiture proceeding to obtain title to its own property. If property already is the government's property – wrongfully taken from its possession by a third party – none of the reasons for insisting on the procedural protections of the forfeiture laws apply. If the property already belongs to the government, there is no third-party property interest to be protected, and no title to be transferred from the third party to the government when the case is concluded.

Plaintiffs' argument that they should be able to force a forfeiture action before

13

establishing any ownership right to the 1933 Double Eagles would lead to an absurd result. For example, imagine if a postal truck were to turn up missing from a parking garage at the post office and then be found the next day in a third party's driveway. A third party might be entitled to a judicial determination of his or her right to the truck if he or she had a plausible explanation for his or her innocent possession of the government-owned vehicle (e.g., "my brother-in-law is a postal worker, and he told me that he had the authority to dispose of the Postal Service's trucks and wanted me to have this one"), but the forum for that determination would not be a forfeiture action governed by the procedural requirements of CAFRA. Rather, it would be a proceeding in the nature of replevin or quiet title.

A civil forfeiture proceeding has a different purpose than a replevin or quiet title proceeding. The statutory scheme is imbued with overlapping due process protections precisely because the initial presumption in any civil forfeiture case is that the defendant rem indeed belongs to a third party and the government is seeking to deprive that party of the rem. To understand this, one need only compare a civil forfeiture proceeding with the ancillary proceeding in a criminal forfeiture case. See 21 U.S.C. § 853(n). The ancillary proceeding is a quiet title proceeding where the government's title vis-à-vis the defendant already has been determined in the criminal trial. Not surprisingly, because it is only a quiet title proceeding, the ancillary proceeding in a criminal case is governed by none of the procedural requirements enacted in CAFRA. For example, there is no right to a jury trial, there are no statutory filing deadlines, and the burden of proof is on the third-party claimant to establish his or her interest in the property. Because the forfeiture laws have nothing whatsoever to do with this case, plaintiffs' complaint – to the extent that it is based on the assumption that the government was

14

required to commence a forfeiture action – must be denied for failure to state a claim on which relief can be granted.[12]

Assuming, arguendo, that civil forfeiture laws apply to this case, there is no basis for plaintiffs' argument that forfeiture is now barred because the government failed to comply with the procedural requirements in CAFRA. Principally, plaintiffs argue that the government failed to file a forfeiture complaint within the 90-day deadline set forth in Section 983(a)(3)(B), and that accordingly, civil forfeiture is now barred and the property in question must be returned to them. The 90-day deadline, however, applies only when a claimant has previously filed a claim in an administrative forfeiture proceeding under Section 983(a)(2). Further, a claim may be filed under Section 983(a)(2) only if the government has commenced an administrative forfeiture proceeding under 983(a)(1)(A). If there is no administrative forfeiture under Section 983(a)(1)(A), there is no claim under Section 983(a)(2), and there is no 90-day deadline under

---

[12] Case law plaintiffs rely upon does not support the legal propositions for which it is offered. For example, United States v. One Parcel of Real Property With Buildings, Appurtenances and Known as 170 Westfield Dr., 34 F. Supp. 2d 107, 114-15 (D.R.I 1999), does not require the government to prevail in a forfeiture before recovering property stolen from the government, as plaintiffs assert. See Plaintiffs' Br. a 12. In that case, the government sought to take by forfeiture accounts containing funds stolen from the government, which were commingled with other funds. The government sought to utilize the constructive trust doctrine to defeat the claimant's standing. The Court found that – to defeat standing on a constructive trust theory – the government first had to prove fraud or that the accounts contained only government money. Id. at 114. Here, the government did not initiate a forfeiture proceeding to take title to property commingled with stolen property, and it did not assert a constructive fraud theory to defeat plaintiffs' standing to contest ownership of the 1933 Double Eagles (through replevin). Similarly, plaintiffs' reliance upon United States v. 144,744 Pounds of Blue King Crab, 410 F.3d 1131 (9th Cir. 2005) is wildly off-point. In that case, the claimants challenged the government's forfeiture of crabs caught in violation of Russian law. The decision focused on the difference between "contraband" (per se illegal) and "other property that it is illegal to possess." Id. at 1135. The decision merely states that, in a forfeiture proceeding, the government would have to prove one or the other. In that case, the government did not claim that the crabs belonged to the United States, and there was no contest of original ownership.

Section 983(a)(3).

Plaintiffs may disagree with Congress for having omitted from the strict deadlines for commencing administrative forfeiture proceedings property valued at more than $500,000, but that is what Congress did.  CAFRA was enacted in response to a perception that the government failed to commence timely forfeiture proceedings – proceedings designed to give a property owner his "day in court" – when the police or federal agents made routine seizures from suspected drug dealers and other criminals of the kinds of property involved in the overwhelming majority of federal forfeiture cases, namely vehicles, vessels, aircraft, weapons, and currency.  It is this type of property that is routinely forfeited administratively (without the involvement of the courts), and hence Congress enacted CAFRA only to govern such forfeiture procedures.  For cases in which administrative forfeiture is not permitted – including where property is worth more than $500,000 – the pre-CAFRA case law in which the Supreme Court and the lower courts routinely applied a due process analysis had been held to be wholly adequate.  See United States v. $8,850 in U.S. Currency, 461 U.S. 555, 565 (1983) (applying four-part test from Barker v. Wingo, Supreme Court finds that 18-month delay in commencing civil forfeiture action did not violate due process); S. Cassella, The Civil Asset Forfeiture Reform Act of 2000, 27 J. Legis. 97, 125-28, 143-44 (2001) (explaining how the CAFRA deadlines apply in various situations); S. Cassella, Asset Forfeiture Law in the United States (Juris: 2007), § 7-4, pp. 220-24 (discussing the application of the 90-day deadline in Section 983(a)(3)(B) and concluding that "the 90-day deadline . . . only applies in cases that begin as administrative forfeiture proceedings").

Plaintiffs' mischaracterize the government's argument as being that if property is "too valuable to subject to administrative forfeiture, the Government may keep [it] with no process at

16

all." See Plaintiffs' Br. at 19. If property is worth more than $500,000, the government may not

forfeiture it administratively; rather, assuming forfeiture is appropriate at all, it may commence a

judicial forfeiture proceeding to obtain title to the property. Judicial forfeiture is governed by the

procedures set forth in Supplemental Rule G of the Supplemental Rules for Admiralty and

Maritime Claims and Asset Forfeiture Actions, not the strict filing deadlines in Sections

983(a)(1)(A), (a)(2) and (a)(3).[13]

---

[13] The Court should afford no weight to plaintiffs' reference to an internal Secret Service document in which an advisor describes deliberations about the disposition of the 1933 Double Eagles among various government officials. A fair reading of the document reveals it to be merely one person's description of ongoing deliberations. At the conclusions of those deliberations, the Department of the Treasury, whose Treasury Executive Office of Asset Forfeiture (TEOAF) is responsible for the administration of the Government's civil and criminal forfeiture programs, see 31 U.S.C. § 9703, rejected the Secret Service's request to commence a forfeiture proceeding on the ground that forfeiture was neither necessary nor appropriate in this circumstance. See Letter of James W. Carroll, Jr., Acting General Counsel of the Department of the Treasury, to Larry Johnson, Special Agent in Charge, Criminal Investigative Division, United States Secret Service, dated May 19, 2005, Exhibit E hereto.

For the reasons set forth in defendants' initial brief and above, the defendants respectfully request that the Court dismiss the complaint, or in the alternative, enter summary judgment in their favor and against the plaintiffs.

Respectfully,

PATRICK L. MEEHAN
United States Attorney


VIRGINIA A. GIBSON
Assistant United States Attorney
Chief, Civil Division


JOEL M. SWEET
Assistant United States Attorney


JACQUELINE ROMERO
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476
Tel. (215) 861-8581
Fac. (215) 861-8349

*For All Defendants*

Of Counsel:

Daniel P. Shaver, Chief Counsel
Greg M. Weinman, Senior Counsel
United States Mint
801 9th Street NW
Washington, DC 20220

June 22, 2007

18

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROY LANGBORD, DAVID LANGBORD, and          :
JOAN LANGBORD,                             :
                                           :
            Plaintiffs,                    :
                                           :
      v.                                   :          C. A. No. 06-5315
                                           :
UNITED STATES DEPARTMENT OF THE            :
TREASURY; UNITED STATES BUREAU OF          :
THE MINT; HENRY M. PAULSON, JR.,           :
Secretary of the United States Department of the    :
Treasury; STEPHEN LARSON, Acting General   :
Counsel of the United States Department of the      :
Treasury; EDMUND C. MOY, Director of the   :
United States Mint; DANIEL P. SHAVER, Chief    :
Counsel, United States Mint; DAVID A. LEBRYK,   :
Deputy Director of the United States Mint; and    :
the UNITED STATES OF AMERICA,              :
                                           :
            Defendants.                    :

**DECLARATION OF JACQUELINE ROMERO, ESQUIRE**

Jacqueline Romero, Esquire, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1.      I am an Assistant United States Attorney for the Eastern District of Pennsylvania.

I represent all of the defendants in this action.

2.      This declaration relates to documents previously filed with the Court by the

defendants in connection with Defendants' Motion to Dismiss, or In the Alternative, for

Summary Judgment.

3.      To the best of my knowledge, information, and belief, the exhibits filed with the

Court on March 9, 2007, are true and correct copies of the following documents:

4.    Exhibit A is a copy of a letter from Barry H. Berke, Esquire, plaintiffs' counsel, to Dan Shaver, Esquire, General Counsel of the United States Mint, dated September 21, 2004, as transmitted by facsimile to Mr. Shaver.

5.    Exhibit B is a copy of the text of Proclamations of the President of the United States on March 5, March 6, and March 9, 1933.

6.    Exhibit C is a copy of a telegram from Director of the Mint to Superintendent, United States Assay Office, dated August 4, 1934.  The original is believed to be located by the National Archives and Records Administration ("NARA").

7.    Exhibit D is a copy of a Memorandum for the Chief, Secret Service Division of the United States Department of the Treasury, dated April 6, 1944.  The original is believed to be located by the archives of the United States Secret Service ("USSS").

8.    Exhibit E is a copy of a written statement by Israel Switt, dated March 30, 1944. The original is believed to be maintained in the archives of the USSS.

9.    Exhibit F is a copy of a letter from United States Attorney Gerald A. Gleason to Fred W. Gerber, Supervisory Agent, United States Secret Service, dated February 6, 1945.  The original is believed to be maintained in the archives of the USSS.

10.    Exhibits G, N and O are copies of the certified records of the Register of Wills Office, County of Philadelphia, Pennsylvania.  The originals of the records are maintained by the Register of Wills.

11.    Exhibit H is a copy of a United States Mint Shipping Report, dated March 6, 1933. The original of this document is believed to be maintained by NARA.

12.    Exibit I is a copy of letter of Secretary of the Treasury W. H. Woodin to the

2

Director of the Mint, dated March 6, 1933. The original of this document is believed to be maintained by NARA.

13.    Exhibit J is a copy of the Cashier's Daily Statement of Receipts, Disbursements, and Balances, dated March 15, 1933. The original of this document is maintained by NARA.

14.    Exhibit K is a copy of an excerpt of the Annual Report of the Director of the Mint for the fiscal year ended June 30, 1934. This is an official government publication of the United States Government Printing Office.

15.    Exhibit L is copies of documents produced pursuant to a subpoena by Wachovia Bank N.A., on or about February 7, 2007.

16.    Exhibit M is a copy of a letter from Barry H. Berke, Esquire, to Dan Shaver, Esquire, dated June 29, 2006.

17.    Exhibits P and Q are copies of Inventories and Appraisals dated July 27, 1998, and  February 16, 2006, prepared and produced pursuant to a subpoena by Samuel M. Freeman II.

18.    Exhibit R is a copy of a letter from Barry H. Berke, Esquire, to Dan Shaver, Esquire, dated July 25, 2005.

19.    Exhibit S is a copy of a letter from Barry H. Berke, Esquire, to Dan P. Shaver, Esquire, and David A. Lebryk, dated May 8, 2006.

20.    Exhibit T is a copy of a letter from James W. Carroll, Jr., Acting General Counsel of the Department of the Treasury, to Larry Johnson, Special Agent in Charge, Criminal Investigation Division, United States Secret Service, dated May 19, 2005.

21.    Exhibit U is a copy of a letter from M. M. O'Reilly, Acting Director of the Mint,

3

to Charles R. Prosser of Seymour State Bank, dated October 26, 1933.  The original of the

document is maintained by NARA.


     I declare under penalty of perjury that the foregoing is true and correct.

Dated: _June 26 2007_

JACQUELINE C. ROMERO
Assistant United States Attorney

4

# EXHIBIT B

October 26, 1933.

Mr. Charles R. Prosser,
Seymour State Bank,
Seymour, Wisconsin.

Dear Sir:

Reference is made to your letter of October 21st,
in which you inquire about gold coins which were minted
in 1933.

Gold coins which were minted in the early part of the
calendar year 1933 are held as assets of the government.
Under the present gold regulations which have been effected
in accordance with the Executive Order of the President,
no gold coins are being issued for circulation.

Very truly yours,

M. M. O'R

Acting Director of the Mint.

O:W

# EXHIBIT C

## Joan Langbord

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

ROY LANGBORD, DAVID         :CIVIL ACTION
LANGBORD, and JOAN          :No. 06-5315
LANGBORD,                   :
        Plaintiffs          :
                            :
    vs.                     :
                            :
UNITED STATES DEPARTMENT     :
OF THE TREASURY; UNITED     :
STATES BUREAU OF THE        :
MINT; HENRY M. PAULSON,     :
JR., Secretary of the       :
U.S. Department of the      :
Treasury; STEPHEN LARSON,   :
Acting General Counsel of   :
the U.S. Department of      :
the Treasury; EDMUND C.     :
MOY, Director of the        :
United States Mint;         :
DANIEL P. SHAVER, Chief     :
Counsel, United States      :
Mint; DAVID A. LEBRYK,      :
Deputy Director of the      :
United States Mint; and     :
UNITED STATES OF AMERICA,   :
        Defendants          :

                Tuesday, April 17, 2007

        Oral deposition of JOAN LANGBORD,
taken pursuant to notice, held at the U.S.
Attorney's Office, 615 Chestnut Street,
Philadelphia, Pennsylvania, beginning at
approximately 10:45 a.m., before Donna M.
Hubert, Court Reporter-Notary Public, there
being present:

        KAPLAN, LEAMAN AND WOLFE
              (800) 295-7571

## Joan Langbord

3

1        - - -
2        INDEX
3        - - -
4   WITNESS
5   JOAN LANGBORD
6   EXAMINATION                 PAGE
7     BY: MR. SWEET             5,349
8     BY: MR. BERKE              342
9
10
11        - - -
12       EXHIBITS
13        - - -
14  NUMBER    DESCRIPTION              PAGE
15  Langbord-1  Inventory and Appraisement
16       document                      93
17  Langbord-2  Inventory and Appraisement
18       document                      93
19  Langbord-3  Wachovia Bank documents   146
20  Langbord-4  3-30-1944 Statement of
21       Isreal Switt                  162
22  Langbord-5  2-10-1945 Letter         172
23  Langbord-6  Excerpt from Double Eagle
24       book                          177

        KAPLAN, LEAMAN AND WOLFE
              (800) 295-7571

## Joan Langbord

2

1  APPEARANCES:
2
3        KRAMER LEVIN NAFTALIS &
         FRANKEL, LLP
4        BY: BARRY H. BERKE,
         ESQUIRE
5        1177 Avenue of the Americas
         New York, New York 10036
6        Phone: (212) 715-7560
         Representing the Plaintiffs
7
8        U.S. DEPARTMENT OF JUSTICE
         U.S. ATTORNEY'S OFFICE
9        BY: JOEL SWEET, ESQUIRE
         615 Chestnut Street, Suite
10       1250
         Philadelphia, Pennsylvania
11       19106
         Phone: (215) 861-8470
12       Representing the Defendants
13
14
15
         ALSO PRESENT: Keith M. Donoghue,
16       Representing Plaintiffs
         Jacqueline C. Romero,
17       Assistant United States
         Attorney
18       Greg M. Weinman,
         Representing United States
19       Mint
         Carolyn Thompson, Paralegal
20       Specialist
         Colin Garry, Law Student
21
22
23
24

        KAPLAN, LEAMAN AND WOLFE
              (800) 295-7571

## Joan Langbord

4

1  EXHIBITS CONTINUED:
2
3   NUMBER    DESCRIPTION              PAGE
4   Langbord-7  Inheritance Tax Return  233
5   Langbord-8  Interrogatories         244
6   Langbord-9  5-8-06 Letter           318
7   Langbord-10  Journal                326
8   Langbord-11  New York Times article  331
9   Langbord-12  7-25-05 Letter          337
10
11  ***** SEALED TESTIMONY ON PAGE 10.
12  ***** MARKED TESTIMONY, PAGE 72, LINE 6.
13  ***** MARKED TESTIMONY, PAGE 166, LINE 20.
14  ***** MARKED TESTIMONY, PAGE 287, LINE 17.
15
16
17
18
19
20
21
22
23
24

        KAPLAN, LEAMAN AND WOLFE
              (800) 295-7571

Joan Langbord

69

1  Q.       Okay.  Until your father went to
2  the nursing home, did you have any
3  involvement in providing paperwork to the
4  accountant for purposes of tax returns?
5  A.       No.
6  Q.       After your father went to the
7  nursing home, who was responsible for doing
8  that?
9  A.       I myself.
10  Q.       And what would you give them?
11  A.       The books.
12  Q.       The sales book?
13  A.       The sales book, the purchase
14  book, and the expense book and the check
15  book.
16  Q.       So those were the four books that
17  you had?
18  A.       Yes, sir.
19  Q.       Do you know if he had sales
20  books, purchase books, expense books, or
21  checkbook --
22  A.       Uh-huh.
23  Q.       -- for the -- any period before
24  1988?

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

71

1  that would reflect upon when your father
2  acquired 1933 Double Eagles?
3  A.       No, sir.
4  Q.       Any piece of paper whatsoever --
5  A.       No, sir.
6  Q.       -- that would reflect upon whom
7  your father acquired 1933 Double Eagles
8  from?
9  A.       No, sir.
10  Q.       Any piece of paper -- to your
11  knowledge, is there any piece of paper
12  whatsoever that would reflect how much your
13  father paid, assuming he paid, to acquire
14  1933 Double Eagles?
15       MR. BERKE:  Piece of paper that
16  she's aware of?
17  BY MR. SWEET:
18  Q.       That you're aware of?
19  A.       No, sir.
20  Q.       Did you ever have -- let me
21  rephrase.
22       For the questions I just asked
23  you, not only do you have such a piece of
24  paper, but are you aware of such a piece of

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

70

1  A.       No, sir.
2  Q.       They would have all been down
3  with the flood and the rats?
4  A.       Yes, sir.  I've got some old
5  appraisals down there that are old that
6  should be thrown out.
7  Q.       Are you aware of any piece of
8  paper, whether an entry in a journal, a
9  receipt, a check, an appraisal relating to
10  1933 Double Eagles?
11  A.       No, sir.  No.
12  Q.       Are you aware of a reference in
13  any paper created by your father relating
14  to 1933 Double Eagles?
15  A.       No, sir.
16  Q.       Same question for Ed Silver.
17  A.       I don't know about him.
18  Q.       Are you aware of any paper?
19  A.       No.
20  Q.       What about letters?
21  A.       No.
22  Q.       Do you have any piece of paper or
23  are you aware of any piece of paper,
24  whether you have it or someone else has it,

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

72

1  paper ever having existed?
2  A.       No, sir.
3  Q.       Are you aware of anyone else who
4  may have such a piece of paper?
5  A.       No, sir.
6  Q.       ******* Are you aware of anyone
7  having such information?  And I'll rephrase
8  -- I'll restate the question.
9       Are you aware of any living
10  person having information about when your
11  father obtained 1933 Double Eagles?
12       MR. BERKE:  I would just want to
13  clarify that --
14       MR. SWEET:  You can object, but
15  let her answer the question first and then
16  you can clarify.
17       MR. BERKE:  Well, no, I'm
18  objecting to make clear that you're not
19  seeking --
20       MR. SWEET:  Don't -- don't lead
21  the witness.  Let her answer the question
22  and then you can make your record.
23       MR. BERKE:  I object on the
24  grounds -- listen to the objection.  I'm

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

73

1  objecting on the grounds of privilege.  I
2  just want to be clear that Ms. Langbord
3  should not reveal any information that she
4  learned solely through counsel.
5       MR. SWEET:  Oh, absolutely.
6       MR. BERKE:  Don't worry.  That's
7  what I'm stating.  And I want to make clear
8  that she understands, and given the nature
9  of your question, that she not share
10 anything with you that she learned from
11 counsel.
12      THE WITNESS:  I learned that then
13 -- how do I -- I don't know how to answer
14 that.
15      MR. BERKE:  You should exclude
16 anything that you learned in your
17 discussions with counsel and excluding
18 anything you learned from your -- from
19 discussions with counsel.  What is your
20 answer to the question?  Do you need the
21 question again?
22      THE WITNESS:  The question about
23 from what I learned from counsel?
24      MR. BERKE:  You're going to

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

74

1  exclude what you learned from counsel.
2       THE WITNESS:  That's it.
3       MR. BERKE:  Then the answer would
4  be no.  Or actually, we should have the
5  question read back.
6       MR. SWEET:  I want to go back to
7  that.  Are you instructing her not to
8  disclose facts that she learned from
9  counsel, as opposed to legal advice that
10 she's learned from counsel?  I think that's
11 over broad as an objection.
12      MR. BERKE:  I don't.  I think any
13 communications that Ms. Langbord has had
14 regarding this case, with counsel, is
15 privileged.  I think that's black letter
16 law.  As I understand it, the only thing
17 that you're interested in is anything that
18 she has firsthand information.  And I
19 assume, Joel, you're not interested in any
20 information she may have obtained through
21 communications with her counsel
22 representing her in this action.
23      MR. SWEET:  Facts that are
24 separate from legal advice, I'd like to

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

75

1  know.  What I'm asking is whether you are
2  instructing her not to provide -- not to
3  answer with respect to facts concerning
4  evidence in this case about what she is
5  presently aware of.
6       MR. BERKE:  I don't understand.
7  What I'm telling you is that I am
8  instructing her because -- used proper
9  black letter instruction that anything that
10 she learned solely through communications
11 with counsel in connection with counsel's
12 representation of her in this matter, she
13 should not disclose because that is a
14 privilege matter.
15      MR. SWEET:  Okay.  Would you mark
16 this section of the deposition please.  We
17 will proceed and I'll state that I don't
18 agree with your characterization of the
19 privilege and I believe that facts that she
20 is aware of concerning evidence relevant to
21 this case are -- that are not communicated
22 to her as legal advice, but instead are
23 providing her with factual statements or
24 factual information about the evidence

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

76

1  relevant in this case, I don't think those
2  are protected.
3       MR. BERKE:  I don't understand
4  the distinction.  What I'm saying is what
5  I'm instructing her is that any discussions
6  we've had in connection with legal advice
7  in this case, and when she may have learned
8  any fact that could be responsive to any of
9  your questions, that she learned solely
10 from communications with counsel, she
11 should not disclose because that's
12 privileged.  If you want to ask her about
13 any firsthand information she has about
14 anything, you may do that.
15 BY MR. SWEET:
16      Q.    Ma'am, do you have knowledge, as
17 we speak -- sit here today, do you have
18 knowledge of any information as to how your
19 father purchased 1933 Double Eagles?
20      A.    This is the only answer I can
21 give you, sir.  And it's through hearsay.
22      Q.    Go ahead.
23      MR. BERKE:  As long as it's not
24 through me.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

77

1    THE WITNESS:  Huh?
2    MR. BERKE:  As long as it's not
3  through me.
4    THE WITNESS:  Not through
5  counsel, but from what I heard through the
6  grapevines, okay, and I believe it was a
7  Mr. Harry Forman, who's a coin dealer, said
8  that my father got them some way, but he's
9  never discussed it with me.  Mr. Foreman
10  has never come to me, I have never seen Mr.
11  Foreman.
12    I knew -- used to see him in the
13  store.  Very vaguely, I would not know if I
14  saw him right now.  But through grapevines,
15  which you care, I heard something that my
16  father got them somewhere or I -- I don't
17  really understand the whole -- what the
18  whole process was.
19  Q.    Do you know who you learned that
20  from, who the grapevine was?
21  A.    Not really.
22  Q.    Do you know when you learned
23  that?
24  A.    Not -- I can't recall dates, but

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

79

1  A.    No.
2  Q.    Did you ever find a cigar box
3  filled with gold coins after your father
4  went into the nursing home?
5  A.    No.
6  Q.    Are you aware of your father, at
7  any point, selling a large number of those
8  gold coins?
9  A.    I was never privileged to that
10  information, no.
11  Q.    Do you know anybody to whom your
12  father sold gold coins?
13  A.    No, sir.
14    MR. BERKE:  Objection to the form
15  of the question.
16    THE WITNESS:  I -- answer it no,
17  I don't.
18    MR. SWEET:  What's the
19  objection?
20    MR. BERKE:  If any.
21    MR. SWEET:  I'm sorry?
22    THE WITNESS:  No.
23    MR. BERKE:  Your question assumes
24  that he did sell gold coins to people.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

78

1  I heard -- this is through hearsay.
2  Q.    Do you have any firsthand
3  knowledge of how your father obtained the
4  1933 Double Eagles?
5  A.    I never knew about the coins,
6  sir.  My family was very --
7    MR. BERKE:  There is no
8  question.
9  BY MR. SWEET:
10  Q.    Go ahead, ma'am.  You can --
11  A.    They were very secretive.  They
12  never discussed anything with me, okay.  I
13  was never privileged with what was going
14  on.  Really, I was like a salesperson in
15  the store and truthfully I was oblivious.
16  Q.    Did your mother ever discuss with
17  you 1933 Double Eagles?
18  A.    No, sir.
19  Q.    Did your mother ever discuss with
20  you your father's legal problems in the
21  thirties and forties?
22  A.    No, sir, I never knew.
23  Q.    Do you recall a cigar box at
24  Switt & Silver filled with gold coins?

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

80

1  BY MR. SWEET:
2  Q.    Do you know anybody your father
3  gave gold coins away to?
4  A.    No.  But if he had coins he sold
5  them.
6  Q.    Did you ever sell gold coins --
7  A.    No, sir.
8  Q.    -- as a salesperson at Switt &
9  Silver?
10  A.    No.
11  Q.    Other than the gold coins that
12  you sold to Stack, did you sell any gold
13  coins at any time in your life?
14    MR. BERKE:  Are you asking her
15  personally or the store?
16    MR. SWEET:  I'm asking her
17  personally.
18    MR. BERKE:  Okay.
19    THE WITNESS:  Yes.
20  BY MR. SWEET:
21  Q.    Which gold coins were those?
22  A.    I don't remember.  I really
23  don't.
24  Q.    Okay.  When was the first time

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

109

1  stolen property?
2  A.  No, sir.
3  Q.  No discussion ever about that?
4  A.  No.
5  Q.  Did you ever become aware of your
6  father having purchased stolen property,
7  knowingly or unknowingly?
8  A.  Unknowingly, yes. I did become
9  aware of it.
10  Q.  Tell us about that.
11  A.  It was when -- he bought this
12  property from a fellow by the name -- what
13  the hell was his name, excuse me. I know
14  he had -- it was in Princeton and he had a
15  shop called the Leopard's Head. And he
16  brought antique silver into the store that
17  my father purchased. And I remember -- I
18  believe I'm coming in, and I don't know if
19  they arrested my father or what they did to
20  it, and then we found out that this man had
21  somebody working in the insurance company
22  or something in Princeton and he was
23  working with a fellow named of Jimmy
24  Budendorff (phonetic), but he was bringing

Joan Langbord

110

1  this in and selling it, but that's the hon
2  -- I remember that and I, but...
3  Q.  Do you remember the name of the
4  guy from Leopard's Head?
5  A.  Wait a minute. Hold on a
6  minute. Let me think. What was his name.
7  Harold Shuster. I believe his name was
8  Harold Shuster and I believe he was a
9  violinist. Hold on a minute.
10  Q.  Okay. I think we got enough. Do
11  you know -- you became aware of this
12  situation how?
13  A.  I was in the store at the time.
14  Q.  And the police came in?
15  A.  Yeah.
16  Q.  Did they arrest your father?
17  A.  I don't know if they did or not.
18  I don't remember, but I know that --
19  Q.  Well, ma'am, you would remember
20  if they put handcuffs on your father and
21  took him out of the store?
22  A.  I do not remember that they put
23  handcuffs on my father.
24      MR. BERKE: And let me -- I think

Joan Langbord

111

1  it's a question whether that happened.
2  It's not a statement that it did happen.
3      THE WITNESS: I know re -- no. I
4  don't rem -- I know that he -- something
5  happened that he was arrested because of
6  this, but he had no knowledge that he was
7  buying stolen property.
8  BY MR. SWEET:
9  Q.  Any other incident in which
10  you've learned later that property you were
11  selling in the store was stolen property?
12  A.  Not that I know of. That's the
13  only thing that I remember.
14  Q.  How would you describe your
15  relationship with your father?
16  A.  Daughter father relationship.
17  Sometimes it was great, sometimes it was
18  not so great. He had his opinion, I had my
19  opinion. Sometimes he purchased things
20  that I said he shouldn't have bought at
21  prices that he paid, in my opinion, but he
22  always won the case.
23  Q.  So your disagreements, were they
24  in terms of running the store?

Joan Langbord

112

1  A.  No, not in running the store. Of
2  buying certain pieces of merchandise that I
3  thought he paid too much money for.
4  Q.  So those were the types of
5  agreements you would have with your
6  father?
7  A.  Uh-huh.
8      MR. BERKE: You have to say yes.
9      THE WITNESS: Yes, I'm sorry.
10      MR. BERKE: That's okay.
11  BY MR. SWEET:
12  Q.  Is it your testimony that you
13  never had any discussions with your father,
14  any whatsoever, concerning his involvement
15  with 1933 Double Eagles?
16  A.  Yes, sir.
17  Q.  When was the first time you saw a
18  1933 Double Eagle?
19  A.  In one of the pictures.
20  Q.  You're pointing to a stack of
21  exhibits, so I want you to not point, but
22  to remember, in your mind, not a picture,
23  but an actual 1933 Double Eagle?
24  A.  In my mind, when I found them.

Joan Langbord

117

1  A.    The bank.
2  Q.    Do you remember at that point
3  which bank?
4  A.    No. I know it wasn't Wachovia.
5  I don't know who it was at the time. Was
6  it First Union before Wachovia?
7  Q.    Might have been. That was the
8  predecessor of Wachovia?
9  A.    Then it must have been First
10 Union.
11 Q.    What did they tell you?
12 A.    They told me that there was a
13 whole -- that I have a vault that couldn't
14 be open and I said because this whole line
15 of vaults, there are quite a few vaults
16 that couldn't be open.
17 Q.    And what did they tell you?
18 A.    That they were warped, would I --
19 and I said I would come and try it, and try
20 it.
21 Q.    Did they ask you to come back?
22 A.    Yes.
23 Q.    And what happened?
24 A.    Then I went there, I couldn't

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

118

1  open the vault again. And they called and
2  said they made arrangements to have the
3  vaults drilled.
4  Q.    The bank made the arrangements?
5  A.    Yes, sir.
6  Q.    Now, was this a -- do you
7  remember the number of this vault, of this
8  particular safe deposit box?
9  A.    442.
10 Q.    442?
11 A.    I believe it's 442.
12 Q.    Who is it registered to?
13 A.    Me and my son, Roy.
14 Q.    Do you -- what was kept in this
15 particular safe deposit box?
16 A.    My mother's jewelry.
17 Q.    Anything else?
18 A.    I found the coins.
19 Q.    So the 1933 Double Eagles and
20 your mother's jewelry?
21 A.    Uh-huh.
22         THE COURT REPORTER: Is that a
23 yes or no?
24         THE WITNESS: Yes.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

119

1  BY MR. SWEET:
2  Q.    Who put your mother's jewelry and
3  the Double Eagles into Safe Deposit Box
4  442?
5  A.    My mother -- I was never allowed
6  to go to the vault, my mother's boxes. I
7  was told -- I had a key, I was given a key
8  and many years before, okay, when she had
9  these boxes and I was told that these boxes
10 were mine, okay. I was never allowed to go
11 to the boxes. I had never been in the
12 boxes.
13         MR. BERKE: You are talking about
14 when your mother was alive?
15         THE WITNESS: When my mother was
16 alive, I'm sorry.
17 BY MR. SWEET:
18 Q.    So it's your testimony that the
19 boxes were registered to you and to Roy?
20 A.    Before that.
21 Q.    This particular Box 442?
22 A.    Yes, yes.
23 Q.    It was registered to you and to
24 Roy?

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

120

1  A.    Yes.
2  Q.    You had a key?
3  A.    Yes.
4  Q.    And what was inside the box was
5  placed in the box by your mother?
6  A.    It must -- I don't know who
7  placed it there, sir.
8  Q.    So you don't know how the
9  contents of the box got into the box?
10 A.    No, sir.
11 Q.    Do you recall having put anything
12 into that box yourself?
13 A.    No, sir.
14 Q.    When was the first time you got
15 into that box?
16 A.    I guess sometime after my mother
17 died.
18 Q.    What year was that?
19 A.    I don't remember. I don't
20 remember. I may have -- and I went to
21 those boxes, I looked at the boxes, I
22 really didn't take anything out, I just
23 shoved them right back in. I went there
24 quite a few times, I looked into the box

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

121

1  and it was just so traumatic that I just
2  left.
3  Q.      So this is all jewelry that your
4  mother owned?
5  A.      Uh-huh.
6  Q.      And the Double Eagles and you
7  don't know how they got into the box and
8  it's your testimony -- and you're shaking
9  your head, but this is the end of this.
10  Tell me if I got it right.
11  A.      Go ahead.
12  Q.      It's your testimony that from the
13  time your mother died, until 2003, you had
14  the key?
15  A.      Oh, I went into the box.
16  Q.      How many times did you go into
17  the box?
18  A.      Maybe eight, ten or twelve, I
19  don't know.
20  Q.      So up to twelve times,
21  approximately, you went into Box 442?
22  A.      Uh-huh.
23          THE COURT REPORTER:  Is that a
24  yes or no?

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

123

1  A.      Yes.
2  Q.      What?
3  A.      There is an amethyst pin of hers
4  that are still in the window, there was an
5  amethyst and diamond necklace that was sold
6  that was in there, there was -- in the
7  store yet.  There's bracelets, pins, the
8  earrings that I'm wearing.  And I don't
9  remember.
10  Q.      Could you put a value on the
11  property?
12          MR. BERKE:  You can't mark that
13  as an exhibit.
14          MR. SWEET:  I was going to have
15  her identify the earrings.  It must be
16  difficult to keep your head up, they are
17  such big diamonds.  They're beautiful.
18          THE WITNESS:  Sentimental value.
19  You can't put a price on sentiment.  Try to
20  prove that in court, okay.
21          MR. SWEET:  I will prove what I
22  have to prove, you prove what you have to
23  prove.
24          THE WITNESS:  But an insurance

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

122

1          THE WITNESS:  Yes.  I'm sorry.
2  BY MR. SWEET:
3  Q.      And until that -- until 2003 you
4  never identified the 1933 Double Eagles?
5  A.      No, sir.
6  Q.      Is that your testimony?
7  A.      I swear, yes, sir.
8  Q.      What else was in the box?  Tell
9  me the items.
10  A.      There's still a lot of jewelry in
11  there.
12  Q.      Is everything in the box now that
13  was in the box in 2003?
14  A.      Yes, sir.  There's stuff that has
15  been removed.
16  Q.      Oh, there has been stuff removed?
17  A.      Yes.
18  Q.      How many pieces of jewelry are in
19  that box?
20  A.      I don't know.
21  Q.      Can you give a rough guess?
22  A.      No.
23  Q.      Do you know what was removed from
24  the box?

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

124

1  company, you can't put a -- this is -- when
2  we do apprais -- when people come in that
3  they've lost or whatever, you put a
4  place on sentiment.
5  BY MR. SWEET:
6  Q.      You don't have any sentimental --
7  the 1933 Double Eagles don't have any
8  sentimental value?
9  A.      God, no.
10          MR. BERKE:  Objection.
11  Objection.
12          THE WITNESS:  Objection, but no.
13  BY MR. SWEET:
14  Q.      The answer is no?
15  A.      The answer is no.
16  Q.      Could you give us a rough value
17  for the -- a rough estimate, I should say,
18  could you give us a rough estimate of the
19  value of the jewelry that was in your
20  mother's box --
21  A.      No.
22  Q.      Couldn't do that?
23  A.      Uh-uh.
24          MR. BERKE:  I'm sorry, that's a

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

125

1  no?
2          THE WITNESS:  No.  Sorry.
3          MR. BERKE:  That's okay.
4  BY MR. SWEET:
5  Q.     Ma'am, you spent -- you've spent
6  sixty years selling fine antique jewelry
7  and you know exactly what's in the box.
8  Why can't you give us a rough estimate?
9          MR. BERKE:  I'd object to every
10 question -- everything leading up to why
11 can't you give a rough estimate.
12      MR. SWEET:  Okay.
13          THE WITNESS:  Because I don't
14 know what the value today would be or what
15 the value was then.
16 BY MR. SWEET:
17 Q.     I'm asking about present day
18 value.
19 A.     I don't remember what's in the
20 box.
21 Q.     Do you have an inventory of
22 what's in the box today?
23 A.     No.
24 Q.     Do you know how many pieces are

KAPLAN,  LEAMAN  AND  WOLFE
(800)  295-7571

---

Joan Langbord

126

1  in the box today?
2  A.     No.
3          MR. SWEET:  We'd like to examine
4  the box.
5          THE WITNESS:  I disagree.
6          MR. BERKE:  We can talk about
7  it --
8          MR. SWEET:  I'd like to examine
9  the box.
10         MR. BERKE:  I'd rather talk about
11 it outside of the deposition.  Let's finish
12 the deposition and we can talk about what
13 you want to talk about.
14         MR. SWEET:  And we'd like to --
15 identification of the items that were taken
16 out of the box since 2003.
17         MR. BERKE:  We'll talk about that
18 after the deposition.  Joan, there is no
19 question for you.  Let me just say -- why
20 don't we go off the record.  There's great
21 sentimental value with her mother's
22 jewelry.  We can take a break.
23         - - -
24         (Whereupon a break was taken at

KAPLAN,  LEAMAN  AND  WOLFE
(800)  295-7571

---

Joan Langbord

127

1  2:15 p.m. to 2:17 p.m.)
2          - - -
3  BY MR. SWEET:
4  Q.     Are you ready to proceed?
5  A.     Yeah.
6  Q.     So my --
7          MR. BERKE:  There is nothing to
8  talk about on the record.  If you have
9  questions --
10         MR. SWEET:  We will address it
11 afterwards.
12         MR. BERKE:  We'll talk about it
13 after the deposition.
14 BY MR. SWEET:
15 Q.     The items that you selected to
16 sell out of the box --
17 A.     Uh-huh.
18 Q.     -- what motivated you, at that
19 particular time, to find items in the box
20 that belonged to your mother to sell at the
21 shop?
22 A.     Because I decided I was never
23 going to wear them.
24 Q.     Did you know -- when you went to

KAPLAN,  LEAMAN  AND  WOLFE
(800)  295-7571

---

Joan Langbord

128

1  the box, did you know what you were looking
2  for, that you intended to take out and to
3  sell?
4  A.     Sort of.
5  Q.     What was in your mind?  What were
6  you thinking of at the time that you went
7  to the box about what you were going to
8  take out and try to sell?
9  A.     Well, my mother was a big lady at
10 one time and liked big jewelry.  And she
11 had a big gold bracelet like this with a
12 cameo in it, which she liked that type of
13 jewelry.  And she had a big wrist that was
14 that big and wear it and there was a
15 necklace that went with it.  And she also
16 liked amethyst, which was her birthstone,
17 my father bought her a tremendous
18 collection of, and I knew I was never going
19 to wear.  So that was a couple of the
20 items.  And I know she had a necklace with
21 a bug on it that I was never going to wear.
22 Q.     At that time, when they drilled
23 the holes and got you into the safe deposit
24 box, who was with you?

KAPLAN,  LEAMAN  AND  WOLFE
(800)  295-7571

## Joan Langbord

129

1  A.      Nobody.
2  Q.      You were by yourself?
3  A.      Yes, sir.
4  Q.      Was there a place in the bank for
5  you to sit down?
6  A.      Yes, sir.
7  Q.      Was it a private viewing room?
8  A.      Yes, sir.
9  Q.      Was there a table?
10 A.      It's -- someplace to put the box
11 on.
12 Q.      And describe what happened.
13 A.      Opened the box.
14 Q.      Speak up, please.
15 A.      Opened the box, picked out the
16 jewelry and I don't know why, I went
17 digging down and there was this gray or
18 paper bag that said John Wanamaker on it in
19 the bottom of the box, which I had never
20 gone into the box looking that much. And I
21 picked this thing up and opened them up and
22 there was a piece of tissue paper and then
23 I saw these coins. And I had -- I couldn't
24 even hold them in my hand. And I took them

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

## Joan Langbord

130

1  to the store.
2  Q.      When you say you couldn't hold
3  them in your hand, why not?
4  A.      Because I saw they were the -- I
5  recognized that they were the Double Eagles
6  that they had just been talking so much
7  about.
8  Q.      Were they wrapped in anything?
9  A.      They were each -- it was in a
10 paper Wanamaker bag and there was a piece
11 of tissue paper on top of it.
12 Q.      Were the coins -- each coin, were
13 they wrapped or --
14 A.      I didn't take them all out. I
15 just looked at the top one and just took it
16 away.
17 Q.      And what did you do with them at
18 that point?
19 A.      I brought them to the store and
20 called my husband.
21 Q.      Okay. Let's stop the story for a
22 moment. The eight to twelve times,
23 approximately, that you went into that Safe
24 Deposit Box 442, before that day, is it

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

## Joan Langbord

131

1  your testimony that you never noticed a
2  bag?
3  A.      Yes, sir. Yes, sir.
4  Q.      Could you describe the box?
5  Shape, size?
6  A.      About that big and about that
7  high.
8  Q.      You go to talk. If you could do
9  inches or feet?
10 A.      I don't know, sir. But it's --
11 say that -- whatever the standard size is
12 and it's about that high.
13 Q.      So was it a long box, meaning,
14 the shape of it, was it more of a square or
15 more of a rectangle?
16 A.      I think it's the normal box. Is
17 like whatever they have in the bank.
18     MR. BERKE: The question is, how
19 far -- how long is the depth?
20     THE WITNESS: The norm. Maybe
21 that depth. I -- you know, when they take
22 it out, maybe it's about this depth.
23 BY MR. SWEET:
24 Q.      About a foot, a little more than

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

## Joan Langbord

132

1  a foot long?
2  A.      That's what it is. I don't know.
3  Q.      Do you know how wide and how
4  deep?
5  A.      It's about this wide and about
6  that deep.
7  Q.      Can you give us in inches?
8  A.      Really, I can't.
9  Q.      Do you need a ruler?
10 A.      I still couldn't --
11     MR. BERKE: It's an estimate. If
12 we need to obtain the information about the
13 size of the box, we can do that.
14     MR. SWEET: Okay. Well, we'll
15 take a look at that when we look at the
16 box.
17     MR. BERKE: And just so the
18 record is clear. We're not agreeing that
19 you can look at the box. We're agreeing
20 we're going to talk about that request
21 after the deposition.
22     MR. SWEET: Okay.
23 BY MR. SWEET:
24 Q.      So until that time you had never

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

137

1   time. I don't remember --
2   Q.      The first time -- do you recall
3   the first time you went to the box after
4   your mother died?
5   A.      No, I don't.
6   Q.      Do you recall any other items,
7   other than the items you described a few
8   moments ago, that you took out of the box?
9          The bracelet and the pin you took
10  out of the box in August 2003, do you
11  remember other items you've taken out of
12  that box?
13  A.      I may have.
14  Q.      Well, ma'am, if you went into the
15  box eight to twelve times, why were you
16  going in the box?
17  A.      To look -- just for sentimental
18  reasons. Just for -- to remember my
19  mother.
20  Q.      Did you go into the box with
21  George, that particular box?
22  A.      I don't remember.
23  Q.      Did you ever have a
24  representative of the Pennsylvania

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

138

1   Department of Revenue with you when you
2   opened that box?
3   A.      No, sir.
4   Q.      Have you ever attempted to sell
5   any Double Eagle coin?
6   A.      No, sir.
7          MR. BERKE: Okay. Now, you're
8   asking for a Double Eagle, not a 1933
9   Double Eagle. Is that what you mean?
10         MR. SWEET: Yeah. That's
11  correct.
12         MR. BERKE: Okay. Do you
13  understand the distinction?
14         THE WITNESS: Yes, I heard him.
15  I heard him. Not to my knowledge.
16  BY MR. SWEET:
17  Q.      Not to your knowledge, meaning,
18  that you may have or --
19  A.      I don't know. I can't answer it
20  truthfully. I don't know. It's the truth,
21  I don't know.
22  Q.      Did you ever have a discussion
23  with your mother where she mentioned that
24  there were coins in that box?

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

139

1   A.      No.
2   Q.      Do you have any reason to believe
3   that your mother knew there were coins in
4   that box?
5          MR. BERKE: Objection to the form
6   of the question.
7   BY MR. SWEET:
8   Q.      Do you have any reason to believe
9   that your mother knew that there were coins
10  in that box?
11         MR. BERKE: I'd object again to
12  the form of the question. You may answer.
13         THE WITNESS: I can answer it. I
14  don't know. It was never discussed -- they
15  never discussed these things with me or she
16  never -- my mother was a very closed mouth,
17  docile woman, okay, who never --
18         MR. BERKE: Listen to the
19  question.
20         THE WITNESS: Okay.
21  BY MR. SWEET:
22  Q.      Did your father ever tell you how
23  much he paid for any coin?
24  A.      No, sir.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

140

1   Q.      Did your father ever discuss gold
2   coins with you, generally?
3   A.      No.
4   Q.      And he never discussed 1933's
5   with you?
6   A.      No, sir.
7   Q.      Did your father ever tell you
8   that there was -- that there were coins in
9   Box 442?
10  A.      No.
11  Q.      What's your understanding of how
12  those 1933 Double Eagles came to be in Box
13  442?
14         MR. BERKE: I'd object to the
15  form of the question.
16         MR. SWEET: What's the
17  objection?
18         MR. BERKE: What's her
19  understanding. I think she's already said
20  she has no direct knowledge of how the
21  coins came into possession --
22         MR. SWEET: That's your
23  objection?
24         MR. BERKE: Yes.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

141

1  BY MR. SWEET:
2  Q.      What's your understanding of how
3  the Double Eagles -- the 1933 Double
4  Eagles, ten of them, came to be put into
5  Box 442?
6       MR. BERKE: I'd object.
7       THE WITNESS: I don't know. I
8  can't answer that.
9  BY MR. SWEET:
10  Q.  Anybody else besides you and Roy
11  ever go into that box?
12  A.    No, sir.
13  Q.    What about David?
14       MR. BERKE: And you're excluding
15  her mother? You're talking about since her
16  mother died or?
17       THE WITNESS: Since my mother
18  died.
19  BY MR. SWEET:
20  Q.      Let's identify all the people who
21  have ever had access to Box 442.
22  A.    My mother.
23  Q.    Your mother, you, and Roy?
24  A.    (witness shakes head.) Well, Roy

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

143

1  pointing out that one of the answers may
2  not have been clear.
3       MR. BERKE: I appreciate you
4  thanking me.
5       MR. SWEET: Very thoughtful.
6  BY MR. SWEET:
7  Q.    Ms. Langbord, I'm going to ask
8  you a question one more time because we
9  didn't get a clear answer.
10       Is there anybody, other than you,
11  your mother, and your son Roy, who had
12  access, at any time, to Box 442?
13  A.    No.
14       MR. BERKE: And I would just
15  clarify that Ms. Langbord did state that
16  she didn't believe that Roy Langbord had a
17  key to the box.
18       MR. SWEET: That's all in the
19  testimony.
20       MR. BERKE: I understand.
21  BY MR. SWEET:
22  Q.    At any time in your life, did you
23  ever go to the Federal Reserve Bank with
24  your father?

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

142

1  doesn't have -- even have the key.
2  Q.    Who has the key?
3  A.    I do.
4  Q.    And you've always maintained the
5  key?
6  A.    Yes, sir.
7  Q.    After your mother died you
8  maintain it?
9  A.    Yes, sir.
10  Q.    Do you know where your mother
11  kept the key?
12  A.    She had them in a little purse.
13       MR. BERKE: If I can just go back
14  on the record. At one point you asked,
15  other than your mother and you -- you asked
16  the question about who had the key. And
17  Ms. Langbord shook her head, but did never
18  verbally -- yes?
19       THE WITNESS: Yes. I'm sorry.
20       MR. BERKE: I don't want you to
21  need anything on the record for that.
22       MR. SWEET: I will go back.
23  BY MR. BERKE:
24  Q.    I want to thank you, Barry, for

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

144

1  A.    You mean the Mint?
2  Q.    No, the Federal Reserve.
3  A.    What's the difference?
4  Q.    Is there a difference, in your
5  mind, the Mint and the Federal Reserve?
6  A.    No.
7  Q.    Okay. Did you ever go to the
8  Mint with your father?
9  A.    Yes.
10  Q.    How many times did you go to the
11  Mint with your father?
12  A.    I don't know. I was three, four
13  years old, five years old.
14  Q.    Did you go to the Mint with him
15  after you were four or five years old?
16  A.    To visit the Mint, a lot of times
17  to visit the Mint.
18  Q.    To do business at the Mint?
19  A.    Not that I remember.
20  Q.    So only when you were three or
21  four years old?
22  A.    Yes, when I was little and he
23  used to sell -- used to go there to sell
24  gold or whatever and he gave me coins.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Joan Langbord

173

1    MR. SWEET: Barry, I'm trying to
2  get through today. I have a lot of
3  questions about a lot of documents.
4    MR. BERKE: I understand. Joan,
5  do you want to take a five minute break?
6    THE WITNESS: No, let's go.
7  BY MR. SWEET:
8  Q.    Ma'am, I'm going to refer you
9  back to this --
10  A.    Sir, let me say this to you.
11  There's so much of my life that you're
12  asking me that I don't know about. And
13  it's really very upsetting to me that I was
14  never really involved with any of this
15  stuff. I wish I could answer you better.
16  Q.    I appreciate that. I can
17  appreciate that it's difficult for you to
18  go through this?
19  A.    That my life was never included.
20    MR. BERKE: Wait for the
21  question.
22    MR. SWEET: Ma'am, I understand
23  you.
24    MR. BERKE: Let's -- I'd like to

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Joan Langbord

174

1  take a two minute break.
2    THE WITNESS: There's so much of
3  my life that I don't know.
4        - - -
5    (Whereupon a short break was
6  taken.)
7        - - -
8  BY MR. SWEET:
9  Q.    Ma'am, going back to the
10  affidavit that's Langbord-4.
11  A.    Right.
12  Q.    Do you know whether your father
13  knew Ralph Rolland?
14  A.    No.
15  Q.    Do you know if your father knew
16  George McCann?
17  A.    No.
18  Q.    Did you ever hear about George
19  McCann or anything of him or about him,
20  other than through your lawyer?
21  A.    No, sir.
22  Q.    Do you know your father to have
23  purchased any gold coins from the Mint,
24  other than commemorative coins from one

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Joan Langbord

175

1  cent to fifty cents or purchases of
2  pennies, nickels and dimes in 100 lots --
3    MR. BERKE: I'd object to the
4  form of the question.
5    THE WITNESS: I can't answer it
6  because I don't know. I don't know.
7  BY MR. SWEET:
8  Q.    So the answer is you don't know?
9  A.    I don't know.
10    MR. BERKE: Objection.
11  Objection. She answered she doesn't know.
12  Is the answer you don't know one way or the
13  other?
14    THE WITNESS: No, I don't know
15  which way or one way or the another, I
16  don't know anything.
17  BY MR. SWEET:
18  Q.    That's fine. That's an answer.
19  A.    Okay.
20  Q.    That's what I'm looking for.
21  A.    All right.
22  Q.    Do you know whether your father
23  ever had any conversations about gold coins
24  with anybody at the United States Mint in

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Joan Langbord

176

1  Philadelphia?
2  A.    No, sir.
3    MR. BERKE: Object to the form of
4  the question.
5    THE WITNESS: No, sir. No, sir,
6  I don't know either way.
7  BY MR. SWEET:
8  Q.    Thank you. Do you know whether
9  your father obtained any gold coins through
10  any employees at the United States Mint?
11  A.    I do not --
12    MR. BERKE: Object to the form of
13  the question.
14    THE WITNESS: I do not know
15  either way.
16  BY MR. SWEET:
17  Q.    Do you know whether in 1944 your
18  father had in his possession, or under his
19  control, any 1933 Double Eagles?
20    MR. BERKE: Object to the
21  question.
22    THE WITNESS: I do not know
23  either way, sir. I don't know who these
24  people are.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

## Joan Langbord

213

1  Government and the lawyers discussed the
2  coins? Did you have any discussions with
3  anyone about that, other than your counsel
4  or --
5        THE WITNESS: Roy and David and
6  Stanton.
7        MR. BERKE: In your discussions
8  with Roy, David and Stanton, did you have
9  any discussions with them other than about
10 the legal advice and legal discussions you
11 had with counsel?
12       THE WITNESS: No.
13 BY MR. SWEET:
14 Q.     Ma'am, you've said repeatedly
15 that you turned them over for
16 authentication?
17 A.     That's -- my -- my --
18 Q.     It's your understanding that you
19 turned them over for authentication
20 purposes only. What's the basis of that
21 understanding?
22       MR. BERKE: And I would object at
23 this point and I direct the witness not to
24 answer because at this point we've -- her

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

## Joan Langbord

214

1  understanding of what happened and the
2  coins occurred through counsel, we've
3  already discussed that, or questions with
4  her.
5  BY MR. SWEET:
6  Q.     Okay. So it's through counsel?
7  A.     Yes, sir.
8  Q.     Do you have any independent
9  knowledge, anything -- any communication in
10 which you were involved directly with
11 anybody, an agent or anyone from the
12 Government --
13 A.     No, sir.
14 Q.     -- concerning any limitations as
15 to the surrender and -- or conditions as --
16 on the surrender of the coins?
17       MR. BERKE: I'd object to the
18 form of the question.
19       THE WITNESS: I don't
20 understand. I don't understand.
21       MR. BERKE: I think you have the
22 answer.
23 BY MR. SWEET:
24 Q.     Did you ever discuss with your

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

## Joan Langbord

215

1  sons, Roy or David, whether they personally
2  had an ownership interest in the 1933
3  Double Eagles?
4        MR. BERKE: Again, objection.
5        THE WITNESS: What are you -- I
6  don't understand what you said to me, sir.
7  BY MR. SWEET:
8  Q.     Did you ever have a discussion --
9  A.     Go ahead.
10 Q.     -- with Roy and/or David --
11 A.     Right.
12 Q.     -- about whether they personally
13 have an ownership interest in the 1933
14 Double Eagles?
15 A.     Well, they're my children. I
16 don't...
17       MR. BERKE: You can answer the
18 question.
19       THE WITNESS: Well, that's the
20 only way I can answer the question. It's
21 -- I found them, which would mean they
22 would be mine. And what's mine is my
23 childrens.
24 BY MR. SWEET:

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

## Joan Langbord

216

1  Q.     Is that your view, that as a
2  matter -- is that your view that whatever
3  belongs to you belongs to your children?
4  A.     Yes, sir.
5  Q.     Is that the same opinion with
6  respect to whatever your father had?
7  A.     Whatever my father had belonged
8  to me.
9  Q.     And is that -- that's how you
10 perceive it?
11 A.     Yes, sir, that's the way it was.
12 My father always said whatever was his was
13 mine.
14 Q.     Your father said that?
15 A.     Yes.
16 Q.     Okay. Did you ever have -- did
17 you ever consult with an estate's attorney
18 over that issue?
19       MR. BERKE: Objection to the form
20 of the question.
21       THE WITNESS: The will said --
22 his will said it went to me.
23 BY MR. SWEET:
24 Q.     Did you ever discuss, ma'am --

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

217

1   well, I'm not going to ask you.
2       Did you have a lawyer handling
3   the estate of your father?
4   A.      Yes, sir.
5   Q.      Who was that?
6   A.      There were many of them.  One was
7   an idiot.  I think we used the -- I
8   remember a Laventhal.  I know -- I think it
9   was --
10  Q.      Let's stop, ma'am.  Think about
11  that.
12      MR. SWEET:  We're going to take a
13  break for Barry's benefit.  It is now 3:27
14  and we'll come back and you can finish your
15  answer.
16          - - -
17      (Whereupon a break was taken at
18  3:27 p.m. to 4:31 p.m.)
19          - - -
20  BY MR. SWEET:
21  Q.      Ma'am, let me go back.  We were
22  discussing last about the period of time
23  after you determined that the Double Eagles
24  were in the safe deposit box until the time

Joan Langbord

219

1   A.      Right.
2   Q.      -- do you recall any such
3   discussions?
4   A.      We may have had -- I do, but I
5   cannot discuss -- I don't understand -- I
6   don't remember them, okay.
7   Q.      Going back to how you came --
8   let's go back -- here's a ruler.
9   A.      Right.
10  Q.      I'd like you to use the ruler and
11  to try, again, to give me the dimensions of
12  the Safe Deposit Box 442.
13      MR. BERKE:  If you believe you
14  can.
15  BY MR. SWEET:
16  Q.      To the best you can, ma'am.
17  A.      This wide.  Is it this wide?
18  Q.      So you're indicating,
19  approximately, fourteen inches long?
20  A.      I guess so.
21  Q.      Okay.  How wide was it?
22  A.      I guess it's like that.
23  Q.      If you could -- are you
24  indicating -- I can't see what you're

Joan Langbord

218

1   that they were turned over -- transferred
2   to the Government's control.
3       During that period, as I
4   understand it, you talked to Stanton, Roy,
5   George, and your lawyer?
6   A.      Right.
7   Q.      Correct?
8       MR. BERKE:  And I would object to
9   the form of the question.  You can answer.
10      MR. SWEET:  What's that
11  objection?
12      MR. BERKE:  Your description of
13  what happened to the coins.  Turned over --
14  I think you said turned over control.  I
15  disagree with your characterization.
16      MR. SWEET:  Okay.  I'm trying to
17  move it ahead here.
18      MR. BERKE:  I understand.
19  BY MR. SWEET:
20  Q.      The discussions you had with
21  Stanton and with Roy --
22  A.      Right.
23  Q.      -- where the three of you were
24  together --

Joan Langbord

220

1   indicating.
2   A.      Like, from here to here.
3   Q.      Okay.  Approximately, a foot?
4   A.      I guess so.
5   Q.      In the other dimension?
6   A.      About that high.
7   Q.      And when you say that high, we're
8   talking about six inches high?
9   A.      I guess so.
10  Q.      Okay.  So it's about fourteen
11  inches by twelve inches by six inches?
12  A.      Right.
13  Q.      Okay.  Thank you.
14  A.      I think.
15      MR. BERKE:  And just let the
16  record reflect, I don't know if you picked
17  up that while Ms. Langbord was doing it.
18  She was indicating with some uncertainty
19  about her estimates.
20      THE WITNESS:  I don't -- I
21  really...
22      MR. BERKE:  Go ahead.
23      THE WITNESS:  I really don't --
24  you know, I never really looked at the size

Joan Langbord

221

1  of the height, you know, just...
2  BY MR. SWEET:
3  Q.    Okay. Ma'am, I just have to go
4  back for a second.
5        You described the items that you
6  took out of that box --
7  A.    Uh-huh.
8  Q.    -- in 2003. 2003 or 2002?
9  A.    Three.
10  Q.    2003?
11       MR. BERKE: 2003.
12  BY MR. SWEET:
13  Q.    And then you described that
14  there's still a lot of stuff in the box?
15  A.    Yes, sir.
16  Q.    And have you taken stuff out of
17  the box since 2003 until now?
18  A.    I think so.
19  Q.    Could you describe what you've
20  taken out?
21  A.    No.
22  Q.    Could you estimate how many
23  pieces you took out?
24  A.    No, uh-uh.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

222

1  Q.    You don't know?
2  A.    Uh-uh.
3  Q.    Or you won't?
4  A.    No, I can't. I don't remember.
5  I don't know.
6  Q.    Do you know how many pieces you
7  took out from the box, approximately, prior
8  to 2003?
9  A.    No.
10  Q.    You don't know?
11  A.    No.
12  Q.    Is the box halfway filled now?
13  A.    I don't remember.
14  Q.    I'd like to go over some
15  documents that your lawyer turned over to
16  us. These are documents relating to your
17  mother's estate.
18       Ma'am, did you have any role in
19  administrating your mother's estate?
20  A.    No, sir.
21  Q.    She died in 1985, correct?
22  A.    I guess so.
23  Q.    Who was responsible for the
24  administration of your mother's estate?

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

223

1  A.    My father. I don't know what
2  lawyer was at the time.
3  Q.    Were you involved in creating an
4  inventory of your mother's possessions?
5  A.    No, I wasn't. I was not involved
6  in any of this, sir.
7  Q.    If you go through here, ma'am,
8  and take a look as closely as you can and
9  tell us whether you see identified in these
10  pages any of your mother's jewelry.
11  A.    She had given it to me, told me
12  it was all mine before. She had told me
13  everything was mine.
14  Q.    When did she tell you that?
15  A.    Years before.
16  Q.    Do you know how many years
17  before?
18  A.    No, sir.
19  Q.    Do you remember the conversation?
20  A.    I don't remember what year she
21  died.
22  Q.    Do you remember the conversation
23  in which she told you that --
24  A.    Yes, she told me whatever was in

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

224

1  her safe deposit boxes was mine.
2        MR. BERKE: And I'd object to
3  characterizing of conversations I thought
4  her testimony was it was more than one
5  conversation. You can clarify.
6  BY MR. SWEET:
7  Q.    Did she give it to you at that
8  time or did she tell you it was yours -- it
9  would be yours after she passed?
10  A.    She told me it was mine.
11  Q.    Do you know whether any gift
12  taxes were paid on any of that jewelry?
13  A.    No, she told me they were mine.
14  Q.    But you don't know whether gift
15  taxes were paid?
16  A.    I don't believe -- I don't know,
17  sir.
18  Q.    Do you know that -- when she told
19  you that, did you know what was in the box?
20  A.    Not really.
21  Q.    Did you have a good -- did you
22  have some idea?
23  A.    I had some idea of the jewelry
24  that she used to wear, yes.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

225

1  Q.    When she told you that it was all
2  yours, did you go to the box to look at
3  it --
4  A.    No.
5  Q.    -- since it was now all yours?
6  A.    No, uh-uh.
7  Q.    Why not?
8  A.    Why didn't I -- I just didn't
9  feel I was going to need it and I wasn't
10  going to use it and I was -- hers and it
11  was -- just one day maybe I would, maybe I
12  wouldn't.
13  Q.    Was it hers or was it yours?
14  A.    It was hers that she gave to
15  mine, to me.
16  Q.    And do you know how many years
17  prior to her death that occurred?
18  A.    No, sir.  I don't remember.
19  Q.    Was any of that jewelry -- take a
20  minute.  You're going through a document.  I
21  don't want to distract you.
22  A.    I'm listening.
23  Q.    I'm going to let you take your
24  time.  Let me know if you see any of her

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

226

1  jewelry identified in that -- in those
2  estate papers.
3  A.    No. No.
4  Q.    Okay.  So it's your testimony,
5  tell me if I got it wrong.
6        It's your testimony that there
7  was a safe deposit box identified as 442
8  and it was registered to you and to Roy and
9  somebody put your mother's jewelry into it,
10  but you don't know who, correct?
11  A.    I presume my mother.
12  Q.    And you didn't have a key to that
13  safe deposit box until she passed, correct?
14        MR. BERKE:  Objection.
15        THE WITNESS:  I knew where the
16  keys were and I was told -- I knew where
17  the keys were, okay.  But I was never
18  invited to go to the box.
19  BY MR. SWEET:
20  Q.    Even though it was your jewelry,
21  correct?
22  A.    That it was given to me, yes.
23  Q.    During the period after your
24  mother gave you the jewelry, was any of

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

227

1  that jewelry worn?
2  A.    Did I wear any of it?
3  Q.    Did anybody wear any of it?
4  A.    No.
5  Q.    So you didn't either?
6  A.    No.
7        MR. BERKE:  Can -- I'm sorry,
8  what period of time?
9  BY MR. SWEET:
10  Q.    From the time that your mother
11  told you the jewelry was yours?
12        MR. BERKE:  Before she passed,
13  I'm sorry.
14  BY MR. SWEET:
15  Q.    Until she passed.
16  A.    No. No.
17  Q.    How many -- how much time was
18  there between the time that she gave you
19  all that jewelry and the time that she
20  passed away?
21  A.    I don't remember how many years.
22  Q.    It was in the years, right?
23  A.    It was in years.
24  Q.    Was it more likely five years or

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

228

1  more likely two years?
2  A.    It was more likely five years.
3  Q.    Could it have been more than five
4  years?
5  A.    I don't know.  I don't remember,
6  sir.
7        MR. BERKE:  I'm sorry, you can
8  clarify your answer.
9        THE WITNESS:  I said I don't
10  remember.
11        MR. BERKE:  You don't remember
12  the specific amount of time?
13        THE WITNESS:  I don't remember
14  the time.  I don't remember -- here, I
15  didn't know -- I don't remember when my
16  mother died.
17        MR. BERKE:  I just want a clear
18  record.  Are you saying you don't recall
19  the amount of time that passed between the
20  time she said she was giving you the
21  property and the time she died?
22        THE WITNESS:  Yes, that's what I
23  was saying.
24  BY MR. SWEET:

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

273

1  BY MR. SWEET:
2  Q.    Let's go to Paragraph 43.  Do you
3  have any firsthand independent knowledge
4  concerning the allegations in Paragraph 43?
5  A.    Says that they seized them.
6        MR. BERKE:  Let me -- I object
7  and I think it's harassing to ask the
8  witness about events in the forties
9  involving the Government.
10       MR. SWEET:  That's fine.
11 BY MR. SWEET:
12 Q.    Do you have any firsthand
13 personal knowledge?  It's an easy answer.
14 A.    Can't answer.
15 Q.    You do or you do, or you don't,
16 you don't.
17 A.    Can't answer.  I don't know.
18 Q.    Let's turn to Paragraph 58.
19 Ma'am, what's the basis of the last --
20       MR. BERKE:  Can she have an
21 opportunity to read it?
22 BY MR. SWEET:
23 Q.    I'll ask the question and then
24 you can read it.

Joan Langbord

275

1  Eagles that are at issue in this case
2  during the 1930's?
3        MR. BERKE:  I object to the form
4  of the question and I object to the extent
5  it calls for any attorney-client
6  communications --
7        THE WITNESS:  I don't know.
8  BY MR. SWEET:
9  Q.    You don't know?
10 A.    I don't know.
11 Q.    And we've established that you
12 don't know how he came into possession of
13 those 1933 Double Eagles --
14       MR. BERKE:  Objection.  Asked and
15 answered.
16       THE WITNESS:  I don't know.
17 BY MR. SWEET:
18 Q.    In Paragraph 59 -- ma'am, did you
19 review this complaint before it was filed
20 in Federal Court?
21       MR. BERKE:  I'd -- I'd object to
22 any questions regarding communications with
23 counsel.
24 BY MR. SWEET:

Joan Langbord

274

1  A.    Go ahead.
2  Q.    What's the basis of your
3  allegation formed in the last sentence of
4  Paragraph 58?
5        MR. BERKE:  I object, to the
6  extent it calls for attorney-client
7  communications.  And I'd ask Ms. Langbord
8  to answer this without referring to any
9  information obtained through
10 attorney-client communications.
11       THE WITNESS:  Says that the
12 family had discovered and owned the 1933
13 Double Eagle.
14 BY MR. SWEET:
15 Q.    What's the basis of that
16 allegation?
17       MR. BERKE:  Which?  Can you be
18 more specific?
19 BY MR. SWEET:
20 Q.    The last sentence of Paragraph
21 58.  Let's break it down.
22       During this period of time, is
23 referring to the 1930's, how do you know
24 that your father obtained the 1933 Double

Joan Langbord

276

1  Q.    Did you review the complaint
2  before it was filed in Federal Court?
3        MR. BERKE:  I'd object.  You are
4  asking her to disclose her communications
5  with counsel.
6        MR. SWEET:  No, I'm not.  I'm
7  asking her if she reviewed the complaint
8  before it was filed.
9        MR. BERKE:  I object to the form
10 of the question.
11       MR. SWEET:  What's your
12 objection?
13       MR. BERKE:  Whether or not she
14 knows the contents of this complaint has to
15 do with communications she's had with
16 counsel.
17       MR. SWEET:  Barry, I'm asking her
18 whether she read a document before it was
19 filed.  I've heard that asked in hundreds
20 of depositions.  I'm -- I think --
21       MR. BERKE:  Your question is
22 solely whether she was --
23       MR. SWEET:  -- it's demonstrating
24 the depth of your objections and the fact

---

Joan Langbord

277

1 that they're frivolous.
2      MR. BERKE: Oh, stop.
3      MR. SWEET: I'm asking her
4 whether she has reviewed -- she reviewed
5 the complaint before it was filed in
6 Federal Court?
7      MR. BERKE: The answer can be
8 answered just yes or no.
9      THE WITNESS: My answer is no.
10 My son and my husband did it. I left it up
11 to them --
12      MR. BERKE: Just answer the
13 question.
14      THE WITNESS: Okay. Well, can't
15 I tell him?
16      MR. BERKE: No, you can't. And
17 you can't talk about any discussions you
18 had with counsel.
19      THE WITNESS: Okay.
20      MR. SWEET: Unless she waives her
21 privilege.
22      MR. BERKE: She's not doing it.
23      MR. SWEET: She may want to.
24 She's an independent woman.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Joan Langbord

278

1      THE WITNESS: Right now I don't
2 know what I am.
3      MR. BERKE: Please -- and again,
4 I object and I object to -- I believe
5 there's so much of this deposition that is
6 harassing my client, including encouraging
7 her to -- you know, my client at
8 seventy-seven years old to waive a
9 privilege by speaking directly to the
10 client. I object. And I think it's
11 totally improper and you know it. You've
12 been asking questions now --
13 BY MR. SWEET:
14 Q.      Ma'am, Paragraph 59. Paragraph
15 59 says, "All the property of Mr. Switt,
16 who died in 1990, and his wife, Elizabeth
17 Switt, who died in April of 1985, was
18 passed to Roy, David, Joan -- and Joan
19 Langbord including the contents of a number
20 of family safe deposit boxes."
21      Do you contend that the property
22 that quote, was passed, end quote, went
23 through the administration, the estate
24 administration process?

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Joan Langbord

279

1      MR. BERKE: I object. This
2 question has been asked and answered --
3      THE WITNESS: I don't know.
4      MR. BERKE: -- countless times and
5 Ms. Langbord has provided a full detail
6 accounting of what happened.
7      THE WITNESS: I don't know.
8 BY MR. SWEET:
9 Q.      Ma'am, in Paragraph 61. The
10 third line -- starting in the second line.
11 It says, "That the family had discovered
12 that it owned and possessed these ten 1933
13 Double Eagle gold coins." Do you see that
14 sentence?
15 A.      Yes, sir.
16 Q.      There are two words there and I
17 want to know if they mean anything
18 differently -- if you can distinguish them
19 in your own mind. Owned versus possessed.
20      Do you know what possessed
21 means? What does possessed mean to you?
22      MR. BERKE: I object to the form
23 of the question.
24      THE WITNESS: What does possessed

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

---

Joan Langbord

280

1 mean? That I own them.
2 BY MR. SWEET:
3 Q.      Are both of those words the same
4 to you?
5      MR. BERKE: Objection. Calls for
6 legal conclusion and it is improper.
7      THE WITNESS: I don't know.
8 BY MR. SWEET:
9 Q.      Could you distinguish owning
10 something from possessing something?
11      MR. BERKE: Objection. It's
12 improper.
13      THE WITNESS: Well, I possess my
14 husband and my children. That's my --
15      MR. BERKE: I object. I direct
16 you not to answer. It's an improper
17 question. I direct her not to answer.
18 It's harassing now. I direct her not to
19 answer. Don't answer, Joan. It's
20 harassing and is improper.
21 BY MR. SWEET:
22 Q.      Ma'am, if there's a piece of
23 merchandise --
24      MR. BERKE: Objection. I'm

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

# EXHIBIT D

Harry Forman



1                UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2
3

ROY LANGBORD, DAVID          : CIVIL ACTION
4  LANGBORD, AND JOAN          :
   LANGBORD                    :
5                              :
       -vs-                    :
6                              :
UNITED STATES                  :
7  DEPARTMENT OF THE           :
   TREASURY; UNITED            :
8  STATES BUREAU OF THE        :
   MINT; HENRY M.              :
9  PAULSON, JR.,               :
   SECRETARY OF THE            :
10 UNITED STATES               :
   DEPARTMENT OF THE           :
11 TREASURY; STEPHEN           :
   LARSON, ACTING              :
12 GENERAL COUNSEL OF          :
   THE UNITED STATES           :
13 DEPARTMENT OF THE           :
   TREASURY; EDMUND C.         :
14 MOY, DIRECTOR OF THE        :
   UNITED STATES MINT;         :
15 DANIEL P. SHAVER,           :
   CHIEF COUNSEL,              :
16 UNITED STATES MINT;         :
   DAVID A. LEBRYK,            :
17 DEPUTY DIRECTOR OF          :
   THE UNITED STATES           :
18 MINT; AND THE UNITED        :
   STATES OF AMERICA           : No.  06-5315
19
                        -    -    -
20               Philadelphia, Pennsylvania
                 Friday, March 30, 2007
21                      -    -    -
22
     Pretrial examination of HARRY FORMAN, held at
23 the law offices of the United States Attorney's
   Office, 615 Chestnut Street, Suite 1250, on the
24 above date, commencing at 11:08 a.m., before Donna
   M. Bittner, Certified Professional Reporter.
25

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Harry Forman

13

| | |
|---|---|
| 1 | MR. BERKE:  I'm sorry, I'm just going |
| 2 | to object and move to strike as nonresponsive. |
| 3 | Excuse me for interrupting. |
| 4 | BY MS. ROMERO: |
| 5 | Q.          You can continue.  Why don't you tell |
| 6 | me, you knew years before of an incident where he |
| 7 | was did you say arrested? |
| 8 | MR. BERKE:  And I object to the |
| 9 | question. |
| 10 | THE WITNESS:  What was that again? |
| 11 | BY MS. ROMERO: |
| 12 | Q.          What did you know about Mr. Switt's |
| 13 | previous dealings with coins -- |
| 14 | A.          Well, I had heard -- |
| 15 | MR. BERKE:  I'm sorry, Mr. Forman, I |
| 16 | object to the question. |
| 17 | THE WITNESS:  I didn't know for sure, |
| 18 | but I had heard that he had been involved with the |
| 19 | '33 20s before I became a coin dealer.  But I |
| 20 | never questioned him about it and never discussed |
| 21 | it with him.  And I eventually became a bigger and |
| 22 | bigger dealer.  And one day he said to me, do you |
| 23 | have a customer for a 1933 20 outside of the |
| 24 | country?  He says I think I know where I can get |
| 25 | you one. |

Harry Forman

1    BY MS. ROMERO:

2    Q.            Let me pause for one moment.  Did you

3    have a conversation with Mr. Switt about 1933

4    Double Eagles?

5    A.            Yes.

6    Q.            Okay.  When roughly did that

7    conversation occur?

8    A.            I would say sometime in the early

9    1970's.

10   Q.            Okay.  How did the conversation

11   happen?  Did he approach you?  Did you approach

12   him?  Was it on the phone?  Explain the

13   circumstances.

14   A.            No, it was in his office.  He

15   happened to know that I was becoming a bigger

16   and bigger coin dealer.  And he asked me point

17   blank, do you have, do you think you could sell

18   a 1933 20.

19   Q.            Did he tell you that had a 1933 20?

20   A.            No, he mentioned he didn't have one

21   but he knew where he could get one.

22   Q.            Okay.  What did you respond to him in

23   terms of your ability to sell a 1933 20?

24   A.            Well, I said I'm not really

25   interested, because I know that the government

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Harry Forman

15

```
 1    is confiscating '33 20s and melting them down.
 2    Q.          Did he say to you that he owned --
 3    A.          No, he didn't say he owned any.  He
 4    said he knew where he could get one.
 5    Q.          Okay.
 6    A.          He thought he knew where he could
 7    get one.
 8    Q.          Did he tell you where he thought he
 9    could get one?
10    A.          No.
11    Q.          Okay.  Did he mention anything about
12    striking a deal of any sort with the 1933 Double
13    Eagles?
14    A.          No.  I never even got a price from
15    him.  I told him I'd let him know if I was
16    interested.  And then I mentioned this fact to
17    a very famous rare coin dealer by the name of
18    John J. Ford.  I says I think Switt offered me
19    a 1933 20.  And John Ford's reply was you don't
20    want to be bothered with it.  The coin is
21    subject to seizure.  Stay away from it.
22               MR. BERKE:  And I'd object and move to
23    strike the response.
24    BY MS. ROMERO:
25    Q.          Did you ever talk to Mr. Switt about
```

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

## Harry Forman

16

1    your conversation with Mr. Ford?

2    A.        No.

3    Q.        Was did Mr. Switt ever mention to you

4    doing the deal for the 1933 20 overseas?

5    A.        Yes.  He said he would sell it only

6    to a customer that I had overseas.

7    Q.        Okay.  So he --

8    A.        He didn't want me to sell it to

9    anybody in the Continental United States.

10    Q.        Okay.  And I want to get back to the

11    conversation with Mr. Ford.  Did you contact Mr.

12    Ford?

13    A.        Yes.

14    Q.        And what did you tell Mr. Ford?

15    A.        I told him that Israel Switt, he

16    knew of Isreal Switt, he had probably done

17    business with him years before, had approached

18    me about a '33 20.

19    Q.        And what --

20    A.        And I --

21    Q.        Go on.

22    A.        And I told him I would let him know

23    if I was interested.  And Ford's reply was

24    don't get involved.  The coin is subject to

25    seizure.  You don't want to be involved with

## Harry Forman

17

1   that.

2                   MR. BERKE:  And I --

3                   THE WITNESS:  So I came back and told

4   this to Switt that I didn't want to be involved.

5   And Switt's reply was why, the coins are legit.  I

6   got them legitimately from the Federal Reserve.  I

7   traded 1931 20s for 1933 20s.

8                   Now I knew that Switt was never

9   prosecuted for selling '33 20s.  And I later found

10  out that every '33 20 that the government seized

11  had a pedigree going back to Switt.  And I

12  actually was, didn't want to get involved because

13  I didn't think that the deal was, how should we

14  say, kosher.

15  BY MS. ROMERO:

16  Q.              When you say it wasn't kosher, what do

17  you mean by that?

18                  MR. BERKE:  Object.  I'd object to the

19  question.

20                  THE WITNESS:  What I meant by that is

21  the coin was subject to seizure by the government.

22  BY MS. ROMERO:

23  Q.              Okay.

24  A.              And I valued my reputation.  And I

25  didn't want to get involved in any deal where I

## Harry Forman

18

1    could besmirch my reputation.

2    Q.          Did you ever discuss with Mr. Switt

3    this concept that the coin was subject to seizure?

4    A.          Yes.  And his reply was he got them

5    legitimately from the Federal Reserve.

6                Now I distinctly remember that he

7    told me he got them from the Federal Reserve,

8    and yet, when a book was written, supposedly

9    the coins never went to the Federal Reserve.

10   That they were gotten out of the U.S. Mint.

11   And of course what he told me made sense.  He

12   gave him '31 20s for '33 20s, that's like

13   trading apples for oranges.

14   Q.          Now, when you said he got them from

15   the Federal Reserve, you're talking about the

16   coins that had been previously seized from the

17   government; is that right?

18   A.          Right.

19   Q.          Okay.  You're not talking about the

20   Double Eagle that he was discussing this deal with

21   for you that he might --

22   A.          No.

23                MR. BERKE:  I object to the question.

24   I'm sorry go ahead.

25                THE WITNESS:  This was afterwards when

## Harry Forman

1    I said, no, I didn't want to be involved with it.

2    He started to tell me that he thought he was

3    getting a bad rep.  That he got the coins

4    legitimately by trading '31 Double Eagles, which

5    he had, for '33 Double Eagles.

6    BY MS. ROMERO:

7    Q.              Okay.  When did you first learn of the

8    controversy around the 1933 Double Eagles?

9    A.              Before I met Izzy Switt.

10   Q.              And roughly when was that?

11   A.              I would say about 1957.

12   Q.              Okay.

13   A.              Incidentally, I knew some owners of

14   '33 Double Eagles that I did business with that

15   had turned in their coins.  One gentleman was

16   Louis Eliasberg of Baltimore, Maryland.

17   Another one was a guy by the name of Jacob

18   Shapiro, who traded under the name of Jake

19   Bell.  He also surrendered a '33 Double Eagle.

20   Q.              How did you learn about the

21   controversy around the 1933 Double Eagles?

22   A.              What's that?

23   Q.              How did you learn about the

24   controversy behind the 1933 Double Eagles?

25   A.              I don't know, just hearsay and the

## Harry Forman

1    bought them legitimately, all thought that they

2    were legal to own at the time they bought them.

3    Now, knowing Eliasberg was a very big banker in

4    Baltimore.  He wouldn't have bought the coin if he

5    didn't think it was legit.

6    BY MR. BERKE:

7    Q.            And so now, let me ask you this, you

8    have a very clear -- do you have a clear

9    recollection that, as I understood your testimony,

10   Mr. Switt told you that he obtained his 1933

11   Double Eagles by exchanging gold coins for those

12   gold coins?

13              MS. ROMERO:  Objection.

14   Mischaracterizing the testimony.

15   BY MR. BERKE:

16   Q.            Well, let me ask you a different

17   question.  If you could be very specific.  How --

18   are you very -- can you tell me precisely what you

19   recall Mr. Switt telling you about how he obtained

20   his 1933 Double Eagles?

21   A.            I remember the conversation like it

22   took place yesterday.  That he told me he

23   traded a guy at the Federal Reserve 1931 Double

24   Eagles for the 1933s.  Now in my mind, I

25   imagined that there's probably some money

## Harry Forman

1  didn't want no parts of it.  Before Ford told

2  me not to get involved, I wouldn't have gotten

3  involved either way.  I just didn't want to be

4  involved.  I'm more involved now then I wanted

5  to be.

6  Q.          When you had the conversation with

7  Israel Switt about the deal, was he aware of the

8  complexities hat you've just described about

9  owning the coin?

10         MR. BERKE:  Objection.  Objection to

11  the form.

12  BY MS. ROMERO:

13  Q.          You can answer.

14  A.          He knew that I valued my

15  reputation.  And when I replied to him I wasn't

16  interested, his reply was I got the coins

17  legitimately.  I traded 1931 20s for the '33

18  20s.  And he seemed to feel that the Government

19  was wrong in seizing the coins from the people

20  that he sold them to.  But still, in order to

21  shield himself and me, he didn't want to sell

22  me the coin unless I had a customer overseas.

23  And yet, I can't honestly say that he had the

24  coin, because I didn't read that until the

25  daughter found it, 20 pieces.

# Harry Forman

1   Q.              What was the importance of having a

2   customer overseas?

3                        MR. BERKE:  Objection.

4                        MS. ROMERO:  What's your legal basis?

5                        MR. BERKE:  Asked and answered five

6   times now.

7                        MS. ROMERO:  No, it hasn't been.

8                        THE WITNESS:  He felt that if it went

9   to a customer overseas, I guess it couldn't be

10  seized.

11  BY MS. ROMERO:

12  Q.              Did he say that to you?

13  A.              No.

14  Q.              Okay.  So what's your basis for that

15  answer?

16  A.              Well, I'm saying that I assume

17  that's why he wanted to know if I had an

18  overseas customer.

19  Q.              Okay.

20  A.              He didn't want me to sell it to

21  anybody in the United States, if I was

22  interested.

23                        MS. ROMERO:  I don't have anymore

24  questions.

25  BY MR. BERKE:

# EXHIBIT E



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

GENERAL COUNSEL

May 19, 2005

Mr. Larry Johnson
Special Agent in Charge
Criminal Investigative Division
United States Secret Service
950 H Street, NW
Washington, DC 20223

RE: Ten Ostensible 1933 Gold Double Eagle Coins

Dear Mr. Johnson:

On September 22, 2004, ten $20 gold pieces, bearing the year inscription 1933, were surrendered to the United States Government. Authenticating these as genuine United States coins will establish that they are "Double Eagles" that were stolen from the United States Mint at Philadelphia 70 years ago.

Since the United States Government has been in possession of these pieces, they have been in the custody of the United States Secret Service. Meanwhile, officials at the Department of the Treasury, the United States Mint, the United States Secret Service, and the Department of Justice have considered the most appropriate disposition of these coins that would serve the best interests of the United States. In particular, these officials have considered whether subjecting these pieces to forfeiture proceedings is necessary or appropriate.

Accordingly, the Assistant Secretary, Terrorist Financing and Financial Crimes, and I agree that if these coins are genuine, it is in the best interests of the United States not to subject them to forfeiture proceedings and to return them promptly to the possession of the agency from which they were stolen—the United States Mint. The United States Mint will have the pieces authenticated and, in the unlikely event that they are not genuine 1933 Double Eagles, will return the pieces to the United States Secret Service for disposition as counterfeits. If the coins are genuine, the United States Mint will retain them, and it is our collective understanding and desire that they will not be sold.

I would appreciate your having the appropriate officials at the United States Secret Service coordinate directly with the United States Mint's Chief Counsel and Chief of the Mint Police to effect the proper transfer of the pieces back to the custody of the United States Mint.

Sincerely,

James W. Carroll, Jr.
Acting General Counsel
Department of the Treasury

CC:
Arnold Havens, Acting Deputy Secretary of the Treasury
Henrietta Holsman Fore, Director of the Mint