IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROY LANGBORD, DAVID LANGBORD, and JOAN LANGBORD, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 06-5315 |
| | : | |
| UNITED STATES DEPARTMENT OF THE TREASURY, et al., | : | |
| | : | |
| Defendants. | : | |

## ORDER

AND NOW, this ____ day of _____, 2008, upon consideration of Defendants'

Motion for Partial Summary Judgment On Plaintiffs' Illegal Seizure and Due Process Claims,

Or in the Alternative, to Compel Testimony Concerning The Circumstances Surrounding a

Purported Implied-in-Fact Agreement, and plaintiffs' response thereto, it is **ORDERED** that

defendants' motion is **GRANTED IN PART AND DENIED IN PART**. The Court finds that

the 1933 Double Eagles were not illegally seized by the government. It is **FURTHER**

**ORDERED** that judgment is entered in favor of the defendants and against plaintiffs on Causes

of Action Four and Five of the Complaint. Defendant's request for alternative relief is denied as

**MOOT**.

BY THE COURT:

_____
**HONORABLE LEGROME D. DAVIS**
*Judge, United States District Court*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ROY LANGBORD, DAVID LANGBORD, and     :
JOAN LANGBORD,                          :
                                       :

              **Plaintiffs,**             :
                                       :

               **v.**                   :        **Civil Action No. 06-5315**
                                       :

UNITED STATES DEPARTMENT OF THE      :
TREASURY, et al.,                       :
                                       :

              **Defendants.**          :

## ORDER

AND NOW, this ____ day of _____, 2008, upon consideration of upon

consideration of Defendants' Motion for Partial Summary Judgment On Plaintiffs' Illegal

Seizure and Due Process Claims, Or in the Alternative, to Compel Testimony Concerning The

Circumstances Surrounding a Purported Implied-in-Fact Agreement, and plaintiffs' response

thereto, it is **ORDERED** that defendants' motion is **GRANTED IN PART AND DENIED IN**

**PART:**

    1.      Defendants' request for summary judgment on Causes of Action Four and Five of

the Complaint is **DENIED.**

    2.      Defendants request for alternative relief is **GRANTED.**  Defendants may take the

deposition of Barry Berke, Esq., concerning the circumstances surrounding any purported

implied-in-fact agreement between plaintiffs and the government, and plaintiffs' communications

with the government, before the surrender of the 1933 Double Eagles on September 22, 2004.

Plaintiffs shall not assert the work-product doctrine with respect to Berkes's opinions and mental

impressions relating to these subjects.

BY THE COURT:

_____

**HONORABLE LEGROME D. DAVIS**
*Judge, United States District Court*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROY LANGBORD, DAVID LANGBORD, and JOAN LANGBORD, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 06-5315 |
| | : | |
| UNITED STATES DEPARTMENT OF THE TREASURY, et al., | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
ON PLAINTIFFS' ILLEGAL SEIZURE AND DUE PROCESS CLAIMS,
OR IN THE ALTERNATIVE, TO COMPEL TESTIMONY CONCERNING
THE CIRCUMSTANCES SURROUNDING A PURPORTED
IMPLIED-IN-FACT AGREEMENT**

Defendants, pursuant to Federal Rule of Civil Procedure 56, respectfully request partial summary judgment in favor of the defendants and against the plaintiffs on plaintiffs' Fourth Amendment illegal seizure claim (Fourth Cause of Action) and their Fifth Amendment due process claim (Fifth Cause of Action) on the ground that the parties had not reached an agreement that the government was required to commence a forfeiture action against the 1933 Double Eagles at issue in this case. If the Court does not grant partial summary judgment, defendants request alternative relief in the form of the the deposition of Barry Berke, Esq.,without assertions of the work-product doctrine with respect to Berkes's opinions and mental impressions, relating to the circumstances surrounding any purported implied-in-fact agreement between plaintiffs and the government, and plaintiffs' communications with the government, before the surrender of the 1933 Double Eagles on September 22, 2004.

The facts and law applicable to this motion are set forth in the accompanying memorandum.

Respectfully,

LAURIE MAGID
Acting United States Attorney

VIRGINIA A. GIBSON
Assistant United States Attorney
Chief, Civil Division

JOEL M. SWEET
Assistant United States Attorney

JACQUELINE ROMERO
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476
Tel. (215) 861-8581
Fac. (215) 861-8618

*For All Defendants*

Of Counsel:

Daniel P. Shaver, Chief Counsel
Greg M. Weinman, Senior Counsel
United States Mint
801 9th Street NW
Washington, DC 20220

November 14, 2008

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROY LANGBORD, DAVID LANGBORD, and          :
JOAN LANGBORD,                             :
                                           :
              Plaintiffs,                  :
                                           :
         v.                                :        Civil Action No. 06-5315
                                           :
UNITED STATES DEPARTMENT OF THE            :
TREASURY, et al.,                          :
                                           :
              Defendants.                  :

DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' ILLEGAL SEIZURE
AND DUE PROCESS CLAIMS, OR IN THE ALTERNATIVE, TO COMPEL
TESTIMONY CONCERNING THE CIRCUMSTANCES SURROUNDING A
PURPORTED IMPLIED-IN-FACT AGREEMENT

On the morning of September 22, 2004, plaintiff Roy Langbord and his lawyer, Barry

Berke, Esq., met up with representatives of the United States Mint at a Starbucks on Market

Street in Philadelphia.  After coffee and pleasantries, the group crossed Market Street and entered

a bank.  In the bank, they were joined by agents of the United States Secret Service, whom they

were expecting.  The group was led to a private room.  In that room, Langbord opened a safe

deposit box and took out a gray paper Wanamakers bag.  Langbord handed the paper bag to a

United States Mint specialist.  The specialist opened the paper bag and withdrew ten 1933

Double Eagle gold pieces, each carefully wrapped in tissue paper.  After inspecting the gold

pieces one-by-one, the specialist placed each gold piece into a plastic holder.  The specialist

handed each plastic holder to a Secret Service agent, who put it into an evidence envelope.  After

this was completed for all the gold pieces, Langbord and Berke returned to New York City; the

Mint representatives returned to Washington and West Point, NY; and the 1933 Double Eagles

returned to the United States for the benefit of the American people.

Plaintiffs contend that the September 22 transfer of the 1933 Double Eagles to the government's possession constituted an illegal seizure and a due process violation. Plaintiffs' claim that before they transferred the 1933 Double Eagles to the government, they had reached an unwritten and unexpressed implied agreement with United States Mint representatives by which the parties would attempt to negotiate an award or other monetary deal for the Langbords, and if no deal was reached, the government would commence a forfeiture action against the 1933 Double Eagles. Deposition Transcript of Barry Berke, Esq., ("Berke Tr.") at 118-20.[1]

There is no evidence of the creation of an implied-in-fact agreement committing the government to commence a forfeiture action in the event no reward deal was reached. To the government, the transfer of the 1933 Double Eagles was a voluntary repatriation of numismatic treasures to their rightful owner – the United States of America – and the Langbords were citizens returning stolen property to the government who sought a reward for their rectitude.

Plaintiffs' allegation that they reached an enforceable agreement by which the government was required to commence a forfeiture action against the 1933 Double Eagles is the keystone supporting their Fourth Amendment Illegal Seizure claim and their Fifth Amendment Due Process claim.[2] The purported agreement is not memorialized in writing, and there is no evidence that the parties expressly discussed a forfeiture action. Indeed, there is no evidence that

---

[1] The Berke transcript is the primary record evidence relied upon in support of this motion. The complete transcript is attached as Exhibit A. We will file the deposition exhibits at the Court's request.

[2] These claims, which are the Fourth and Fifth causes of action in the Complaint, are the only claims for which plaintiffs arguably may be entitled to a jury.

the parties even engaged in a discussion in which the word "forfeiture" was used. Id. at 133 ("I don't recall them – meaning Mr. Shaver or Mr. Weinman – using the word CAFRA and I cannot say, as I sit here today, whether they referred to forfeiture or not."), 177. Plaintiffs' illegal seizure and due process claims are based entirely upon their own counsel's subjective, unilateral belief – never articulated to the government before September 22, 2004 – about the kind of litigation would follow if no deal was struck.

The government seeks partial summary judgment because – as a matter of law, applied to the undisputed material facts – there was no enforceable agreement between plaintiffs and the government committing the government to commence a forfeiture action if no reward deal was reached. Because there was no enforceable agreement, the transfer of the 1933 Double Eagles to the government was a voluntary surrender and not a seizure.

If the Court denies the government's motion for partial summary judgment on plaintiffs illegal seizure and due process claims, the government respectfully moves to compel plaintiffs' counsel, Barry Berke, Esq., to answer questions at a deposition relating to the purported agreement, including Berke's thought process relating to the communications that plaintiffs contend formed the purported implied-in-fact agreement, and all the circumstances surrounding the purported agreement.

## I.
## THE PARTIES' COMMUNICATIONS
## BEFORE THE SURRENDER OF THE 1933 DOUBLE EAGLES.

Plaintiffs' counsel, Barry Berke, Esq. ("Berke"), was the plaintiffs' primary representative in all of the communications with the government before the September 22 surrender of the 1933

3

Double Eagles.[3] Daniel P. Shaver, Chief Counsel to the United States Mint ("Shaver"), and Greg

Weinman, Senior Counsel to United States Mint ("Weinman"), were the primary representatives

of the United States Mint. Berke was familiar with Shaver and Weinman from prior litigation

involving the Fenton 1933 Double Eagle. In the summer of 2004, Berke called Shaver and

requested a meeting. Berke Tr. at 73. Berke suggested that he, Shaver and Weinman have lunch

in Washington "to discuss an issue" – although Berke did not disclose to Shaver that the issue he

wished to discuss concerned ten 1933 Double Eagles. Id. at 73-74.

### A.   August 25 Lunch Meeting

On August 25, 2004, Berke, Shaver and Weinman had lunch at an Italian restaurant in

Washington. Id. at 78-79. After pleasantries, Berke informed Shaver and Weinman that he had

clients with ten 1933 Double Eagles. Id. at 79-80. Shaver and Weinman responded with

surprise. Id. at 82. Berke did not identify his clients, but he did tell Shaver and Weinman that

his clients' identity would make sense to them based upon information they already knew "about

the history or at least the purported history of the coins." Id. at 80. Berke believed that Shaver

and Weinman would have recognized Israel Switt – plaintiffs' mother and grandfather – as a

person believed to have received and sold a number of 1933 Double Eagles that had been taken

from the United States Mint without authority. Id. at 88-92.

Berke suggested to Shaver and Weinman that the parties discuss a "resolution similar to

what was reached in the Fenton case" rather than "embark on a multi-year litigation." Id. at 81.

---

[3] The Langbords also retained Washington lobbyists, The Paul Laxalt Group, to influence
senior officials at the Department of the Treasury with respect to this matter. Those
communications did not address the purported agreement upon which plaintiffs' seizure and due
process claims are based.

As for a discussion of forfeiture, Berke suggests only that he made a "very light and passi[ng] reference" to CAFRA and the fact that the forfeiture laws had changed. Id. at 81-82. According to Berke, Shaver told him that the government would be interested in discussing an agreed-upon resolution, id. at 82, and Shaver said, "'obviously, there are going to be other people that are going to be part of that discussion.'" Id. at 82, 93. Berke understood Shaver's reference to "other people" to mean Henrietta Holsman-Fore, the Director of the United States Mint. Id. at 94.

As the meeting ended, Berke understood that there was a possibility that the government would negotiate with the plaintiffs and that they would speak to other people about that possibility. Id. at 95. Berke recalled that, as the trio was standing up to leave the restaurant, Shaver stated that the government would "want to take possession of the coins and have them tested to make sure they are authentic." Id. at 83. Berke responded by stating that his clients would want to "preserve all their rights, but I didn't think that would be a problem." Id. Berke's relationship with Shaver and Weinman at the time of the meeting was "professional, frank and honest," id. at 75 and Berke does not contend that Shaver or Weinman knowingly misrepresented anything at that meeting. Id. at 225-26.

## B.   September 15 Meeting in Brooklyn, New York

The next substantive communication between plaintiffs and the government occurred on September 15, 2004, at the offices of the United States Secret Service in Brooklyn, NY. Id. at 108-109.  That meeting was attended by Berke, his Kramer Levin colleague Steven Sparling, Esq., Shaver, Weinman, and United States Secret Service Special Agents Rizza and Dunleavy. Id. at 111.  At that meeting, Berke disclosed that this client was Roy Langbord and he identified the bank in Philadelphia where the 1933 Double Eagles were being kept. Id. at 111.

5

Berke recalled one of the Secret Service agents asking whether Berke's clients were prepared to waive venue. Id. at 112. Berke contends that he inferred the agent's question a reference to a forfeiture action. Id. at 112. Berkes conceded that he does not recall either of the agents using the term "forfeiture" at the meeting. Id. at 130. There is no evidence of an explicit mention by anyone at the meeting about a forfeiture proceeding. The only other issue discussed at this meeting concerned the logistics of the surrender of the 1933 Double Eagles, including who would attend. Id. at 113. Berke admitted that there was no explicit discussion about limitations to the surrender, although he recalls stating that his client would be "reserving all of their rights to the coins and are not in any way waiving any of their legal rights or claims related to the coins." Id. at 112.

There is no evidence that the government ever represented to the plaintiff that the 1933 Double Eagles would be returned to the plaintiffs if the gold pieces were determined to be authentic. Id. at 117. Nor is there any evidence that Shaver or Weinman expressly discussed (much less agreed to) a forfeiture action, or a CAFRA proceeding, if the parties were unable to reach a compensation agreement for the plaintiffs. Id. at 132-33. There is no evidence of any agreement by the end of the meeting on September 15, 2004, concerning the nature of litigation that either party might commence if no agreement was reached to pay money to the plaintiffs. Moreover, Berke acknowledged that neither Shaver nor Weinman knowingly misrepresented anything to Berke at that meeting. Id. at 226.

### C.    Plaintiffs' September 21, 2008, Reservation of Rights Letter

On the afternoon before the mutually agreed day for the surrender of the 1933 Double Eagles, Berke faxed a letter to Shaver. Id. at 153. The letter states in relevant part:

6

> At the request of the United States Mint, Roy Langbord will make the Coins available to the government on Wednesday September 22, 2004 based upon our understanding that the government will test the Coins for authenticity and secure the Coins while we discuss a possible resolution of the issues relating to the Coins.
>
> This agreement to make available the Coins as described above is without prejudice to all of my clients' rights and remedies existing at law, in equity, or otherwise. We specifically reserve all rights and remedies with respect to the Coins.

See Letter of September 21, 2004, from Barry Berke, Esq., to Daniel P. Shaver, Chief Counsel, United States Mint, Exhibit B hereto. The letter does not address the return of the 1933 Double Eagles to the Langbords, or the government commencing a forfeiture action in the event the parties were not able to reach a "resolution of the issues relating to the Coins."[4] The letter did not seek assent or confirmation of any sort, and the government did not respond to the letter in the hours remaining before the surrender.

### D.    September 22, 2004, Surrender of the 1933 Double Eagles.

As mutually arranged by the parties, the surrender of the 1933 Double Eagles took place on September 22, 2004, at a bank were the plaintiffs had been keeping the gold pieces. Id. at 174-75. On the morning of September 22, Berke, Shaver and Weinman met for coffee at a Starbucks in Philadelphia. Id. at 175. Berke asked Shaver and Weinman whether they had received his letter of the day before, and Shaver or Weinman confirmed that the letter had been received. Id. at 175-77. Berke did not recall any substantive discussion with the United States

---

[4] The letter is vague in several respects. As further described below, at this deposition Berke refused to testify on work product grounds: what he meant by the term "the issues" relating to the gold pieces; whether the term "our understanding" was referred to plaintiffs' unilateral understanding or, on the other hand, a purported agreement with the government; or what particular "rights and remedies" plaintiffs contend existed at the time the letter was sent to the Mint.

Mint representatives about the September 21 letter, and there was no discussion concerning the government commencing a forfeiture action. Id. at 177-78. There is no evidence that Shaver or Weinman committed to plaintiffs – explicitly or implicitly – any particular result from anticipated discussions about the 1933 Double Eagles. And again, Berke testified that he does not contend that Shaver or Weinman knowingly misrepresented anything at that meeting. Id. at 226.

## II.
## ARGUMENT

### A.    Legal Standards for Summary Judgment Motions

Federal Rule of Civil Procedure 56(c) provides for the entry of summary judgment when "there is no genuine issue as to any material fact and [where] the movant is entitled to judgment as a matter of law." Summary judgment should be rendered "if the pleadings, the discovery and disclosure material on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. A court must decide not whether the evidence unmistakably favors one side or the other, but rather whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at 252. A party opposing summary judgment may not rest on mere denials of the movant's

evidence, but rather "must – by affidavits or as otherwise provided by [Rule 56] – set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2).  If the non-moving party's evidence is "merely colorable, or is not significantly probative," summary judgment may be granted.  Bixler v. Central Penn. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1302 (3d Cir. 1993) (non-moving party may not rest upon mere allegations, general denials, or vague statements).

### B.   PLAINTIFFS' SURRENDER OF THE 1933 DOUBLE EAGLES WAS VOLUNTARY AND DID NOT CONSTITUTE AN ILLEGAL SEIZURE.

Plaintiffs' surrender of the 1933 Double Eagles to the government on September 22, 2004, was voluntary.  Plaintiffs approached the government about the gold pieces.  The parties met and mutually agreed to the logistics of the surrender, including a convenient date, time and place.  Plaintiffs acknowledge that the there was nothing coercive about their communications with the government in connection surrender.  See id. at 105 (August 25 meeting described as friendly, without coercion); see id. at 140-41 (no coercion at September 15 meeting); see id. at 183 (objecting to answering question with the word "coercion" on ground that it is a "legal term," but acknowledging no threats by government against Langbord but for the possibility of future litigation).

Plaintiffs' claim that the 1933 Double Eagles were seized by the government and that due process has been denied rest entirely upon their contention that the government violated an implied-in-fact agreement by which the government purportedly had committed to commence a forfeiture action if there was no resolution concerning plaintiffs' request for money.  If the Court decides that there was no implied-in-fact agreement, then plaintiffs' illegal seizure and due

process claims must be dismissed.[5]

Traditional principles of contract law apply to determining whether the parties reached an enforceable agreement with respect to the disposition of the 1933 Double Eagles. There is no written agreement between the parties concerning the 1933 Double Eagles. There is no evidence of an express oral agreement. Plaintiffs' claims therefore depend on plaintiffs proving that the parties entered an implied-in-fact agreement. A binding implied-in-fact agreement arises between a private party and the government upon proof by the person asserting the existence of the agreement of: (1) mutuality of intent to contract; and (2) consideration; and (3) an unambiguous offer and acceptance; and (4) "actual authority" on the part of the government's representative to bind the government. See Schism v. United States, 316 F.3d 1250, 1278 (Fed. Cir. 2002); see also Trauma Serv. Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (implied-in-fact agreement with government requires proponent to establish elements of traditional agreement).

An implied-in-fact agreement must be "founded upon a meeting of the minds" inferred from conduct of the parties showing "in the light of the surrounding circumstances, their tacit understanding." Hercules, Inc. v. United States, 516 U.S. 417, 423-24 (2006) (finding no implied-in-fact agreement). No agreement will be implied unless "the meeting of the minds was indicated by some intelligible conduct, act or sign." Baltimore & O. R. Co. v. United States, 261

---

[5] Proving an illegal seizure requires more than mere evidence that the government accepted property that the plaintiffs relinquished. See Brown v. Brierley, 438 F.2d 954, 957-60 (3d Cir. 1971) (holding no Fourth Amendment seizure where party voluntarily relinquished gun to investigator; absence of coercion relevant in determining violation); United States v. Messina, 507 F.2d 73, 76 (2d Cir. 1974), cert. denied, 420 U.S. 993 (1975) (agent's receipt of voluntarily relinquished stolen property did not constitute Fourth Amendment violation).

U.S. 592, 598 (1923).  Moreover, a private party entering into an agreement with the government "assumes the risk of having accurately ascertained that he who purports to act for the government does in fact act within the bounds of his authority."  Schism v. United States, 316 F.3d at 1278 (citing Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947)); see also City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990) (implied-in-fact agreement requires an agent of the government with authority to bind the government). [6]

In this case, there is no evidence to support the contention that there is an enforceable implied-in-fact agreement between the plaintiffs and the government concerning the 1933 Double Eagles committing the government to commence a forfeiture action.  Neither Shaver nor Weinman had authority to enter into any agreement requiring the government to file a forfeiture action.  Moreover, there is no evidence of an unambiguous offer by the plaintiffs, or unambiguous assent by the government, and therefore there was no meeting of the minds concerning the type of litigation that potentially would follow should the parties not reach an agreement to pay money to plaintiffs.

1.   **United States Mint Representatives Lacked Authority to Bind the Government to an Agreement to Commence a Forfeiture Action Against the 1933 Double Eagles.**

Assuming arguendo that plaintiffs' characterization of discussions with the government were accurate, still there could be no enforceable agreement because Shaver and Weinman did not have authority to bind the government to an agreement to commence a forfeiture action.  "[O]nly those with specific authority can bind the government contractually; even those persons

---

[6]  Plaintiffs carry the burden to prove their seizure claim, and therefore carry the burden to establish the existence of an enforceable implied-in-fact agreement the government committed to commence a forfeiture action if no further agreement was reached.

may do so only to the extent their authority permits." Gardiner v. Virgin Islands Water & Power Auth., 145 F.3d 635, 644 (3d Cir. 1998). This rule applies to purported implied-in-fact agreements involving the United States. See City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990). A party is out of court if it incorrectly "assumes the risk of having accurately ascertained that he who purports to act for the government does in fact act within the bounds of his authority." Schism v. United States, 316 F.3d at 1278 (citing Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947).

Congress has placed in the Attorney General of the United States authority to commence legal proceedings on behalf of the United States. When "the head of any executive department or agency is of the opinion that the interests of the United States require the service of counsel on the examination of any witness concerning any claim, or on the legal investigation of any claim, pending in the department or agency, he shall notify the Attorney General . . . and the Attorney General shall provide the service." 28 U.S.C. § 514. It is only the "Attorney General or any other officer of the Department of Justice, or any other attorney specially appointed by the Attorney General under law," who may "conduct any kind of legal proceeding, civil or criminal . . . ." 28 U.S.C. § 515 (a). There is no evidence that the Attorney General or any designee of the Attorney General played any role in the communications with plaintiffs, or otherwise authorized Shaver or Weinman to commit the government to commence a forfeiture action against the 1933 Double Eagles.

Shaver and Weinman did not have authority to bind the government to an agreement to commence a forfeiture action. On the contrary, as set forth in the attached Declaration of Daniel P. Shaver, Chief Counsel for the United States Mint, United States Department to the Treasury

12

("Shaver Decl."), attached as Exhibit C, neither Shaver, Weinman, nor anyone else at the United States Mint had authority in 2004 to bind the government to an agreement to commence an administrative or judicial forfeiture proceeding against the 1933 Double Eagles.

Shaver explains in his declaration that the United States Mint is a bureau of the Department of the Treasury, Shaver Decl. at ¶ 3 (citing 31 U.S.C. § 304(a)), and that the general duties and powers of officers and employees of the Department of the Treasury are vested in the Secretary of the Treasury. Id. at ¶ 4 (citing 31 U.S.C. § 321(c)). Authority to initiate an administrative forfeiture action is among the general duties and powers of the Secretary of the Treasury. Id. at ¶ 5. However, "the United States Mint is not an enforcement agency and is not authorized by law to commit the United States (or any of its departments or agencies) to commence an administrative forfeiture action, or a judicial forfeiture action." Id. at ¶ 6. Shaver states that "[n]o United States Mint official is authorized to commit the United States to commence an administrative forfeiture action or a judicial forfeiture action." Id.

The Secretary of the Treasury has never delegated to the United States Mint, the Director of the United States Mint, or any Senior Executive or other official of the United States Mint, any authority to initiate an administrative forfeiture proceeding. Id. at ¶ 7. This contrasts sharply with the Secretary's express forfeiture delegations published in Treasury Directives, such as Treasury Directives 15-54 (Nov. 5, 2001) & 15-55 (Jan. 10, 2001) (delegating forfeiture authorities to the Director, United States Secret Service); Treasury Directive 15-42 (Jan. 21, 2002) (delegating forfeiture authorities to the Commissioner, Internal Revenue Service); Treasury Directives 15-27 (Feb. 27, 2001) & 15-29 (Nov. 5, 2001) (delegating forfeiture authorities to the Commissioner, United States Customs Service). Id.

13

Shaver's own authority as Chief Counsel of the United States Mint is derived from the authority accorded the General Counsel of the Department of the Treasury, who is appointed by the President with the advice and consent of the Senate. Id. at ¶¶ 8-9 (citing 31 U.S.C. § 301 and Treasury General Counsel Order No. 5 (Jan. 19, 2001)).  Shaver and Weinman never have been delegated by the Secretary of the Treasury, the General Counsel of the Department of the Treasury, any other official of the Department of the Treasury, or the Director of the United States Mint, authority to initiate – or to commit to initiate – an administrative or judicial forfeiture proceeding on behalf of the United States Mint, the United States Department of the Treasury, or any other federal department or agency. Id. at ¶¶ 10-11.

There can be no enforceable implied-in-fact agreement between plaintiffs and the government concerning the commencement of a forfeiture action against the 1933 Double Eagles because neither Shaver nor Weinman possessed authority to bind the government to such an agreement.  Absent an enforceable agreement to commence a forfeiture action, plaintiffs' surrender of the 1933 Double Eagles to the government's possession was not a seizure, and plaintiffs have not been denied any due procedural rights.[7]

> **2.      There is No Evidence of an Unambiguous Offer by the Plaintiffs and Unambiguous Assent by the Government to the Terms of the Purported Implied-in-Fact Agreement.**

There is no implied-in-fact agreement between the parties concerning the commencement of a forfeiture action against the 1933 Double Eagles because there is no evidence of plaintiffs having made an unambiguous offer, or of the government giving unambiguous assent.  See

---

[7] If the Court grants this motion, plaintiffs still will have replevin and other claims by which they can attempt to recover property that they claim they own.

Schism v. United States, 316 F.3d at 1278 (implied-in-fact agreement requires *unambiguous* offer and acceptance). Berke testified that the basis of the parties' pre-surrender discussions was an unarticulated understanding that if no resolution was reached to pay the Langbords, "there would be proceedings related to the coins." Id. at 120; see also id. at 184 (acknowledging that after surrender there would either be a settlement "or there would be litigation"). There is no evidence anywhere in the record that the parties ever discussed whether that "proceeding" would be a forfeiture action commenced by the government, or a replevin action commenced by the plaintiffs, or some other type of proceeding. Berke was asked directly whether there was a discussion between the parties concerning the nature of the litigation that would follow if no negotiated resolution was reached. Id. at 119. Berke responded by identifying three events that plaintiffs now contend were the basis for an implied-in-fact agreement by the government to commence a forfeiture action: (1) Berke's "very light and pass[ing]" reference to CAFRA at the Italian restaurant on August 25, 2004;  (2) Berke's comment, also at the Italian restaurant on August 25, that the parties should avoid embarking on protracted litigation (which Berke believes the government should have understood to mean forfeiture litigation); and (3) Berke's unilateral understanding that the Secret Service agent's mention of the word "venue" on September 25, 2004, must have related to a forfeiture action. Id. at 119-120.

This evidence – assuming for purposes of this motion only that it is true – is too indefinite to constituted an unambiguous offer. See USA Machinery Corp. v. CSC, Ltd., 184 F.3d 257, 263 (3d Cir. 1999) (test for enforceability of an agreement is "whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced."). At his deposition, Berke could not identify even a single instance in

which either Shaver or Weinman stated that the government would commence a forfeiture action. In fact, there is no evidence of any discussion before the surrender in which the word "forfeiture" was used by Berke or Shaver or Weinman. At his deposition, Berke was asked whether he ever had an explicit discussion with Shaver, Weinman, or the Secret Service agents concerning forfeiture, id. at 120-127, 130. Berke testified that he did not recall Shaver or Weinman "using the word 'CAFRA'" and he could not recall whether Shaver or Weinman "referred to the word forfeiture or not." Id. at 133. "Unilateral and subjective beliefs of one party, without more, do not establish a bilateral meeting of the minds." Ernest Lawrence Group v. Marketing Americas, Inc., 2005 WL 2811781 at *7 (S.D.N.Y. October 27, 2005) (citing Murray Walter, Inc. v. Sarkisian Bros., Inc., 183 A.D.2d 140, 146 (3d Dep't 1992)); see also Sterling v. Beneficial National Bank, N.A., 1994 WL 315365 (Del. Super. Apr. 13, 1994) ("subjective beliefs or expectations" do not impose a duty on another entity). Id. Berke's unilateral belief or expectation that the government would commence a forfeiture action does not constitute an unambiguous offer, which is a prerequisite to an enforceable agreement creating an obligation on the government.

Moreover, it is not disputed that the government did not assent in writing or orally to an agreement to commence a forfeiture action against the 1933 Double Eagles. In the absence of evidence, plaintiffs suggest that the government's assent is established by the fact that the United States Mint "never disputed orally or in writing or said that they in any way disagreed" with Berke's September 21 letter, which Berke had faxed to Shaver in the afternoon the day before the transfer of the 1933 Double Eagles. See Berke Tr. at 291. Silence, however, "does not ordinarily manifest assent, particularly in cases where the parties' relationship and circumstances justify the

16

offeror's expecting a reply." Elliot & Frantz, Inc. v. Ingersoll-Rand, Co., 457 F.3d 312, 323 n.9 (3d Cir. 2006). Here, the government's non-response to the September 21 letter is not evidence of unambiguous assent. The letter did not contain the terms of the purported agreement that plaintiffs now insist the letter reflected. The government would have had no reason to attach forfeiture significance to the letter, particularly since the parties never had a single discussion before the surrender in which either party expressly raised the idea of the government commencing a forfeiture action against the 1933 Double Eagles. See Atlas Corporation v. United States, 895 F.2d 745, 754 (Fed. Cir. 1990) (rejecting existence of implied-in-fact agreement where events had not been contemplated).[8] Under these circumstances, the government's non-response to an ambiguous fax sent the afternoon before the surrender of the 1933 Double Eagles is of no legal or factual significance, and does not satisfy the requirement of unambiguous assent to an unambiguous offer needed to create an enforceable implied-in-fact agreement.[9] Based upon the testimony of plaintiffs' counsel, Barry Berke, it is indisputable that there is no evidence reflecting a "tacit understanding" between the panties that the government would commence a forfeiture action in the event no resolution was reached to pay the Langbords.

---

[8] There is no evidence of the type of prior dealing or other circumstances by which the government's non-response to the September 21 letter can reasonably be taken as assent to enter an agreement to commence a forfeiture action. Compare Luden's Inc. v. Local Union No. 6 of the Bakery, Confectionary and Tobacco Workers' International Union of America, 28 F.3d 347, 355 (3d Cir. 1994) (circumstances manifesting assent through silence include prior course of dealing, such as parties continuing to act as if performing under a past contract).

[9] In the September 21 letter, plaintiffs sought to reserve undefined "rights" to the 1933 Double Eagles following the transfer. There is no evidence that the government understood the reservation of rights language to mean more than plaintiffs had the right to assert their purported ownership over the 1933 Double Eagles by filing a replevin action. By reserving their rights, plaintiffs did not create rights that did not already exist.

17

See Hercules, 516 U.S. at 986.  For these reasons, the government respectfully requests that the Court enter judgment in favor of the government on plaintiffs' claims of illegal seizure and lack of due process.

### C.     IF THE COURT DENIES THE DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT, THE GOVERNMENT REQUESTS AN OPPORTUNITY TO DEPOSE BARRY BERKE CONCERNING HIS THOUGHTS, BELIEFS AND UNDERSTANDINGS DURING THE TIME PERIOD UNTIL THE TRANSFER OF THE 1933 DOUBLE EAGLES.

Barry Berke is the only person who can testify for the plaintiffs concerning the communications that purportedly formed an implied-in-fact agreement relating to the surrender of the 1933 Double Eagles and a forfeiture action.  At Berke's deposition, however, plaintiffs' counsel objected approximately 33 times on the ground of the work product doctrine.  See Berke Tr. at 18, 28-29, 75-76, 78, 90, 101-102, 139-40, 104, 115, 149-150, 154-57, 157-58, 163-64, 168-69, 182, 193-94, 201, 209, 213, 219-20, 221-25, 239, 241-42, 248, 251-52, 253-54, 258, 266, 272 and 275.  The objections and instructions not to answer frustrated the government's proper efforts to obtain probative information concerning the communications leading to the surrender and the circumstances surrounding the purported implied-in-fact agreement.

Federal Rule of Civil Procedure 26(b)(3) protects from disclosure the mental impressions, conclusions, opinions, and legal theories of an attorney.  The public policy supporting the work product doctrine, however, is "not to protect all recorded opinions, observations and impressions of an attorney made in connection with any legal problem," but rather it is to "protect the integrity of the adversary process."  Hercules, Inc. v. Exxon Corp., 434 F. Supp. 136, 150-51 (D. Del. 1977).  The attorney work-product protection therefore has limits, and it "does not provide automatic protection for every document in an attorney's file."  Langer v. Presbyterian Med. Ctr.

18

of Philadelphia, 1995 WL 79520 at *12 (E.D. Pa. Feb. 17, 1995). A party seeking discovery may overcome the protection by showing a "substantial need," and that the substantial equivalent of the information is unavailable through other sources. See Fed.R.Civ.P. 26(b)(3). While opinion work product generally receives greater protection than ordinary work product, it is discoverable only upon a showing of rare and exceptional circumstances. See In re Cendant Corp. Secur. Litig., 343 F.3d 658, 663 (3d Cir. 2003). One such circumstance is where an attorney's conduct is a central issue in the litigation and the work product is evidence of the attorney's conduct.

"Courts have recognized an exception to the work product doctrine in cases where an attorney's 'mental impressions and opinions are directly at issue.'" In re Sunrise Secur. Litig., 130 F.R.D. 560, 566 (E.D. Pa. 1989) (quoting Reavis v. Metro. Prop. and Liab. Ins. Co., 117 F.R.D. 160, 164 (S.D. Cal. 1987)). "In circumstances in which an affirmative defense places an attorney's mental impressions at issue, the courts have not hesitated to make those impressions discoverable." Tardiff v. Knox, 246 F.R.D. 66, 69 (D. Maine 2007) (citing cases); see also 8 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure §2026 (Supp. 1994) ("Documents that would otherwise be protected must be produced in the knowledge, mental impressions, opinions, and advice of a lawyer or law firm are at issue in a litigation to which the lawyer of law firm is a party"); 4 J. Moore, Federal Practice ¶26.64[3.-2], at 26-385 (1987) ("Cases indicate that when the activities of counsel are inquired into because they are at issue in the action before the court, there is cause for production of documents that deal with such activities, though they are 'work product'").

This precise issue was addressed in Environ Products, Inc. v. Total Containment, Inc., 1996 WL 4941132 (E.D. Pa. 1996). That case concerned a patent dispute in which the defendant

19

asserted that the plaintiff's counsel had acted improperly during the patent reexamination. The

plaintiff's counsel during the reexamination also was the plaintiff's counsel in the litigation. The

court explained that "[i]mpressions protected by the work-product doctrine may be discovered

when directly relevant to the litigation and when the need for production is compelling." Id. at 4

(citing Bird v. Penn Cent. Co., 61 F.R.D. 43, 47 (E.D. Pa. 1973)). A compelling need exists

"'whenever information is within the exclusive control of the party from whom discovery is

sought.'" Id. (citing In re Sunrise Secur. Litig., 130 F.R.D. 560, 569 (E.D. Pa. 1989)). The court

found that the plaintiff's counsel's conduct during the patent reexamination was directly at issue

in the litigation, and that counsel's mental impressions would "only be discovered directly from

him." Id. The court ruled therefore that the defendant had the right to depose the plaintiff's

counsel about his mental impressions because his mental impressions were directly relevant to

the defense theory. Id. at *5.[10]

Environ Products and the consistent ruling in In re Sunrise Secur. Litig. follow the

reasoning of Chief Judge Lord's decision in Bird v. Penn Central Co., 61 F.R.D. 43 (E.D. Pa.

---

[10] Although the government does not seek to intrude on Berke's mental impressions concerning the prosecution of this lawsuit, plaintiffs could have avoided the circumstance in which their trial counsel was subjected to a deposition by retaining for this lawsuit a lawyer other than the one who handled all of the discussions with the government that are now the subject if litigation. Plaintiffs should not be permitted to use the work-product doctrine as a sword asserting claims based upon counsel's communications, and also as a shield by seeking to prevent discovery of the circumstances surrounding the purported implied-in-fact agreement. See BASF Aktiengesellschaft v. Reilly Indus., Inc., 283 F. Supp.2d 1000, 1007(S.D. Ind. 2003) (allowing deposition of attorney-witness and recognizing that party "brought this problem on itself by choosing to retain the same counsel to litigate" as had provided an opinion letter at issue in the litigation); United Phosphorus, Ltd. v. Midland Fumigant, Inc., 164 F.R.D. 245, 249 (D. Kan. 1995) ("When a party employs counsel to represent it in a case, where an attorney has played a role in the underlying facts, both the attorney and the party have every reason to expect that the attorney's deposition may be requested.")

1973), where the court found that counsel's communications containing legal opinion and recommendations with respect to bringing or not bringing a lawsuit were discoverable. The court concluded that because the nature of the defense concerned the "knowledge, legal theories and conclusions of plaintiffs' attorneys," such information was discoverable. Id. at 47; see also Tri-State Hosp. Supply Corp. v. United States, 2005 U.S. Dist. LEXIS 33156 (D.D.C. Dec. 16, 2005) (ordering disclosure of opinion work product – despite stringent protection – where is goes to heart of issues in litigation); Frazier v. Southeastern Penn. Transp. Author., 161 F.R.D. 309, 319 (E.D. Pa. 1995) (ordering disclosure of opinion work product directly relevant to plaintiff's claim); Shore Acres Nursing Home, Inc. v. Cont'l Med. Sys., Inc., 1992 WL 57916 (E.D. Pa. 1992) (ordering disclosure of witness-counsel's opinions, thoughts and advice where directly at issue in litigation); Sec. and Exch. Comm'n. v. Nat'l Student Mktg. Corp., 18 Fed. R. Serv. 2d 1302, 1305 (D.D.C. 1974) ("[W]hile Rule 26(b)(3) provides for protection against discovery of the attorney's . . . 'mental impressions, conclusions, opinions or legal theories' shall be provided, such protection would not screen information directly at issue.")

Courts considering whether an agreement existed, and if so the terms of the agreement, have permitted the inquiry into an attorney-witness' knowledge, mental impressions and opinions where the attorney-witness' conduct during settlement-related activities is directly at issue. In Marcario v. Pratt & Whitney Canada, Inc., 1991 WL 1004 (E.D. Pa. Jan. 2, 1991), for example, the parties' dispute concerned the alleged breach of a settlement agreement. The court recognized that the work-product doctrine did not protect the attorney-witness' mental impressions and opinions concerning the settlement discussions, which were directly at issue in the litigation. Similarly, in Truck Insur. Exch. v. St. Paul Fire and Marine Insur. Co., 66 F.R.D.

21

129 (E.D. Pa. 1975), the court held that the work-product doctrine did not protect an attorney-witness' mental impressions relating to prior settlement negotiation, and therefore ordered an attorney to turn over documents and to be deposed. Id. at 136.

The work product doctrine does not protect from disclosure Berke's mental impressions concerning issues directly related to the claims and defenses in this action – specifically the circumstances surrounding the purported implied-in-fact agreement – where such information is unobtainable from any other source.  Plaintiffs contend that an implied-in-fact agreement was created before the surrender of the 1933 Double Eagles on September 22, 2004.  Because there is no evidence to satisfy the elements of an implied-in-fact agreement, as discussed above, the Court should grant the motion for partial summary judgment.  If the Court were to decline granting judgment on the ground that an implied agreement may have been formed – then it is axiomatic that Berke's mental impressions are relevant and highly probative of a key issue in this case.  To determine whether an implied-in-fact agreement was created, the circumstances surrounding the creation of the purported agreement are directly at issue.  Berke was the sole representative of the plaintiffs who interacted with the government with respect to the purported agreement.  Berke's knowledge, mental impressions and opinions therefore are crucial to determining whether the parties' had reached a meeting of the minds and thus had created an agreement – or whether Berke had merely unilateral beliefs and expectations about what would happen if the government declined to pay money to the Langbords in connection with the 1933 Double Eagles.[11]

_____

[11] To establish work-product protection, a "party must show that there existed 'an identifiable specific claim or impending litigation when the materials were prepared.'" Montgomery County v. MicroVote Corp., 175 F.3d 296, 305 (3d Cir. 1999) (internal citation

Plaintiffs have unfairly frustrated discovery of issues directly related to the communications between the plaintiffs and the government before the surrender of the 1933 Double Eagles, including the circumstances surrounding the purported implied-in-fact agreement upon which their seizure and due process claims are based.  Areas of inquiry to which plaintiffs objected on the ground of the work product doctrine at Berke's deposition[12] include, by way of example:

- whether Berke's use of the phrase "our understanding" in his September 21 letter referred to a *unilateral* understanding among Berke and his clients – or a purported *mutual* understanding between Berke and the government.  See Berke Tr. at 153-59, 301-303.

- which "remedies" Berke referred to when he wrote in his September 21 letter that plaintiffs reserved "all rights and remedies with respect to the coins."  Id. at 168-69 (plaintiffs' counsel objected, stating: "I don't see how he can describe what remedies at the time, as a lawyer, he thought were available, without revealing his mental thoughts and process.")

- at what point in time the September 22 surrender of the 1933 Double Eagles purportedly became an illegal seizure.  See id. at 241-42.

- The *authorized* channels through which 1933 Double Eagles could have left the United States Mint, as Berke referenced in an interview with the Washington Post in 1996.  See id. at 257-58 (plaintiffs' counsel objected, stating:  "That's what this litigation is about.  We'll present our proof at trial.")

---

omitted).  The information plaintiffs attempt to shield here does not satisfy this requirement. Before the September 22 surrender, there was no "identifiable specific claim" and no "impending litigation" relating to the gold pieces.  Berke's mental impressions before plaintiffs determined that litigation with the government might ensue are not protected by the work product doctrine. This is the logic applied in Hartman v. Banks, 164 F.R.D. 167, 170-71 (E.D. Pa. 1995), where the conduct of an insurance company was at issue and the court ordered the insurance company to disclose attorney mental impressions and opinions related to the time period before it became a party to the litigation.

[12] Plaintiffs also objected to numerous requests for admission on the ground of the work product doctrine.

23

- Berke's understanding of the government's view of Israel Switt's involvement with the 1933 Double Eagles, which would reveal plaintiffs' understanding before the surrender that the government considered the 1933 Double Eagles to have been illegally taken from the United States Mint in a scheme involving Switt. See id. at 90.

- Berke's understanding about why the Secret Service would be involved in the surrender of the 1933 Double Eagles. See id. at 115.

- If the Langbords believed they owned the 1933 Double Eagles, why does Berke believe they initiated any discussions with the government in the first place. See Id. at 241.

- Plaintiffs' knowledge and understanding before the surrender of the legal significance of the Barnard case, which found that a 1993 Double Eagle did not leave the Mint through an authorized channel, and which before the September 22 surrender reflected the government's long-held view that the 1933 Double Eagles always have belonged to the United States. See Id. at 266.

Berke's knowledge, understanding, opinions and mental impressions before the surrender relate directly to plaintiffs' claim that the parties had reached an agreement about how to proceed in the event the government declined to give money to the Langbords. Each of these particular areas of inquiry that the plaintiffs shut down with work product objections would have led to follow-up questions. The answers collectively would provide probative evidence of the parties' respective knowledge of the other parties' attitudes and stated positions vis-á-vis the 1933 Double Eagles – all of which were the "circumstances surrounding" the creation of plaintiffs' purported implied-in-fact agreement.

24

## III.
## CONCLUSION

For the reasons set forth above, the government respectfully requests the entry of summary judgment pursuant to Federal Rule of Civil Procedure 56 in favor of the government and against the plaintiffs on plaintiffs' illegal seizure and due process claims, Causes of Action Four and Five of the Complaint. If the Court denies defendants' request for partial summary judgment, the government requests an order compelling Barry Berke, Esq., to testify at a deposition, without asserting the work product doctrine, concerning the circumstances surrounding any purported implied-in-fact agreement between plaintiffs and the government, and plaintiffs' communications with the government, before the surrender of the 1933 Double Eagles.

Respectfully,

LAURIE MAGID
Acting United States Attorney

VIRGINIA A. GIBSON
Assistant United States Attorney
Chief, Civil Division

JOEL M. SWEET
Assistant United States Attorney

JACQUELINE ROMERO
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476
Tel. (215) 861-8581
Fac. (215) 861-8618

*For All Defendants*

25

Of Counsel:

Daniel P. Shaver, Chief Counsel
Greg M. Weinman, Senior Counsel
United States Mint
801 9th Street NW
Washington, DC 20220

November 14, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2008, I caused a true and correct copy of the

foregoing Defendants' Motion for Partial Summary Judgment On Plaintiffs' Illegal Seizure and

Due Process Claims, Or in the Alternative, to Compel Testimony Concerning The Circumstances

Surrounding a Purported Implied-in-fact Agreement, along with a memorandum of law and

proposed orders, to be served by email and first-class mail, postage prepaid, upon the following:

> Eric Tirschwell, Esquire
> KRAMER LEVIN NAFTALIS & FRANKEL
> 1177 Avenue of the Americas
> New York, NY 10036

> _____
> JOEL M. SWEET
> Assistant United States Attorney

30