# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
    EASTERN DISTRICT OF PENNSYLVANIA
- - - - - - - - - - - - - - - - - - - - - - - -x
ROY LANGBORD, DAVID LANGBORD &
JOAN LANGBORD,


                        Plaintiffs,

                                    Civil Action
            - vs -                  No. 06-5315


UNITED STATES DEPARTMENT OF THE
TREASURY; UNITED STATES BUREAU
OF THE MINT; HENRY M. PAULSON, JR.,
Secretary of The United States
Department of the Treasury; STEPHEN
LARSON, Acting General Counsel of
The United States Department of The
Treasury; EDMUND C. MOY, Director
of The United States Mint; DAVID A.
LEBRYK, Deputy Director of The
United States Mint; and, THE UNITED
STATES OF AMERICA,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - -x

            DEPOSITION OF BARRY BERKE, ESQ.
                New York, New York
                Wednesday, June 18, 2008

            Reported by:  Joseph V. Connolly


            SUMMIT COURT REPORTING, INC.
        Certified Court Reporters & Videographers
        1500 Market Street, 12th Floor-East Tower
            Philadelphia, Pennsylvania  19102
        424 Fleming Pike, Hammonton, New Jersey  08037
        (215) 665-5633 * (800) 447-8648 * (609) 567-3315
                www.summitreporting.com
                        .

## Page 2

```
 1
 2
 3
 4                    June 18, 2008
 5                    10:49 a.m.
 6
 7          Deposition of BARRY BERKE, ESQ.,
 8    taken by the Defendants, held at the Offices of the
 9    United States Attorney, 86 Chambers Street, 4th
10    Floor, New York, New York, before Joseph V.
11    Connolly, a Shorthand Reporter and Notary Public.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1    APPEARANCES:
 2    UNITED STATES ATTORNEY'S OFFICE
          Attorneys for the United States of America
 3      615 Chestnut Street, Suite 1250
        Philadelphia, Pennsylvania 19106
 4      Tel. 215-861-8581
      BY: JACQUELINE C. ROMERO, ESQ &
 5          JOEL M. SWEET, ESQ
 6
 7    KRAMER LEVIN NAFTALIS & FRANKEL, LLP
          Attorney for the Plaintiffs
 8      1177 Avenue of the Americas
        New York, New York 10036
 9      Tel. 212-715-8404
      BY: ERIC A. TIRSCHWELL, ESQ
10
11
12
13
14
15
16
17
18
      ALSO PRESENT: Daniel P. Shaver, Chief Counsel, &
19      Greg M. Weinman, Senior Legal Counsel,
        Department of the Treasury
20      United States Mint
21
22
23
24
25
```

## Page 4

```
 1                    MR. SWEET: Swear the witness.
 2    B A R R Y   B E R K E,
 3          having been called as a witness and having
 4          been duly sworn by the Notary Public, was
 5          examined and testified as follows:
 6                    THE WITNESS: Barry Berke, B-E-R-K-E.
 7    EXAMINATION
 8    BY MR. SWEET:
 9          Q.    Mr. Berke, thanks for coming in
10    today.
11                    We're going to cut right to it. But
12    if you do have any questions about procedure or
13    process, just wave, stop, ask a question.
14                    I'm assuming that we're all on equal
15    grounds about knowing the rules of the deposition?
16          A.    Fair enough.
17          Q.    Can you describe, generally, your
18    legal practice?
19          A.    Okay. I'm a litigator. I do all
20    types of litigation.
21                    I have a white-collar criminal
22    defense aspect to my practice, where I represent
23    individuals and companies that are being
24    investigated or have been charged by, generally,
25    the federal government, but on occasion the state
```

## Page 5

```
 1    government.
 2                    I also represent companies and
 3    individuals in all types of civil actions, more
 4    generally in federal court. But I have also
 5    appeared in state court.
 6                    I also do arbitrations and represent
 7    people in other alternative dispute forums. I
 8    would say as a general matter, you know, I
 9    represent, you know, them all - - and companies in
10    all types of litigation where there are disputed
11    issues.
12                    I would say I also - - my practice
13    also involves, you know, a fair amount of potential
14    trial work, again, across all those areas.
15          Q.    Okay. In the area of forfeiture,
16    have you run into that in your career?
17          A.    I have.
18          Q.    Could you tell us about your
19    experience in forfeiture?
20          A.    Yes.
21                    I have - - I represented Stephen
22    Fenton in the forfeiture case in the 1933 Double
23    Eagles, which some people describe as one of the
24    more known forfeiture actions that was contested.
25                    I've represented individuals in
```

2  (Pages 2 to 5)

Page 6

1  forfeiture actions, one in particular in mind that
2  was a contested action involving money - - a civil
3  action involving significant sums of monies to a
4  individual in South America, and the action was out
5  of the Eastern District, U.S. Attorney's Office.
6          And then I represent individuals in a
7  variety of other actions, typically criminal
8  actions or criminal investigations, that have
9  either a civil or criminal forfeiture component to
10  it.
11          They have involved criminal cases,
12  where there's a separate civil forfeiture action
13  involving some aspect of the individual's property,
14  and I've also been involved in criminal action
15  where there's a criminal forfeiture component.
16          And then I've been in a host of cases
17  where there's not actually a filed forfeiture
18  action, but there is a potential forfeiture
19  proceeding that is part of the representation.
20      Q.    Okay.  So, you know your way around
21  the forfeiture statutes?
22      A.    I'm familiar with forfeiture statutes
23  that I've dealt with in my practice, which I've
24  just described.
25      Q.    Okay.  In your experience as a

Page 7

1  defense lawyer representing criminal defendants,
2  have you had opportunities to enter plea agreements
3  on behalf of your clients?
4      A.    I have.
5      Q.    How many times have you entered a
6  plea agreement?
7      A.    Many times.
8      Q.    Many?
9      A.    Many.
10      Q.    More than ten?
11      A.    Yes.
12      Q.    And those required negotiation with
13  the government; correct?
14      A.    Yes.
15          Usually it's typically, in federal
16  cases, the people you're dealing with are the
17  criminal, the Assistant U.S. Attorney's in the
18  criminal part of that office, generally.  There is
19  also instances where you're dealing with main
20  justices, depending on the nature of the case.
21      Q.    And - -
22      A.    As you probably know.
23      Q.    In your experience with plea
24  agreements and other agreements with the
25  government, is it your understanding that the line

Page 8

1  assistant has authority to close a deal?
2          MR. TIRSCHWELL:  Objection to the
3  form of the question.
4  BY MR. SWEET:  (Continued)
5      Q.    Do you know what I'm talking about?
6      A.    I'm not sure I understand.
7      Q.    In your experience with plea
8  agreements, isn't it true that supervisory approval
9  is generally needed?
10      A.    It depends on the nature of the case.
11          In my experience on the federal level
12  - - I'm only going to the speak to the federal
13  level.
14      Q.    Stick to the federal.
15      A.    State, as well.
16          That the line assistants typically
17  have a tremendous amount of discretion and
18  authority that I feel if I'm negotiating a deal
19  with them, I'm going to be negotiating within their
20  authority.
21          I do believe that as a general matter
22  they do have the authority to negotiate a deal.  I
23  assume that those negotiations, you know, are often
24  times in conjunction with other discussions they
25  may be having with other people in their office,

Page 9

1  but I generally feel I can negotiate with a line
2  assistant with comfort; if they tell me they are
3  able to agree to a deal, that they are able to do
4  that.
5      Q.    But - -
6      A.    I'm sorry.  Go ahead.
7      Q.    I'm sorry.
8      A.    No, go ahead.
9      Q.    On a - - in a negotiation with the
10  government, the deal isn't done until it's a signed
11  agreement; correct?
12          MR. TIRSCHWELL:  Objection to the
13  form.
14          THE WITNESS:  Well, in my experience,
15  I reach agreements all the time with the
16  government about a variety of issues
17  involving my clients, and I generally believe
18  if I have an agreement with, you know, a
19  lawyer for the U.S. Government, that that's
20  an agreement.
21          I believe, obviously, there are
22  different agreements, agreements you put to
23  writing.  There are other agreements.
24          But I believe if we've reached an
25  agreement, where there's going to be a judge

3  (Pages 6 to 9)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke6/18/2008

| Page 10 |
|---|

1    to represent we reached an agreement, we're
2    relying on that, that we reached an
3    agreement.
4    BY MR. SWEET: (Continued)
5        Q.    Have you resolved a case based on a
6    verbal agreement?
7        A.    Certainly.
8            I've had - -
9        Q.    With the government, I'm saying?
10       A.    Absolutely.
11           I've had the government tell me that
12   they are going to dismiss a complaint and they did,
13   you know, they dismissed the complaint; not going
14   to bring charges; they are going to do all sorts of
15   things they are telling me and they do, absolutely.
16   That happens very regularly in my practice.
17       Q.    Have you ever had an agreement with
18   the United States, a verbal agreement with the
19   United States, involving disposition of assets?
20           MR. TIRSCHWELL: Do you mean oral?
21       Q.    An oral agreement?
22           MR. TIRSCHWELL: You said verbal, but
23   I think you meant oral.
24       Q.    Oral agreement.
25       A.    (No response.)

| Page 11 |
|---|

1            MR. SWEET: During the break, you can
2    discuss that point.
3            MR. TIRSCHWELL: Verbal means with
4    words.
5            MR. SWEET: I said, "during the
6    break."
7            MR. TIRSCHWELL: Oh.
8    BY MR. SWEET: (Continued)
9        Q.    Go ahead, Mr. Berke.
10           MR. TIRSCHWELL: I thought this was a
11   break.
12           THE WITNESS: The reason I hesitated
13   before answering is that - - I certainly
14   have had written agreements about the
15   disposition of assets, but I've been in
16   situations where there's been either a claim
17   against property or the threat of a claim
18   against property, and I've had discussions
19   with the government that have resulted in an
20   agreement that would take some action, either
21   either to remove a restriction on the
22   property that had been filed or make a
23   representation in consideration or do
24   something vis-a-vis that property that
25   happened in oral agreements, and I've had,

| Page 12 |
|---|

1    you know, in the give and take of a reality
2    of, you know, regular dealings with the
3    government.
4            I've had many situations where there
5    have been oral agreements affecting property
6    that is either the subject or we've been told
7    is the potential subject of action by the
8    government and that agreement would have been
9    an oral agreement about some action that
10   would be taken, vis-a-vis that property.
11   BY MR. SWEET: (Continued)
12       Q.    And that's - -
13       A.    So, I would say the answer is yes.
14       Q.    And that's all before the government
15   takes action; correct?
16       A.    It's not.
17           Again, I'm trying to remember the
18   specifics and I want to be accurate in what I say.
19           But I've been in situations, thinking
20   of both criminal and at least one civil case, where
21   there have been various discussions and then
22   agreements about action the government would take
23   vis-a-vis that forfeiture action that are
24   discussions, that aren't the product - - that don't
25   result in a formal written agreement, but they take

| Page 13 |
|---|

1    action. So, I've had those situations.
2        Q.    Okay. In your experience with the
3    United States Government, what types of agreements
4    require a formal written agreement as opposed to an
5    oral agreement?
6            MR. TIRSCHWELL: Objection.
7            THE WITNESS: Okay. Again, having a
8    little trouble with the dichotomy because I
9    speak to you, you know, lawyers for the
10   government very, very regularly and in the
11   course of either a case that we have that's
12   an active case before a judge, there
13   pre-trial, trial or some other stage, there
14   are all types of issues that come up that are
15   resolved in discussion and agreement that is
16   then reflected either in action taken by one
17   side, representations to the court in
18   actions, if there's an agreement that
19   something doesn't have to be done; actions
20   regarding what a client can or can't do. So,
21   those sorts of discussions happens every day.
22           There are times, for whatever reason,
23   we write a letter to confirm that we've had
24   this discussion and this is what's going to
25   happen. Sometimes the government writes the

4 (Pages 10 to 13)

SUMMIT COURT REPORTING, INC.

Page 14

1   letter: I'll write the letter. Other time it
2   is an agreement that's understood and that
3   typically the parties rely on.
4           That's part of my practice that goes
5   on a very regular basis.
6           There are other types of agreements,
7   obviously, that do become recorded in a
8   written agreement, to be signed by the client
9   and by the government.
10  BY MR. SWEET: (Continued)
11      Q.   What kind of agreements are those?
12      A.   Again, it varies.
13          But, you know, typically, you know,
14  you raised a plea agreement. There's not always a
15  written, signed plea agreement. There are
16  instances in which there are written, signed plea
17  agreements that the parties enter into, that agree to
18  certain terms of either how the guidelines will
19  apply or that offenses will be dismissed or other
20  things, but there are also pleas that I've been
21  involved with that don't have a formal written
22  agreement, but do have an understanding of the
23  parties that may be represented to the court.
24      Q.   Okay.
25      A.   So, really, it varies by situation.

Page 15

1       Q.   Have you ever had a plea agreement
2   where it was not in writing and it was not --
3   either in writing or represented to the court
4   orally?
5       A.   Again, I'd have to sort of think
6   back. I've had a lot of pleas. But I've certainly
7   been involved in situations with open pleas, where
8   there's no agreement about how the guidelines
9   apply, either because the parties couldn't agree or
10  choose not to agree for a strategic reason, and in
11  those situations there was a period of time when
12  the government, in the Southern District, at least,
13  would write a letter describing how they believed
14  the guidelines would apply, which was at the urging
15  of the Second Circuit.
16          Typically, during the course of these
17  discussions, there was an agreement between the
18  parties which would be put on the record, either
19  following agreement, where there's an agreement
20  that charges certain counts will be dismissed.
21          So, I've been in discussions. I'm
22  aware of those types of situations.
23          Obviously, as I already mentioned,
24  there are, obviously, situations where there is a
25  formal agreement, where you enter into the

Page 16

1   agreement and you to the specific terms and what
2   parties can argue.
3           But even as to those agreements, as
4   you know, they are generally not binding on the
5   court by simply the parties' agreement about what
6   they will or will not argue, but there are all
7   sorts of exceptions in the agreements, as well as
8   sentences that the courts allow, as a matter of
9   practice.
10      Q.   Are you done?
11      A.   Yes.
12      Q.   Great. Your experience with the
13  Fenton litigation --
14      A.   Yes?
15      Q.   Could you tell us what your role was
16  in the Fenton litigation?
17      A.   Yes.
18          I was retained to represent Stephen
19  Fenton when he was -- he had been charged in a
20  criminal complaint with an offense related to his
21  possession and ownership of a 1933 Double Eagle.
22          As you -- as I'm sure you know, a
23  complaint is often described as an informal charge.
24          In the course of that representation,
25  the criminal complaint was dismissed and a civil

Page 17

1   forfeiture action, In Rem proceeding, was filed
2   against the coin itself.
3           I then represented Stephen Fenton in
4   the filing of his claim against the coin and then
5   throughout the course of the litigation related to
6   that 1933 Double Eagle.
7       Q.   How many years ago did that action
8   take place?
9       A.   I believe I began representing Mr.
10  Fenton in 2005 or 2006.
11          MR. TIRSCHWELL: Nineteen?
12          THE WITNESS: I'm sorry.
13          1995, 1996.
14          And I believe it was settled sometime
15  in 2001, although the representation
16  continued through the sale of the coin and
17  the exercise of his rights under the
18  settlement agreement and I believe that
19  continued into early 2002.
20          That's a rough time line, obviously.
21  I know the dates are recorded somewhere.
22  BY MR. SWEET: (Continued)
23      Q.   Okay. Now, in connection with that,
24  did you investigate the history of the 1933 Double
25  Eagles?

5  (Pages 14 to 17)

Page 18

1         MR. TIRSCHWELL: Objection.
2    He's not going to tell you what his
3    litigation strategy was in that case.
4         MR. SWEET: I'm not asking about
5    strategy.
6         MR. TIRSCHWELL: I view that question
7    as calling for him to revealing the strategy.
8    BY MR. SWEET: (Continued)
9         Q.   Did you come to develop an expertise
10   in the history of the 1933 Double Eagle?
11        MR. TIRSCHWELL: I object to the
12   form.
13   BY MR. SWEET: (Continued)
14        Q.   You can answer.
15        MR. TIRSCHWELL: As to the
16   "expertise."
17   BY MR. SWEET: (Continued)
18        Q.   You can answer.
19        THE WITNESS: I gained knowledge
20   regarding a host of facts surrounding the
21   1933 Double Eagle and documents that
22   discussed the '33 Double Eagle, both
23   documents that were governmental documents,
24   as well as documents that were
25   non-governmental, from the that litigation.

Page 19

1    BY MR. SWEET: (Continued)
2         Q.   Did you believe your knowledge rose
3    to the level of an expertise?
4         MR. TIRSCHWELL: I object to the form
5    of the question.
6         THE WITNESS: What I can say - - I'm
7    not sure what you mean by "expertise."
8         What I can say, I believe when you
9    represent a client in a case you often become
10   very familiar with the facts specific to that
11   case and I believe that was certainly the
12   case in connection with the Fenton case.
13   BY MR. SWEET: (Continued)
14        Q.   Let me refer you to Exhibit 1.
15   I'll call this Berke 1.
16        (Published article, 8 pages, so
17   marked Berke Exhibit 1 for identification by
18   counsel.)
19        (Handed to the witness.)
20        (Witness reviews the exhibit.)
21   BY MR. SWEET: (Continued)
22        Q.   Do you recognize this?
23        A.   I believe I have seen this.
24        Q.   Okay. If you'd turn to the page - -
25        MR. SWEET: Forgive me. That is a

Page 20

1    different version, so I have to take a look at it
2    for a moment.
3         THE WITNESS: Okay.
4         (Pause.)
5         Q.   Turn to page 5 of 8.
6         A.   (Witness complies.)
7         Q.   At the bottom there's a question,
8    which said, "How did you come to represent Fenton
9    in the first place?"
10        And then, following that, there's
11   response. It's under the term - - under the word
12   "Berke."
13        In the second - - in the last
14   sentence on the page, it says, "I knew virtually
15   nothing about numismatics when I first represented
16   Stephen Fenton, and at the end of it I could say
17   that I knew probably everything that there is to
18   know about the 1933 Double Eagle."
19        Did this accurately record what you
20   told the reporter?
21        A.   I don't recall specifically what I
22   told the reporter.
23        But if you don't mind, I think it's
24   the full sentence that I'd be happy to read in the
25   record, if you want, but I think it's the full

Page 21

1    sentence - - the full paragraph, rather, about that
2    issue, where I say, "In terms of some of the
3    expertise, part of what I do as a trial lawyer is,
4    in every case," then parenthesis, I become, "an expert in
5    that matter as it relates to the case. I knew
6    virtually nothing about numismatics when I first
7    represented Stephen Fenton, and at the end of it I
8    could say that I knew probably everything there is
9    to know about the 1933 Double Eagle. But if you
10   want to ask me about a 1913 Liberty Head nickel, I
11   could tell you about the questionable background,
12   but other than that, my knowledge would fall far
13   short."
14        Q.   Okay. Thank you for reading the
15   whole paragraph.
16        A.   You're welcome.
17        Q.   I'm going to focus on that one part
18   about at the end of the Fenton case, knowing
19   probably everything that there is no know about the
20   1933 Double Eagle.
21        Did that accurately record what you
22   told the reporter?
23        A.   As I sit here today, I can't recall
24   the specific words I used. But I think the notion
25   that I knew an awful lot about the '33 Double Eagle

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 22

1  at the end of that case is an accurate statement.
2      Q.    Okay. Now, was this interview one
3  that was face-to-face?
4      A.    No.
5           I recall getting a call from Leon
6  Worden, I believe, on the weekend, I believe being
7  out of the office. I believe, talking to him on my
8  cell phone. And I believe he asked me if I could -
9  - he could ask me a few questions about the coins.
10     Q.    Was there a back and forth with this
11 article, in terms of you editing it?
12     A.    I recall one conversation.
13          Now, I should say, Leon Worden was
14 somebody who has called me on more than one
15 occasion. But if my recollection is correct about
16 this one, I remember specifically being away for
17 that weekends; I recall getting a call on my cell
18 phone and maybe he had called a few different
19 times. That's why I returned the call from my cell
20 as opposed to waiting until I was in the office,
21 although that part of my memory is not as clear.
22 But I do remember being on my cell phone and I
23 remember where I was standing when I spoke to him
24 and he asked me questions.
25          And I do not recall -- I'm fairly

Page 23

1  sure there was no follow-up; it was just one call
2  and questions.
3      Q.    You had a chance to edit this before
4  it was published; correct?
5      A.    I don't recall that.
6           MR. SWEET: It's a nice picture.
7           THE WITNESS: I don't think I've seen
8  that version of it.
9           MR. SWEET: We might have an extra.
10          THE WITNESS: You can make fun of me,
11 too. Everybody else does.
12          MR. SWEET: No, it is a nice picture.
13 I like it.
14 BY MR. SWEET: (Continued)
15     Q.    Okay. The issues, the legal issues
16 in the Fenton case included whether the Double
17 Eagles had been stolen from the Mint; correct?
18     A.    That was one of the legal issues in
19 the case; absolutely.
20     Q.    And another legal issue was whether
21 the Double Eagle had been put in circulation or
22 monetized as currency.
23          That was an issue too; right?
24     A.    I would describe the issue
25 differently than you're describing it.

Page 24

1      Q.    How would you describe it?
2      A.    I would describe the issue was
3  whether the coins could have been released lawfully
4  outside the Mint.
5           I would not refer to circulation; I
6  would not refer to those issues. I think the
7  question was whether or not it could have been
8  released lawfully from the Mint.
9      Q.    Okay.
10     A.    That would have included to private
11 collectors in exchange for gold, for gold, in a
12 variety of other ways.
13     Q.    So, you concede that -- do you
14 concede now that the Double Eagles were not put
15 into circulation?
16          MR. TIRSCHWELL: Objection.
17          He's not here to make concessions.
18 If you want to serve a request for admission,
19 go ahead.
20          MR. SWEET: We have.
21          MR. TIRSCHWELL: Okay.
22          MR. SWEET: With regards to that
23 request, you objected on the grounds we'll be
24 exploring it with Barry Berke's deposition.
25          MR. TIRSCHWELL: That question, why

Page 25

1  don't you show me that, Joel?
2           MR. SWEET: We'll get to that.
3           MR. TIRSCHWELL: Okay.
4  BY MR. SWEET: (Continued)
5      Q.    So on this question, do you concede
6  at this point that the 1933 Double Eagles were not
7  put into circulation by the Mint?
8      A.    I think - -
9           MR. TIRSCHWELL: Wait.
10          Now you're asking what our legal
11 position is in the Fenton litigation as a
12 matter of public record.
13          MR. SWEET: No, I'm asking - -
14          MR. TIRSCHWELL: He's not here to
15 answer questions about what our legal
16 position is in this case; he's here as a fact
17 witness.
18          THE WITNESS: What I can tell you is
19 there was no such concession in the Fenton
20 case, getting back to your original question.
21 BY MR. SWEET: (Continued)
22     Q.    At any point?
23     A.    On that issue.
24          (Off-the-record discussion between
25 the witness and Mr. Tirschwell.)

7 (Pages 22 to 25)

Page 26

1  BY MR. SWEET: (Continued)
2       Q.    I'm going to give you Berke Exhibit
3  2.
4            (Court transcript, 3 pages, so marked
5  Berke Exhibit 2 for identification by
6  counsel.)
7            (Handed to the witness.)
8       Q.    Take a look at that for a moment.
9       A.    (Witness complies.)
10      Q.    Do you recognize what this is?
11      A.    Let me just read it for a second.
12            (Witness reviews the exhibit.)
13      A.    Can I ask you this?
14            Is this the - - I should note it's
15  two pages of a much longer transcript.
16            This is the argument on the summary
17  judgment motion papers?
18            I just can't tell from the pages
19  you've given me.
20      Q.    Do you recognize now what this is?
21      A.    I recognize that this is a transcript
22  of a court appearance before the judge and I assume
23  that it's an argument based on your summary
24  judgment motions.
25            But without seeing more on the

Page 27

1  transcript, I can't say for certain that this is an
2  argument on the summary judgment motions as
3  opposed to some other argument.
4       Q.    Okay.
5       A.    But from the two pages, it says from
6  pages 24 and 25 of the transcript, I assume that
7  it's from the summary judgment argument, but I
8  would want to see more to make sure that's
9  accurate.
10      Q.    So, this is a excerpt of the
11  transcript from the Fenton case; is that correct?
12      A.    I'm sorry.
13            That's correct.
14      Q.    It's dated March 23rd, 2000; right?
15      A.    I see that.
16      Q.    But I'm going to refer you to page
17  25.
18      A.    Okay.
19      Q.    Where you say, "As I believe we
20  demonstrated - - and I don't think the government
21  can contest - - and we can present to the Court as
22  much documentation as necessary to show that" - -
23  and this is the part I'm focusing on - - "even
24  though" - - it's put a quote in there - - "even
25  though 1933 Double Eagles were not issued as part

Page 28

1  of a circulation or necessarily put through the
2  Federal Reserve Bank in the normal course, they
3  were given to collectors," et cetera.
4            I'm not going to finish reading.
5            Do you still contend that in the
6  Fenton litigation you did not concede the fact that
7  the Double Eagles were not put into circulation?
8       A.    Okay. Let me be clear.
9            MR. TIRSCHWELL: Before you answer
10  the question.
11            I object to the question. I object
12  to the form of the question.
13            I object to the relevance of the
14  question.
15            I want to make clear that - - why Mr.
16  Berke is here and what he will answer and why
17  - - and what he won't answer.
18            He's not here to be questioned about
19  his representation of Stephen Fenton, other
20  than to get some general background so you
21  know generally where he was coming from when
22  he came into this case.
23            There is absolutely no legal or other
24  significance to what positions Mr. Berke may
25  or may not have articulated in the Fenton

Page 29

1  litigation and I'm instructing him not to
2  answer the question.
3            MR. SWEET: Okay. Eric.
4            MR. TIRSCHWELL: Yes.
5            MR. SWEET: He testified - - would
6  you read back, please, his testimony?
7            MR. TIRSCHWELL: I remember his
8  testimony.
9            MR. SWEET: His answer to the last
10  question?
11            (The requested material was read
12  aloud.)
13            MR. SWEET: I would like to take a
14  break for a minute.
15            (Recess: 11:25 a.m.)
16            (Resumed: 11:26 a.m.)
17            MR. SWEET: I want to go back and ask
18  you a question, because it's either in the
19  transcript or it's not. We didn't just get
20  it now.
21  EXAMINATION (Continued)
22  BY MR. SWEET:
23      Q.    Before I showed you this exhibit, Mr.
24  Berke, you've testified that that issue was not
25  conceded in the Fenton litigation?

8 (Pages 26 to 29)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

---

Page 30

1          MR. TIRSCHWELL: What issue?
2          MR. SWEET: The issue of whether the
3    Double Eagles were circulated, put into
4    circulation.
5          MR. TIRSCHWELL: I object to the form
6    of the question.
7    BY MR. SWEET: (Continued)
8          Q.   And I'm showing you here - -
9          MR. TIRSCHWELL: Joel, I'm making my
10   objection.
11         MR. SWEET: Oh.
12         MR. TIRSCHWELL: You're making a
13   speech.
14         MR. SWEET: Are you making a speaking
15   objection or just an objection to form or - -
16         MR. TIRSCHWELL: Why don't you finish
17   your speech and - -
18         MR. SWEET: A privilege objection?
19         MR. TIRSCHWELL: Why don't you finish
20   your speech; I'll say what I have to say.
21   BY MR. SWEET: (Continued)
22         Q.   The question is: Do you recall
23   saying that before?
24         MR. TIRSCHWELL: Saying what?
25   BY MR. SWEET: (Continued)

---

Page 31

1          Q.   Before, in your testimony, that the
2    issue - - in the Fenton litigation you had not
3    concede whether the Double Eagles had been put into
4    circulation?
5          MR. TIRSCHWELL: You're asking him
6    what he testified to fifteen minutes ago?
7          MR. SWEET: Yes.
8          THE WITNESS: I don't recall the
9    precise question you asked.
10         What I can tell you, though, is in
11   the Fenton litigation we did not enter into
12   any factual stipulation.
13         I do not recall a - - I mean, I
14   recall a question you asked me earlier about
15   being issued, issued, which I didn't hear in
16   your last question, but I don't recall any
17   factual concession that we made.
18         I certainly know we didn't stipulate
19   that fact out of the case.
20         Prior to us litigating the case with
21   the actual facts that were in dispute at a
22   trial, the case settled.
23         Obviously, there was a period of
24   argument before the court in the context of
25   summary judgments, where we had to assume

---

Page 32

1    certain facts that were in the complaint to
2    be true for purposes of the argument.
3          That's why I believe this argument
4    was in the context of summary judgments,
5    although, again, it's hard to tell with only
6    two pages, where we were constrained, as you
7    know, as a matter of law, to assume the facts
8    that are alleged in the complaint to be true
9    for purposes of then arguing that,
10   nevertheless, there's a legal issue that
11   requires some action by the court.
12         And, again, I don't have the full
13   transcript in front of me, but I've just got
14   2 pages.
15         I believe this was in the context of
16   summary judgments argument.
17   BY MR. SWEET: (Continued)
18         Q.   Okay. But that is your - - that is
19   what you told the judge though - - right - - "even
20   though 1933 Double Eagles were not issued as part
21   of a circulation or necessarily through the
22   Federal Reserve Bank in the normal courses"?
23         MR. TIRSCHWELL: I object to the form
24   of the question.
25         You're reading a snippet of a very

---

Page 33

1    lengthy statement.
2    BY MR. SWEET: (Continued)
3          Q.   And that's what you told the judge at
4    the time; right?
5          A.   Well - -
6          MR. TIRSCHWELL: That's part of it.
7          THE WITNESS: Let's be clear.
8          Again, I don't have the rest of the
9    transcript. But what I read here to be the
10   focus of this argument is that we were
11   arguing whether they were released for
12   circulation.
13         In arguing that, nevertheless,
14   whether or not the coins were part of
15   circulation, which was not the issue, quote,
16   as it says here in the transcript, they were
17   given to collector; they were given to
18   numismatics; they were given to people who
19   showed up to the Mint or the Treasury
20   Department and said, "want a 20-dollar a gold
21   piece; I would like the one same year as
22   my family."
23         I don't - - I can't tell you the
24   exact words that I recall saying to Judge
25   Hellerstein, but, again, I do recall, I do

---

SUMMIT COURT REPORTING, INC.
215.665.5633 * 800.447.8648                    www.summitreporting.com

Page 34

1  believe this was in the context of having to
2  assume the truth of the government's
3  allegations and making the larger point that
4  I believe I had made earlier, that the issue
5  that I recall was whether or not they had
6  lawfully left the Mint.
7      Period.
8  BY MR. SWEET: (Continued)
9      Q.    Mr. Berke, in connection with the
10 government's present dispute with the Langbords,
11 could you identify each person representing the
12 United States with whom the Langbords
13 representatives have communicated?
14     MR. TIRSCHWELL: When you say
15 "representing the United States," meaning
16 this case?
17     MR. SWEET: In this case, sure.
18     MR. TIRSCHWELL: In this case.
19 In this litigation?
20     MR. SWEET: Yes.
21     MR. TIRSCHWELL: Okay.
22     MR. SWEET: Including the
23 negotiations proceedings?
24     MR. TIRSCHWELL: Yes.
25     MR. SWEET: If you want to call them

Page 35

1  negotiations, the communications between --
2  let's start over.
3  Strike that.
4  BY MR. SWEET: (Continued)
5      Q.    In 2004 you contacted the Mint
6  concerning the Langbord family having possession of
7  ten 1933 Double Eagles; correct?
8      A.    That is correct.
9      Q.    And at some point you filed a lawsuit
10 on behalf of Langbords; correct?
11     A.    That is correct.
12     Q.    From the first communication until
13 the time you filed the lawsuit, I would like you to
14 identify for me all of the people that communicated
15 with the government on behalf of the Langbords.
16     A.    Okay. I would like to consult with
17 my counsel as to a privilege issue, if that's okay?
18     MR. TIRSCHWELL: I don't think I
19 understand.
20 You're asking who in the government
21 he communicated with?
22     MR. SWEET: I'm asking him now, I'm
23 starting with the Langbords.
24     MR. TIRSCHWELL: Okay; I'm sorry.
25 BY MR. SWEET: (Continued)

Page 36

1      Q.    Who communicated, on behalf of the
2  Langbords, with the United States Government?
3      MR. TIRSCHWELL: Who communicated on
4  behalf of the Langbords with the United
5  States Government?
6      MR. SWEET: Yes.
7      THE WITNESS: I thought the question
8  was a different question than that.
9  Maybe now I don't understand the
10 question.
11     MR. TIRSCHWELL: You mean their
12 lawyers or other representations?
13     MR. SWEET: I'm going to get into a
14 lot of communications between the Langbords
15 and the government.
16     MR. TIRSCHWELL: Right.
17     MR. SWEET: So right now I want to
18 identify all the lawyers on the Langbord side
19 who had communications with the government
20 and all the people on the government side who
21 had communications with the --
22     MR. TIRSCHWELL: Langbord
23 representatives.
24     MR. SWEET: So that we know who the
25 lawyers are.

Page 37

1      MR. TIRSCHWELL: Okay.
2      MR. SWEET: And we can identify all
3  the communications.
4  BY MR. SWEET: (Continued)
5      Q.    So, let's start with the Langbords'
6  side.
7      A.    Okay.
8      MR. TIRSCHWELL: Who from the
9  Langbords' side communicated with the
10 government?
11     MR. SWEET: Yes.
12     THE WITNESS: Okay. I communicated
13 with the government; Lauren Friedman
14 Bosworth, who was a Kramer Levin associate at
15 the time, was involved in discussions with me
16 with the government.
17 And I'm describing the time frame
18 that you identified.
19     Q.    Yes, from your first phone call to
20 the Mint, 2004, about the Langbords --
21     A.    Okay.
22     Q.    Until the time you filed the lawsuit.
23     A.    Okay. Steven Sparling had limited
24 communications. I believe my assistant had limited
25 communications.

10 (Pages 34 to 37)

Page 38

1    Q.    Who would that be?
2    A.    I believe at the time Olivette
3  Taylor.
4          But that's only to take calls, et
5  cetera.
6    Q.    Yes?
7    A.    I should limit it to Olivette or
8  anyone else that was acting as my assistant at the
9  time, to be precise.
10         Roy Langbord.
11   Q.    "Roy," you said?
12   A.    Roy Langbord had communications with
13 the government.
14         Senator Laxalt; Senator Laxalt's
15 daughter.
16         MR. TIRSCHWELL: Michelle.
17         THE WITNESS: Thank you.
18         Michelle Laxalt.
19   Q.    From Podunk?
20   A.    Sorry?
21   Q.    From Podunk?
22   A.    Yes.
23         MR. TIRSCHWELL: I don't think he
24 read the transcript.
25         MR. SWEET: At her deposition she

Page 39

1  offered to translate her answers into Podunk
2  for me.
3          THE WITNESS: Okay.
4          I did not know that.
5          I'm not - - and I don't know, there
6  may have been other people that worked with
7  Michelle and Senator Laxalt, who also had
8  communications. I just don't know, as I sit
9  here today.
10 BY MR. SWEET: (Continued)
11   Q.    Anyone else?
12   A.    Nobody who comes to mind, as I sit
13 here today.
14   Q.    Okay.
15   A.    If I think of anybody else as we're
16 speaking, I'll let you know.
17   Q.    On the government's side?
18   A.    Okay.
19         MR. TIRSCHWELL: By the way, when you
20 say "the government," are you limiting
21 yourself to the executive branch of the
22 government or any - - are you referring to
23 any members of Congress, just so we're clear?
24         MR. SWEET: The United States
25 Government.

Page 40

1          MR. TIRSCHWELL: All three branches?
2          MR. SWEET: Yes.
3          But no contractors.
4    A.    Okay.
5          And let me just qualify this. This
6  is, obviously, based on my recollection as I sit
7  here today.
8    Q.    Of course.
9    A.    Obviously, Dan Shaver, Greg Weinman,
10 there were two Secret Service agents who I met in
11 Brooklyn and two or three agents who I met in
12 Philadelphia.
13         I've seen documentation with their
14 names in it - - on it, but I have no independent
15 recollection of their names, but I'm sure you know
16 who they are.
17         Okay?
18   Q.    I'm going to give you some names.
19 Would that help you?
20   A.    I can tell you, I've read their names
21 in documents but I still have no independent
22 recollection of their names.
23   Q.    Okay.
24   A.    But you know who I'm talking about.
25   Q.    Yes.

Page 41

1    A.    The names in the documentation, I
2  can, you know, confirm that those are the names in
3  the documentation. I just can't independently
4  remember - -
5    Q.    Let's go on.
6    A.    Knowing those names at the time.
7          Okay.
8          The Laxalts had discussions with, I
9  believe, Arnold Havens, who is General Counsel of
10 the Mint - - I'm sorry - - General Counsel of the
11 Treasury.
12         I'm sorry.
13         And there may have been other people
14 who were part of those discussions, where Mr. Haven
15 was, but I just don't know.
16         And as I sit here today, I don't
17 recall whether or not there were other people
18 beyond Arnold Haven, who Senator Laxalt spoke to,
19 and I'm not prepared to say there weren't others.
20 But I'm not prepared to say, one way or the other,
21 just to be clear.
22   Q.    Okay.
23   A.    I have a recollection of somebody
24 from either Senator Laxalt or Michelle Laxalt
25 having a conversation with either Congressman Lucas

11 (Pages 38 to 41)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 42

1    or someone from his staff, or both.
2         I recall having a conversation with
3    Congressman Lucas or someone from his staff, or
4    both. But, obviously, my recollection is not so
5    clear.
6         And I believe it was a conversation
7    with Congressman Lucas, I believe.
8         As I sit here today, those are the
9    people that I've had a conversation with.
10        There are, obviously, letters
11   written, which you have, which included other
12   people in the government to whom the letters were
13   addressed.
14        That's my recollection.
15        I have spoken to other people in the
16   government, obviously, in other context. But - -
17   I'm sorry - - Jane Levine I recall a conversation
18   with.
19   Q.    While she was in the U.S.A.?
20   A.    Yes.
21   Q.    Anyone else?
22   A.    That's my recollection, as I sit here
23   today.
24   Q.    Okay.  Lauren Friedman Bosworth?
25   A.    Bosworth.

Page 43

1    Q.    Bosworth, do you recall whether she
2    participated with you in any meetings with
3    representatives of the Mint?
4    A.    She participated in phone
5    conversations.
6    Q.    Do you recall which ones?
7    A.    I don't.
8         These were conversations with some
9    combination of Dan Shaver and Greg Weinman.
10        I say some combination.  It could be
11   Dan; it could have been Greg; it could have been
12   both.
13        I believe she participated in a
14   conversation shortly prior to the September 21st
15   transfer and then, I believe, she participated in
16   calls between that date and a meeting that took
17   place in Washington regarding the coins sometime
18   after that.
19   Q.    So, these are calls with Mint
20   representatives?
21   A.    Yes.
22   Q.    Okay.  Any other contacts that you
23   know of?
24   A.    That's my recollection.
25        She was - - let me just describe -

Page 44

1    - she was an associate at our firm who had come
2    back from maternity leave right around the time of
3    my initial meeting with the Mint and she since left
4    the firm, just to go into in-house - - an in-house
5    counsel position.
6    Q.    Do you know where she is?
7    A.    No, not off the top of my head I
8    don't.
9    Q.    Okay.  Do you know if she had - -
10   A.    It's a pharmaceutical, a company in
11   New Jersey.  I just don't remember the name.
12   Q.    Do you know any - - if she had any
13   conversations or communications with the Mint in
14   which you were not a participant?
15   A.    I don't believe so.
16   Q.    We've spoken to Mr. Sparling.
17        Olivette Taylor, that would just be
18   administerial?
19   A.    Literally, you know, she got Dan
20   Shaver or Greg Weinman on the phone, something like
21   that.
22   Q.    Roy Langbord?
23   A.    The only communication that comes to
24   mind is at the Starbucks, where we met prior to the
25   transfer on September 21st, very brief

Page 45

1    communication, and then I remember communication -
2    - I guess they can agree - - there were
3    communications during the time that the coins were
4    being taken out of a safe deposit box by a Mint
5    representative, with Mr. Langbord and Secret
6    Service and possibly Mint representatives, and
7    then, immediately after that, I believe, there was
8    a brief exchange, potentially, involving Mr.
9    Langbord and Mint representatives.
10   Q.    Same day?
11   A.    All the same day.
12   Q.    You said September 21st.
13        It's September 22nd; correct?
14   A.    September 22nd.
15        Thank you.
16   Q.    Okay.  And the Starbucks meeting was
17   the same day, as well; right?
18   A.    All the same day.  September 22nd,
19   you're correct.
20   Q.    And Senator Laxalt and Michelle
21   Laxalt, you cannot put a date or time on those
22   communications?
23   A.    I cannot.
24   Q.    Now, your conversation with Jane
25   Levine, when did that occur?

Page 46

1    A.   I recall running into Jane near her
2  office, in the Southern District, on some occasion.
3  I really can't remember when.
4       I don't remember a particularly
5  substantive discussion.
6       I just have a vague recollection of
7  running into her when I was there for another
8  matter and ran into her.
9    Q.   Coincidental?
10   A.   Purely coincidental.
11   Q.   Do you have any - -
12   A.   And I don't remember the details,
13 other than it was a light and brief discussion.
14   Q.   Do you know if it was before or after
15 September 22nd, 2004?
16   A.   I believe it was almost certainly
17 after. But I don't have a clear recollection of
18 the time frame.
19   Q.   Do you recall any substance being
20 discussed concerning the 1933 Double Eagles?
21   A.   I really don't recall the
22 conversation, other than it was brief and I was
23 there on another matter and I assume I had other
24 people with me. Because I typically have other
25 people with me.

Page 47

1       And then I recall receiving a phone
2  call from Ms. Levine. I can't recall the precise
3  date, but I remember I was in the middle of a trial
4  in the Eastern District.
5       And if you want a date, I could give
6  you at least a framework of when it could be, when
7  we were on trial.
8       And I remember getting a message from
9  her to call her.
10      I remember calling her during a lunch
11 break from my trial, from my cell phone.
12      I don't recall the specifics of the
13 call, by I recall her saying, in substance, that
14 she wanted to let me know that there was a dispute
15 of some sort between the Secret Service and the
16 U.S. Mint related to the coins and to let me know
17 that it was possible the Secret Service may try to
18 interview Joan Langbord.
19      She may have said - - I remember Joan
20 - - it may have been the Langbord family. I don't
21 recall specifically.
22      I recall having the impression that
23 she didn't think it was an appropriate thing to do,
24 but I can't say whether she expressed that or I
25 inferred that from the tone and the nature of the

Page 48

1  call.
2       That's what I recall about the call.
3  I remember where I was when I received it, as I
4  said, during a lunch break.
5       But, as I sit here today, I don't
6  remember any other aspect of that call.
7    Q.   Any conversations with Jane after
8  that, while she was still in the U.S.A.?
9    A.   There may have been. I don't recall.
10   Q.   Did you have any communications with
11 Jane Levine after her departure from the U.S.
12 Attorney's Office?
13   A.   I have had conversations with her; I
14 had a lunch with her. But I don't recall any
15 discussions in the conversations we've had where
16 the lunch related to the - - related to the
17 Langbords' '33 Double Eagles.
18   Q.   The Langbords, the dispute with the
19 Langbords between the Langbords and the government,
20 that didn't come up at all?
21   A.   I don't recall a discussion about it.
22 It's possible we said, "Oh, it's still going on;
23 it's going on," but I don't recall a discussion
24 about it.
25      I remember having a conversation with

Page 49

1  her about other things and me not raising that
2  issue, nor she raising it.
3       Then I remember we had a lunch
4  shortly after she took on her new position at
5  Sotheby's, a - - you know, in her role as - - I
6  forget her title - - but her title as senior lawyer
7  at Sotheby's.
8    Q.   Do you recall 1980 - - 1933 Double
9  Eagles being discussed?
10   A.   I would find it hard to believe that
11 we didn't have a discussion about the Fenton case,
12 just because we both lived through that case for an
13 extended period of time. So, I assume we did
14 discuss it.
15      I don't remember the details.
16   Q.   Okay. Mr. Berke, understand then
17 that I'm going to draw a conclusion based on your
18 testimony concerning representatives of the
19 parties, and tell me if I'm incorrect.
20      Except for discussions with - - this
21 occurred between the Laxalts and anybody in
22 Washington, D.C., the communications between the
23 Langbords and the government always involved you
24 being present in the communications; correct?
25   A.   I mean, I'd have to go back through

13  (Pages 46 to 49)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 50

1   what I just testified to.
2           I mean, I think my testimony
3   described that I was - - that, you know, putting
4   aside the Laxalts, I was, you know, the principal
5   person, as counsel for the Laxalts, and my dealing
6   - - I'm sorry - - representing the Langbords in my
7   dealing with the government.
8       Q.   Okay.
9       A.   I'm not agreeing with your statement.
10  I just have to think through every contact I have.
11      Q.   I read the through the list and,
12  except for the Laxalts, there's nobody else who
13  interestingly, independent from you, communicated
14  with the government.
15      A.   I believe that's correct.
16          MR. TIRSCHWELL: Just so we're clear,
17  we're up until the time of the filing of the
18  complaint?
19          MR. SWEET: Right.
20          THE WITNESS: That has been my
21  assumption.
22          MR. SWEET: We'll mark this as Berke
23  3, a copy of the settlement agreement in the
24  Fenton litigation.
25          (Settlement agreement, so marked

Page 51

1           Berke Exhibit 3 for identification by
2           counsel.)
3           (Handed to the witness.)
4   BY MR. SWEET: (Continued)
5       Q.   I'm going to represent to you, in the
6   upper right-hand corner it says, "Ex. 2," that is
7   my handwriting.
8       A.   Okay.
9       Q.   That I put on this document at the
10  deposition last week.
11      A.   Okay.
12      Q.   You're familiar with this document?
13      A.   I am.
14      Q.   How so?
15      A.   I represented Stephen Fenton in the
16  settlement that's reflected by this agreement.
17      Q.   So, you had a substantial role in the
18  - - the primary role on behalf of Fenton in the
19  negotiation over this agreement; correct?
20      A.   I had the primary role on behalf of
21  Stephen Fenton in negotiation of the settlement.
22      Q.   Well, this is memorialized in the
23  settlement; correct?
24      A.   It does.
25          I draw the distinction only because

Page 52

1   there was significant discussions regarding the
2   settlement and the terms and what was important to
3   both parties prior to it being recorded as an
4   agreement.
5           What I recall is that the
6   negotiations that were at the heart of the
7   negotiations really revolved around reaching the
8   terms of the settlement. Once we did that,
9   including what was important to both parties, there
10  wasn't much negotiations in the agreement we had
11  already reached, you know, or the framework as to
12  what was important to Mr. Fenton and what was
13  important to the government.
14      Q.   Okay.
15      A.   That's why I draw that distinction.
16      Q.   This settlement agreement, Berke 3,
17  memorializes the agreement that resolved that
18  dispute; correct?
19      A.   That is correct.
20      Q.   If you look at B-2 - - I'm sorry - -
21  page 2, page 2, sub-paragraph b, under paragraph 2?
22      A.   Okay.
23      Q.   It says, "the sale of the In Rem 1933
24  Double Eagle shall take place on mutually agreeable
25  terms in a commercially reasonable manner to be

Page 53

1   agreed upon by the United States Mint Public
2   Enterprise Fund and Mr. Fenton."
3           Did I read that correctly?
4       A.   Yes.
5       Q.   This provision gave certain right to
6   Mr. Fenton to be involved in the approval of the
7   promotional material for the auction; correct?
8       A.   I would disagree with that.
9       Q.   Okay.
10      A.   Well, I don't want to be unfair. It
11  gave him a lot more than that.
12      Q.   Oh, yes.
13      A.   I mean, let me just be clear. Maybe
14  I misunderstood your question.
15      Q.   I asked a bad question. Let me start
16  over. Under this agreement, did Mr. Fenton have a
17  right to participate in the consideration of
18  promotional materials for the auction?
19      A.   Well, let me say this. What Mr.
20  Fenton wanted, and what's reflected in this
21  agreement, is the ability to have an equal say in
22  terms of the terms and decisions related to the
23  sale of the coin.
24      Q.   Okay.
25      A.   There was an overlay that the

14  (Pages 50 to 53)

## Page 54

1   government had certain federal regulations that
2   governed the government's hiring of vendors, and
3   the like, that was just a practicality to deal
4   with.
5           The purpose of the agreement is to
6   say that Mr. Fenton would receive half the
7   proceeds, but would also have a say on issues such
8   as how the coin was going to be auctioned; was it
9   and auction or private sale and issues such as
10  that, there were - - that it was understood
11  that he would have equal rights to the Mint.
12      Q.      Okay.
13      A.      Or, I should say, to the United
14  States Mint Public Enterprise Fund.
15      Q.      In connection with the auction
16  process, you were involved in reviewing and
17  approving text for the catalogue and for Sotheby's
18  magazine articles, et cetera?
19      A.      Up to a point.
20          And I say that because after the
21  discussion of the agreement, there were issues
22  regarding how much - - what Mr. Fenton's rights
23  were, vis-a-vis what the U.S. Mint said about the
24  coin and what - - how that was reflected.  There
25  were issues regarding that and some disagreement as

## Page 55

1   to what role he would play.
2       Q.      How did that play out?
3       A.      Well, again, the issues, although I
4   certainly had dealings with Mr. Shaver and Mr.
5   Weinman in connection, I recall most of the
6   discussion as to the marketing issues, and issues
7   such as that were issues to be with a gentlemen by
8   the name of David Pickens, and I recall having
9   communications where we said, "Stephen Fenton's
10  sole interested is maximizing the value of the coin
11  and on making sure that nothing is said that - -
12  has a reputation impact on it."
13          Beyond that, he's perfectly
14  comfortable with it being, essentially, a Mint sale
15  because he believes that will maximize the value
16  and he's perfectly happy to fade into the woodwork
17  in a public way because, again, it was his view
18  that the market value would be the U.S. government
19  selling this coin and it set up the framework where
20  the government had much more say in terms of the
21  P.R. and releases and the like, because it was an
22  understanding between the parties that that would
23  be the best way to attract attention, bidders, and
24  working with Sotheby's, trying to maximize the
25  value.

## Page 56

1       Q.      You were involved in this role;
2   correct?
3       A.      I was. I was, up to a point.
4           But i do recall there being instances
5   - - as I sit here today. I can't recall exactly
6   what it was - - but it was on important fundamental
7   issues on which there was some agreement about what
8   role Mr. Fenton would play. It may have been
9   things such as the reserve to be set, which would
10  be the minimum price that would be met.
11          And I remember different points there
12  were some issues about what role Mr. Fenton had a
13  right to have and what role he should have.
14          I recall that we worked through those
15  issues.
16          But as a general matter, as to
17  marketing issues, as to the catalogue, what I
18  recall is playing some role in that, also as a
19  facilitator because I had documents that were
20  produced in discovery and thing like that, but that
21  there was a general consensus, certainly from the
22  government's view and our view, that it would be
23  better for the government's position in this to be
24  dominant in terms of the P.R. for the sale than for
25  Mr. Fenton because that would be - - that would

## Page 57

1   help to bring in the greatest value for the coin.
2       Q.      Leaving aside whose voice was
3   dominant, could you describe your role in the
4   review of publicity material for the sale?
5       A.      Okay. I recall that the Mint had
6   some strong views about what they wanted to say and
7   didn't want to say because I think it was viewed
8   that the catalogue would be viewed as a statement
9   by the government, which, obviously, has much
10  greater restrictions on it than Mr. Fenton. So, I
11  recall that the government had strong views about
12  what they wanted to say and what they didn't want
13  to say.
14          I recall that the catalogue writer,
15  which was, you know, I think, principally David
16  Tripp, T-R-I-P-P, who was doing the day-to-day, was
17  essentially using governmental documents to put
18  together sort of what were reflected in the
19  documents, put together a time line of things to
20  tell an interesting story that he thought would
21  help the marketing and sale of the coins.
22          I recall having things to say about
23  certain issues that had come up at times that were
24  more, for example, the individual who had been
25  involved with Mr. Fenton in purchasing certain

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

---

Page 58

1  coins prior to the '33 Double Eagle. had a strong
2  view that his name never be publicly used and there
3  was a separate agreement that at the time Jane
4  Levine, on behalf of the government, and myself, on
5  behalf of Mr. Fenton, had entered into with him and
6  I recall that David Tripp wanted to use his name
7  and there were issues about whether or not, because
8  the name had already been published somewhere else,
9  could you do that. And I remember being involved
10 in that.
11            I remember some specific questions
12 and issues coming up like that.
13            I remember there was some questions
14 about something in the litigation, although, I
15 think, we felt and think it was agreed, that the
16 litigation part of it is not something that
17 enhanced the sale value. So, I think a lot of
18 those facts were just not part of what was being
19 told.
20            So, I would say the lion's share of
21 what was done was done with Sotheby's and the
22 people working with Sotheby's to do the catalogue,
23 working with, principally, David Pickens, who I
24 understood had a big role in marketing, as well as
25 other people at the Mint, and that I would

Page 59

1  occasionally play a role.
2            We asked that we be able to see
3  things, again, principally with a view towards
4  making sure there was nothing there that had a
5  reputational impact on Mr. Fenton; number 1.
6            Number 2: Mr. Fenton, having been in
7  the coin business all his life, had views as to
8  what would help market the coin and, I think,
9  occasionally expressed those views through me and I
10 would typically be the conduit to represent those
11 views.
12            And then, 3: The catch-all, if there
13 were other issues.
14       Q.    Excuse me.
15            You would be the one whose views - -
16       A.    Mr. Fenton.
17            He would send the recommendations to
18 me, I would send it to him and then they would see
19 if it would help the sale, if they were comfortable
20 saying something else about the coin or they
21 emphasized the U.S. government or something,
22 something like that.
23            I'm giving you an example that I'm
24 making up.
25            But you understand, it would be

Page 60

1  specific issues to emphasize purely marketing
2  value.
3            And then the third would be whether
4  there were specific issues that came up, like the
5  technical legal issue of identifying the identity
6  of the third person.
7            I would say I played more of a role
8  at the very outset, in terms of getting documents,
9  just as they were handed to me, in terms of looking
10 at certain things that they had c.c.'ed me to look
11 at.
12            But then, as time had gone on, the
13 drafting of the catalogue sort of took on momentum.
14            My memory, as I sit here today, is
15 that I played less of a role, as did my client,
16 after, as it - - as the people at the Mint - - I'm
17 sorry - - people at Sotheby's began to form a clear
18 view of what they thought would be the best way to
19 market the coin.
20       Q.    You provided documents for Tripp, as
21 well, so that he can prepare material for the
22 catalogue; right?
23       A.    I recall having conversations with
24 Jane Levine, that we were all working off the same
25 documents, they were discovery in the case. And I

Page 61

1  recall having conversations with her about figuring
2  out what's the best way to get them to Tripp.
3            And at the end of the day, as I sit
4  here today, I don't remember what documents he had
5  provided and what documents I provided.
6            This was in - - he was hired by
7  Sotheby's to do the catalogue. So, this was in
8  connection with the catalogue.
9       Q.    You had the ability to provide
10 whatever information you had to him to make sure
11 that it would be a catalogue that was accurate.
12            That was the goal; right, to make it
13 accurate?
14       A.    No. I did not - - when you say
15 "accurate," I did not play a role to fact check.
16 In fact, I believe the catalogue mostly involved,
17 you know, supposition, hypothesis, ideas.
18            I think the idea was just to tell a
19 good story to try to get people intrigued. And I
20 think everyone recognizes, as much as is not known
21 about the '33 Double Eagle, some of the things that
22 are known tell a very good story.
23            So, I think the goal was to make sure
24 that Sotheby's and the people working on it had
25 enough documents to tell a compelling story that

16 (Pages 58 to 61)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

---

Page 62

1  they thought they were trying to tell to draw
2  interest and, at the time, as I said, to make sure
3  there was nothing about - - that would have a
4  reputational impact on Mr. Fenton.
5          And I think those issues were fairly
6  easy to resolve because everyone agreed focusing on
7  the initial seizure and the issues of Mr. Fenton, and
8  those issues, were not necessarily a key part of
9  the marketing.
10         Q.   Mr. Berke, you had an opportunity to
11 review the final version before it went to print;
12 right, of the catalogue?
13         A.   I recall reviewing drafts of it.
14 But, as I said, after it had gone on and I saw they
15 were not going to focus on the things that were
16 mostly - - that I was mostly concerned about, that
17 I viewed that to be an issue mostly between
18 Sotheby's and the Mint to make sure the Mint was
19 comfortable with what they were saying and
20 Sotheby's was - - was of the view that it was the
21 best marketing.
22         And I think part of the issues that I
23 mentioned earlier between us and David Pickens,
24 principally, in terms of the roles, that he viewed
25 their role as really controlling that process.

Page 63

1          Q.   I don't - -
2          A.   And so, I don't recall playing a
3  principal role after things got off the ground.
4          I'm sure they sent us, you know,
5  drafts to look at because we told them they were
6  obligated to do that and I'm sure. But I don't
7  recall whether it was the final draft.
8          And I don't remember, as I sit here
9  today, playing a significant role and going through
10 that at that point.
11         Q.   Let me go back to my question.
12         A.   Okay.
13         Q.   Do you recall reviewing the final
14 draft of the catalogue before it went to - -
15         A.   As I sit here today, I didn't review
16 a final draft. But I'm sure we reviewed a draft
17 that was, you know, a fairly developed draft.
18         Q.   Do you recall - - do you remember
19 giving approval on behalf of Fenton for the final
20 draft before it went to print?
21         A.   I don't, as I sit here today. But I
22 would suspect that we did give some sort of
23 approval to go forward.
24         Q.   Okay.
25         A.   But I don't recall that, as I sit

Page 64

1  here today.
2          Q.   Okay.
3          A.   Let me just be clear. When I say
4  "approval," it may be clear to you, but in case
5  it's not, there was no efforts by us - - and we
6  were very brief, we're not approving any of the
7  factual statements or anything like that.
8          If, at all, the only question was:
9  Did this in any way impact on the three things I
10 told you; you know, was it going to do a
11 reputational harm to Mr. Fenton, which we resolved
12 early; was there any other things that Mr. Fenton
13 thought should either be done or shouldn't be done
14 or should be done to enhance the marketing of the
15 coin; and then on the third, whether it implicated
16 any other legal issues that came up during the
17 course of the litigation.
18         Q.   Mr. Berke, you knew the catalogue
19 would be relied upon for people who would be
20 bidding millions of dollars for this coin; right?
21         A.   When you say "replied upon," it was
22 the catalogue that Sotheby's was issuing and I knew
23 that the U.S. government was, obviously, part of
24 the sale.
25         Q.   Okay. If there were inaccuracies and

Page 65

1  you noticed them, you would have pointed them out;
2  correct, because you knew somebody was going to
3  spend million of dollars on this coin and this was
4  the primary market package document for the coin?
5          MR. TIRSCHWELL: Objection to the
6  form of the question.
7          THE WITNESS: Let me be clear. When
8  you say "inaccuracies," the entire document
9  included, you know, sort of thoughts and
10 views that we vehemently disputed.
11         This was a theory. And they are
12 positive throughout the report. We didn't
13 have a view to that. That's all they wanted,
14 to tell the story. Their views.
15         And honestly, as I mentioned, it was
16 Mr. Fenton's view, which made sense to me,
17 that it was the best sale if this was sold
18 from the government's prospective because
19 that's what will attract value and also make
20 - - make collectors comfortable with having
21 what had been a controversial coin, that it
22 was being sold by the government.
23         So, we viewed the document to be
24 largely a government prospective. This is
25 the government's position about this coin,

17 (Pages 62 to 65)

Langbord v. US Dept. of Treasury, et al.                  Barry Berke 6/18/2008

Page 66

1    largely.
2        But again, our view was that that's
3    the way to go to best market it. So, we
4    agreed with that strategy. So, we didn't in
5    any way have a view - - when I say "we," I
6    should speak to me and my role as counsel for
7    my client - - that this was a definitive
8    history of the '33 - - and I don't have the
9    catalogue in front of me - - but I don't
10   believe it was written in that way.
11   BY MR. SWEET: (Continued)
12       Q.    Okay.
13       A.    To suggest that, you know, this is a
14   document that Mr. Fenton and the government agreed
15   or stipulated this was a definitive history related
16   to the coin, or stipulated to facts about the coin
17   - - related to the coin - - but if you have it,
18   I'll look at it - - but I don't have a clear memory
19   of that.
20       Q.    It was your understanding - - let me
21   make sure I have this clear - - that the facts as
22   presented in the catalogue you understood to be the
23   government's view of the facts?
24       A.    Largely, yes.
25       Q.    Okay.

Page 67

1        A.    And the government made certain
2    decisions about what they wanted to say and didn't
3    to say.
4        For example, I recall specifically
5    the government did not want to say that this was
6    the Farouk coin, the same '33 Double Eagle that had
7    once been owned by King Farouk of Egypt.
8        Q.    Mr. Berke, would you turn to
9    paragraph 6 of the agreement?
10       A.    Sure.
11       Q.    We're still talking about Berke 3.
12       Do you see this provision?
13       (Witness reviews the exhibit.)
14       A.    Yes.
15       Q.    Who asked for this provision to go
16   into the final agreement?
17       A.    The government.
18       Q.    Do you have - -
19       A.    And - - I'm sorry.
20       Q.    Did you have any discussions about
21   this?
22       A.    I recall that in our negotiations for
23   a settlement there were certain things that Mr.
24   Fenton wanted and certain things that the
25   government wanted. And it led, once we crossed the

Page 68

1    threshold of saying we're going to reach a
2    settlement, it was easy to do because the things
3    the government wanted, Mr. Fenton had an interest
4    in, didn't care.
5        Q.    What were the things the government
6    wanted?
7        A.    What I recall the government - - when
8    we had the negotiations, the terms were that there
9    would be an auction of the coin and the proceeds
10   would be split.
11       Q.    Yes?
12       A.    There was some discussion about
13   whether the split would first include Mr. Fenton
14   gets his purchase price back and then you split and
15   there was some discussion about how to make the
16   split.
17       But, essentially, we quickly came to
18   a split of net proceeds, which seemed to be a
19   reasonable way of doing it.
20       Then, from Mr. Fenton's prospective,
21   what he wanted was, he wanted absolute, you know,
22   an equal say in terms of how to sell the coin and
23   whether it should be sold and what number. He
24   didn't want the government to do a sale that he
25   thought was an undervalue of the coin.

Page 69

1        And he wanted a complete release.
2        Q.    Coin, single?
3        A.    Coin.
4        Thank you.
5        And he wanted a complete release.
6        Q.    He doesn't have it anymore, does he?
7        A.    Not that I know of.
8        MR. TIRSCHWELL: Objection.
9        THE WITNESS: Note the smile.
10       MR. TIRSCHWELL: And I would object.
11       A.    And I'll note, I was smiling.
12       Q.    Let's go back to my question.
13       A.    Let me just - - no, can I just finish
14   though?
15       Q.    Absolutely.
16       A.    Okay.
17       And the government had two things
18   that were important to them.
19       Q.    That's what I wanted.
20       A.    I remember the government said, you
21   know, "We're going to enter into this but, you
22   know, this is sort of what we're going to want to
23   say; that, you know - - you know, we get the coin
24   pending - - between the time the settlement
25   agreement is executed and the sale; you can say

18  (Pages 66 to 69)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

---

**Page 70**

1    that we have the coin."
2           And Mr. Fenton said, "I couldn't care
3    less who has the coin or who has" - - however you
4    describe it. We had no interest in that because it
5    didn't affect the value of the settlement.
6           Then I recall, at some point - - I
7    can't say this was part of the negotiations
8    initially and may have been at the time we executed
9    the agreement - - they wanted to put in the fact
10   that this is not intended to have any precedential
11   significance.
12          Again, from Mr. Fenton's prospective,
13   it didn't impact the value of the settlement to him
14   and he had only one coin, so he really had no
15   interest in whether it had precedential
16   significance or not.
17          Q.    Okay. There were no other aspects of
18   the agreement that are outside of this written
19   agreement; correct?
20          (Witness reviews the exhibit.)
21          A.    There were other agreements that need
22   to be - - needed to be met, to effectuate this.
23   For example, the dismissal of the action.
24          There was some technical issue that
25   came up, that we had to reach an agreement how to

**Page 71**

1    resolve.
2           Then there were issues that came up
3    that we resolved, but this is the essential terms
4    of the agreement.
5           Q.    Okay. I just want to turn to your
6    phone call in the summer of 2004 to the Mint, the
7    first contact.
8           A.    Do you mind taking a brief break,
9    just while I go to the men's room?
10          MR. SWEET: Absolutely.
11          THE WITNESS: Is that okay?
12          MR. SWEET: Take a break for three
13   minutes, four minutes?
14          Take your time.
15          (Recess: 12:17 p.m.)
16          (Resumed: 12:25 p.m.)
17          MR. SWEET: The record is open.
18   EXAMINATION (continued)
19   BY MR. SWEET:
20          Q.    Do you want to clarify something,
21   after having a break?
22          A.    I do.
23          Q.    After you've had the opportunity to
24   consider your answer?
25          A.    Not to consider my answer.

**Page 72**

1           As I mentioned. I was going to
2    reflect whether there was any other government
3    contacts.
4           Q.    All right.
5           A.    And I recall - - I recall that the
6    Laxalts had communication with Congressman Hyde.
7    It may have been after he left the Congress. I
8    don't recall that. But he was the principal author
9    amended CAFRA bill.
10          Then I have a very vague recollection
11   of having a conversation with someone in the staff
12   of one of two senators, either Senator Lieberman or
13   Senator Alan Spector.
14          And - -
15          Q.    You've had a contact?
16          A.    I believe I had - - I say, "I
17   believe." Either I had it or Lauren Friedman
18   Bosworth had it or some combination.
19          I believe it was a very brief
20   contact.
21          And the reason was somebody had had a
22   conversation with one of the two - - I just don't
23   recall which, as I'm sitting here - - I just don't
24   recall who knew about the coins and expressed there
25   may be some interest on their part to learn more

**Page 73**

1    about the coins.
2           I recall one very brief conversation
3    with somebody on the staff, just to give them a
4    very, very thumbnail sketch, as I recall, just
5    being the facts.
6           Q.    Okay.
7           A.    But I don't remember which one it
8    was.
9           MR. SWEET: Thank you.
10          THE WITNESS: Okay.
11   BY MR. SWEET: (Continued)
12          Q.    Let's go to the summer of 2004, when
13   you made your initial call to the Mint concerning
14   the Langbords having possession of 1933 Double
15   Eagles.
16          What do you recall of that telephone
17   call or calls?
18          A.    Okay. I recall putting a call into,
19   I believe, Dan Shaver.
20          Q.    Did you reach him?
21          A.    I don't recall whether I reached him
22   on the first try or left a message and he called me
23   back.
24          Q.    And what happened in that call?
25          A.    I recall, during that call,

19 (Pages 70 to 73)

Page 74

1   expressing interest in coming down to Washington
2   and having lunch with him and Greg to discuss an
3   issue.
4           And I did not identify what the issue
5   was.
6       Q.    At that point you had - - strike
7   that - - the purpose of the meeting was to do what?
8       A.    What I communicated to Dan - - and I
9   don't recall, as I sit here today, whether Greg was
10  part of that call, although my general memory was
11  just Dan, was that after discussing pleasantries -
12  - and I should note that, you know, I got to know
13  Dan and Greg pretty well in connection with the
14  auction of the coin after the settlement had been
15  reached - - so, I called Dan. I believe we
16  exchanged and then I said I would I like to come
17  down and discuss an issue with you.
18          And he was very - - and he said,
19  "that would be good."
20      Q.    Okay.
21      A.    Then I recall we had communications
22  after that to schedule.
23          And I think I had to postpone it once
24  and then we had it re-scheduled.
25      Q.    In one of your letters we'll get to

Page 75

1   later, you described having considered your
2   relationship with Dan Shaver and Greg Weinman as
3   being, quote, "professional, frank and honest."
4           Is that your recollection of your - -
5   is that an accurate characterization of how you
6   viewed your relationship with Mr. Shaver and Mr.
7   Weinman?
8       A.    At the time I made the call?
9       Q.    At the time you made the call.
10      A.    Yes.
11      Q.    Is it still your characterization of
12  your relationship with them?
13          MR. TIRSCHWELL: I object to the
14  form.
15          You really want to ask that?
16          MR. SWEET: I want an answer.
17          MR. TIRSCHWELL: Don't know what the
18  answer is.
19          MR. SWEET: I don't know how to
20  answer that, of course.
21          MR. TIRSCHWELL: I don't think he can
22  answer.
23          I'm going to instruct him not to
24  answer.
25          I don't see how he can answer that

Page 76

1   without revealing his thoughts about the
2   correspondence, which we know reflect a
3   significant disagreement between counsel
4   about what happened at certain meetings.
5           So, I don't see how he can answer
6   that without revealing his thought process
7   about some of the issues that are disputed in
8   this case.
9           MR. SWEET: I don't see what's
10  objectionable about that.
11          MR. TIRSCHWELL: I just explained, it
12  would reveal his mental thoughts and his - -
13  what his views are of the very issues that
14  we're here to discuss.
15          MR. SWEET: We're about to discuss
16  those issues.
17          MR. TIRSCHWELL: We can discuss what
18  happened. You can discuss the - - what, you
19  know, what he remembers and what the
20  agreements are.
21          But his subjective view, I don't
22  think how - - that will require him to - -
23  require him to reveal his - - his thoughts
24  about not just what happened, which obviously
25  you can ask him about, but his thoughts about

Page 77

1   what it means. And that's really his, you
2   know, his thoughts about the strategy and the
3   legal analysis of the case.
4           MR. SWEET: It seems to me that your
5   case is based upon, to some degree,
6   allegations concerning what happened during
7   the communications prior to the surrender of
8   the Double Eagles and immediately following
9   that.
10          Mr. Berke's relationship with the two
11  people who he negotiated, discussed,
12  commented, communicated, however you want to
13  characterize the communication that occurred,
14  is important and it's not protected in any
15  way. And I think it's completely
16  appropriate.
17          I want to ask the question a
18  different way. If you want to instruct him
19  not to answer, you can instruct him.
20          MR. TIRSCHWELL: Okay.
21  BY MR. SWEET: (Continued)
22      Q.    At some point in your relationship
23  with Mr. Shaver and Mr. Weinman, leading up to the
24  time that you - - leading up until the time that
25  you filed the complaint against the government, did

20  (Pages 74 to 77)

Langbord v. US Dept. of Treasury, et al.                 Barry Berke 6/18/2008

---

Page 78

1   your view that your relationship with them had been
2   professional, frank and honest, did that change?
3          MR. TIRSCHWELL: I'm going to
4   instruct him not to answer that for the same
5   reasons.
6   BY MR. SWEET: (Continued)
7      Q.    Are you aware of anybody taking notes
8   at the meeting in Washington, D.C., on August 25th?
9      A.    I -- I don't know. It was at a --
10  at a restaurant. I believe there were notes as I
11  sit here today, but I don't recall there being
12  notes.
13     Q.    You don't recall there being notes?
14     A.    I don't.
15     Q.    Are you aware of a memoranda to file
16  being created concerning what happened at that
17  meeting?
18          MR. TIRSCHWELL: You can answer,
19  without getting into what it might say.
20          THE WITNESS: No.
21  BY MR. SWEET: (Continued)
22     Q.    You don't recall or there was no
23  memoranda?
24          MR. TIRSCHWELL: You asked, "are you
25  aware?"

---

Page 79

1          THE WITNESS: I'm not aware of a
2   memoranda.
3      Q.    The meeting on August 25th in
4   Washington, who participated in that?
5      A.    Myself, Greg Weinman, and Dan Shaver.
6      Q.    That's it; right?
7      A.    Yes.
8      Q.    Where did it take place?
9      A.    It was an Italian restaurant, that I
10  believe Dan and Greg selected.
11     Q.    Okay.
12     A.    I want to say I had been there with
13  them in connection with the Fenton case, but that
14  could be wrong.
15     Q.    Describe everything you can remember
16  about what occurred at that meeting.
17     A.    I remember meeting them for lunch.
18          I remember the first portion of the
19  lunch spent really talking about pleasantries,
20  talking about the prior case, talking about things
21  other than the Langbords' ten 1933 Double Eagles.
22          I recall at some point well into the
23  lunch, stating -- probably wondered why I wanted
24  to have this lunch; I'm curious, in words or
25  substance.

---

Page 80

1          I recall saying I wanted to tell you
2   that I have -- I'm here on behalf of a client with
3   a 1933 Double Eagle.
4          I recall at this meeting, in fact,
5   telling them that the -- that it involved ten 1933
6   Double Eagles.
7          I recall that I did not identify who
8   I was there on behalf of by name, but I did say
9   that when you heard who the -- who my client is
10  and the circumstances of the coins, it will make
11  sense to you based on other information you know
12  about the history or at least the purported history
13  of the coins.
14          And I recall saying, "the reason I
15  wanted to meet with you guys, obviously, in the
16  Fenton case we" -- meaning us and the government,
17  in which I understood the Mint essentially to be
18  the client of the U.S. Attorney's Office in the
19  Southern District, as they had been portrayed,
20  where we had been litigating for over five years on
21  hotly disputed issues, and at the end, I think, we
22  all reached what was perceived at the time to be a
23  win-win situation, a favorable settlement that had
24  benefits for both.
25     Q.    What was the last part, the last

---

Page 81

1   sentence?
2      A.    A favorable settlement that had
3   benefits for both sides.
4          I recall saying, in substance, "so
5   before we begin what could be another many years of
6   litigation involving the same issues, I thought it
7   made sense, in light of the Fenton settlement, for
8   us to meet and discuss whether or not you believe,
9   from your end, there would be interest in us
10  reaching an agreement, a resolution similar to what
11  was reached in the Fenton case before us -- before
12  we again embark on a multi-year litigation."
13          I believe I said that I think in this
14  case, in fact, there may be more flexibility in
15  trying to reach a settlement prior to litigation
16  because there are ten coins.
17          And I also believe I said, in
18  substance, that the value of the coins would be
19  affected by how many of them were to be sold or
20  released into the public, if that were the terms of
21  the -- of the settlement. So that there is a lot
22  of flexibility in terms of how a settlement similar
23  to what was done in Fenton could be reached.
24          I recall referencing that law had
25  changed, in terms of CAFRA, the burden of proof,

---

21 (Pages 78 to 81)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 82

1  but I remember that being a very light and passive
2  reference, simply that the issues would be the
3  same. But, you know, as you may or may not know,
4  there is a different law in Fenton that applies
5  here.
6         I recall that to be very - - you
7  know, it was a reference to it and I believe the
8  context of the reference, my memory is, not that
9  the law changed, but in this discussion that - -
10 with others, it may be worth noting that this is a
11 development.
12        I recall Dan and Greg expressing
13 surprise, as you would expect, even given our prior
14 experience with a single coin.
15        I recall Dan saying that he did think
16 that this would be something that they'd be very
17 interested in discussing about a possible
18 resolution of the issues.
19        I remember him saying, "but,
20 obviously, there are going to be other people that
21 are going to be part of that discussion."
22        I remember expressing that I
23 understood that.
24        I recall standing, as we were
25 standing up - - and we weren't going to walk out

Page 83

1  the door - - I recall walking them back towards
2  their offices. But I remember, as we were standing
3  up in the restaurant, Dan saying, "you know, I'm
4  sure that we're going to want to take possession of
5  the coins and have them tested to make sure they
6  are authentic."
7         And I recall saying, in substance,
8  "obviously my client is going to want to preserve
9  all their rights, but I didn't think that would be
10 a problem."
11        I recall the meeting, essentially,
12 ending by saying - - exchanging more pleasantries
13 and Dan and Greg saying, obviously, they were going
14 to speak to people back in their office.
15    Q.    I'm sorry?
16    A.    Dan and Greg were going to speak to
17 people back in the office. And they would get back
18 to me.
19        Now, let me just add, I do recall a
20 decision, although I cannot say, as I sit here
21 today, that the discussion happened at the meeting.
22 It may have happened at - - in a subsequent call,
23 where - - I don't recall whether it was Dan or Greg
24 - - but where one of them mentioned that the
25 Department structure had changed and that there was

Page 84

1  now the Homeland Security and that the Secret
2  Service and the Mint were not now - - not both part
3  - - were now - - there was a different governmental
4  structure. It may have been at the meeting; it may
5  have also been in some calls afterwards, but I
6  recall them saying there was, obviously, a change
7  in that regard.
8         And those are the salient points of
9  the meeting.
10    Q.    Okay. Who picked up the bill for
11 lunch?
12    A.    (No response.)
13    Q.    That's a serious question.
14    A.    Is that a serious question?
15    Q.    Yes.
16    A.    I don't recall specifically, although
17 my memory is splitting the bill. That's my memory.
18    Q.    Going back to Berke 3 for a moment.
19        Do you recall who, on the
20 government's side, had to approve this agreement?
21        (Witness reviews the exhibit.)
22    Q.    It had to be approved by the U.S.
23 Attorney's Office; right?
24    A.    What I recall is that there was a
25 brief period of time where Jay Johnson was the

Page 85

1  Director of the Mint.
2         When I say "brief," he was literally
3  a director for a brief period.
4         I recall, when we had some settlement
5  discussions - - they were authorized by the court -
6  - he required that people of authority be in the
7  conference room who could sign off on any
8  settlement agreement, as many judges require.
9         Stephen Fenton flew in from London,
10 since he was the one person of authority on our
11 end, and, for the Mint, Greg Weinman was there as
12 the person of authority to sign off on any
13 agreement.
14    Q.    Do you understand whether that to
15 have been ultimate authority or could he have been
16 carrying authority from someone else?
17        Do you have an understanding - - let
18 me ask the question.
19    A.    I'm sorry.
20    Q.    Did you have an understanding about
21 what level in the government would be required - -
22 what level of the government would be required to
23 sign off on this agreement that's in Berke 3?
24    A.    I had two points over reference.
25        One was in court, where Judge

                          22  (Pages 82 to 85)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 86

1    Hellerstein is very clear in his direction, that
2    there has to be somebody in court with authority to
3    sign off on the agreement, in the event there is
4    progress in the - - the Judge's mediation of the
5    dispute.
6           I recall that Greg Weinman was the
7    Mint representative there for that purpose.
8           I remember that when Jane and I - -
9    Jane Levine and I were talking about a settlement,
10   she said, "It may be possible, I'm going to speak to
11   the Mint." I don't know who she spoke to.
12          I recall that when she called me back
13   - - and I believe we had a number of back and forth
14   calls - - just towards the end of the week, before
15   a weekend, and I recall her talking to the Mint and
16   saying - - I think that's the word she used, so I
17   can't say who she was talking to.
18          Those are my two points of reference.
19          Q.    Mr. Berke, is it your understanding -
20   - is it your testimony today that at the time that
21   the Fenton agreement was reached, Greg Weinman had
22   authority to enter the agreement on behalf of the
23   United States?
24          A.    I think - -
25          Q.    Is that your testimony today?

Page 87

1           A.    I think I described the facts that I
2    knew.
3           MR. TIRSCHWELL: I object to the form
4    of the question.
5    BY MR. SWEET: (Continued)
6           Q.    So, those are the facts you knew?
7           So, you don't know anything else
8    about how high the authority had to come for the
9    resolution of this case?
10          A.    I don't know who else was involved in
11   discussions, after Jane Levine and I were
12   discussing terms and she said she had to speak to
13   the Mint to get authority. I don't know who else.
14          And I recall that - - and I don't
15   recall whether Jane - - at what point - - well, I
16   don't recall who else was involved in the
17   discussions.
18          Q.    You don't know if it had to be the
19   Vice President of the United States?
20          You have no idea; right?
21          A.    I recall the discussions that Jane
22   Levine needed the authority to be with the U.S.
23   Mint because she said that. I just don't know who
24   at the Mint.
25          Q.    Let's look at Berke 3, again.

Page 88

1           Do you have your copy?
2           A.    Yes.
3           Q.    You see who signed on behalf of the
4    United States Mint?
5           A.    I do.
6           Q.    Who is that?
7           A.    It's Jay Johnson, handwritten in, as
8    Director of U.S. Mint.
9           It says, "U.S. Mint" in type and then
10   he signs it and underneath he wrote, "Director of
11   U.S. Mint."
12          Q.    Does that refresh your recollection
13   of the level of authority required in order to sign
14   off on this agreement?
15          A.    It refreshes my recollection as to
16   who signed this agreement.
17          Q.    Okay. When you said to Dan Shaver
18   and Greg Weinman that when they learned the
19   identity of the holder of the ten Double Eagles it
20   would make sense to them, what did you mean by
21   that?
22          A.    What I meant by that was, in the
23   prior case there were allegations that coins had
24   been purchased or obtained from Israel Switt. And
25   because we're talking about family members of

Page 89

1    Israel Switt, I was just telling them I thought,
2    when they got more information, it would give them
3    greater understanding than simply the name of the
4    person, is what I was trying to communicate or what
5    I communicated.
6           MR. TIRSCHWELL: Just for the record,
7    it's S-W-I-T-T, Switt.
8           You say it's Sweet?
9           THE WITNESS: Now we've cracked the
10   case.
11          MR. SWEET: Thank you for
12   contributing. I appreciate it.
13          MR. TIRSCHWELL: That you can
14   applaud.
15   BY MR. SWEET: (Continued)
16          Q.    Mr. Berke, you understood at that
17   time that the government's understanding, the
18   government's view, the government's position had
19   been that Israel Switt was involved in the illegal
20   activity that resulted in Double Eagles, 1933
21   Double Eagles, reaching the hands of the public?
22          You understood that?
23          MR. TIRSCHWELL: I'm going to object
24   to the form of the question, as to what he
25   understood.

23  (Pages 86 to 89)

Page 90

1      If you want to ask him whether - -
2      MR. SWEET: I'll strike the question.
3      MR. TIRSCHWELL: Yes.
4  BY MR. SWEET: (Continued)
5      Q.    What was your understanding of the
6  government's view of Israel Switt's involvement in
7  the 1933 Double Eagles?
8      MR. TIRSCHWELL: I'm going to object
9  to the form of the question, as to his
10 understanding.
11     If you want to ask him what he knew
12 the government had said, something like that,
13 but anything about his understanding, we're
14 not going to go into.
15 BY MR. SWEET: (Continued)
16     Q.    What did you know that the government
17 had represented concerning Israel Switt's
18 involvement with the 1933 Double Eagles?
19     A.    Okay. Let me say this. There is no
20 easy answer to this question or short answer.
21     There were hundreds of pages filed in
22 the Fenton case describing various things about the
23 coins. Some were facts, some were suspicions and
24 some were something in between.
25     I was certainly familiar, generally,

Page 91

1  with what the government had filed in the Fenton
2  litigation about the case.
3      Q.    And that - -
4      A.    Including the role of Israel Switt.
5      Q.    And what do those files represent
6  about the role of Israel Switt?
7      A.    That there are certain historical
8  reports, to which we had made a variety of
9  objections as to their admissibility in court, that
10 reflected interviews of people who said that they
11 had purchased '33 Double Eagles from Israel Switt,
12 either directly - - I believe to be the case - - or
13 indirectly.
14     There are also, in these reports,
15 suspicions that Mr. Switt obtained them, those
16 coins, improperly, although I believe the statement
17 that stands out in my mind is that a statement in
18 the Secret Service report that they were never able
19 to conclusively, conclusively establish how those
20 coins left the Mint.
21     Let me just say, to be fair, that is
22 a gross, gross simplification of the reports and
23 documentation on this, which are very vast. And,
24 obviously, the documents are available and are part
25 of the record in this case.

Page 92

1      So, by my simplification, I don't
2  mean to leave anything out, but I don't think I
3  could repeat all the nuances and facts and
4  suspicions that are contained within that trove of
5  documents.
6      Q.    When you told Mr. Shaver and Mr.
7  Weinman that it would all make sense when they
8  heard the name, it's because you understood that
9  "they," meaning Greg Weinman and Dan Shaver, would
10 understand that Israel Switt was - - I'll summarize
11 - - a crook and involved in illegalities with
12 regard to the 1933 Double Eagles?
13     A.    I would - -
14     MR. TIRSCHWELL: Objection to the
15 form.
16     THE WITNESS: I would disagree with
17 that.
18     I would have to say that they would
19 understand that there was purported evidence
20 that he was the source for some of the '33
21 Double Eagles. Therefore, it would make
22 sense that if those allegations are true,
23 that he was the source, that he had
24 additional '33 Double Eagles.
25     MR. SWEET: I'll take that.

Page 93

1  BY MR. SWEET: (Continued)
2      Q.    When you told Mr. Shaver and Mr.
3  Weinman - - when you raised the idea that the - -
4  there would be benefits to both your client and the
5  government if this matter were settled, did either
6  of them respond to you with regard to that idea?
7      MR. TIRSCHWELL: Objection to the
8  form.
9      A.    What I recall is speaking for a while
10 and laying out why I was coming to them and what
11 the issue was that I wanted to discuss and why I
12 thought it may make sense for both sides to talk
13 about it. I recall making those statements.
14     And then I recall, at some point
15 after I had laid out many of those statements, Dan
16 Shaver saying, "I think that would be something
17 we'd be very interested in talking about."
18     I remember him also saying though,
19 "but, obviously, we would need to speak to other
20 people" - -
21     Q.    Who did you - -
22     A.    - - "about" - -
23     Q.    I'm sorry.
24     A.    "about any such agreement like that."
25     Q.    Who did you understand those "other

24  (Pages 90 to 93)

Langbord v. US Dept. of Treasury, et al.

Barry Berke 6/18/2008

Page 94

1  people" to be?
2      A.   At that point I had understood, in
3  all - - whether we discussed it directly or
4  indirectly - - I don't recall that - - but I
5  understood it to be the Director of the Mint, who
6  was at that time, at that point, I believe,
7  Henrietta Holsman-Fore, who was the director who
8  presided over the auctioning of the coins.
9          MR. TIRSCHWELL: H-O-L-S-M-A-N, last
10 name, F-O-R-E, for the record.
11         MR. WEINMAN: Correct.
12 BY MR. SWEET: (Continued)
13     Q.   You understood at the time that - -
14 do you recall what Mr. Shaver's comment being,
15 before or after you mentioned there may be more
16 flexibility here because there are ten coins and
17 the value will be affected by the number being
18 issued to the public?
19     A.   I believe that I went through a
20 number of points to make about the proposal and I
21 believe it was after I made those points, including
22 that point that you just mentioned, that Mr. Shaver
23 made that statement.
24     Q.   These points were all from your head?
25     A.   I had, obviously, thought about it

Page 95

1  going down, but I did not have a written script.
2      Q.   Did Mr. Weinman respond to your
3  presentation?
4      A.   I recall that the principle response
5  was from Mr. Shaver, but I believe - - I recall Mr.
6  Weinman joining in the discussion about it, very
7  brief discussion.
8          But I recall, in terms of the
9  responses, "Yes, that's something we would be
10 interested in; we would want to speak to other
11 people," being Mr. Shaver.
12     Q.   So, at the end of that lunch meeting,
13 it was your understanding that there was a
14 possibility that the government would negotiate - -
15 it would enter a negotiation?
16     A.   Yes.
17         Well, I should say this:  I believe
18 there was interest from these gentlemen to discuss
19 a potential reaching of a potential agreement.
20     Q.   Did you discuss with them what you
21 thought the benefits would be to the United States
22 of an agreement?
23     A.   I think what I said was, "I thought
24 that the Fenton resolution was mutually beneficial
25 and that the alternative to reaching an agreement

Page 96

1  would be another protracted litigation over the
2  same issues. And given that we've already done
3  that once and saw - - and that's after many years
4  of resources being spent and we reached a
5  resolution that was satisfactory to both sides - -
6  it would seem to me to make sense in this case to
7  see if we could, at the outset, reach a similar
8  resolution, as opposed to spending another years
9  and resources that it takes to litigate the
10 identical issues and end up at same spot, with a
11 resolution after that.
12     Q.   So, you anticipated then - - is it
13 fair to say you anticipated, if there was not a
14 successful negotiation, there would be litigation?
15     A.   I believe I very clearly expressed
16 that this was a discussion about an agreement that
17 would avoid or forestall the litigation.
18     Q.   Are there any specific benefits,
19 except for avoiding litigation, are there any other
20 benefits that you described for the United States?
21     A.   I recall alluding - - I recall
22 alluding to the mutual benefits that were achieved
23 in the Fenton litigation and the point that I was
24 making was those would be mutual benefits that
25 would, obviously, follow any agreement in this

Page 97

1  case. But I don't believe I got into any specifics
2  about what those mutual agreements were, just that
3  it was a mutually beneficial agreement in the last
4  case, obviously.
5      Q.   So, there was no discussion between
6  you and the officials from the Mint at this meeting
7  concerning what the benefits would be, going in one
8  direction versus the other?
9      A.   Well, no.
10         But I think there was - - right - -
11 the benefit of avoiding litigation.
12     Q.   You raised that?
13     A.   Yes.
14         Resources and the benefits that both
15 sides saw in reaching the settlement that was
16 reached in the Fenton litigation.
17     Q.   Did you get anything back from Mr.
18 Weinman and Mr. Shaver concerning a discussion of
19 the benefits or disadvantages, for that matter?
20     A.   What I perceived was an enthusiastic
21 response, that they would be very interested in
22 discussing a potential agreement, and I noted
23 enthusiasm, just as there was enthusiasm from the
24 Mint after we reached a settlement in the Fenton
25 case about the coin.

25 (Pages 94 to 97)

Langbord v. US Dept. of Treasury, et al.          Barry Berke 6/18/2008

Page 98

1      Although, as I mentioned, Mr. Shaver
2   was clear that he would need to speak to other
3   people about it.
4      Q.    Are you positive you didn't confuse
5   what you called the enthusiasm about the
6   possibility of a settlement with the shock of
7   learning that you had a client with ten Double
8   Eagles?
9      A.    I have a very clear recollection of
10  lunch and I do think, without question, as I
11  mentioned, there was surprise and interest in the
12  coins.
13      But I also, my understanding and
14  perception of their reaction was enthusiasm on
15  their part to the idea of discussing - - reaching a
16  potential agreement related to these new coins.
17      Q.    Do you recall Mr. Shaver telling you,
18  in substance, that - - these words are in
19  substance, that the Langbords would have to turn
20  the Double Eagles over to the government?
21      A.    What Mr. Shaver said was - - as I
22  recall, we stood up from the table, and we were
23  walking towards the exit, and we were to the right
24  of the table and Mr. - - we were standing and Mr.
25  Shaver said, in substance, "You know, we're going

Page 99

1   to want to take possession of the coins and test
2   them to make sure they are authentic before we're
3   going to be able to discuss, you know, whether they
4   are coins to reach an agreement about."
5      Q.    So, it was your understanding at that
6   point that there would not even be discussion about
7   a resolution until after authentication?
8      A.    What he expressed to me is that - -
9      Q.    I'm asking what you understood from
10  what he said.
11      A.    Say it again?
12      Q.    Yes.
13      As you walked out of that restaurant,
14  it was your understanding that there would not be
15  even a discussion about a resolution until after
16  the Mint knew whether the Double Eagles were
17  authentic?
18      A.    What I can say is, as I walked out of
19  the meeting, my understanding, there would not be
20  any agreement until there was an authentication.
21      At a later point in the discussions
22  it became clear that, for the Mint, they wanted to
23  authenticate it before discussing terms and
24  negotiating what that resolution would be, whereas
25  we were interested in saying that we believed that

Page 100

1   these are authentic; we understand why you need to
2   confirm for your benefit the authenticity of the
3   coins and not counterfeit, but we would be
4   interested in having a discussion in the interest
5   of time, et cetera.
6      And I remember learning the Mint's
7   position was, "We want to have those; you know,
8   we're interested in having those discussions, but
9   we're not prepared to have those discussions until
10  we have confirmed that these are, in fact, 1933
11  Double Eagles gold coins."
12      Q.    When did they communicate that to
13  you?
14      A.    I can't put a clear time, but I
15  believe it was after the transfer of the coins and
16  before the resolution.
17      Because I recall part of the issue
18  was it was an inordinate passage of time, which Mr.
19  Shaver and Mr. Weinman were both apologetic about
20  in explaining why it was taking so long to test
21  them.
22      And I recall having those
23  discussions, in the context of the passage of time,
24  that it was making, as I expressed, my clients
25  uncomfortable.

Page 101

1      So, in my mind, I recall discussions
2   sometime between the September 22nd date and - -
3   and the final meeting.
4      Q.    Do you recall Mr. Shaver telling you
5   that the Double Eagles would need to be turned over
6   to the government and you responding, "of course"?
7      A.    What I recall regarding the coins and
8   the government taking possession and testing, which
9   is exactly what I described.
10      Q.    Did you discuss with Shaver and
11  Weinman any alternative means of authenticating the
12  Double Eagles, other than turning them over to the
13  government?
14      A.    Well, I believe Mr. Shaver's
15  statement was that "we would wanted to authenticate
16  them," meaning the government, and I don't recall
17  us discussing - - either side suggesting other ways
18  to authenticate them.
19      Q.    As you left that restaurant, you knew
20  that those Double Eagles would have to be turned
21  over to the government's position; is that not
22  correct?
23      MR. TIRSCHWELL: You're asking based
24  on the conversations?
25      I mean, that - - that - - the problem

26 (Pages 98 to 101)

Langbord v. US Dept. of Treasury, et al.                     Barry Berke6/18/2008

---

Page 102

1  with that question is it's unclear whether
2  you're asking him to share with you his
3  thoughts just about what had transpired at
4  the meeting or more broadly share his
5  thoughts about different possible legal
6  approaches to the problem, which he's not
7  going to answer.
8        MR. SWEET: Your instructing him not
9  to answer the question?
10       MR. TIRSCHWELL: I'm telling you the
11  problem with the question.
12       I'm instructing him not to answer
13  unless you have clarified what you're asking;
14  yes.
15       MR. SWEET: Just give me the
16  objection and the instruction so I
17  understand.
18       MR. TIRSCHWELL: The objection is it
19  would reveal his work product, his mental
20  thoughts about the case.
21       And I'm instructing him not to answer
22  in the form that you asked him.
23       MR. SWEET: Okay.
24       MR. TIRSCHWELL: For the reasons I've
25  explained.

Page 103

1  BY MR. SWEET: (Continued)
2        Q.   There's no discussion at that meeting
3  about returning the Double Eagles back to the
4  possession of the Langbords following
5  authentication, was there?
6        A.   Implicit in the discussions were that
7  either we were going to reach an agreement or we
8  were going to have litigation. There was no
9  discussions about the details of such as what you
10  just asked about.
11       Q.   Was there any specific discussion
12  about the nature of the litigation that may ensue
13  if there was no agreement?
14       A.   What I recall was the brief
15  discussion of that CAFRA had changed the statute,
16  the burden of proof, from what had been in the
17  Fenton litigation.
18       Q.   And that came from you; is that
19  right?
20       A.   That's correct.
21       Q.   And there was no response from Mr.
22  Shaver or Mr. Weinman; is that correct?
23       A.   I don't recall a specific reference
24  to that point.
25       Q.   And you described that earlier as a

Page 104

1  "light and passing" reference?
2        A.   What?
3        Q.   Is that how you characterized it?
4        A.   And then I went on to describe what I
5  meant by that.
6        Q.   Okay.
7        A.   When I said "light," I didn't mean
8  humorous. I meant what I said was, you know, that
9  part of the pitch is, you know, our, you know, we
10  have - - the law has changed since Fenton and you
11  can - - obviously, you may know this - - but it may
12  be something relevant to the discussions in
13  reaching an agreement.
14       In that litigation the burden of
15  proof is different now, which, obviously, only
16  applies to forfeiture actions.
17       Q.   Obvious to who?
18       A.   I'm saying to you.
19       Q.   Now, why didn't you disclose the
20  Langbords' identity at this meeting?
21       MR. TIRSCHWELL: Objection.
22       I'm directing him not to answer. It
23  calls for his mental thoughts about strategy.
24  BY MR. SWEET: (Continued)
25       Q.   You didn't disclose their identity

Page 105

1  because you knew that they were holding on to
2  property that didn't belong to them; correct?
3        MR. TIRSCHWELL: Same objection.
4        Same instruction.
5  BY MR. SWEET: (Continued)
6        Q.   Was there any discussion about why
7  the - - was there a discussion about the Secret
8  Service being involved in the taking possession of
9  the Double Eagles?
10       A.   I don't believe so at the initial
11  meeting.
12       As I mentioned, there was the one
13  discussion that I recall about the structure being
14  different. But I don't recall there was a
15  discussion of the Secret Service taking possession
16  of the coins at that initial meeting.
17       Q.   Now, would you characterize the tone
18  of the meeting as being friendly?
19       A.   Yes.
20       Q.   There were no threats or coercion by
21  the government concerning what was - - concerning
22  the Double Eagles, was there?
23       A.   No.
24       Q.   Let's go to the next communication
25  you had with the Mint.

27 (Pages 102 to 105)

Page 106

1    Would that have been the September
2  15th meeting in Brooklyn?
3       A.   No, we had phone conversations
4  between the initial meeting and the meeting in
5  Brooklyn.
6       Q.   What do you recall about those phone
7  conversations?
8       A.   I recall having a conversation. I
9  recall having more than one conversation.
10      I recall a conversation with Dan and,
11 I believe, Greg, in which, following the meeting,
12 they said they have spoken to other people in the
13 office and they would be interested in discussing
14 potentially having an agreement, as we had talked
15 about at the initial meeting.
16      No terms were discussed, no
17 specifics.
18      I recall they reiterated that, as
19 they - - as he expected - - I do remember it was
20 Dan - - that they do want to test the coins to
21 authenticate that they are - -
22      Q.   Who?
23      A.   Double Eagles.
24      Q.   I'm sorry?
25      A.   To authenticate they were Double

Page 107

1  Eagles.
2       Q.   Who do you contend - - which was it,
3  Mr. Shaver or Mr. Weinman who you contend said that
4  they had spoken to other people in the office and
5  they would be interested in discussing an
6  agreement?
7       A.   My recollection - - and to be clear -
8  - it's a general recollection. I remember a
9  follow-up call, in which they confirmed interest in
10 having these discussions, having spoken to people
11 in their office. I don't recall though, on that
12 phone call, who said what.
13      Q.   Do you recall who they had spoken to
14 in their office?
15      A.   I don't recall being told that.
16      Q.   And there were no terms of an
17 agreement discussed in any way?
18      A.   No.
19      And I recall another call about
20 discussing - -
21      Q.   Hold on one minute.
22      This call occurred how many days
23 after the meeting in the restaurant?
24      A.   I don't recall.
25      Q.   Okay. Now you got another call?

Page 108

1       A.   I recall another call.
2       Q.   How many days later?
3       A.   I don't recall.
4       Q.   Do you know who initiated this phone
5  call that you're talking about, the first one?
6       A.   I don't recall.
7       Q.   How long did the call take?
8       A.   I don't remember being - - it being a
9  long call.
10      Q.   Do you recall having any notes?
11      Do you know whether there were any
12 notes created concerning that telephone call?
13      A.   Not that I'm aware of.
14      Q.   Did you communicate to anyone else
15 the nature of that call, the substance of that
16 call?
17      MR. TIRSCHWELL: I mean, I'm going to
18 instruct him to answer only so far as it was
19 someone other than lawyers at Kramer Levin or
20 his clients.
21 BY MR. SWEET: (Continued)
22      Q.   Okay?
23      A.   Other than my client?
24      My clients or lawyers at Kramer
25 Levin?

Page 109

1       I don't believe so.
2       Q.   You don't believe you communicated to
3  anybody?
4       A.   Other than - - I'm excluding any
5  conversation may have had with lawyers at Kramer
6  Levin or my clients. Excluding them, I don't
7  believe that I had somebody I spoke to about that
8  conversation.
9       Q.   There was no discussion at all about
10 the terms of a prospective agreement?
11      A.   No.
12      And what I recall, there were
13 discussion in e-mails about logistics - - but I
14 don't recall what the logistics were - - in the
15 call where it was expressed this interest in
16 discussing possible resolution. I don't recall
17 whether that included discussions about logistics.
18 I don't recall both the call and e-mail. I just
19 don't recall, you know, the specifics.
20      Q.   Okay. Now, you said there was a
21 second telephone call, as well; right?
22      A.   I remember a - - another call that -
23 - that I would describe as really a logistical call
24 and I also recall an e-mail. This was just about
25 that the government said that they would like to

28 (Pages 106 to 109)