Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

|  | Page 110 |
|---|---|
| 1 | have a meeting and, I believe, it was the Secret |
| 2 | Service would like to have a discussion about the |
| 3 | details regarding the coin and the potential |
| 4 | transfer that we had discussed earlier. |
| 5 | And I recall saying, communicating, |
| 6 | whether by e-mail or phone, "happy to have it in my |
| 7 | office." And I recall this as an e-mail, I |
| 8 | believe, "happy to have the coins go to the Secret |
| 9 | Service offices." |
| 10 | Q. Okay. Let's move to the September - |
| 11 | - there were these e-mails and this one phone call |
| 12 | that you described and then a second phone call |
| 13 | that you think was mostly about logistics? |
| 14 | A. Right. |
| 15 | Q. It wasn't substantive about an |
| 16 | agreement of any sort? |
| 17 | A. I don't recall. |
| 18 | Q. And - - |
| 19 | A. I describe it as two - - I can't |
| 20 | swear there wasn't a third - - calls in terms of |
| 21 | lining up the logistics. But that is what I |
| 22 | recall. |
| 23 | Q. Let's move to the September 15th |
| 24 | meeting in Brooklyn. |
| 25 | A. Yes. |

|  | Page 111 |
|---|---|
| 1 | Q. How did that come about? |
| 2 | A. As I said, I believe there was a |
| 3 | discussion about it, that there would be such a |
| 4 | meeting, and I recall an e-mail about such a |
| 5 | meeting. |
| 6 | And it was - - then I said I would be |
| 7 | perfectly willing to go to the Secret Service |
| 8 | offices, if that was preferred. |
| 9 | Q. And what occurred? |
| 10 | A. I was there; Steven Sparling, of my |
| 11 | office, was there. I recall that Greg Weinman and |
| 12 | Dan Shaver were there. And I recall two Secret |
| 13 | Service agents were there. |
| 14 | Q. Okay. |
| 15 | A. I recall a very brief discussion |
| 16 | about the coins, very brief. |
| 17 | I recall identifying the person they |
| 18 | would be meeting as Roy Langbord. |
| 19 | I recall identifying the bank where |
| 20 | the coins were at, in Philadelphia. |
| 21 | It may have been that I didn't have |
| 22 | the exact address there, but provided additional |
| 23 | details later. But I recall identifying the name |
| 24 | of the bank that we were talking about. |
| 25 | I recall clearly discussing that we |

|  | Page 112 |
|---|---|
| 1 | would be submitting - - |
| 2 | (Phone ringing.) |
| 3 | Q. I'm sorry. Go ahead. |
| 4 | A. I remember clearly discussing that we |
| 5 | would be submitting a letter, making clear the |
| 6 | Langbords are reserving all their rights to the |
| 7 | coins and are not in any way waiving any of their |
| 8 | legal rights or claims related to the coins. |
| 9 | Q. Yes? |
| 10 | A. I remember one of the Secret Service |
| 11 | agents asking whether we would be prepared to waive |
| 12 | venue, which I understood to be meaning that if |
| 13 | they were to bring a forfeiture action against the |
| 14 | coins, an agreement that the venue could rest in |
| 15 | New York, because I understood why there may be |
| 16 | concern that there may not be such action for venue |
| 17 | against the coins in New York. |
| 18 | And that's an issue that had - - that |
| 19 | had occurred - - well, let me just say, I wasn't |
| 20 | surprised - - well, let me just say this |
| 21 | differently - - that I was prepared to say that we |
| 22 | would be prepared to waive venue, so if there was |
| 23 | an ultimate - - if there was a In Rem action |
| 24 | against the coins, it would be in New York. |
| 25 | Q. Anything else you recall? |

|  | Page 113 |
|---|---|
| 1 | A. I recall discussing the actual |
| 2 | logistics, generally. |
| 3 | And I do recall that the Secret |
| 4 | Service wanted to know who would be there and I |
| 5 | recall telling them that I would certainly be there |
| 6 | and expected Roy Langbord would be there. |
| 7 | And those are the salient terms and |
| 8 | importance of the meeting that I recall. |
| 9 | Q. Are you aware of any notes of that |
| 10 | meeting? |
| 11 | A. I'm aware of Secret Service reports |
| 12 | that were made of that meeting, that, I assume - - |
| 13 | just based on prior knowledge - - were made from |
| 14 | notes. |
| 15 | Q. Are you aware of any other notes? |
| 16 | A. I'm not. |
| 17 | Q. Are you aware of any memoranda to |
| 18 | file concerning what happened? |
| 19 | A. I'm not. |
| 20 | Q. Is that the first time you identified |
| 21 | the Langbords? |
| 22 | A. My recollection is that it was, |
| 23 | identified to the government. |
| 24 | Q. Do you recall saying that - - |
| 25 | describing the Langbords as good citizens, in |

29 (Pages 110 to 113)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 114

1    quotes, "good citizens who wanted to do the right
2    thing"?
3         A.    I believe that in describing them I
4    said more than that. I don't recall using those
5    specific words.
6         Q.    How else did you describe them?
7         A.    I remember saying -- I believe that
8    I said that Roy Langbord is an admitted -- is an
9    attorney, although not a practicing attorney; and I
10   believe I -- I characterized -- I referenced
11   their voluntary alerting the Mint to that.
12        In other words, I made clear that I
13   don't believe that anybody was aware that the
14   Langbords had these coins prior to them voluntarily
15   alerting the Mint to the coins. I think I had made
16   reference, although in words or substance, that's
17   not how everyone would have responded to
18   discovering these coins.
19        Q.    Okay. So, in substance, the idea
20   they were good citizens and did the right thing,
21   you don't disagree with that?
22        A.    No, I don't.
23        And I think there's a little more
24   that I've said, but I don't dispute those may have
25   been the words I used, the notion that I didn't

Page 115

1    conceal them, et cetera.
2         Q.    What was your understanding of why
3    the Mint was involved, at all?
4         A.    (No response.)
5         MR. SWEET: I'm sorry.
6         Strike that.
7    BY MR. SWEET: (Continued)
8         Q.    What was your understanding of why
9    the Secret Service was involved, at all, in this
10   matter?
11        MR. TIRSCHWELL: Again, I'm going to
12   instruct him to answer only insofar as his
13   understanding is based on communications with
14   the government.
15        To the extent he has an understanding
16   based on his legal work, I'm going to
17   instruct him not to answer.
18        THE WITNESS: It was clear to me, and
19   it had been expressed by the lawyers -- I'm
20   sorry --
21        MR. TIRSCHWELL: Well.
22        THE WITNESS: What was your -- I'm
23   sorry.
24        Remind me of what you said?
25        MR. TIRSCHWELL: If you can answer

Page 116

1    based on your communications with the
2    government, if based on those communications
3    you formed an understanding as to why the
4    Secret Service was involved, you can answer.
5         But if your understanding as to why
6    the Secret Service was involved deals with
7    your legal thinking on the case or the
8    possible case, then you shouldn't answer the
9    question.
10   BY MR. SWEET: (Continued)
11        Q.    The answer is fine. You have started
12   off fine.
13        A.    Okay.
14        Q.    Clearly to you?
15        A.    Clear to me in my conversations with
16   the Mint was that they wanted to be the government
17   agency that would deal with us related to the
18   coins, the ultimate issues about whether or not we
19   can reach an agreement related to the coins, as had
20   been the case in the Fenton litigation.
21        MR. TIRSCHWELL: The question --
22        THE WITNESS: I understood the
23   question.
24        I don't recall specifically what was
25   said prior to that meeting, other than that

Page 117

1    based on their internal discussions it would
2    have to be the -- the Mint who would be
3    involved in taking the coins, although I
4    understood that the role of the Mint would
5    be, as I understand it to be, the party we
6    would be talking to the coins about.
7         I do recall being expressed at some
8    point that if the coins were counterfeit,
9    then that would be something that the Secret
10   Service would be involved in investigating.
11        I think that's what I summarize being
12   told about the role of the Secret Service, up
13   to that point.
14        There were subsequent discussions,
15   following the transfer, about the role of the
16   Secret Service.
17   BY MR. SWEET: (Continued)
18        Q.    At this meeting, leading up to this
19   meeting, nobody from the Mint said to you that if
20   the Double Eagles turned out to be authentic and no
21   agreement were reached, they would be returned to
22   the Langbords, did they?
23        A.    That was not -- that statement was
24   not made.
25        Q.    Okay. And no statement similar, no

30 (Pages 114 to 117)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke6/18/2008

---

**Page 118**

1  statement conveying that, that message, was
2  conveyed to you, was it?
3      A.  I want to be careful about what you
4  mean by "similar" and what I mean by "similar."
5      The entire basis of our conversation
6  was that if we did not reach an agreement, there
7  would be litigation. These would be coins for
8  which the Langbords' rights were preserved and that
9  the government would have to take the steps that
10  they would take, as if we never had these
11  discussions. We would be in a litigation mode.
12      I understood -- well, as far as what
13  I understood, those were the entire basis of our
14  discussions up to that point.
15      Q.  So, you understood that it would be
16  either if they were counterfeit, it could go to the
17  Secret Service, or if they have were genuine, that
18  there would be an agreement or there would be
19  litigation?
20      A.  Yes.
21      Q.  You never believed they would simply
22  be returned to the Langbords?
23      MR. TIRSCHWELL: Objection to the
24  form.
25      THE WITNESS:  I'm talking about what

**Page 119**

1      we discussed, not what I believed.
2  BY MR. SWEET: (Continued)
3      Q.  And what you discussed, those two
4  options, were either a resolution or litigation?
5      A.  Yes.
6      Q.  And there was never a discussion
7  concerning the nature of the litigation, was there?
8      A.  There was.
9      Q.  When?
10      A.  There was discussions at our initial
11  meeting about --
12      Q.  Your "light in passing" reference to
13  CAFRA?
14      A.  About CAFRA.
15      There was discussions at the meeting
16  with the agents about -- about waiving venue,
17  which --
18      Q.  That WAS a comment by the Secret
19  Service agent?
20      A.  Which I understood, you know, it's
21  the Defendants who waive venue because Plaintiffs
22  can decide to file where they want to file.
23      Q.  That was based on the comment by the
24  Secret Service agent?
25      A.  By the Secret Service agent.

**Page 120**

1      Q.  Okay.
2      A.  Okay.
3      There were discussions about the
4  Fenton litigation, obviously, the In Rem nature of
5  the Fenton litigation.
6      I believe it was the -- our basis
7  for our discussion was that the litigation we would
8  be avoiding, by having an agreement, was an In Rem
9  forfeiture proceeding related to these coins.
10      Q.  That was your assumption?
11      A.  That was my belief, based on our
12  discussions. That was what I believed, based on
13  all our discussions.
14      Q.  In any of your discussions leading up
15  to the transfer, did Greg Weinman ever discuss with
16  you any aspect of a forfeiture proceeding?
17      A.  Our discussions certainly reflected
18  that the Langbords were reserving all their rights
19  to the coins -- let me finish -- reserving all
20  their rights to the coins; that we were seeking to
21  avoid the litigation; and, that if we did not avoid
22  the litigation, there would be a -- there would be
23  a -- I'm sorry -- if we did not reach an
24  agreement, there would be a -- there would be
25  proceedings related to the coins.

**Page 121**

1      Q.  Okay. Can you answer my question?
2      A.  I believe I have.
3      Q.  No, you haven't.
4      MR. SWEET:  Would you go back to my
5  last question, please?
6      (The requested material was read
7  aloud.)
8      Q.  That's the question.
9      Could you give me a yes or no and
10  then explain?
11      A.  I believe I described for you the
12  nature of our discussions.
13      Q.  Okay. I take that as a no?
14      A.  No, it's --
15      Q.  Same question for Dan Shaver.
16      MR. TIRSCHWELL: Excuse me.
17      Q.  At any point up --
18      MR. TIRSCHWELL: Excuse me.
19      MR. SWEET:  I'm asking a question.
20  I'm responding --
21      MR. TIRSCHWELL:  You didn't let him
22  finish his answer.
23      THE WITNESS:  That's not appropriate.
24  BY MR. SWEET: (Continued)
25      Q.  Do you have any more to say on that?

31 (Pages 118 to 121)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

---

Page 122

1        A.    It is not a no; it's a yes.
2             The entire basis of our discussions
3    was that if we did not reach an agreement, there
4    was going to be a forfeiture proceeding related to
5    the coin. That was the - - the implicit and
6    explicit purpose of the discussion underlying our
7    first meeting, as well as our subsequent
8    discussions.
9        Q.    Now, you just said it was your
10   implicit and explicit understanding of the
11   communication.
12            I'm asking you explicitly, did Dan
13   Shaver or Greg Weinman ever say to you, explicitly,
14   that there would be a forfeiture proceeding?
15       A.    Well, as I've described, I think many
16   times now, the basis for our discussion was that if
17   we did not reach an agreement there would be a
18   forfeiture proceeding related to the coins.  I
19   believe that was for the initial meeting and I
20   believe that was consistent with the discussion at
21   the meeting with the Secret Service, where we were
22   asked to waiver venue, and I believe that it was
23   clear throughout that what we were talking about -
24   - and explicitly talking about, as made clear by
25   those discussions, by what my original discussion

---

Page 123

1    about what type of agreement we would be interested
2    in talking about and the subsequent discussions,
3    including with the Secret Service related to venue
4    that - - it would be an In Rem forfeiture
5    proceeding related to the coins.
6        Q.    Okay.
7        A.    I believe that was the entire basis
8    that we were talking about reaching an agreement to
9    avoid that type of litigation.
10       Q.    Okay.
11            MR. SWEET: I'm going to make it very
12   clear for the record now that you are
13   improperly using the work product privilege
14   by allowing your witness to testify about his
15   belief, his unilateral belief about a
16   discussion that occurred without - - while
17   he's refusing to answer other questions about
18   his beliefs arising out of those
19   communications.
20            He's refusing to answer very specific
21   questions about whether certain discussions
22   were had explicitly, but he's allowing - -
23   he's instead using his unilateral beliefs
24   about what occurred to be - - to form the
25   basis of his answers.

---

Page 124

1             So, I'm going to ask him questions
2    now about what else he believed about those
3    negotiations.
4             Are you going to instruct him not to
5    answer those questions?
6             MR. TIRSCHWELL: Well, I think we've
7    been very clear that he's been testifying
8    about his understanding, to the extent he had
9    an understanding, based on his dealings with
10   the government and he's been instructed to -
11   - and I don't believe he has revealed his
12   understanding or thoughts that are - - that
13   may be based on his own legal thinking,
14   strategy, et cetera
15            So, that's our position and we'll
16   stick to it and I believe we have been
17   sticking to it.
18            MR. SWEET: Our position is that
19   you've waived the attorney-client privilege
20   with respect to your understanding and
21   beliefs based on these conversations.
22            And I'll - -
23            MR. TIRSCHWELL: Obviously, we
24   disagree, let me just say.
25            MR. SWEET: You had a good - -

---

Page 125

1             THE WITNESS: If it wasn't - -
2             MR. SWEET: There's no question
3    pending.
4             THE WITNESS: I would like to
5    clarify.
6             If it wasn't clear to you as I
7    recited my facts, I was expressing, as you
8    asked me to do, my understanding of the
9    statements made by the government
10   representatives who I dealt with, that was
11   from the Mint, as well as the Secret Service.
12   BY MR. SWEET: (Continued)
13       Q.    Which of these meetings did Dan
14   Shaver say the word "forfeiture"?
15       A.    Mr. Sweet, I just went through the
16   discussions we've had.
17       Q.    It's true that he never did, isn't
18   it?
19       A.    In detail. In detail.
20       Q.    It's true he never did say forfeiture
21   or CAFRA to you; isn't that true?
22       A.    Well, no.
23            The substance of the discussion - -
24   the basis of our discussions was avoiding a
25   forfeiture proceeding.

32 (Pages 122 to 125)

Page 126

1      Q.   In your mind?
2      A.   Let me finish.
3          We talked about the Fenton litigation
4   and how we would avoid that type of litigation,
5   meaning a forfeiture proceeding on the coins.
6          The entire basis of our initiating
7   the discussions and their expressing interest to me
8   was to see if we can have an agreement that would
9   avoid the identical litigation that we had for
10  years. We - - they were very familiar with it and
11  I was very familiar with it, which was an In Rem
12  proceeding related to the coins.
13         MR. SWEET: Understood what your
14      position is.
15  BY MR. SWEET: (Continued)
16      Q.   Isn't it true, Mr. Berke, that
17  neither Mr. Shaver nor Mr. Weinman ever said to
18  you, explicitly, the word "forfeiture" or the word
19  "CAFRA" at any time before the transfer of the
20  Double Eagles to the possession of the United
21  States?
22      A.   Well, what I can tell you is that at
23  the meeting we had with the Secret Service, on - -
24  in Brooklyn, prior to the transfer, there was an
25  explicit discussion, in which they were very much a

Page 127

1   part of - - they were there - - in which there was
2   a discussion about waiving venue for a forfeiture
3   proceeding.
4          And the Secret Service asked those
5   questions?
6          Yes, they did.
7          And did I understand, though, that
8   the Secret Service and Mr. Weinman and Mr. Shaver
9   were all speaking on behalf of the government?
10         I certainly did.
11         MR. SWEET: I see you're not going to
12      answer the question.
13         I think you'll have to, once we get
14      in front of a judge.
15         THE WITNESS: I believe I did answer
16      the question.
17         MR. TIRSCHWELL: It's 1:30. Let's
18      take our break.
19         MR. SWEET: I have a couple more
20      questions and we'll break real soon.
21         MR. TIRSCHWELL: No, let's break now,
22      as we agreed.
23         It's 1:40.
24         MR. SWEET: We didn't agree.
25         I have a few more questions, sir.

Page 128

1          MR. TIRSCHWELL: We didn't agree, is
2   that you're what saying, that we didn't agree
3   to break at 1:30, when you asked an hour ago
4   if we should go for one hour?
5          MR. SWEET: I don't recall.
6          But, Eric, I have a few more
7   questions and then we'll break.
8   BY MR. SWEET: (Continued)
9      Q.   You were - - you had a good
10  relationship with Jane Levine; correct?
11      A.   We - -
12         MR. TIRSCHWELL: When?
13         When?
14      Q.   At all times following the Fenton
15  litigation.
16      A.   We had had a good professional - - we
17  were - - we had a good professional relationship.
18      Q.   Okay. And you knew she was in the
19  loop on the Langbord situation; correct?
20         MR. TIRSCHWELL: Objection to the
21      form, in the loop," and when.
22         THE WITNESS: Can you clarify your
23      question?
24  BY MR. SWEET: (Continued)
25      Q.   You knew that she was involved, in

Page 129

1   some respects, in handling the government's
2   interest in the Langbord situation?
3      A.   Are you talking about prior to the
4   transfer of the coins?
5      Q.   Yes.
6      A.   I don't recall knowing that at that
7   point.
8      Q.   Jane Langbord - - Jane Levine was
9   your principal lawyer contact during the five years
10  of the Fenton litigation; correct?
11      A.   She handled the case for the U.S.
12  Attorney's Office for the Southern District on
13  behalf of the U.S. Mint. The party that was
14  litigating was the U.S. Mint. She was the lawyer
15  for that office, handling it for the client, the
16  Mint.
17      Q.   So, at any time between August, your
18  first meeting with - - in Washington, in August,
19  and the transfer of the Double Eagles on September
20  22nd, did you call Jane Levine and discuss with her
21  issues concerning the 1933 Double Eagles that the
22  Langbords had?
23      A.   Well, I don't think it was my
24  position to decide who should be involved in the
25  government and I don't recall having been told

33 (Pages 126 to 129)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 130

1    prior to the transfer that she was in any way - -
2    she had been in any way brought in or asked to
3    consult for the Mint on the matter.
4         Q.    So, the answer is no?
5         A.    The answer is no.
6               That's my recollection.
7         Q.    Do you recall at the meeting, on
8    September 15th in Brooklyn, whether there was a
9    need for a seizure warrant?
10        A.    I don't recall that issue being
11   raised.
12        Q.    And you described the Secret Service
13   discussing venue.
14              Did the Secret Service agents, either
15   of them, mention the word "forfeiture," explicitly?
16        A.    As I sit here today, I can't tell you
17   the exact words they used.
18              I can tell you my understanding, from
19   the words that they did use, was that they were
20   talking about waiver of venue for a forfeiture
21   action against the coin and it made sense to me - -
22   withdraw what made sense to me - - that's what I
23   understood the Secret Service agent asking - - to
24   be asking.
25              Not necessarily a forfeit - - I

Page 131

1    recall them specifically asking for a waiver of
2    venue, for a forfeiture proceeding.
3               MR. TIRSCHWELL: I want to clarify
4    one thing before.
5    BY MR. SWEET: (Continued)
6         Q.    For a forfeiture proceeding?
7               Did the word "forfeiture" come out of
8    their mouths or was it a waiver of venue?
9         A.    What I'm telling you, I don't recall
10   the specific words that they used, but I can tell
11   you that my understanding of the words that they
12   used was that they were seeking a waiver of venue
13   for a forfeiture proceeding against the '33 Double
14   Eagles.
15        Q.    Do you know if they were talking
16   about a waiver of venue with respect to a search
17   warrant or a seizure warrant?
18        A.    I had a very clear understanding,
19   based on our communications, that they were asking
20   me for a waiver of venue and I believe that they
21   would only ask me for a waiver of venue if I was a
22   party in the litigation, which I understood to be a
23   litigation against the coin, which I understood why
24   they had, from their statements, that they were
25   asking me for a waiver of venue so that that

Page 132

1    forfeiture proceeding could proceed in New York.
2         Q.    And you assumed it was a forfeiture
3    proceeding?
4         A.    I'm not saying I assumed it. I
5    understood that from their statements. I didn't
6    assume anything. I understood that from their
7    statements, which was quite clear, and why I said
8    we would be prepared to do that.
9               MR. TIRSCHWELL: I would like to
10   clarify one thing on the record before - - I
11   gather you're ready to break for lunch now?
12              MR. SWEET: Yes.
13              MR. TIRSCHWELL: Okay.
14              Because I'm not sure. You made a
15   lengthy comment, Mr. Sweet, about what Mr.
16   Berke was or wasn't doing. I wanted to make
17   sure we're all clear here and that he under-
18   stood your question and you understood what
19   he was trying to explain.
20              So, I would like to ask the question
21   and have Mr. Berke make clear for the record
22   the following: That is:
23   EXAMINATION BY
24   MR. TIRSCHWELL:
25        Q.    In your conversations with Mr.

Page 133

1    Weinman and Mr. Shaver, up to the point of the
2    transfer of the coins, and leaving aside your
3    understanding or your belief, did they expressly
4    refer to the alternative to a settlement being a
5    forfeiture or CAFRA proceeding?
6               Did they expressly tell that you?
7               MR. TIRSCHWELL: I'm not sure that
8    that's clear on the record, one way or the
9    other.
10              THE WITNESS: I don't recall them - -
11   meaning Mr. Shaver or Mr. Weinman - - using
12   the word "CAFRA" and I cannot say, as I sit
13   here today, whether they referred to
14   forfeiture or not.
15              MR. TIRSCHWELL: I think the record
16   is clear as to what you understood the
17   totality of the conversations to be about.
18              MR. SWEET: I appreciate the effort
19   to have your witness answer the question.
20   That was great, for the first time.
21              MR. TIRSCHWELL: I don't agree with
22   that.
23              MR. SWEET: You don't have to.
24              We're going to break now. It's 1:45.
25              Before we break, could we assume that

34 (Pages 130 to 133)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

| Page 134 | Page 136 |
|---|---|
| 1 we're going to just keep working hard and | 1 thought process. |
| 2 continue or do you want to take a ten-minute | 2     But go ahead. |
| 3 break now and work through? | 3     THE WITNESS: What we discussed about |
| 4     I don't want to take up a lot of | 4 the issues from the Fenton litigation, which |
| 5 time. | 5 related to issues as to how the coin may have |
| 6     MR. TIRSCHWELL: I need -- | 6 left the Mint and whether the government has |
| 7     MR. SWEET: If the deposition is | 7 a claim to forfeit the '33 Double Eagles, in |
| 8 going to end before we're done -- | 8 substance. |
| 9     MR. TIRSCHWELL: We're on the record. | 9     (Mr. Shaver left the conference |
| 10     MR. SWEET: We're off the record. | 10 room.) |
| 11     (Recess: 1:46 p.m.) | 11 BY MR. SWEET: (Continued) |
| 12     (Resumed: 2:39 p.m.) | 12     Q.   Did either Mr. Shaver or Mr. Weinman, |
| 13 EXAMINATION (Continued) | 13 at any time, convey to you the impression that they |
| 14 BY MR. SWEET: | 14 did not believe that the Double Eagles were the |
| 15     Q.   Are you good? | 15 property belonging to the United States? |
| 16     A.   I'm good. | 16     A.   I'm having trouble answering your |
| 17     Whenever you're ready. | 17 question as formulated. I want to be responsive to |
| 18     Q.   We'll begin. | 18 your question. |
| 19     Mr. Berke, is it fair to say that as | 19     I don't believe there was any |
| 20 of September, the end of the meeting on September | 20 discussion that was, well, these belong to the |
| 21 15th in Brooklyn, the representatives of the United | 21 United States or these don't belong to the United |
| 22 States Mint had consistently maintained to you that | 22 States. |
| 23 it was their belief that the Double Eagles were the | 23     I believe the discussions were that |
| 24 property of the United States? | 24 there would be a dispute about the coins, which |
| 25     A.   I would disagree with that. | 25 would involve the same issues, essentially, or an |

| Page 135 | Page 137 |
|---|---|
| 1     Q.   And in what way? | 1 overlap of issues, I should say, that were involved |
| 2     A.   I would disagree. | 2 in the Fenton litigation. |
| 3     I don't believe that statement -- I | 3     Q.   And one of those issues was who has |
| 4 don't believe that statement was made. | 4 title to the 1933 Double Eagles; is that correct? |
| 5     I believe it was clearly discussed, | 5     A.   Well, I would describe it a little |
| 6 in substance, that if there wasn't an agreement | 6 more broadly than that and that relates to the |
| 7 there would be disputed issues related to the coin. | 7 issues as to whether or not -- how the coins may |
| 8 But I don't recall an occasion where that statement | 8 have left the Mint and whether there's a basis for |
| 9 was explicitly stated, as you said. | 9 the government to seek forfeiture of those coins. |
| 10     Q.   I'm asking about explicit statements. | 10     Let me just say, and so I believe |
| 11     Now let's talk about the issue. What | 11 that the Langbords had their position related to |
| 12 issues did you understand would have to be | 12 the coins and the government may have had their |
| 13 resolved? | 13 position related to the coins and we're talking |
| 14     A.   Well, I understood that -- | 14 about an agreement. Just as in the Fenton |
| 15     MR. TIRSCHWELL: I'm sorry to | 15 litigation, it was a settlement. But that didn't |
| 16 interrupt. | 16 involve both sides saying, okay, you're right and |
| 17     THE WITNESS: Based on -- | 17 okay, you're right. It was a settlement of a |
| 18     MR. TIRSCHWELL: Clearly, we're | 18 disputed set of issues. |
| 19 answering only with respect to his | 19     And at that point what we were |
| 20 understanding as gleaned from or derived from | 20 talking about was a potential settlement of a |
| 21 conversations with the government. We're not | 21 disputed set of issues as opposed to a discussion; |
| 22 answering -- we're maintaining work product | 22 this is -- this is the issue that I'm impressing |
| 23 protection and any other available privilege | 23 upon you or this is the issue I'm impressing upon |
| 24 as to any thinking that Mr. Berke had as | 24 you. It was whether a settlement would resolve all |
| 25 derived from his own legal analysis or | 25 disputed issues. |

35  (Pages 134 to 137)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 138

1    And I want to be clear about why I'm
2  having difficulty answering this specific question
3  that you were asking.
4       (Mr. Shaver returned to the
5  conference room.)
6    Q.    You understood about the transfer, on
7  September 22nd, that the government and the
8  Langbords had different views about who had title
9  to the 1933 Double Eagles; is that correct?
10   A.    Well, again, I wouldn't agree with
11  that statement as framed because just as - - as I
12  mentioned at the outset, just as Mr. Fenton and the
13  government and Mr. Fenton had disputes and they
14  settled it, I did not know whether or not these
15  were positions that the government was going to be
16  prepared to litigate as opposed to settling.
17       But I certainly knew if we didn't
18  reach a settlement and we were in litigation, that,
19  based on their statements, that the parties would
20  be taking positions similar to what was taken in
21  the Fenton case, which was the government said, we
22  have a right to these coins, and the - - in that
23  case, the Claimant said no, I have a right to the
24  coins.
25   Q.    When you say "a right," you're

Page 139

1  talking about ownership title; is that correct?
2    A.    Again, those are very loaded terms.
3       I think in forfeiture proceedings,
4  you know, a party prevails in the forfeiture
5  proceeding. That's why I'm not using necessarily
6  ownership, because that doesn't necessarily carry
7  title and what happens in the forfeiture action,
8  it's whether the government has a basis to forfeit
9  the coins and there can be a whole range or issues
10  that impact that question.
11   Q.    Okay. And the Barnard,
12  B-A-R-N-A-R-D, case, that was a replevin case; is
13  that correct?
14       MR. TIRSCHWELL: I'm going to object
15  to his legal analysis of the Barnard case.
16       MR. SWEET: Okay. If you object to
17  him saying whether it was a replevin case,
18  you can. I don't mean to.
19  BY MR. SWEET: (Continued)
20   Q.    Do you know whether the Barnard case
21  was a replevin case?
22       MR. TIRSCHWELL: Same objection.
23  BY MR. SWEET: (Continued)
24   Q.    You don't know?
25       MR. TIRSCHWELL: No, he didn't

Page 140

1  answer, on my instruction.
2       It's legal analysis or assessment of
3  what the Barnard case was.
4  BY MR. SWEET: (Continued)
5    Q.    Do you know whether the Barnard case
6  concerned title to that particular 1933 Double
7  Eagle?
8       MR. TIRSCHWELL: Objection to the
9  form.
10      THE WITNESS: (No response.)
11   Q.    You don't know, do you?
12      MR. SWEET: Okay.
13      MR. TIRSCHWELL: Objection.
14   Q.    The September 15th meeting, would you
15  characterize it as a friendly meeting?
16   A.    I'm sorry, I just didn't hear the
17  date.
18   Q.    The September 15th meeting, in
19  Brooklyn.
20   A.    I wouldn't describe it as friendly or
21  unfriendly. It was just different because I had
22  never met the Secret Service agents. It was just -
23  - I wouldn't describe it as friendly or unfriendly.
24   Q.    There was no sort of coercion though,
25  was there?

Page 141

1    A.    There was none.
2    Q.    Do you recall Mr. Shaver telling you,
3  at that meeting, that the government would not
4  agree to any conditions on the surrender of the
5  1933 Double Eagles?
6    A.    I do not.
7    Q.    You don't remember one way or the
8  other?
9    A.    No, I don't remember him making that
10  statement.
11   Q.    There was no discussion with the
12  government - - between you and the government
13  concerning having the Double Eagles authenticated
14  by an independent expert, was there?
15   A.    I don't recall that.
16       My only hesitation is that when there
17  had been some delays in having the coins tested,
18  it's possible that it may have come up, whether - -
19  whether the delays were caused by the Mint's expert
20  not being available and whether there's a
21  possibility of somebody else doing it.
22       I know there was that discussion in
23  the prior case and I just can't say that discussion
24  didn't happen. But if it did, it would have been
25  after the September '04 transfer.

36  (Pages 138 to 141)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 142

1    Q.    Did it come up in the prior case?
2    A.    Only in that there was an outside
3  person who tested the coin regarding authenticity.
4  There was somebody the Mint hired who was an
5  expert, who did the analysis comparing the coins
6  and I just don't remember what the role was, but I
7  don't think they were a consultant the Mint used as
8  opposed to a Mint employee. They did it for the
9  government.
10   Q.    You never discussed, with anyone from
11 the Mint, having - - as an alternative to
12 transferring the Double Eagles to the possession of
13 the government, having them maintained in another
14 location and tested independently?
15   A.    That was not discussed.
16   Q.    And you were certain at that time
17 that the Double Eagles that the Langbords
18 possessed, you were certain that they were genuine,
19 were you not?
20         MR. TIRSCHWELL: Well, to the extent
21 it calls on him to disclose, I don't see how
22 he can answer that without exposing what his
23 client - - what he may have discussed with
24 his client or clients.
25         You can ask him whether he

Page 143

1  independently tested them or sent them to be
2  tested, had a basis on that sort of ground,
3  then you can ask him.
4         But I don't - - can you answer that
5  question, in part, from discussing your
6  conversations with your client?
7         THE WITNESS: No.
8  BY MR. SWEET: (Continued)
9    Q.    Let me refer you, Mr. Berke, to
10 exhibit?
11        MR. TIRSCHWELL: One.
12   Q.    One, page 4.
13   A.    (Witness complies.)
14   Q.    In the middle of the page, the
15 reporter says, "Why did the coins need to be
16 authenticated?"
17        And your response is, "From our
18 prospective, they didn't need to be authenticated.
19 We had no question."
20   A.    I agree with that statement.
21   Q.    You said that to the reporter?
22   A.    That was my prospective.
23   Q.    So, it was your understanding at the
24 time that there was no question as to the
25 authenticity of the Double Eagles?

Page 144

1         MR. TIRSCHWELL: Well.
2         THE WITNESS: That's a different
3  question.
4         MR. SWEET: I'm trying to understand.
5  BY MR. SWEET: (Continued)
6    Q.    What did you mean here - -
7    A.    Okay.
8    Q.    With what you told the reporter?
9    A.    That I was not asking that they be
10 authenticated; that I was comfortable that there
11 was not a question that they were authentic, given
12 the circumstances and the facts, but that the Mint
13 wanted to authenticate them to make sure that they
14 were real.
15   Q.    And - -
16   A.    This was not a joint request, but a
17 request of the Mint.
18   Q.    Okay. When you say "the
19 circumstances," what circumstances were those?
20        MR. TIRSCHWELL: I don't think - - I
21 think we have the same problem, that
22 explaining the basis for this answer would
23 require him to divulge communications with
24 his client.
25        And I don't think, having given his

Page 145

1  answer, he's waived anything beyond the
2  answer itself, which you have.
3         MR. SWEET: Well, it wouldn't be
4  attorney-client privilege if he tells us
5  facts.
6         And here he's making a statement to
7  the reporter that he was - - had no question
8  - - here he said, from his answer, he's
9  saying that he had no question about the
10 authenticity.
11        So, the basis for that, the fact he
12 said "the circumstances," so I think we're
13 entitled to know what the circumstances are.
14        You don't have to tell us where you
15 got that, but what are the facts that led you
16 to - - to the conclusion that they are
17 authentic.
18        THE WITNESS: Can I consult about
19 privilege?
20        (Off-the-record discussion between
21 the witness and Mr. Tirschwell.)
22        MR. TIRSCHWELL: Well, he's going to
23 tell you it does appear, now that I've had a
24 chance to consult, that he can answer that
25 question without getting into any

37 (Pages 142 to 145)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 146

1    conversations he had with his client.
2         So, to that extent, without waiving
3    any privilege, go ahead and answer it.
4         THE WITNESS: The circumstances I'm
5    talking about is the connection of the coins
6    to Israel Switt.
7    BY MR. SWEET: (Continued)
8         Q.   It was the understanding that you're
9    right because they originated in - - they came into
10   the possession of the Langbords through Israel
11   Swit, you were sure they were authentic?
12        A.   Based on that factor, I did not
13   believe they needed to be authenticated.
14        Well, withdrawn.
15        Yeah, I - - no, I can say that I
16   didn't think they needed to be authenticated; that
17   they needed to establish that they were 1933 Double
18   Eagles.
19        Q.   Did you, at any time, tell the Mint
20   that because of the circumstances of how they were
21   found you did not believe they needed to be
22   authenticated?
23        A.   I do believe that I did say, you know
24   - - I don't believe there's any question that they
25   are authentic, but I understand your request to

Page 147

1    authenticate them.
2         Q.   And that's based upon the fact of
3    your connection with Swit and the authenticity on
4    the fact that you recognize that at some point in
5    the history of these things he had involvement with
6    a large number of them?
7         A.   I'm not prepared to say that.
8         What I am prepared to say - -
9         MR. TIRSCHWELL: Again, be careful to
10   answer, not to reveal your legal analysis
11   with - -
12        MR. SWEET: It's all factual. I'm not
13   asking for legal analysis.
14        MR. TIRSCHWELL: I'm cautioning him
15   to make sure he keeps it factual.
16        THE WITNESS: I don't think there's
17   more I can say now without revealing
18   attorney-client privilege communications.
19   BY MR. SWEET: (Continued)
20        Q.   At any time before the transfer on
21   September 22nd did you determine the value of the
22   Double Eagles through an appraisal or some other
23   means?
24        A.   No.
25        I don't believe so.

Page 148

1         Q.   Since the transfer, have you?
2         MR. TIRSCHWELL: Well, I mean, to the
3    extent that - - and I'm not sure I know the
4    answer to this - - but to the extent there
5    were consultations with someone as part of a
6    legal strategy, I don't think he's required
7    to reveal that. That would be - - you know,
8    that person would be - -
9         MR. SWEET: I'm not asking you to
10   reveal who; I'm just asking you first
11   threshold questions.
12   BY MR. SWEET: (Continued)
13        Q.   Have the Langbords done an appraisal
14   of the 1933 Double Eagles at issue in the
15   litigation?
16        MR. SWEET: I don't see how that can
17   possibly be privileged.
18        MR. TIRSCHWELL: Give me a minute to
19   think about it.
20        MR. SWEET: Sure.
21        (Recess: 2:56 p.m.)
22        (Resumed: 3:00 p.m.)
23        MR. SWEET: The question was:
24   EXAMINATION (Continued)
25   BY MR. SWEET:

Page 149

1         Q.   Whether since the transfer of the
2    Double Eagles on September 22nd, the Plaintiffs,
3    the Langbords, have done an appraisal or some
4    estimate of the value of the Double Eagles?
5         MR. TIRSCHWELL: And we've conferred,
6    Mr. Berke and I, about issues of privilege
7    and work product and what I can represent for
8    the record is there has been no appraisal, to
9    the extent there may have been conversations
10   with third parties, about what the coins or
11   how the coins might be valued or what they
12   might be valued at. Those conversations are
13   part of our legal strategy and we assert work
14   product protection as to those conversations.
15        MR. SWEET: Okay.
16        Q.   Well, you said there were
17   conversations with a third party.
18        Who were the third parties?
19        MR. TIRSCHWELL: Well, it's certainly
20   work product to those, as well.
21        MR. SWEET: Over the identity of the
22   third party?
23        MR. TIRSCHWELL: Who we decided to
24   consult with about the coins I don't think is
25   something you're entitled to.

38  (Pages 146 to 149)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

---

Page 150

1    BY MR. SWEET: (Continued)
2        Q.   Do you have a number; do you have an
3    appraisal number, an estimate or some number as to
4    the value of the coins?
5            MR. TIRSCHWELL: I don't think we
6        have to answer that.
7            MR. SWEET: Are you instructing him
8        not to answer that?
9            MR. TIRSCHWELL: I am.
10           And I should say, also, that the
11       additional basis for the objection - -
12           MR. SWEET: Let's get them all out.
13           MR. TIRSCHWELL: For this objection,
14       on questions like this, is the reason Mr.
15       Berke is here is not so you can, you know,
16       ask him about these things. In any ordinary
17       case you would never have a chance to depose
18       opposing counsel about these things.
19           He's here for the sole reason that he
20       was a witness to certain communications with
21       the government and he's here to answer
22       questions about that.
23           I do not think - - and I feel very
24       strongly about this - - this is an
25       inappropriate opportunity for you to be

Page 151

1    asking him the kinds of questions that, but
2    for the fact that he was a party to the to
3    certain conversations and communications with
4    the government, you would never have any
5    opportunity to ask him as part of a
6    deposition.
7            MR. SWEET: Thanks, Eric.
8        Usually clients don't hide behind
9    their attorneys on every possible relevant
10   fact of the case and usually requests for
11   admissions are responses and admission or
12   denial and not, again, a reference to "talk
13   to Mr. Berke when you take his deposition."
14           MR. TIRSCHWELL: That's the second.
15           MR. SWEET: We'll take the deposition
16   and you can assert objections as you want and
17   we'll leave it to a judge to decide whether
18   they are legitimate objections.
19           MR. TIRSCHWELL: We will, indeed.
20       I note for the record your second
21   reference to our responses to your requests
22   for admissions and I'm confident, having
23   reviewed them many times recently, that the
24   only questions that we've referred you to Mr.
25   Berke on were questions you posed about his

Page 152

1    interactions with the government.
2            And so, you continue to misrepresent
3    the record.
4        You can make your baseless
5    accusations as many times as you want about
6    our client, but you're the one who is
7    actually misstating, misrepresenting the
8    record repeatedly.
9            MR. SWEET: We'll get there.
10   BY MR. SWEET: (Continued)
11       Q.   Let's go to the letter, the revised
12   letter of September 21st.
13           MR. SWEET: We'll mark this as Berke
14       4.
15           (Letter, 1 page, so marked Berke
16       Exhibit 4 for identification by counsel.)
17           (Handed to the witness.)
18           (Witness reviews the exhibit.)
19       Q.   Are you familiar with this letter?
20       A.   Yes.
21       Q.   Is this your first written
22   correspondence to the government on the behalf of
23   the Langbords concerning the 1933 Double Eagles?
24       A.   There may be e-mails, but I'm not
25   just sure if they were before this. But there were

Page 153

1    e-mails.
2        Q.   Other than e-mails?
3        A.   I believe this is the first letter.
4        Q.   Now, you sent this the afternoon
5    before the transfer itself; right?
6        A.   I had told Mr. Shaver and Mr. Weinman
7    I would be sending this letter as confirmation of a
8    full reservation of rights and then I sent the
9    letter the day before our meeting.
10       Q.   Okay. The last meeting you had had,
11   the September 15th meeting, was the last in-person
12   meeting was September 15th; right?
13       A.   The last in-person meeting was
14   September 15th.
15       Q.   And then there were a couple of
16   phones calls; right?
17       A.   My recollection is a couple of phone
18   calls.
19       Q.   Then you waited until the night
20   before to send this?
21       A.   I wouldn't agree I waited until the
22   night before.
23           I sent it the day before our meeting
24   because I - - and - - yes.
25       Q.   Now, when it says, "our

39 (Pages 150 to 153)

SUMMIT COURT REPORTING, INC.
215.665.5633 * 800.447.8648              www.summitreporting.com

Langbord v. US Dept. of Treasury, et al.                    Barry Berke6/18/2008

Page 154

1  understanding," do you see that, the second
2  sentence?
3       (Witness reviews the exhibit.)
4       Q.    "Based on our understanding that the
5  government will test."
6       A.    Huh-huh.  Huh-huh.
7       Q.    That understanding that you had, did
8  you ever expressly talk to Mr. Weinman or Mr.
9  Shaver to determine whether that was also their
10  understanding?
11      A.    That was what we discussed when we -
12  - when we reached an agreement that this would
13  concur, this would be discussed.
14      Q.    Obviously, there's a dispute about
15  what the understanding was.  That's one of the
16  reasons we're here.
17           The question I have for you is:  When
18  you say, "Based on our understanding," you're
19  referring - - "our" is referring to the Langbords;
20  right?
21           MR. TIRSCHWELL:  Well, I don't think
22  he - - I think you can ask.
23           MR. SWEET:  He wrote the letter.
24           MR. TIRSCHWELL:  Yes.
25           MR. SWEET:  I asked the question.

Page 155

1           Do you want to object?
2           MR. TIRSCHWELL:  Are you going to let
3  me talk?
4           MR. SWEET:  I'm going to let you
5  object, but not start off with your
6  explanation - -
7           MR. TIRSCHWELL:  I object.
8           MR. SWEET:  Telling the witness how
9  he should think about the question.
10           That I'm not going to let you do.
11           You can object as to form; you can
12  object on a basis of a privilege and instruct
13  him not to answer.
14           MR. TIRSCHWELL:  All right; I object
15  on the basis of work product and instruct him
16  not to answer.
17           And if you don't want - -
18           MR. SWEET:  Well - -
19           MR. TIRSCHWELL:  You didn't let me
20  explain, so now that's what happens.
21           MR. SWEET:  That's fine.
22           So, it is your explanation now that
23  he can't testify about what "our" means in a
24  letter that he wrote concerning a purported
25  agreement which he contends is at the heart

Page 156

1  of this case?
2           MR. TIRSCHWELL:  Are you now allowing
3  me to speak?
4           MR. SWEET:  No.
5           I would like an answer.
6           MR. TIRSCHWELL:  Well, I've made my
7  objection.
8           And my instruction.
9  BY MR. SWEET:  (Continued)
10      Q.    Who does the "our" refer to?
11           MR. TIRSCHWELL:  I've made my
12  objection and given my instruction.
13           So the record is clear, whether you
14  want me to speak or not is not really the
15  point.
16           I am objecting to the question that
17  would call for what Mr. Berke's thinking was
18  in choosing specific words in this letter.
19           If you want to ask him about what the
20  understanding was, what understanding there
21  was and what it was based on, he can answer
22  that.
23      Q.    So, the question is:  In using the
24  words "our understanding" in this letter, who do
25  you - - who did you intend "our" to refer to, the

Page 157

1  Mint and the Langbords or just the Langbords?
2           MR. TIRSCHWELL:  I object and
3  instruct him not to answer as to what he
4  intended the - - I will allow him to answer
5  as to what understanding he believed there
6  was, based on the conversations.
7           MR. SWEET:  Well, he's already
8  testified what understanding he believed
9  there was and our clients have a different
10  understanding.
11           What we're trying to do in this
12  litigation is try to understand where the
13  parties sit and whether there was an
14  understanding, whose interpretation is
15  correct.  These are issues that go to the
16  heart of the case, Eric.
17           And this is a letter written by Mr.
18  Berke, which he contends is an important
19  letter reflecting an understanding reserving
20  his clients' rights, and you're not letting
21  him testify about who "our" refers to?
22           MR. TIRSCHWELL:  Why don't you ask
23  him what the basis of - - of the statement
24  is?
25           And he'll explain.

40  (Pages 154 to 157)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke6/18/2008

Page 158

1        MR. SWEET: What? What is the
2    suggestion?
3        MR. TIRSCHWELL: What the basis of
4    the statement was -- is -- was?
5        What's the basis of the statement,
6    based on our understanding that the
7    government will defend?
8        He can tell you about the basis, you
9    know, based on his conversations with the
10   government. But that's different than asking
11   him what he was intending to convey.
12       MR. SWEET: Does this -- I'll ask
13   you a different way.
14   BY MR. SWEET: (Continued)
15       Q.    Does the word "our" in this letter,
16   in the second sentence, mean just the Mint and the
17   Langbords or does it mean just the Langbords?
18       MR. TIRSCHWELL: That's the same
19   problem.
20       Same objection; same instruction;
21   with the same explanation, that you can ask
22   him whether, based on the conversations, he
23   understood there to be an understanding with
24   the government and whether --
25       MR. SWEET: You're asking again --

Page 160

1    lawyer who, for forty-five minutes, had
2    criticized two lawyers from the Mint. I just
3    think that it's hypocritical for you to --
4        MR. TIRSCHWELL: We wrote --
5        MR. SWEET: To the ultimate extent,
6    to question someone about what they meant by
7    the use of their word and now you're not
8    allowing me asking to get your own witness,
9    who wrote letter, to testify about the
10   word "our."
11       That's so hypocritical and you should
12   be ashamed of yourself.
13       MR. TIRSCHWELL: If you want --
14       MR. SWEET: Do you want to a break
15   and reconsider this?
16       MR. TIRSCHWELL: No.
17       But if you want, you can end the
18   deposition --
19       MR. SWEET: You can do whatever you
20   want to do.
21       MR. TIRSCHWELL: If you're just going
22   to insult me.
23       MR. SWEET: Eric, it's insulting to
24   have a lawyer take two lawyers from the Mint,
25   take their depositions and spend a lot of

Page 159

1    you're suggesting now that I can ask him
2    about his understanding and what I'm asking
3    is --
4        MR. TIRSCHWELL: Based on -- you can
5    ask him his understanding -- you can ask him
6    what the basis -- you can ask him whether --
7    -- you can ask him what he understood, as that
8    understanding derives from the conversations
9    he had with the government. I think we've
10   been clear about that.
11       MR. SWEET: That's --
12       MR. TIRSCHWELL: That's --
13       MR. SWEET: That's as unclear as I've
14   ever heard.
15       MR. TIRSCHWELL: You can ask him what
16   understanding he had, based on his
17   conversations with the government, about an
18   agreement or an understanding, or whatever
19   you want to call it. That's what I'm saying.
20       But I'm not letting him answer as to
21   his thought process in choosing to use words
22   in this letter.
23       MR. SWEET: Okay.
24       For the record, that's the most
25   hypocritical thing I've ever heard from a

Page 161

1    time over their understanding of the word
2    "their," in Mr. Berke's letter, and not allow
3    me to ask Mr. Berke about the word "our" in
4    his own letter.
5        MR. TIRSCHWELL: I don't even see the
6    word "their."
7        MR. SWEET: You don't remember the
8    forty-five minutes we spent on that either,
9    last week?
10   BY MR. SWEET: (Continued)
11       Q.    There was no understanding with the
12   government, was there, Mr. Berke, concerning -- do
13   you admit now, Mr. Berke, based upon the -- at
14   this time, today, do you believe there was an
15   understanding with the government, meeting of the
16   minds, concerning the limitations, any limitations,
17   on the transfer of the Double Eagles?
18       A.    Yes.
19       Q.    You believed there was a meeting of
20   the minds?
21       A.    Yes.
22       Q.    What's your basis for believing there
23   was a meeting of the minds?
24       A.    The discussions that happened.
25       Well, the discussions that happened,

41 (Pages 158 to 161)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

---

Page 162

1  that there was an agreement that we were going to
2  discuss, possibly resolve the matter without
3  litigation; that the Langbords would permit the
4  government to take possession of the coins to test
5  for authenticity while we discussed resolving the
6  issue related to the coins to determine if we can
7  reach an agreement; and that the Langbords were
8  preserving all of their rights to the coins and
9  nothing about the government's testing of the coins
10 or taking possession of the coins, during the
11 discussions was in any way a waiver of their
12 rights.
13    Q.    Okay. Is it your contention that Mr.
14 Shaver and Mr. Weinman misled you?
15    MR. TIRSCHWELL: About what?
16 BY MR. SWEET: (Continued)
17    Q.    About anything?
18    A.    Your question is: As I sit here
19 today, do I believe that I was misled by the
20 government?
21    Q.    No, by Mr. Shaver or Mr. Weinman.
22    A.    By Mr. Shaver and Mr. Weinman?
23    MR. TIRSCHWELL: To the extent you
24 can answer that question without getting into
25 your analysis and thought process about the

---

Page 163

1  legal issues in the case, just based on the
2  communications and what transpired.
3    THE WITNESS: Well, I'm not sure the
4  two can be separated.
5    I would like to consult.
6    MR. SWEET: While you're consulting,
7  we'll go off the record and we'll mark the
8  time, please.
9    Give some thought, please, to whether
10 the position that you've taken in this
11 deposition with regard to what is acceptable
12 question is consistent with your objection to
13 Mr. Berke testifying about the word "our" in
14 his very own - -
15    MR. TIRSCHWELL: Well, I'm reminded,
16 just that my question to these - -
17    MR. SWEET: Just consult. I don't
18 want to argue on the record. It costs money.
19    MR. TIRSCHWELL: I thought we're off
20 the record?
21    MR. SWEET: No, we're still going.
22    MR. TIRSCHWELL: Let's go off the
23 record.
24    (Recess: 3:16 p.m.)
25    (Resumed: 3:18 p.m.)

---

Page 164

1    MR. SWEET: Back on the record.
2    MR. TIRSCHWELL: I've had the
3  opportunity to confer with Mr. Berke and we
4  do not believe - - I do not believe that
5  there is a way to answer the question of
6  whether Mr. Berke thinks he was misled by Mr.
7  Shaver or Mr. Weinman or anyone from the
8  government without revealing his thoughts,
9  analysis and consideration of everything
10 that's transpired in this case.
11    So, I don't believe - - I'm
12 instructing him not to answer.
13    I don't believe it's possible for him
14 to answer that without getting into what is
15 protected thought process.
16 EXAMINATION (Continued)
17 BY MR. SWEET:
18    Q.    You've never represented in any
19 letter to the government, in connection with the
20 1933 Double Eagles, that Mr. Shaver has misled you,
21 have you?
22    A.    I think my letters speak for
23 themselves.
24    And I would reference the letter that
25 you had asked me about earlier that referred to our

---

Page 165

1  prior dealings.
2    Q.    Okay. Same question with regard to
3  Mr. Weinman.
4    Have you ever written in any letter
5  to the United States, in connection with this case,
6  that you were misled by Mr. Weinman?
7    A.    Again, I would refer to the letter
8  that I did write in response to a letter that was
9  signed by Mr. Shaver about how I characterized our
10 prior dealings.
11    Q.    Okay. That would be it; right?
12    If it's in that letter, it's in that
13 letter, otherwise you never did?
14    A.    I never did what, make sure I know
15 what you're asking?
16    Q.    Communicate in writing your belief
17 that Mr. Weinman or Mr. Shaver had misled you?
18    A.    I want to make sure we're saying the
19 same thing.
20    I believe I did communicate that I
21 thought their characterization of our prior
22 discussions was at odds with those discussions. I
23 believe I communicated that in a variety of
24 letters.
25    Q.    That's something else.

---

42 (Pages 162 to 165)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 166

1       I'm asking if you ever communicated
2   in writing that either of these gentlemen, sitting
3   to my left, misled you in connection with the
4   entire 1933 Double Eagles?
5           MR. TIRSCHWELL: Object to the form
6       of the question.
7           THE WITNESS: I didn't - - I don't
8       believe I used the word "misled," but I also
9       don't want to be in a position of giving a
10      blanket characterization of my letters.
11          There are quite a number of letters
12      in the record. I think they do speak for
13      themselves, in terms of my - - in terms of
14      the concerns I expressed in those letters,
15      that the prior discussions I had with the
16      government were not being accurately
17      characterized, the letter I was receiving
18      from the government.
19  BY MR. SWEET: (Continued)
20      Q.   I'm asking you something else.
21          In any letter, in any correspondence
22   that you've created in this case, that you've sent
23   to the United States, have you ever said that Mr.
24   Shaver or Mr. Weinman misled you or fraudulently
25   induced you or pulled the wool over your eyes or

Page 167

1   something - - or something other, some other
2   statement, some other characterization in the same
3   tone, into surrendering the 1933 Double Eagles?
4       A.   I think my letters, which I know you
5   have, express my concerns that the government's
6   actions were inconsistent with our prior
7   discussions related to those coins.
8           And I don't want to be in a position
9   of characterizing each of those letters or what has
10  happened since. But I think those letters speak
11  for themselves.
12      Q.   In your letter, in Berke 4, which is
13  your September 21st letter, it says, bottom line of
14  the first paragraph, "while we discuss a possible
15  resolution of the issues representing to the
16  coins." You don't say in this letter anywhere that
17  if there is no resolution there would be some form
18  of litigation, do you?
19      A.   I don't use those words in that
20  letter, but I do make clear, as you know in the
21  next paragraph, that all - - this was "without
22  prejudice to all my clients' rights and remedies
23  existing at law, in equity, or otherwise," which I
24  understand is understood to mean rights to bring
25  claims in a litigation.

Page 168

1       Q.   Okay. You still have the right to
2   bring claims and litigation; you never lost that
3   right.
4           MR. TIRSCHWELL: Objection.
5           THE WITNESS: No.
6           The agreement, to make - - let me
7       just read it.
8           "This agreement to make available the
9       coins as described above is without prejudice
10      to all my clients' rights and remedies
11      existing at law, in equity or otherwise. We
12      specifically reserve all rights and remedies
13      with respect to the coins."
14      Q.   What remedies were you referring to?
15      A.   Referring to - -
16          MR. TIRSCHWELL: Whoa, whoa, whoa.
17          MR. SWEET: You're not going to let
18      him say what remedies he's referring to?
19          MR. TIRSCHWELL: I don't see how he
20      can describe what remedies at the time, as a
21      lawyer, he thought were available, without
22      revealing his mental thoughts and process.
23          You can ask him a different question.
24          MR. SWEET: Are you instructing him
25      not to answer that question?

Page 169

1           MR. TIRSCHWELL: As phrased, yes.
2   BY MR. SWEET: (Continued)
3       Q.   You used the words "rights and
4   remedies." Each of those words is the plural;
5   correct?
6       A.   "Rights and remedies existing at law,
7   in equity, or otherwise," "rights and remedies with
8   respect to the coins."
9       Q.   So it's clear from this letter that
10  there were more than - - there was more than one
11  potential right and more than one potential remedy;
12  correct?
13      A.   I think this letter is clear.
14      Q.   Oh, obviously not. Because we're
15  here.
16      A.   I think this letter is clear that it
17  is reserving every right and every remedy that the
18  Langbords had and could possibly have as to the
19  1933 Double Eagle coins.
20      Q.   Has anybody threatened you with a
21  malpractice suit - -
22      A.   No.
23      Q.   In connection with this case?
24          MR. TIRSCHWELL: Objection.
25          MR. SWEET: That's a fact question.

43 (Pages 166 to 169)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 170

1    MR. TIRSCHWELL: Anyone threaten you
2  with a malpractice suit what basis do you
3  have to ask that question?
4    MR. SWEET: I just read the letter.
5    MR. TIRSCHWELL: I'm not following.
6  BY MR. SWEET: (Continued)
7    Q.    Okay.  When you talk about resolution
8  of the issues relating to the coins, what issues
9  are you referring to?
10   A.    The issues that were litigated in the
11 Fenton litigation.
12   Q.    And did you discuss all those issues
13 with the folks from the Mint?
14   A.    Discuss the possible resolution of
15 the issues related to the coins, those are the
16 issues.  Are we going to have a settlement of the
17 litigation and resolve the issues as was done in
18 the prior time we had a '33 Double Eagle or are we
19 going to litigate.  That's what it refers to.
20   Q.    And there was no specific discussion
21 with anybody from the Mint about the nature of the
22 litigation, was there?
23   A.    (No Response.)
24   Q.    Well, that's not in this letter.
25      Is that in any other letter - -

Page 171

1    MR. TIRSCHWELL: Objection.
2    Q.    Prior to the transfer?
3    MR. TIRSCHWELL: Objection to the
4  form.
5    THE WITNESS: I believe there was
6  extensive questions and I believe I answered
7  that question.
8    Q.    You never discussed with anybody from
9  the Mint the consideration of a bailment agreement,
10 did you, with respect to the Double Eagles, did
11 you?
12   A.    No.
13   Q.    With regard to Berke 4, are there any
14 explicit conditions described here concerning the
15 surrender?
16   MR. TIRSCHWELL: Objection to the
17 form of that.
18   MR. SWEET: I'm sorry?
19   MR. TIRSCHWELL: I object to the
20 form.
21      I don't understand the question.
22   MR. SWEET: The format you object to?
23   MR. TIRSCHWELL: Yeah.  It's - - I
24 object to the format.  I don't understand
25 what you're asking.

Page 172

1    THE WITNESS: The condition is the
2  language, we're only making the coins
3  available to the government for the purposes
4  of testing them for authenticity and securing
5  them while we discuss a possible resolution
6  of the issues related to the coins, while
7  expressly and clearly doing so without
8  prejudice to the Langbords' rights and
9  remedies existing in law, or equity, or
10 otherwise, and specifically with respect to
11 the coins.
12 BY MR. SWEET: (Continued)
13   Q.    You just testified the letter said
14 "only."
15      Where is the word "only"?
16   A.    I don't understand your question.
17   MR. SWEET: Go back and read his last
18 answer from the beginning.
19      (The requested material was read
20 aloud.)
21   MR. SWEET: That's enough.
22   Q.    We just had the question, your answer
23 read back and your describing a letter, where you
24 said "only," turning them over only for
25 authentication.

Page 173

1      But the word "only" isn't this
2  letter, is there?
3    A.    That's what the letter says.
4    Q.    Where does did say only?
5    A.    That is what the first paragraph and
6  second paragraph of the letter says, it says on
7  what basis the coins are being turned over.  It's
8  very explicit and clear.
9    Q.    But the word "only" is not in the
10 letter, is it?
11   A.    You're asking if the word "only" is
12 in the letter?
13      I can look to see if the word "only"
14 is in the letter.
15   Q.    Can you take a look?
16      (Witness reviews the exhibit.)
17   A.    The words "only" is not in the
18 letter.
19   Q.    The transfer occurred on the 22nd of
20 September; right?
21   A.    Yes.
22   Q.    How did the date come to be agreed
23 to?
24   A.    (No response.)
25   MR. SWEET: I'll ask it a different

44 (Pages 170 to 173)

Page 174

1      way.
2      BY MR. SWEET: (Continued)
3          Q.    Do you know why it occurred on the
4      22nd of September?
5          A.    I recall a discussion with the Mint
6      regarding a mutually convenient date and I believe
7      that was a mutually convenient date.
8          Q.    Was it convenient to the lawyers and
9      the Secret Service and Mr. Langbord?
10         A.    That's my recollection.
11         Q.    The location of the surrender was the
12     bank where they were being held; correct?
13         A.    Correct.
14         Q.    And how was it determined that the
15     surrender would occur at the bank?
16             MR. TIRSCHWELL: Objection to the
17         form of the question.
18             And we don't agree to the term
19         "surrender," for the record.
20             THE WITNESS: There was a discussion
21         between myself and the government and we
22         reached an agreement that the transfer would
23         occur at the bank where they were being held.
24     BY MR. SWEET: (Continued)
25         Q.    So, it's a mutual agreement to - -

Page 175

1      for this transaction to take place at the bank?
2          A.    We reached that agreement; yes.
3          Q.    How was it determined who would
4      attend?
5          A.    Well, I think the government
6      determined who would attend on their end and I
7      believe we determined who would attend on our end.
8          Q.    So, any party can decide who they
9      wanted, was able to decide who they wanted to
10     attend?
11         A.    I think in this instance, I recall
12     that the government - - I don't recall having a
13     discussion where I expressed a view to the
14     government who they should have attend, nor did I
15     have a discussion with the government about who
16     they thought we should have in attendance.
17         Q.    There was a meeting that morning, the
18     22nd, at Starbucks; correct?
19         A.    Correct.
20         Q.    Can you describe everything that
21     happened at that meeting?
22         A.    I recall being at the Starbucks; I
23     recall us having coffee; I recall - - I recall
24     asking Mr. Shaver and Mr. Weinman to confirm and
25     make sure they received my letter from the prior

Page 176

1      day: and I recall receiving confirmation that they
2      received it.
3              I recall a brief discussion about who
4      would be there for the Secret Service and then I
5      just recall, you know, pleasantries.
6          Q.    Anything else?
7          A.    That's what I recall.
8          Q.    And this meeting was with you. Was
9      Mr. Langbord there?
10         A.    Yes.
11         Q.    And Mr. Shaver and Mr. Weinman?
12         A.    That's my recollection.
13         Q.    And that's it?
14         A.    That's correct.
15         Q.    Okay.
16         A.    What I don't recall is, there was
17     somebody there from the Mint to - - with an
18     expertise in handling the coins and I don't recall
19     what point, whether they were at the bank, whether
20     they came to the Starbucks at some point. That's
21     one point I don't recall.
22         Q.    Do you recall if you gave them
23     another copy of the letter?
24         A.    I recall explicitly a discussion, I
25     wanted to make sure they received it, and I recall

Page 177

1      them saying they did.
2              As I sit here now, I don't recall
3      anything about a copy or not.
4          Q.    Do you recall who said that they did;
5      was it Mr. Shaver or Mr. Weinman?
6          A.    I recall receiving the confirmation.
7      I can't say whether it was both, one or the other.
8      I recall receiving it from some combination of
9      them.
10             And I recall, as I say, I recall all
11     being together. I recall sitting at a small table,
12     a small Starbucks' table.
13         Q.    Do you recall, Mr. Berke, was there
14     any discussion on this particular day, any time
15     during that day, not just in the Starbucks, about
16     the commencement of a forfeiture action?
17         A.    I don't recall any such discussions.
18         Q.    Was there any discussion during this
19     day concerning the potential of a negotiated
20     settlement?
21         A.    I don't recall, one way or the other,
22     if it did come up, you know, initially with Mr.
23     Langbord there. We did have a very brief
24     discussion. I don't recall whether or not that
25     came up in that part of the discussion.

45 (Pages 174 to 177)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 178

1           And at the very end, there was a
2     discussion, again, without the Secret Service. I
3     don't recall whether it came up during that
4     discussion.
5           Q.    To the extent that at any time until
6     the day of the transfer did you believe - - to the
7     extent that you believe Mr. Shaver or Mr. Weinman
8     has mischaracterized events, what events do you
9     contend they mischaracterized?
10          A.    I'm not comfortable being in a
11    position to characterize their letters that I
12    responded to in my letter. I think the letters
13    speak for themselves.
14          But the characterization refers to
15    our dealings prior to the September 22nd date, as
16    well as, I believe, characterizations following
17    that date.
18          Q.    To what issue do those or issues do
19    those mischaracterizations - - purported
20    mischaracterizations relate?
21          A.    Again, I'm not comfortable
22    characterizing the lengthy letters. They are in
23    the record. I'll be happy to confirm the letter
24    that I sent. But I think the letters speak for
25    themselves.

Page 179

1           Q.    Do you have - - you're a deponent and
2     I'm asking you, letters aside, I'm asking you what
3     you recall factually and what you contend they
4     mischaracterized?
5           A.    I believe I have already described
6     the - - the events and I think my letters are
7     explicit in terms of the issue I raise regarding
8     the characterization in their letters, through
9     letters that were exchanged.
10          So, I'm not comfortable generalizing
11    about what the letters say or didn't say. I think
12    they are very explicit and they cover a lot of
13    topics.
14          MR. SWEET: Okay; we'll go through
15    all of them.
16    BY MR. SWEET: (Continued)
17          Q.    The activities of September 22nd,
18    2004, were voluntary; correct?
19          A.    (No response.)
20          Q.    The transfer of the Double Eagles?
21          MR. TIRSCHWELL: Objection.
22          That calls for a legal conclusion.
23          Q.    As a factual matter, was there
24    anything coercive in connection with the transfer
25    of the Double Eagles, anything in which the United

Page 180

1     States Mint coerced some conduct by the Langbords?
2           A.    If there was a condition precedent
3     set for having discussions about resolving the
4     matter without litigation, without doing this, we
5     would have gone directly to litigation.
6           I believe those were the issues.
7           Q.    And by "this," you're referring to
8     what, "this"?
9           A.    The agreement to allow them to take
10    possession of the coins and test them for
11    authenticity, while we discussed whether or not
12    we're going to reach a resolution.
13          Q.    You claim that the transfer was a
14    condition precedent to a discussion about a
15    possible resolution?
16          A.    That agreeing to have a settlement
17    without litigation, that's correct.
18          Q.    Was that condition precedent
19    reflected expressly anywhere in correspondence?
20          A.    I believe in my letter.
21          I should say, I'm pointing to the
22    September 21st letter.
23          Q.    That's the best evidence you have of
24    the consideration of a condition precedent?
25          A.    You asked.

Page 181

1           MR. TIRSCHWELL: Objection to the
2     form of the question.
3     BY MR. SWEET: (Continued)
4           Q.    I'm asking you, is that the best
5     evidence?
6           A.    You asked.
7           I testified at length about our
8     discussions and you asked if there was a written
9     document and that's the written - - that is the
10    written document I'm referring you to.
11          Q.    So, when you said that the transfer
12    was a condition precedent, otherwise the Plaintiffs
13    would have gone directly to litigation?
14          A.    No.
15          Q.    Do I have that straight?
16          A.    No.
17          Otherwise we would not have had an
18    agreement and the government would have had to take
19    whatever action it was going to take vis-a-vis the
20    courts.
21          Q.    You would not have transferred them;
22    is that what I'm understanding, that the Langbords
23    would not have transferred possession to the United
24    States if they - - if they knew that the
25    negotiations would not have resulted in a

46 (Pages 178 to 181)

Page 182

1    settlement?
2        A.    No. I'm saying something different.
3            Absent an agreement, that we were
4    going to have discussions about a settlement to
5    avoid litigation, there would have been litigation.
6    I would have required the government to file a
7    claim against the '33 Double Eagles and then the
8    Langbords would have had to file a notice of claim
9    as to the coins.
10       Q.    That's how you saw it playing out?
11       A.    I'm not going to.
12       Q.    You've already testified to it?
13       A.    No.
14           MR. TIRSCHWELL: He testified - -
15           THE WITNESS: I'm testifying as to a
16   discussion we had with the government.
17       Q.    So, I want to make sure I'm clear
18   that the surrender or transfer of the Double Eagles
19   to the possession of the government, you contend
20   was a condition precedent to a negotiation, but it
21   wasn't coerced, was it?
22           MR. TIRSCHWELL: Objection to the
23   form of the question.
24           "Coercion" is a legal term.
25           MR. SWEET: Well, you want a

Page 183

1    definition of coerced?
2            MR. TIRSCHWELL: Do you want to ask a
3    more specific question?
4            MR. SWEET: Are you voluntary, as
5    well.
6            MR. TIRSCHWELL: "Did anyone threaten
7    you," he can probably answer that.
8    BY MR. SWEET: (Continued)
9        Q.    Was there a threat - - did the
10   Langbords surrender the Double Eagles as a result
11   of a threat by the government?
12       A.    I don't believe they surrendered the
13   coins.
14       Q.    Did they transfer possession of the
15   Double Eagle - - did they transfer possession of
16   the Double Eagles as that was a result of a threat
17   by the government?
18       A.    The threat, the only threat, is a
19   threat of litigation, absent an agreement. Other
20   than the threat of the filing, the action against
21   the coins and having the litigation, there were no
22   other - - there are no threat made by the
23   government.
24       Q.    Mr. Berke, you contend that there was
25   an agreement that the Double Eagles would be

Page 184

1    transferred for authentication purposes only and
2    then there would be one of two results.
3            Do I have that correct?
4            MR. TIRSCHWELL: I object to the form
5    of the question, as to what he contends.
6            You can ask him what he understood.
7    BY MR. SWEET: (Continued)
8        Q.    Your testimony is that the Double
9    Eagles were transferred to the possession of the
10   United States for purposes of having the Double
11   Eagles authenticated and then there would be either
12   a settlement or there would be litigation.
13           Do I have that right?
14       A.    Correct.
15       Q.    Were there any other agreements
16   between the United States and the Langbords as of
17   the day of the transfer?
18       A.    I have to consult with counsel for
19   one thing.
20           MR. SWEET: Sure.
21           (Recess: 3:47 p.m.)
22           (Resumed: 3:49 p.m.)
23           THE WITNESS: I'm sorry. Can I have
24   the question read back?
25           MR. SWEET: Do you want me to ask it

Page 185

1    again?
2            THE WITNESS: I just want to make
3    sure - - either way.
4            MR. SWEET: Let me ask it again.
5            THE WITNESS: Okay.
6            MR. SWEET: I think it would be
7    easier.
8            THE WITNESS: Yes.
9    EXAMINATION (Continued)
10   BY MR. SWEET:
11       Q.    Mr. Berke, I'm trying to - - you
12   testified that there was an agreement between the
13   United States and the Langbords concerning the
14   transfer of the Double Eagles.
15           You contend that the agreement was
16   that they were being transferred solely for
17   purposes of authentication, subject to another
18   result.
19           Correct?
20           We got through that part already and
21   you agreed.
22       A.    And the agreement that they were not
23   - - that they were reserving all their rights.
24       Q.    Yes?
25       A.    And remedies and weren't in any way

47 (Pages 182 to 185)

## Page 186

1  waiving any rights and remedies as we talked about.
2      Q.    Understood.
3      A.    Yes.
4      Q.    Were there any other agreements - -
5  in your view, were there any other agreements
6  besides the purported agreement that the transfer
7  was for purposes of authentication only and that
8  the Langbords reserved their rights and remedies?
9      A.    I don't necessarily agree with that
10  characterization, but, I can say, other than what
11  I've previously testified to.
12      Q.    No, I'm asking you.
13      A.    There were no other agreements.
14      Q.    When you say other than I previously
15  testified to, that's almost three-and-a-half hours
16  of testimony.
17          I'm trying to identify what
18  agreements existed between the Langbords and the
19  government at the time of the transfer.
20          And I think we've identified, you
21  contend that one of the agreements was - - was the
22  purported agreement that the transfer was only for
23  purposes of authentication.
24          And the second agreement you
25  discussed is that the Langbords reserved their

## Page 187

1  rights and remedies - - all rights and remedies.
2          Were there any other agreements
3  between the parties, in your mind?
4      A.    Not necessarily accepting your
5  characterization of my testimony about it, but
6  those, those are the agreements that I would agree
7  existed.
8      Q.    Were there any others that you can
9  recall?
10      A.    No.
11      Q.    Did you discuss with the Mint or any
12  third party whether the Langbords should simply put
13  the 1933 Double Eagles up for sale rather than
14  engage with the United States?
15      MR. TIRSCHWELL: At any point?
16          Are you talking about a particular
17  time?
18  BY MR. SWEET: (Continued)
19      Q.    Ever.
20      A.    Excluding any discussions I had with
21  the Langbords or with attorneys working on the case
22  with me - -
23      Q.    Yes?
24      A.    I did not have those, any such
25  discussions with either the government or anyone

## Page 188

1  else.
2      Q.    Okay. After the transfer on June - -
3  in June - - in September of '04, there was,
4  eventually, in June of '05, another meeting with
5  Mr. Langbord - - Mr. Shaver and Mr. Weinman;
6  correct?
7      A.    Yes.
8      Q.    Between those two periods, those two
9  times, okay, between September '04, and June '05,
10  did you have any other discussions with the Mint?
11      A.    Yes.
12      Q.    Could you identify each discussion
13  and tell us what happened?
14      A.    It's going to be hard for me to take
15  it discussion by discussion.
16      Q.    Yes?
17      A.    I'll tell you I had multiple
18  discussions by telephone with either Dan Shaver or
19  Greg Weinman. My best recollection is the number
20  would be somewhere between 6 and 10.
21          And I recall my contacting - - I
22  would typically contact Dan first. If he wasn't
23  available, Greg, but not always, as we contacted
24  them to find out the progress report on their
25  attempts to authenticate the coins.

## Page 189

1          I recall discussions - - initially I
2  recall Mr. Shaver raising that things were delayed
3  because of the election and they were having
4  difficulties having the availability of the Secret
5  Service to transport the coins for the purpose of
6  testing, because it was in, roughly, November.
7      Q.    Yes?
8      A.    I remember him being apologetic about
9  that, saying they have no control over the Secret
10  Service.
11          Following that, I recall - - and I
12  can't say this is the exact sequence - - I want to
13  tell you generally the calls that I remember.
14          I recall conversations with Mr.
15  Shave, in which he said there were political
16  disputes described as, essentially, turf battles,
17  between the Mint and the Secret Service related to
18  the coins and they were delaying moving the
19  discussion further to authenticate and determine
20  whether and what agreement they would be prepared
21  to enter into.
22          And my recollection is I had more
23  than one conversation in which that issue was
24  raised by Mr. Shaver.
25          I recall having discussions with Mr.

48 (Pages 186 to 189)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 190

1    Weinman, in which Mr. Weinman, as Mr. Shaver was,
2    was apologetic about the delay.
3            I recall there was some optimism that
4    this would move more quickly and they understood
5    the frustration that it was taking so long.
6            I don't recall Mr. Weinman giving a
7    specific explanation for the delay, other than that
8    they to wanted to get it done and were frustrated,
9    as well, that it hadn't gotten done.
10           I recall a period of time, after some
11   time had passed, where I was not getting a return
12   phone call for a number of weeks and that concerned
13   me, given that we had been discussing - - our
14   discussions about to determine whether we can reach
15   an agreement.
16           I sent an e-mail to Mr. Weinman,
17   expressing my clients' concern about the amount of
18   time that had passed and that it had been a period
19   of time that they hadn't returned our calls.
20           And I recall shortly after that
21   e-mail Mr. Weinman calling, apologizing, saying
22   that it had nothing to do with our position as to
23   the coins; that there were - - that there were
24   other things that affected why they didn't get back
25   to me.

Page 191

1            I don't recall anything more specific
2    than that.
3            I recall, at some point towards the
4    end of the time frame you're talking about, that, I
5    believe it was Mr. Weinman, saying that they either
6    had authenticated the coins or were close to
7    authenticating the coins and that they would be in
8    a position to discuss whether or not we would be
9    reaching an agreement.
10           Between - - during one of those
11   calls, I recall, I believe it was Mr. Weinman,
12   although it could have been Mr. Shaver, saying, you
13   know, in their discussions among - - I can't place
14   this specifically in time - - but saying in
15   discussions among themselves, they thought that any
16   agreement to settle the dispute, they maybe - - at
17   a better time doing it, it was characterized as a
18   finder's fee.
19       Q.    Is the first time the term "finder's
20   fee" came up?
21       A.    When it came up in the telephone
22   conversation with the Mint - - and I just can't
23   place it in time as to when it came up - - but it
24   came after the initial meeting that we were talking
25   about.

Page 192

1        Q.    It was after the transfer?
2        A.    My recollection is it was after the
3    transfer and before the June meeting you
4    referenced.
5        Q.    And you recall - - who do you recall
6    raising the concept of a finder's fee, using those
7    terms?
8        A.    My best recollection is that was Mr.
9    Weinman, but I can't say it was Mr. Shaver, both of
10   them on the phone.
11           And my recollection of it - - I want
12   to be clear because I'm absolutely sure that the
13   notion didn't come up in the first two meetings,
14   and it's possible it came up in a phone call
15   immediately prior to the transfer, in those
16   conversations, two conversations that I remember,
17   although my best memory is it came up sometime
18   after the transfer.
19           But as I said, I'm unsure about the
20   date and I remember my response to be, "I'm sure my
21   clients aren't going to care how it's characterized
22   or described publicly, so long as - - so long as
23   the financial terms were acceptable to reach an
24   agreement."
25           Okay.

Page 193

1            I also - - well, let me just go
2    back, and I do recall that Mr. Shaver and Mr.
3    Weinman did express that it was important that the
4    fact of these coins and the fact of our discussions
5    not be made public while they go through their
6    internal processes, that that was also described
7    for me, which I had understood.  And I believe that
8    was described for me prior to the transfer.
9            And I believe that came up again in
10   our discussions between the time of the transfer
11   and the June meeting you're talking about.
12       Q.    Mr. Berke, did the delay from
13   September until getting the government's answer
14   about the authentication and its position in June
15   of '05, did it prejudice your clients in any way?
16           MR. TIRSCHWELL: Objection.
17           I'm instructing him not to answer.
18   BY MR. SWEET:  (Continued)
19       Q.    Was there injury to your client as a
20   result of that delay, on a factual basis?
21           MR. TIRSCHWELL: Objection.
22           I cannot let him answer that without
23   revealing communications with his client or
24   his thought processes about how their legal
25   rights might be impaired.

49 (Pages 190 to 193)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 194

1         MR. SWEET: So, you're not going to
2    let him testify about whether that's part of
3    the claim or not, this delay?
4         MR. TIRSCHWELL: That's correct.
5    This is not the forum to explore the
6    nature of your claims; it's the forum to
7    explore facts about the interactions between
8    Mr. Berke and the government.
9    BY MR. SWEET: (Continued)
10        Q.    Okay. It's a fact, was your - - was
11   the delay something that adversely affected you and
12   your client?
13        MR. TIRSCHWELL: Objection.
14   I'm instructing him not to answer for
15   the same reasons.
16        Q.    Anything else you remember from those
17   telephone conversations?
18        A.    So, to finish the description of what
19   I recall, I recall, shortly prior to the meeting,
20   getting a call - - again, I believe it was from Mr.
21   Weinman - - saying that either they had
22   authenticated the coins or were about to
23   authenticate the coins and they felt they were
24   moving closer to being able to discuss the
25   potential agreement.

Page 195

1         I recall I had not heard from them
2    for some period of time after that and I had a
3    reason to go to Washington on another case and I
4    recall calling them and saying, "I think I'm going
5    to be in D.C. Are you guys in a position yet where
6    you've authenticated the coins and are they
7    prepared to talk about, you know, whether or not we
8    can reach an agreement, avoid litigation?"
9         My recollection is they said they
10   were not prepared right at that moment and they
11   needed a little more time.
12        Then sometime shortly after that, we
13   spoke - - and I don't recall whether I called them
14   again or they called me back - - and, essentially,
15   said, "We're prepared to have a discussion. Why
16   don't you come down?"
17        They did not tell me what their - -
18   what their position, resolution was.
19        I believe in that final call to come
20   down, they said - - again, I can't say whether it
21   was this call or the call immediately prior - - but
22   that they had authenticated the coins.
23        I knew that before I went down.
24        And that's leading up to the - - and
25   I believe those were the last conversations before

Page 196

1    the meeting in June.
2         Q.    Okay. You don't recall the day in
3    June, do you?
4         A.    I'm sure it's - - it's recorded
5    somewhere. I just don't have it on my mind.
6         Q.    Okay. During - - from September to
7    June, did you have any discussions with the Mint
8    concerning the substance of an agreement to resolve
9    the dispute?
10        A.    I'm sorry, your time frame again was?
11        Q.    September 22nd to the meeting in
12   June.
13        MR. TIRSCHWELL: Did he have any
14   what?
15   I'm sorry, I didn't hear it.
16        THE WITNESS: Subsequent discussions
17   discussing the terms of the resolution?
18        Q.    Yes.
19        A.    I remember, because I mentioned it,
20   whether it's going to be characterized as a
21   finder's fee or an agreement. I do recall that in
22   conversations the - - I recall having a discussion,
23   again, similar to what was had at the initial
24   meeting, about the flexibility in reaching an
25   agreement because of the number of coins, but I do

Page 197

1    not recall a discussion where the Mint said, "We're
2    prepared to do X or we're prepared to offer X." I
3    don't recall any discussion of that sort.
4         Q.    When you talk about - - do you have
5    some recollection of somebody mentioning the
6    flexibility to do an agreement because of the
7    number of coins or was that you specifying those
8    terms to the Mint or was that somebody from the
9    Mint speaking to you?
10        A.    My recollection is that, in talking
11   about the Mint, to the Mint - - and, again, Mr.
12   Shaver and Mr. Weinman were always very apologetic
13   and always expressed that they were anxious to get
14   them authenticated, resolve whatever internal
15   issues they had and we can sit down and see if we
16   can resolve the issues, I believe in that
17   discussion it was me who would say, who did say,
18   you know, we should talk to about it; you should
19   give it more thought because we've thought about
20   it; there are a lot of different ways to slice - -
21   to think about resolving the issues, given the
22   number of coins and the evaluation of the coins.
23        Q.    Neither Mr. Shaver nor Mr. Weinman
24   committed to you in any way that there would be an
25   agreement?

50 (Pages 194 to 197)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke6/18/2008

Page 198

1   A.   No, they did not.
2   Q.   I want to go to a few documents.
3        MR. SWEET: This will be Berke 5.
4        (E-mails, 4 pages, so marked Berke
5   Exhibit 5 for identification by counsel.)
6        (Handed to the witness.)
7   Q.   You see at the top of it my name.
8   That is because this is an e-mail that was
9   forwarded to me by Mr. Weinman and I printed it.
10  A.   Huh-huh.
11  Q.   Except for my name, do you recognize
12  the document?
13  A.   I don't.
14       But I'm going to read it.
15  Q.   Take your time.
16       Does this refresh your recollection
17  about this document?
18  A.   I don't remember this document.
19  Q.   Do you have any doubt that it is an
20  e-mail correspondence between you and Greg Weinman?
21  A.   I don't. I don't.
22  Q.   Okay. Starting at the top of the
23  second page - -
24  A.   I'm sorry. Just let me finish it.
25       (Witness reviews the exhibit.)

Page 199

1   A.   Okay.
2   Q.   Starting at the top of the second
3   page, you can see - -
4   A.   Yes.
5   Q.   - - the e-mail starts by having Greg
6   Weinman send to you an article from the A.P.?
7   A.   Yes.
8   Q.   Off the wire; right?
9   A.   Yup.
10  Q.   You go to the second page, we see
11  that you respond to Mr. Weinman and you say,
12  "Thanks, Greg. What do you guys think of the
13  story?"
14       And then Mr. Weinman responds to you,
15  later on - -
16  A.   Huh-huh.
17  Q.   That same day, a few minutes later --
18  A.   Huh-huh.
19  Q.   "I haven't spoken to David or
20  Henrietta, but I personally thought the story was
21  tight and generally well done. One missing element
22  was that this is the" - - capitalized word - -
23  "Only 1993 GDE available for private ownership."
24  A.   Huh-huh.
25  Q.   "It's inferred, but never

Page 200

1   articulated. What are your thoughts?"
2        And then you respond, when you say,
3   "I generally agree."
4        Then you say, "they mangled my
5   statements."
6        I see what you said.
7        When you say you generally agree, you
8   generally agree to those comments that - - correct?
9   A.   I'll be honest with you. Let me just
10  say, I don't remember this at all. I just don't.
11  I don't compute it was sent.
12       I read "I generally agree." I don't
13  know whether I'm referring to I personally thought
14  the story was tight and generally well done or
15  something else. I just don't recall seeing it.
16  Q.   Okay. Let's turn to the story
17  itself, which is on the second page.
18  A.   (Witness complies.)
19  Q.   Do you see the fourth paragraph, it
20  says, "Double Eagles were first minted"?
21       Do you see that?
22  A.   Huh-huh.
23  Q.   And says - - do you want to read that
24  second sentence of that paragraph?
25  A.   "The ones that were minted in 1933

Page 201

1   were never put into circulation because President
2   Franklin Roosevelt decided to take the nation off
3   the gold standard."
4   Q.   Did you, at the time, agree with that
5   statement?
6        MR. TIRSCHWELL: Objection.
7        I instructed him not to answer this.
8        We're not here for this.
9        MR. SWEET: You're instructing him
10  not to answer?
11       MR. TIRSCHWELL: That's correct.
12  BY MR. SWEET: (Continued)
13  Q.   You did not, Mr. Berke, challenge
14  that statement when you were referring back to Mr.
15  Weinman, did you?
16       There's nothing about - -
17       MR. TIRSCHWELL: Objection.
18       The e-mail speak for itself.
19       I'm instructing him not to answer.
20  BY MR. SWEET: (Continued)
21  Q.   You're not going to answer?
22       MR. TIRSCHWELL: It has nothing to do
23  with this case, absolutely nothing.
24       MR. SWEET: It has nothing do with
25  this case?

51  (Pages 198 to 201)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 202

1      MR. TIRSCHWELL:  That's correct.
2      As I said, he's here to testify about
3  communications he had that are relevant to
4  deciding the issues in this case.
5      And to some extent, we don't even
6  think they are relevant, but we're not going
7  to talk about e-mails five years ago.
8      MR. SWEET:  Let's go to another one.
9      MR. TIRSCHWELL:  A different case and
10  article.
11  BY MR. SWEET:  (Continued)
12     Q.    This is Berke 6.
13         (E-mail, 4 pages, so marked Berke
14  Exhibit 6 for identification by counsel.)
15         (Handed to the witness.)
16     Q.    Same thing; take a minute.
17         (Witness reviews the exhibit.)
18     Q.    Do you recall this transmission?
19     A.    Let me just take a look at it.
20     Q.    Sure.
21         (Witness reviews the exhibit.)
22     A.    I recall giving some comments to
23  things like this, particularly early on.  I don't
24  recall this specifically.
25     Q.    I'm going to represent that the

Page 203

1  attachment, "The Frequently Asked Questions: 1933
2  Double Eagle," is the attachment that's referenced
3  to the e-mail itself.
4     A.    Okay.
5     Q.    Okay?
6         This is an e-mail - - you have no
7  doubt this is an e-mail from you to a number of
8  people; correct?
9     A.    I have no basis to challenge it;
10  that's correct.
11     Q.    Do you recall now what the Q and A
12  was for, the purpose of the Q and A was?
13     A.    In my mind, I remember two instances
14  when we talked about Q and A.  It was a Q and A
15  for, I believe, Sotheby's, but possibly the
16  government, to deal with the press inquiry and then
17  I recall a Q and A for the web site, for the Mint's
18  web site, which may or may not have been cross
19  referenced to the Sotheby's web site or the other
20  way around, the Sotheby's web site cross referenced
21  to the Mint.
22         Looking at this, I don't know what
23  this one is for.
24     Q.    But it would have been for public
25  consumption as opposed to having anything to do

Page 204

1  with litigation or for the parties?
2     A.    It is not for the litigation of the
3  parties.  One Q and A was not to give out to the
4  public but was just for people to have, to consult,
5  depending on the press inquiries, if my memory
6  serves, and one would be actually published - -
7     Q.    Okay.
8     A.    On the web site and so forth.
9     Q.    You would consider them public
10  documents though?
11     A.    I would consider them documents that
12  were on the web site, that Q and A would have been
13  on the web site, available to the public.
14     Q.    I understand.
15         You say, "I think the changes" - -
16  I'm reading the second sentence - - well, I'll read
17  the text.
18         "First, I attach a revised Q and A,
19  with the changes highlighted for your review.  I
20  think the changes will minimize the controversy in
21  numismatic circles."
22         Do you see that part?
23     A.    Yes.
24     Q.    So, is it correct that you took an
25  existing document and you made edits to it and then

Page 205

1  sent back the revised version, with either
2  strikeouts and underlining or something of that
3  nature?
4     A.    That's what the e-mail indicates.
5     Q.    Okay.  Did you do this yourself or
6  did somebody else do this, in your office?
7         If it's not objectionable, I just
8  want to know whether it's your work or someone
9  else's work.
10     A.    I don't recall.
11     Q.    Let's turn to the second page.
12     A.    (Witness complies.)
13     Q.    Toward the bottom, there's some text
14  that's underlined.
15         Do you recall inserting that text
16  into the answer?
17     A.    I don't.
18         What I would like to see is what was
19  taken out, which I don't know if there's a document
20  that you have that shows what was the original
21  document.
22     Q.    Look at the second page of the Q and
23  A.
24         Do you see where there's strikeouts?
25     A.    Yes.

52 (Pages 202 to 205)

Page 206

1    But what's not clear to me is, this
2  is - - this isn't a - - this is a program that
3  allows you to make changes in a document, then it
4  automatically is reflected. I think it's more
5  common and more accessible today than it was back
6  then. I don't believe these changes are made on
7  that program.
8    So, I am reading this, I'm assuming -
9  - I believe that this reflects changes that are
10  added, but not necessarily the words that they
11  replace, for example, in the first page on the Q
12  and A.
13    Q.  If you look at the third page, you
14  see where at the bottom there's a place where
15  there's a strikeout and then, immediately following
16  it, underlined text added in?
17    A.  Huh-huh.
18    Q.  Does that help you to recollect
19  whether the language that's underlined on the first
20  page of the Q and A is changes that you made?
21    A.  I'd be guessing.
22    The one thing I do want to say is
23  that I do know when I - - before the program that
24  is now used became easiest to use, I would sometime
25  mark changes and I know I would inconsistently put

Page 207

1  both strikeouts and underlined, but sometime going
2  to underline to make clear to someone this is what
3  I'm adding.
4    As I look at this section, I don't
5  know whether there's something else that I changed.
6  I don't know if there is or not.
7    When I read, there's underlining.
8  I'm inconsistent because I'm not particularly - -
9  it requires a lot of manual crossing out and
10  underlining.
11    So, that's the only point that I'm
12  making.
13    As I read this, it reads as if there,
14  maybe, in the first page I'm trying to - - it reads
15  as if it may have said something else than what I
16  added.
17    Q.  What you added is what is underlined;
18  right?
19    A.  Again, I'm interpreting the document.
20  I have no memory of it and I'm just interpreting
21  the document.
22    But I'm assuming, based on that
23  interpretation, what is underlined is what I added.
24    Q.  Okay. Let's turn to the June '05
25  meeting.

Page 208

1    A.  (Witness complies.)
2    Q.  Where did that meeting take place?
3    A.  Dan Shaver's office, in the Mint.
4    Q.  And it was you, Greg and Dan?
5    A.  We're coming to - - yes.
6    Q.  You have nobody else?
7    A.  No.
8    Q.  Tell us everything you remember about
9  that meeting.
10    A.  Okay.
11    I remember walking in; I remember
12  having a discussion about issues related to the
13  coins.
14    For example, I recall, as we were
15  walking to Shaver's office, I recall him talking
16  about a FOIAQ, F-O-I-A-Q, caps, that they had
17  received about '33 Double Eagles that suggested - -
18  that suggested to them that somebody may know
19  something about our coins, but it was really just a
20  speculation.
21    Q.  You mean the Langbords' coins?
22    A.  Yes.
23    I recall coming to their office; I
24  recall a little small talk; and then I recall Dan
25  saying that - - I recall Dan saying that the

Page 209

1  government has decided not to offer a financial
2  settlement to resolve the issues related to the
3  coins. And the most the government would offer is
4  the Langbords an opportunity to get public
5  recognition.
6    And there was some sort of public
7  disclosure about the coins.
8    I recall expressing extreme
9  disappointment and saying, in substance, "I'll
10  speak to my clients. But, as you know, there'll,
11  obviously, be litigation."
12    And I believe that was the extent of
13  the conversation.
14    Q.  Was there any discussion about the
15  nature of the litigation that there would be?
16    A.  I don't recall at that meeting; no.
17    Q.  Did - - you're familiar with the
18  Barnard case; right?
19    A.  I'm familiar with the Barnard case.
20    Q.  Generally familiar?
21    Do you recall who the Plaintiff was
22  in that case?
23    MR. TIRSCHWELL: I'm going to object
24  and instruct him not to answer.
25    MR. SWEET: Eric, it's leading to a

Page 210

1    factual question. I'm just trying to lay a
2    predicate.
3            I'm not trying to get into any deep
4    meaning.
5            I'll show him the decision.
6            I'll ask it a different way.
7            MR. TIRSCHWELL: Maybe just get to
8    the question and maybe he can answer it.
9            MR. SWEET: I'll get it through a
10   different way.
11   BY MR. SWEET: (Continued)
12       Q.    Mr. Berke, the Barnard case was a
13   replevin action brought by the United States. You
14   may be familiar with the case and the fact it was
15   brought by the United States.
16           The status of the Double Eagle issued
17   - - at issue in that case, at the time that the
18   litigation was brought, do you know what - - where
19   it was?
20           MR. TIRSCHWELL: Does he know as a
21   matter of fact?
22           MR. SWEET: As a matter of fact.
23           MR. TIRSCHWELL: Whether the Double
24   Eagle was in the Barnard case when the case
25   was brought?

Page 211

1            MR. SWEET: Yes.
2            MR. TIRSCHWELL: I mean, if you know
3    that?
4            THE WITNESS: Can I talk to you?
5            MR. TIRSCHWELL: Yes.
6            I don't know how he can use that, but
7    let's confer.
8            MR. SWEET: I'll save some time.
9    I'll save time. I'll ask it a different way.
10           MR. TIRSCHWELL: Okay.
11   BY MR. SWEET: (Continued)
12       Q.    Mr. Berke, the Sotheby's catalogue
13   for the Fenton coin states that Mr. Barnard turned
14   his - - the Double Eagle that he had in his
15   possession, turned it into the registry of the
16   Court, and following that, the United States filed
17   a replevin action.
18           Were you aware of that?
19           MR. TIRSCHWELL: That is said in the
20   Sotheby's catalogue?
21           MR. SWEET: Yes.
22           MR. TIRSCHWELL: You can answer
23   whether you read that in the Sotheby's
24   catalogue.
25           Do you remember?

Page 212

1            THE WITNESS: I don't recall that
2    fact being in the Sotheby's catalogue. I
3    don't recall that - - that word.
4        Q.    Do you recall a fact - - if you think
5    it's privileged, it's privileged - - but do you
6    recall the fact that that's what happened?
7            MR. TIRSCHWELL: I mean, to the
8    extent that - - yeah, I don't see how he can
9    answer that.
10           But give us a chance to confer and
11   see if we can figure it out.
12           (Recess: 4:24 p.m.)
13           (Resumed: 4:32 p.m.)
14           MR. SWEET: If I'm correct, we just
15   ended with your description of what happened
16   at the June 2005 meeting.
17           Right?
18           Do we have questions after that?
19   I don't recall the last question.
20           MR. TIRSCHWELL: There was a question
21   about Barnard.
22           MR. SWEET: That's correct.
23           MR. TIRSCHWELL: Not that I'm
24   interested in reminding you.
25           MR. SWEET: And you took a break to

Page 213

1    confer.
2            MR. TIRSCHWELL: Yes.
3            MR. SWEET: I lost track.
4            MR. TIRSCHWELL: And I've conferred
5    with Mr. Berke and it's clear to me that
6    there is no way for him to discuss the
7    Barnard case, his thought or knowledge about
8    the Barnard case, without revealing his
9    strategies, thoughts process and legal
10   analysis.
11           So, I've instructed him not to answer
12   any questions about the Barnard case.
13           You asked him something about seeing
14   something in the catalogue and he answered
15   that question.
16           But with respect to the case itself,
17   I've stated our objection.
18   EXAMINATION (Continued)
19   BY MR. SWEET:
20       Q.    Mr. Berke, did you have any
21   discussions with the Mint about the mechanism, such
22   as placing the Double Eagles in the custody of the
23   court as opposed to turning them over to the
24   government?
25       A.    Not that I recall.

54 (Pages 210 to 213)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 214

1    Q.    Going back to the last document we
2  were just looking at, which I think is Berke?
3        Do you have it there?
4        It's Berke 6, I guess, the Q and A?
5    A.    Yes.
6    Q.    The second page, bottom left?
7    A.    Yes.
8    Q.    There's a footer, "KL." That's a
9  footer showing it is a document from Kramer Levin?
10   A.    It is.
11       But I'm sure what I did is, I was
12  sent a Word document that I just saved in our
13  system to make changes and save it.
14   Q.    Okay.
15   A.    But I will tell you, I have no
16  recollection of any of these changes, so I can't
17  tell you what changes I did or didn't make or
18  whether there are words I took out or whether there
19  was things that were added. I would be guessing.
20   Q.    Okay.
21   A.    I just don't recall anything.
22   Q.    I want to confirm that the footer
23  template - - if I'm correct - - that that shows it
24  was a document from the Kramer Levin computer
25  system; right?

Page 215

1    A.    Yes.
2    Q.    Okay.
3    A.    But, well, I want to be clear,
4  though.
5        A copy of this document was saved on
6  the system. But the document itself did not
7  originate on the Kramer Levin system.
8    Q.    Okay.
9    A.    Do you understand?
10   Q.    Understood.
11       But from what you can tell here, from
12  this e-mail from you, with an attachment - - and
13  then I'm representing that this was the attachment
14  and it has a footer showing that it's from the
15  Kramer Levin system - - you don't have any doubt,
16  do you, that this was a document that you conveyed,
17  transmitted to Mr. Pickens and Mr. Weinman and Ms.
18  Smith?
19   A.    No, what I'm saying I can't say, as I
20  look at this, what changes I may have made or
21  didn't make and what had been in the document that
22  was created somewhere else and that the document
23  itself was not created on the Kramer Levin system.
24  In other words, it was sent to me, saved and then
25  sent back.

Page 216

1        As I look at it today, I can't say
2  what changes, alterations were made in that
3  process. That what I'm saying.
4    Q.    Okay. But we can say that if this is
5  your text, which you don't dispute, your changes
6  were intended to minimize the controversy in
7  numismatic circles?
8    A.    Yes. I agree that's what I wrote.
9    Q.    Yes.
10   A.    I just can't say anything beyond
11  that.
12   Q.    Do you recall, at the meeting of the
13  25th, suggesting that the Mint reconsider its
14  position and consider auctioning off at least one
15  of the Double Eagles?
16   A.    Are you talking about the June
17  meeting?
18   Q.    Yes.
19       MR. TIRSCHWELL: June 2005?
20       MR. SWEET: Yes.
21       THE WITNESS: I don't recall that.
22       What I recall, very generally, is
23  expressing my frustration and, you know,
24  talking about that there were a variety of
25  words avoiding this litigation and we're

Page 217

1  going to go back, you know, where we were in
2  the Fenton case and recalling that, you know,
3  there are a lot of issues that would be
4  litigated.
5        I can't recall, as I sit here today,
6  the precise discussion. I don't believe I -
7  - well, I just recall - - recall saying that
8  there were a lot of ways to avoid what would
9  be a tremendous expenditure of resources in
10  another litigation that we've already had.
11       I don't recall that statement.
12  BY MR. SWEET: (Continued)
13   Q.    Do you recall at some point
14  suggesting, at some point - - I'm not putting a
15  time on it - - suggesting to Mr. Shaver and/or Mr.
16  Weinman that the government should consider
17  auctioning one of the Double Eagles as a route
18  toward a settlement?
19   A.    I recall discussing a lot of
20  different possibilities and I recall in that
21  analysis talking about how if you have, for
22  example, five of those coins which are now made
23  available, the value would be much less than if you
24  have a fewer number.
25       That's giving an example.

55 (Pages 214 to 217)

Page 218

1    So, I recall discussing a lot of
2  combinations and possibilities of how to think
3  about trying to settle the case short of
4  litigation.
5         I can't say that I specifically
6  recall doing that analysis as to one coin. But I
7  don't believe I ever said, and if you did that,
8  that would be a deal. But certainly there had been
9  some experience of one coin being out there and
10 then you would extrapolate to say what that might
11 mean if there were only going to be two coins out
12 there.
13        MR. SWEET: And I might have asked
14 this and if I have, I'm sorry.
15 BY MR. SWEET: (Continued)
16     Q.    In the June meeting, did you discuss
17 the nature of any contemplated litigation, the
18 nature of the claims?
19     A.    I don't recall us discussing the
20 specifics of any claims.
21     Q.    Anything else from that meeting that
22 you recall?
23     A.    Other than, as I mentioned, you know,
24 pleasantries prior to the actual discussion, I
25 think I described everything I recall.

Page 219

1      Q.    Was there anything that Mr. Berke or
2  Mr. Shaver said at that meeting that you believe
3  was misleading or --
4      A.    You mean Mr. Weinman?
5      Q.    Yes.
6      A.    You said Mr. Berke.
7      Q.    Mr. Weinman or Mr. Shaver, anything
8  they said at the June 2005 meeting that you believe
9  was misleading or in bad faith?
10        MR. TIRSCHWELL: Objection to the
11 form.
12        THE WITNESS: I'm not comfortable
13 characterizing it or drawing any legal
14 conclusions.
15        I have to talk to my counsel to see
16 if I can say something consistent with his
17 instructions to me.
18        MR. TIRSCHWELL: If you want to ask a
19 specific question, the problem with asking,
20 you know, counsel on the case questions like
21 that is it's just impossible to separate.
22        So, that's why I'm asking you to
23 focus on -- focus your questions specific-
24 ally on something that was said, "Is there
25 something that was said, that you later

Page 220

1  learned was inaccurate?"
2         You know, specific factual things
3  that won't call on him to -- to think about
4  and, therefore, reveal his thought process in
5  terms of what -- how to characterize
6  something.
7         MR. SWEET: You know one of the
8  problems I think we're having here -- and
9  I've seen this in other cases where lawyers
10 are witnesses -- is that you have a person
11 who was involved in the activity by which the
12 claim arises and that person also continues
13 to represent the client in the case and is
14 involved in the legal strategies and
15 discussions and is, therefore, in an
16 untenable position.
17        That's why there is a rule, ethics
18 rules, that precludes a lawyer who is a
19 witness from also being the lawyer at the
20 trial.
21        And what I'm suggesting now is that
22 you can't have it both ways. You can't have
23 a claim arising from -- you can't have a
24 claim arising from negotiations and
25 activities and then have the same -- and

Page 221

1  then for that lawyer to object to providing
2  discovery on the ground that it reveals
3  mental impressions, legal strategies on the
4  very same case.
5         It denies us a fundamental right to
6  get discovery, which is relevant and
7  probative to understanding the claims and to
8  defend the claims.
9         So, I make this statement now because
10 I see this going and I -- I see this
11 becoming an issue that is likely to get
12 addressed through motion practice and I'm
13 trying to find a way to avoid that.
14        But I'm, from my prospective, I'm
15 finding my frustration is very great from
16 what I'm sure you consider in many cases
17 appropriate orders to your client,
18 instructions not to testify about things that
19 I consider fundamentally important to the
20 very nature of the claims.
21        And that may just be a problem that
22 we have to ask the judge to look at the issue
23 and see the objections and see the kind of
24 stuff that's not being testified to and ask
25 Mr. Berke to come back.

56 (Pages 218 to 221)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

**Page 222**

1    And I'm spreading it out there
2  because if you can find a way around this,
3  great. I'm trying to be cooperative and
4  resolve the problem. I'm not threatening
5  anything. But I'm telling you that I'm
6  finding a good faith deposition to be
7  severely hampered and frustrated by your
8  objections and instructions not to answer.
9    MR. TIRSCHWELL: Well, I mean, I
10  don't think the ethics rules say what you
11  describe.
12    I think we've been very clear here.
13  I think he's answered every question as to
14  what happened and, quite frankly, I think
15  that's all that matters, what happened; what
16  did he say; what did the gentlemen say; what
17  was the correspondence?
18    What their subjective beliefs about
19  all that are or were is not relevant.
20    And I think you blocked lots of my
21  questions to Mr. Shaver and Mr. Weinman about
22  their thought process and their subjective
23  beliefs, even though they are not acting as,
24  you know, litigation counsel at this point -
25  - at least I don't think so - - I think

**Page 223**

1  you're acting as litigation counsel.
2    So, I don't see the problem. I don't
3  think we're blocking any question about what
4  happened and what happened is what's
5  relevant.
6    And you're free to ask him any
7  question you want and you have asked him lots
8  of questions and he's answered every one
9  about what happened.
10    But when you start asking him to
11  characterize things or you use words that
12  have legal implications, then you cross the
13  line into something that is just not
14  appropriate for a lawyer to be answering.
15    And a lawyer is not required to
16  answer.
17    So, I don't see the problem and I
18  think there's a clear line. I think, as I
19  said, he will answer any question. That's
20  why I suggested on the last question, if you
21  wanted to ask him what statements did they
22  make; did anything later occur that was
23  inconsistent with that statement, you can ask
24  him that. That's what happened.
25    But how he thought about what

**Page 224**

1  happened is not relevant.
2    MR. SWEET: Would you agree that
3  where there's a dispute over the meeting - -
4  where there is an agreement, where there was
5  an agreement, whether a document accurately
6  memorializes an agreement, the person - - the
7  - - the subjective understanding of the
8  person who wrote the letter, the frame of
9  mind, the information known to the person, to
10  the parties, that that's relevant?
11    MR. TIRSCHWELL: I mean, that's a
12  very broad statement.
13    I don't agree with that in the
14  blanket way, at all.
15    MR. SWEET: Okay.
16    That's - - that's - - so I
17  understand, if we do have to tee this up,
18  that's where I'm coming from right now.
19    I'm finding that the deposition is
20  being hampered because reasonable inquiries
21  into areas of knowledge and intent and
22  meaning are being frustrated by the
23  objections.
24    So, let's just continue and we'll do
25  what we can.

**Page 225**

1    My last question was about whether
2  anything that occurred at the June 25th
3  meeting you believe was misleading, any
4  comments or statements by Mr. Shaver or Mr.
5  Weinman.
6    And I think your answer was that you
7  wouldn't answer that; right?
8    MR. TIRSCHWELL: Well, we objected to
9  the form of the question.
10    MR. SWEET: Did you also instruct him
11  not to answer?
12    MR. TIRSCHWELL: I believe we did,
13  unless you can make it more precise or you
14  stick to not his characterization or
15  impression, but what happened and what was
16  said and what was later said and was there
17  anything that was later said that was
18  inconsistent, then we'll answer.
19    MR. SWEET: Okay.
20  BY MR. SWEET: (Continued)
21    Q.   Did Mr. Shaver or Mr. Weinman make
22  any false statements to you at the lunch meeting at
23  the Italian restaurant?
24    A.   I'm not sure I understand your
25  question.

57 (Pages 222 to 225)

Page 226

1    Q.    As a factual matter, did Mr. Shaver
2  or Mr. Weinman make any false statements to you,
3  statements which you later determined. or at the
4  time or later determined, to be false statements,
5  at that meeting?
6    A.    The reason why I don't understand
7  your question, are you asking me did they tell me
8  something as a matter of fact that I later came to
9  believe they knew to be false when they told me?
10   Q.    Yes. That's what I'm asking.
11   A.    Well, I can't answer whether they
12 knew something to be false that they told me at
13 that meeting. I don't know.
14   Q.    Did you have a belief that they did?
15   A.    I'm having trouble understanding your
16 question as it's framed; okay?
17        Because the question is: Do I have a
18 belief that when they told me certain things at
19 that meeting they believed them false at the time
20 they said them to me?
21   Q.    That's exactly what my question is.
22   A.    I have no basis, as I sit here today,
23 that at that meeting they said things to me that
24 they believed to be false.
25   Q.    Same question with respect to the

Page 227

1  September 15th meeting in Brooklyn.
2    A.    I cannot say that I know whether they
3  said things to me at that meeting that they
4  believed to be false at the time they said it.
5    Q.    Same thing on September 22nd.
6    A.    Again, I cannot say that I know that
7  when they made statements on September 22nd they
8  knew they were false when they made them.
9    Q.    I'm going to show you a series of
10 letters, Mr. Berke.
11        The first is Berke 7.
12        (Letter, 3 pages, so marked Berke
13        Exhibit 7 for identification by counsel.)
14        (Handed to the witness.)
15   Q.    Could you identify this document?
16   A.    It's a July 25th, 2005, letter from
17 me to Dan Shaver.
18   Q.    Okay. You wrote it; right?
19   A.    (No response.)
20   Q.    I mean, not just signed, but this is
21 your authorship?
22        MR. TIRSCHWELL: What's the question?
23        MR. SWEET: Whether it's his
24 authorship?
25        I just want to confirm that I can

Page 228

1  talk to Mr. Berke about what he wrote as
2  opposed to some other person who may have
3  wrote the letter.
4        MR. TIRSCHWELL: Well, I think you
5  can ask him whether he signed it, whether he
6  reviewed it.
7        But whether it was a collaborative
8  effort or not sure is relevant.
9  BY MR. SWEET: (Continued)
10   Q.    That's your signature on the third
11 page; right?
12   A.    Yes.
13   Q.    There are a couple of places here in
14 the letter - - and I'll point them out if you want
15 - - the first place in the second paragraph, where
16 it says, "discussed resolving any issue relating to
17 the coins."
18        That's a term that comes up over and
19 over again in various correspondence in the
20 complaint.
21        What issues does this refer to?
22   A.    This refers - - refers to the issues
23 that would be litigated, absence a settlement of
24 the case.
25   Q.    Including who owns them?

Page 229

1    A.    Well, I believe the issues is best
2  described as to whether they are subjected to
3  forfeiture.
4    Q.    Okay. That's how you describe it.
5        Did you ever discuss - - 1 mean, the
6  letter says, "discuss resolving any issues relating
7  to the coins."
8        But you testified earlier that you
9  never specifically discussed forfeiture with - -
10 expressly with Mr. Shaver or Mr. Weinman.
11        Did you discuss any other issues,
12 such as ownership?
13   A.    I don't believe that was my
14 testimony.
15   Q.    Well, I think it was.
16   A.    No.
17   Q.    But we have a transcript for that
18 reason.
19   A.    I don't believe that was my
20 testimony.
21   Q.    At any point in your discussions with
22 Mr. Weinman and Mr. Shaver did you identify the
23 issues relating to the coins, expressly identify
24 what they are?
25   A.    (No response.)

58  (Pages 226 to 229)