Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

| Page 230 | Page 232 |
|---|---|
| 1  Q. As that term is used here in the | 1  will not be able to show how the '33 Double Eagles |
| 2  letter. | 2  left the Mint over seventy years ago and the coins |
| 3  A. I identified them as the issues that | 3  are subject to forfeiture. I believe that covers |
| 4  were litigated in the Fenton action, which were the | 4  they would not be able to seek forfeiture of those |
| 5  circumstances surrounding the coins leaving the | 5  coins from the Langbords. |
| 6  Mint and whether they were subject to forfeiture by | 6  MR. SWEET: That's not what my |
| 7  the government. | 7  question is. |
| 8  Q. And title was also an issue; correct? | 8  BY MR. SWEET: (Continued) |
| 9  A. I -- I include that under the rubric | 9  Q. I'm asking here factually, do you |
| 10  of whether they are subject to forfeiture. | 10  argue or do you state here, anywhere in this |
| 11  Q. Does it also fall under the rubric of | 11  letter, not just among those four sub-paragraphs, |
| 12  whether they were -- how they left the Mint? | 12  but anywhere, that the facts supporting the |
| 13  That's how the Barnard and the judge | 13  Langbords' purported ownership, having title of the |
| 14  in the summary judgment argument addressed it in | 14  1933 Double Eagles -- |
| 15  terms of the probative -- | 15  A. My memory is, point 4 is the -- how the coins |
| 16  A. I think that's one of the issues that | 16  the government cannot show that the -- how the coins |
| 17  gets resolved if you have a settlement. | 17  left the Mint or that the coins are otherwise |
| 18  Q. But who owns them? | 18  subject to forfeiture. |
| 19  A. Disputes about how and what can be | 19  I mean, yes. |
| 20  proven about how they lost the coin -- how they | 20  Q. Is that the only place? |
| 21  left the Mint. | 21  A. I discuss that in the body of the -- |
| 22  Q. Okay. Now, in the second paragraph | 22  of the brief. |
| 23  there's -- this is the second full sentence, in | 23  Q. The brief, the letter? |
| 24  this letter you're attempting to -- this is the | 24  A. The letter. |
| 25  first letter after the June meeting; right? | 25  Q. And where is that? |

| Page 231 | Page 233 |
|---|---|
| 1  A. Correct. | 1  A. The last paragraph, when I said, |
| 2  Q. And here you're trying to tell the | 2  "final" -- second to last paragraph, "There is no |
| 3  judge -- tell the government why it made a | 3  basis for the government to seek forfeiture of the |
| 4  mistake. | 4  Langbord family's 1933 Double Eagles," referring to |
| 5  Correct? | 5  the Langbord family's 1933 Double Eagles. |
| 6  MR. TIRSCHWELL: Objection as to what | 6  Q. So, the only place where this letter |
| 7  he's attempting to do. | 7  talks about -- |
| 8  BY MR. SWEET: (Continued) | 8  A. And then it goes on to make the |
| 9  Q. In the second paragraph you say, "The | 9  point. |
| 10  government's position wholly ignores," and you | 10  I'm sorry. |
| 11  mention one, two, three, four, there are four | 11  Q. The only place where this letter |
| 12  sub-parts that you mention; right? | 12  attempts to set forth the language about the |
| 13  MR. TIRSCHWELL: The third paragraph? | 13  Langbords' ownership is in the first page, sub four |
| 14  MR. SWEET: This is the second -- | 14  of the third paragraph, and the reference to the |
| 15  third paragraph, yes. | 15  Langbord family's Double Eagles. |
| 16  THE WITNESS: Yes, it identifies four | 16  A. I disagree with your characterization |
| 17  sub-parts after the sentence begins, "The | 17  of what this letter does. |
| 18  government's position wholly ignores." | 18  Q. Just show me somewhere else in the |
| 19  Q. Now, nowhere, in none of those four | 19  letter you're referring to. |
| 20  purported facts does it state that the Langbords | 20  MR. TIRSCHWELL: Read the whole |
| 21  owned the Double Eagles. | 21  letter and then you can note all the places |
| 22  A. I disagree with that. | 22  that refer to the Langbords' '33 Double |
| 23  Q. Or the -- oh, which one would that | 23  Eagles. |
| 24  come up in? | 24  THE WITNESS: What I am -- what I |
| 25  A. I believe FOAIQ, that the government | 25  have -- I'll read the article, but -- let |

SUMMIT COURT REPORTING, INC.
215.665.5633 * 800.447.8648              www.summitreporting.com

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 234

1        me read it and I will.
2              (Witness reviews the exhibit.)
3    BY MR. SWEET: (Continued)
4        Q.    What I'm looking for is where you
5    state that the Langbords own.
6        A.    Let's mark through.
7              Second paragraph, second sentence,
8    "On September 22nd, 2004, the Langbord family,
9    while reserving all of their rights to the coins,
10   made their 1933 Double Eagles available to the
11   Mint."
12       Q.    So, you say that word "their"?
13       A.    I think it's very clear.
14       Q.    The word "their" is what you're
15   saying?
16       A.    It's referring to the Langbord
17   family's 1933 Double Eagles.
18       Q.    Okay.
19       A.    And again, at the end of that
20   paragraph, it refers to the Langbords' 1933 Double
21   Eagles.
22             Third paragraph, as I mentioned,
23   refers to the fact that the government cannot show
24   the coins are subject to forfeiture.
25             I'm sorry.

Page 235

1              Above that, third paragraph, first
2    sentence, "The Mint has rejected their good faith
3    efforts to amicably resolve any issues relating to
4    their coins," the emphasis on "their coins."
5              "Instead has taken the untenable
6    position that it will attempt to retain their 1933
7    Double Eagles."
8        Q.    Why don't you slow down for the court
9    reporter; okay?
10             Go ahead.
11       A.    Continuing to the next sentence, "The
12   government's position wholly ignores that the Mint
13   only became aware of the coins because the Langbord
14   family freely brought their coins to the
15   government's attention," with the emphasis again on
16   "their coins."
17       Q.    You say, "the emphasis" again.
18   You're putting that emphasis there. It's not in
19   the letter.
20       A.    I want the record to reflect how I'm
21   reading, that's what I'm emphasizing.
22       Q.    To make sure what you're emphasizing?
23       A.    The possessory word, the ownership
24   word.
25       Q.    It's really the possessory word

Page 236

1    rather than an explicit discussion about ownership?
2        A.    No, I think there's an explicit
3    discussion - - again, this is a letter - - well, I
4    won't characterize the letter.
5              I go to the first paragraph of the
6    second page.
7              "The Mint's apparent decision to
8    respond to the Langbords family's good faith
9    efforts by attempting to take their 1933 Double
10   Eagles will certainly discourage others in the
11   future from cooperating with the Mint regarding
12   numismatic rarities."
13             Then the next paragraph talks about
14   other coins of numismatic interest with colorful
15   backgrounds, that have been bought and sold and the
16   numismatic community has been permitted to enjoy.
17       Q.    That has nothing to do with the
18   Langbords' purported ownership though; right? A.
19   The point I'm making, the analogy is the government
20   has allowed private citizens to own other coins
21   that are indistinguishable from the '33 Double
22   Eagles.
23       Q.    By analogy? Anything else?
24       A.    I'm still going through the document.
25             Then I say, at the end of that

Page 237

1    paragraph, "Nonetheless, the government took" - -
2    this is the end of the second paragraph, on the
3    second page - - "Nonetheless, the government took
4    no action to interfere with this or any other sale
5    of the 1913 Liberty Head nickel it" - - I'm sorry -
6    - "the Liberty nickel, or with the ownership of
7    this coin within the numismatic community," to make
8    clear the analogy.
9              Then again, the top of the page 3,
10   "the Mint's decision to try to prevent collectors
11   from freely trading these numismatic legends is
12   entirely inconsistent with the Mint's own practices
13   has been policy and unjustified as a matter of fact
14   and law," again referring to the Mint's decision to
15   try to prevent the Langbords from freely trading
16   the '33 Double Eagles and that it's not only
17   inconsistent with practice, but unjustified as a
18   matter of law and a matter of fact.
19             Then the next paragraph, "Finally,
20   there's no basis for the government to seek
21   forfeiture of the Langbord family's '33 Double
22   Eagles."
23             Again, the reference, again, "The
24   government will not be able to establish that the
25   coins are subject to forfeiture."

60  (Pages 234 to 237)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

| Page 238 | Page 240 |
|---|---|
| 1  MR. SWEET: (Continued) | 1        MR. SWEET: Which we'll mark as Berke-8. |
| 2    Q.    So, Mr. Berke - - | 2 |
| 3    A.    I'm not done. | 3        (Letter, 1 page, so marked Berke |
| 4    Q.    I thought you were. | 4    Exhibit 8 for identification by counsel.) |
| 5    A.    I'm not done. | 5        (Handed to the witness.) |
| 6    Q.    Go for it. | 6    Q.    Do you recall this document? |
| 7    A.    There's something in every paragraph. | 7    A.    I do. |
| 8    Q.    Go for it. The case is hanging on a | 8    Q.    What is it? |
| 9  preposition. | 9    A.    This is a seized asset claim filed on |
| 10       Go for it. | 10 behalf of the Langbords, dated September 9th, 2005, |
| 11   A.    Otherwise, the last sentence, "For | 11 and it has a cover letter. |
| 12 all these reasons, we are urging the Mint to | 12   Q.    Okay. Regarding the - - in the |
| 13 re-consider their position. Otherwise, now that | 13 letter itself, the sentence that starts, "From the |
| 14 the testing of their 1933 Double Eagles has been | 14 out - - from the outset the Langbord family was |
| 15 completed, the Langbord family requests their coins | 15 very explicit regarding their ownership of these |
| 16 be immediately returned." | 16 coins," could you tell me, briefly, was the very |
| 17   Q.    So, Mr. Berke, there is no discussion | 17 explicit, was that in oral communications or was |
| 18 in this letter about how the Langbords came to have | 18 that in correspondence? |
| 19 purported title of the Double Eagles, is there? | 19   A.    In our discussions at the initial |
| 20       MR. TIRSCHWELL: Objection to the | 20 meeting and then in the letter that we had |
| 21 form, "came to have purported." | 21 discussed and that I had sent to confirm that they |
| 22       MR. SWEET: Okay. | 22 - - the - - the circumstances surrounding the |
| 23   Q.    Are you going to answer or no? | 23 transfer and reservations of all their rights to |
| 24       MR. TIRSCHWELL: You can answer. | 24 their coins. |
| 25       I don't know what that means. | 25   Q.    The September 21 letter? |

| Page 239 | Page 241 |
|---|---|
| 1        THE WITNESS: Well, I would say | 1    A.    That's correct. |
| 2  there's a reference to how the Langbord | 2    Q.    And you claim that that letter makes |
| 3  family came into possession of these | 3  it very explicit that they had an ownership |
| 4  numismatic treasures and that had been | 4  interest? |
| 5  discussed previously, so the Mint was aware | 5    A.    No. |
| 6  of, you know, how they - - | 6        I didn't only refer to that letter; I |
| 7  BY MR. SWEET: (Continued) | 7  referred to that letter and prior discussions; yes. |
| 8    Q.    I'm not saying that they weren't - - | 8    Q.    Okay. Again we have the reference to |
| 9    A.    How they came to have these '33 | 9  "resolving any issues relating to their coins." |
| 10 Double Eagles. | 10       Any issues, that refers to the same |
| 11       And that's referenced back, and I | 11 issues you described with regard to the last |
| 12 believe that was, obviously, prior discussions and | 12 letter? |
| 13 that information was known. | 13   A.    Again, the settlement of any disputed |
| 14   Q.    Sub-paragraph 4, when you say that | 14 issues related to the coins to avoid litigation. |
| 15 "The government will not be able to show how the | 15   Q.    If the Langbords owned the Double |
| 16 1933 Double Eagles left the Mint over 70 years ago | 16 Eagles, why would they engage in any discussions |
| 17 or that the coins are subject to forfeiture," how - | 17 with the United States? |
| 18 - whether the coins are subject to forfeiture, that | 18       MR. TIRSCHWELL: Objection. |
| 19 hinges on a lot more than just title; right? | 19       I instruct you not to answer. |
| 20       MR. TIRSCHWELL: Objection. | 20 BY MR. SWEET: (Continued) |
| 21       I'm instructing him not to answer a | 21   Q.    Now, you styled this as a seized |
| 22 legal question. | 22 asset claim. |
| 23 BY MR. SWEET: (Continued) | 23       At what point do you contend the |
| 24   Q.    Let's look at your letter of | 24 seizure occurred? |
| 25 September 9th. | 25       MR. TIRSCHWELL: Objection. |

61 (Pages 238 to 241)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 242

1        Instruction not to answer.
2    BY MR. SWEET: (Continued)
3        Q.    You contend - -
4            MR. TIRSCHWELL: It's a legal
5    question.
6    BY MR. SWEET: (Continued)
7        Q.    You contend it was a seizure?
8            MR. TIRSCHWELL: Objection.
9            Instruction not to answer.
10   BY MR. SWEET: (Continued)
11       Q.    Was the seizure on September 22nd or
12   was the seizure June 2005?
13           MR. TIRSCHWELL: Objection.
14           It's a legal question.
15           Instruction not to answer.
16           MR. SWEET: Is there a point at the
17   litigation where you'll actually disclose
18   this information?
19           MR. TIRSCHWELL: Not through
20   deposition of opposing counsel.
21           MR. SWEET: Through deposition of Mr.
22   Langbord, can we expect that?
23           MR. TIRSCHWELL: Not through the
24   deposition of Mr. Berke. That's all we need
25   to discuss right now.

Page 243

1    BY MR. SWEET: (Continued)
2        Q.    There's another letter, Berke 9.
3            (Letter, 1 page, so marked Berke
4    Exhibit Number 9 by counsel.)
5            (Handed to the witness.)
6            (Witness reviews the exhibit.)
7        A.    Okay.
8        Q.    This is your letter; correct?
9        A.    It is a letter signed by me, sent to
10   Dan Shaver on December 6th, 2005, cc to Arnold I.
11   Haven, Esquire.
12       Q.    And he was general counsel at the
13   Treasury Department?
14       A.    At that time, yes.
15       Q.    Okay.
16       A.    I'm - - yes.
17       Q.    This is the letter that references,
18   you say, "I have always believed that you and I
19   have had a professional, frank and honest
20   relationship."
21           Up until this point, did you still
22   believe that you and Mr. Shaver were having a
23   professional, frank and honest relationship?
24           MR. TIRSCHWELL: Up until before he
25   wrote the letter?

Page 244

1            MR. SWEET: Up until the time he
2    wrote the letter.
3            MR. TIRSCHWELL: I mean, we had this
4    question before and I think the problem we
5    had was characterizing the interactions as
6    opposed to simply describing what they were.
7            I'm not sure why it matters how it's
8    characterized.
9            MR. SWEET: Because you brought a due
10   process claim and you're suggesting that the
11   Mint has denied the Langbords of certain
12   rights and it's based upon a purported
13   agreement that the Mint doesn't believe ever
14   existed.
15           So, I'm trying to understand if there
16   are issues that Mr. Berke contends where he
17   was misled, lied to, misdirected, or in any
18   way mistreated by the only two people from
19   the Mint who he ever had any negotiations
20   with. I need to know. I'm trying to explore
21   that.
22           And without knowing that, I don't see
23   how you can possibly pursue a claim - -
24           MR. TIRSCHWELL: Well - -
25           MR. SWEET: Of due process violation.

Page 245

1            MR. TIRSCHWELL: A due process claim
2    is that the coins were confiscated without
3    due process, which the due process is, you
4    know, described in the complaint.
5            MR. SWEET: Well, you --
6            MR. TIRSCHWELL: I don't think the
7    process is Mr. Shaver or Mr. Weinman, you
8    know, were supposed to do something
9    additional.
10           But I don't see how that follows.
11           MR. SWEET: Will you stipulate now
12   that Mr. Shaver and Mr. Weinman did not
13   mislead, misdirect, falsely induce or in any
14   way lie to Mr. Berke in connection with the
15   surrender of the Double Eagles and the
16   transactions, the negotiations, the
17   discussions surrounding them?
18           If you can stipulate to that, I'll
19   stop asking these questions.
20           (Pause.)
21           MR. SWEET: Do you want to have a
22   minute to think about it?
23           MR. TIRSCHWELL: Sure. Let's take a
24   five-minute break.
25           (Recess: 5:13 p.m.)

62 (Pages 242 to 245)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

---

Page 246

```
 1        (Resumed: 5:28 p.m.)
 2        (Ms. Romano is not present in the
 3   conference room.)
 4        MR. SWEET: Can we have the last
 5   question read back?
 6        (The requested material was read
 7   aloud.)
 8        THE WITNESS: What I can say to that
 9   question is, to the extent that the
10   government was saying, in its December 5th
11   letter, that the Langbord family had waived
12   or relinquished any rights as a result of the
13   transfer that occurred on September 22nd,
14   that that would have been inconsistent with
15   the agreement and our dealings prior to the
16   transfer on September 22nd.
17        That is what I'm communicating.
18        And if the government, by their
19   letter, intended then or at any point to
20   argue that there was any waiver or
21   relinquishment of those rights, that, I would
22   believe, that, I believed, was inconsistent
23   with the professional, frank and honest
24   relationship that I had thought had defined
25   our relationship previously.
```

Page 247

```
 1        MR. SWEET: Okay. I'm going to ask
 2   you a question about that; hopefully you'll
 3   answer it.
 4   BY MR. SWEET: (Continued)
 5        Q.   Is it your contention that - - then
 6   that the reservation of rights was such that it
 7   would allow the Langbords to be in a position that
 8   they were in before the transfer of the Double
 9   Eagles?
10        A.   The understanding is that by allowing
11   these discussions to go forward and allowing the
12   government to take the coins, authenticate them, to
13   see if we could reach an agreement to resolve
14   issues outside of litigation, the Langbords would
15   not be in any way relinquishing or giving up the
16   rights that they possessed to those coins prior to
17   the transfer.
18        Q.   Okay. Would that include the rights
19   to continue to possess the 1933 Double Eagles?
20        A.   Well, what I would say, whatever that
21   they - - they - - that the understanding was, that
22   all their rights would be preserved as they existed
23   prior to the transfer. That was the understanding
24   and terms upon which the transfer was made and that
25   would include right, whether they are characterized
```

Page 248

```
 1   as ownership right, possessory rights or any other
 2   rights as the letter refers, any other rights or
 3   remedies that existed at that time.
 4        (Ms. Romano returned to the
 5   conference room.)
 6        Q.   Okay. And would you agree that if a
 7   right did not exist prior to the transfer, that
 8   right would not - - a right would not be created
 9   following the transfer?
10        A.   Well - -
11        MR. TIRSCHWELL: I mean, that one I'm
12   going to instruct him not to answer.
13        That's a legal question.
14        Whether he believed there was an
15   agreement that they would gain right after
16   the transfer, you can ask him that. But you
17   probably know the answer.
18        But, I mean, the way you phrased it
19   is a legal question.
20        MR. SWEET: We'll go on.
21        Q.   I'm going to show you a document
22   we're marking as Berke 10.
23        (Claim for damages, so marked Berke
24   Exhibit 10 by counsel.)
25        (Handed to the witness.)
```

Page 249

```
 1   BY MR. SWEET: (Continued)
 2        Q.   Can you identify this document?
 3        A.   It's a document dated May 8th, 2006,
 4   captioned, "Claim for Damage - 1933 Double Eagle
 5   Coins," addressed to Daniel P. Shaver, Chief
 6   Counsel at the Mint, and David A. Lebryk, Deputy
 7   Director of the Mint.
 8        It's signed by me, with
 9   certifications.
10        MR. TIRSCHWELL: Can I get a copy of
11   that?
12        MR. SWEET: Oh, I'm sorry.
13        We may come back to these; we may
14   not.
15        I'm marking for identification Berke
16   11.
17        (Letter, 1 page, so marked Berke
18   Exhibit 11 for identification.)
19        (Handed to the witness.)
20        Q.   Do you recognize that document?
21        (Witness reviews the exhibit.)
22        A.   This is a June 29th, 2006 letter from
23   me to Dan Shaver, in response to a June 6, 2006
24   letter from Mr. Shaver regarding our claim for
25   damage.
```

63  (Pages 246 to 249)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke6/18/2008

Page 250

1      Q.    Okay. Now, the prior letter, I'll
2   take it out, B-10; right?
3          Actually, we don't have Mr. Shaver's
4   letter.
5          But there's a letter from Mr. Shaver
6   asking you for additional information about the
7   Langbords' purported ownership interest in the
8   Double Eagles; right?
9      A.    I recall there was a letter of June
10  6th.
11         I don't know the precise question in
12  my mind.
13     Q.    Okay.
14     A.    But that was clearly in response to
15  that.
16     Q.    And you're attempting now to - - you
17  can see from the letter, that here you're trying to
18  provide further information to support the claim of
19  ownership.
20         Is that an accurate characterization?
21     A.    You know, I think the letter speaks
22  for itself.
23         I would just say this is a letter
24  provided in response to Mr. Shaver's June 6th, 2006
25  letter.

Page 251

1      Q.    In paragraph 1, you say that the
2   coins are the property of Joan, Roy and David
3   Langbord, by virtue of their being the ultimate
4   beneficiaries under the wills of Elizabeth and
5   Israel Switt.
6          That turns out not to be correct;
7   right?
8          MR. TIRSCHWELL: Objection.
9          MR. SWEET: It is a factual matter.
10         MR. TIRSCHWELL: It's not.
11  BY MR. SWEET: (Continued)
12     Q.    You contend that's still correct?
13         MR. TIRSCHWELL: We're not here to
14  talk about what we contend in the case.
15  BY MR. SWEET: (Continued)
16     Q.    Is there anything in this letter
17  which you subsequently learned is incorrect, in
18  paragraph 1?
19         MR. TIRSCHWELL: We're not going to
20  answer that question.
21         MR. SWEET: Are you instructing him
22  not to answer?
23         MR. TIRSCHWELL: Yes.
24         It calls for a legal analysis, legal
25  strategy, thoughts about legal thoughts,

Page 252

1   mental legal thoughts about the case.
2          MR. SWEET: It's calling for a fact,
3   his clarification of a fact issue in this
4   letter.
5          MR. TIRSCHWELL: I've stated my
6   objection.
7   BY MR. SWEET: (Continued)
8      Q.    In paragraph 2, there's a reference
9   to a number of transactions of other coins of - -
10  well, coins, I should say. I'm not familiar with
11  all of them.
12         You see there's one that sold - -
13  there's a 1913 Liberty Head nickel that sold for 3
14  million dollars in 2004.
15         Do you know if that was before or
16  after the transfer of the Double Eagles to the
17  United States?
18     A.    As I sit here today, I don't recall.
19     Q.    Okay. Then the Brasher coin that was
20  sold in January 2005, for 2.9 million dollars.
21         Do you have any reason to believe
22  that the government's actions with respect to the
23  1933 Double Eagles that had been in the possession
24  of the Langbords affected the sale of this coin?
25         Do you have any facts concerning

Page 253

1   that?
2          MR. TIRSCHWELL: Well, you can ask
3   him does he have any facts concerning the
4   settlement.
5          MR. SWEET: Well, the government's
6   activities with regard to the 1933 Double
7   Eagles that had been in the possession of the
8   Langbords had an affect on the sale price of
9   the Brasher coin. It's a factual question.
10         MR. TIRSCHWELL: Do you have any
11  information, apart from conversations with
12  your clients?
13         THE WITNESS: I don't know, one way
14  or the other.
15     Q.    The same question with respect to the
16  1097 Ultra High Relief Double Eagle, which
17  reportedly sold for 2.9 million dollars in 2005.
18     A.    Same answer.
19     Q.    Is there anything in this letter, as
20  you sit here today, is there anything in this
21  letter you can - - that is factually not correct?
22         MR. TIRSCHWELL: That - - I'm going
23  to instruct him not to answer that question
24  to the extent it calls - -
25         MR. SWEET: For him to?

64  (Pages 250 to 253)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

## Page 254

1    MR. TIRSCHWELL: For him to reveal
2  either conversations with his clients, his
3  legal analysis, his factual investigation of
4  the case, all of which are protected.
5    MR. SWEET: Are you instructing him
6  not to answer whether there are any facts in
7  this letter that he now knows are incorrect?
8    MR. TIRSCHWELL: I think my
9  instruction is clear.
10   MR. SWEET: You didn't instruct him
11 yet not to answer.
12   MR. TIRSCHWELL: I did.
13   MR. SWEET: Did you?
14   MR. TIRSCHWELL: I said, I instruct
15 him not answer, to the extent that answering
16 would require him to disclose any
17 conversation with his clients, any legal
18 analysis or legal and factual investigation
19 that he is aware of or which he participated,
20 as well as counsel.
21   THE WITNESS: I'm not able to answer
22 the question, one way or the other then.
23 BY MR. SWEET: (Continued)
24   Q.   I show you a letter identified as
25 Berke 12.

## Page 255

1    (Letter, 1 page, so marked Berke
2  Exhibit 12 for identification by counsel.)
3    (Handed to the witness.)
4    (Witness reviews the exhibit.)
5    Q.   Are you familiar with this letter?
6    A.   I recognize this as a letter from me
7  to Mr. Shaver, dated August 18th, 2006, responding
8  to Mr. Shaver's August 15th, 2006, but I don't have
9  a specific recollection of, as I sit here today, of
10 Mr. Shaver's August 15th, 2006, letter.
11 So, if you have a copy of that, that
12 would help me to respond to questions about this
13 letter.
14   Q.   I'm going to give you a copy of the
15 August letter.
16   MR. SWEET: We're not going to mark
17 it now.
18   THE WITNESS: Okay.
19   MR. SWEET: I don't see any need to
20 mark it.
21   (Handed to the witness.)
22   (Witness reviews the exhibit.)
23 BY MR. SWEET: (Continued)
24   Q.   Do you see, at the bottom of the
25 August 15th letter from Mr. Shaver, where he says

## Page 256

1  to you that the Mint would find it helpful,
2  "helpful," if you would tender evidence indicating
3  the assessed value of the property based on another
4  act of responsible citizenship, the payment of
5  estate taxes, gift taxes, or inheritance taxes to
6  the federal and state revenue authorities.
7    Do you see that?
8    A.   I do.
9    Q.   Did you provide any such information
10 to the government after it was requested?
11   A.   I believe our response as to this
12 request is reflected in the third paragraph of my
13 August 18th letter, which states, "Second, the
14 Claim for Damage submitted on behalf of the
15 Langbords' family," pursuant to the statutes, "on
16 May 8th, 2006, has now been pending for over three
17 months. Moreover, additional information related
18 to this claim that you requested was provided to
19 you on June 29th, 2006.
20 "The Langbords have never provided
21 more information than is required by statute,
22 regulations or otherwise, and we request the
23 government make a final determination with respect
24 to this second claim."
25 I should note, the letter refers to

## Page 257

1  the first claim as the - - as - - as the Statement
2  F claim that had been filed on September 9th, 2005.
3    Q.   Okay?
4    A.   So, this is our response to the
5  August 15th, 2006, a letter by Mr. Shaver.
6    Q.   So, my question is: Did you, in
7  response to the August 15th letter, provide the
8  information that Mr. Shaver specifically was
9  requesting?
10 And that would have been evidence of
11 payment of estate tax, gifts tax or inheritance
12 taxes to the federal and state revenue authorities
13 in connection with the purported inheritance of the
14 Double Eagles, under the wills of Israel Switt and
15 Elizabeth?
16   A.   Obviously, without waiving any work
17 property or any other privilege, the answer is no.
18   Q.   I want to go back to the statement
19 that you made to the court, I think it's Berke 2,
20 the statement to the court in the Fenton
21 litigation, and you also made a statement to a
22 reporter for the Washington Post, in 1996 - - if
23 you want, I can show that, too - - in which you say
24 there are a number of ways that the 1933 Double
25 Eagles could have left the Mint, with authority.

65 (Pages 254 to 257)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke6/18/2008

| Page 258 | Page 260 |
|---|---|

**Page 258**

1    You can read the statement here, what
2  you told the Court in the Fenton case.
3    Could you tell us what those ways
4  were?
5    MR. TIRSCHWELL: Objection.
6  I'm instructing him not to answer.
7  That's what this litigation is about.
8  We'll present our proof at trial.
9    MR. SWEET: That will be your proof
10  at trial, but you won't let us know ahead of
11  time, before trial, what the purported way
12  that these things got out.
13    MR. TIRSCHWELL: Unless you want to
14  be deposed about how you're going do prove
15  the opposite?
16    MR. SWEET: Well, you'll have plenty
17  of witnesses. You get to ask all the
18  witnesses what happened.
19  But this is your claim.
20    MR. TIRSCHWELL: But you don't get to
21  ask trial counsel how he's going to prove his
22  case in the deposition.
23    MR. SWEET: But this is the kind of
24  fact that you think should be held until
25  trial?

**Page 259**

1    MR. TIRSCHWELL: No.
2  But I don't think asking Mr. Berke
3  this question is the appropriate way to get
4  it.
5  I've observed a lot of
6  interrogatories. If you asked us a question
7  about what the evidence is, we've responded
8  as we thought appropriate.
9    MR. SWEET: Okay.
10  I should ask, would Mr. Langbord be
11  in a position to answer that question?
12    MR. TIRSCHWELL: We'll deal with Mr.
13  Langbord when he's being deposed.
14    MR. SWEET: So, there's no way that
15  he can answer the question?
16    MR. TIRSCHWELL: I didn't say that.
17    MR. SWEET: Barry is itching to tell
18  you something. I think he's wishing the
19  answer.
20  (Off-the-record discussion between
21  the witness and Mr. Tirschwell.)
22    MR. TIRSCHWELL: And that's the
23  ultimate legal issue that will be litigated
24  in the case. That's the issue that will be
25  litigated in the case.

**Page 260**

1    MR. SWEET: And the fact, how they
2  got out, he's not going to testify to
3  facts?
4    MR. TIRSCHWELL: Let m e ask you
5  this, Joel: Do you think if we have a trial
6  you'll be able to call Barry to the stand and
7  question him about how the coins got out of
8  the Mint?
9  I don't think so.
10  That's why it's not appropriate here;
11  okay?
12  You put in the evidence at a trial.
13  You don't interrogate the lawyers about what
14  the evidence is. That's how it works.
15  Okay?
16  You know that.
17    MR. SWEET: But he's not - -
18    MR. TIRSCHWELL: This is ridiculous.
19    MR. SWEET: He's not just a lawyer;
20  he's a witness.
21    MR. TIRSCHWELL: He's not a witness.
22  He wasn't around in 1933 when the coins got
23  out of the Mint.
24    MR. SWEET: Is that your view, you
25  only need somebody from 1933?

**Page 261**

1    MR. TIRSCHWELL: Not Mr. Berke. He's
2  not the witness as to how the coins got out
3  of the Mint.
4    MR. SWEET: Okay.
5    MR. TIRSCHWELL: He's a lawyer, in
6  representing clients, learned information
7  about that. It's not appropriate inquiry in
8  a deposition.
9    MR. SWEET: Okay.
10  BY MR. SWEET: (Continued)
11    Q.  Mr. Berke, just so we set the stage,
12  my clients, both lawyers, were asked last week
13  whether they were aware of any situation where the
14  United States took somebody's coin without
15  initiating a forfeiture proceeding.
16  Okay?
17  So my question is a follow-up of the
18  same question:
19  Were you aware, during the period of
20  time that you had discussions with the Mint, in
21  2004 and 2005, that the 1933 Double Eagle in the
22  possession of F.C.C. Boyd was turned over to the
23  United States without litigation?
24    MR. TIRSCHWELL: Are you referring to
25  the Barnard case?

66 (Pages 258 to 261)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

---

Page 262

1       I don't know who F.C.C. Boyce is.
2       MR. SWEET: No, Boyd.
3       Q.    Were you aware of that during the
4  time you had discussions with the Mint?
5       A.    Consistent with my counsel's
6  instructions, I need to speak to him.
7       MR. SWEET: Okay.
8       (Recess: 5:50 p.m.)
9       (Resumed: 5:56 p.m.)
10      MR. TIRSCHWELL: Okay; on the record?
11      MR. SWEET: Yes.
12      There was a pending question.
13      MR. TIRSCHWELL: Yes, I think Mr.
14  Berke has an answer, with the understanding
15  we're not waiving work product.
16      But go ahead and give the answer.
17      THE WITNESS: Is that the
18  understanding, it's not a waiver of work
19  product.
20 BY MR. SWEET: (Continued)
21      Q.    It's not?
22      A.    Not a waiver of work product?
23      Q.    It's not a waiver of work product.
24      A.    I recall reviewing certain documents
25  that purported to represent what certain

---

Page 263

1  individuals did with their '33 Double Eagles in the
2  '40s.
3       As I sit here today, I can't recall
4  specifically -- I do remember F.C.C. Boyd being
5  one of the individuals.
6       But as I sit here today, I can't
7  recall the chronology of what happened with his
8  coin.
9       Again, I believe this was in the
10  early to mid 1940s.
11      Q.    Okay. Well, I'm trying to understand
12  your answer.
13      During the period you were having
14  discussions with the Mint, from the time you first
15  called to say that you were -- you had identified
16  a client with Double Eagles, all the way through
17  the time that you filed your lawsuit, you were
18  aware that a number of the prior 1933 Double Eagles
19  that were recovered by the United States did not
20  result in litigation?
21      A.    What I can say is, I recall, prior to
22  the conversations, having seen documentation that
23  purported to represent what happened to certain
24  individuals in the '40s, as to their coins.
25      Okay?

---

Page 264

1       I knew some of those instances did
2  not result in litigation.
3       Q.    Okay.
4       A.    I didn't get into the details.
5       But what I would say is, obviously, I
6  was aware in more recent times the government filed
7  a forfeiture claim against the Fenton 1933 Double
8  Eagle, as to that forfeited action, and I was not
9  familiar with any instance in modern times
10  involving the present forfeiture statutes,
11  including CAFRA, where the government did not
12  institute a forfeiture claim against a coin or
13  property to seize it.
14      Q.    Okay. Did you know that C.M.
15  Williams also surrendered a 1933 Double Eagle
16  without litigation?
17      A.    The answer would be, I can't say that
18  I knew that.
19      But my answer would be the same as it
20  was for the other people.
21      Q.    Okay. I'm going to ask you about
22  other people.
23      Louis Eliasberg (phonetic), do you
24  know about him?
25      A.    I would not have known the specifics

---

Page 265

1  regarding the Louis Eliasberg coin.
2       Q.    But you knew several people had
3  surrendered '33 Double Eagles without litigation
4  following --
5       A.    I want to be clear, this was in -- I
6  believe that this was all in the 1940s, under a
7  whole set of other circumstances that I'm not
8  talking about.
9       And what I knew was not what
10  happened; I knew that I had read certain documents
11  that purported to represent a course of events
12  involving certain coins.
13      I didn't actually know what happened.
14      Q.    Okay. In the Plaintiffs' Request --
15  Plaintiffs' Responses And Objections To Defendants'
16  First Set Of Requests For Admission, at 90, 92 and
17  93.
18      (Handed to the witness.)
19      (Witness reviews the exhibit.)
20      A.    You're saying 90?
21      MR. SWEET: Hold on one second.
22      (Pause.)
23      MR. SWEET: Well, let me ask you
24  this:
25 BY MR. SWEET: (Continued)

---

67 (Pages 262 to 265)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 266

1    Q.   Do you have any factual information
2 that - - I'll put this aside for a minute - - any
3 factual information that the findings of fact in
4 the Barnard case are erroneous?
5         MR. TIRSCHWELL: Objection.
6    I'm instructing him not to answer.
7    It's work product.
8         MR. SWEET: Okay.
9         Off the record for a minute.
10        (Off-the-record discussion between
11 counsel.)
12        MR. SWEET: Back on the record.
13    So, you're not going to allow Mr.
14 Berke to testify about anything about the
15 Barnard decision; is that what you're - -
16        MR. TIRSCHWELL: I'm not going to
17 allow him to testify as to his legal
18 analysis, our legal analysis, our thoughts,
19 our impressions about the Barnard case or why
20 we think that the Barnard case is erroneously
21 decided or not a proper basis for the
22 government to rely on, even the court to rely
23 on in this case.
24        All of that is work product.
25        MR. SWEET: Okay. We've tried to

Page 267

1 probe that in requests for admissions and you
2 objected and won't answer there.
3         On the record: Is there a place
4 where we can at least try to understand what
5 your arguments are?
6         MR. TIRSCHWELL: I'm not going to
7 discuss that on the record. It's just not
8 the time.
9         MR. SWEET: It's going to remain a
10 mystery?
11        MR. TIRSCHWELL: I'm not saying it's
12 going to remain a mystery.
13        If you have a question about our
14 response, you want to meet and confer, you
15 know, we'll talk to you about it.
16        MR. SWEET: Okay. We've done all of
17 this.
18        MR. TIRSCHWELL: If you want to write
19 us a letter where you think our response is
20 inappropriate, insufficient, we'll consider
21 it.
22        But a deposition of Mr. Berke, in his
23 dealings with the government, it's not the
24 time and places to deal with the adequacies
25 of our response to our admissions.

Page 268

1         MR. SWEET: That's not what I'm
2 asking.
3         MR. TIRSCHWELL: You're asking - -
4         MR. SWEET: If Mr. Berke can answer
5    the question and your response is that he
6    won't?
7         MR. TIRSCHWELL: That's correct.
8 BY MR. SWEET: (Continued)
9    Q.   Mr. Berke, have you had any
10 discussions with David Tripp since January 1st,
11 2004?
12    A.   Yes.
13    Q.   Could you describe those
14 communications?
15    A.   I'm a little unclear about the cutoff
16 of January 4th. So.
17    Q.   January 1st, 2004?
18    A.   January 1st, 2004, I'm a little
19 unclear what conversations may have, you know - -
20 when certain conversations were.
21        But to the best of my ability, using
22 that date as a guide, a rough guide, I believe I
23 had discussions with Mr. Tripp regarding a book
24 that he was writing.
25        I don't recall exactly when that book

Page 269

1 was completed and came out. My best memory is that
2 it came out sometime in 2004.
3         I had discussions with him, writing
4 questions about that he would ask about the coin or
5 about the litigation involving the Fenton coin,
6 more specifically.
7    Q.   He asked you questions or you asked
8 him questions?
9    A.   He asked me questions for his book.
10   Q.   Okay.
11   A.   I recall that he was - - he was - -
12 he gave a lecture somewhere, after he came - -
13 after put the book out and he invited me to attend.
14 It may have been more than one lecture. But I
15 remember attending one, a lecture he gave about the
16 book. And I remember having discussions with him
17 at that lecture.
18        I generally recall having a
19 discussion with him in which he told me that his
20 book was - - had been well received in some regard.
21        I don't know whether he had been
22 nominated for a prize or had been recognized in
23 some way.
24        And I don't recall that was part of
25 another discussion involving his book or him

                              68  (Pages 266 to 269)

Langbord v. US Dept. of Treasury, et al.                      Barry Berke 6/18/2008

| Page 270 | Page 272 |
|---|---|

**Page 270**

1  extending an invitation to me to the lecture, but I
2  recall having a conversation with him in which he
3  shared with me that it had received or been
4  nominated for something.
5      I then recall a call I placed to Mr.
6  Tripp - - this is my general recollection. There
7  may have been other additional discussions we had.
8  That's my best memory.
9      Until I recall after the meeting you
10  had asked about, in June of '05, with the
11  government, when the government had indicated they
12  were going to be issuing a press release about the
13  coins, I recall, as a courtesy, calling Mr. Tripp
14  to tell him about it, I think the night before,
15  roughly right before, on the theory that he would
16  have interest in it.
17      Q.   Okay.
18      A.   I may have had a subsequent
19  conversation with Mr. Tripp after that. I just
20  don't recall.
21      Q.   Okay.
22      A.   I should say there are other
23  interactions I've had with him.
24      For example, David Tripp's father had
25  created Tubby the Tuba, I believe is the name, a

**Page 271**

1  famous cartoon character that he was trying to
2  reintroduce, and I believe he sent to my youngest
3  children a copy of that and either called me before
4  or after.
5      I mean, there were a variety of
6  discussions I've had with David Tripp over the
7  years.
8      I'm giving you my best memory, but
9  I'm sure I'm leaving some occasions out.
10      Q.   How would you describe your
11  relationship with him?
12      A.   We had a good professional
13  relationship.
14      He - - I - - I met David Tripp in
15  connection with the Sotheby's catalogue.
16      He - - in writing his book, he asked
17  questions in writing the book.
18      Also, we had a professional
19  relationship.
20      Q.   You know him to be credible?
21      A.   I'm not comfortable characterizing
22  him. I don't - - I will say this.
23      Well, let me ask my counsel.
24      (Off-the-record discussion between
25  the witness and Mr. Tirschwell.)

**Page 272**

1      THE WITNESS: What I can say is,
2  outside of this litigation, I did not agree
3  with all of the conclusions or inferences
4  that he drew in his book.
5  BY MR. SWEET: (Continued)
6      Q.   But do you feel - - have you found
7  him to be credible?
8      A.   I can't answer that question.
9      Q.   You just don't have a basis to answer
10  it or you don't want to?
11      A.   I can't separate his role as an
12  expert in this case and my views about certain
13  statements in his report in this case, to answer
14  the question without revealing legal process, legal
15  thought and work product.
16      Q.   When did you first learn that he
17  would be an expert for the United States in this
18  case?
19      A.   I believe when I saw the report.
20      Q.   Did you ever talk to David Tripp
21  about whether he would agree to be retained for the
22  Langbords?
23      MR. TIRSCHWELL: I mean, I think - -
24  I don't know the answer. But I think if
25  there were conversations with a potential

**Page 273**

1  expert, who is - - any communications,
2  whether the communication between the lawyer
3  and the expert would be privileged and that
4  would be protected.
5      So, I think it would reveal a
6  strategy.
7      MR. SWEET: I'm not asking about
8  strategy.
9  BY MR. SWEET: (Continued)
10      Q.   But isn't it true you asked Mr. Tripp
11  if he would be willing to be an expert for you?
12      MR. TIRSCHWELL: You can answer that
13  yes or no.
14      Presumably, you've asked Mr. Tripp,
15  as well.
16      Let us confer for one minute. There
17  may be things I don't know.
18      (Recess: 6:11 p.m.)
19      (Resumed: 6:16.)
20      MR. TIRSCHWELL: Shall we go back on
21  the record?
22      MR. SWEET: Yes.
23      MR. TIRSCHWELL: Okay.
24      MR. SWEET: By the way?
25      MR. TIRSCHWELL: Yes?

69 (Pages 270 to 273)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 274

1        MR. SWEET: Courtesy purposes, just
2    so you know, you objected to me conferring
3    with my witnesses between the question and
4    answer and I am being very liberal.
5        MR. TIRSCHWELL: Not on privileged
6    grounds, I don't think.
7        MR. SWEET: Excuse me?
8        MR. TIRSCHWELL: I don't think the
9    issue was privilege.
10       MR. SWEET: Yes, it was.
11       But I'm being - - that's why I had to
12   assert the privilege several times.
13       I just want you to recognize, at
14   least, we've gone now for a very long
15   deposition and I've never made that objection
16   because I though - -
17       MR. TIRSCHWELL: You've been very
18   courteous in letting us confer. I agree with
19   that.
20       MR. SWEET: I want you to be able to
21   confer so you can preserve your issues.
22       (Off-the-record discussion between
23   the witness and the Mr. Tirschwell.)
24       MR. SWEET: Do you want now to answer
25   the question?

Page 275

1        MR. TIRSCHWELL: Well,
2    notwithstanding your courtesy, our position
3    is that who Mr. Berke may have consulted with
4    or discussed the possibility of being a
5    witness in the case, an expert witness in the
6    case, is protected legal strategy.
7        I don't think, but for the odd
8    circumstance of him being here for a
9    deposition, you would be entitled to ask the
10   other side who they consulted with as a
11   possible expert. So, I don't think you're
12   entitled to that information.
13       So, on those grounds, I'm instructing
14   him not to answer.
15   BY MR. SWEET: (Continued)
16       Q.    Okay. Did you review a draft of Mr.
17   Tripp's book before its publication?
18       A.    I believe he sent me - - this is my
19   memory - - that he sent me some chapters and I
20   believe they were chapters related to the
21   litigation. But I don't remember him sending me
22   the whole book.
23       Q.    Do you remember giving comments back
24   to him?
25       A.    I don't recall, either way. I don't

Page 276

1    recall, either way.
2        I recall - - I do recall reading it
3    with an eye towards anything would be embarrassing
4    or cause reputational harm to my clients, Stephen
5    Fenton. And I just don't recall whether or not I
6    had comments.
7        Q.    Do you recall providing Mr. Tripp and
8    his wife with access to your firm's documents;
9    correct?
10       A.    I provided Mr. Tripp and his wife
11   access to some of our firm's documents.
12       Q.    Is that in connection with his
13   research for the book?
14       A.    Yes.
15       Q.    Okay.
16       A.    Oh, let me go back.
17       I had given him access to some of our
18   documents in relation to his work in relationship
19   to the catalogue that he was doing for Sotheby's.
20       In my mind, I have a hard time
21   distinguishing between what he had access in
22   connection with that and what additional documents
23   he had in connection with the book.
24       Q.    So, you gave him access for both
25   purposes?

Page 277

1        A.    There was - - in connection with the
2    Sotheby's catalogue, I recall there was a pile we
3    gave him of documents. We sent him over documents.
4        I recall there was also a time, in
5    connection following the auction when he finished
6    his book, that he, in connection with his book,
7    that he saw other documents. And I have a hard
8    time distinguishing what additional documents - -
9    what additional documents he may have seen in
10   connection with the book.
11       Q.    I'm asking you about specific
12   documents.
13       A.    I just wanted to be precise.
14       Q.    You gave him access at least twice,
15   once for the catalogue and once for the book?
16       A.    When you say "access," we gave him
17   certain documents, as I think I mentioned earlier,
18   in connection with the catalogue, after consulting
19   with the government about appropriate - - okay - -
20   documents that he would need to see or wanted to
21   see.
22       There were additional documents that
23   he also - - that we also gave him access to in
24   connection with his book.
25       That's all.

70  (Pages 274 to 277)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke6/18/2008

|  | Page 278 |
|---|---|
| 1 | Q.   Okay. Well, let's see if you agree |
| 2 | with the characterization. |
| 3 | He told us that he had unlimited time |
| 4 | in a large conference room filled with documents |
| 5 | and was able to copy anything he wanted. |
| 6 | Is that how you would characterize |
| 7 | it? |
| 8 | A.   Well, the one - - I guess the |
| 9 | distinction I would say - - I would say is there |
| 10 | were certain documents we were prepared to allow |
| 11 | him access to, including documents, many documents, |
| 12 | that we had given him in connection with his work |
| 13 | for Sotheby's and I recall putting him a conference |
| 14 | room and he told us which of those documents he |
| 15 | would like copies of and we worked with him to - - |
| 16 | to assist. But we did not give, put in that room |
| 17 | all of our documents related to the Fenton case. |
| 18 | Q.   You held some documents back? |
| 19 | A.   We had some documents available and |
| 20 | others, others that were - - were not available to |
| 21 | him. |
| 22 | Q.   Would you tell us the nature of the |
| 23 | documents that he did not have access to? |
| 24 | A.   As I sit here today, I can't. |
| 25 | I know at least some documents that |

|  | Page 279 |
|---|---|
| 1 | were unique to the Fenton case that didn't seem to |
| 2 | be relevant and then what other documents were |
| 3 | included or not, as I sit here today, I just can't |
| 4 | do that. |
| 5 | Q.   You just don't know? |
| 6 | A.   As I sit here today, I can't do that. |
| 7 | Q.   You had conversations with Judith |
| 8 | Silver in connection with the Langbord litigation? |
| 9 | A.   I - - |
| 10 | MR. TIRSCHWELL: Objection. |
| 11 | Now we're getting into what witnesses |
| 12 | he talked to, what factual investigation he |
| 13 | may have conducted. |
| 14 | We're not going to allow him to |
| 15 | answer that. That's correct, all work |
| 16 | product. |
| 17 | BY MR. SWEET: (Continued) |
| 18 | Q.   Your conversations with - - or your |
| 19 | communications with Representative Lucas, could you |
| 20 | describe those, please? |
| 21 | A.   What I recall is that he was having |
| 22 | hearings about a bill and I spoke to him and, |
| 23 | again, it was - - my memory is a little - - is not |
| 24 | entirely clear as to whether I - - I spoke to him |
| 25 | or him and a staffer. I'm pretty sure I spoke to |

|  | Page 280 |
|---|---|
| 1 | him, himself, and this was in connection with |
| 2 | legislation that they were discussing, in which I |
| 3 | came - - I learned that the Mint had this |
| 4 | discussion with him and there may be provisions - - |
| 5 | and that there was a potential that there would be |
| 6 | a discussion related to the '33 Double Eagles. |
| 7 | I recall very brief discussion, which |
| 8 | I did nothing other than to describe the current |
| 9 | status of the case, which, at the time, was - - it |
| 10 | was a legal dispute about the coins. |
| 11 | I don't recall any details beyond |
| 12 | that. |
| 13 | Q.   Is that one conversation with |
| 14 | Representative Lucas? |
| 15 | A.   I recall one conversation and I - - I |
| 16 | might be able to say something else - - I just |
| 17 | wanted to make sure it's consistent with my |
| 18 | counsel's directive on work product. |
| 19 | With your permission? |
| 20 | MR. SWEET: All right. |
| 21 | (Off-the-record discussion between |
| 22 | the witness and Mr. Tirschwell.) |
| 23 | THE WITNESS: I'm also aware, as I |
| 24 | may have mentioned already, that either |
| 25 | Senator Laxalt, who I think more likely |

|  | Page 281 |
|---|---|
| 1 | Michelle Laxalt, had a conversation with the |
| 2 | Mint's - - or someone who worked with them |
| 3 | had a conversation with either Senator Lucas |
| 4 | or his staff or both, also in connection with |
| 5 | the same proposal and legislation. |
| 6 | BY MR. SWEET: (Continued) |
| 7 | Q.   Representative Lucas? |
| 8 | A.   I'm sorry. |
| 9 | Representative Lucas. |
| 10 | Thank you. |
| 11 | Q.   So, that was the extent of the |
| 12 | communications with Representative Lucas, what |
| 13 | you've just described to me? |
| 14 | A.   That I'm aware of, yes. |
| 15 | Q.   Do you recall anything about your |
| 16 | communications with Senator Lieberman or Senator |
| 17 | Spector? |
| 18 | A.   I never spoke with either senator. |
| 19 | I remember a very brief discussion |
| 20 | with a staffer for one of them, who, as I |
| 21 | understand, one of the senators may have some |
| 22 | interest in the facts. I believe she suggested we |
| 23 | could put in a letter and, I should say, I don't |
| 24 | recall whether it was a conversation I had or a |
| 25 | colleague of my firm had and that we would put in a |

71  (Pages 278 to 281)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke6/18/2008

                                                        Page 282
1    letter, if we'd like to put a letter, for the
2    senator to review.
3            And we did not submit any letter.
4            I don't recall a discussion beyond
5    that.
6        Q.    Let's turn to the request for
7    admissions.
8            Turn, please, to page 53.
9        A.    (Witness complies.)
10           MR. TIRSCHWELL: Fifty-three?
11           MR. SWEET: Page 93, question.
12   BY MR. SWEET: (Continued)
13       Q.    Question, request number 95.
14           (Witness reviews the exhibit.)
15       Q.    The request asks you, the Plaintiffs,
16   to admit "on August 25th, '04, Mr. Berke acknow-
17   ledged to representatives of the United States Mint
18   that the only course of action was for Plaintiffs
19   to transfer possession of the '33 Double Eagles to
20   the United States."
21           And the response says that - -
22           MR. TIRSCHWELL: You don't have to
23   read it.
24           MR. SWEET: There's an objection?
25       Q.    It says that the issue can be

                                                        Page 283
1    explored at the noticed deposition of Barry Berke.
2        A.    Yes.
3        Q.    Do you see that?
4        A.    Yes.
5        Q.    Can you admit or deny number 95?
6            MR. TIRSCHWELL: I believe it's asked
7    and answered.
8            THE WITNESS: I believe I already
9    have denied it.
10           If it's unclear, I deny that.
11   BY MR. SWEET: (Continued)
12       Q.    So, you're denying that?
13       A.    Yes.
14       Q.    Turning to 98.
15       A.    (Witness complies.)
16       Q.    On page 95.
17       A.    Huh-huh.
18       Q.    The request states, "admit that
19   Plaintiffs knew on September 22nd, 2004, that the
20   United States maintained that none of 1933 Double
21   Eagles had been lawfully issued as coinage."
22           Again, the response says, "to be
23   explored at depositions."
24           MR. TIRSCHWELL: Well, what does it
25   say?

                                                        Page 284
1            MR. SWEET: Let me finish my
2    question.
3    BY MR. SWEET: (Continued)
4        Q.    Is that a request that you're willing
5    to either admit or deny?
6            MR. TIRSCHWELL: Objection.
7            You're mischaracterizing what it
8    says.
9            It says, "Plaintiffs further object
10   on the grounds that this request is improper,
11   under Rule 36, as it is an attempt to find
12   out what Plaintiffs knew, which Defendants
13   have already explored and indicated they plan
14   to explore further at Plaintiffs'
15   depositions."
16           MR. SWEET: Oh.
17           MR. TIRSCHWELL: It does also
18   indicate that, to the extent this request
19   seeks information protected by
20   attorney-client privilege or work product
21   doctrine, it's objectionable.
22           MR. SWEET: You don't have to repeat
23   all that.
24           MR. TIRSCHWELL: You're
25   mischaracterizing it.

                                                        Page 285
1            MR. SWEET: When it says, "explore
2    further at Plaintiffs' depositions," I was
3    thinking of this one as being included in
4    that.
5            That would have to be Mr. Langbord's
6    deposition?
7            MR. TIRSCHWELL: Yes.
8            I believe you asked this question of
9    Joan Langbord. I expect you'll ask Roy
10   Langbord, to the extent he can answer without
11   revealing communications with counsel.
12           MR. SWEET: Okay.
13           MR. TIRSCHWELL: And he will.
14           MR. SWEET: Mr. Berke you're
15   instructed not to answer that one?
16           MR. TIRSCHWELL: You're asking Mr.
17   Berke what his clients knew.
18           Yes, I'm instructing him not to
19   answer that. It's only learned from
20   communications with his clients.
21           MR. SWEET: Imputed - - his clients
22   can only impute knowledge through him to the
23   extent that he's the one who knows everything
24   and they claim to know nothing. So, I'm just
25   asking.

SUMMIT COURT REPORTING, INC.
215.665.5633 * 800.447.8648                     www.summitreporting.com

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 286

1        If you're going to instruct him not
2    to answer - -
3             MR. TIRSCHWELL: What's the question?
4             MR. SWEET: I don't want to argue.
5    If he admits or denies 98?
6             MR. TIRSCHWELL: I'm instructing him
7    not to answer a question about what the
8    Plaintiffs knew.
9             MR. SWEET: Okay.
10   BY MR. SWEET: (Continued)
11        Q.    Let's look at 99.
12        A.    (Witness complies.)
13        Q.    It says, "admit that Daniel P.
14   Shaver, Chief Counsel, United States Mint, informed
15   Mr. Berke before the transfer of possession of the
16   1933 Double Eagles from the Plaintiffs to the
17   United States that the United States did not agree
18   to any conditions or qualifications to the transfer
19   of possession."
20        And if you see the answer - - the
21   response, I should say, refers to this being a
22   disputed issue that the Defendants have indicated
23   they plan to explore at the noticed deposition of
24   Barry Berke.
25        So, I'm going to ask Mr. Berke now

Page 287

1    to admit or deny 99.
2             MR. TIRSCHWELL: For the record,
3    you've asked this question and he's answered
4    it.
5    BY MR. SWEET: (Continued)
6        Q.    What's the answer?
7        A.    I believe I have answered; it's
8    denied.
9        Q.    Okay. In fact, I think you said you
10   did not recall him saying that?
11        A.    I don't believe I said that.
12        Q.    Now you're testifying maybe - - you
13   did before.
14        A.    I recall very specifically what I
15   said is I did not recall him saying that.
16        And you said, "You don't recall
17   whether he said it or not?"
18        I said, "No, I don't recall him
19   saying that," meaning it wasn't.
20        I'm very certain that's what the
21   record says.
22        Q.    I think we might have understood
23   different things from that.
24        A.    Okay.
25        Q.    It's possible.

Page 288

1        A.    I thought I had qualified, it's not
2    that I didn't recall one way or the other, but he
3    did not say that.
4        Q.    You recall that he did not say that?
5        A.    Exactly.
6        Q.    Let's look at 100.
7             MR. SWEET: I'm not going to read it.
8        Q.    Why don't you just read the request
9    and tell me if you notice it's to be explored at
10   the deposition of Barry Berke?
11        Why don't you tell me if you can
12   admit or deny 100?
13        (Witness reviews the exhibit.)
14             MR. TIRSCHWELL: Well, to the extent
15   you can answer that without - - the objection
16   - - there's an objection to the form, which
17   is stated in our response.
18        But I think Mr. Berke has testified
19   at length about his understanding of the
20   terms and circumstances surrounding the
21   transferred possession of the coins.
22             MR. SWEET: I don't think he answered
23   this question.
24        What I'm asking is, whether he can
25   admit or deny this fact?

Page 289

1             MR. TIRSCHWELL: Do you want him to
2    go through the whole explanation again of
3    what occurred and what he said and what they
4    said and what he understood?
5             MR. SWEET: No, I would just like one
6    word, admit or deny.
7    BY MR. SWEET: (Continued)
8        Q.    When it says, "Do not agree to any
9    conditions," if we put the word "expressly" before
10   the word "agree," so it reads, "admit that the
11   United States did not expressly agree to any
12   conditions or qualifications - - did not expressly
13   agree to any conditions or qualifications
14   concerning Plaintiffs' transfer of possession of
15   the 1933 Double Eagles to the United States."
16        (Witness reviews the exhibit.)
17             MR. TIRSCHWELL: I still object to
18   the form of the question.
19        The witness can answer to the extent
20   that he can answer, admits or deny, or - -
21   but if he can't, if it's more complicated
22   than that, which is what we indicated here,
23   then it's not.
24             THE WITNESS: I believe I've already
25   testified at length to this question.

73  (Pages 286 to 289)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 290

1    And again, as it is presently posed,
2    I don't think I can improve upon that answer
3    that I've already given at length.
4    I don't think I can answer the
5    question as it's presently posed.
6    BY MR. SWEET: (Continued)
7    Q.    Okay. You don't think you can?
8    A.    Well, I think I've answered the
9    question.
10    Q.    I don't think you've answered this
11    question.
12    And if you've answered it already, it
13    shouldn't be a problem to answer it again.
14    I think it's a different question. I
15    think it's very succinct.
16    (Witness reviews the exhibit.)
17    Q.    There was no expressed agreement to a
18    condition or qualification, was there?
19    MR. TIRSCHWELL: I object to the
20    form.
21    You keep using "expressed." You
22    mean, did they say the words, "we agree"?
23    I don't know what you mean by that.
24    (Witness reviews the exhibit.)
25    THE WITNESS: What I can say is what

Page 291

1    I've said before, is there was an
2    understanding that my clients were making the
3    coins available, the basis that we discussed,
4    and that they were not waiving any rights or
5    remedies that they possessed at the time as
6    to the coins.
7    That's a simplification of my longer
8    answer, which is, obviously, part of this
9    record.
10    BY MR. SWEET: (Continued)
11    Q.    When you say there was an
12    "understand," there was an understanding by whom?
13    A.    There was an understanding by both
14    parties to the transfer.
15    It's memorialized in my September
16    21st letter, to which the government never disputed
17    orally or in writing or said that they in any way
18    disagreed with the - - with any statement in that
19    letter or the full reservations of rights that were
20    part of that letter, for which the - -
21    Q.    Okay. So your position is that their
22    lack of a response was an expressed agreement to a
23    condition or qualification?
24    A.    That wasn't my testimony.
25    Q.    That sums up your testimony.

Page 292

1    Could you give me an answer?
2    A.    I don't believe it accurately does.
3    Q.    Can you give me an answer to 100?
4    MR. TIRSCHWELL: He just answered it.
5    Asked and answered.
6    MR. SWEET: Do you think that was an
7    answer?
8    MR. TIRSCHWELL: Yes.
9    BY MR. SWEET: (Continued)
10    Q.    Did the government - - when you say
11    there was an understanding between the Plaintiffs
12    and the government, in what way did the government
13    express its agreement with the terms you've just
14    described?
15    MR. TIRSCHWELL: You can describe
16    what happened.
17    A.    I walked through our entire course of
18    dealings and discussions were based on the
19    understanding that the government would have the
20    opportunity to take these coins and test them for
21    authenticity to determine whether or not we can
22    reach an agreement without my client relinquishing
23    any of the rights or remedies that they had prior
24    to that and would be the subject of any litigation
25    in the event that we didn't reach an agreement.

Page 293

1    Q.    Okay. And I'm asking you if there
2    was an affirmative acknowledgement by someone from
3    the government to the understanding which you
4    contend existed?
5    A.    Those were the only terms that we
6    said we would be prepared to take the action that
7    we did.
8    The government said they were
9    interested in having those discussions on those
10    terms. There was a full discussion that this would
11    be pursuant to a reservation of rights. Those
12    rights that were stated repeatedly. That were
13    stated in writing.
14    And the government - -
15    Q.    By you?
16    A.    In addition, in addition to expressly
17    accepting and agreeing to those terms, also never
18    in any way, in writing or orally, disputed what,
19    in fact, were the terms of the transfer.
20    Q.    And they never, in writing or orally,
21    acknowledged your contention of a purported
22    agreement?
23    A.    I disagree with that.
24    The entire basis of our discussions,
25    the entire purpose of what we were doing was

74  (Pages 290 to 293)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 294

1    pursuant to this understanding that as to how we
2    were proceeding. So, I disagree with you. Those
3    were the entire basis of our discussions related to
4    what happened.
5          And it was discussed expressly.
6    Q.    Number 103.
7          Would you give me an admission or
8    denial to 103, please?
9          (Witness reviews the exhibit.)
10         MR. TIRSCHWELL: Objection; asked and
11   answered.
12         It's essentially the same as to 100.
13   He's given an answer all afternoon to
14   that question.
15         THE WITNESS: My answer to 103 would
16   be the same answer I just gave to 100.
17   BY MR. SWEET: (Continued)
18   Q.    Is it an admission or denial?
19         MR. SWEET: But here's the thing.
20   I'm trying to narrow some of this down. So,
21   if you file a motion to have these deemed
22   admitted for invalid objections, we can try
23   to narrow the number of requests that we're
24   dealing with.
25         And I would like to take these off

Page 295

1    the table. If it's asked and answered, then
2    it shouldn't be difficult.
3          I don't believe these are. I believe
4    these are carefully worded requests.
5          MR. TIRSCHWELL: I think it's pretty
6    clear from a legal point of view, in terms of
7    moving forward, I think it's pretty clear
8    that Mr. Berke doesn't agree and, therefore,
9    we don't admit this characterization of what
10   occurred.
11         MR. SWEET: So it's denied, 103?
12         MR. TIRSCHWELL: I think it's very
13   clear.
14         MR. SWEET: 103 is denied?
15         (Pause.)
16         MR. TIRSCHWELL: Well, I think, you
17   know, it's - - the problem, as we sit here,
18   it's vague, it's over simplified.
19         I think Mr. Berke has made it clear
20   that there was an understanding and what that
21   understanding was prior to the transfer of
22   the coins.
23         So, to the extent that this request
24   for admission is inconsistent with that
25   testimony, as to that understanding, then

Page 296

1    it's denied.
2          Quite frankly, I'm not sure exactly
3    what this means.
4          MR. SWEET: Read it and the witness
5    can read it and tell us. If it's consistent,
6    then it's denied, it's denied.
7          (Pause.)
8          MR. TIRSCHWELL: I mean, you can try
9    to answer.
10         THE WITNESS: I don't understand how
11   you phrase it here.
12         I think I've given you my explanation
13   and my recollection of everything that
14   happened and what did happen on these issues.
15         And I think it's, obviously,
16   answering interrogatories is obviously not an
17   attempt to see if a, you know, statement that
18   we don't think is clearly worded is admitted
19   or denied or refers to the deposition.
20         I believe, I've answered these
21   questions to the best of my ability, based on
22   what happened.
23         And I find - - I find our objections
24   to your question here to be a valid
25   objection.

Page 297

1    BY MR. SWEET: (Continued)
2    Q.    Okay. Mr. Berke, first of all, they
3    are not interrogatories. There is a big
4    difference.
5    A.    Excuse me.
6          A request for admission.
7    Q.    The request for admissions are
8    intended to let the parties clarify disputed facts.
9          MR. TIRSCHWELL: Just to cut through
10   it, this is a disputed fact. I don't know
11   how that could be any more clear.
12         MR. SWEET: Just simply deny it.
13         MR. TIRSCHWELL: I'm not here to
14   answer your request for admission. We have a
15   deposition.
16         You want to ask him a question, ask
17   him a question.
18         MR. SWEET: But the answer is that we
19   should talk to Mr. Berke at his deposition.
20         MR. TIRSCHWELL: And you did and he
21   --
22         MR. SWEET: Now - -
23         MR. TIRSCHWELL: It says - -
24         MR. SWEET: No, we're asking a
25   specific question.

75  (Pages 294 to 297)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 298

1    MR. TIRSCHWELL: You're asking for --
2    MR. SWEET: You're not giving us a
3  yes or no.
4    MR. TIRSCHWELL: Because it is more
5  complicated than that and he's given you the
6  more complicated answer and I think the
7  record is very clear on that.
8    MR. SWEET: But the request for
9  admissions requires simplicity. If it's
10  denied -- if you want to deny it because
11  it's simply not accurate, you can admit it or
12  deny it.
13    (Off-the-record discussion between
14  the witness and Mr. Tirschwell.)
15    MR. TIRSCHWELL: I mean, this isn't
16  the time and place to explore what you think
17  of our responses to your requests for
18  admissions. It is just not.
19    MR. SWEET: Well, you know, you tell
20  us in the answer that the information can be
21  explored at the noticed deposition of Barry
22  Berke.
23    MR. TIRSCHWELL: Yes, information.
24    MR. SWEET: Now, in the deposition of
25  Barry Berke, you're telling us it is not the

Page 299

1  time or place.
2    MR. TIRSCHWELL: No, that's, as you
3  know, that's a mischaracterization.
4    What we said is, you're seeking
5  discovery of information regarding disputed
6  issues that Defendants have indicated they
7  plan to explore with the noticed deposition
8  of Barry Berke.
9    You have explored adnauseum the
10  disputed recollections; that is, the
11  recollections that, apparently, the witnesses
12  on your side disagree with, but the
13  recollections that Mr. Berke has had -- has
14  of what happened with his interactions with
15  the government prior to the transfer of the
16  coins.
17    We've allowed you to explore that as
18  much as you wanted. You've asked open-ended
19  questions, close-ended questions. You've
20  asked the same questions over and over again.
21  He's answered every, every question you've
22  asked about what happened between him and the
23  government and that's exactly what we said we
24  would allow and we have allowed it.
25    And you continue to lecture us on the

Page 300

1  purpose of the request for admissions, that
2  it's to eliminate disputed issues.
3    Finally, and you know, that is a
4  disputed issue. It couldn't be more clear
5  based on the testimony that has been given
6  today.
7    MR. SWEET: Let's go back to Berke 4.
8    MR. TIRSCHWELL: Four?
9    MR. SWEET: Four.
10    MR. TIRSCHWELL: It's also getting
11  pretty late. I don't know how much more you
12  have.
13    MR. SWEET: I have?
14    MR. TIRSCHWELL: What do you have?
15    MR. SWEET: About an hour.
16    MR. TIRSCHWELL: All right.
17    MR. SWEET: I'm hoping to end before
18  that.
19    But let's keep moving.
20    MR. TIRSCHWELL: We started at eleven
21  and it is a quarter to seven. Forty-five
22  minutes for lunch.
23    MS. ROMERO: We took an hour and
24  fifty-three minutes worth of breaks. So, we
25  have about an hour left.

Page 301

1    MR. SWEET: Let's just keep moving
2  and hopefully we'll be done soon.
3    MR. TIRSCHWELL: A little longer.
4    MR. SWEET: Berke 4.
5    MR. TIRSCHWELL: Yes, we can go to
6  Berke 4.
7  BY MR. SWEET: (Continued)
8    Q.   Mr. Berke, based upon the speech you
9  just heard from your counsel, will you answer now
10  the third line, where it says, "based on our
11  understand," is "our understanding" referring to
12  Plaintiffs or is that referring to a mutual
13  understanding?
14    A.   I'm under a direction not to answer.
15    MR. TIRSCHWELL: Let's --
16    MR. SWEET: I think that speaks
17  enough about your --
18    MR. TIRSCHWELL: No.
19    MR. SWEET: Your cooperation and
20  willingness to have him answer questions.
21    MR. TIRSCHWELL: You're not going to
22  silence me or we'll be done.
23    MR. SWEET: I would never try to
24  silence you.
25    MR. TIRSCHWELL: Thank you.

76 (Pages 298 to 301)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 302

1    So, he's been instructed not to
2    answer about what his thoughts and intentions
3    were when he used particular words.
4         He has answered - - and I've invited
5    you to ask him, although you didn't get, but
6    you subsequently have - - I invited you to
7    ask what was the understanding. I'm not
8    blocking that.
9         And the record is clear.
10        And he's testified to what was the
11   understanding and he's testified to as to
12   whether it was just his understanding or he
13   thought the representatives of the government
14   understood that, as well.
15        You are free to ask him that and he
16   has answered that question.
17        So, the record is clear.
18        And what - - and what - - instead,
19   what you're asking him is his mental thoughts
20   and his thought process about the letter.
21   That is not proper and I'm not allowing him
22   to answer that.
23        (Off-the-record discussion between
24   the witness and Mr. Tirschwell.)
25        MR. TIRSCHWELL: I'm reminded that's

Page 303

1    the same objection you made as to your
2    clients.
3         MR. SWEET: A privilege involved with
4    my clients?
5         MR. TIRSCHWELL: Ours is no less
6    important.
7         MR. SWEET: It's a different
8    privilege.
9         MR. TIRSCHWELL: That may be.
10   BY MR. SWEET: (Continued)
11        Q.   Mr. Berke, the term "our
12   understanding," did you mean this to refer to
13   Plaintiffs and the government?
14        MR. TIRSCHWELL: This is asked and
15   answered.
16        MR. SWEET: So, you're objecting?
17        MR. TIRSCHWELL: I am.
18        We have our record on this. He's
19   made it clear as to what the understanding
20   was. He's made it clear, in his view, the
21   understanding was a shared one. He couldn't
22   be more clear than that.
23   BY MR. SWEET: (Continued)
24        Q.   Do you have any - - could you
25   identify any explicit statement from Mr. Shaver or

Page 304

1    Mr. Weinman that would reflect their agreement with
2    your purported understanding referenced in Berke 4?
3         MR. TIRSCHWELL: I mean, this is
4    asked and answered.
5         He's testified as to what they said,
6    what he understood, what they didn't say.
7         MR. SWEET: I'm asking specifically
8    if he has anything that either of them have
9    said that would be an explicit
10   acknowledgement that they agreed that there
11   was - - that this would - - the purported
12   understanding reflected here.
13        That's a question about what they - -
14        MR. TIRSCHWELL: You can answer that.
15        MR. SWEET: Communicated.
16        THE WITNESS: I believe I've answered
17   this on multiple occasions. I don't mean to
18   narrow or exclude any of the prior
19   statements.
20        But it's my understanding in our
21   discussions regarding what we were prepared
22   to do, the entire purpose was to have a
23   discussion about resolving disputes; the
24   terms that we agreed is, we would make them
25   available for the government to inspect,

Page 305

1    which they had said was a precondition.
2    Having discussions about a settlement of the
3    issues, they indicated at our initial meeting
4    that they were interested. After our initial
5    meeting, in the phone call, they understood,
6    after speaking to them, they said they would
7    be interested in pursuing what we proposed.
8         Part of this was a reservation of my
9    clients' rights.
10        It was an understanding and agreement
11   that those were the terms in which we were
12   moving forward.
13        That was the agreement that's
14   reflected in our discussions, it's reflected
15   in the letter that I sent and I don't think
16   it could have been any clearer.
17   BY MR. SWEET: (Continued)
18        Q.   And that's as specific as you can
19   get?
20        A.   I've gotten more specific in my
21   discussions earlier and I'm not repeating the
22   entire sequence of dealings that I laid out, many
23   times.
24        Q.   Do you recall Mr. Shaver telling you,
25   Mr. Berke - - prior to June 2005 - - that the

                              77 (Pages 302 to 305)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 306

1    United States would not pay any money to the
2    Plaintiffs in connection with the 1933 Double
3    Eagles?
4         A.    He most certainly did not tell me
5    that.
6              MR. SWEET: Can you give me five
7    minutes?
8              We may be done.
9              THE WITNESS: All right.
10             MR. SWEET: Do you want to wait
11   outside?
12             THE WITNESS: Yes.
13             (Recess: 6:53 p.m.)
14             (Resumed: 6:55 p.m.)
15             MR. SWEET: Just a couple of short
16   questions.
17   EXAMINATION (Continued)
18   BY MR. SWEET:
19        Q.    Mr. Berke, in front of you is Berke
20   13.
21             (Sotheby/Stack's catalogue, so marked
22   Berke Exhibit 13 for identification by
23   counsel.)
24        Q.    Do you recognize this?
25             (Handed to the witness.)

Page 307

1         A.    The catalogue that was used for the
2    Sotheby/Stack's, S-T-A-C-K, catalogue that was used
3    for the auction of the Fenton coin.
4         Q.    If you notice, Mr. Berke, on page 8,
5    you are thanked for your contribution.
6              Actually, page 9.
7              You're thanked for your contribution
8    in preparing this; correct?
9         A.    Well, I think there are certain
10   people that are specifically thanked and I think
11   I'm included in the list of people who made
12   contributions.
13        Q.    What was your contribution to this?
14        A.    I mean, I'm reading, it says,
15   "Sotheby/Stack would like to thank and acknowledge
16   the following individuals for their valuable
17   assistance and advice, as well as permission to use
18   the archival materials."
19        Q.    So, what was your role in this
20   document?
21        A.    I think I already described, I made
22   documents available, provided documents that were
23   used here.
24        Q.    You edited the text, as well?
25        A.    I don't recall editing the text.

Page 308

1         Q.    Let me point out, towards the back.
2    there's a chronology.
3              You participated in the editing of
4    the chronology?
5         A.    I don't know that I participated in
6    the editing of it per se. I - - I'm sure I
7    reviewed it and may have made suggestions.
8              I don't recall whether I did or
9    didn't.
10        Q.    Okay. If you saw information that
11   you thought was erroneous, you had the opportunity
12   to attempt to correct it; correct?
13        A.    Again, the purpose of me reviewing it
14   wasn't to say this is the issue that the government
15   and Mr. Fenton disputed.
16             As I said previously, as a government
17   - - a government auction of the coin, which we
18   thought was the right to maximize the value of the
19   coins, we made the conscious decision, for Mr.
20   Fenton to fade in the background and we did not
21   think it was advisable, in terms of maximizing the
22   value of the coin, for Mr. Fenton to emphasize the
23   litigation, to emphasize the contested issues. So,
24   we understood that many of the facts that were
25   being used were obtained from government documents

Page 309

1    that were very much disputed as part of the
2    litigation but were used here as part of the story
3    that was being told by, in this case, David Tripp,
4    who was trying to tell us a story.
5              As I look through it, you can walk
6    through and tell what was contested and what was
7    not.
8              If there were things that I just
9    thought were - - that, for example, there's a date
10   of something else related to the coin that they
11   just got it wrong off the documents or missing
12   something, there seems to be something missing, I
13   may tell them.
14             But my principle reason for reading
15   it, as I think I mentioned a number of times at
16   this point, was to make sure there was nothing that
17   would - - that - - there's nothing that would
18   affect the marketing value of the coins, which was
19   largely information provided to me by my client,
20   which I relayed, and, to an extent, to make sure
21   there was nothing there that would impact
22   negatively on the reputation of Mr. Fenton and
23   then, as I say, there was some miscellaneous issues
24   that I recall addressing based on issues that had
25   come up in the litigation.

78 (Pages 306 to 309)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

---

Page 310

1          Q.    In says several places here - - if
2  you like, I can point them out to you - - that "the
3  coin that was being auctioned was the only one that
4  was - - that was authorized for private ownership."
5          You knew that statement would be in
6  there; correct?
7      A.    I did.
8          There are a couple of things about
9  that and that was, again, management of the
10 marketing.
11         I think at some point in the process,
12 I believe it was David Pickens who thought it would
13 be good for the marketing of the coin if they
14 actually had a certificate monetizing the coin - -
15 I thought this was his idea - - and as part of the
16 marketing plan and maximizing the value.
17         My memory, it was David Pickens who
18 came up with the idea.
19         I think there was a variety of things
20 to suggest to the bidders that at that point, that
21 the only Double Eagles that were meant to be
22 private were the two Double Eagles that were in the
23 hands of the Smithsonian and that the government
24 was authorizing and blessing this '33 Double Eagle.
25         I think that was a big part of the

---

Page 311

1  marketing of the coin at the time.
2          Q.    And the - - if you look at page 8, at
3  the bottom, where it says, "Certificate"?
4      A.    (Witness complies.)
5          Q.    And think we can also look at - - at
6  Berke-3, the settlement agreement.
7      A.    I'm sorry; Berke 3, the settlement
8  agreement?
9          Q.    Yes. Let me ask you first. Do you
10 recall the settlement agreement referring to this
11 Double Eagle having to be monetized, the Fenton
12 Double Eagle?
13         (Witness reviews the exhibit.)
14     A.    And the answer is I don't recall that
15 being in the settlement agreement.
16         But I'm reviewing the agreement now.
17     Q.    I'll ask you a more open question.
18     A.    I don't believe it's in the
19 agreement.
20     Q.    You know that's one of the things
21 that had to happen before the Fenton coin was sold,
22 monetized?
23     A.    I strongly disagree with that.
24         I recall the discussions quite
25 vividly as being an idea that had - - was shared.

---

Page 312

1  I recall David Pickens talking about it, whether it
2  came up in discussions he had with other people,
3  that this would be a good way, a good marketing
4  tool. It was never suggested this had to be done
5  in order for the coin to be sold.
6          That's my recollection.
7          MR. SWEET: No further questions.
8          MR. TIRSCHWELL: Okay; I have some
9  questions for you now.
10         Off the record.
11         (Off-the-record discussion between
12 counsel.)
13         MR. SWEET: Any time.
14         We've concluded?
15         MR. TIRSCHWEL: Yes.
16         MR. SWEET: All right
17         (Time noted: 7:03 p.m.)
18              *      *      *
19              BARRY BERKE
20
21 Subscribed and sworn to before me
22 this ____ day of _____ 2008.
23 _____
24
25

---

Page 313

1
2
3
4
5
6
7
8
9               INDEX
10
11 EXAMINATION BY:                     PAGE
12 Mr. Sweet                  4
13
14              EXHIBITS
15 FOR ID        DESCRIPTION        PAGE
16 BERKE EXHIBIT 1:    Published Article, 8 pages.    18
17 BERKE EXHIBIT 2:    Court Transcript, 2 pages.    25
18 BERKE EXHIBIT 3:    Settlement Agreement, 5 pages.    49
19 BERKE EXHIBIT 4:    Letter, dated September 21, 2004. 149
20 BERKE EXHIBIT 5:    E-mails, 4 pages.    194
21 BERKE EXHIBIT 6:    E-mail & Frequently Asked
22             Question: 1933 Double Eagle
23             document, 5 pages.    198
24 BERKE EXHIBIT 7:    Letter, dated July 25, 2005.    223
25 BERKE EXHIBIT 8:    Letter, dated September 9, 2005. 235

79  (Pages 310 to 313)

Langbord v. US Dept. of Treasury, et al.                    Barry Berke 6/18/2008

Page 314

```
 1    BERKE EXHIBIT 9:    Letter, dated December 6, 2005.   238
 2    BERKE EXHIBIT 10:   Letter, dated August 18, 2006.    244
 3    BERKE EXHIBIT 11:   Letter, dated June 29, 2006.      244
 4    BERKE EXHIBIT 12:   Letter, dated May 8, 2006.        250
 5    BERKE EXHIBIT 13:   Sotheby/Stack's Catalogue.        301
 6
 7    REQUESTS:    (None)
 8
 9
10                    CERTIFICATE
11
12    STATE OF NEW YORK  )
13                      : ss:
14    COUNTY OF NEW YORK )
15          I, JOSEPH V. CONNOLLY, a Reporter and Notary
16    Public for the State of New York, do hereby
17    certify:
18          That BARRY BERKE, the witness whose deposition
19    is herein before set forth, was duly sworn by me
20    and that such deposition is a true record of the
21    testimony given by such witness.
22          I further certify that I am not related to any
23    of the parties to this action by blood or marriage
24    and that I am in no way interested in the outcome
25    of this matter.
```

Page 316

```
 1    From _____ to _____
 2    Page _____ Line _____ Reason _____
 3    From _____ to _____
 4    Page _____ Line _____ Reason _____
 5    From _____ to _____
 6
 7                BARRY BERKE
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 315

```
 1          In witness whereof, I have hereunto set my
 2    hand this 14th day of May, 2008.
 3
 4              JOSEPH V. CONNOLLY
 5              REGISTRATION NO. 01C06174436
 6
 7
 8
 9    NAME OF CASE: ROY LANGBORD, et al, vs. THE UNITED STATES
10          DEPARTMENT OF THE TREASURY, et al
11    DATE OF DEPOSITION: June 18, 2008
12    NAME OF WITNESS: Barry Berke
13    Codes:
14       1. To clarify the record.
15       2. To conform to the facts.
16       3. To correct transcription errors.
17    Page _____ Line _____ Reason _____
18    From _____ to _____
19    Page _____ Line _____ Reason _____
20    From _____ to _____
21    Page _____ Line _____ Reason _____
22    From _____ to _____
23    Page _____ Line _____ Reason _____
24    From _____ to _____
25    Page _____ Line _____ Reason _____
```

SUMMIT COURT REPORTING, INC.
215.665.5633 * 800.447.8648              www.summitreporting.com