UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

———————————————————— x

ROY LANGBORD, et al.,    :
            :
    Plaintiffs,   :
            :  CIVIL ACTION
    v.     :
            :  No. 2:06-cv-05315 (LDD)
UNITED STATES DEPARTMENT OF THE :
TREASURY, et al.,    :
            :
    Defendants. :
            :

———————————————————— x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' ILLEGAL SEIZURE AND DUE PROCESS CLAIMS, OR IN THE ALTERNATIVE, TO COMPEL TESTIMONY CONCERNING THE CIRCUMSTANCES SURROUNDING A PURPORTED IMPLIED-IN-FACT AGREEMENT**

Barry H. Berke
Eric A. Tirschwell
KRAMER LEVIN NAFTALIS
 & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100 (Telephone)
(212) 715-8000 (Fax)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................i

PRELIMINARY STATEMENT ....................................................................................1

COUNTER-STATEMENT OF FACTS ........................................................................5

    Background/The Fenton Case.................................................................................5

    The Langbords' Discovery of the Coins.................................................................6

    Pre-Transfer Meetings with Government Officials ................................................6

    The Full Reservation of Rights Letter and the Transfer of the Coins....................8

    Post-Transfer Events...........................................................................................10

ARGUMENT ..............................................................................................................12

I.     DEFENDANTS' MOTION SHOULD BE DENIED AS PLAINTIFFS DO NOT
       CLAIM OR INTEND TO RELY FOR THEIR CONSTITUTIONAL CLAIMS ON
       THE EXISTENCE OF AN AGREEMENT BY THE GOVERNMENT TO
       COMMENCE FORFEITURE IF A SETTLMENT WAS NOT REACHED ........................12

II.    PLAINTIFFS' FOURTH AND FIFTH AMENDMENT CLAIMS ARE
       MERITORIOUS ...............................................................................................13

      A.    The Langbords Reserved All Their Rights to the Coins................................13

      B.    Plaintiffs State a Valid Claim Under the Fifth Amendment .........................16

      C.    Plaintiffs State a Valid Claim Under the Fourth Amendment ......................19

III.   THERE IS NO BASIS AND NO NEED TO COMPEL ADDITIONAL
       TESTIMONY CONCERNING PLAINTIFFS' COUNSEL'S MENTAL
       IMPRESSIONS AND THOUGHT PROCESSES.................................................21

CONCLUSION.........................................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Latshaw*,
    164 F.3d 141 (3d Cir. 1998) ........................................................18

*Austin v. Ligonier*,
    551 A.2d 403 (Pa. Commw. Ct. 1988) ...................................16

*Bd. of Regents of State Colls. v. Roth*,
    408 U.S. 564 (1972) ..................................................................16

*Brown v. Brierley*,
    438 F.2d 954 (3d Cir. 1971) ....................................................20

*Brown v. City of Pittsburgh*,
    186 A.2d 399 (Pa. 1962) ..........................................................14

*Brown v. Muhlenberg Twp.*,
    269 F.3d 205 (3d Cir. 2001) ....................................................19

*Calero-Toledo v. Pearson Yacht Leasing Co.*,
    416 U.S. 663 (1974) ..................................................................16

*Dusenbery v. United States*,
    534 U.S. 161 (2002) ..........................................................16, 17

*Fuentes v. Shevin*,
    407 U.S. 67 (1972) ....................................................................18

*Hartman v. Banks*,
    164 F.R.D. 167 (E.D. Pa. 1995) ..............................................22

*Justice v. Fabey*,
    541 F. Supp. 1019 (E.D. Pa. 1982) .........................................17

*Laviage v. Lyons*,
    No. CIV. H-92-1149, 1993 WL 207508 (S.D. Tex. Mar. 19, 1993) ............................20

*Leitch v. Sanford Motor Truck Co.*,
    123 A. 658 (Pa. 1924) ..............................................................16

*Lesher v. Reed*,
    12 F.3d 148 (8th Cir. 1994) .....................................................19

*Macario v. Pratt & Whitney Canada, Inc.*,
    No. 90-3906, 1991 WL 1004 (E.D. Pa. 1991) ........................23

*Montgomery County v. MicroVote Corp.*,
 175 F.3d 296 (3d Cir. 1999) ....................................................21

*Petruska v. Gannon Univ.*,
 462 F.3d 294 (3d Cir. 2006) ....................................................14

*Rossi v. Town of Pelham*,
 35 F. Supp. 2d 58 (D.N.H. 1997) ............................................19

*Samuel J. Marranca Gen. Contracting Co. v. Amerimar Cherry Hill Assocs.*,
 610 A.2d 499 (Pa. Super. Ct. 1992) ........................................15

*Sherrock Bros. v. DaimlerChrysler Motors Co.*,
 No. 06-4767, 2008 WL 63300 (3d Cir. Jan 7, 2008) ...............15

*Soldal v. Cook County*,
 506 U.S. 56 (1992) ..................................................................19

*United States v. Jacobsen*,
 466 U.S. 109 (1984) ................................................................19

*United States v. James Daniel Good Real Property*,
 510 U.S. 43 (1993) ..................................................................17

*United States v. Messina*,
 507 F.2d 73 (2d Cir. 1974) ......................................................21

*United States v. 144,774 Pounds of Blue King Crab*,
 410 F.3d 1131 (9th Cir. 2005) ................................................18

*United States v. One Parcel of Real Property With Bldgs.,*
 *Appurtenances & Known as 170 Westfield Dr.*,
 34 F. Supp. 2d 107 (D.R.I. 1999) ...........................................18

*Vaughn v. Baldwin*,
 950 F.2d 331 (6th Cir. 1991) ..................................................20

*Willcox v. Stroup*,
 467 F.3d 409 (4th Cir. 2006) ..........................................16, 17

## PRELIMINARY STATEMENT

Defendants' Motion for Partial Summary Judgment is nothing more than a classic straw-man argument. The Defendants suggest to this Court that Plaintiffs' constitutional claims are based on nothing more than a broken alleged promise – that the government would commence a forfeiture proceeding if the parties could not reach a resolution with respect to the Langbord family's 1933 Double Eagle gold coins – and then purport to show that no such legally enforceable promise or agreement was made. The problem with this argument is that Plaintiffs' constitutional claims do not rely or depend on any such promise or agreement. These claims, and this case, are instead about the government ignoring and defying its statutory and constitutional obligations when it decides to confiscate property from private citizens.

Defendants' Motion, and the record established in discovery, make clear that certain facts are undisputed. One is that, prior to the September 22, 2004 transfer of the Coins, there was an understanding and agreement between the two parties to try and reach an amicable resolution (without the need to resort to the multi-year litigation that ultimately ended with an eve-of-trial settlement in the prior Fenton action involving a single 1933 Double Eagle). Another is that, prior to that same transfer of the coins, Plaintiffs reserved *all* of their rights in a letter that Defendants received, understood, and never disputed or otherwise responded to. Defendants admit as much in their motion papers, writing: "By reserving their rights, plaintiffs did not create rights that did not already exist." (Br. 17 n.9.) Putting aside Defendants' irrelevant argument, the point is that "by reserving their rights" – to quote Defendants' own words – Plaintiffs did not give up any rights that existed prior to the transfer.

Accordingly, in the face of an undisputed record on these points, the issues presented by Plaintiffs' various claims include whether, once the government authenticated the Coins but decided not to reach a settlement with the Langbord family, the Defendants were then required to

1

follow the dictates of CAFRA, and the strictures of the Fourth and Fifth Amendments, before confiscating and retaining property – the Coins – from their presumptive owners. As we have argued to the Court in prior motion papers, and will argue again when Plaintiffs move for summary judgment, CAFRA provides that, in order to confiscate the Coins, the government would bear the burden of proving that these 1933 Double Eagles were stolen from the United States Mint in the 1930s and that the government is entitled to forfeiture of the Coins.

Apparently recognizing the weakness of their position on these core issues in the case, Defendants' latest motion for summary judgment (their earlier one having been rejected as premature) invents an issue that does not exist in a meritless attempt to defeat Plaintiffs' Fourth and Fifth Amendment claims. Ignoring the fact that Plaintiffs' reserved *all* of their rights prior to transferring the Coins, Defendants argue that Plaintiffs' constitutional claims are based on an "unwritten and unexpressed implied agreement" that the government would specifically commence a forfeiture action against the Coins in the event no settlement was reached. But Plaintiffs have never asserted that their constitutional claims are based on such an agreement. Rather, because it was and is undisputed that Plaintiffs gave up no rights in connection with the transfer – including the right to insist on the government discharging its legal obligation to commence a forfeiture action in order to confiscate property possessed and claimed to be owned by private citizens – whether or not the Defendants explicitly or implicitly told Plaintiffs' counsel that they would commence such a forfeiture (or whether they had the legal authority to make such a promise) is beside the point. Plaintiffs' rights were no different (no less, and no more) on September 22, after the Coins were transferred, than they were on September 21, when the Coins were still in the Langbord family's possession. Accordingly, Plaintiffs' Fourth and

Fifth Amendment claims do not depend on any "implied agreement" by the government to commence a forfeiture proceeding if discussions failed to yield a settlement. [1]

Defendants continue to refer misleadingly to their characterization that Plaintiffs "surrendered" the Coins on September 22 and were "returning stolen property," as if Plaintiffs had simply said:  here, take them, they are yours, we waive and abandon any rights or claims we might have had.  But nothing could be further from the truth, and, despite the ill-founded rhetoric in their motion papers, the deposition testimony of all of the parties involved in the discussions – including the Mint's lawyers, the supervising Secret Service agent, Plaintiff Roy Langbord, and Plaintiffs' counsel Barry Berke – makes clear that nobody believed that this was what the Langbords were doing.  Instead, in an act of responsible citizenship, they voluntarily alerted the Mint to their possession and ownership of the Coins and – after fully reserving their rights – agreed to transfer possession to the government for purposes of authentication and discussing a resolution.  In fact, under basic principles of the law of waiver, Defendants' "surrender" theory is a complete non-starter.  Defendants would have to prove that the Langbords clearly, unequivocally, and decisively chose to intentionally relinquish or abandon their rights in the Coins for all times and all purposes – which is the exact *opposite* of what the undisputed record shows.  As set out in detail below, that record establishes that from the very first in-person meeting, Plaintiffs made clear they intended to reserve all of their rights; the Defendants understood Plaintiffs intended to do so; Plaintiffs in fact did so, in writing, prior to the transfer of the Coins; and Defendants never did or said anything to dispute this clear and timely full reservation.

---

[1] Filing such a forfeiture action is precisely what the government did in the Fenton case, what the law requires, and what Plaintiffs fully expected the government would do here, although none of this is material to resolution of this motion.

Defendants also mischaracterize Plaintiffs' claims as "contend[ing] that the September 22 transfer of the 1933 Double Eagles to the government's possession constituted an illegal seizure and a due process violation." (Br. 2.). What Defendants fail to appreciate, or choose to ignore (since we made these points in opposing Defendants' earlier, premature motion for summary judgment), is that Plaintiffs' Fourth and Fifth Amendment claims are predicated not simply on what happened and what was said on September 22 – which is not in material dispute – but rather on Defendants' later decision, following authentication of the Coins, to summarily and unilaterally confiscate, seize and retain Plaintiffs' 1933 Double Eagles without affording Plaintiffs any legal process whatsoever, based on the mere assertion (but no admissible or persuasive proof offered in a court of law) that the Coins must have been stolen from the Mint many decades earlier.

So lacking in merit is Defendants' motion for partial summary judgment that it raises a question as to whether it is little more than a pretext to further question Plaintiffs' lead counsel, Barry Berke, Esq., and invade the protected sphere of privileged communications and work product. But Defendants' alternative motion to further examine Mr. Berke is equally meritless. Mr. Berke has answered all questions that were put to him about what was said between him and Mint officials and other government representatives in connection with the transfer of the Coins, discussions of a possible resolution, and the authentication process. He has also testified to his understanding of these interactions. What Plaintiffs have not allowed Mr. Berke to reveal are his clearly protected mental thoughts and impressions and legal opinions. Plaintiffs have not put Mr. Berke's mental thoughts and impressions "at issue." Instead, what Plaintiffs have put at issue in bringing their various claims is what the Defendants were *obligated by law to do* (under CAFRA and the Fourth and Fifth Amendments, among other provisions) if and when they chose to

4

confiscate and retain the Coins following authentication – i.e., commence a forfeiture proceeding and satisfy the government's burden of proving that the Coins were stolen and are illegal to possess and own.  Plaintiffs' constitutional claims thus raise issues of law, to be decided by this Court, that are not informed or affected by Mr. Berke's subjective mental thoughts and opinions formed in and through his role as Plaintiffs' counsel.  There is no need and no basis to allow further questioning of Mr. Berke.

For all of these reasons – as well as the fact that Defendants have ignored this Court's rules governing Motion Practices and Procedures by failing to file "a separate, concise and explicit statement of the material facts as to which the moving party contends no genuine issue exists," including "citations to the record" – we respectfully submit that Defendants' motion should be denied in its entirety.

## COUNTER-STATEMENT OF FACTS[2]

**Background/The Fenton Case**

One of Plaintiffs' lawyers here, Barry Berke, Esq., represented Mr. Stephen Fenton in connection with his 1933 Double Eagle case, which commenced in the mid-1990s and ended with a settlement in 2002.  (*See* Deposition Transcript of Barry Berke, Esq., attached to Defendants' Motion ("Berke Tr.") at 17.)  Federal agents had initially seized Mr. Fenton's single 1933 Double Eagle and attempted to forfeit it through a federal court proceeding commenced by the government; however, the government eventually dropped its legal claim and agreed to auction the coin and split the $7.5 million in proceeds between the coin's owner, Mr. Fenton, and the United States.  (*Id.* at 16.)

---

[2] Because Defendants have not complied with this Court's requirement for a separate statement of alleged undisputed material facts with numbered paragraphs and citations to the record, Plaintiffs cannot file a responsive and correspondingly numbered statement setting out which of those material facts are disputed.

**The Langbords' Discovery of the Coins**

In 2003, the Langbord family discovered its ownership of ten 1933 Double Eagle gold coins (the "Coins") in a family safe deposit box, among property that had belonged to the parents of plaintiff Joan Langbord and the grandparents of plaintiffs Roy and David Langbord. (*See* Declaration of Eric Tirschwell, dated December 11, 2008 ("Tirschwell Decl."), Exh. F (Deposition Transcript of Roy Langbord ("Langbord Tr.")) at 104-05; Compl. ¶4.) Mindful of the prior litigation and settlement arising from the government's seizure and later auctioning of Stephen Fenton's Double Eagle, the Langbord family's response to this extraordinary discovery was to first consult with counsel – ultimately, Mr. Berke. Through Mr. Berke, the Langbord family voluntarily alerted the United States Mint to the family's possession of the Coins and attempted to reach an amicable resolution of any issues that might be raised by the Mint. (Langbord Tr. at 162-65; 203-05; Compl. ¶5.)

**Pre-Transfer Meetings with Government Officials**

The first meeting between Mr. Berke and the U.S. Mint's Chief Counsel, Daniel Shaver, and Senior Legal Counsel, Greg Weinman, took place on August 25, 2004. It is undisputed that Mr. Berke disclosed at this meeting that he had a new client with ten 1933 Double Eagles, raised the issue of whether there might be a settlement or resolution with respect to these Coins, referenced the Fenton case and all of the time and energy that had been spent before that case ultimately settled, suggested that a resolution might be easier in the current situation because there were multiple Coins, and asked whether the Mint would be interested in discussing a possible settlement or resolution. (*See* Tirschwell Decl. Exh. G (Deposition Transcript of Daniel P. Shaver ("Shaver Tr.")) at 95-96; Berke Tr. at 80-81, 96-97; *see also* Tirschwell Decl. Exh. H (Deposition Transcript of Greg M. Weinman ("Weinman Tr.")) at 32-35.) There is no dispute

that Mr. Shaver answered Mr. Berke's question in the affirmative, stating that the Mint "would

be willing to discuss the matter." (Shaver Tr. at 96-97; *see also* Berke Tr. at 82; Weinman Tr. at

33-35 (we communicated that we were "amenable to a discussion" of the possibility of "some

type of . . . agreement").) It also is undisputed that toward the end of this first meeting, Mr.

Shaver broached the subject of the government taking possession of the Coins in order to

authenticate them and Mr. Berke responded that this would not be a problem, but made clear that

Plaintiffs would want to preserve all of their rights. (Shaver Tr. at 89-90, 97; Weinman Tr. at 42-

43; Berke Tr. at 82-83.) There is no dispute that at no point during this first meeting did either

Mr. Shaver or Mr. Weinman say in words or substance that if Plaintiffs turned over the Coins so

the government could authenticate them, they would be surrendering any rights or that the

government would simply keep the Coins and/or would refuse to negotiate or to commence a

legal proceeding. (Weinman Tr. at 39-40, 45-46.)

The second meeting between Mr. Berke and the government took place at the Secret

Service's offices in Brooklyn, N.Y., on September 15, 2004. Messrs. Shaver and Weinman were

present, along with two Secret Service agents – the case agent and squad supervisor Hugh

Dunleavy. (*See* Tirschwell Decl. Exh. I (Deposition Transcript of Hugh Dunleavy ("Dunleavy

Tr.")) at 19, 38-39.) At this meeting Mr. Berke revealed the Plaintiffs' identity and the location

of the Coins, and the parties also discussed the logistics of transferring the Coins from the

Plaintiffs to the government. (Shaver Tr. at 57-59; Weinman Tr. at 49-52; Berke Tr. at 111-113.)

Several additional and important aspects of this second meeting are not in material dispute.

First, Mr. Berke repeated, *and the government officials understood*, what Mr. Berke had said at

the first meeting: that in connection with the transfer of the Coins for authentication, Plaintiffs

would be reserving all of their rights. (Shaver Tr. at 62-63; Berke Tr. at 112.) Second, nobody

from the government said to Mr. Berke, in words or substance, that Plaintiffs could not, or the

government would not allow them to, reserve all of their rights. (Weinman Tr. at 56-57;

Dunleavy Tr. at 57-58.) Third, Mr. Berke also was not told that the government was no longer

open to discussing some sort of resolution or settlement (Weinman Tr. at 68-69). Fourth, no one

from the government told Mr. Berke that by transferring the Coins or allowing for their

authentication, the government would argue that Plaintiffs would be waiving or giving up any

rights they had to the Coins or that the government would simply keep them. (Shaver Tr. at 64-

65; Weinman Tr. at 54-55; Dunleavy Tr. at 56-57.) Lastly, one of the Secret Service agents

raised the issue of whether Plaintiffs would waive venue (Dunleavy Tr. at 47-49; Weinman Tr. at

57; Berke Tr. at 112) and Mr. Berke stated that his clients would be prepared to do so. (Shaver

Tr. at 65-66.)[3]

**The Full Reservation of Rights Letter and the Transfer of the Coins**

Plaintiffs' pre-transfer full reservation of rights letter to the government dated September

21, 2004 reads as follows:

> I write on behalf of the Langbord family regarding their ownership of ten
> 1933 Double Eagle Coins (the "Coins"). At the request of the United States Mint,
> Roy Langbord will make the Coins available to the government on Wednesday,
> September 22, 2004 based on our understanding that the government will test the
> Coins for authenticity and secure the Coins while we discuss a possible resolution
> of the issues relating to the Coins.

---

[3]While the parties to this conversation expressed differing views about how the reference to
"venue" was or should have been understood, the parties' subjective beliefs or understandings
are not material to this motion. In any event, S.A. Dunleavy agreed that an entry in his
handwritten notes from the day of the meeting with Mr. Berke that reads "take possession in
Philadelphia have client/attorney consent to venue in SDNY" reflected the government's desire
to obtain "consent to venue for a legal proceeding in the Southern District of New York."
(Dunleavy Tr. at 115-16; *See also* Berke Tr. at 131 ("my understanding of the words that they
used was that they were seeking a waiver of venue for a forfeiture proceeding against the '33
Double Eagles").)

> This agreement to make available the Coins as described above is without prejudice to all of my clients' rights and remedies existing at law, in equity, or otherwise. We specifically reserve all rights and remedies with respect to the Coins.

(Tirschwell Decl., Exh. A.)

The record is undisputed that the government received and read the letter on September 21 (the day before the transfer) [4] and then orally confirmed having done so when Messrs. Shaver and Weinman met in person with Mr. Berke prior to the Coins' transfer on the morning of September 22. (Weinman Tr. at 70-77; Berke Tr. at 176-77.) It is also undisputed that prior to the transfer and for months thereafter nobody from the government ever took issue with or otherwise responded in any way to Mr. Berke's reservation-of-rights letter, whether orally or in writing, other than acknowledging having received it. (Shaver Tr. at 45, 84, 86; Weinman Tr. at 76-77.) On September 22, after confirmation was given that the government had received the full reservation of rights letter, the Coins were transferred from the Plaintiffs to the Defendants with the understanding that the next step would be authentication and continuation of discussions about a possible resolution. (Langbord Tr. at 187, 205; Dunleavy Tr. at 86 ("He [Roy Langbord] gave them to me for authentication and so forth."); *id.* at 30 (Mr. Langbord "was going to surrender the coins to us for subsequent analysis [and] authenticaton").) It also is undisputed that at no point prior to the transfer did anybody from the government ever say to Mr. Berke that if his clients turned over the Coins so the government could authenticate them, the government would argue that they would be giving up any or all rights they might have. (Shaver Tr. at 64-65.)[5]

---

[4] It was sent at 1:13 p.m. (Shaver Tr. at 41.)

[5] Contemporaneous internal Secret Service reports reflect that law enforcement officials believed that the Coins had been "seized" on September 22, 2004. (*See, e.g.,* Tirschwell Decl. Exh. B at 1 ("NOTIFICATION OF CONTRABAND SEIZURE," including numerous references to the

Summing up what had transpired in connection with the transfer of the Coins, Plaintiff

Roy Langbord recounted what he told the other members of his family:

> . . . I discussed with my family, as I said, my understanding, which
> was we were providing the coins to the government for
> authentication, that we would attempt to amicably resolve the case,
> and that if we didn't, we would – we had maintained all our rights.
> We were no worse off than before.  And that we would be back ...
> we would be in court in a litigation like the first time [referring to
> the Fenton case].

(Langbord Tr. at 205; *see also id.* at 195 ("my personal belief was that if we could not amicably

resolve the situation, we would be involved in a litigation similar to that brought in the Fenton

case"); *id.* at 199-200.)[6]

**Post-Transfer Events**

Although not directly relevant to the Defendants' motion, certain post-transfer facts are

undisputed as well.  In December 2004, attorneys representing a number of law enforcement

agencies met to discuss the Langbords' 1933 Double Eagles, including the United States Mint,

United States Attorney for the District of Columbia, the Treasury Executive Office for Asset

Forfeiture (responsible for "train[ing] law enforcement personnel . . . in various aspects of asset

---

"seized" Coins) and 8 (Certified Inventory of Evidence reflecting ten 1933 Double Eagle coins
that "were seized" by Special Agents on September 22, 2004).)  Secret Service squad supervisor
Dunleavy similarly testified that on September 22 he took the Coins "on behalf of the
government and *seized them* on behalf of the government."  (Dunleavy Tr. at 86-87 (emphasis
added) (also claiming the Coins were, prior to seizure, "surrendered to us").)

[6] Although the understanding of Plaintiffs and Plaintiffs' counsel as to what would occur if the
Coins were authenticated but no settlement could be reached is not material to resolution of this
motion (as Plaintiffs do not claim any binding promises or agreements were made or reached in
these respects), we note that Mr. Berke's testimony on this issue is completely consistent with
Mr. Langbord – i.e., he understood and believed that in the absence of a resolution, the parties
would be in litigation (as CAFRA required).  (*E.g.,* Berke Tr. at 122 ("the basis for our
discussion was that if we did not reach an agreement there would be a forfeiture proceeding
related to the Coins"); *id.* at 161-62; *id.* at 182; *id.* at 184.)  Mr. Berke also testified, fully
consistent with the record set out above, that "the understanding was, that all of [the Langbords']
rights would be preserved as they existed prior to the transfer."  (*Id.* at 247-48.)

forfeiture"[7]), and the United States Secret Service.  As reflected in a Memorandum summarizing

the meeting and addressed to the then-Assistant Secretary of the Treasury, "[a]ll the agencies

involved, with the exception of the US Mint, are in favor of pursuing forfeiture."  (Tirschwell

Decl. Exh. C.)  The Mint took a different position, arguing that "the coins are government

property and should be returned without the need for forfeiture."  (*Id.*)

During the period between September 2004 and May 2005, Messrs. Shaver and Weinman

updated Mr. Berke about the different difficulties that were delaying the authentication process.

(Shaver Tr. at 100-02; Berke Tr. at 188-190.)  In May 2005 – some eight months after transfer of

the Coins – the Mint ultimately determined that the Coins were in fact authentic 1933 Double

Eagles.  (Weinman Tr. at 80-82, 87.)  At a meeting in Washington in June 2005, Messrs. Shaver

and Weinman informed Mr. Berke of this determination.  (Weinman Tr. at 87.)  They also told

Mr. Berke that the government would not offer any kind of monetary settlement to the Langbord

family.  (Weinman Tr. at 88-89; Berke Tr. at 208-09.)

On August 10, 2005, Mr. Shaver provided written notice to the Plaintiffs advising that

because the Mint had satisfied itself that the Coins had been stolen ("taken out of the United

States Mint in an unlawful manner") more than 70 years earlier, no further process was required

in connection with their seizure and confiscation.  (Tirschwell Decl., Exh. D.)  In response to this

written notice, the Langbord family on September 9, 2005 filed a verified claim pursuant to

CAFRA, 18 U.S.C. § 983(a)(2), re-stating their ownership interest in the Coins.  (Tirschwell

Decl., Exh. E.)  On  December 5, 2005, exactly eighty-seven days later – just within the ninety-

day window allowed under CAFRA (18 U.S.C. § 983(a)(3)) for the government to either return

the property or file a forfeiture action – Mr. Shaver sent a second letter to the Plaintiffs advising

---

[7] *See* http://www.treas.gov/offices/enforcement/teoaf/about.shtml.

that defendants were "returning" Plaintiffs' claim "without action." (Compl. ¶74.) No further process has been afforded Plaintiffs to contest the government's confiscation of the Coins. Following the summary rejection of additional administrative claims filed under the Federal Torts Claim Act (Compl. ¶80), the Langbord family promptly filed this lawsuit.

## **ARGUMENT**

I. **DEFENDANTS' MOTION SHOULD BE DENIED AS PLAINTIFFS DO NOT CLAIM OR INTEND TO RELY FOR THEIR CONSITUTIONAL CLAIMS ON THE EXISTENCE OF AN AGREEMENT BY THE GOVERNMENT TO COMMENCE FORFEITURE IF A SETTLEMENT WAS NOT REACHED**

The Defendants make only two arguments in support of their motion for summary judgment on Plaintiffs' Fourth and Fifth Amendment claims: (1) that Messrs. Shaver and Weinman lacked authority "to bind the government to an agreement to commence a forfeiture action" if no settlement or resolution was reached (Br. 11-14) and (2) even if they did have such authority, the evidence cannot support an implied-in-fact agreement that the government would do so. (Br. 14-18.) The short and dispositive response to these two arguments is that they are irrelevant to Plaintiffs' Fourth and Fifth Amendment claims because, as previously indicated, Plaintiffs have not alleged in their complaint, are not contending, and do not intend to rely on the existence of any *agreement* (implied-in-fact or otherwise) entered into by Messrs. Shaver and/or Weinman that the government would commence a forfeiture action if no resolution or settlement could be reached. On the basis of this clear statement of Plaintiffs' position (which we believe has always been clear), and because Defendants do not contend or cite any authority that such an agreement is necessary to assert a Fourth or Fifth Amendment claim or make any other

12

arguments in support of their motion for summary judgment with respect to those claims, the Court should deny Defendants' Motion in its entirety.[8]

## II.    PLAINTIFFS' FOURTH AND FIFTH AMENDMENT CLAIMS ARE MERITORIOUS

Defendants' motion for summary judgment with respect to Plaintiffs' Fourth and Fifth Amendment claims should be denied for an additional reason: not only are such claims in no way dependent on any such agreement with Messrs. Shaver and Weinman, they are meritorious as a matter of law. The Plaintiffs, having reserved all of their rights, had the same constitutional protections with respect to the Coins after the September 22, 2004 transfer as they had before that transfer. And as we now show, and will more fully present when Plaintiffs file their dispositive motion for summary judgment, those constitutional protections prohibited the government from doing what it did here – confiscating property from private citizens without any process of law (not to mention in clear violation of CAFRA).[9]

### A.    The Langbords Reserved All Their Rights to the Coins.

As outlined above, the undisputed factual record shows that, far from surrendering to the government or waiving their rights in the Coins, the Langbord family agreed only to make the Coins "available" to the government for specific purposes – so the government could "test the Coins for authenticity and secure the Coins while we discuss a possible resolution of the issues relating to the Coins" – and with a full reservation of "*all*" of Plaintiffs' "rights and remedies." (Tirschwell Decl., Exh. A.) While Defendants argue that their silence in response to this

_____

[8]For the same reason, Plaintiffs do not address Defendants' arguments about whether Messrs. Shaver and Weinman had "actual authority" to agree that the government would commence forfeiture proceedings if no agreement could be reached.

[9] Pursuant to the Court's scheduling Order, dispositive motions are to be filed "not later than thirty (30) days following" the Court's resolution of the pending *Daubert* motions. Docket No. 59.

September 21 letter "is not evidence of unambiguous assent" to a purported agreement that

Defendants would commence a forfeiture action (Br. 17) (an agreement that, as stated above,

Plaintiffs agree is not a part of their case), nowhere in their brief do Defendants argue that

Plaintiffs failed to reserve their rights given the parties' pre-September 21 dealings and the

clarity of the September 21 letter on this point.  Indeed, Defendants sensibly concede that

Plaintiffs reserved their rights when they state:  "By reserving their rights, plaintiffs did not

create rights that did not already exist."  (*Id., n.9.*)  As noted above, it is axiomatic that what

follows from Defendants' concession is that "by reserving their rights," Plaintiffs had the same

rights to the Coins following the transfer as existed prior to the transfer.[10]

Any other position by Defendants would fly in the face of black-letter law governing the

waiver of rights – which would require evidence that that the Langbords "clear[ly],

unequivocal[ly] and decisive[ly]" chose to "intentionally relinquish[] or abandon[]" their rights

in the Coins.  *See Brown v. City of Pittsburgh*, 186 A.2d 399, 401 (Pa. 1962) (under

Pennsylvania law, a waiver "is the act of *intentionally* relinquishing or abandoning some known

right, claim, or privilege.  To constitute a waiver of legal right, there must be a clear, unequivocal

and decisive act of the party with knowledge of such right and an evident purpose to surrender

it.") (emphasis added) (citations omitted); *Petruska v. Gannon Univ.*, 462 F.3d 294, 309 (3d Cir.

2006) (explaining that "[a] waiver is 'an intentional relinquishment or abandonment of a known

right or privilege'" and that "'courts indulge every reasonable presumption against waiver of

---

[10] Defendants' argument that "[t]here is no evidence that the government understood the
reservation of rights language to mean more than plaintiffs had the right to assert their purported
ownership over the 1933 Double Eagles by filing a replevin action" is both unsupported and
immaterial.  (*Id.*)  The assertion about the Defendants' state of mind is pure conjecture with
absolutely no support in the record.  In any event, the undisputed *material* evidence as to the
government's understanding on this point is that they understood (1) Plaintiffs intended to and
would be reserving all of their rights, and (2) that the September 21 letter memorialized in
writing that promised and anticipated full reservation.

fundamental constitutional rights'") (citations omitted); *Sherrock Bros. v. DaimlerChrysler Motors Co.*, No. 06-4767, 2008 WL 63300, at *3 n.3 (3d Cir. Jan. 7, 2008) (waiver may only "be established by a party's express declaration or by a party's undisputed acts or language . . . .") (citing *Samuel J. Marranca Gen. Contracting Co., v. Amerimar Cherry Hill Assocs.*, 610 A.2d 499, 501 (Pa. Super. Ct. 1992)).

No such evidence of waiver exists here; the undisputed evidence is exactly to the contrary, establishing that the Langbords reserved all of their rights and remedies, such that their rights and remedies were no different following the transfer of the Coins on September 22 than they were the day before the transfer.  (*See* Langbord Tr. at 192 ("If there was no resolution, I expected that we had maintained all of our rights and that we would have been no worse off than before the coins were provided for authentication . . ."); Berke Tr. at 247-48 ("all their rights would be preserved as they existed prior to the transfer...whether they are characterized as ownership right[s], possessory rights or any other rights as the letter refers").

The record also is undisputed that Plaintiffs' full reservation of rights could not have come as a surprise to Defendants, as Plaintiffs' counsel, Mr. Berke, had made Plaintiffs' intentions in these respects clear to Messrs. Shaver and Weinman in both the August and September pre-transfer meetings.  Indeed, the record is undisputed that the Defendants *understood* from Mr. Berke's statements that Plaintiffs intended to reserve all of their rights.  It also is undisputed that Defendants received and read the September 21 letter the day before the transfer, confirmed to Mr. Berke that they had done so the morning before the transfer, and – despite ample opportunity prior to consummating the transfer – neither said nor did anything following receipt of the letter to respond to, reject or otherwise take issue with the parameters of plaintiffs' limited purpose transfer and full reservation of rights as described in the letter.

Instead, Defendants took possession of the Coins, authenticated them, but then – in late spring 2005 – announced their intention to keep the Coins permanently, refused Plaintiffs' demand that they be returned, and failed to comply with the requirements of the Fourth and Fifth Amendments and CAFRA. It is this announcement and decision that gives rise to Plaintiffs' constitutional and statutory claims.[11]

### B.    Plaintiffs State a Valid Claim Under the Fifth Amendment[12]

Turning more specifically to Plaintiffs' Fifth Amendment claim, the Supreme Court has made it clear that "property interests protected by procedural due process extend" to and "well beyond actual ownership of real estate, chattels, or money." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571-72 (1972). Under Pennsylvania law, possession is *prima facie* evidence of ownership. *Leitch v. Sanford Motor Truck Co.*, 123 A. 658 (Pa. 1924); *Austin v. Ligonier*, 551 A.2d 403, 404-05 (Pa. Commw. Ct. 1988). In the closely analogous case of *Willcox v. Stroup*, 467 F.3d 409 (4th Cir. 2006), the Fourth Circuit emphasized that this rule – "that 'actual possession is, prima facie, evidence of a legal title in the possessor'" – "has been a feature of American law almost since its inception" and "applies across the law of personal property." *Id.* at 412 (quoting Blackstone's *Commentaries*).

---

[11] The continuing suggestion by the Defendants that Plaintiffs somehow "surrendered" the Coins is nothing more than misleading hyperbole. Equally specious is Defendants' argument that, from their perspective, the transfer of the Coins was "a voluntary repatriation of numismatic treasures to their rightful owner" by "citizens returning stolen property to the government who sought a reward for their rectitude." (Br. 2.) As the record discussed above establishes without dispute, in fact the transfer arose in the context of an agreement between the parties to try to avoid anticipated litigation and work out a resolution of issues concerning provenance and ownership claims with respect to the Coins.

[12] The Fifth and Fourteenth Amendments afford equivalent protection against deprivations of property without due process of law, the distinction between the two being their application to federal and state officials, respectively. *Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 633, 668 n.5 (1974). Accordingly, we cite here cases decided under both Amendments.

As described above, the Plaintiffs reserved any and all rights and remedies with respect to the Coins prior to the transfer, including their constitutional rights under the Fourth and Fifth Amendments, their statutory rights under CAFRA, and their presumptive property and ownership rights and interests that arose by virtue of their possession of the Coins for decades.

"[I]ndividuals whose property interests are at stake are entitled to notice and an opportunity to be heard." *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (internal quotation marks omitted). When the government alleges that it may confiscate property as the fruit or instrumentality of crime, case law shows that the requirement that notice and a hearing be provided via a judicial forfeiture has always been presumed. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 57 (1993). The nature of the "hearing" required must be informed both by the irreversible effect of forfeiture upon the affected private interest, *e.g.*, *id.* at 54, and by the substantial risk of erroneous determinations absent a genuine adversary hearing, *id.* at 55-56. Furthermore, as we have stressed in prior filings, Congress has directed – via the enactment of CAFRA – that in such an action the government bears the burden of establishing that the property is subject to forfeiture by a preponderance of evidence. 18 U.S.C. § 983(c).

"The fact that a possessor's claim of ownership may be disputed does not negate the existence of a property interest or his right to procedural safeguards mandated by the Fourteenth Amendment." *Justice v. Fabey*, 541 F. Supp. 1019, 1022-23 (E.D. Pa. 1982) (Pollak, J.) ("[In light of Pennsylvania law which attaches a presumption of entitlement to one in possession, and the broad protection afforded by the Fourteenth Amendment, I find that plaintiff's complaint alleges facts constituting a property interest in the truck sufficient to impose upon government officials a due process obligation not to terminate plaintiff's possession of the truck without according him a hearing to adjudicate his claim of ownership."); *see also Fuentes v. Shevin*, 407

U.S. 67, 86 (1972) ("The Fourteenth Amendment's protection of 'property'… has never been interpreted to safeguard only the rights of undisputed ownership.  Rather, it has been read broadly to extend to 'any significant property interest.'") (citations omitted); *Abbott v. Latshaw*, 164 F.3d 141, 146 & n.2 (3d Cir. 1998) ("Because deprivation of a possessory interest alone invokes the right to procedural due process, we need not consider these arguments as to who owned the van.").

Courts also have held that even probable cause to believe property to have been stolen from the government does not excuse the government from the necessity of prevailing in a forfeiture proceeding in order to recover the property.  *See United States v. One Parcel of Real Property With Bldgs., Appurtenances & Known as 170 Westfield Dr.*, 34 F. Supp. 2d 107, 114-15 (D.R.I. 1999).  Rather, "[e]ven in the most obvious cases of property that it is illegal to possess, the government must prove certain elements before possession is deemed unlawful."  *United States v. 144,774 Pounds of Blue King Crab*, 410 F.3d 1131, 1135 (9th Cir. 2005).

Here, by confiscating the Coins as the alleged fruit of crime without filing a complaint for forfeiture, and thus preventing the Langbords from being heard in a proceeding structured by the statutory burden of proof and other applicable Federal Rules, defendants have deprived the Langbords of property without the process that Congress and the courts have defined as due. Defendants have thus violated the Fifth Amendment.

### C.    Plaintiffs State a Valid Claim Under the Fourth Amendment

With respect to Plaintiffs' Fourth Amendment claim, as noted above, it is clearly established that Plaintiffs had possessory and ownership rights in the coins both prior to the September 22 transfer and (because of the full reservation of rights) still had those same rights after.  Accordingly, when the Defendants decided to retain and confiscate the Coins following authentication, that decision amounted to "some meaningful interference with [the Langbord's] possessory interests" and thus constituted a "seizure" without a warrant or probable cause in violation of the Fourth Amendment.  *See Soldal v. Cook County*, 506 U.S. 56, 61 (1992); *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 209-10 (3d Cir. 2001) ("In the ordinary case, the Supreme Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.") (internal citation omitted).

Courts consistently have rejected the argument – similar to Defendants' position here – that the constitutional right against unreasonable seizures is "vitiated merely because the [government] defendants *believed* the [property] belonged to the" government.  *Lesher v. Reed*, 12 F.3d 148, 150 (8th Cir. 1994) (emphasis added).  *Accord Rossi v. Town of Pelham*, 35 F. Supp. 2d 58, 69-70 (D.N.H. 1997) ("police seizure of stolen property from a thief is subject to Fourth Amendment scrutiny" even "when the government . . . has paramount right to possession").

In addition, even when property has been voluntarily entrusted to a third party (including the government), it is "the decision by governmental authorities to exert dominion and control over" the property "for their own purposes" that implicates the Fourth Amendment.  *United States v. Jacobsen*, 466 U.S. 109, 120 n.18 (1984); s*ee also Soldal,* 506 U.S. at 62 ("our cases

19

unmistakably hold that the Amendment protects property as well as privacy"). *Vaughn v. Baldwin*, 950 F.2d 331 (6th Cir. 1991), is illustrative. There, business records were "temporarily surrendered" to the IRS on "a voluntary basis in connection with a tax investigation." The court held that the government's continued retention and copying of these documents after the taxpayer demanded their return and withdrew his consent violated the Fourth Amendment, applying the rule that "when the basis for search or seizure is consent, the government must conform to the limitations placed upon the right granted to search, seize or retain the papers or effects." *Id.* at 332-33 (internal quotations and citation omitted). The court went on to condemn the government's approach, which it described – in words equally applicable to the government's approach here to the Langbord family – as "basically the joke is on you. You shouldn't have trusted us." *Id.* at 334 (internal quotations and citation omitted). *See also Laviage v. Lyons*, No. CIV. H-92-1149, 1993 WL 207508, at *2 (S.D. Tex. Mar. 19, 1993) (where plaintiffs voluntarily produced documents to the government, "the government's right to possess the documents derives from the owner's consent," and once that consent is withdrawn, plaintiffs are entitled to "reinvoke rights under the Fourth Amendment").

Here, after the Defendants completed the authentication process, it was their decision in the late spring of 2005 to keep and refuse to return, or file a forfeiture action against, the Coins – and thus "exert dominion and control" over the Coins "for their own purposes" – that violated the Fourth Amendment.[13]

---

[13] The weakness of Defendants' position on the Fourth Amendment issue is only underscored by their repeat citation to the same inapposite case law they relied on in their first, failed motion for summary judgment. In *Brown v. Brierley*, 438 F.2d 954 (3d Cir. 1971), the defendant voluntarily relinquished a gun to a police officer and authorized its sale. There was no reservation of rights or limitation placed on the surrender; moreover, the issue raised on appeal – and lost – was not "the absence of his voluntary consent," *id.* at 957, but rather whether the police's undisclosed intention to perform a ballistics test on the gun constituted "deceit and

**III.  THERE IS NO BASIS AND NO NEED TO COMPEL ADDITIONAL TESTIMONY CONCERNING PLAINTIFFS' COUNSEL'S MENTAL IMPRESSIONS AND THOUGHT PROCESSES**

The only basis Defendants invoke for seeking leave to explore the "thoughts, beliefs and understandings" of Plaintiffs' counsel, Mr. Berke, is to obtain additional information about the "circumstances surrounding" the "purported implied-in-fact agreement" that the government would commence a forfeiture action if no resolution could be reached with respect to the Coins. (Br. 22, 24.)  Because, as is made clear above, Plaintiffs do not assert or intend to prove or rely on any such "implied-in-fact agreement" that the government would commence forfeiture, Defendants' request to explore Mr. Berke's mental thoughts and impressions – which thoughts and impressions are protected as core work-product – should be denied as moot.[14]

_____

misrepresentation" (*id*. at 956) that violated the Fourth Amendment.  In *United States v. Messina*, 507 F.2d 73 (2d Cir. 1974), the court found no search or seizure where a defendant told law enforcement officials he "wanted 'to cooperate,'" admitted that he had been selling the sweaters under investigation, told the agents "[i]f you want these sweaters, you can have them," and instructed his wife to give the agents the remaining sweaters.  This holding too has no applicability to the case at bar where, far from admitting crimes and voluntarily turning over the conceded fruits of the crime, the Langbords have done nothing wrong, no crime has been charged (much less proven), the property was made available to the government for specific and limited purposes and with a documented and full reservation of rights, and the legality of the ownership of that property is disputed.

[14] Defendants' passing suggestion that the work-product doctrine may not even apply to protect Mr. Berke's mental thoughts and impressions before the September 22 transfer (Br. 22-23 n.11) is frivolous.  The question is whether, during the pre-transfer discussions, the possibility of litigation was anticipated, and the record – and common sense – unambiguously establish that it was, by both sides.  (*See* Berke Tr. at 122, 161-62, 182, 184; Langbord Tr. at 195, 205; Dunleavy Tr. at 115-16; Br. at 17 n.9 (arguing that as of September 21, Defendants anticipated that plaintiffs might file an action).

The cases Defendants cite are not to the contrary. *Montgomery County v. MicroVote Corp.,* 175 F.3d 296 (3d Cir. 1999), was an attorney-client privilege, not work product, case. Defendants' citation to the concurring opinion of Judge Greenberg  - who believed that documents prepared to avoid litigation before any adversarial proceedings had commenced were sufficiently "in anticipation of litigation" to warrant work product protection – actually *supports* a finding of work product protection in this case.  *Id.* at 305 ("a party does not have to be threatened with litigation by a plaintiff before the documents it prepares could be considered prepared in

The record is clear, moreover, that Mr. Berke has fully testified about who said what during the interactions he had with Mint officials and other government representatives concerning the transfer of the Coins, discussions of a possible resolution, and the authentication process. (*E.g.*, Berke Tr. at 79-84 (describing first meeting with Mint lawyers); Berke Tr. at 111-114 (describing meeting at Secret Service offices).) He also has testified to his understanding of these interactions. (*E.g.,* Berke Tr. at 95-100 (describing his "understanding" of what transpired at first meeting)). What Plaintiffs have not allowed Mr. Berke to reveal are his clearly protected mental thoughts and impressions, including his legal strategies and reasons for doing, saying or writing the things he did as part of his representation of Plaintiffs and his analysis and conclusions as counsel for Plaintiffs, particularly about many of the central issues raised in the case, such as questions about how the 1933 Double Eagles were released from the Mint in the 1930s.[15]

Contrary to Defendants' argument, Plaintiffs have not put Mr. Berke's mental thoughts and impressions "directly at issue." Instead, as described in the preceding sections, Plaintiffs' Fourth and Fifth Amendment claims put at issue what the Defendants were *obligated by law to do* if and when they chose to confiscate and retain the Coins following authentication in the late spring of 2005. Plaintiffs' constitutional claims thus raise issues of law, to be decided by this

---

anticipation of litigation.") (citation omitted). Similarly, in *Hartman v. Banks,* 164 F.R.D. 167 (E.D. Pa. 1995), the Court ordered only the production of those documents that were relevant to the alleged intentional infliction of emotional distress. *Id.* at 170-71. The fact that the District Court cut off discovery at the time when the insurance company was added as a party to the litigation was *not* because of work product protection, but for relevancy reasons.

[15] Defendants' counsel similarly instructed Mint attorneys, e.g., not to answer questions when counsel believed that the answer would call for the Mint attorneys to interpret or reveal their mental thoughts about correspondence exchanged in the case. (*See, e.g.,* Shaver Tr. at 27-32.) Government counsel also objected to questions about what Mint lawyers understood and concluded about certain things that Mr. Berke said to them. (*Id.* at 63-64; Weinman Tr. at 44-55.)

Court, that are not informed or affected by Mr. Berke's protected mental thoughts, strategies, and impressions formed in and through his role as Plaintiffs' counsel. There simply is no need, much less the "compelling need" required by the "directly at issue" cases Defendants cite, for any additional testimony from Mr. Berke. *Compare, e.g.*, *Macario v. Pratt & Whitney Canada, Inc.*, No. 90-3906, 1991 WL 1004 (E.D. Pa. 1991) (applying doctrine where terms of an actual (not an imagined) agreement were in fact "directly at issue").[16]

It also bears pointing out that most of what Defendants specifically seek leave to ask Mr. Berke would be far afield of either the issue Defendants claim to want to explore or any issue that is fairly explored with opposing party's counsel. For example, Defendants seek leave to ask Mr. Berke his opinions and knowledge about how "1933 Double Eagles could have left the United States Mint" in the 1930s, his knowledge of "the government's views of Israel Switt's involvement with the 1933 Double Eagles," and what his clients understood about the *Barnard* case, which was decided in 1947 (Br. 23-24). None of this would have the slightest relevance to any implied-in-fact agreement to commence forfeiture that might have arisen in 2004. Moreover, Mr. Berke's views on these topics are plainly protected as and inextricably tied up in his core protected mental thoughts, impressions and legal opinions and conclusions about many of the central issues that have been raised in this litigation.

For all of these reasons, Defendants' alternative motion to compel further testimony of Barry Berke, Esq., should be denied.

---

[16] While Defendants complain that Mr. Berke refused to divulge his mental thoughts and impressions with respect to certain references in the September 21 letter, in fact, Mr. Berke did provide context and explanation to the extent he could without revealing protected work product. (*See, e.g.*, Berke Tr. at 229-230 (explaining the "issues" he identified with Mint officials); *id.* at 247-48 (providing examples of the reserved "rights and remedies").)

## CONCLUSION

The existence or non-existence of an alleged "implied-in-fact" agreement with respect to what would happen with the Coins if no settlement was reached is not an issue in this case. Plaintiffs' Fourth and Fifth Amendment claims do not depend on any such agreement and were fully preserved (along with all other claims) by Plaintiffs' clear and undisputed reservation of all rights. For these reasons, as explained in detail above, it is respectfully submitted that Defendants' Motion should be denied in its entirety, and this case should move forward to full briefing and resolution by this Court of the merits of Plaintiffs' compelling statutory and constitutional claims.

Dated: December 11, 2008

Respectfully submitted,

s/Eric A. Tirschwell

Barry H. Berke
Eric A. Tirschwell
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100 (Telephone)
(212) 715-8000 (Fax)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

——————————————————— x

ROY LANGBORD, et al.,                    :
                                         :
                    Plaintiffs,          :     CIVIL ACTION
                                         :
             v.                          :
                                         :     No. 2:06-cv-05315 (LDD)
UNITED STATES DEPARTMENT OF THE          :
TREASURY, et al.,                        :
                                         :
                    Defendants.          :
                                         :
                                         :
——————————————————— x

## CERTIFICATE OF SERVICE

I, Eric A. Tirschwell, hereby certify on this 11th day of December, 2008, that I caused a copy of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment, along with plaintiffs' annexed exhibits and proposed order, to be placed in an official depository of the United States Postal Service, enclosed in a first class postage prepaid wrapper, addressed to:

> Joel M. Sweet, Esq.
> Assistant United States Attorney
> U.S. Attorney's Office
> 615 Chestnut Street, Suite 1250
> Philadelphia, PA 19106

I hereby further certify on this 11th day of December, 2008, that I caused a copy of the foregoing memorandum in opposition, annexed exhibits, and proposed order to be filed electronically in the Eastern District's CM/ECF system.

Dated: December 11, 2008

                              s/Eric A. Tirschwell
                              ERIC A. TIRSCHWELL