UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

——————————————————— X
ROY LANGBORD, et al.,                :
                                     :
                  Plaintiffs,        :
                                     :
                                     :    CIVIL ACTION
            v.                       :
                                     :    No. 2:06-cv-05315 (LDD)
UNITED STATES DEPARTMENT OF THE      :
TREASURY, et al.,                    :
                                     :
                  Defendants.        :
                                     :
——————————————————— x

**SURREPLY MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' ILLEGAL SEIZURE AND DUE
PROCESS CLAIMS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT ..............................................................................................................2

I.      PLAINTIFFS' EXHAUSTION OF ADMINISTRATIVE REMEDIES DOES NOT EXCUSE DEFENDANTS FROM THEIR CONSTITUTIONAL AND STATUTORY DUTIES TO PROVIDE PRE-SEIZURE DUE PROCESS OF LAW ...............................2

II.     THE RECORD CLEARLY ESTABLISHES THAT PLAINTIFFS HAVE A PROPERTY INTEREST PROTECTED BY THE DUE PROCESS CLAUSE.................8

CONCLUSION.........................................................................................................12

# TABLE OF AUTHORITIES

## CASES

*Alvin v. Suzuki,*
    227 F.3d 107 (3d Cir. 2000)....................................................................................3

*Austin v. Borough of Ligonier,*
    551 A.2d 403 (Pa. Commw. Ct. 1988) ...........................................................10

*Boyd v. United States,*
    116 U.S. 616 (1886)........................................................................................5

*Chung v. Park,*
    514 F.2d 382 (3d Cir. 1975)...........................................................................4

*Davis v. United States,*
    328 U.S. 582 (1946).......................................................................................6

*Dunbar Corp. v. Lindsey,*
    905 F.2d 754 (4th Cir. 1990) .......................................................................11

*Dixon v. Lowery,*
    302 F.3d 857 (8th Cir. 2002) .......................................................................11

*Elsmere Park Club, L.P. v. Town of Elsmere,*
    542 F.3d 412 (3d Cir. 2008)...........................................................................3

*FDIC v. Morrison,*
    747 F.2d 610 (11th Cir. 1984) .....................................................................11

*Figueroa v. United States,*
    66 Fed. Cl. 139 (2005) ...................................................................................6

*Fisher v. United States,*
    425 U.S. 391 (1976).......................................................................................6

*Fuentes v. Shevin,*
    407 U.S. 67 (1972)..............................................................................3, 4, 11

*Joint Anti-Fascist Refugee Comm. v. McGrath,*
    341 U.S. 123 (1951).......................................................................................5

*McKenzie v. City of Chicago,*
    968 F. Supp. 1268 (N.D. Ill. 1997) ...............................................................4

*In re Three Grand Jury Subpoenas Duces Tecum Dated Jan. 29, 1999,*
    191 F.3d 173 (2d Cir. 1999)...........................................................................6

*United States v. Fisher,*
    500 F.2d 683 (3d Cir. 1974)..................................................................................6

*United States v. James Daniel Good Real Prop.,*
    510 U.S. 43 (1993).....................................................................................3, 4

*United States v. Sellers,*
    30 C.M.R. 262 (C.M.A. 1961).............................................................................6, 7

*United States v. Stern,*
    225 F. Supp. 187 (S.D.N.Y. 1964)......................................................................6

*Willcox v. Stoup,*
    467 F.3d 409 (4th Cir. 2006) ........................................................................9-10

*Wilson v. United States,*
    221 U.S. 361 (1911)..........................................................................................5

## PRELIMINARY STATEMENT

In their reply, defendants argue that their motion should be granted for "two reasons." (Reply Mem. at 3.) First, they claim that plaintiffs "have been afforded the due process to which they are entitled in connection with their assertion of a property interest in the 1933 Double Eagles." (*Id.*) Second, defendants claim that plaintiffs "have failed to offer any evidence of a cognizable property interest in the 1933 Double Eagles, and, without having established such a right, they cannot sustain a claim for denial of due process." (*Id.*) Defendants' arguments are incorrect both legally and factually, and plaintiffs have viable, and indeed meritorious, claims based on a denial of due process.

Simply stated, plaintiffs have never been afforded the fundamental protections of due process -- an opportunity to be heard before a detached and neutral decision-maker and to challenge the bases for defendants' confiscation of the Coins. Instead, plaintiffs' ten 1933 Double Eagle Coins were taken on nothing more than the unilateral assertion by the United States Mint, hardly a disinterested party, that because it believes (but has never proven) that the Coins must have been stolen, they belong to the government. It was that decision, announced by defendants in the summer of 2005 (a full year before the "administrative claims process" on which plaintiffs rely here), that gives rise to plaintiffs' meritorious Fifth Amendment claims.

Remarkably, in their motion to file a reply memorandum in support of their first motion to dismiss or for summary judgment (which the Court denied), defendants conceded that "plaintiffs are entitled as a matter of due process to a judicial determination that they own the 1933 Double Eagles." (Defs.' Proposed Reply Mem. at 12 (Ex. A to Docket No. 21 (dated June 22, 2007)). Now, in a complete about-face, they argue – contrary to decades of precedent – that no judicial hearing is required and that an after-the-fact administrative claims process by the

1

same agency that confiscated the Coins, and relating to separate tort claims, satisfied due process. Defendants' latest argument could not be more wrong, and the law is squarely to the contrary. Moreover, contrary to defendants' unsupported assertions in its reply, the record in this case clearly demonstrates that plaintiffs, who possessed the Coins for many years, had (and never relinquished) a constitutionally protected interest in those Coins.

**ARGUMENT**[1]

## I.    PLAINTIFFS' EXHAUSTION OF ADMINISTRATIVE REMEDIES DOES NOT EXCUSE DEFENDANTS FROM THEIR CONSTITUTIONAL AND STATUTORY DUTIES TO PROVIDE PRE-SEIZURE DUE PROCESS OF LAW

On their first argument, defendants claim that plaintiffs were afforded due process when they "took advantage of an administrative claims process" in which they were "requested" to "provide evidence of their purported interests in the 1933 Double Eagles." (Reply Mem. at 3-4.) This argument fails for at least four reasons.

First, this administrative process related to something entirely different. As a prerequisite to bringing their replevin and conversion claims against the United States under the Federal Torts Claim Act, plaintiffs were first required to exhaust their administrative remedies by filing a claim with the government agency that they believed had committed the tortious conduct. *See* Reply Mem. Ex. B (plaintiffs' Claim for Damage, pursuant to 28 C.F.R. § 14.2). Plaintiffs did so on May 8, 2006 and provided a further submission on June 29, 2006. This was almost a year *after* defendants notified plaintiffs of the government's final decision to confiscate and retain the Langbord's Coins, on August 10, 2005. (Tirschwell Decl., Ex. D.) In other words, defendants

---

[1] We note that defendants' reply makes no new or additional arguments in support of its motion for summary judgment on plaintiffs' Fourth Amendment claims, and thus defendants' motion should be denied on those claims, for the reasons stated in plaintiffs' opposition memorandum.

2

had already violated plaintiffs' due process rights well before the administrative claims process was initiated as a procedural prerequisite for bringing plaintiffs' tort claims.

Defendants cite no case, and we are aware of none, that suggests that an after-the-fact administrative process that must be exhausted before bringing tort claims against the government somehow cures an earlier deprivation of property without constitutional due process. In fact, the opposite is true: the due process decisions of the Supreme Court make clear that in all but the most exigent of circumstances, pre-deprivation due process is what is required and a post-deprivation opportunity to be heard cannot cure a pre-deprivation denial of due process.[2] And defendants make no argument here, nor could they, that any such exigencies existed under the facts and circumstances presented in this case.

Second, defendants ignore several of the most fundamental requirements of due process, which were provided neither before nor after defendants confiscated the Langbords' 1933 Double Eagles, including a meaningful opportunity to be heard before a neutral decision-maker.

The "essential elements" of due process have been identified as:

> (1) adequate notice of the charges or basis for government action; (2) a
> neutral decision-maker; (3) an opportunity to make an oral presentation

---

[2] As a general rule, "due process requires an opportunity for a hearing *before* a deprivation of property takes effect." *Fuentes v. Shevin*, 407 U.S. 67, 88 (1972) (emphasis added); *see also id.* at 90 ("[O]utright seizure without opportunity for a prior hearing" is permissible only where the government shows an "extraordinary situation[] that justif[ies] postponing notice and opportunity for a hearing."); *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 62 (1993) (holding that, except in extraordinary circumstances, "the Due Process Clause requires the Government to afford notice and a meaningful opportunity to be heard before seizing real property").

Where the government was "required to provide a predeprivation hearing," "no amount of postdeprivation process could cure [its] initial failure to provide a hearing." *Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 417 (3d Cir. 2008); *see also Alvin v. Suzuki*, 227 F.3d 107, 120 (3d Cir. 2000) (where "the Constitution requires pre-termination procedures," even "the most thorough and fair post-termination hearing cannot undo the failure to provide such procedures").

to the decision-maker; (4) an opportunity to present evidence or witnesses to the decision-maker; (5) a chance to confront and cross-examine witnesses or evidence to be used against the individual; (6) the right to have an attorney present the individual's case to the decision-maker; (7) a decision based on the record with a statement of reasons for the decision.

3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law – Substance & Procedure* § 17.8(a) (4th ed. 2007). *See, e.g., Chung v. Park*, 514 F.2d 382, 386 (3d Cir. 1975) (reciting nearly identical list of "procedural safeguards").

While not every such protection is required in every situation, an "informed evaluation by a neutral official" that "provide[s] a real test" of the strength of the competing claims is, at a minimum, what Due Process requires. *Fuentes v. Shevin*, 407 U.S. 67, 83, 97 (1972). And, as previously noted, in apparent recognition of this fundamental law, defendants themselves *conceded* in a prior filing that "plaintiffs are entitled as a matter of due process to a judicial determination of their claim that they own the 1933 Double Eagles." (Defs.' Proposed Reply Mem. at 12 (Ex. A to Docket No. 21.)[3]

"The purpose of an adversary hearing is to ensure the requisite neutrality that must inform all governmental decisionmaking." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 55 (1993). "That protection is of particular importance here, where the Government has a direct pecuniary interest in the outcome of the proceeding." *Id.* at 55-56. *See also McKenzie v. City of Chicago*, 968 F. Supp. 1268, 1275-76 (N.D. Ill. 1997) ("an adversary hearing before a neutral third party may be even more essential when the government has a direct pecuniary or political interest in the outcome").

---

[3] In this same proposed reply, defendants argued that the process due plaintiffs was "resolution of their replevin claim." (*Id.*) But as noted above, such an after-the-deprivation hearing plainly does not pass constitutional muster in the absence of exigent circumstances not present here. *See supra* note 3. Nor would it satisfy CAFRA's burden of proof mandate, as discussed below.

As Justice Frankfurter long ago observed, "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170-72 (1951) (concurring opinion), quoted in *James Daniel*, 510 U.S. at 502. And when property is forfeited from private citizens, Congress, through the enactment of CAFRA, more recently has prescribed a particularly fundamental component of the process that is due – and of which plaintiffs also were deprived here – the right to require the government to shoulder the burden of *proving with admissible evidence* that the confiscated property is properly forfeitable by the government (here, that the Coins were indeed stolen or unlawfully removed from the Mint in the 1930s). *See* 18 U.S.C. § 983(c).[4] Finally, as we argued in our opposition memorandum, where property is confiscated on the theory that it is the fruit of a crime, "the requirement that notice and a hearing be provided via a judicial forfeiture has always been presumed," and this requirement adheres even where the claim of ownership is disputed. (Opp'n Mem. at 17-18 (citing cases).)

Third, the cases defendants cite in support of the notion that less process is due when the government seeks to recover its own property establish no such thing, do not even purport to address Fifth Amendment issues, and have been long discredited. The first case, *Wilson v. United States*, 221 U.S. 361 (1911), is about the government's subpoena power over corporate documents, not, as defendants claim, about the "government's right to recover property." (Reply Mem. at 5-6.) Moreover, *Wilson* relied on *Boyd v. United States*, 116 U.S. 616 (1886), where the

---

[4] It should be noted that CAFRA's burden of proof provision (§ 983(c)) applies to any "suit or action brought under *any* civil forfeiture statute for the civil forfeiture of *any* property" and thus applies to the government's confiscation and forfeiture of the Coins irrespective of whether plaintiffs prevail on their separate claims arising out of violations of other provisions of CAFRA governing administrative forfeitures (§ 983(a)). Notably, Title 18 of the United States Code specifically contemplates forfeiture of "property of any kind obtained directly or indirectly, as the result of" the theft or conversion of any "thing of value of the United States." *See* 18 U.S.C. §§ 641, 981(a)(1)(C) & (a)(2) and 1956(c)(7).

Court held that the government may not, consistent with the Fourth Amendment, seize a person's

documents or other property as evidence unless it can claim a proprietary interest superior to that

of the person from whom the property is obtained. *Id.* at 623 (comparing, for the purposes of an

example, "the search for and seizure of stolen or forfeited goods" with "a search for and seizure

of a man's private books and papers.").

Defendants use the Court's example in *Boyd* to suggest there is an "analytical distinction"

between circumstances where government is entitled to possession of the property and where

government takes private property. (Reply Mem. at 6.) But, *Boyd* does not address due process

issues and the distinction advanced by defendants, based on nothing more than *dicta* from the

120-year old case, no longer stands. *See In re Three Grand Jury Subpoenas Duces Tecum Dated

Jan. 29, 1999*, 191 F.3d 173, 177 (2d Cir. 1999) (referring to *Boyd* as "now-discredited") and

*Figueroa v. United States*, 66 Fed. Cl. 139, 151 (2005) (*Boyd* is "largely overruled").[5]

Defendants' three other cases, *Davis v. United States*, 328 U.S. 582 (1946), *United States

v. Stern*, 225 F. Supp. 187 (S.D.N.Y. 1964), and *United States v. Sellers*, 30 C.M.R. 262 (C.M.A.

1961), are inapposite Fourth Amendment decisions addressing situations where – unlike here – it

was *undisputed* that certain property belonged to the government and/or the government had a

clear statutory or regulatory right to inspect or recover such property.[6] These cases

---

[5] *See also Fisher v. United States*, 425 U.S. 391, 407 (1976) ("Several of *Boyd*'s express or
implicit declarations have not stood the test of time."); *United States v. Fisher*, 500 F.2d 683,
690 (3d Cir. 1974) (describing *Boyd* as a case "whose vigor has been seriously sapped by
subsequent analyses by the Supreme Court.").

[6] In *Davis,* government agents seized gasoline ration coupons that were *unquestionably*
government property, as government regulations clearly declared that "[a]ll coupon books, bulk
coupons, inventory coupons, and other evidences, are, and when issued shall remain, the
property of the Office of Price Administration." 328 U.S. at 588 n. 9. Similarly, in *Stern*, 225 F.
Supp. At 193-94, the government contended, and the defendant *did not dispute*, that internal
regulations of the IRS clearly established that certain internal IRS forms were "government
property not available to the public, which the defendant . . . had no right to possess." And in

6

do not address, much less resolve, the Fifth Amendment due process issues at the heart of
plaintiffs' case here, but rather merely address whether seizures (and searches) are "reasonable"
under the Fourth Amendment. This case of course is not about the seizure of evidence but
instead about the confiscation of property from private citizens.

Furthermore, defendants ignore a critical warning in *Davis,* and carefully acknowledged
in both *Stern* and *Sellers*, that *Davis* should not be read to "suggest that officers seeking to
reclaim government property may proceed lawlessly and subject to no restraints." *Davis*, 328
U.S. at 591. Unlike in *Davis, Stern* and *Sellers*, here there is a genuine dispute about who owns
the Coins. In the face of such a legal and factual dispute, the Due Process Clause demands that
defendants prove – not merely assert – their right to "reclaim" the Langbords' Coins prior to
confiscating them.

Fourth, defendants misstate the record in arguing that less process is due plaintiffs here
because plaintiffs allegedly transferred their Coins to the government "without having secured
any agreement limiting or conditioning the transfer." (Reply Mem. at 8.) Defendants cite to
none of the evidence in the record to establish this factual predicate, nor do they cite a single
legal precedent to support their argument. In fact, as we explained in our opposition
memorandum, defendants have conceded that plaintiffs' waived no rights, and therefore those
rights were no less after the transfer of the Coins than they were before the transfer. (Opp'n
Mem. at 13-16.) These undisputed facts conclusively refute and preclude the argument
defendants make in their reply, that, because of the circumstances under which the Coins were
transferred, plaintiffs are entitled to *less* due process after the transfer than they might have been
entitled to before. Indeed, endorsing defendants' argument would have the perverse result of

---

*Sellers*, 30 C.M.R. at 266, the court made clear that the challenged seizure related to
"Government records to which the United States was indisputably entitled."

affording citizens who hide contested property *more rights* than responsible citizens like the

Langbords, who voluntarily came forward and engaged in a good-faith effort to come to a

resolution of any issues with respect to disputed property.

In sum, plaintiffs have been denied fundamental aspects of due process, including the

opportunity to have the government's claimed right to confiscate the Coins tested in a hearing

before a neutral decision-maker and structured by the burden of proof imposed by CAFRA.

## II.    THE RECORD CLEARLY ESTABLISHES THAT PLAINTIFFS HAVE A PROPERTY INTEREST PROTECTED BY THE DUE PROCESS CLAUSE

As to defendants' second reply memorandum argument, the evidence put before the

Court with plaintiffs' opposition brief, and additional substantial evidence in the record in

connection with prior motions and submissions, shows that plaintiffs have more than adequately

established a property interest that is protected by the Due Process Clause.[7]

Defendants misleadingly describe the record when they argue that "plaintiffs have

admitted that they have no evidence concerning whether the 1933 Double Eagles were taken

---

[7] We note that defendants' procedural argument – that plaintiffs "failed to respond to the government's motion . . . with affidavits setting out specific facts showing a genuine issue for trial" – is disingenuous. (Reply Mem. at 9-10.) Defendants raised only a single argument in support of their motion – the existence of an imagined implied-in-fact agreement that the government would commence a forfeiture proceeding – as the basis for granting summary judgment on plaintiffs' constitutional claims. As we explained in our opposition papers, plaintiffs do not claim or intend to rely on any such agreement. There was accordingly no reason for plaintiffs to put forth facts showing a genuine disputed issue for trial, because defendants' entire motion was based on a factual assertion that plaintiffs were not advancing. Indeed, defendants themselves did not put forth the required Statement of Undisputed Facts in support of their motion, thereby preventing plaintiffs from putting in any responsive statement of material disputed facts (a problem we noted in footnote 2 of our opposition papers).

Plaintiffs will put before the Court a separate and comprehensive set of undisputed facts that support their Fifth and Fourth Amendment-based claims when they affirmatively move for summary judgment on those claims. Following the Court's recent decisions concerning motion schedules, and so the Court has all of the facts and arguments on the Fourth and Fifth Amendment before it at one time, plaintiffs expect to file for summary judgment on these particular claims by January 23.

from the . . . Mint through an authorized channel, or how they were obtained by Israel Switt."
(Reply Mem. at 10.)  The deposition excerpts to which defendants cite for this proposition state
the obvious – that Joan Langbord, who was a young child in the 1930s, and her sons David and
Roy Langbord, who had not yet been born, have no *personal knowledge* as to how the Coins left
the Mint in the 1930s or how their father/grandfather, Israel Switt, obtained them or exactly how
the Coins were first placed in the family safe deposit box.

But that does not mean, as defendants suggest, that plaintiffs therefore have no
"cognizable property interest" in the Coins and therefore no constitutional rights.  (Reply Mem.
at 3.)  While defendants note that "property interests" for purposes of constitutional analysis
arise from state law, under the law of Pennsylvania, the record establishes that plaintiffs had –
both before and after the transfer of the Coins – both ownership and possessory interests that fall
squarely within the zone of "property interests" protected by the Fifth (and Fourth) Amendment.

First, defendants once again cite no authority in making their nonsensical argument that
"no presumption of ownership arises from mere possession of disputed property."  (Reply Mem.
at 14.)   It is precisely because of situations where the ownership of property is disputed that the
common law, going back hundreds of years, has developed the presumption that possession is
*prima facie* evidence of ownership.  It is that presumption that often carries the day where, as
may turn out here, the circumstances of the original acquisition of possession are difficult or
even impossible to prove.  That is the central teaching of the law recited in *Willcox v. Stoup*, 467
F.3d 409, 413 (4th Cir. 2006) ("Where neither party can establish title by a preponderance of the
evidence, the presumption cuts the Gordian knot, determining ownership in favor of the
possessor."), cited in our opposition memorandum (at 16).  *See also id.* at 412 ("'Undoubtedly,'

noted the Supreme Court, 'if a person be found in possession . . . it is *prima facie* evidence of his ownership.' *Ricard v. Williams*, 20 U.S. (7 Wheat.) 59, 105, 5 L.Ed. 398 (1822).").

Contrary to defendants' suggestion in their reply, Pennsylvania law fully supports this presumption, even for "disputed property." *Austin v. Borough of Ligonier*, 551 A.2d 403, 404 (Pa. Commw. Ct. 1988), cited in our opposition papers but not addressed in defendants' reply, is directly on-point. The Borough of Ligonier filed a replevin claim against the widow Austin, alleging that her late husband had given a painting to the Borough in 1968 that had "hung in the Mayor's office . . . until September of 1986," when the Borough transferred the painting to the widow in response to her request to "refurbish the painting." *Id.* The widow thereafter refused to return the painting, arguing that the painting was loaned, not gifted, to the Borough. In affirming the lower court's decision in favor of the Borough, the appellate court held that the Borough's longstanding possession created a presumption of entitlement in favor of the Borough, and that, as a result, "[t]he burden of going forward with evidence to rebut this presumption then shifted to Austin." *Id.*

Here, the record establishes that the Langbord family had possession of the Coins for many years.[8] The same presumption that attached to the painting in *Austin* is therefore fully

---

[8] Israel Switt's wife, Elizabeth Switt, leased a safe deposit box at Coin Exchange National Bank, which, after a series of transfers, came to be housed at a Wachovia branch in Philadelphia. (Tirschwell Surreply Decl., Ex. 1, Joan Langbord Dep. Tr. at 113-14.) Mrs. Switt died in 1985, leaving her property to Mr. Switt and her grandsons. (Tirschwell Surreply Decl., Ex. 2.) Mr. Switt died five years later, bequeathing his entire estate to plaintiff Joan Langbord and her sons. (Tirschwell Surreply Decl., Ex. 3.) Before Mrs. Switt passed away, she gave a key to the box to her daughter, Joan Langbord, and told her that the contents of the box belonged to her. (Joan Langbord Dep. Tr. at 119, 226.) After Mrs. Switt died, Wachovia registered the box to Mrs. Langbord and her son, plaintiff Roy Langbord. (Joan Langbord Dep. Tr. at 118.) In August 2003, upon going through the contents of the box – to which only she and Mrs. Switt had access – Mrs. Langbord discovered ten 1933 Double Eagle coins that had been kept inside the box in a paper bag. (Joan Langbord Dep. Tr. at 112, 128-30, 133, 135.)

applicable to the Coins here and, along with the fact that plaintiffs' were given and inherited all of the property of Israel and Elizabeth Switt,[9] more than satisfies the requirement of showing that plaintiffs had a "cognizable property interest" protected by the Due Process Clause.

Even beyond these facts, the record developed in this case, and put before the Court in connection with prior motion papers, reflects substantial evidence that gold coins, including 1933 Double Eagles, continued to be available to the public in *authorized* ways even after President Roosevelt's actions of March 1933 – including through purchase directly from the Treasurer of the United States by mail, or in exchange for gold of equal value at the Philadelphia Mint. *See* Pls.' Mem. of L. in Opp'n to Defs.' Mot. to Dismiss and for Summ. J. (Docket No. 14) at 5-7, and exhibits cited therein. The record further establishes Israel Switt's ability to have obtained the Coins through such lawful channels and includes direct evidence that he in fact did so. *Id.*

At the very least, these historical facts and circumstances raise genuine disputed issues of material fact as to how Mr. Switt obtained the Coins in the 1930s. And it is black-letter law that "due process 'extends to property rights less substantial than full legal title. . . . Even a merely arguable right of possession constitutes property.'" *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 760 (4th Cir. 1990) (quoting *FDIC v. Morrison*, 747 F.2d 610, 614 (11th Cir. 1984)). *Accord Dixon v. Lowery*, 302 F.3d 857, 864 (8th Cir. 2002) (even where "claim to continued possession is in dispute, that possessory interest is still constitutionally protected"). *See also Fuentes*, 407 U.S. at 86-88 (due process requires a pre-deprivation hearing even where plaintiffs lacked legal title, "right to continued possession" of chattels was "in dispute," and plaintiffs may have had no "valid defenses").

---

[9] *See* note 9, *supra*; Pls.' Mem. of L. in Opp'n to Defs.' Mot. to Dismiss and for Summ. J. (Docket No. 14) at 24-25, and exhibits cited therein.

In sum, by virtue of their many years of possession of the Coins, as the recipients and heirs of the property of Israel and Elizabeth Switt, the plaintiffs have established a more than sufficient "cognizable interest" in the Coins that – even though contested by the government – was and is protected by the Fifth Amendment's Due Process Clause (as well as by the Fourth Amendment).

## CONCLUSION

For the reasons set forth above and in their initial memorandum of law in opposition to defendants' motion, plaintiffs respectfully request that the Court deny defendants' motion for partial summary judgment, or in the alternative, to compel testimony.

Dated: January 12, 2009

Respectfully submitted,

s/Barry H. Berke
Barry H. Berke
Eric A. Tirschwell
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100 (Telephone)
(212) 715-8000 (Fax)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

———————————————————— x

ROY LANGBORD, et al.,                                  :
                                                       :
                        Plaintiffs,                    :      CIVIL ACTION
                                                       :
              v.                                       :
                                                       :      No. 2:06-cv-05315 (LDD)
UNITED STATES DEPARTMENT OF THE                        :
TREASURY, et al.,                                      :
                                                       :
                        Defendants.                    :
                                                       :
                                                       :
———————————————————— x

### CERTIFICATE OF SERVICE

I, Barry H. Berke, hereby certify on this 12th day of January, 2009, that I caused a copy of Plaintiffs' Motion for Leave to File Surreply Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment on Plaintiffs' Illegal Seizure and Due Process Claims, a supporting declaration, and annexed exhibits to be placed in an official depository of the United States Postal Service, enclosed in a first class postage prepaid wrapper, addressed to:

>     Joel M. Sweet, Esq.
>     Assistant United States Attorney
>     U.S. Attorney's Office
>     615 Chestnut Street, Suite 1250
>     Philadelphia, PA 19106

I hereby further certify on this 12th day of January, 2009, that I caused a copy of the foregoing Motion for Leave to File Surreply Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment on Plaintiffs' Illegal Seizure and Due Process Claims, a supporting declaration, and annexed exhibits to be filed electronically in the Eastern District's CM/ECF system.

Dated: January 12, 2009

>                             s/Barry H. Berke
>                             BARRY H. BERKE

# EXHIBIT  B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

—————————————————— x

ROY LANGBORD, DAVID LANGBORD, and    :
JOAN LANGBORD,                       :
                                     :
              Plaintiffs,            :
                                     :    No. 2:06-cv-5315 (LDD)
              v.                     :
                                     :
UNITED STATES DEPARTMENT OF THE      :
TREASURY; UNITED STATES BUREAU OF    :    **DECLARATION OF ERIC A.**
THE MINT; HENRY M. PAULSON, JR.,     :    **TIRSCHWELL, ESQ.**
Secretary of the United States Department of the   :
Treasury; STEPHEN LARSON, Acting General   :
Counsel of the United States Department of the   :
Treasury; EDMUND C. MOY, Director of the   :
United States Mint; DANIEL P. SHAVER, Chief   :
Counsel, United States Mint; DAVID A. LEBRYK,   :
Deputy Director of the United States Mint; "JOHN   :
DOE" Nos. 1 to 10, "John Doe" being fictional first  :
and last names; and the UNITED STATES OF   :
AMERICA,                             :
                                     :
              Defendants.            :
                                     :

—————————————————— x

        ERIC A. TIRSCHWELL, Esq., pursuant to 28 U.S.C. § 1746, hereby declares as
follows:

        1.  I am a member of the firm of Kramer Levin Naftalis & Frankel LLP, counsel for

plaintiffs Roy, David, and Joan Langbord in the above-captioned matter.

        2.  I submit this Declaration to provide the Court with documents pertinent to

Plaintiffs' Motion for Leave to File a Surreply in Opposition to Defendants' Motion for

Partial Summary Judgment on Plaintiff's Illegal Seizure and Due Process Claims, as filed

herein on January 12, 2009.

3.   To the best of my knowledge, information, and belief, the exhibits to this Declaration are true and correct copies of the following documents:

4.   Exhibit 1 is a copy of excerpts from the deposition testimony of Joan Langbord, taken April 17, 2007.

5.   Exhibit 2 is a copy of the Last Will and Testament of Elizabeth Switt, executed on April 28, 1981.

6.   Exhibit 3 is a copy of the Last Will and Testament of Israel Switt, executed on April 28, 1981.


I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: January 12, 2009

Respectfully submitted,

s/Eric A. Tirschwell

Barry H. Berke
Eric A. Tirschwell
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100 (Telephone)
(212) 715-8000 (Fax)

**Exhibit 1**

Joan Langbord 

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF
 2                       PENNSYLVANIA
                         -   -   -
 3    ROY LANGBORD, DAVID       :CIVIL ACTION
      LANGBORD, and JOAN        :No. 06-5315
 4    LANGBORD,                 :
                   Plaintiffs   :
 5                              :
                   vs.          :
 6                              :
      UNITED STATES DEPARTMENT  :
 7    OF THE TREASURY; UNITED   :
      STATES BUREAU OF THE      :
 8    MINT; HENRY M. PAULSON,   :
      JR., Secretary of the     :
 9    U.S. Department of the    :
      Treasury; STEPHEN LARSON, :
10    Acting General Counsel of :
      the U.S. Department of    :
11    the Treasury; EDMUND C.   :
      MOY, Director of the      :
12    United States Mint;       :
      DANIEL P. SHAVER, Chief   :
13    Counsel, United States    :
      Mint; DAVID A. LEBRYK,    :
14    Deputy Director of the    :
      United States Mint; and   :
15    UNITED STATES OF AMERICA, :
                   Defendants   :
16                          -   -   -
                   Tuesday, April 17, 2007
17                          -   -   -
18         Oral deposition of JOAN LANGBORD,
19    taken pursuant to notice, held at the U.S.
20    Attorney's Office, 615 Chestnut Street,
21    Philadelphia, Pennsylvania, beginning at
22    approximately 10:45 a.m., before Donna M.
23    Hubert, Court Reporter-Notary Public, there
24    being present:
                            -   -   -
```

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

2

```
1   APPEARANCES:

2

3                       KRAMER LEVIN NAFTALIS &
                        FRANKEL, LLP
4                       BY:  BARRY H. BERKE,
                        ESQUIRE
5                       1177 Avenue of the Americas
                        New York, New York 10036
6                       Phone:  (212) 715-7560
                        Representing the Plaintiffs
7

8                       U.S. DEPARTMENT OF JUSTICE
                        U.S. ATTORNEY'S OFFICE
9                       BY:  JOEL SWEET, ESQUIRE
                        615 Chestnut Street, Suite
10                      1250
                        Philadelphia, Pennsylvania
11                      19106
                        Phone:  (215) 861-8470
12                      Representing the Defendants

13

14

15

16  ALSO PRESENT:   Keith M. Donoghue,
                    Representing Plaintiffs
17                  Jacqueline C. Romero,
                    Assistant United States
                    Attorney
18                  Greg M. Weinman,
                    Representing United States
19                  Mint
                    Carolyn Thompson, Paralegal
20                  Specialist
                    Colin Garry, Law Student
21

22

23

24
```

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

112

1   A.          No, not in running the store.  Of

2   buying certain pieces of merchandise that I

3   thought he paid too much money for.

4   Q.          So those were the types of

5   agreements you would have with your

6   father?

7   A.          Uh-huh.

8           MR. BERKE:  You have to say yes.

9           THE WITNESS:  Yes, I'm sorry.

10          MR. BERKE:  That's okay.

11  BY MR. SWEET:

12  Q.          Is it your testimony that you

13  never had any discussions with your father,

14  any whatsoever, concerning his involvement

15  with 1933 Double Eagles?

16  A.          Yes, sir.

17  Q.          When was the first time you saw a

18  1933 Double Eagle?

19  A.          In one of the pictures.

20  Q.          You're pointing to a stack of

21  exhibits, so I want you to not point, but

22  to remember, in your mind, not a picture,

23  but an actual 1933 Double Eagle?

24  A.          In my mind, when I found them.

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

113

1    Q.        I'm sorry?

2    A.        When I found the coins.

3    Q.        What month was that and what

4    year?

5    A.        It was in '03 when they drilled

6    my safe deposit -- the safe deposit box.

7    And I was looking for my mother's -- some

8    of my mother's jewelry to sell.  I believe

9    it -- I don't remember the date, but I

10   think -- I think it was in August of '03.

11   Q.        Why do you think it was in

12   August?

13   A.        Because there was a safe deposit

14   box of my mother's that hadn't -- that I

15   could not open, okay.

16   Q.        Why is that?

17   A.        Because -- okay.  The safe

18   deposit box was brought from -- this is how

19   it went.  They were originally -- when I --

20   was in a place called Coin Exchange

21   National Bank.  From the Coin Exchange

22   National Bank they went to Gimbel Brothers

23   Bank.  From Gimbel Brothers Bank they went

24   to 7th and Chestnut.

Joan Langbord

1          Now, that bank had changed three

2    names and then they closed that bank at 7th

3    -- excuse me, 6th and Chestnut, not 7th

4    and Chestnut.  6th and Chestnut.  And then

5    they closed that bank and they took it

6    across the street without anybody -- they

7    called you and said they're taking it again

8    across the street.

9    Q.          Across what street?

10   A.          Chestnut Street.  To 6th and

11   Chestnut.  Now it's Wachovia.  Before it

12   was Corestate or First Union.  It was I

13   don't know how many names.

14   Q.          So it went from the Public Ledger

15   Building to --

16   A.          Across the street.

17   Q.          -- north?

18   A.          Yes.

19   Q.          Okay.

20   A.          And I decided to sell my mother's

21   -- some of my mother's jewelry and I went

22   to the vault, like, a year or two before

23   and the vault was -- the -- I didn't get

24   into the vault and then all of the sudden I

Joan Langbord

118

1   open the vault again.  And they called and

2   said they made arrangements to have the

3   vaults drilled.

4   Q.        The bank made the arrangements?

5   A.        Yes, sir.

6   Q.        Now, was this a -- do you

7   remember the number of this vault, of this

8   particular safe deposit box?

9   A.        442.

10  Q.        442?

11  A.        I believe it's 442.

12  Q.        Who is it registered to?

13  A.        Me and my son, Roy.

14  Q.        Do you -- what was kept in this

15  particular safe deposit box?

16  A.        My mother's jewelry.

17  Q.        Anything else?

18  A.        I found the coins.

19  Q.        So the 1933 Double Eagles and

20  your mother's jewelry?

21  A.        Uh-huh.

22            THE COURT REPORTER:  Is that a

23  yes or no?

24            THE WITNESS:  Yes.

Joan Langbord

119

BY MR. SWEET:

Q.        Who put your mother's jewelry and
the Double Eagles into Safe Deposit Box
442?

A.        My mother -- I was never allowed
to go to the vault, my mother's boxes.  I
was told -- I had a key, I was given a key
and many years before, okay, when she had
these boxes and I was told that these boxes
were mine, okay.  I was never allowed to go
to the boxes.  I had never been in the
boxes.

        MR. BERKE:  You are talking about
when your mother was alive?

        THE WITNESS:  When my mother was
alive, I'm sorry.

BY MR. SWEET:

Q.        So it's your testimony that the
boxes were registered to you and to Roy?

A.        Before that.

Q.        This particular Box 442?

A.        Yes, yes.

Q.        It was registered to you and to
Roy?

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

1   the box, did you know what you were looking

2   for, that you intended to take out and to

3   sell?

4   A.        Sort of.

5   Q.        What was in your mind?  What were

6   you thinking of at the time that you went

7   to the box about what you were going to

8   take out and try to sell?

9   A.        Well, my mother was a big lady at

10  one time and liked big jewelry.  And she

11  had a big gold bracelet like this with a

12  cameo in it, which she liked that type of

13  jewelry.  And she had a big wrist that was

14  that big and wear it and there was a

15  necklace that went with it.  And she also

16  liked amethyst, which was her birthstone,

17  my father bought her a tremendous

18  collection of, and I knew I was never going

19  to wear it.  So that was a couple of the

20  items.  And I know she had a necklace with

21  a bug on it that I was never going to wear.

22  Q.        At that time, when they drilled

23  the holes and got you into the safe deposit

24  box, who was with you?

Joan Langbord

129

1    A.        Nobody.

2    Q.        You were by yourself?

3    A.        Yes, sir.

4    Q.        Was there a place in the bank for

5    you to sit down?

6    A.        Yes, sir.

7    Q.        Was it a private viewing room?

8    A.        Yes, sir.

9    Q.        Was there a table?

10   A.        It's -- someplace to put the box

11   on.

12   Q.        And describe what happened.

13   A.        Opened the box.

14   Q.        Speak up, please.

15   A.        Opened the box, picked out the

16   jewelry and I don't know why, I went

17   digging down and there was this gray or

18   paper bag that said John Wanamaker on it in

19   the bottom of the box, which I had never

20   gone into the box looking that much.  And I

21   picked this thing up and opened them up and

22   there was a piece of tissue paper and then

23   I saw these coins.  And I had -- I couldn't

24   even hold them in my hand.  And I took them

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

130

1  to the store.

2  Q.       When you say you couldn't hold

3  them in your hand, why not?

4  A.       Because I saw they were the -- I

5  recognized that they were the Double Eagles

6  that they had just been talking so much

7  about.

8  Q.       Were they wrapped in anything?

9  A.       They were each -- it was in a

10 paper Wanamaker bag and there was a piece

11 of tissue paper on top of it.

12 Q.       Were the coins -- each coin, were

13 they wrapped or --

14 A.       I didn't take them all out.  I

15 just looked at the top one and just took it

16 away.

17 Q.       And what did you do with them at

18 that point?

19 A.       I brought them to the store and

20 called my husband.

21 Q.       Okay.  Let's stop the story for a

22 moment.  The eight to twelve times,

23 approximately, that you went into that Safe

24 Deposit Box 442, before that day, is it

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571

Joan Langbord

133

1    noticed that bag?

2    A.        Yes, sir.

3    Q.        And you don't know who put the

4    bag in the safe deposit box?

5    A.        No, sir.

6    Q.        Who else had access to that box

7    over those years?

8    A.        Just my mother.

9    Q.        Did your father have access to

10   the box?

11   A.        No.

12   Q.        When did you receive the key in

13   the box?

14   A.        After my mother died.

15   Q.        Who --

16   A.        Excuse me, before my mother died

17   I got the keys to the box.

18   Q.        Opening that box, how did that

19   play out?  Who opened the box?

20             MR. BERKE:  Are you talking about

21   at the time it was drilled?

22   BY MR. SWEET:

23   Q.        Box 442.

24             MR. SWEET:  No.  The first time

Joan Langbord

135

1    Q.        And before she passed away she

2    gave you the key, is that your testimony?

3    A.        Yes, sir.

4    Q.        Did your father have access to

5    the box?

6    A.        Not that I know of.

7    Q.        Were there any other keys to the

8    box?

9    A.        Not that I know of.

10   Q.        Did Roy ever go into the box?

11   A.        Roy went with me.

12   Q.        When?

13   A.        At one time.

14   Q.        After you found the Double

15   Eagles?

16   A.        I don't know if it was before or

17   after.

18   Q.        What was Roy doing with you at

19   the box?

20   A.        I asked him to come with me.  I

21   don't know -- I don't remember what for.

22   Q.        Where was the box at that time,

23   which bank?

24   A.        I don't remember.  My mind is --

Joan Langbord

226

1    jewelry identified in that -- in those

2    estate papers.

3    A.          No.  No.

4    Q.          Okay.  So it's your testimony,

5    tell me if I got it wrong.

6               It's your testimony that there

7    was a safe deposit box identified as 442

8    and it was registered to you and to Roy and

9    somebody put your mother's jewelry into it,

10   but you don't know who, correct?

11   A.          I presume my mother.

12   Q.          And you didn't have a key to that

13   safe deposit box until she passed, correct?

14          MR. BERKE:  Objection.

15          THE WITNESS:  I knew where the

16   keys were and I was told -- I knew where

17   the keys were, okay.  But I was never

18   invited to go to the box.

19   BY MR. SWEET:

20   Q.          Even though it was your jewelry,

21   correct?

22   A.          That it was given to me, yes.

23   Q.          During the period after your

24   mother gave you the jewelry, was any of

Joan Langbord

362

1

2                    C E R T I F I C A T E

3

4  STATE OF NEW JERSEY

5                                      SS

6  COUNTY OF GLOUCESTER

7            I, Donna M. Hubert, Court

8  Reporter-Notary Public in and for the

9  County of Gloucester, State of New Jersey,

10 do hereby certify that the foregoing

11 testimony was taken by me in shorthand and

12 reduced to typing under my direction and

13 control, that the foregoing pages contain a

14 true and correct transcription of all the

15 testimony of said witness on April 17,

16 2007.

17

18            *Donna M. Hubert*

                DONNA M. HUBERT

19              Notary Public

                Commission

20              expires

                June 27, 2011

21

22

23

24

KAPLAN, LEAMAN AND WOLFE
(800) 295-7571