UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

—————————————————— x
ROY LANGBORD, et al.,                    :
                                         :
                Plaintiffs,              :    **ORAL ARGUMENT REQUESTED**
                                         :
        v.                               :
                                         :
UNITED STATES DEPARTMENT OF THE          :    CIVIL ACTION
TREASURY, et al.,                        :
                                         :    No. 2:06-cv-05315 (LDD)
                Defendants.              :
                                         :
—————————————————— x


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT ON PLAINTIFFS' DUE PROCESS AND ILLEGAL SEIZURE CLAIMS**

Barry H. Berke
Eric A. Tirschwell
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100 (Telephone)
(212) 715-8000 (Fax)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................i

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 4

    Background/The Fenton Case ................................................................................ 4

    The Langbords' Discovery of the Coins................................................................ 4

    Pre-Transfer Meetings with Government Officials ............................................... 5

    The Full Reservation of Rights Letter and the Transfer of the Coins .................... 7

    Post-Transfer Events............................................................................................ 9

ARGUMENT................................................................................................................... 10

I.   DEFENDANTS VIOLATED THE LANGBORD FAMILY'S FIFTH AMENDMENT
     RIGHTS BY CONFISCATING THE COINS WITHOUT AFFORDING THEM DUE
     PROCESS OF LAW................................................................................................ 11

II.  THE GOVERNMENT MUST RETURN THE COINS OR COMMENCE AND PREVAIL
     IN A CIVIL FORFEITURE ACTION ..................................................................... 16

III. DEFENDANTS' ATTEMPTS TO DEFEAT PLAINTIFFS' CONSTITUTIONAL RIGHTS
     WITH VARIOUS ARGUMENTS ARE UNAVAILING......................................... 19

IV. DEFENDANTS VIOLATED PLAINTIFFS' FOURTH AMENDMENT RIGHTS................. 23

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Latshaw*,
    164 F.3d 141 (3d Cir. 1998) ............................................. 12

*Acheampong v. United States*,
    99 No. Civ. 2169, 2000 WL 1262908 (S.D.N.Y. Sept. 5, 2000)......................... 20

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..............................................10-11

*Acadia Tech. Inc., v. United States*,
    458 F.3d 1327 (Fed. Cir. 2006) ......................................... 19

*Austin v. Borough of Ligonier*,
    551 A.2d 403 (Pa. Commw. Ct. 1988) ............................... 12

*Austin v. United States*,
    509 U.S. 602 (1993) ................................................. 18

*Bell v. Hood*,
    327 U.S. 678 (1946) ................................................. 11

*Berlanti v. Bodman*,
    780 F.2d 296 (3d Cir. 1985) ......................................... 12

*Bd. of Regents of State Colls. v. Roth*,
    408 U.S. 564 (1972) ................................................. 11

*Boyd v. United States*,
    116 U.S. 616 (1886) ................................................. 20

*Brown v. Brierley*,
    438 F.2d 954 (3d Cir. 1971) ......................................... 25

*Brown v. City of Pittsburgh*,
    186 A.2d 399 (Pa. 1962) ............................................. 21

*Brown v. Muhlenberg Twp.*,
    269 F.3d 205 (3d Cir. 2001) ......................................... 23

*Calero-Toledo v. Pearson Yacht Leasing Co.*,
    416 U.S. 633 (1974) ................................................. 11

*Davis v. United States*,
    328 U.S. 582 (1946) ................................................. 20

*Dixon v. Lowery*,
    302 F.3d 857 (8th Cir. 2002) ................................................................................. 13

*Dunbar Corp. v. Lindsey*,
    905 F.2d 754 (4th Cir. 1990) ................................................................................. 12

*Dusenbery v. United States*,
    534 U.S. 161 (2002) ............................................................................................... 11

*Elsmere Park Club, L.P. v. Town of Elsmere*,
    542 F.3d 412 (3d Cir. 2008) ..............................................................................13-14

*Fuentes v. Shevin*,
    407 U.S. 67 (1972) .......................................................................................... 13, 15

*Hugh v. Butler County Family YMCA*,
    418 F.3d 265 (3d Cir. 2005) .................................................................................. 11

*Garcia v. Meza*,
    235 F.3d 287 (7th Cir. 2000) ................................................................................. 15

*Johnson v. West*,
    No. Civ. A. PJM-03-3406, 2004 WL 4986628 (D. Md. 2004) ........................... 20

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
    341 U.S. 123 (1951) .............................................................................................. 14

*Jones v. DEA*,
    819 F. Supp. 698 (M.D. Tenn. 1993) ................................................................... 25

*Justice v. Fabey*,
    541 F. Supp. 1019 (E.D. Pa. 1982) ........................................................... 13, 14, 15

*Laviage v. Lyons*,
    No. CIV. H-92-1149, 1993 WL 207508 (S.D. Tex. Mar. 19, 1993) ................... 24

*Leitch v. Sanford Motor Truck Co.*,
    123 A. 658 (Pa. 1924) ........................................................................................... 12

*Lesher v. Reed*,
    12 F.3d 148 (8th Cir. 1994) ................................................................................... 23

*Longenette v. Krusing*,
    322 F.3d 758 (3d Cir. 2003) .................................................................................. 19

*Mantilla v. United States*,
    302 F.3d 182 (3d Cir. 2002) .................................................................................. 20

*Micklus v. Carlson*,
    632 F.2d 227 (3d Cir. 1980) ........................................................................ 11

*Petruska v. Gannon Univ.*,
    462 F.3d 294 (3d Cir. 2006) ........................................................................ 21

*Rossi v. Town of Pelham*,
    35 F. Supp. 2d 58 (D.N.H. 1997) ................................................................ 23

*Samuel J. Marranca Gen. Contracting Co. v. Amerimar Cherry Hill Assocs. Ltd. P'ship*,
    610 A.2d 499 (Pa. Super. Ct. 1992) ............................................................ 21

*Sherrock Bros. v. DaimlerChrysler Motors Co.*,
    No. 06-4767, 2008 WL 63300 (3d Cir. Jan. 7, 2008) .................................... 21

*Slocum v. Mayberry*,
    15 U.S. 1 (1817) .................................................................................... 24-25

*Soldal v. Cook County*,
    506 U.S. 56 (1992) .............................................................................. 23, 24

*United States v. Bowman*,
    341 F.3d 1228 (11th Cir. 2003) .................................................................... 2

*United States v. Charles D. Kaier Co.*,
    61 F.2d 160 (3d Cir. 1932) .......................................................................... 18

*United States v. Farrell*,
    606 F.2d 1341 (D.C. Cir. 1979) ................................................................... 17

*United States v. Giraldo*,
    45 F.3d 509 (1st Cir. 1995) ......................................................................... 15

*United States v. Howell*,
    425 F.3d 971 (11th Cir. 2005) ..................................................................... 20

*United States v. Jacobsen*,
    466 U.S. 109 (1984) ............................................................................... 23-24

*United States v. James Daniel Good Real Prop.*,
    510 U.S. 43 (1993) .............................................................................. 13, 14

*United States v. Kim*,
    738 F. Supp. 1002 (E.D. Va. 1990) .............................................................. 20

*United States v. Lane Motor Co.*,
    199 F.2d 495 (10th Cir. 1952) ................................................................. 17-18

*United States v. Lavin*,
    942 F.2d 177 (3d Cir. 1991) ............................................................ 18

*United States v. Messina*,
    507 F.2d 73 (2d Cir. 1974) .............................................................. 25

*United States v. One 1936 Model Ford V-8 De Luxe Coach*,
    307 U.S. 219 (1939) ......................................................................... 18

*United States v. Sellers*,
    30 C.M.R. 262 (C.M.A. 1961) ........................................................ 20

*United States v. Stern*,
    225 F. Supp. 187 (S.D.N.Y. 1964) ................................................. 20

*United States v. Woodall*,
    12 F.3d 791 (8th Cir. 1993) ......................................................15-16

*Vaughn v. Baldwin*,
    950 F.2d 331 (6th Cir. 1991) .......................................................... 24

*Willcox v. Stroup*,
    467 F.3d 409 (4th Cir. 2006) .......................................................... 12

*Wilson v. United States*,
    221 U.S. 361 (1911) ......................................................................... 20

## STATUTES AND RULES

5 U.S.C. § 706 ....................................................................................... 11

18 U.S.C. § 641 ..................................................................................... 19

18 U.S.C. § 981 ..................................................................................... 19

18 U.S.C. § 983 ................................................................... 3, 10, 17, 19

18 U.S.C. § 1956 ................................................................................... 19

13 Pa. Cons. Stat. Ann. § 1308 .......................................................... 21

Fed. R. Civ. P. 56 ................................................................................ 10

## PRELIMINARY STATEMENT

This case is about the government ignoring and defying its statutory and constitutional obligations when it decides to confiscate property from private citizens.  Plaintiffs, including 78-year old Joan Langbord, the owner and proprietor of a Philadelphia jewelry store, and her two sons, Roy and David Langbord, bring this action to recover ten 1933 Double Eagle $20 gold coins (hereinafter the "Coins") that were illegally and summarily confiscated by the United States government after the Langbords voluntarily disclosed that they had discovered the Coins in a family safe deposit box.

As we argue in Point I below, defendants violated plaintiffs' due process rights when they unilaterally decided to confiscate the Coins from their presumptive owners – on the mere assertion that they were "taken out of the United States Mint in an unlawful manner" – without following a procedure that would have afforded plaintiffs an opportunity to be heard and challenge the government's theory before a neutral tribunal.  Indeed, the law is clear – as we demonstrate in Point II below – that what defendants specifically were and are required to do in order to lawfully confiscate the Coins is to commence a forfeiture proceeding.  There simply is no other basis applicable here on which the government can confiscate and retain property as to which private citizens have asserted possessory and ownership interests.  Accordingly, because of the violation of plaintiffs' due process rights, defendants must return the Coins to the Langbord family unless and until the government follows the procedure required by law – *i.e.*, file and prevail in a civil forfeiture proceeding.

Starting well before and continuing throughout this litigation, the government defends its actions with the astonishing argument that by merely *asserting* – but not *proving* – that the Coins were taken out of the Mint in an unlawful manner, government officials need not commence a forfeiture proceeding, are exempt from the strictures of the Fifth and Fourth Amendments, and are

entitled to simply confiscate property that has been in the possession of the Langbord family for decades. But as we explain in Point III, none of the various and shifting arguments or inapposite and discredited case law defendants have cited to date even remotely supports this radical departure from the foundational principles of American law on which plaintiffs' claims rely. Indeed, well over a year ago, defendants themselves submitted a motion to file reply papers in which they conceded that "plaintiffs are entitled as a matter of due process to a judicial determination that they own the 1933 Double Eagles," (Defs.' Proposed Reply Mem. (Ex. A to Docket No. 21) at 12), only to reverse course in a more recent filing and claim that plaintiffs in fact are not entitled to such a judicial hearing (Defs.' Reply Mem. (Docket No. 73) at 9). And in the closest precedent on the books – the government's attempt several years ago to confiscate a single 1933 Double Eagle from British Coin dealer Stephen Fenton – the government itself proceeded by doing what plaintiffs seek to establish was required here: filing a civil judicial forfeiture complaint.

There is only one explanation for defendants' very different approach to this case: they are engaged in a tactical effort to improperly shift the burden of proof as to events that took place over 70 years ago off of the government, where CAFRA squarely and more recently placed it for judicial forfeiture proceedings, and onto the Langbord family, where it does not belong. CAFRA was "designed to rectify an unfairness to the individual vis-à-vis the government," "leveling the playing field" by "forcing the Government to prove that property is subject to forfeiture as opposed to forcing the property owner to prove that his property is *not* subject to forfeiture." *United States v. Bowman*, 341 F.3d 1228, 1236 (11th Cir. 2003) (emphasis in original). The defendants' actions in this case are a transparent attempt to reinstate the very unfairness that CAFRA was intended to eliminate and improperly flip the burden back on to the Langbord family to prove the Coins are not subject to forfeiture.

As we asserted in prior filings, and shortly will discuss more fully in plaintiffs' cross-motion for summary judgment on their CAFRA-based claims, defendants violated CAFRA by summarily confiscating the Coins and then, following receipt of plaintiffs' Claim asserting their ownership interests, refusing and failing to commence a judicial forfeiture proceeding required by 18 U.S.C. § 983(a)(3)(A). Consequently, as we will further argue, defendants are now forever barred from seeking civil forfeiture of the Coins under § 983(a)(3)(B).

But even if the Court rejects plaintiffs' CAFRA-based argument that it is simply too late for defendants to seek forfeiture of the Coins, for purposes of this motion, and contrary to what defendants continue to argue, the issue is not who would prevail *if* the government were to fulfill its legal obligation to commence a judicial forfeiture proceeding. At the core of plaintiffs' complaint is instead the much more fundamental question of whether the government is required to provide that due process in the first place. This central claim does not raise, much less require resolution of, the disputed issues that have occupied much of defendants' motion papers to date, such as how the Coins left the Mint in or around 1933, the actions of plaintiffs' father and grandfather, the late Israel Switt, and how the plaintiffs came to possess and own the coins. Those issues will be decided – to the extent relevant – only if and when the government is allowed and/or ordered to commence a proper forfeiture proceeding and afford plaintiffs the process to which they are entitled.

In this motion for partial summary judgment we demonstrate that plaintiffs' Fifth and Fourth Amendment rights were violated and that, on the basis of undisputed facts in the record, plaintiffs should prevail on their Fourth and Fifth Causes of Action (under the Fifth and Fourth Amendments, respectively), as well as on that portion of their Second Cause of Action that seeks relief under the Administrative Procedures Act ("APA") for violating these same constitutional provisions. As a result of these violations (we address the Fourth Amendment violation in Point

IV, below), defendants should be ordered to return the Coins to plaintiffs unless or until they commence (and then prevail in) a judicial forfeiture proceeding. In a cross-motion to be filed on January 30, we will make the separate but related arguments that plaintiffs are entitled to summary judgment on their CAFRA-based claims, including a finding that defendants are forever barred from bringing any further proceedings to forfeit the Coins.

## STATEMENT OF FACTS[1]

**Background/The Fenton Case**

In the mid-1990s, federal agents seized a 1933 Double Eagle coin from Mr. Stephen Fenton and attempted to forfeit it through a civil judicial forfeiture proceeding commenced by the government in federal court in New York; however, the government eventually dropped its legal claim and agreed to auction the coin and split the $7.59 million in proceeds between the coin's owner, Mr. Fenton, and the United States. (Tirschwell Decl., Ex. A; Tirschwell Decl., Ex. B.)

**The Langbords' Discovery of the Coins**

In 2003, Joan Langbord discovered ten 1933 Double Eagle gold coins (the "Coins") in a safe deposit box that had been in her family for many years, among property that had belonged to her parents. *See* Deposition Transcript of Joan Langbord ("J. Langbord Tr.") at 112-122, 128-130,

---

[1] This Statement of Facts is in large part identical to the Counter-Statement of Facts set forth in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment on Plaintiffs' Illegal Seizure and Due Process Claims (Docket No. 66), but is set out here in full, with some additions, so that the factual record is before the Court in connection with this motion. The sub-universe of facts that are material to the Court's resolution of this motion are separately set forth in Plaintiffs' Statement of Undisputed Facts, filed herewith.

Deposition transcripts of the relevant witnesses have previously been filed with the Court in connection with other motions. *See* Docket Nos. 14 (Joan Langbord), 60 (Barry Berke), 66 (Hugh Dunleavy, Roy Langbord, Daniel P. Shaver, and Greg M. Weinman), and 76 (Joan Langbord). So as not to unnecessarily clog the docket, in lieu of re-filing those transcripts, we will be delivering to the Court's chambers a courtesy copy of a complete bound set of all the cited deposition transcripts along with the courtesy copy of these motion papers. Citations to deposition transcripts will be to the name of the deponent and the page number.

132-33, 153-54, 215-16, 223-26, 229-233, 344-46; Deposition Transcript of Roy Langbord ("R. Langbord Tr.") at 104-05.[2]  Mindful of the prior litigation and settlement arising from the government's seizure and later auctioning of Stephen Fenton's 1933 Double Eagle, the Langbord family's response to this extraordinary discovery was to first consult with counsel – ultimately, Mr. Berke, who had represented Mr. Fenton.  Through Mr. Berke, the Langbord family voluntarily alerted the United States Mint to the family's possession of the Coins and attempted to reach an amicable resolution of any issues that might be raised by the Mint.  (R. Langbord Tr. at 162-65; 203-05; Compl. ¶ 5.)

**Pre-Transfer Meetings with Government Officials**

The first meeting between Mr. Berke and the U.S. Mint's Chief Counsel, Daniel Shaver, and Senior Legal Counsel, Greg Weinman, took place on August 25, 2004.  It is undisputed that Mr. Berke disclosed at this meeting that he had a new client with ten 1933 Double Eagles, raised the issue of whether there might be a settlement or resolution with respect to these Coins, referenced the Fenton case and all of the time and energy that had been spent before that case ultimately settled, suggested that a resolution might be easier in the current situation because there were multiple Coins, and asked whether the Mint would be interested in discussing a possible settlement or resolution.[3]  There is no dispute that Mr. Shaver answered Mr. Berke's question in

---

[2] *The details surrounding the safe deposit box are not material to the resolution of this motion except insofar as they establish without question that the Coins were found in a safe deposit box belonging to plaintiffs' family, that box was under Joan Langbord's control for many years, and plaintiffs are the sole ultimate named beneficiaries under the wills of Israel and Elizabeth Switt. (Deposition Transcript of Joan Langbord at 112-13, 119, 226, 128-30, 133, 135; R. Langbord Tr. at 117-18; Tirschwell Decl., Ex. C; Tirschwell Decl., Ex. D.)*

[3] *See* Deposition Transcript of Daniel P. Shaver ("Shaver Tr.") at 95-96; Deposition of Barry Berke ("Berke Tr.") at 80-81, 96-97; *see also* Deposition Transcript of Greg M. Weinman ("Weinman Tr.") at 32-35.

the affirmative, stating that the Mint "would be willing to discuss the matter."[4]  It also is undisputed that toward the end of this first meeting, Mr. Shaver broached the subject of the government taking possession of the Coins in order to authenticate them and Mr. Berke responded that this would not be a problem, but made clear that plaintiffs would want to preserve all of their rights.  (Shaver Tr. at 89-90, 97; Weinman Tr. at 42-43; Berke Tr. at 82-83.)  There is no dispute that at no point during this first meeting did either Mr. Shaver or Mr. Weinman say in words or substance that if plaintiffs turned over the Coins so the government could authenticate them, they would be surrendering any rights or that the government would keep the Coins and/or would refuse to negotiate or to commence a legal proceeding.  (Weinman Tr. at 39-40, 45-46.)

The second meeting between Mr. Berke and the government took place at the Secret Service's offices in Brooklyn, N.Y., on September 15, 2004.  Messrs. Shaver and Weinman were present, along with two Secret Service agents – the case agent and squad supervisor Hugh Dunleavy.  *See* Deposition Transcript of Hugh Dunleavy ("Dunleavy Tr.") at 19, 38-39.  At this meeting, Mr. Berke revealed the plaintiffs' identities and the location of the Coins, and the parties also discussed the logistics of transferring the Coins from the plaintiffs to the government.  (Shaver Tr. at 57-59; Weinman Tr. at 49-50; Berke Tr. at 111-13.)  Several additional and important aspects of this second meeting are not in material dispute.  First, Mr. Berke repeated what he had said at the first meeting:  that in connection with the transfer of the Coins for authentication, plaintiffs would be reserving all of their rights.  (Shaver Tr. at 62-63; Berke Tr. at 112.)  Second, nobody from the government said to Mr. Berke, in words or substance, that plaintiffs could not, or the government would not allow them to, reserve all of their rights.  (Weinman Tr. at 56-57; *see*

---

[4] Shaver Tr. at 96-97; *see also* Berke Tr. at 82; Weinman Tr. at 33-35 (we communicated that we were "amenable to a discussion" of the possibility of "some type of . . . agreement").

*also* Dunleavy Tr. at 57-58.)  Third, Mr. Berke also was not told that the government was no longer

open to discussing some sort of resolution or settlement.  (Weinman Tr. at 68-69.)  Fourth, no one

from the government told Mr. Berke that by transferring the Coins or allowing for their

authentication, the government would argue that plaintiffs would be waiving or giving up any

rights they had to the Coins or that the government would simply keep them.  (Shaver Tr. at 64-65;

Weinman Tr. at 54-55; Dunleavy Tr. at 56-57.)  Lastly, one of the Secret Service agents raised the

issue of whether plaintiffs would waive venue, (Dunleavy Tr. at 47-49; Weinman Tr. at 57; Berke

Tr. at 112), and Mr. Berke stated that his clients would be prepared to do so.  (Shaver Tr. at 65-

66.)[5]

**The Full Reservation of Rights Letter and the Transfer of the Coins**

   Plaintiffs' pre-transfer full reservation of rights letter to the government dated

September 21, 2004 reads as follows:

   I write on behalf of the Langbord family regarding their ownership of ten 1933
Double Eagle Coins (the "Coins").  At the request of the United States Mint, Roy
Langbord will make the Coins available to the government on Wednesday,
September 22, 2004 based on our understanding that the government will test the
Coins for authenticity and secure the Coins while we discuss a possible resolution
of the issues relating to the Coins.

   This agreement to make available the Coins as described above is without
prejudice to all of my clients' rights and remedies existing at law, in equity, or
otherwise.  We specifically reserve all rights and remedies with respect to the Coins.

(Tirschwell Decl., Ex. E.)

---

[5] While the parties to this conversation expressed differing views about how the reference to
"venue" was or should have been understood, the parties' subjective beliefs or understandings are
not material to this motion.  In any event, Special Agent Dunleavy agreed that an entry in his
handwritten notes from the day of the meeting with Mr. Berke that reads "take possession in
Philadelphia have client/attorney consent to venue in SDNY" reflected the government's desire to
obtain" consent to venue for a legal proceeding in the Southern District of New York."  (Dunleavy
Tr. at 115-16; *see also* Berke Tr. at 131 ("my understanding of the words that they used was that
they were seeking a waiver of venue for a forfeiture proceeding against the '33 Double Eagles").)

The record is undisputed that the government received and read the letter on September 21 (the day before the transfer)[6] and then orally confirmed having done so when Messrs. Shaver and Weinman met in person with Mr. Berke prior to the Coins' transfer on the morning of September 22. (Weinman Tr. at 70-77; Berke Tr. at 176-77.) It is also undisputed that, prior to the transfer and for months thereafter, nobody from the government ever took issue with or otherwise responded in any way to Mr. Berke's reservation-of-rights letter, whether orally or in writing, other than acknowledging having received it. (Shaver Tr. at 44-45, 83-86; Weinman Tr. at 76-77.) On September 22, after confirmation was given that the government had received the full reservation of rights letter, the Coins were transferred from the plaintiffs to the defendants with the understanding that the next step would be authentication and continuation of discussions about a possible resolution. (R. Langbord Tr. at 187, 205; Dunleavy Tr. at 86 ("He [Roy Langbord] gave them to me for authentication and so forth."); *id.* at 30 (Mr. Langbord "was going to surrender the coins to us for subsequent analysis [and] authentication").) It also is undisputed that at no point prior to the transfer did anybody from the government ever say to Mr. Berke that if his clients turned over the Coins so the government could authenticate them, the government would argue that they would be giving up any or all rights they might have. (Shaver Tr. at 64-65.)[7]

Summing up what had transpired in connection with the transfer of the Coins, plaintiff Roy

---

[6] It was sent at 1:13 p.m. (Shaver Tr. at 41.)

[7] Contemporaneous internal Secret Service reports reflect that law enforcement officials believed that the Coins had been "seized" on September 22, 2004. *See, e.g.*, Tirschwell Decl., Ex. F at 1 ("NOTIFICATION OF CONTRABAND SEIZURE," including numerous references to the "seized" Coins); *id.* at 8 (Certified Inventory of Evidence reflecting ten 1933 Double Eagle coins that "were seized" by Special Agents on September 22, 2004). Special Agent Dunleavy similarly testified that on September 22 he took the Coins "on behalf of the government and *seized them* on behalf of the government." (Dunleavy Tr. at 86-87 (emphasis added) (also claiming the Coins were, prior to seizure, "surrendered to us").)

Langbord recounted what he told the other members of his family:

> . . . I discussed with my family, as I said, my understanding, which was we were providing the coins to the government for authentication, that we would attempt to amicably resolve the case, and that if we didn't, we would – we had maintained all our rights. We were no worse off than before. And that we would be back . . . we would be in court in a litigation like the first time [referring to the Fenton case].

(R. Langbord Tr. at 205; *see also id.* at 194-95; *id.* at 198-200.)[8]

**Post-Transfer Events**

In December 2004, attorneys representing a number of law enforcement agencies met to discuss the Langbords' 1933 Double Eagles, including the United States Mint, United States Attorney for the District of Columbia, the Treasury Executive Office for Asset Forfeiture, and the United States Secret Service. As reflected in a Memorandum summarizing the meeting and addressed to the then-Assistant Secretary of the Treasury, "[a]ll the agencies involved, with the exception of the US Mint, are in favor of pursuing forfeiture." (Tirschwell Decl., Ex. G.) The Mint took a different position, arguing that "the coins are government property and should be returned without the need for forfeiture." (*Id.*)

During the period between September 2004 and May 2005, Messrs. Shaver and Weinman updated Mr. Berke about the different difficulties that were delaying the authentication process. (Shaver Tr. at 100-02; Berke Tr. at 188-91.) In May 2005 – some eight months after transfer of the

---

[8] Although the understanding of plaintiffs and plaintiffs' counsel as to what would occur if the Coins were authenticated, but no settlement could be reached, is not material to resolution of this motion, we note that Mr. Berke's testimony on this issue is completely consistent with Mr. Langbord's understanding – *i.e.*, he understood and believed that in the absence of a resolution, the parties would be in litigation. *See, e.g.*, Berke Tr. at 121-23 ("the basis for our discussion was that if we did not reach an agreement there would be a forfeiture proceeding related to the Coins"); *id.* at 161-62, 181-82, 184. Mr. Berke also testified, fully consistent with the record set out above, that "the understanding was, that all of [the Langbords'] rights would be preserved as they existed prior to the transfer." *Id.* at 247-48.

Coins – the Mint ultimately determined that the Coins were in fact authentic 1933 Double Eagles. (Weinman Tr. at 80-82, 87.)  At a meeting in Washington, D.C. in June 2005, Messrs. Shaver and Weinman informed Mr. Berke of this determination.  (Weinman Tr. at 87.)  They also told Mr. Berke that the government would not offer any kind of monetary settlement to the Langbord family.  (Weinman Tr. at 88-89; Berke Tr. at 208-09.)

On August 10, 2005, Mr. Shaver provided written notice to the plaintiffs that the Mint had determined that forfeiture proceedings were "entirely unnecessary" and advising that the Mint would retain the Coins because, the Mint asserted, the Coins "were never lawfully issued but, instead, were taken out of the United States Mint at Philadelphia in an unlawful manner." (Tirschwell Decl., Ex. H.)  In response to this written notice, the Langbord family on September 9, 2005 filed a verified claim pursuant to CAFRA, 18 U.S.C. § 983(a)(2), re-stating their ownership interest in the Coins.  (Tirschwell Decl., Ex. I.)  On  December 5, 2005, exactly eighty-seven days later – just within the ninety-day window allowed under CAFRA (18 U.S.C. § 983(a)(3)) for the government to either return the property or file a forfeiture action – Mr. Shaver sent a second letter to the plaintiffs advising that the government was "returning" plaintiffs' claim "without action." (Compl. ¶ 74; Tirschwell Decl., Ex. J.)

In May 2006, as a prerequisite to bringing tort claims for replevin and conversion under the Federal Torts Claim Act, plaintiffs submitted to the defendants a Claim for Damage pursuant to 28 C.F.R. § 14.2.  (Tirschwell Decl., Ex. K.)  Following some additional correspondence, (Tirschwell Decl., Ex. L; Tirschwell Decl., Ex. M), that claim was summarily rejected.  (Tirschwell Decl., Ex. N.)  The Langbord family then promptly filed this lawsuit.

## **ARGUMENT**

The standards for granting summary judgment are of course well known to this Court and we do not repeat them in detail here.  *See* Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 250 (1986); *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 266-67 (3d Cir. 2005).

By virtue of its federal question jurisdiction under 28 U.S.C. § 1331 and its inherent equitable powers, this Court is empowered to enjoin violations of plaintiffs' Fifth and Fourth Amendment rights. *Bell v. Hood*, 327 U.S. 678, 684 (1946) (confirming "established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution"); *Micklus v. Carlson*, 632 F.2d 227, 239-40 (3d Cir. 1980) (explicitly applying reasoning of *Bell* to Fifth Amendment in context of federal action).

The APA complements the Court's inherent equitable powers to vindicate plaintiffs' rights under the Fifth and Fourth Amendments, directing that the court "shall . . . hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2). *See also* 5 U.S.C. § 706(1) ("reviewing court shall . . . compel agency action unlawfully withheld").

As we now explain, based on the clear law and undisputed facts, plaintiffs are entitled to summary judgment on their Fifth and Fourth Amendment-based claims – both the direct claims (Fourth and Fifth Causes of Action) and the claim under the APA (Second Cause of Action).

## I.    DEFENDANTS VIOLATED THE LANGBORD FAMILY'S FIFTH AMENDMENT RIGHTS BY CONFISCATING THE COINS WITHOUT AFFORDING THEM DUE PROCESS OF LAW

A few basic principles of due process provide the foundation for plaintiffs' Fifth Amendment-based claims here.[9] <u>First</u>, the Supreme Court has made it clear that "property interests protected by procedural due process extend" to and "well beyond actual ownership of real estate, chattels, or money." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571-72 (1972).

---

[9] The Fifth and Fourteenth Amendments afford equivalent protection against deprivations of property without due process of law, the distinction between the two being their application to federal and state officials, respectively. *Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 633, 668 n.5 (1974). Accordingly, we cite here cases decided under both Amendments.

*Accord Abbott v. Latshaw*, 164 F.3d 141, 146 & n.2 (3d Cir. 1998) ("deprivation of a possessory interest alone invokes the right to procedural due process"); *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 760 (4th Cir. 1990) ("due process 'extends to property rights less substantial than full legal title. . . . Even a merely arguable right of possession constitutes property'").

Second, "[p]roperty interests," in the constitutional sense, are "created and defined by state law." *Berlanti v. Bodman*, 780 F.2d 296, 299 (3d Cir. 1985). Third, under Pennsylvania law, possession is *prima facie* evidence of ownership. *Leitch v. Sanford Motor Truck Co.*, 123 A. 658 (Pa. 1924), even for "disputed property." *Austin v. Borough of Ligonier*, 551 A.2d 403, 404 (Pa. Commw. Ct. 1988). In *Austin*, the Borough of Ligonier filed a replevin claim against the widow Austin, alleging that her late husband had given a painting to the Borough in 1968 that had "hung in the Mayor's office . . . until September of 1986," when the Borough transferred the painting to the widow in response to her request to "refurbish the painting." *Id.* The widow thereafter refused to return the painting, arguing that the painting was loaned, not gifted, to the Borough. In affirming the lower court's decision in favor of the Borough, the appellate court held that the Borough's longstanding possession created a presumption of entitlement in favor of the Borough, and that, as a result, "[t]he burden of going forward with evidence to rebut this presumption then shifted to Austin." *Id.*[10]

---

[10] As previously argued, in the closely analogous case of *Willcox v. Stroup*, 467 F.3d 409 (4th Cir. 2006), the Fourth Circuit emphasized that this rule – "that 'actual possession is, prima facie, evidence of a legal title in the possessor'" – "has been a feature of American law almost since its inception" and "applies across the law of personal property." *Id.* at 412 (quoting Blackstone's *Commentaries*). It is this presumption that often carries the day where, as may turn out here, the circumstances of the original acquisition of possession are difficult or even impossible to prove. *See id.* at 413 ("Where neither party can establish title by a preponderance of the evidence, the presumption cuts the Gordian knot, determining ownership in favor of the possessor."); *see also id.* at 412 ("'Undoubtedly,' noted the Supreme Court, 'if a person be found in possession . . . it is *prima facie* evidence of his ownership.' *Ricard v. Williams*, 20 U.S. (7 Wheat.) 59, 105, 5 L.Ed. 398 (1822).").

Here, the record establishes that the Langbord family had possession of the Coins for many years. The same presumption that attached to the painting in *Austin* is therefore fully applicable to the Coins here and, along with the undisputed facts that the Coins were found in a family safe deposit box and that plaintiffs are the sole ultimate named beneficiaries under the wills of Israel and Elizabeth Switt, more than satisfies the requirement of showing that plaintiffs had a "cognizable property interest" protected by the Due Process Clause. *See* Statement of Undisputed Material Facts ¶¶ 4-10.

Fourth, "[t]he fact that a possessor's claim of ownership may be disputed does not negate the existence of a property interest or his right to procedural safeguards mandated by the Fourteenth Amendment." *Justice v. Fabey*, 541 F. Supp. 1019, 1022-23 (E.D. Pa. 1982) (Pollak, J.), (citing *Fuentes v. Shevin*, 407 U.S. 67, 86-88 (1972) (explaining that "[t]he Fourteenth Amendment's protection of 'property' . . . has never been interpreted to safeguard only the rights of undisputed ownership"; "[r]ather, it has been read broadly to extend to 'any significant property interest'"; and holding that Due Process applies even where plaintiffs lacked legal title, "right to continued possession" of chattels was "in dispute," and plaintiffs may have had no "valid defenses") (citations omitted)). *Accord Dixon v. Lowery*, 302 F.3d 857, 864 (8th Cir. 2002) (even where "claim to continued possession is in dispute, that possessory interest is still constitutionally protected").

Fifth, where there is a protected property interest, and absent exigent circumstances not present here, due process demands, at a minimum, that "individuals must receive notice and an opportunity to be heard *before* the Government deprives them of property," *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993) (emphasis added), *i.e.*, there must be a pre-deprivation "informed evaluation by a neutral official" that "provide[s] a real test" of the strength of the competing claims, *Fuentes*, 407 U.S. at 83, 97. *Accord Elsmere Park Club, L.P. v. Town of*

*Elsmere*, 542 F.3d 412, 417 (3d Cir. 2008) (absent "exceptional circumstances," the government must provide a hearing "before the Government deprives a person of his property."). "The purpose of an adversary hearing is to ensure the requisite neutrality that must inform all governmental decisionmaking." *James Daniel*, 510 U.S. at 55. "That protection is of particular importance here, where the Government has a direct pecuniary interest in the outcome of the proceeding." *Id.* at 55-56. As Justice Frankfurter long ago observed, "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170-72 (1951) (concurring opinion), quoted in *James Daniel*, 510 U.S. at 55. And as we pointed out in prior papers, in apparent recognition of this fundamental law, defendants themselves *conceded* in an earlier filing that "plaintiffs are entitled as a matter of due process to a judicial determination of their claim that they own the 1933 Double Eagles." (Defs.' Proposed Reply Mem. (Ex. A to Docket No. 21) at 12.)[11]

Judge Pollak's decision in *Justice v. Fabey* is instructive. In that case, a truck was first seized in a police raid as stolen property, then sold by the police to a shop called Zappone Brothers, and then purchased by the plaintiff from Zappone. *Justice*, 541 F. Supp. at 1021. After learning of the identity of the original owner five years later, and without affording any hearing, the police seized the truck from the plaintiff and returned it to its original owner. *Id.* The police defendants argued that because the plaintiff was not the "true owner" of the vehicle, he had no property right protected by the due process clause. *Id.* Rejecting that position, Judge Pollak explained that just

---

[11] In this same proposed reply, defendants argued that the process due plaintiffs was "resolution of their replevin claim." (*Id.*) But as we also explained in our prior papers, such an after-the-deprivation hearing plainly does not pass constitutional muster in the absence of exigent circumstances not present here. *See* Pls.' Surreply Mem. (Docket No. 76) at 3 n.2. Further, by selectively focusing only on Plaintiffs' replevin claims and asserting they are the only claims necessary to be adjudicated to satisfy Plaintiffs' due process rights, the Government is attempting to improperly shift the burden of proof as established under CAFRA, as discussed below.

because "a possessor's claim of ownership may be disputed" – and even if, as a matter of

Pennsylvania law, plaintiff could not have obtained good title to the stolen car – that did "negate

the existence of a property interest or his right to procedural safeguards mandated by the

Fourteenth Amendment." *Id.* at 1022.

Judge Pollak went on to "look to the law of Pennsylvania to determine the nature of

plaintiff's interest in the truck." *Id.* at 1022. Applying the "settled" law "in Pennsylvania that

possession of a chattel is deemed to be prima facie evidence of ownership," and noting that

plaintiff had "enjoyed undisturbed possession of the truck for almost five years," he concluded:

> Therefore, in light of Pennsylvania law which attaches a presumption
> of entitlement to one in possession, and the broad protection afforded
> by the Fourteenth Amendment, I find that plaintiff's complaint
> alleges facts constituting a property interest in the truck sufficient to
> impose upon government officials a due process obligation not to
> terminate plaintiff's possession of the truck without according him a
> hearing to adjudicate his claim of ownership.

*Id.* at 1023.[12]

---

[12] Defendants previously argued that this decision is distinguishable in part because Fabey's automobile was seized by the police whereas the Coins here allegedly were "voluntarily relinquished." But as we have explained before and do so again below, plaintiffs fully reserved all of their rights in connection with the transfer of the Coins, and so their rights to due process were no less after the transfer than they were before. *See infra* at 21. Nor is *Justice* distinguishable on the ground that the plaintiff there had a stronger claim to title to the car than the Langbords do to the Coins; in fact, Judge Pollak found that Fabey had no certificate of title and it was unlikely, as a matter of Pennsylvania law, that he could have obtained good title to the stolen car even as a bona fide purchaser for value. *Id.* at 1022.

Judge Pollak went on to find that a prompt post-deprivation hearing would satisfy due process because property of the kind at issue – an automobile – "can be easily removed from the jurisdiction or concealed" and thus "it is possible that a notice and hearing prior to the seizure would have resulted in frustration of the City's affirmative obligation to return the vehicle promptly to its titleholder." *Id.* at 1024. Of course here, with the Coins secure in the government's possession following the all-rights-reserved-limited-purpose-transfer, no such concerns or other exigency could excuse the failure to afford plaintiffs a *pre-deprivation* hearing.

Here too, having established a constitutionally protected "property interest" as explained above, and notwithstanding defendants' contention that the Coins belong to the government, there can be little doubt that as a matter of due process, plaintiffs were entitled to – but have never been afforded – an "informed evaluation by a neutral official" that "provide[s] a real test" of the strength of the competing claims. *Fuentes*, 407 U.S. at 83, 97. By confiscating the Coins as the alleged fruit of crime without affording them such a hearing, defendants have deprived the Langbords of property without the process that the Supreme Court (as well as Congress) has defined as due. Defendants have thus violated the Fifth Amendment.[13]

## II.    THE GOVERNMENT MUST RETURN THE COINS OR COMMENCE AND PREVAIL IN A CIVIL FORFEITURE ACTION

Having established that defendants confiscated the Coins without due process of law in violation of plaintiffs' Fifth Amendment rights, the remedy is clear: the defendants must return the Coins unless and until they afford plaintiffs the process to which they are due. *See, e.g.*, *Garcia v. Meza*, 235 F.3d 287, 292 (7th Cir. 2000) (where due process requirements were not met, "the district court must set aside the forfeiture declaration and order the government to either return the money to the plaintiffs or to commence judicial forfeiture"); *United States v. Giraldo*, 45 F.3d 509, 512 (1st Cir. 1995) (because claimant was denied due process, court of appeals directed district court to "set aside the declaration of forfeiture and order the Customs Service to return the money to Giraldo or to begin judicial forfeiture"); *United States v. Woodall*, 12 F.3d 791, 795 (8th Cir. 1993) (administrative forfeiture was void because of Fifth Amendment violation; district court

---

[13] As we noted in our surreply papers, while there are disputed issues of fact as to how the Coins came out of the Mint in the 1930s (Pls.' Surreply Mem. (Docket No. 76) at 11), these disputes are not material to the constitutional claims at issue on this motion; to the contrary, as just noted, the fact that the circumstances surrounding competing claims of ownership are disputed is the very reason why the Fifth and Fourth Amendments (and CAFRA) erect protections that must be honored prior to the government confiscating property from private citizens.

instructed to set aside the forfeiture declaration and order agency to either to return claimant's property or commence judicial forfeiture).

As we will argue in our forthcoming cross-motion on plaintiffs' CAFRA claims, in fact it is now too late for the government to attempt to follow the proper and required procedures in order to forfeit the Coins. This is because, in the summer of 2005, the government effected an administrative forfeiture, but then failed to meet CAFRA's strict deadlines for commencing a forfeiture proceeding. 18 U.S.C. § 983((a)(3)(A). As a result, CAFRA's "death penalty" provision bars any further action by the government to forfeit the Coins. § 983(a)(3)(B). But even if the Court rejects this argument, the fact remains that in all events as a matter of due process, a forfeiture action by the Government is required, and in order to retain possession of the Coins, defendants must thereafter make their case in front of a neutral fact-finder and prevail in such an action.

One of the bedrock principles enshrined in the Constitution and enforced through the case law and statutes is that forfeiture and confiscation of property from private citizens can only be effectuated where a forfeiture statute explicitly and affirmatively authorizes the government to so act; there simply is no common law right to forfeit property. As two former Justice Department attorneys aptly summarized, "in this country property may only be forfeited if its forfeiture is specifically authorized by statute." Arthur W. Leach & John G. Malcolm, *Criminal Forfeiture: An Appropriate Solution to the Civil Forfeiture Debate*, 10 Ga. St. U. L. Rev. 241, 241 (1994) (citing *United States v. Farrell*, 606 F.2d 1341, 1345-46 (D.C. Cir. 1979) (rejecting argument that "the Government has an inherent right to confiscate property that is not covered by a forfeiture statute merely because it was an instrumentality of crime"); *United States v. Lane Motor Co.*, 199 F.2d 495, 497 (10th Cir. 1952) ("Proceedings of this kind instituted by the United States for the forfeiture of property are essentially statutory proceedings, and they cannot be maintained unless

authorized by an applicable statute."); *United States v. Charles D. Kaier Co.*, 61 F.2d 160, 162 (3d Cir. 1932) ("The power to condemn or to declare a forfeiture must be found in the statutes . . . .")).

Indeed, the Secret Service's Asset Forfeiture Manual, produced in this very case, similarly explains: "There are no federal common law forfeiture provisions. Unless a statute specifically provides for forfeiture, there is no means of forfeiting property." (Tirschwell Decl., Ex. O at 357.) The Asset Forfeiture Manual reflects the Supreme Court's account of how forfeiture law developed in this country: "Three kinds of forfeiture were established in England at the time the Eighth Amendment was ratified in the United States: deodand, forfeiture upon conviction for a felony or treason, and statutory forfeiture. . . . Of England's three kinds of forfeiture, only the third took hold in the United States." *Austin v. United States*, 509 U.S. 602, 611-13 (1993). More generally, it is "a hoary maxim that 'the law abhors a forfeiture," *United States v. Lavin*, 942 F.2d 177, 182 (3d Cir. 1991), and the Supreme Court has long held that "[f]orfeitures are not favored; they should be enforced only when within both letter and spirit of the law." *United States v. One 1936 Model Ford V-8 De Luxe Coach*, 307 U.S. 219, 226 (1939).

That a forfeiture proceeding is required if the defendants seek to confiscate and retain the Coins is of course underscored by the considered determination by three of the four government agencies that met in December 2004 – including the U.S. Attorney's Office for the District of Columbia, the Treasury Executive Office for Asset Forfeiture, and the United States Secret Service – and concluded that a forfeiture proceeding was the proper way to proceed in this very case. *See* Statement of Facts, *supra* at 9. These agencies, with far more experience in forfeiting property than defendant United States Mint, no doubt were aware of the fact – reflected most clearly in the Secret Service manual quoted above – that absent specific statutory authorization, confiscation and forfeiture simply are not authorized under American law. They also no doubt were cognizant of the fact that in the closest precedent, the Fenton litigation, the government commenced a judicial

18

forfeiture proceeding in federal court seeking "the forfeiture of all right, title and interest" in the 1933 Double Eagle at issue in that case.  (Tirschwell Decl., Ex. P.)

Accordingly, because there is no common law of forfeiture and forfeiture is permitted only to the extent expressly authorized by Congress, unless and until the government (if permitted by this Court) commences a civil forfeiture proceeding pursuant to a statute that would authorize forfeiture of the Coins (such as the statutory provisions expressly providing for forfeiture of stolen government property[14]), the Coins remain the property of and must be returned to the plaintiffs, from whom they were unlawfully confiscated without due process of law.  *See Acadia Tech. Inc. v. United States*, 458 F.3d 1327, 1333-34 (Fed. Cir. 2006) ("Following the seizure of property, the owner of the property has a due process right to have the government either return the property or initiate forfeiture proceedings without unreasonable delay."); *Longenette v. Krusing*, 322 F.3d 758, 766 (3d Cir. 2003) (where "administrative forfeiture is voidable, the proper remedy is to vacate the forfeiture and restore the prior situation . . . and the matter would be referred to the local United States Attorney for judicial forfeiture").[15]

## III.   DEFENDANTS' ATTEMPTS TO DEFEAT PLAINTIFFS' CONSTITUTIONAL RIGHTS WITH VARIOUS ARGUMENTS ARE UNAVAILING

In their various memoranda of law filed to date, defendants have wheeled out a range of arguments, and have even changed their own position, in an attempt to avoid and evade the

---

[14] Title 18 of the United States Code specifically contemplates forfeiture of "property of any kind obtained directly or indirectly, as the result of" the theft or conversion of any "thing of value of the United States."  *See* 18 U.S.C. §§ 641, 981(a)(1)(C) and 1956(c)(7).  The same Secret Service manual quoted above specifically recognizes that 18 U.S.C. § 981 authorizes forfeiture of property obtained in violation of, among other statutes, 18 U.S.C. § 641.  (Tirschwell Decl., Ex. O at 359-60.)

[15] If and when such a forfeiture proceeding is allowed and commenced, there can be no doubt that CAFRA's placement of the burden of proof on the government – which broadly controls "a suit or action brought under *any* civil forfeiture statute for the civil forfeiture of *any* property" – must and will apply.  18 U.S.C. § 983(c) (emphasis added).

strictures of the Fifth (and Fourth) Amendment and to misdirect this Court from the plain and simple circumstances underlying this dispute. None of these arguments has any merit. To avoid burdening the Court with unnecessary repetitive briefing, in this submission we summarize and incorporate by reference our prior responses to these various arguments.

First, as we previously explained, the cases defendants have cited in support of the alleged notion that less process is due when the government seeks to recover its own property establish no such thing, are factually inapposite, do not even purport to address Fifth Amendment issues, and have in material respects been long discredited. *See* Pls.' Surreply Mem. (Docket No. 76) at 5-7 (addressing *Wilson v. United States*, 221 U.S. 361 (1911), *Boyd v. United States*, 116 U.S. 616 (1886), *Davis v. United States*, 328 U.S. 582 (1946), *United States v. Stern*, 225 F. Supp. 187 (S.D.N.Y. 1964), and *United States v. Sellers*, 30 C.M.R. 262 (C.M.A. 1961)).

Second, no case supports the idea of an exemption from the forfeiture laws for property alleged to be stolen from the government. Defendants citations to cases involving the recovery by the government of drug buy-money or money used to purchase illegal narcotics or to procure illegal acts are worlds apart from this case – where no crime related to the Coins is charged, much less admitted, the disputed property has been in private hands for decades, and the Coins were transferred to the government not as part of some attempt to commit an illegal act, but rather as part of a good-faith effort to avoid litigation and arrive at a mutually acceptable resolution of issues relating to the ownership of the Coins. *See* Pls.' Mem. of L. in Opp'n to Defs.' Mot. to Dismiss & for Summ. J. (Docket No. 14) at 9-13 (distinguishing the cases cited by the government).[16]

---

[16] In these pages, plaintiffs distinguished *United States v. Howell*, 425 F.3d 971 (11th Cir. 2005), *Johnson v. West*, No. Civ. A. PJM-03-3406, 2004 WL 4986628 (D. Md. 2004), *Mantilla v. United States*, 302 F.3d 182 (3d Cir. 2002), *Acheampong v. United States*, 99 No. Civ. 2169, 2000 WL 1262908 (S.D.N.Y. Sept. 5, 2000), and *United States v. Kim*, 738 F. Supp. 1002 (E.D. Va. 1990).

Moreover, had Congress intended to carve out a unique exception for property allegedly stolen

from the government, it presumably would not have suggested precisely the contrary intent by

enacting legislation that specifically identifies stolen government property as subject to forfeiture.

*See supra* note 14.

Third, defendants err in arguing that less process is due plaintiffs here because plaintiffs

allegedly transferred the Coins to the government "without having secured any agreement limiting

or conditioning the transfer." (Defs.' Reply Mem. (Docket No. 73) at 8.) As we previously

explained, defendants have conceded that plaintiffs' waived no rights, and the undisputed record

and the law of waiver shows that there was no such waiver in connection with the all-rights-

reserved-limited-purpose-transfer on September 22, 2004. *See* Pls.' Mem. of L. in Opp'n to Defs.'

Mot. for Partial Summ. J. (Docket No. 66) at 13-16; Pls.' Surreply Mem. (Docket No. 76) at 7-8;

*see also* Pls.' Mem. of L. in Opp'n to Defs.' Mot. to Dismiss & for Summ. J. (Docket No. 14) at

13-16.) [17] Accordingly, plaintiffs' rights – including their constitutional rights – were no less after

the transfer of the Coins than they were before the transfer. These undisputed facts conclusively

refute and preclude any argument that, because of the circumstances under which the Coins were

---

[17] *See Brown v. City of Pittsburgh*, 186 A.2d 399, 401 (Pa. 1962) (under Pennsylvania law, a waiver "is the act of *intentionally* relinquishing or abandoning some known right, claim, or privilege. To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it.") (citations omitted); *Petruska v. Gannon Univ.*, 462 F.3d 294, 309 (3d Cir. 2006) (explaining that "[a] waiver is 'an intentional relinquishment or abandonment of a known right or privilege'" and that "'courts indulge every reasonable presumption against waiver of fundamental constitutional rights'") (citations omitted); *Sherrock Bros. v. DaimlerChrysler Motors Co.*, No. 06-4767, 2008 WL 63300, at *2 n.3 (3d Cir. 2008) (waiver may only "be established by a party's express declaration or by a party's undisputed acts or language . . . .") (citing *Samuel J. Marranca Gen. Contracting Co. v. Amerimar Cherry Hill Assocs. Ltd. P'ship*, 610 A.2d 499, 501 (Pa. Super. Ct. 1992)). *Cf.* 13 Pa. Cons. Stat. Ann. § 1308 ("party that with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved").

transferred, plaintiffs are entitled to *less* due process (or *less* protection under the Fourth Amendment) after the transfer than they might have been entitled to before.

Fourth, defendants' continuing unproven assertion that the Coins must have been stolen from the Mint in the 1930s, their argument that plaintiffs will not be able to prove otherwise, their contention that plaintiffs cannot provide specific direct evidence of how the Coins came to be in their family safe deposit box, and their claims that alleged technical defects in probate-related proceedings possibly defeat some of plaintiffs' claims to have inherited the Coins, are at best premature, and for certain are not relevant in any way whatsoever to the questions presented here and now: whether, prior to confiscating the Coins, defendants were required to follow the dictates of the Fifth and Fourth Amendments (not to mention CAFRA). All of these other arguments are nothing more than a claim that ownership of the Coins is disputed and an attempt to obfuscate the clear and factually undisputed issues now before this court. But as the cases cited above make clear, from *Fuentes v. Shevin* to *Justice v. Fabey*, neither the fact that ownership is contested nor the possibility that plaintiffs may be unable to prove their ownership or legal title in a forfeiture proceeding absolves the government of its obligation to provide due process and otherwise abide by the Constitution and applicable statutes prior to confiscating property from private citizens.[18]

---

[18] In fact, defendants' challenges on the inheritance issues – including their misplaced reliance on the limited Renunciation and Disclaimers filed by David and Roy Langbord – are meritless, particularly in light of defendants' concession that Joan Langbord inherited 100% of Israel Switt's distributed estate. *See* Pls.' Mem. of L. in Opp'n to Defs.' Mot. to Dismiss & for Summ. J. (Docket No. 14) at 24-25 & nn. 26 and 27; Defs.' Statement of Indisputable Material Facts in Support of Defs.' Mot. to Dismiss & for Summ. J. (Docket No. 8) ¶ 7.

And as plaintiffs have made clear in various prior submissions, while not material to resolution of this motion (*see supra* note 13*)*, the record developed in this case, and put before the Court in connection with prior motion papers, reflects substantial evidence that gold coins, including 1933 Double Eagles, continued to be available to the public in *authorized* ways even after President Roosevelt's actions of March 1933 – including through purchase directly from the Treasurer of the United States by mail or in exchange for gold of equal value at the Philadelphia Mint. *See* Pls.'

IV.    **DEFENDANTS VIOLATED PLAINTIFFS' FOURTH AMENDMENT RIGHTS**

With respect to plaintiffs' Fourth Amendment claim, as noted above, it is clearly established that Plaintiffs had possessory and ownership rights in the coins both prior to the September 22, 2004 transfer and still had those same rights after (particularly in light of the full reservation of rights).  Accordingly, when the defendants confiscated and retained the Coins following authentication, that decision amounted to "some meaningful interference with [the Langbords'] possessory interests" and thus constituted a "seizure" without a warrant or probable cause in violation of the Fourth Amendment.  *See Soldal v. Cook County*, 506 U.S. 56, 61 (1992); *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 209-10 (3d Cir. 2001) ("In the ordinary case, the Supreme Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.") (citation omitted).

Courts consistently have rejected the argument – similar to defendants' position here – that the constitutional right against unreasonable seizures is "vitiated merely because the [government] defendants *believed* the [property] belonged to the" government.  *Lesher v. Reed*, 12 F.3d 148, 150 (8th Cir. 1994) (emphasis added).  *Accord Rossi v. Town of Pelham*, 35 F. Supp. 2d 58, 69-70 (D.N.H. 1997) ("police seizure of stolen property from a thief is subject to Fourth Amendment scrutiny" even "when the government . . . has paramount right to possession").

In addition, even when property has been voluntarily entrusted to a third party (including the government), it is "the decision by governmental authorities to exert dominion and control over" the property "for their own purposes" that implicates the Fourth Amendment.  *United States*

---

Mem. of L. in Opp'n to Defs.' Mot. to Dismiss & for Summ. J. (Docket No. 14) at 5-8, and exhibits cited therein.  The record further establishes Israel Switt's ability to have obtained the Coins through such lawful channels and includes direct evidence that he in fact did so.  *Id.*

*v. Jacobsen*, 466 U.S. 109, 120 n.18 (1984); s*ee also Soldal,* 506 U.S. at 62 ("our cases

unmistakably hold that the Amendment protects property as well as privacy"). *Vaughn v. Baldwin*,

950 F.2d 331 (6th Cir. 1991), is illustrative.  There, business records were "temporarily

surrendered" to the IRS on "a voluntary basis in connection with a tax investigation."  The court

held that the government's continued retention and copying of these documents after the taxpayer

demanded their return and withdrew his consent violated the Fourth Amendment, applying the rule

that "when the basis for search or seizure is consent, the government must conform to the

limitations placed upon the right granted to search, seize or retain the papers or effects."  *Id.* at

332-33 (internal quotations and citation omitted).  The court went on to condemn the government's

approach, which it described – in words equally applicable to the government's approach here to

the Langbord family – as "basically the joke is on you.  You shouldn't have trusted us."  *Id.* at 334

(internal quotations and citation omitted).  *See also Laviage v. Lyons*, No. CIV. H-92-1149, 1993

WL 207508, at *2 (S.D. Tex. Mar. 19, 1993) (where plaintiffs voluntarily produced documents to

the government, "the government's right to possess the documents derives from the owner's

consent," and once that consent is withdrawn, plaintiffs are entitled to "reinvoke rights under the

Fourth Amendment").

    Here, after the defendants completed the authentication process, it was their decision in the

late spring of 2005 to keep and refuse to return, or file a forfeiture action against, the Coins – and

thus "exert dominion and control" over the Coins "for their own purposes" – that violated the

Fourth Amendment.  As with the violation of plaintiffs' Fifth Amendment rights, once it is

determined that defendants violated plaintiffs' Fourth Amendment rights, the remedy is clear:  the

Coins must be returned unless and until defendants commence a judicial forfeiture proceeding.  *See*

*Slocum v. Mayberry*, 15 U.S. 1, 10 (1817) ("If the seizing officer should refuse to institute

proceedings to ascertain the forfeiture, the district court may, upon the application of the aggrieved

party, compel the officer to proceed to adjudication, or to abandon the seizure."); *see also Jones v. DEA*, 819 F. Supp. 698 (M.D. Tenn. 1993) (ordering federal agents to return property discovered and seized during an unconstitutional search).[19]

## **CONCLUSION**

For the reasons set forth above, and based on the Statement of Undisputed Material Facts filed herewith, plaintiffs respectfully submit that the Court should grant summary judgment on their Fourth and Fifth Causes of Action (under the Fifth and Fourth Amendments, respectively), as well as on that portion of their Second Cause of Action that seeks relief under the Administrative Procedures Act for violating these same constitutional provisions, and direct that defendants either return these Coins to the plaintiffs or, to the extent plaintiffs' claims for relief under CAFRA do not preclude such an action, promptly commence a civil forfeiture proceeding.

Dated: January 27, 2009

                                        Respectfully submitted,

                                        s/Barry H. Berke
                                        Barry H. Berke
                                        Eric A. Tirschwell
                                        KRAMER LEVIN NAFTALIS & FRANKEL LLP
                                        1177 Avenue of the Americas
                                        New York, New York  10036
                                        (212) 715-9100 (Telephone)
                                        (212) 715-8000 (Fax)

---

[19] As we have previously explained, the weakness of defendants' position on the Fourth Amendment issue is only underscored by their repeated citation to inapposite authority. *See* Pls.' Mem. of L. in Opp'n to Defs.' Mot. to Dismiss & for Summ. J. (Docket No. 14) at 13-16 (discussing and distinguishing *Brown v. Brierley*, 438 F.2d 954 (3d Cir. 1971), and *United States v. Messina*, 507 F.2d 73 (2d Cir. 1974)).