# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROY LANGBORD, DAVID LANGBORD, and :
JOAN LANGBORD, :
 :
   **Plaintiffs,** :
 :
  **v.** :  **Civil Action No. 06-5315**
 :
UNITED STATES DEPARTMENT OF THE :
TREASURY, et al., :
 :
   **Defendants.** :

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
## PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' DUE PROCESS,
## ILLEGAL SEIZURE, AND ADMINISTRATIVE PROCEDURES ACT CLAIMS

  Plaintiffs request summary resolution of their constitutional claims offering no decisional law even remotely similar to the facts here, and failing to establish the keystone fact upon which all of their claims rest – that is, whether they have a constitutionally protected property interest in the 1933 Double Eagles.[1]  The existence and nature of plaintiffs' alleged property interests in the 1933 Double Eagles is the keystone issue in this case, and it is a precursor to deciding more complex constitutional issues raised in plaintiffs' motion.  The government believes it is essential – as a matter of logic, fairness and efficiency – to establish first plaintiffs' purported interests in the 1933 Double Eagles through their replevin and conversion claims.  Once plaintiffs prove – or

---

[1] The government already has explained in its own motion for partial summary judgment why – as a matter of law applied to undisputed facts – the Court should grant judgment in favor of the government and against plaintiffs on plaintiffs' constitutional claims for alleged unlawful seizure and deprivation of due process.  The government incorporates herein by reference the arguments and case law contained in their prior submissions on these issues, namely Docket Nos. 60 and 73.  The factual disputes that preclude summary judgment in favor of plaintiffs do not preclude summary judgment in favor of the government.

fail to prove – the existence and nature of any interest in the 1933 Double Eagles, the remaining legal issues in this case are likely to melt away.

It is precisely for this reason that the Supreme Court directs courts first to establish the nature of a purported property interest before deciding whether the interest is protected by the Constitution, and whether there has been a constitutional violation. See Board of Regents of State Colleges v. Roth, 408, U.S. 564, 570-71 (1972) (court in the first place must look to the nature of the interest at stake). This approach permits the Court to decide plaintiffs' forfeiture statute based claims – which are dependent on determination of title – based on a sound factual foundation rather than an unsupported hypothetical claim of ownership. The government respectfully submits that the Court should resolve plaintiffs' replevin and conversion claims before addressing whether plaintiffs have been denied constitutional protections in any potential interests they may have in the 1933 Double Eagles.

Plaintiffs have not established by undisputed facts that entitle them, as a matter of law, to judgment on their constitutional claims under the Fourth and Fifth Amendments to the Constitution, or under the Administrative Procedures Act ("APA"). Finally, plaintiffs have not rebutted with undisputed facts the government's equitable defense of unclean hands.

## I.
## FACTUAL BACKGROUND

The parties already have provided the Court with several briefs presenting the facts in this case. Rather than repeat the facts again, we incorporate by reference the introduction and factual statement set forth in Defendants' Memorandum of Law in Support of Motion For Partial Summary Judgment on Plaintiffs' Illegal Seizure And Due Process Claims, or in the Alternative,

to Compel Testimony Concerning the Circumstances Surrounding a Purported Implied-in-Fact

Agreement (Docket No. 60), which are attached hereto as Exhibit 1.  Also submitted with this

memorandum is the government's counter-statement of undisputed material facts.

## II.
## ARGUMENT

### A.    Plaintiffs' Have Not Established a Fifth Amendment Procedural Due Process Violation in Connection With the 1933 Double Eagles.

Plaintiffs' Fifth Amendment due process claim is based principally upon the allegation

that plaintiffs were entitled to a hearing *before* the government purportedly confiscated the 1933

Double Eagles.  See Plaintiffs' Mem at 12-16.[2]  Plaintiffs' motion should be denied because: (1)

plaintiffs have not established a constitutionally protected property interest in the 1933 Double

Eagles;  (2) plaintiffs have not established that the government had an obligation to return the

1933 Double Eagles to the plaintiffs; and (3) assuming arguendo plaintiffs have been deprived of

a protected interest in 1933 Double Eagles, the process afforded plaintiffs to challenge the

deprivation has been constitutionally adequate.

### 1.    Analytical Framework for a Procedural Due Process Analysis.

"Procedural due process rules are meant to protect persons not from the deprivation, but

from mistaken or unjustified deprivation of life, liberty, or property."  Carey v. Piphus, 435 U.S.

247, 259 (1978).  "The fundamental requirement of due process is the opportunity to be heard 'at

a meaningful time and in a meaningful manner.'"  Mathews v. Eldridge, 424 U.S. 319, 333

---

[2]  Plaintiffs also argue that the procedure due to them was a government-commenced forfeiture proceeding.  See Pl. Mem at 16-19.  Because these arguments are virtually the same as those raised in plaintiffs' cross-motion for summary judgment concerning forfeiture and CAFRA (Docket No. 78), we will address the forfeiture argument in response to the cross-motion.

(1976) (citation omitted). To determine whether a constitutional violation has occurred, "it is necessary to ask what process the [government] provided, and whether is was constitutionally adequate." Zinermon v. Burch, 494 U.S. 113, 126 (1990).

Due process is not one-size-fits-all. Rather, "'[d]ue process is flexible and calls for procedural protections as the particular situation demands.'" Mathews v. Eldridge, 424 U.S. at 334 Id. (citation omitted). To determine whether a constitutional violation has occurred, "it is necessary to ask what process the [government] provided, and whether it was constitutionally adequate." Zinermon v. Burch, 494 U.S. at 126. To determine the procedural protections the Constitution requires in a particular case, courts must weigh:

1)    the private interest that will be affected by the official action;

2)    the risk of an erroneous deprivation of such interest through the procedures used, and the probable value of additional or substitute procedural safeguards;

3)    the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

Id. at 127 (citation omitted). The Constitution does not require a predeprivation hearing where there is a statutory provision for a postdeprivation hearing, or where there is a common-law tort remedy for an erroneous deprivation. Id. The plaintiff carries the burden to prove that the procedures available to challenge a taking do not satisfy the requirements of procedural due process. See DeBlasio v. Zoning Board of Adjustment for the Township of West Amwell, 53 F.3d 592, 597 (3d Cir. 1995) (due process plaintiff must prove inadequacy of process afforded).

2.    **Plaintiffs Have Failed to Establish a Constitutionally Protected Property Interest in the 1933 Double Eagles.**

The Supreme Court directs that "to determine whether due process requirements apply in the *first place*," a court must look "not to the 'weight' but to the nature of the interest at stake. We must look to see if the interest within the [Constitution's] protection of liberty and property." Board of Regents of State Colleges v. Roth, 408, U.S. 564, 570-71 (1972) (citation omitted) (emphasis added). "It is axiomatic that a cognizable liberty or property interest must exist in the first instance for a procedural due process claim to lie." Mudric v. Attorney General, 469 F.3d 94 (3d Cir. 2006) (citation omitted). A court therefore must *first* identify the nature of a plaintiff's purported constitutionally property interest before assessing whether that interest has been denied without due process.

"Process is not an end in itself," and the Constitution only guarantees due process where "the individual has a *legitimate* claim of entitlement" to a substantive right. Olim v. Wakinekona, 461 U.S. 238, 250 (1983) (italics added). Here, there is no evidence that plaintiffs have a *legitimate* property interest in the 1933 Double Eagles under state law. Plaintiffs claim that their interests in the 1933 Double Eagles derive from Israel Switt's purported interest. Plaintiffs, however, have not established that Switt lawfully acquired the 1933 Double Eagles.[3]

---

[3] In footnote 18 of their memorandum, plaintiffs claim that there is evidence that Israel Switt *could* have obtained 1933 Double Eagles lawfully, and that there is "direct evidence that he in fact did so." Plaintiffs' record citation for this assertion is one of their prior filings (Docket No. 14), and unidentified "exhibits cited therein." The government has reviewed the pages cited by plaintiffs and has found no evidence that Israel Switt lawfully obtained the 1933 Double Eagles. If evidence of Switt's lawful ownership actually existed, one would have expected plaintiffs to have highlighted the evidence in their moving papers rather than burying it in a footnote referring to identified exhibits referenced in yet another filing.

In the absence of any evidence that Switt had a legitimate *ownership* interest in the 1933 Double Eagles, plaintiffs urge the Court to grant judgment in their favor on their constitutional claims on the basis of a purported *possessory* interest in the 1933 Double Eagles. However, having failed to establish that Switt had any legitimate interest in the 1933 Double Eagles, plaintiffs have failed to establish their own possessory interest. Even the estate documents offered by plaintiffs in support of their motion (at Exhibits C and D to their memorandum) do not support Joan Langbord's claim to a legitimate possessory interest because, as plaintiffs admit, those documents do not mention the 1933 Double Eagles – either in the estate property inventories or the tax documents. See Declaration of Jacqueline Romero ("Romero Decl."), Exhibit 2 hereto, at Exhibit at K. Plaintiffs have not established that Joan Langbord's brief, knowing possession of the 1933 Double Eagles was anchored in any legitimate authority, and therefore they have failed to demonstrate that it deserves constitutional protection.

Similarly, there is no evidence that Roy or David Langbord had any kind of property interest in the 1933 Double Eagles. The 1933 Double Eagles plainly did not pass to Roy and David through their Israel Switt's will, as it is undisputed that Joan Langbord inherited 100 percent of Israel Switt's estate, thereby excluding Roy and David from inheritance. See Pl.'s Mem. at n.18 and Exhibit D, Lang 00031. Moreover, documents exchanged in discovery (that plaintiffs elected to exclude from the probate documents they have submitted to the Court) show that Roy and David expressly renounced their interests in Switt's estate. See Romero Decl. at Exhibit J. There is no evidence that Joan Langbord conveyed an interest in the 1933 Double Eagles to either of her sons, or that either Roy or David possessed the gold pieces prior to

6

September 22, 2004. Plaintiffs have failed to establish that Roy or David Langbord have any constitutionally protected property interest in the 1933 Double Eagles.

Given the absence of any evidence that Israel Switt lawfully obtained the 1933 Double Eagles, plaintiffs urge the Court to find that Switt's mere alleged possession of the 1933 Double Eagles at the time of his death created a presumption of ownership. By this argument, plaintiffs seek to evade their burden of proving the threshold element of their claim – that is, that they have a constitutionally protected property interest in the 1933 Double Eagles. The government is not aware of any case in which a court has found a violation of due process based upon a *presumed* property interest arising from a decedent's mere possession of property. In any case, plaintiffs' argument is contrary to Pennsylvania law. In In re Carr's Estate, 92 A.2d 213 (Pa. 1952), the Pennsylvania Supreme Court explicitly rejected the argument that mere possession of property by a decedent creates a presumption of ownership. In that case, which concerned securities found among a decedent's possessions, a lower court had ruled that possession at death created a presumption of ownership, as plaintiffs argue here. The Supreme Court reversed and held: "A *presumption of ownership* does not arise solely because property is in the *possession* of decedent at death. Many circumstances may exist under which property is in the possession of a decedent without the presumption or inference of decedent's ownership" Id. at 216 (emphasis in original). Even if the law permitted a presumption of ownership based upon a decedent's mere possession, no presumption should attach in this case. Under these circumstances, where the estate inventory does not include the 1933 Double Eagles, there cannot be a presumption of ownership arising from mere possession. See In Re Roger's Estate, 108 A.2d 924, 924-25 (Pa. 1954) (inclusion in estate inventory is considered prima facia evidence of ownership).

Even the cases plaintiffs cite to support their argument that the Court should enter judgment based upon a presumed property interest explain that where a presumption of ownership applies, the presumption is only the first step in establishing an ownership interest – not the last. For example, <u>Leitch v. Sanford Motor Truck Co.</u>, 123 A. 658 (Pa. 1924), concerned competing claims of a property owner, a bailee, and a creditor of the bailee, after the bailee absconded. The <u>Leitch</u> court warned that mere possession is "not conclusive, as it may result from purchase, bailment or trespass, and the claimant, in replevin, must show not only a general or special property in the goods, but also his exclusive right to possession." <u>Id.</u> at 163-64. If <u>Leitch</u> stands for anything applicable to this case, it is that possession based upon trespass or another unjustified taking – as the court found occurred with a 1933 Double Eagle in <u>United States v. Barnard</u>, 72 F. Supp. 531 (W.D. Tenn. 1947) – is not a substitute for evidence of ownership or a legitimate right of possession.

Similarly, <u>Austin v. Borough of Ligonier</u>, 551 A.2d 403 (Pa. Commw. Ct. 1988), is a replevin action involving a dispute between a widow and a Borough concerning the ownership of a painting hanging in the town hall. While the court found that the Borough's 17-year open possession of the painting created a presumption of ownership, the court explained that the presumption merely operated to impose on the widow an obligation to offer some evidence of ownership, in which case "the presumption has served its purpose and has no effect whatsoever." <u>Id.</u> at 162. The widow offered evidence of ownership, thereby negating the presumption, after which the Borough offered superior evidence of ownership. <u>Id.</u> at 404. The only guidance <u>Austin</u> offers here is that we should proceed directly to a resolution of plaintiffs' replevin claim

8

so that the Court can weigh the parties' respective evidence relating to ownership of the 1933 Double Eagles.[4]

Plaintiffs have failed to establish the first element of their claim – the existence of a legitimate property interest in the 1933 Double Eagles. They cite no case in which a court has entered summary judgment based on a presumed constitutionally protected property interest arising from a decedent's possession of property. In this case, applying such a presumption would be contrary to the holding in In re Carr's Estate, and even if a presumption were applied, it would easily be overcome by the government's evidence of its ownership of the 1933 Double Eagles.[5]

### 3.    The Government Was Not Under an Obligation to Return the 1933 Double Eagles to Plaintiffs After the Voluntary Transfer.

Plaintiffs contend that the government seized the 1933 Double Eagles when it "confiscated and retained the coins after authentication." Pl. Mem. at 23.[6] But plaintiffs have

---

[4] In a recent decision about the ownership of a historical artifact, State of Maine v. Adams, 2009 WL 485093 (Va. Feb. 27, 2009), the Virginia Supreme Court decided a quiet title action concerning a 1776 print of the Declaration of Independence. Maine argued that the print was a public record that had been unlawfully converted. The state supreme court found that as a matter of law the print did not meet the common law or statutory definitions for a public record, and that Maine had "presented no evidence that the print was wrongfully removed or converted." Id. at *3. Only after a trial in which Maine failed to produce any evidence in support of its claim did the presumption of ownership affect the outcome of the case.

[5] The government has extraordinarily strong evidence to support its claim to the 1933 Double Eagles, including the expert opinion of David E. Tripp, which has previously been submitted to the Court and which we incorporate herein by reference.

[6] Plaintiffs have not identified the date on which they contend an illegal confiscation occurred. Plaintiffs did not testify as to the date of the purported seizure, and at his deposition Barry Berke refused to disclose the date on the ground that to do so would reveal his mental impressions. See Berke Deposition Tr. at 241-42. Plaintiffs state only that the purported "confiscation" occurred "following authentication" of the 1933 Double Eagles. See Pl. Mem. at

9

not established that the government confiscated the gold pieces because it has not established that the government was obligated to return the 1933 Double Eagles following authentication.   The government's retention of the gold pieces therefore was not an illegal confiscation.

Plaintiffs already have conceded that the September 22 transfer was voluntary and that the government was not bound by any agreement to return the 1933 Double Eagles.  Plaintiffs have stated clearly that their purported right to possession of the 1933 Double Eagles does not arise from any promise by, or agreement with, the government.  See Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment, Docket No. 66, at 1 ("Plaintiffs' constitutional claims do not rely or depend on any such promise or agreement").

As far as plaintiffs' September 21, 2004, letter – a unilateral reservation of unarticulated rights – plaintiffs have not established its legal significance or how it could have imposed an obligation on the government, or diminished the government's own property interests in the 1933 Double Eagles.  See Pl. Mem. at E.  To the extent plaintiffs sought by their September 21 letter to reserve their already existing rights in the 1933 Double Eagles, plaintiffs have not established that any such rights existed in the first place.  The text of the letter is no help in deciphering its meaning.  The letter is vague and obfuscates the nature of plaintiffs' unarticulated purported rights by referring only to "resolution of the issue relating to the Coins".  The context in which the letter was sent provides no guidance to its meaning because it is undisputed that the parties

---

23.  Plaintiffs state that they were informed of the authentication in June 2005.  See Pl. Mem. at 10.  The government suggests that the date of the  alleged illegal confiscation could only have been July 25, 2005, which was the first time after authentication that plaintiffs requested the return the 1933 Double Eagles.  See Romero Decl. at P, at 3.

never discussed the nature of any rights that plaintiffs now claim to have reserved. Romero Decl. at L, pp. 177-78.

Moreover, the government's attempts to probe the meaning of the September 21 letter were improperly rebuffed in discovery. Barry Berke refused to testify at his deposition about the nature of the purportedly reserved rights and remedies on the ground of the work product doctrine. See Berke Tr. at 153-59, 301-303 (refusing to testify about meaning of terms used in reservation of rights letter); id. at 168-69 (refusing to identify the "remedies" referred to in reservation of rights letter). Moreover, there is no evidence that plaintiffs intended the September 21 letter to have reserved the right to regain possession of the 1933 Double Eagles because there is no evidence that plaintiffs expected the government to return the gold pieces. See Deposition Tr. of Roy Langbord at pp. 194-200 (refusing to answer whether he had expectation of return of 1933 Double Eagles; testifying that plaintiffs had reserved right to litigate if no agreement reached).

It is of no matter that plaintiffs' letter purports to reserve *all* rights in the 1933 Double Eagles because a factual dispute remains whether plaintiffs had *any* rights the first place. In prior briefs, the government stated that "[b]y reserving their rights, plaintiffs did not create rights that did not already exist," and that "plaintiffs are entitled as a matter of due process to a judicial determination that they own the 1933 Double Eagles," statements plaintiffs now argue represent concessions of some kind with respect to the legal significance of the September 21 letter. See Pl. Mem. at 2 and 21. These statements are entirely consistent with the government's position from day one of this dispute: (1) plaintiffs *never* had *any* legitimate rights in the 1933 Double

11

Eagles and thus no rights existed to be reserved; and (2) if plaintiffs seek to establish rights to the 1933 Double Eagles, they are entitled to pursue their replevin claim before this Court.

By analogy, if Mr. Berke were to find the Court's lost car keys and return them with a note stating that he is reserving all of his rights to the Court's car, the letter would not create for Mr. Berke any legal rights in the car that did not already exist before Mr. Berke penned the note. Mr. Berke still would have no legitimate right in the Court's car. Similarly, plaintiffs have no legitimate property interest in the 1933 Double Eagles (although they are entitled to attempt to prove otherwise by way of their replevin claim).[7]

### 4.    Plaintiffs Have Been Afforded Constitutionally Sufficient Process to Challenge the Government's Retention of the 1933 Double Eagles.

The crux of plaintiffs' due process claim is that they were denied a constitutionally guaranteed "predeprivation" hearing before a neutral tribunal. Pl. Mem. at 13. Plaintiffs claim fails as a matter of law because a predeprivation hearing is not automatically required under all circumstances and is not required here. Plaintiffs have not established that in the circumstances of *this* case they were entitled to a hearing *before* any particular date or event. Plaintiffs have offered no evidence about how additional procedures before July 25, 2005, would have protected their rights any further. Assuming <u>arguendo</u> that plaintiffs have a constitutionally protected property interest in the 1933 Double Eagles and the government had an obligation to return the gold pieces, neither of which plaintiffs have established – plaintiffs still have not proven that they

---

[7] To the extent plaintiffs' rights arise from the September 21 letter, the Court should deny plaintiffs' motion for summary judgment pending resolution of the government's challenge to plaintiffs' work product objections (Docket No. 60), and resolution of the government's motion concerning plaintiffs' failure to answer adequately requests for admission (Docket No. 81).

were denied a constitutionally sufficient process to assert their purported rights to the 1933 Double Eagles.

### a.     Plaintiffs Have Been Afforded Reasonable Opportunities to Assert Their Rights in the 1933 Double Eagles.

Plaintiff have been afforded at least two opportunities to assert their rights in the 1933 Double Eagles. On May 8, 2006, plaintiffs submitted an administrative tort claim with respect to the 1933 Double Eagles. See Pl. Mem. at K. The government requested evidence to support their claim of ownership, which plaintiffs declined to provide. See Pl. Mem. at L. Upon consideration of the administrative claim and the absence of any evidentiary support of ownership, the government denied the claim and informed plaintiffs of their right to file a claim in court under the Federal Tort Claims Act. See Pl. Mem. at N. Following the denial of the administrative tort claim, on December 5, 2006, plaintiffs filed this very action in which they have asserted tort claims for replevin and conversion. In both of these processes, plaintiffs have had ample opportunity to present evidence of their alleged ownership of the 1933 Double Eagles.

### b.     The Process Afforded Plaintiffs Satisfied the Matthews Test.

Constitutional due process is a flexible concept. Courts test the constitutional sufficiency of a process by assessing the Matthews factors, described above. In this case, the factors all weigh heavily in favor of the government. First, the private interest affected by alleged deprivation is particularly light. Plaintiffs claim they were aware of their possession of the 1933 Double Eagles for approximately 13 months before they voluntarily and indefinitely relinquished the gold pieces to the government with hope for a reward but without any agreement or expectation for their return. There is no evidence that plaintiffs made any commercial or other

13

use of the 1933 Double Eagles during the short period of their known possession. Plaintiffs have not established any hardship or loss resulting from their nonpossession of 1933 Double Eagles.

Second, there was *no* risk of an erroneous deprivation arising from the process afforded plaintiffs in this matter. Virtually all of the cases cited by plaintiffs concerning due process violations concern coercive government takings. On the contrary, the predeprivation process at issue in this case began when plaintiffs – represented by renown 1933 Double Eagle litigator Barry Berke – approached the government and informed it that plaintiffs had ten 1933 Double Eagles. The process included two face-to-face meetings, telephone calls, and correspondence between Berke and United States Mint officials leading to the voluntary transfer of the gold pieces to the government. During this process, plaintiffs had unlimited opportunities to negotiate their rights and present evidence of their interest in the 1933 Double Eagles. No additional or substitute procedural safeguards were necessary to protect plaintiffs' interests, and plaintiffs have not explained how any sort of hearing before the transfer or at any other time would have reduced the risk of an erroneous deprivation.[8]

Third, the government's interests justify the procedures followed in this case. The government had a strong interest in recovering and securing its stolen property. The government's belief that the 1933 Double Eagles were stolen government property is rooted in the decision in United States v. Barnard, an extensive record of a Secret Service investigation,

---

[8] The only additional procedure plaintiffs claim should have been provided is a forfeiture action in which the government would be required to prove a crime that occurred more than 70 years ago and in which Israel Switt appears to have participated. We will describe in response to plaintiffs' cross-motion on forfeiture that a forfeiture action against the 1933 Double Eagles would have been legally inappropriate and unnecessary in light of the uncontroverted evidence that title to the 1933 Double Eagles already belonged to the United States.

14

the evidence considered in the Fenton litigation, and research of an independent historian. Given the circumstances of the surrender of the 1933 Double Eagles, the extensive communications with plaintiffs' counsel, and plaintiffs' failure to provide any evidence of a legitimate interest in the 1933 Double Eagles, any additional procedures offered by the government would not have contributed to protecting plaintiffs' rights and would have amounted to a waste of scarce governmental resources.

<blockquote>c.    <strong>A Predeprivation Hearing Was Not Required in These Circumstances.</strong></blockquote>

Plaintiffs claim a denial of due process because they did not have a predeprivation hearing. A predeprivation hearing, however, is not a constitutional requirement. Although predeprivation hearings are favored where feasible, "in situations where a predeprivation hearing is unduly burdensome in proportion to the liberty interest at stake . . . postdeprivation remedies might satisfy due process." Zinermon v. Burch, 494 U.S. at 132. In some circumstances "a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." Zinermon v. Burch, 494 U.S. at 128; see also Deninno v. Municipality of Penn Hills, 269 Fed. Appx. 153, 157 (3d Cir. 2008) (holding if there is "'a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants.'") (citation omitted); Cowell v. Palmer Township, 263 F.3d 286, 290 (3d Cir. 2001) (compensation for a taking "need not be paid in advance of the taking – 'all that is required is that a reasonable, certain and adequate provision for obtaining compensation exist at the time of the taking.'") (citation omitted); DeBlasio v. Zoning Bd. of Adjustment for Tp. of West Amwell, 53 F.3d 592, 597 (3d Cir. 1995)

(no constitutional due process violation where state provides reasonable remedies to challenge the administrative decision).

Affording a hearing postdeprivation is not an exception to the Mathews balancing test, but rather "an application of that test to the unusual case in which one of the variables in the Mathews equation – the value of predeprivation safeguards – is negligible in preventing the kind of deprivation at issue." Zinermon v. Burch, 494 U.S. at 129; see also Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 19 (1978) (predeprivation hearing not required where potential length or severity of deprivation does not indicate a likelihood of serious loss and where procedures afforded are sufficiently reliable to minimize the risk of erroneous determination).

The circumstances in this case contrast vividly with those in United States v. James Daniel Good Real Property, 510 U.S. 43 (1993), a case relied upon by plaintiffs for the proposition that a due process requires a predeprivation hearing. In that case, the Supreme Court ruled that the government should have been provided a hearing before the seizure of a house. The Supreme Court stated that real property "by its very nature, can be neither moved nor concealed." Id. at 53. Under those circumstances – where the court's jurisdiction over the property was not at risk "[b]ecause real property cannot abscond," and where the plaintiff was faced with deprivation of a substantial property interest – his home, the Supreme Court found a predeprivation notice and hearing was required.

By contrast, the 1933 Double Eagles are small and easily concealed. (Indeed, plaintiffs claim that for more than a decade Joan Langbord failed to notice a bag full of 1933 Double Eagles while selecting pieces of her mother's jewelry from a safe deposit box.) The government has expended significant resources since the 1940s to recover all of the known 1933 Double

16

Eagles in private hands. Under these circumstances, relinquishing possession of the 1933 Double

Eagles at any time before a final judicial resolution of this matter would have created a

substantial and unnecessary risk that the 1933 Double Eagles once more would disappear. See

Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 678-79 (1974) (due process did not

require a hearing before seizure of a yacht because a yacht was type of property that could be

taken from jurisdiction, destroyed, or concealed, thereby frustrating government's interests).

     The Court of Appeals agrees with the government that where it is impractical to provide a

meaningful predeprivation hearing, due process is satisfied by providing a meaningful

postdeprivation remedy. In Elsmere Park Club, LP v. Town of Elsmere, 542 F.3d 412 (3d Cir

2008), a case cited by plaintiffs in their brief, it found a postdeprivation hearing adequate to

safeguard due process and  affirmed summary judgment against a building owner who had

alleged the township violated his due process rights by condemning his property without a

predeprivation hearing.  In doing so, the court identified the constitutional significance in

providing a predeprivation hearing: "'for when a person has an opportunity to speak up in his

own defense, and when the State must listen to what he has to say, substantively unfair and

simply mistaken deprivations of property interests can be prevented." Id. at 417 (citation

omitted).  In this case, the parties had meetings, telephone calls and correspondence during which

plaintiffs had unlimited opportunity to "speak up" with regard to their purported rights in, and the

disposition of the 1933 Double Eagles. See also Tillman v. Lebanon County Correctional

Facility, 221 F.3d 410, 421 (3d Cir. 2000) (holding that where it is "impractical to provide

meaningful predeprivation process," due process is "satisfied by a meaningful postdeprivation

remedy.")

Before the transfer of the 1933 Double Eagles, plaintiffs, for their own strategic reasons, elected not to articulate or address the purported rights that they now claim have been unfairly trampled. The government's conduct has not been "substantively unfair" and there has been no "mistaken deprivations of property interests" that would have been prevented had the government provided additional process before July 25, 2005, or at any other time.

**B.    Plaintiffs Have Not Established a Fourth Amendment Illegal Seizure Violation in Connection With the 1933 Double Eagles.**

      **1.    Legal Standards Applicable to a Fourth Amendment Illegal Seizure Claim.**

A seizure of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984). A seizure does not violate the Constitution "unless it fails standards of Fourth Amendment reasonableness," a determination that "requires a careful balancing of governmental and private interests." Rossi v. Town of Pelham, 35 F. Supp. 2d 58, 70 (D.N.H. 1997); see also Brigham City v. Stuart, 126 U.S. 1943, 1947 (2006) (reasonableness is "ultimate touchstone" of the Fourth Amendment). A seizure is reasonable under the Fourth Amendment, "'as long as the circumstances, viewed *objectively*, justify [the] action.'" Id. (citing Scott v. United States, 436 U.S. 128, 138 (1978)).

In a previous brief the government explained that the law recognizes a distinction in Fourth Amendment analysis where the government recovers its own property, compared to when it seizes property belonging to a private party. See Davis v. United States, 328 U.S. 582, 590-91 (1946) (acknowledging analytical distinction in Fourth Amendment cases between circumstances where government is entitled to the possession of the property from circumstances where

government takes private property); <u>Wilson v. United States</u>, 221 U.S. 361, 380 (1911) (same);

<u>Boyd v. United States</u>, 116 U.S. 616, 623 (1886) (same); <u>United States v. Stern</u>, 225 F. Supp.

187, 194 (S.D.N.Y. 1964) (holding no violation of constitutional rights where government seized

documents belonging to the United States); <u>United States v. Sellers</u>, 30 C.M.R. 262, 264-67

(C.M.A. 1961) (no constitutional violation where government "obtained no more than that to

which it was entitled, <u>i.e.</u>, possession of its own property, and it did so by means totally lacking

coercive intent.").[9] Since plaintiffs have not established that the 1933 Double Eagles belong to

them, the government respectfully suggest that for purposes of deciding plaintiffs' summary

judgment motion the principle set forth in <u>Davis</u> should apply.

### 2. Plaintiffs Have Not Established That the Government Violated the Fourth Amendment By Unreasonably Seizing the 1933 Double Eagles.

Plaintiff's have not established that the government's conduct with respect to taking

possession and retaining the 1933 Double Eagles was objectively unreasonable. The September

22 transfer of the 1933 Double Eagles indisputably was voluntary and cannot be the basis of a

Fourth Amendment claim. See <u>Brown v. Brierley</u>, 438 F.2d 954, 957-60 (3d Cir. 1971) (holding

no Fourth Amendment seizure where party voluntarily relinquished gun to investigator; absence

of coercion relevant in determining Fourth Amendment violation); <u>United States v. Messina</u>, 507

---

[9] Plaintiffs have criticized the government's reliance on this line of cases by incorrectly claiming that it has been discredited. The only case that has been criticized is <u>Boyd</u>, and the reason for that criticism is completely unrelated to the reason for which it is cited by the government. <u>Boyd</u> also addressed constitutional limitations to compelling production of incriminating private papers. All of the cases plaintiffs cite as criticism of <u>Boyd</u> address *that* issue – not the issue for which the government cited <u>Boyd</u>. Plaintiffs have not cited to any criticism of <u>Davis</u>, <u>Wilson</u>, <u>Stern</u> or <u>Sellers</u> – or the principle that Fourth Amendment analysis differs where the government recovers its own property.

F.2d 73, 76 (2d Cir. 1974) (agent's receipt of voluntarily produced stolen property did not

constitute Fourth Amendment violation), cert. denied, 420 U.S. 993 (1975).

Nor is there evidence of improper conduct by any government agent or official. Plaintiffs

do not claim they were misled by the government. Plaintiffs always were aware of the

government's long-standing legal position that the 1933 Double Eagles had been stolen from the

United States Mint and are the property of the United States – a position confirmed in Barnard.

With that knowledge, plaintiffs arranged with the government a mutually convenient time and

place to transfer possession of the 1933 Double Eagles to the United States without having

secured any agreement to limit or condition the surrender, without any agreement for the return

of the 1933 Double Eagles, and without any expectation of their return.[10]  Before September 22,

2004, the government offered the plaintiffs nothing other than the possibility of a discussion

concerning a potential reward for the plaintiffs for having returned the 1933 Double Eagles.

The reasonableness of the government's conduct must be assessed in the context of its

good-faith and well-founded belief that in accepting the 1933 Double Eagles from plaintiffs it

was taking possession of property that, if authentic, had always belonged to the United States.

The government's belief was based in part on the decision in Barnard, where the court found that

---

[10]  Plaintiffs cite to Vaughn v. Baldwin, 950 F.2d 331 (6th Cir. 1991), for the proposition
that documents "temporarily surrendered" to the IRS must be returned upon withdrawal of
consent. Vaughn is easily distinguished from this case. In Vaughn, the government
unreasonably delayed returning business records that had been temporarily provided so that it
could make copies. The court concluded that the "government's right to possession stemmed
from the owner's consent," and the government had no right to possession after consent was
withdrawn. Id. at 333. Here, there is no evidence that the transfer of the 1933 Double Eagles to
be temporary, and more importantly, the government's right to possession of the 1933 Double
Eagles stems from its ownership – not from the Langbord's consent.  Laviage v. Lyons, 1993
WL 207508 (S.D. Tex. Mar. 19, 1993) is inapposite for the same reasons.

no 1933 Double Eagles were released as coinage by the United States Mint, and that any 1933

Double Eagles in the possession of the public must have been "stolen or, through fraudulent

breach of trust" taken from the United States Mint.[11]  The government's belief that the 1933

Double Eagles belonged to the United States was fortified by extensive historical research,

including an exhaustive investigation by the United States Secret Service finding that the 1933

Double Eagles were not issued as circulating coinage.  See Pl. Mem. at N.  Moreover, despite the

government's repeated invitations to plaintiffs to provide evidence to support their claim of

ownership of the 1933 Double Eagles, plaintiffs failed to offer any proof to support their claim.

Plaintiffs simply have not established that the government's conduct with respect to the 1933

Double Eagles was objectively unreasonable.

**C.**      **Plaintiffs Have Not Established That the APA is Applicable to the Government's Conduct in Connection With the 1933 Double Eagles.**

In their memorandum, plaintiffs offer no fact, legal analysis, or discussion in support of

their motion for summary judgment on their Administrative Procedures Act ("APA") claim.

APA review plainly is not available here.  The APA is a limited waiver of sovereign immunity

that provides for judicial review only of agency actions "made reviewable by statute and *final*

*agency action* for which there is *no other adequate remedy in a court.*"  5 U.S.C. § 704 (2000)

-----------------------

[11] Plaintiffs completely ignore the only two published decisions in 1933 Double Eagles cases, Barnard and Stack v. Strang, 94 F. Supp. 54 (S.D.N.Y. 1950), and suggest that the Fenton litigation is the "closest precedent on the books" to this case. Pl. Mem. at 2. The Fenton case, however, offers no guidance because the court did not decide any legal or factual issues. Moreover, the settlement agreement in that case – which was negotiated and signed by Barry Berke – expressly states that the case "should not be deemed to have any precedential significance or effect, legal or otherwise, on any other coin or property of the United States, including any other 1933 Double Eagle that may exist, other than the In-Rem 1933 Double Eagle." Pl. Mem., Exhibit A, at ¶6.

(emphasis added). "Under the APA, a court may set aside a final agency action when it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law' or when the action is 'unsupported by substantial evidence' in the administrative record taken as a whole." Lehigh Valley Hosp.-Muhlenberg v. Leavitt 2006 WL 2547061, *3 (E.D. Pa. Aug. 31 2006).

Plaintiffs have not established that the government's conduct with respect to the 1933 Double Eagles is a final agency action reviewable under the APA, and other adequate remedies (like their replevin claim) plainly are available to plaintiffs. Assuming arguendo the government's alleged conduct were reviewable under the APA, plaintiffs still have not established that any final government action with respect to the 1933 Double Eagles was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2000). Indeed, the government's explanations for its decisions with respect to the 1933 Double Eagles are well-reasoned and reflect serious and meaningful consideration of the evidence and the law. Pl. Mem. at N.

**D.      The Court Should Deny Plaintiffs' Motion for Summary Judgment on the Ground of Plaintiffs' Unclean Hands.**

The Court should deny the plaintiffs' motion because plaintiffs come to the Court with unclean hands.[12] In Keystone Driller Co. V. General Excavator Co., 290 U.S. 240 (1933), the Supreme Court described the unclean hands maxim as an equitable defense to be applied by the Court for "violations of conscience [that] in some measure affect the equitable relations between

---

[12] The government pleaded "unclean hand" and "illegality" as affirmative defenses. See Defendants' Answer and Affirmative Defenses to Plaintiffs' Complaint, Docket No. 24, at First, Fifth and Sixth Affirmative Defenses.

the parties in respect of something brought before the court for adjudication," and upon

"considerations that make for the advancement of right and justice." Id. at 245. The doctrine of

unclean hands applies when a party seeking relief has committed an unconscionable act

immediately related to the equity the party seeks in respect to the litigation. See Highmark, Inc.

v. UPMC Health Plan, Inc., 276 F.3d 160, 174 (3d Cir. 2001) (citation omitted).

 This case is flush with unconscionable acts by plaintiffs that justify application of the

unclean hands defense and denial of their constitutional claims. Substantial evidence suggests

that plaintiffs knowingly concealed the 1933 Double Eagles for years, including after becoming

aware that the 1933 Double Eagles had been taken illegally from the United States Mint in the

1930s, and Israel Switt's association with that activity. The evidence also refutes Joan

Langbord's claim that she "found" the 1933 Double Eagles only in 2004. For example, Roy

Langbord testified that in 2002, prior to the Fenton auction, he saw an advertisement in the New

York Times that mentioned Israel Switt in connection with 1933 Double Eagles. See Romero

Decl. at B., pp. 45-56. Joan Langbord had the Sotheby's catalogue fo the Fenton auction

(discussing Israel Switt's nefarious involvement with the 1933 Double Eagles) in her possession

around the time of the Fenton auction. See id. pp. 50- 51. And Wachovia Bank records reveal

that Joan Langbord visited safety deposit box 442 (the box in which she allegedly later found the

Double Eagles) on July 29, 2002 – *the very day before the Fenton auction.* See Romero Decl.

at D. A factfinder assessing Joan Langbord's testimony and demeanor easily would conclude

that she was aware of her possession of stolen government property for at least two years before

she claims to have innocently found ten 1933 Double Eagles in a safe deposit box.

Moreover, plaintiffs should be denied equitable relief based upon purportedly inherited property interests because – when it was in their pecuniary interest – they elected not to acknowledge possession of the 1933 Double Eagles and excluded them from Switt's estate inventory and tax documents.  By failing to comply with inheritance disclosure and tax laws with respect the 1933 Double Eagles, plaintiffs' possibly deprived the Commonwealth of Pennsylvania and the United States of estate tax revenue.

Plaintiffs' conduct has been unconscionable and unjust, and fully deserving of application of the unclean hands maxim to plaintiffs' claims.  Plaintiffs' dealings with the government were not a good faith effort to address their legal rights in the 1933 Double Eagles, but rather a deliberate and calculated scheme to attempt to create litigation leverage by maneuvering the government into a forfeiture proceeding.

**III.**
**CONCLUSION**

For the reasons set forth in its initial motion and above, the government respectfully

requests that the Court deny plaintiffs' motion for summary judgment on their Second, Fourth

and Fifth Causes of Action.

Respectfully,

LAURIE MAGID
United States Attorney

VIRGINIA A. GIBSON
Assistant United States Attorney
Chief, Civil Division

JOEL M. SWEET
Assistant United States Attorney

JACQUELINE ROMERO
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106-4476
Tel. (215) 861-8581

*For All Defendants*

Of Counsel:

Daniel P. Shaver, Chief Counsel
Greg M. Weinman, Senior Counsel
United States Mint
801 9th Street NW
Washington, DC 20220

March 9, 2009

25

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2009, I caused a true and correct copy of the foregoing

Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment on Plaintiffs' Due

Process, Illegal Seizure, and Administrative Procedures Act Claims, to be served by ECF, email,

and first-class mail, postage prepaid, upon the following:

> Barry Berke, Esquire
> Eric Tirschwell, Esquire
> KRAMER LEVIN NAFTALIS & FRANKEL
> 1177 Avenue of the Americas
> New York, NY 10036

> JOEL M. SWEET
> Assistant United States Attorney