IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROY LANGBORD, et al.,                :
     Plaintiffs,                       :            CIVIL ACTION
                                     :
     v.                                :
                                       :
UNITED STATES DEPARTMENT OF          :
THE TREASURY, et al.,                :            NO. 06-CV-05315
     Defendants.                       :

Legrome D. Davis, J.                              May 7, 2009

## MEMORANDUM

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This litigation arises out of a dispute over ten 1933 Double Eagle gold coins.  In August 2004, Plaintiffs Roy, Joan and David Langbord, acting through their counsel Barry Berke ("Berke"), contacted officials of the United States Mint to inform them that they had discovered the Double Eagles in a family safety deposit box in Philadelphia.  According to Plaintiffs, the coins had belonged to their late family member, Israel Switt ("Switt"), and passed to Plaintiffs following the deaths of Switt and his wife.  On September 22, 2004, Plaintiff Roy Langbord, accompanied by Berke, opened the safe deposit box and turned the coins over to Mint officials.  The parties disagree over the purpose and legal effect of that event.  In June 2005, Mint officials informed Plaintiffs that the Mint would not be returning the coins to them.  The Mint and the United States Department of the Treasury rejected Plaintiffs' subsequent demands for return of the coins based on the agencies' determination that the coins had been stolen from the United States Government.  In December 2006, Plaintiffs instituted this civil action against Defendants

1

the United States Department of the Treasury, the United States Mint, and numerous

governmental officials, alleging, in part, causes of action for conversion, violations of the Civil

Asset Forfeiture Reform Act, violations of the Administrative Procedure Act, and violations of

Plaintiff's Fourth and Fifth Amendment rights.

One of the questions in this case that may become significant at trial is whether the ten

1933 Double Eagle coins at issue were obtained legally from the United States Mint or the

Department of Treasury.  Both sets of parties have sought to introduce expert testimony that

bears on that question.  Plaintiffs' proposed expert witness, David Bowers ("Bowers"), is an

established professional numismatist and author who has written on the history of coins,

including the history of Double Eagles.  Bowers's expert report offers the opinion that the coins

could have been obtained by a member of the public directly from the United States Mint or the

Department of Treasury pursuant to those agencies' practices and policies in place at the relevant

time.  Defendants' proposed expert witness, David Tripp ("Tripp"), is also an established

professional numismatist and has also written works on the history of coins, including the history

of the 1933 Double Eagles.  Tripp's expert report concludes that the 1933 Double Eagles at issue

were never officially released from the United States Mint.

Plaintiffs have moved to exclude Tripp's expert opinion, and Defendants have moved to

exclude Bowers's expert opinion.  We consider the admissibility of each expert's opinion below.


II.    ANALYSIS

A.    Standards for Admission of Expert Testimony

Pursuant to the Federal Rules of Evidence, this Court must act as a "gatekeeper" to ensure

2

that "all expert testimony or evidence is not only relevant, but also reliable." Pineda v. Ford

Motor Co., 520 F.3d 237, 243 (3d Cir. 2008). In so doing, however, we must keep in mind that

the Rules of Evidence "embody a strong preference for admitting any evidence that may assist

the trier of fact" and have "a liberal policy of admissibility" with respect to expert testimony. Id.

Federal Rule of Evidence 702,[1] which governs the admissibility of expert testimony, has three

major requirements:

> (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact.

Id. at 244 (internal citations omitted). The Court of Appeals for the Third Circuit has

summarized these requirements as "a trilogy of restrictions on expert testimony: qualification,

reliability and fit." Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).

1.    Qualification

Under the first factor, in order to be qualified, the witness must "possess specialized

expertise." Id. The Third Circuit has interpreted this requirement liberally, holding that "a broad

range of knowledge, skills, and training qualify an expert." Id. (citing In re Paoli Railroad Yard

---

[1]    Rule 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

3

PCB Litig. (Paoli II), 35 F.3d 717, 741-43 (3d Cir. 1994)).  The Third Circuit has also

highlighted that this liberal approach "extends to the substantive as well as the formal

qualifications of experts."  Pineda, 520 F.3d at 244.  Specifically, the Third Circuit has held that

"[i]t is an abuse of discretion to exclude testimony simply because the trial court does not deem

the proposed expert to be the best qualified or because the proposed expert does not have the

specialization that the court considers most appropriate."  Id. (citing Holbrook v. Lykes Bros.

S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996)).  As the Third Circuit emphasized in Holbrook:

> [M]ost arguments about an expert's qualifications relate more to the
> weight to be given the expert's testimony, than to its admissibility.
> Thus, witnesses may be competent to testify as experts even though
> they may not, in the court's eyes, be the "best" qualified. Who is
> "best" qualified is a matter of weight upon which reasonable jurors
> may disagree . . . . [I]nsistence on a certain kind of degree or
> background is inconsistent with our jurisprudence in this area.

Holbrook, 80 F.3d at 782.  In fact, according to the Advisory Committee Notes on the 2000

Amendments to Federal Rule of Evidence 702, experience alone may be a sufficient ground for

qualifying a witness as an expert.  See Fed. R. Evid. 702 advisory committee's note ("[T]he text

of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.

In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable

expert testimony.").

    2.    Reliability

The reliability standard requires that "the expert . . . have good grounds for his on her

belief."  Schneider, 320 F.3d at 404 (citing Paoli II, 35 F.3d at 742).  The test is whether the

expert's "particular opinion is based on valid reasoning and reliable methodology."  In re TMI

Litig., 193 F.3d 613, 665 (3d Cir. 1999).  The Third Circuit has explained that:

> The grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion . . . . [T]he judge should not exclude evidence simply because he or she thinks that there is a flaw in the expert's investigative process which renders the expert's conclusions incorrect. The judge should only exclude the evidence if the flaw is large enough that the expert lacks the "good grounds" for his or her conclusions.

Id. (citing Paoli II, 35 F.3d at 742). The Third Circuit has also explained that the parties do not have to prove that the conclusions of the experts are correct. Id. Rather, they "only have to demonstrate by a preponderance of evidence that their opinions are reliable." Id. (citing Paoli II, 35 F.3d at 744). Therefore, "the evidentiary requirement of reliability is lower than the merits standard of correctness." Id. (citing Paoli II, 35 F.3d at 744).

Under the Supreme Court decision in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), and the Third Circuit's decision in United States v. Downing, 753 F.2d 1224 (3d Cir. 1985), the factors that a court may consider in deciding the issue of reliability include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Pineda, 520 F.3d at 248. However, these factors "are neither exhaustive nor applicable in every case." Id. The Supreme Court has explained that "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 153 (1999).

We find that most of the <u>Daubert</u> factors are not applicable to the methods employed by the experts in this matter.  Rather, a more suitable approach here is to begin from the Supreme Court's statement that our task "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Id.</u> at 152.

In cases involving the testimony of historians and other social scientists the reliable methodology often consists of the review of the pertinent historical documents.  <u>See, e.g.</u>, <u>NewYork v. Shinnecock Indian Nation</u>, 523 F. Supp. 2d 185, 262 (E.D.N.Y. 2007) (finding reliable the testimony of expert ethnohistorians where "the experts analyzed and considered the pertinent historical documents (including deeds, patents, confirmations, and other colonial era documents) in the context of the contemporary historical understanding").  It is also well-established that an expert's reliable methodology may consist primarily of applying his personal knowledge and experience to the facts of a case.  <u>See</u> <u>Kumho</u>, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").  However, according to the Advisory Committee Notes on the 2000 Amendments to Federal Rule of Evidence 702, " [i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 advisory committee's note.

3.    <u>Fit</u>

In order to meet the "fit" requirement, the expert's testimony must help the trier of fact to "understand the evidence or to determine a fact in issue." <u>In re TMI Litig</u>, 193 F.3d at 663.

6

The Third Circuit has explained that the "fit" requirement is one of relevance.  Id. at 670.  The testimony must therefore "have a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  In other words, the testimony will meet the fit requirement only if there is "a connection between the expert opinion offered and the particular disputed factual issues in the case."  In re TMI Litig., 193 F.3d at 670 (citing Paoli II, 35 F.3d at 744).  The Third Circuit has also emphasized that the standard for this factor "is not that high." United States v. Ford, 481 F.3d 215, 219 (3d Cir. 2007).

B.     Testimony of David Bowers

        Below we will consider the question of whether the testimony of Plaintiffs' proffered expert, David Bowers, can be properly admitted under the above-described standards.  In so doing, we will evaluate Bowers's qualifications to testify as an expert witness, the reliability of the methodology he employed in formulating his opinion, and the relevance of his opinion to the issues in this matter.

        1.     Qualification

        We turn first to the question of whether Bowers is adequately qualified to provide his expert opinion in this case.  Bowers has over fifty of experience as a professional numismatist and has served in positions of leadership in the numismatic community.  (Bowers Report 2-4.) For example, he has served as president of the American Numismatic Association and as president of the Professional Numismatists Guild.  (Id.)  In addition, Bowers has assisted the Treasury Department on matters involving coin history and authentication and has acted as an expert witness for the Federal Trade Commission on matters involving rare coins.  (Id. at 3-4.)

Bowers has also authored books on the history of American gold coins, one of which is A Guide Book of United States Double Eagles. (Id. at 4.) Accordingly, we find that, as an experienced numismatist with a background in gold coin history who has collaborated with the United States Government on coin-related matters, Bowers is qualified to provide an opinion regarding the United States Mint's and the Department of Treasury's official and unofficial practices related to the 1933 Double Eagle.

      2.    Reliability

We turn next to the question of whether Bowers's opinion is reliable. Namely, whether his methodology is sound and provides good grounds for his conclusions. See Schneider, 320 F.3d at 404. In his report, Bowers explains that he based his conclusions on: 1) Treasury Department records, 2) the Annual Report of the director of the Mint, 3) reports in the journal The Numismatist; and 4) his experience of over fifty years studying gold coins, the Philadelphia Mint's history and policies, and the field of numismatics. (Bowers Report 4.) We find that the historical documents and reports upon which Bowers relied are the sort of sources that an expert numismatist would rely upon when proffering an opinion of this nature.[2] Bowers

---

[2]    Defendants state that "Bowers's opinions are fundamentally unreliable because of his heavy reliance upon The Numismatist." The Numismatist is the official journal of the American Numismatic Association, and has been in publication for over one hundred years. We find that Bowers's reliance on that particular source does not make his methodology unsound. Several of Bowers's references to The Numismatist concern items authored by agencies of the United States government that were subsequently reprinted in the journal. (See, e.g., Bowers Report 11, 12, 19, 28, 46.) Most of his other references to The Numismatist involve then-current reports of news and events related to the Mint and the Department of Treasury. (See, e.g., id. at 10, 11, 18, 44.) We find that, as the primary publication relating to numismatic news and events, The Numismatist is the type of source that a numismatist would rely on in seeking to understand and interpret historical numismatic news and events. This is particularly true in light of the evidence offered in Bowers's report showing that the Department of the Treasury sometimes made exceptions to their coin-related official policies such as when members of the public

summarizes his opinion as follows:

> Based on my intensive studies of the United States Treasury
> Department, its gold coin, gold coin policies, and records, it is
> abundantly clear that anyone interested in obtaining a 1933 $20 (or
> a 1933 $10) could have done so upon application either at the
> Philadelphia Mint or the Treasury Department.

(Id. at 6.)  To support this conclusion, Bowers cites numerous historical reports and documents

which show, for example, that: 1) the Department of Treasury sometimes distributed

uncirculated coins to members of the public who requested them and made statements affirming

this practice in 1932 and 1939 (Bowers Report 11-12); and 2) according to a May 1933 letter

from the Acting Director of the Mint, specimens of Double Eagles manufactured that year could

be obtained from the Department of Treasury at face value plus postage (Bowers Dep. 478:10-

479:17, Oct. 2, 2008).  Bowers analyzes each of the coin-related historical documents upon

which he relies in the context of his extensive experience as a numismatist and of his familiarity

with government policies and practices concerning coins.  In reviewing Bowers's methodology,

we note that our role is not to "exclude evidence simply because [we think] that there is a flaw

in the expert's investigative process which renders the expert's conclusions incorrect."  In re

TMI, 193 F.3d at 665.  The Third Circuit has consistently emphasized that the "focus . . . must

be solely on principles and methodology, not on the conclusions they generate."  Id. at 664.  The

Third Circuit has also explained that we can only exclude expert evidence if there is a flaw in

his methodology that "is large enough that the expert lacks the 'good grounds' for his or her

---

request "a few pieces" of uncirculated coins for special purposes.  (See id. at 11.)  We find that
an expert seeking to find information about these out-of-the-ordinary practices would reasonably
look to the numismatic community's primary publication, The Numismatist, for news and reports
regarding such exceptions to the official policies.

conclusions" and we find that "there is simply too great a gap between the data and the opinion proffered." Id. at 665-66 (internal citations omitted). Upon careful review of Bowers's report and the Defendants' deposition of Bowers, we find that there is not such a great gap between Bowers's data and the opinion he has offered as to render his opinion inadmissible.[3] Accordingly, we find that Bowers's opinion is sufficiently reliable.

In their motion to exclude Bowers's testimony, Defendants take issue with the sources that Bowers's relied upon and with the sufficiency of his evidence. However, we find that Defendants' contentions go to the weight and not the admissibility of the evidence. See United States v. Velasquez, 64 F.3d 844, 848 (3d Cir. 1995). We also note that, as the Third Circuit has explained, "[a] party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination." Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 415 (3d Cir. 2002); see also Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Therefore, we find that the proper venue to explore Defendants' contentions is cross-examination at trial.

---

[3]    We make this determination in light of the fact that, in the cases where courts have found that the gap is significant enough, the flaw in the methodology has been remarkably more serious than any we could find in Bowers's testimony. See In re TMI, 193 F.3d at 698 (finding inadmissible the report of a medical expert who relied almost exclusively on medical history summaries prepared for the purpose of litigation by the staff of the plaintiff's counsel); Elcock v. Kmart Corp., 233 F.3d 734, 756 (3d Cir. 2000) (finding inadmissible an economist's expert testimony where his economic model contained disability percentage and earnings figures that were directly contrary to factual information of which he was aware prior to preparing the model).

3.    <u>Fit</u>

Finally, we examine whether Bowers's opinion "fits" with the issues in this case.  That is, whether his opinion will help the jury to better understand the evidence or to determine one of the disputed issues in this matter.  <u>In re TMI Litig</u>, 193 F.3d at 663.  As we mentioned above, one of the central questions in this case is whether the 1933 Double Eagles at issue could have been obtained through legitimate means.  Bowers's opinion that the coins could have been obtained by a member of the public "upon application either at the Philadelphia Mint or the Treasury Department," if believed, tends to weaken Defendants' argument that the coins could not have been obtained legally.  (<u>Id.</u> at 6.)  Accordingly, Bowers's opinion would help the jury understand the evidence and determine whether they indeed believe that the coins were stolen.

Defendants argue that Bowers's testimony is not helpful to the trier of fact because he "opines only about what could have happened . . . and he admits having no opinion about what actually did happen."  (Defs.' Mot. to Exclude Bowers 16.)  However, as the Third Circuit has held, "[a]n expert opinion that expresses a possibility that" a fact is true "and otherwise comports with the <u>Daubert</u> analysis, is clearly relevant to the question of whether" that fact is indeed true.  <u>United States v. Ford</u>, 481 F.3d 215, 221 (3d Cir. 2007).  In other words, "[w]here an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies <u>Daubert</u>'s relevancy requirement."  <u>Smith v. Ford Motor Co.</u>, 215 F.3d 713, 719 (7th Cir. 2000); <u>see also</u> <u>Ambrosini v. Labarraque</u>, 101 F.3d 129, 136 (D.C. Cir. 1996) (finding relevant an expert's opinion that a contraceptive could have caused certain birth defects and stating that the opinion need only be helpful to the jury and need not "satisfi[y] the [party's] burden on the ultimate issue at trial").  Therefore, because Bowers's

opinion is relevant to the jury's determination of whether the coins were obtained legally, we find that it meets the "fit" requirement in this case.

C.    Expert Testimony of David Tripp

      We turn next to our analysis of whether the testimony of Defendant's proffered expert, David Tripp, meets the required standards to be admitted in this case. Below we will evaluate Tripp's qualifications as well as the reliability and fit of his testimony.

      1.    Qualification

      Upon review of David Tripp's qualifications, we find that he is amply qualified to testify as an expert on matters relating to the history of the 1933 Double Eagles. Tripp has extensive experience with numismatic and historical research. He has studied documents professionally for 35 years and has conducted extensive archival research. (Tripp Dep. 458:22-459:7, Oct. 3, 2008.) Tripp has also been a professional numismatist for the past 40 years and has worked as a numismatic consultant, advisor, appraiser, and researcher to numerous numismatic collections and auction catalogues. (Tripp Report 1-2.) In addition, Tripp was the chief author of the Sotheby's auction catalogue on the 1933 Double Eagle. (Tripp Dep. 482:15-483:5.) Tripp is also the author of a book on the history of the 1933 Double Eagles, Illegal Tender: Gold, Greed, and the Mystery of the Lost 1933 Double Eagle. (Tripp Report 1.) Illegal Tender has received significant acclaim, including the 2005 Professional Numismatists Guild's Robert Friedberg Award for Literary Excellence and the Numismatic Literary Guild's 2005 Book of the Year Award. (Id.) Bowers described Illegal Tender as "a great book." (Defs.' Reply Pls.' Mot. Exclude Tripp, Ex. D.) We find that Tripp's extensive numismatic research experience and the particular focus of his research and literary work on the history of the 1933 Double Eagles has

given him a "specialized expertise" that qualifies him to render an expert opinion in this case.[4]

Schneider, 320 F.3d at 404.

      2.    Reliability

We analyze next whether the methodology that Tripp employed in preparing his report is

sound and reliable.  Tripp's methodology consisted of reviewing thousands of historical

documents, books, and articles related to the history of the 1933 Double Eagles.[5]  (Tripp Report

3, App. 6.)  Tripp analyzed a vast number of primary sources and conducted extensive archival

research.  (Id.)  We find that Tripp relied on the types of documents and procedures upon which

other numismatic experts conducting historical research would rely.  In so doing, Tripp applied

a "level of intellectual rigor that characterizes the practice of an expert" in his field.  Kumho

Tire, 526 U.S. at 152.  We also find that his testimony is sound in that he drew "a conclusion

from a set of observations based on extensive and specialized experience."  Id. at 156.  Finally,

in analyzing the grounds that Tripp cites for his conclusions we can identify no flaw so large

that Tripp would lack "'good grounds' for his . . . conclusions."  Schneider, 320 F.3d at 404

---

      [4]      Plaintiffs urge this Court to disqualify Tripp because Tripp "has never been a scholar of history . . . did not major in history as an undergraduate, never completed any graduate work in history . . . and never authored a scholarly, historical publication." (Pls.' Mot. Exclude Tripp 5.)  The approach that Plaintiffs urge us to take, namely to disqualify Tripp because he does not possess the exact qualifications that Plaintiffs deem adequate, is exactly the approach that the Third Circuit warned against in Pineda when it stated, "[i]t is an abuse of discretion to exclude testimony simply because . . . the proposed expert does not have the specialization that the court considers most appropriate."  See Pineda, 520 F.3d at 244.  Here, it is clear that Tripp's extensive historical numismatic research experience has given him the necessary expertise to testify as an expert in this matter.  Therefore, we do not find relevant the fact that he does not have a specialization as a historian.

      [5]      According to Defendants, the only archive of relevant documents that Tripp was unable to review was an archive for which Plaintiffs have claimed work product doctrine protection.  (Defs.' Reply Mot. Exclude Tripp 6 n.3.)

(citing <u>Paoli II</u>, 35 F.3d at 742).  Accordingly we find that Tripp's conclusions are "based on valid reasoning and reliable methodology."  <u>In re TMI Litig.</u>, 193 F.3d at 665.

Plaintiffs take issue with Tripp's decision to exclude certain documents from his report and his reliance on other documents.  However, as we mentioned above, these types of arguments go to the weight and not the admissibility of the evidence.  <u>See</u> <u>Velasquez</u>, 64 F.3d at 848.  Plaintiffs will have the opportunity at trial to highlight any perceived weaknesses in Tripp's opinion through cross-examination.  <u>See</u> <u>Daubert</u>, 509 U.S. at 596; <u>Stecyk</u>, 295 F.3d at 415.

3.    <u>Fit</u>

We turn next to the question of whether Tripp's testimony "will assist the trier of fact to understand the evidence or determine a fact in issue."  Fed. R. Evid. 702.  The core of Tripp's expert opinion is the conclusion that only twenty-two 1933 Double Eagles were ever officially released by the United States Mint.  (Tripp Report 4.)  According to Tripp, those twenty-two coins have been accounted for, and none were released to the public.  (<u>Id.</u>)  Tripp's testimony is directly relevant to the question of whether the 1933 Double Eagles at issue in this case could have been legally obtained from the United States Mint or the Department of Treasury.  Accordingly, Tripp's testimony would help the jury determine a fact at issue.  In addition, Tripp's report provides the relevant historical and numismatic context surrounding the 1933 Double Eagles.  This information would help the jury better understand the body of evidence relating to this issue.

Plaintiffs argue that the testimony will not be helpful to the jury because Tripp does not have "any specialized knowledge" of how to analyze the Mint's records and because his review of those records is "hardly something that the finder of fact needs assistance in performing."  (Pls.' Mot. Exclude Tripp 16-19.)  Although Tripp does not have accounting or bookkeeping

14

experience, he does have extensive experience analyzing historical records, including records about coins. Tripp has previously analyzed the same Mint records in conjunction with his other work related to the 1933 Double Eagles, including the preparation of the catalogue for the 2002 Sotheby's auction of the Fenton 1933 Double Eagle. (See Tripp Dep. 456:8-456:13.; Defs' Reply Mot. Exclude Tripp 14.) We find that these records are of the type that a numismatic historian would examine to determine the Mint's treatment of a certain coin. In fact, Plaintiffs' own expert, Bowers, testified that he was able to read those same Mint records because he considers himself to be "a good reader of historical records." (Bowers Dep. 228:15-228:19.) We believe that Tripp, too, has the experience that would allow him to be a good reader of such historical records. The other type of specialized knowledge that Tripp brings to the analysis of these records is his understanding of the historical context in which they were produced. Given Tripp's numismatic expertise and his extensive experience on historical research related to the 1933 Double Eagles, Tripp's testimony would help the jury better understand the significance of those records by providing the relevant historical and numismatic background surrounding the records. Accordingly, we find that Tripp's testimony regarding the Mint records would be appropriate and helpful to the jury.

### 4.    Testimony on Legal Conclusions

Plaintiffs correctly point out that, pursuant to Federal Rule of Evidence 704, "an expert witness is prohibited from rendering a legal opinion." Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006). See also United States v. Leo, 941 F.2d 181, 196 (3d Cir. 1991) (finding that an expert may "not give his opinions as to legal duties that arose under the law"). Such testimony is prohibited because "it would usurp . . . [this court's] pivotal role in explaining

15

the law to the jury." Berckeley Inv. Group, Ltd., 455 F.3d at 217. However, "if the witness avoids drawing legal conclusions, courts will permit expert legal testimony which 'sheds light on activities not within the common knowledge of the average juror.'" United States v. McDade, No. 92-249, 1995 U.S. Dist. LEXIS 11640, at *7 (E.D. Pa. Aug. 7, 1995) (citing United States v. Duncan, 42 F.3d 97, 102 n.3 (2d Cir. 1994)). In the present case, Tripp's testimony regarding the fact that several Presidential Orders and other legal documents were issued and describing the context surrounding their issuance does not amount to a legal conclusion. Rather, the testimony relating to their issuance and the relevant context involves statements about historical events that will help the jury understand facts "not within [their] common knowledge." McDade, 1995 U.S. Dist. LEXIS 11640, at *3. We agree, however, that, at trial, Tripp may not testify as to any legal conclusions that he may derive from those documents. In fact, Defendants have readily admitted that the legal effect of such documents is outside the realm of Tripp's expertise. (Defs.' Reply Pls.' Mot. Exclude Tripp 17 ("[T]he fact of the Executive Order is squarely within Tripp's specialized knowledge; the legal effect of the Executive Order, however, is not.").)

At trial, the experts may testify regarding the fact that official government orders or other legal documents were issued; they may not, however, apply the resulting law to the facts of this case to draw a legal conclusion. In essence, the experts may testify as to their factual conclusions so long as they do not offer a legal opinion as to the legal implications of those conclusions. To the extent that the parties wish to preclude or request the admission of specific testimony based on these guidelines, they shall submit motions in limine addressing the relevant issues prior to trial.

   5.   Hearsay Evidence

Plaintiffs also argue that we must exclude Tripp's expert testimony because "[m]ost of the

16

documents upon which [he] places his reliance are simply inadmissible" because they contain

hearsay. (Pls.' Mot. Exclude Tripp 22.) Federal Rule of Evidence 703 provides:

> If of a type reasonably relied upon by experts in the particular field in
> forming opinions or inferences upon the subject, the facts or data need
> not be admissible in evidence in order for the opinion or inference to
> be admitted.

Fed. R. Evid. 703. As an initial matter, we find that many of the documents that Plaintiffs believe

to contain hearsay, such as Mint documents and Secret Service reports of investigations related to

the 1933 Double Eagle, are precisely the type of documents that a professional numismatic

researcher would rely upon when conducting historical research on these coins. Therefore, the

documents need not be admissible in order for us to admit Tripp's testimony that is based on those

documents. Plaintiffs assert that the provisions of Rule 703 should not govern here because "[t]o

allow Mr. Tripp, bringing no specialized knowledge to bear, to summarize inadmissible evidence

would turn Rule 703 into a backdoor hearsay exception." (Pls.' Mot. Exclude Tripp 25.) We

disagree.

Rule 703 "permits experts to rely on hearsay so long as that hearsay is of the kind normally

employed by experts in the field." TMI Litig., 193 F.3d at 697. The reasoning behind this rule is

that the expert's "validation, expertly performed and subject to cross-examination" is thought to

be a sufficient safeguard. See Advisory Committee Notes Fed. R. Evid. 703; see also TK-7 Corp.

v. Estate of Barbouti, 993 F.2d 722, 732 (10th Cir. 1993). Although Plaintiffs recognize this

principle, they argue that "when, in fact, the expert adds nothing to out-of-court statements other

than transmitting them to the jury . . . Rule 703 is simply inapplicable and the usual rules

regulating the admissibility of evidence control." (Pls.' Mot. Exclude Tripp 22.) That situation,

however, is inapposite in this case. As we have explained above, we find that Tripp does possess

relevant specialized knowledge that would help the jury better understand the evidence. His extensive experience with numismatic historical research in general and the history of the 1933 Double Eagles in particular would allow Tripp to provide the jury with the adequate context and background for the large amounts of historical documents that form the basis for his opinion. This would, in turn, help the jury understand the significance of the documents and the statements contained within them. Accordingly, we find that Tripp's expertise would add a helpful analytical component to the evidence, and we reject Plaintiffs' argument that allowing Tripp to testify would serve only to transmit "unreliable and inadmissible hearsay to the finder of fact." (Id. at 24.) Therefore, Tripp's reliance on evidence that might otherwise constitute hearsay is acceptable under the terms of Rule 703.[6]

III.    CONCLUSION

For the reasons stated above, we find that: 1) Bowers and Tripp are qualified to testify as experts in this matter; 2) their opinions are based on specialized knowledge; 3) they have employed sound and reliable methodologies in arriving at their opinions; and 4) their testimony will help the jury understand the evidence and decide the issues in this case. Accordingly, we deny Defendants' motion to exclude Bowers's testimony and Plaintiffs' Motion to exclude Tripp's testimony.

---

[6]    We also note that, contrary to Plaintiffs' assertion, many of the documents relied upon by Tripp would likely fall under one of the hearsay exceptions including the exceptions provided for business records and ancient records. In addition, even if certain statements within an ancient document may constitute hearsay, we would be able to "admit parts of an ancient document and exclude others." Columbia First Bank, F.S.B. v. United States, 58 Fed. Cl. 333, 338 (2003). Prior to trial, Plaintiffs will have an opportunity to submit motions in limine to request the exclusion of testimony concerning specific documents that it believes to contain hearsay.

To the extent that the parties wish to request that this Court place specific limits on the testimony of either expert at trial, the parties shall file the appropriate motions in limine.

An appropriate Order follows.