IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROY LANGBORD, et al.,                    :
      Plaintiffs,                         :          CIVIL ACTION
                                     :
      v.                                  :
                                       :
UNITED STATES DEPARTMENT OF              :
THE TREASURY, et al.,                    :          NO. 06-CV-05315
      Defendants.                         :

Legrome D. Davis, J.                              July 28, 2009

MEMORANDUM

I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This litigation arises out of a dispute between Plaintiffs and the United States

Government over ten 1933 Double Eagle $20 gold coins.  In August 2004, Plaintiffs Roy, Joan,

and David Langbord, acting through their counsel Barry Berke ("Berke"), contacted the Chief

Counsel for the United States Mint, Daniel Shaver ("Shaver"), and the Senior Legal Counsel for

the United States Mint, Greg Weinman ("Weinman"), to inform them that they had discovered

the Double Eagles in a family safety deposit box in Philadelphia.  Plaintiffs assert that the coins

had belonged to their late family member, Israel Switt ("Switt"), and passed to Plaintiffs

following the deaths of Switt and his wife.  According to Berke, he suggested to Shaver and

Weinman that the parties discuss a "resolution similar to what was reached in the Fenton case," a

mid-1990s case in which the Government initiated forfeiture proceedings against a 1933 Double

Eagle.  (Berke Dep. at 80:14-81:12, June 18, 2008.)  In that case, the Government eventually

decided to dismiss its claims, auction the coin, and divide the profits with the coin's holder.[1]

Shaver and Weinman testified at their depositions that Berke indeed suggested reaching some

sort of agreement and that they responded that they "would be willing to discuss the matter,"

(Shaver Dep. at 96:16-97:2, June 12, 2008), and that they were "amenable to a discussion" on

that topic (Weinman Dep. at 34:2-35:2, June 13, 2008).  At the conclusion of that meeting,

Shaver indicated that the Government would authenticate the coins.  (Shaver Dep. 89:14-90:4.)

Berke agreed.  On September 15, 2004, Berke visited the Secret Service's offices in Brooklyn,

N.Y., and met with Shaver, Weinman, and several Secret Service agents to discuss the coins.  In

the course of that meeting, there was a discussion between Berke and one of the Secret Service

agents about venue, and Berke responded that his clients were prepared to waive venue.  On

September 21, 2004, the day before Plaintiffs would transfer the coins to the Government, Berke

sent Shaver a letter that stated, in relevant part:

> I write on behalf of the Langbord family regarding their ownership of
> ten 1933 Double Eagle Coins ("the Coins.") At the request of the
> United States Mint, Roy Langbord will make the coins available to
> the government . . . based on our understanding that the government
> will test the Coins for authenticity and secure the Coins while we
> discuss a possible resolution of the issues relating to the Coins.  This
> agreement to make available the Coins . . . is without prejudice to all
> of my clients' rights . . .  We specifically reserve all rights and
> remedies with respect to the Coins.

(Pls.' Mot. Summ. J. Due Process & Illegal Seizure, Ex. E.)  On the morning of September 22,

---

[1]    In the mid-1990s, federal agents seized a 1933 Double Eagle from Stephen Fenton and initiated a judicial forfeiture proceeding in federal court in New York.  The Government took the position in that case that the Double Eagle was the property of the United States because no 1933 Double Eagles had ever left the Mint through authorized channels.  The Government eventually voluntarily dismissed its legal claim and agreed with Fenton to auction the coin.  The auction yielded $7.59 million, which was divided between the Government and Fenton.

2004, the day of the transfer, Berke again met with Shaver and Weinman.  During that meeting, both Shaver and Weinman confirmed that they had received Berke's letter.  Plaintiff Roy Langbord, accompanied by Berke, opened the safe deposit box and turned the coins over to the Government.

According to a December 6, 2004, internal memorandum written to the then-Assistant Secretary of Treasury, a number of representatives from the different government agencies involved in the matter met on December 3, 2004, to discuss "how to proceed with the case."  (Id., Ex. G at 1.)  The agencies represented included the United States Attorney's Office for the District of Columbia, the United States Secret Service, the Treasury Department, and the United States Mint.  The memorandum explained that "[a]ll the agencies involved, with the exception of the US Mint, are in favor of pursuing forfeiture."  (Id.)  The document further stated that "[t]he US Mint asserts that the coins are government property" and that there was therefore no "need for forfeiture."  (Id.)

In May 2005, the United States Mint ultimately determined that the coins were in fact authentic 1933 Double Eagles.  At a meeting in Washington, D.C., in June 2005, Shaver and Weinman informed Berke that the authentication had been completed and advised him that the Government would not offer any monetary settlement to Plaintiffs.  On July 25, 2005, Berke sent Shaver a letter urging him to reconsider his position and requesting the immediate return of the coins.  On August 9, 2005, Shaver responded with a letter stating:

> The United States Mint has no intention of seeking forfeiture of [the] ten Double Eagles because they already are, and always have been, property belonging to the United States; this makes forfeiture proceedings entirely unnecessary.

(Id., Ex. H.)

On September 9, 2005, Berke submitted a letter containing a "Seized Asset Claim" to Shaver and to the General Counsel of the Treasury Department, Arnold Havens ("Havens"). The Claim demanded either return of the coins or the initiation of a judicial forfeiture proceeding. Plaintiffs' Seized Asset Claim was allegedly based on the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 983. Shaver responded on December 5, 2005 stating:

> [T]here has been no seizure of property; your client voluntarily surrendered to the United States property belonging to the United States. Therefore, there is no basis for a forfeiture action, and I have concluded that the documents you submitted do not constitute a cognizable claim under any law of the United States.

(Id., Ex. J at 2.)

Plaintiffs then submitted a "claim for damage" to the Treasury Department, via Havens, for damages in the amount $40 million dollars based on the "government's unlawful seizure, forfeiture, and conversion of the 1933 Double Eagle Coins." (Id., Ex. K at 3.) Shaver responded on June 6, 2006, requesting, among other things, "[p]roof of ownership" of the coins. (Id., Ex. L.) Berke responded on June 29, 2006, that Plaintiffs were the owners of the coins "by virtue of their being the ultimate beneficiaries under the wills of Elizabeth and Israel Switt." (Id., Ex. M at 1.) Shaver sent a final letter on November 6, 2006, informing Berke that "the Director of the United States Mint conclude[d] that the Langbord family . . . provided no evidence to suggest that it ever held title to the property in question, and as such, denied your claim." (Id., Ex. O at 3.)

In December 2006, Plaintiffs instituted this civil action against the United States, the Department of the Treasury, the United States Mint, and numerous officials thereof, including

4

Shaver, alleging causes of action for conversion, replevin, violations of CAFRA, violations of the Administrative Procedure Act ("APA"), and violations of Plaintiffs' Fourth and Fifth Amendment rights.

The parties have filed cross motions for summary judgment on Plaintiffs' CAFRA claim and on their Fourth and Fifth Amendment claims. Plaintiffs also move for summary judgment on their Administrative Procedure Act claim. Defendants move for summary judgment on Plaintiffs' replevin and conversion claims.

## II.    LEGAL STANDARD

In evaluating a motion for summary judgment, the court must consider whether "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). Where the moving party has the burden of proof at trial, it has the burden at summary judgment "of supporting [his] motion[] with credible evidence . . . that would entitle [him] to a directed verdict if not controverted at trial." In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (internal quotations omitted). In ruling on the motion, the court "may not weigh the evidence or make credibility determinations." Boyle v. City of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998); see Anderson, 477 U.S. at 255. Furthermore, all reasonable inferences from the record are drawn in favor of the non-movant. See Anderson, 477 U.S. at 255; J.F. Feeser, Inc. v.

Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990), cert. denied, 499 U.S. 921 (1991).

"This standard does not change when the issue is presented in the context of cross-motions for

summary judgment."  Appelmans v. Philadelphia, 826 F.2d 214, 216 (3d Cir. Pa. 1987)

III.    ANALYSIS

A.    Plaintiffs' CAFRA Claims

Plaintiffs claim that Defendants violated CAFRA, 18 U.S.C. § 983(a) ("§ 983(a)"),

because they did not comply with the notice and claim procedures set forth in that statute.

The provisions of § 983(a) apply "in any non-judicial civil forfeiture proceeding under a civil

forfeiture statute, with respect to which the Government is required to send written notice to

interested parties."  18 U.S.C. § 983(a).  A non-judicial civil forfeiture "is commenced when the

Government sends notice of the forfeiture proceeding to potential claimants."  Stefan D.

Cassella, Asset Forfeiture Law in the United States 143 (2007).  In fact, Plaintiffs concede that

administrative forfeiture "consists of no more than notice by the Government that it intends to

forfeit the property."  (Pls.' Cross-Mot. Summ. J. CAFRA at 2 (citing Lopez v. United States,

No. 96-1972, 2006 WL 2788999, at *10 (D.D.C. Sep. 26, 2006)).  Here, it is undisputed that the

Government never sent Plaintiffs such a notice.  In fact, it is undisputed that the Government

informed Plaintiffs that it believed that a forfeiture proceeding was "entirely unnecessary" and

that it had "no intention of seeking the forfeiture of any 1933 Double Eagle."  (Pls.' Mot. Summ.

J. Due Process & Illegal Seizure, Ex. H.)  Accordingly, we find that the Government never began

an administrative forfeiture proceeding and therefore the requirements of § 983(a) do not apply.

Plaintiffs argue that we should nonetheless apply § 983(a) of CAFRA because, whether

authorized by statute or not, the Government "in fact confiscated and forfeited the Coins

6

nonjudicially." (Pls.' Cross Mot. Summ. J. CAFRA at 2.) Plaintiffs do not cite any authority for

the proposition that, where the Government did not technically begin an administrative forfeiture,

but acted as if it had in fact administratively forfeited the property, § 983(a) of CAFRA should

apply.[2] The leading treatise on the subject, which both parties cite to support their positions,

specifically explains that the provisions in § 983(a) of CAFRA apply only where a nonjudicial

forfeiture proceeding has been commenced under a civil forfeiture statute and do not apply

"when the property is seized for some non-forfeiture purpose." Stefan D. Cassella, Asset

Forfeiture Law in the United States 144 (2007); see DWB Holding Co. v. United States, 593 F.

Supp. 2d 1271, 1272 (M.D. Fla. 2009) ("Although Plaintiff is correct that written notice is

required within sixty (60) days after the date of seizure when there is a nonjudicial civil forfeiture

proceeding, 18 U.S.C. § 983(a)(1)(A)(I), Plaintiff is incorrect that such notice is required in this

instance because the United States has not commenced nonjudicial forfeiture proceedings."). As

we mentioned above, the undisputed evidence here shows that the Government never intended to

pursue a forfeiture process.

We find nothing in the language of CAFRA to indicate that § 983(a) is intended to govern

"de facto" administrative forfeitures. In interpreting CAFRA, "our task is to give effect to the

will of Congress, and where its will has been expressed in reasonably plain terms, that language

must ordinarily be regarded as conclusive." Negonsott v. Samuels, 507 U.S. 99, 104 (1993).

---

[2]     Plaintiffs cite Via Mat Int'l S. Am. Ltd. v. United States, 446 F.3d 1258, 1263-64
(11th Cir. 2006) for the proposition that the plain language of CAFRA indicates that, "[o]nce a
person files a claim, the Government is required to either initiate a judicial action or return the
property." That case is inapposite, however, because it pertains to a situation where the
Government had already initiated an administrative forfeiture proceeding prior to receiving the
claim.

The plain meaning of CAFRA's language therefore controls "unless the language is ambiguous or leads to absurd results."  United States v. Carrell, 252 F.3d 1193, 1198 (11th Cir. 2001).  Here, we find that the language is not ambiguous.  CAFRA clearly indicates that the provisions of § 983(a) only apply "in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute."  18 U.S.C. § 983(a).  Therefore, because § 983(a) governs only the procedures of an administrative forfeiture and because no such forfeiture was ever pursued by the Government, we find the section inapplicable in this case.[3]  Accordingly, we will grant summary judgment in favor of Defendants on Plaintiffs' CAFRA claim.

Plaintiffs argue that this interpretation leads to an absurd result because it would cause the Langbords to lose all their rights to the property and would allow the Government to retain the coins simply because it chose not to begin a forfeiture action.  That is not the case.  Although we hold that § 983(a) does not apply to the present situation, as we will explain below, we also hold that due process requires that the Government begin a judicial forfeiture proceeding in a timely manner.  In addition, CAFRA's provisions that apply to all civil forfeiture actions will apply to the upcoming judicial proceeding.

B.      Plaintiffs' Illegal Seizure Claims

---

[3]      We note that, even if  § 983(a) did apply to the present matter, the Government might still have had an opportunity to file a judicial forfeiture action.  Section 983(a)(3)(A) allows a court to extend the period in which the Government is allowed to file a complaint for judicial forfeiture "for good cause shown."  Courts have found good cause where the Government's decision not to bring a complaint was based on a mistaken belief that it had the independent legal authority to determine that a complainant lacked standing to challenge the forfeiture.  See Hammoud v. Woodard, No. 05-74222, 2006 U.S. Dist. LEXIS 10248, at *10 (E.D. Mich. Feb. 17, 2006).  Similarly, the Government's mistaken belief in this case that it was not legally required to file a forfeiture action is a legal error that could support a finding of good cause.  Accordingly, had we found § 983(a) applicable here, we could have directed the Government to promptly file a judicial forfeiture action.

Plaintiffs assert that the Government violated their Fourth Amendment rights when it refused to return the coins.  (Pls.' Opp'n Defs.' Mot. Summ. J. Due Process & Illegal Seizure at 19.)  The first clause of the Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. iv.  To determine whether Plaintiffs' Fourth Amendment rights were violated we must analyze whether there was indeed a seizure and, if so, whether that seizure was unreasonable.

     1.     Did a Seizure Occur?

A seizure of property occurs where "there is some meaningful interference with an individual's possessory interest."  Id.  In the present case, it is undisputed that, before the transfer to the Government, the coins were in the Plaintiffs' exclusive possession.  However, the Government asserts that its taking of the coins was not a "seizure" for the purpose of the Fourth Amendment because the coins were voluntarily relinquished to the Government.[4]

The Government's position is initially weakened by the fact that the Secret Service's Investigative Support Division prepared a Notification of Contraband Seizure for the coins, indicating that the coins were seized on September 22, 2004, the date of the transfer in Philadelphia.  (Pls.' Mot. Summ. J. Due Process & Illegal Seizure, Ex. F at 1.)  The Notification

---

[4]     The Government highlights that it took no coercive measures to prompt Plaintiffs' transfer of the coins.  However, the Supreme Court has explained that, even where a seizure violates neither a person's liberty nor privacy, it is still subject to Fourth Amendment scrutiny based on its violation of the persons' property rights.  Soldal v. Cook County, 506 U.S. 56, 65-66 (1992).  The Court explained that this was the reason why, when property is seized under the "plain view" exception to the warrant requirement, it is still "scrupulously subjected to Fourth Amendment inquiry" and to probable cause analysis.  Id. at 66.

further demonstrates that, although a seizure warrant was initially considered, it was decided that one was not necessary because Plaintiffs were cooperating with the Government.  (Id. at 6.) However, it is clear from the undisputed facts submitted by both parties that Plaintiffs never intended to permanently relinquish the coins.

In order to justify a search or seizure through consent, the Government bears the burden of showing that the consent was "unequivocal, specific, [and] intelligently given."  United States v. Salvo, 133 F.3d 943, 953 (6th Cir. 1998).  The Government has presented absolutely no evidence to show that Plaintiffs gave their unequivocal and specific consent for the Government to permanently seize the coins.  Weinman conceded that prior to the transfer, neither he nor Shaver informed Plaintiffs that they would keep the coins permanently without further agreement.  (Weinman Dep. 45:18-46:12.)  In fact, both indicated to Plaintiffs through Berke that they were amenable to discussing some type of agreement over the coins.  (Shaver Dep. at 96:16-97:2; Weinman Dep. at 34:2-35:2.)  Furthermore, in their pre-transfer letter, Plaintiffs specifically stated: "[We will] make the coins available to the government . . . based on our understanding that the government will test the Coins for authenticity and secure the Coins while we discuss a possible resolution of the issues relating to the Coins."  (Pls.' Mot. Summ. J. Due Process & Illegal Seizure, Ex. E.)  Whether or not that understanding was shared by the Government is of no import.  The fact remains that Plaintiffs' letter communicated that Plaintiffs did not intend the transfer to be an unconditional, permanent surrender.  In addition, once Plaintiffs became aware that the Government intended to keep the coins permanently, they promptly requested their return.  Therefore, Plaintiffs withdrew any consent previously given for the Government to hold the coins.

These facts are in direct contrast with the case relied upon by the Government in which the plaintiff clearly and unequivocally surrendered the property to the Government with absolutely no discussion of limits or expectations.  United States v. Messina, 507 F.2d 73, 75 (2d Cir. 1974) (where the complainant admitted to having sold stolen sweaters, handed over the remaining sweaters to the police saying, "[i]f you want these sweaters, you can have them," and indicated that he wanted to "help" and "cooperate" with the police investigation regarding the stolen goods).[5]

We find persuasive the decisions of the several Courts of Appeals that have held that, where a person's consent for the Government to hold their property "was unilateral and contained no agreement as to duration" that consent is "implicitly limited by [the plaintiff's] right to withdraw his consent and reinvoke his Fourth Amendment rights."  Mason v. Pulliam, 557 F.2d 426, 429 (5th Cir. 1977) (finding that, where the complainant authorized the IRS to examine his business records and subsequently demanded their return, the IRS was required to return the materials); see United States v. Ward, 576 F.2d 243, 244 (9th Cir. 1978) (same).  Once the person withdraws that consent and reinvokes his Fourth Amendment rights, the Government's possession becomes a seizure because it interferes with the individual's possessory interests.  Mason, 557 F.2d at 429.   One of the courts applying this approach explained that, in consenting

---

[5]        The Government also cites Brown v. Brierley, 438 F.2d 954, 957 (3d Cir. 1971), for the proposition that voluntarily relinquished property is not seized.  However, Brown is inapposite because, unlike in the present matter, in that case the complainant never denied that he indeed completely relinquished a gun to the police and authorized its sale.  His only argument was that his agreement was procured through coercion.

to allow the Government to possess certain property, the plaintiff had a right to expect fair treatment.  Vaughn v. Baldwin, 950 F.2d 331, 334 (6th Cir. 1991) (finding that the IRS violated the plaintiff's Fourth Amendment rights when it requested the plaintiff's documents to photocopy them, rejected several requests for their return, and only returned them after the plaintiff sued to get them back).  The court characterized the government's attitude as "the joke is on you[,] [y]ou shouldn't have trusted us."  Id.

We find that the Mason line of cases is clearly applicable here.  Far from being an unconditional surrender, the Plaintiffs' pre-transfer letter clearly communicated that they consented to the Government holding the coins while the Government authenticated them and while the parties attempted to reach a resolution.  Plaintiffs unequivocally withdrew consent for the Government's possession via Berke's July 25, 2005, letter to Shaver requesting return of the coins.  At that point, the Government decided to keep the coins for their own purposes.  As the Supreme Court has explained, when the Government chooses "to exert dominion and control over the [property] for their own purposes," the taking "clearly constitute[s] a 'seizure.'"  United States v. Jacobsen, 466 U.S. 109, 122 (1984).  Accordingly, we find that the Government's possession became a seizure once it refused to comply with Plaintiffs' request to return the coins.

The Government further argues that it was justified in taking the coins because "the law recognizes a distinction in Fourth Amendment analysis where the government recovers its own property."[6]  (Defs.' Opp'n Pls.' Mot. Summ. J. Due Process & Illegal Seizure at 18.)  Courts

---

[6]   While there are certain circumstances in which the Government may seize property that it has probable cause to believe is contraband, see e.g., United States v. Troiano, 365 F.2d

have consistently rejected this type of argument.  For example, the Eighth Circuit Court of

Appeals has highlighted that "[a] seizure of property occurs when there is some meaningful

interference with a person's possessory interests in that property," and that person's "right

against unreasonable seizures is not vitiated" merely because the Government believes that it is

the rightful owner of the property in question.[7]  Lesher v. Reed, 12 F.3d 148, 150 (8th Cir. 1994).

Even where "a claim to continued possession is in dispute, that possessory interest is still

constitutionally protected."  Dixon v. Lowery, 302 F.3d 857, 864 (8th Cir. 2002).  Furthermore,

"[c]onstitutional protection of possessory interests is not diminished when the government, as

opposed to a private individual, has paramount right to possession."  Rossi v. Town of Pelham,

35 F. Supp. 2d 58, 69 (D.N.H. 1997) (citing Warden v. Hayden, 387 U.S. 294, 300-310 (1967)).

Accordingly, we find that the Government's belief that the coins had been stolen did not

diminish Plaintiffs' Fourth Amendment rights and did not change the nature of the Government's

seizure.

       2.       Was the Seizure Reasonable?

Having found that the Government's actions constituted a seizure, we must next

---

416, 418 (3d Cir. 1966), the Government in this case has not argued that its belief that the coins
were stolen would be sufficient to support a finding of probable cause.

    [7]   The cases cited by the Government to support the argument that it acted properly in
recovering its own property are inapposite.  They each address situations where the government's
ownership of the property was undisputed or where there were statutes or regulations dictating
that the particular property belonged to the Government.  See United States v. Sellers, 12
U.S.C.M.A. 262, 265 (C.M.A. 1961) (indicating that, prior to the government's taking of the
property, the complainant had been ordered by his military superior to return the property, which
undisputedly belonged to his military battalion); Davis v. United States, 328 U.S. 582, 588
(1946) (indicating that there was a statute that specified that the gasoline coupons at issue were
government property subject to inspection and recall by the government); United States v. Stern,
225 F. Supp. 187, 193, 195 (S.D.N.Y. 1964) (finding that, under IRS regulations, the forms
seized were government property that could only be possessed by IRS agents).

determine whether the seizure was reasonable.  Ordinarily, "the Supreme Court has viewed a seizure of personal property as per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized."  Brown v. Muhlenberg Twp., 269 F.3d 205, 210 (3d Cir. 2001).  Although there are several judicially recognized exceptions to the warrant requirement, the Government in this case does not argue that any specific exception applies here.  Instead, it argues that its conduct was reasonable under the circumstances.  In the absence of the Government's assertion of a particular exception, our determination of what is reasonable "requires a balancing of the 'nature and extent of the governmental interests' that justify the seizure against the 'nature and quality of the intrusion on individual rights' that the seizure imposes."  Johnson v. Campbell, 332 F.3d 199, 205 (3d Cir. 2003).

Here, the Government's asserted interest was in protecting coins that it believed to have been stolen from the Government several decades earlier.  The Plaintiffs' interest was in preserving their right to possession of coins that they had allegedly inherited.  The question before us is whether the Government's interest justified the "nature and quality" of the seizure.

The Government asserts that its actions were justified, in part, because Plaintiffs consented to the transfer of the coins.  However, as we explained above, the seizure actually came into being when Plaintiffs expressly withdrew their consent and demanded the return of the coins.  Accordingly, Plaintiffs clearly did not consent to the seizure of the coins.

The Government also argues that its actions were reasonable because it had a "good-faith and well-founded belief that . . . it was taking possession of property that, if authentic, had always belonged to the United States."  (Defs.' Opp'n Pls.' Mot. Summ. J. Due Process & Illegal

Seizure at 20.)  However, as the Supreme Court has explained:

> The premise that property interests control the right of the Government to search and seize has been discredited.  Searches and seizures may be "unreasonable" within the Fourth Amendment even though the Government asserts a superior property interest at common law.

Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 304 (1967).[8]  The Government here does not argue that its belief that the coins were stolen amounted to probable cause to believe that they were seizing contraband subject to forfeiture, which might have been sufficient to justify the seizure.[9]  Instead, the Government simply argues that it held its belief in "good-faith" and that its actions are reasonable when viewed in the context of that belief.  (Defs.' Opp'n Pls.' Mot. Summ. J. Due Process & Illegal Seizure at 20.)

In asserting the reasonableness of its actions, the Government relies heavily on the 1947 decision in United States v. Barnard, 72 F. Supp. 531 (D. Tenn. 1947), which found that a 1933 Double Eagle had not left the mint through legal means.  However, the court in Barnard was

---

[8]    Hayden provides a useful context in which to read Boyd v. United States, 116 U.S. 616 (1886).  The Government cites Boyd for the proposition that the government is held to different constitutional standards when recovering its own property.  Boyd stated in dicta that, in the case of "[t]he search for and seizure of stolen or forfeited goods . . . the government is entitled to the possession of the property" because "[t]he seizure of stolen goods is authorized by the common law."  Id. at 623.  We read Boyd in light of the statement in Hayden that "seizures may be 'unreasonable' within the Fourth Amendment even though the Government asserts a superior property interest at common law."  387 U.S. at 304.

[9]    The Third Circuit has found that a "warrant is not required for seizure in a forfeiture action" and such an action need only show probable cause.  United States v. One 1977 Lincoln Mark v. Coupe, 643 F.2d 154, 158 (3d Cir. 1981).  However, the Government has vigorously argued that this case does not involve a forfeiture action.  Furthermore, in some circumstances the Government may seize property that it has probable cause to believe is contraband.  United States v. Troiano, 365 F.2d 416, 418 (3d Cir. 1966).  Nevertheless, the Government in this case has never argued that its belief that the coins were stolen would be sufficient to support a finding of probable cause.  Accordingly, we need not address that question.

simply ruling on the evidence that it had before it at the time.  The decision did not serve as a blanket authorization for future warrantless seizures of 1933 Double Eagles.  Furthermore, the Government in Barnard had brought a judicial replevin action to attempt to recover the coin.  In that sense, far from supporting the reasonableness of a warrantless seizure, Barnard serves as an example of a reasonable course of action available to the Government to recover a coin that it believed to have been stolen.

The Government provides no reason why it could not obtain a warrant to properly seize the coins as contraband once they were under its control with Plaintiffs' consent.  As we explained above, the actual seizure of the coins occurred once the Government chose not to honor Plaintiffs' request to return the coins.  At that point, the coins were safely in the Government's possession.  The Government authenticated the coins in May 2005, approximately two months before Plaintiffs requested return of the coins.  Therefore, the Government had ample opportunity after authentication to request a seizure warrant without compromising the safety of the coins.  We find that the Government's "good-faith" belief that the coins were once stolen is not sufficient, under the circumstances, to justify its decision to conduct a warrantless seizure.  The Government's interest in protecting the coins would have been equally protected by a search pursuant to a seizure warrant.

Given the undisputed circumstances in this case, we find that the seizure was objectively unreasonable and that the Government has presented no evidence from which a reasonable factfinder could conclude otherwise.  Accordingly, we will grant summary judgment in favor of Plaintiffs on their Fourth Amendment claim.

3.     Adequate Remedy

Our holding does not imply that the Government will be required to return the coins immediately.  Indeed Plaintiffs concede that return is not required if the Government promptly initiates a judicial forfeiture proceeding.  (Pls.' Mot. Summ. J. Due Process & Illegal Seizure 24).  Also, it is well established that "illegal seizure of property does not immunize it from forfeiture as long as the government can sustain the forfeiture claim with independent evidence."  United States v. Pierre, 484 F.3d 75, 87 (1st Cir. 2007); see United States v. 47 West 644 Route 38, 190 F.3d 781, 782 (3d Cir. 1999).  For the reasons explained in the next section, we will require the Government to promptly initiate a forfeiture action.

C.      Plaintiffs' Due Process Claims

Both parties have moved for summary judgment on Plaintiffs' Fifth Amendment claim.  Plaintiffs argue that the Government violated their Fifth Amendment procedural due process rights when it deprived them of the coins without due process.[10]

"Procedural due process rules are meant to protect persons . . . from the mistaken or unjustified deprivation of life, liberty, or property."  Carey v. Piphus, 435 U.S. 247, 259 (1978).  In analyzing Plaintiffs' claim, the first question we must ask is "whether the plaintiff has alleged the violation of a clearly established statutory or constitutional right."  Samuel v. Holmes, 138 F.3d 173, 176 (5th Cir. 1998).  If we find that the Due Process Clause was indeed triggered, we must then "ask what process the [government] provided, and whether it was constitutionally

---

[10]     In its initial Motion for Summary Judgment on Plaintiffs' Due Process and Illegal Seizure claims, the Government argued that Plaintiffs were not entitled to due process because, at the time of transfer, the Government had not reached an implied agreement with Plaintiffs to begin a forfeiture action.  However, after Plaintiffs responded that their claims were not based on any implied agreement, the Government expressly abandoned that argument.  Accordingly, the question before us is not whether there was ever an implied agreement, but rather whether the Government's actions violated Plaintiffs' rights under the Fifth Amendment.

adequate."  Zinerman v. Burch, 494 U.S. 113, 126 (1990).  We address each issue below.

1.      Applicability of Due Process

To determine whether the alleged violation triggers due process, "we must look . . . to the nature of the interest at stake" and decide whether it is the type of property interest protected by due process.  Anderson v. Philadelphia, 845 F.2d 1216, 1220 (3d Cir. 1988) (citing Bd. of Regents v. Roth, 408 U.S. 564, 571 (1972)).  The Supreme Court has made clear that "the property interests protected by procedural due process extend well beyond actual ownership."  Roth, 408 U.S. at 571-572.  However, in order to determine the specific nature of Plaintiffs' interest we must look to state law.  Id. at 577; see Brown v. Trench, 787 F.2d 167, 170 (3d Cir. 1986) ("State law determines whether such a property interest exists.").

This court previously addressed the question of whether, under Pennsylvania law, possession alone creates a sufficient property interest to trigger due process rights in Justice v. Fabey, 541 F. Supp. 1019, 1022 (E.D. Pa. 1982) (applying Pennsylvania law).  There, the police had seized a truck from the plaintiff without due process.  The plaintiff had allegedly obtained the truck as a bonafide purchaser from a party whose possession was traceable to the theft of the truck from its true owner.  The plaintiff, therefore, appeared to lack good title to the truck.  The court found, however, that "while plaintiff may not be able ultimately to establish good title to the seized truck under Pennsylvania law, this does not conclusively determine whether the police were required under the due process clause to afford him some kind of hearing when they sought to take possession of the truck."  Id.  The Justice court explained that, under Pennsylvania law, "[i]t is settled . . . that possession of a chattel is deemed to be prima facie evidence of ownership."  Id. at 1023.  The court further found that "any person claiming ownership of

property which is in the possession of another bears the burden of proving facts essential to his claim of ownership."  Id.  It therefore concluded that "one's earlier possession of property, which has subsequently been seized, is prima facie evidence of one's entitlement to the property" and is sufficient to establish a protected possessory interest.  Id.

In this case, it is undisputed that the coins, when first acquired by the Government, were in the exclusive possession of Plaintiffs.  There is no argument that Plaintiffs themselves ever stole the coins.  In fact, it is undisputed that Plaintiffs came into possession of the coins because they had once been held by now-deceased family members.  We find that Plaintiffs' possession of the coins is similar to that of the plaintiff in Justice in that, although it may turn out that the original family member who obtained the coins never had good title, Plaintiffs are still entitled to the protections of due process by virtue of their original possession of the coins and their asserted claim of ownership.  Accordingly, we find that, in light of Pennsylvania law "which attaches a presumption of entitlement to one in possession," Plaintiffs have established a sufficient property interest to trigger due process rights.  Id.

The Government argues that the presumption created under Pennsylvania law should not apply in this case because Plaintiffs "have offered no evidence to demonstrate a cognizable interest in the 1933 Double Eagles" and "have no facial possessory interest in the coins."  (Defs.' Mem. Supp. Mot. Summ. J. Due Process & Illegal Seizure at 9, 12.)  Here, Plaintiffs clearly assert that they have a possessory interest in the coins because they were passed down to them through their deceased family members.  We find that this assertion, combined with the fact that Plaintiffs did in fact possess the coins prior to the transfer, is sufficient to establish a facial possessory interest.  Although the Government disputes whether Plaintiffs lawfully inherited the

coins, as the Supreme Court has made clear, even where a party lacks full title to a chattel and his

"right to continued possession" is "a matter in dispute," his possessory interest is nonetheless

constitutionally protected as a significant property interest.  Fuentes v. Shevin, 407 U.S. 67, 84

(1972).  "Constitutional protection of possessory interests is not diminished when the

government, as opposed to a private individual, has paramount right to possession."  Rossi v.

Town of Pelham, 35 F. Supp. 2d 58, 69 (D.N.H. 1997).  The Justice court also addressed this

issue directly when it stated, "[t]he fact that a possessor's claim of ownership may be disputed

does not negate the existence of a property interest or his right to procedural safeguards."  541 F.

Supp. at 1022.  Other courts have similarly found that, even where the Government is attempting

to recover property that allegedly belongs to the Government, it must still bring an action to

recover that property.  See United States v. One Parcel of Real Prop., 34 F. Supp. 2d 107,

114-115 (D.R.I. 1999) (finding that, to obtain the allegedly stolen Government property from the

plaintiffs, the Government had the choice of suing the plaintiffs for the property or initiating a

forfeiture action).  Accordingly, we find that Plaintiffs have established a sufficiently significant

possessory interest to trigger the application of due process.[11]

---

[11]     The cases cited by the Government for the proposition that due process
requirements are different where the Government is recovering its own property are inapposite
because not one of those cases deals with the question of whether due process was triggered.
Furthermore, the cited cases address situations where ownership was undisputed or where there
were statutes or regulations dictating that the particular property belonged to the Government.  In
United States v. Sellers, 12 U.S.C.M.A. 262, 265 (C.M.A. 1961), it was undisputed that the
property belonged to the Government and that the plaintiff was required under military law to
surrender it once his military superior ordered him to do so.  In Davis v. United States, 328 U.S.
582, 588 (1946), there was a statute that specified that the specific subject property, government-
issued gasoline coupons, were subject to inspection and recall by the Government.  Finally, in
United States v. Stern, 225 F. Supp. 187, 195 (S.D.N.Y. 1964), the property at issue consisted of
internal government forms that, by IRS regulation, were made Government property which the
public was not allowed to possess.

2.      Sufficiency of the Process Provided

Having found that Plaintiffs were entitled to due process, we must next determine the type of process that Plaintiffs were due.  The "fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  Abdulai v. Ashcroft, 239 F.3d 542, 549 (3d Cir. 2001).  Here the Government argues that Plaintiffs were provided sufficient process when they "were afforded and took advantage of an administrative claims process in which they had the opportunity to . . . provide evidence of their purported interest."[12] (Pls.' Reply Opp'n Defs.' Mot. Summ. J. Due Process & Illegal Seizure at 4.)  They further argue that Plaintiffs were given due process because they "had meetings, [and exchanged] telephone calls and correspondence" which gave them an "unlimited opportunity to 'speak up' with regard to their purported rights in" the coins.  (Defs.' Opp'n Pls.' Mot. Summ. J. Due Process & Illegal Seizure at 17.)

The only official that corresponded with Plaintiffs regarding their claims for return of the coins and compensation for the seizure was Shaver, the Chief Counsel of the Mint, who was one of the primary officials in charge of procuring the seizure.  When Plaintiffs initially requested return of the coins, Shaver responded that no seizure had occurred and that no forfeiture was necessary because the coins already belonged to the Government.  When Plaintiffs then

---

[12]      The Government cites <u>Deninno v. Municipality of Penn Hills</u> for the proposition that, if there is "a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants."  269 Fed. Appx. 153, 157 (3d Cir. 2008).  However, <u>Deninno</u> also states that, once the plaintiff exhausts such remedies, he may bring an action in federal court for deprivation of due process.  <u>Id.</u> at 156. Here, Plaintiffs clearly attempted to exhaust all administrative remedies, first through a purported CAFRA claim for return of the coins and then through their Claim for Damages.  Accordingly, we find that Plaintiffs did not "skip" any process available to them.

submitted a claim for damages to the Department of Treasury, Shaver again responded,

demanding, among other things, proof of ownership of the coins.  Once Plaintiffs submitted an

explanation that they owned the coins by virtue of inheritance, Shaver informed Plaintiffs that

they had failed to meet their burden and that their claim was denied.  No hearing was ever held.

In determining whether the process given complies with the requirements of due process,

we apply the balancing test outlined by the Supreme Court in Mathews v. Eldridge, 424 U.S. 319

(1976), which requires us to consider:

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through
> the procedures used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural
> requirement would entail.

424 U.S. at 335.  First, as we explained above, the private interest at issue was Plaintiffs' interest

in the possession of the coins which they purport to own as a result of inheritance.  Second, the

risk of an erroneous deprivation appears to be significant given the fact that the only official

apparently in charge of responding to Plaintiffs' claims was Shaver, the very person whose

actions were the subject of Plaintiffs' claims and who can hardly be said to provide the neutrality

that due process requires.  See Concrete Pipe & Prods. v. Constr. Laborers Pension Trust, 508

U.S. 602, 617-618 (1993) ("[O]ne is entitled as a matter of due process of law to an adjudicator

who is not in a situation 'which would offer a possible temptation to the average man . . . which

might lead him not to hold the balance nice, clear and true.").  Turning now to the probable value

of the additional safeguards, we note that the Court has emphasized the importance of neutrality

in the process provided:

> The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process.

Marshall v. Jerrico, Inc., 446 U.S. 238, 242 (1980). The Court has further stated that a neutral hearing is especially valuable where, as here, "the Government has a direct pecuniary interest in the outcome of the proceeding." United States v. James Daniel Good Real Prop., 510 U.S. 43, 56 (1993). Accordingly, we find that the risk of erroneous deprivation here was sufficiently high as to make a hearing before a neutral adjudicator especially important. With regard to the timing of the hearing, the Good Court emphasized the importance of a predeprivation hearing designed to protect the plaintiff's "possession of property from arbitrary encroachment -- to minimize substantively unfair or mistaken deprivations of property." Id. at 53. Absent exigent circumstances, "prior notice and a hearing is central to the Constitution's command of due process." Id. We find that, given the circumstances in this case, a predeprivation hearing would have provided safeguards that were particularly important given Shaver's potentially biased position.

Under the third element of the Mathews test, we must examine the Government's interest and the potential burden presented by additional safeguards. Here, the Government's asserted interest is an "interest in recovering and securing its stolen property." (Defs.' Opp'n Pls.' Mot. Summ. J. Due Process & Illegal Seizure at 14.) While this interest is indeed significant, the Government fails to argue why providing a hearing would have in any way affected that interest or constituted a significant burden. The only argument that the Government makes in regard to

23

this question is that a hearing would have been impractical because "relinquishing possession of the 1933 Double Eagles at any time before a final judicial resolution of this matter would have created a substantial and unnecessary risk that the 1933 Double Eagles once more would disappear" because "the coins were small and easily concealed."  (Defs.' Opp'n Pls.' Mot. Summ. J. Due Process & Illegal Seizure at 16-17.)  However, this argument is wholly unsupported by the undisputed facts in this case.  The Government took control of the coins in September 2004.  It authenticated the coins in May 2005.  As we explained above, the actual seizure in this case occurred when the Government failed to honor Berke's July 25, 2005, letter requesting return of the coins.  (Defs.' Opp'n Pls.' Mot. Summ. J. Due Process & Illegal Seizure, Ex. P.)  Therefore, the Government had eight months from the time of taking possession and two months from the time of authentication during which to initiate a predeprivation forfeiture proceeding while the coins were safely under its control.  Under those circumstances, a predeprivation hearing presented no risk of loss.  We find that the Government has not presented any burden that would have been created by the requirement to provide Plaintiffs a hearing.

With regard to the timing of the hearing, it is well established that, "[i]n situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a post-deprivation . . . remedy."  Zinermon v. Burch, 494 U.S. 113, 132 (1990).  The Government concedes that predeprivation hearings are favored where feasible but argues that a postdeprivation hearing was sufficient in this case because of the risk of losing the coins.  As we explained above, because the coins were in the Government's possession at the time of the seizure, no such risk existed.  Accordingly, the Government has presented no reason why a predeprivation hearing would have been impractical.

Accordingly, after considering each of the Mathews factors, we find that the Government clearly deprived Plaintiffs of their due process rights by denying them a predeprivation hearing before a neutral official.  Therefore, we will grant Plaintiffs' Motion for Summary Judgment of their due process claims and deny the Defendants' cross-motion.

3.    Adequate remedy

Having determined that a due process violation occurred, we turn to the appropriate remedy.  Where a court concludes, as we have here, that the Government seized property without due process and intends to retain the property, we must "order the government to either return the [property] to the plaintiffs or to commence judicial forfeiture . . . at which time the plaintiffs may raise whatever defenses are available to them."  Garcia v. Meza, 235 F.3d 287, 292 (7th Cir. 2000); see United States v. Von Neumann, 474 U.S. 242, 251 (1986) (finding that, with regard to seized property that is allegedly subject to forfeiture, the plaintiff's "right to a forfeiture proceeding . . . satisfies any due process right"); United States v. Giraldo, 45 F.3d 509, 512 (1st Cir. 1995) (finding that, where the process provided is constitutionally inadequate, the court must direct the government to return the property or begin a judicial forfeiture proceeding).  The Federal Circuit has explained the relationship between due process and a forfeiture proceeding as follows:

> [T]he courts have recognized a right not to have property held in such settings for an unreasonable time and have crafted a remedy to vindicate that right.  Following the seizure of property, the owner of the property has a due process right to have the government either return the property or initiate forfeiture proceedings without unreasonable delay.

Acadia Tech., Inc. v. United States, 458 F.3d 1327, 1334 (Fed. Cir. 2006).

Here, the initiation of a judicial forfeiture proceeding for the coins is specifically

25

authorized by statute.  The Secret Service's Notification of Contraband Seizure presented in this case specified that the coins were seized as contraband obtained in violation of 18 U.S.C. § 641, which pertains to the embezzlement and theft of public money, property, or records.  (Pls.' Mot. Summ. J. Due Process & Illegal Seizure, Ex. F at 1.)  18 U.S.C. § 641(a)(1)(C) specifically authorizes the forfeiture of property obtained in violation of 18 U.S.C. § 641.

For these reasons, we find that the appropriate and authorized remedy for the Government's denial of Plaintiffs' due process rights is a prompt forfeiture hearing.  Accordingly, we will direct the Government to initiate a judicial forfeiture proceeding as part of this action on or before Monday, September 28, 2009.

D.     Unclean Hands Defense

Defendants argue that, even if we find that Plaintiffs' rights were violated, we should not grant them relief because they allegedly had "unclean hands."  Courts apply the doctrine of unclean hands when the "party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation."  Highmark Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 174 (3d Cir. 2001) (citations omitted).  Here, Defendants assert that: (1) Roy Langbord saw an advertisement that mentioned Israel Switt in connection with Double Eagles in 2002; (2) Joan Langbord had a catalog for the Fenton auction; and (3) Joan Langbord visited the safety deposit box around the time of the auction.  Defendants therefore argue that "a fact finder . . . easily would conclude that [Joan Langbord] was aware of her possession of stolen government property for at least two years before she claims to have found the coins."  (Defs.' Opp'n Pls.' Mot. Summ. J. Due Process & Illegal Seizure at 23.)  However, the Government's argument assumes the answer to the ultimate question at issue in this matter.  Even assuming that

the Langbords were aware of their possession of the coins in 2002, none of the evidence

presented by the Government would allow a factfinder to conclude that they knew the coins were

stolen.  No court has yet determined that these particular coins were ever stolen.  The Langbords'

alleged knowledge about the Fenton case is similarly irrelevant because that case never

concluded that any Double Eagle had ever been stolen.  Therefore, the Government's argument

that the Langbords "knew" a fact that has never been conclusively established amounts to

unsupported speculation.

The Government further argues that Plaintiffs had unclean hands because they "elected

not to acknowledge possession of the 1933 Double Eagles and excluded them from Switt's estate

inventory and tax documents."  (Defs.' Opp'n Pls.' Mot. Summ. J. Due Process & Illegal Seizure

24.)  First, the executor of Switt's estate was Staton Langbord, not Plaintiffs, and therefore it was

he who would have been responsible for those documents.  (Defs.' Mot. Summ. J. Illegal Seizure

& Due Process, Ex. J.)  Furthermore, for Plaintiffs' conduct to support an unclean hands theory,

it must bear a close nexus to the relief requested.  Highmark Inc., 276 F.3d at 174.  We find that

the nexus between tax payments and Plaintiffs' Fourth and Fifth Amendment rights is not close

enough to merit application of the theory.

For these reasons, we find that the unclean hands doctrine does not apply here.

E.      Plaintiffs' Administrative Procedure Act Claim

Plaintiffs move for summary judgment on their claims pursuant to the Administrative

Procedures Act ("APA"), 5 U.S.C. § 704.  The threshold requirement for applicability of the

APA is that the agency decision in question be an "[a]gency action made reviewable by statute

and final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

Here, Plaintiffs have an adequate remedy by virtue of their Fourth and Fifth Amendment violation claims.  That remedy, which we grant for the reasons explained above, consists of requiring the Government to promptly initiate a forfeiture action.  That is the same remedy that Plaintiffs apparently request under the APA.  Therefore, we find that, because Plaintiffs clearly have another "adequate remedy in a court," the APA is inapplicable in this case.  Accordingly, we will deny Plaintiffs' motion for summary judgment with respect to their APA claim.

F.      Plaintiffs' Replevin and Conversion Claims

Because Plaintiffs' replevin and conversion claims will necessarily involve many of the same factual issues that will need to be addressed as part of the Government's forfeiture action, we find that it would be in the best interest of justice to postpone ruling on any issues regarding those claims until after the completion of that action.

Accordingly, we will deny Defendants' Motion for Summary Judgment on Plaintiffs' replevin and conversion claims without prejudice with leave to reinstate upon written request by Defendants following the conclusion of the judicial forfeiture proceeding.

III.    CONCLUSION

The Government has vigorously argued throughout this case that it should not have to follow the requirements established by the Fourth and Fifth Amendments to recover what it believes to be its own property.  However, we find that such a holding would be contrary not only to the governing law, but also to the bedrock principles of justice on which our government is founded.  It is axiomatic that "men naturally trust in their government, and ought to do so, and they ought not to suffer for it."  Menges v. Dentler, 33 Pa. 495, 500 (1859).  The Government must not squander that trust.  Instead, the Government must invariably respect the wise restraints

embodied by the Constitution and must follow the clearly delineated paths to justice that they create.  Seeking shortcuts to these paths does nothing more than undermine their valuable function and erode the meaning of the rights they are designed to protect.  As Justice Black once explained, "[i]t is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government."  St. Regis Paper Co. v. United States, 368 U.S. 208, 229 (1961) (Black, J., dissenting).  Through the forfeiture proceeding the Government will have the opportunity to "turn square corners" by asserting its ownership of the coins while affording Plaintiffs the process they deserve.

An appropriate Order follows.