IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ROY LANGBORD, et al.,                    :
        Plaintiffs,                       :
                                :
        v.                                :
                                  :
UNITED STATES DEPARTMENT OF              :
THE TREASURY, et al.,                    :
        Defendants.                       :        CIVIL ACTION
_____ :
                                  :
UNITED STATES OF AMERICA,                :        No. 06-5315
        Third-Party Plaintiff,            :
                                  :
        v.                                :
                                  :
TEN 1933 DOUBLE EAGLE GOLD PIECES,       :
        Third-Party Defendant-in-rem.    :
                                  :
_____ :

Legrome D. Davis, J.                                              July 5, 2011

## MEMORANDUM OPINION

## I.     BACKGROUND

       In that the Court writes for the parties, who are well aware of the basic facts underlying

the dispute, it need not again set out the full tale here, but rather incorporates the factual

background found in previously issued memorandum opinions.  (See Docs. No. 96, 108 & 131.)

Suffice it to recount only this: In July 2009, the Court ordered that the Government initiate

forfeiture proceedings against ten 1933 Double Eagles (the "Double Eagles," "Coins," or "Gold

Pieces") that the Langbords had turned over to the Government so that they could be

authenticated.  (Doc. No. 108.)  Two months later the United States sought leave to file a

multi-count complaint (Doc. No. 111), which included the court-ordered forfeiture count against

the Double Eagles.[1]  Forfeiture is warranted, the Government argues, because the Double Eagles were embezzled or stolen from the United States Mint, and wrongfully retained by someone with knowledge that they were embezzled or stolen.  See 18 U.S.C. § 641.  On the eve of the forfeiture trial, the United States and Langbords challenge the admissibility of various evidence offered by the other side.  This opinions resolves those evidentiary disputes to the extent they can be resolved prior to trial.

II.    DISCUSSION

To better explain its evidentiary rulings and provide further guidance to the parties, the Court sets forth here the law and analysis underlying its decisions.  The Opinion proceeds in logical steps: We first discuss the threshold question of authenticity, an area of some concern given the age and state of many proposed exhibits.  It then moves on to determine which of the proposed exhibits are relevant, and weighs the probative value of the relevant documents against their potential prejudicial effect.  Next, the Opinion tackles the hearsay questions raised by the parties, followed by a brief discussion of expert testimony.  Finally, although the Court does not resolve the majority of jury-instruction issues in this Opinion, it does explain its ruling on the Langbords' motion for instructions related to the unconstitutional seizure of the Coins by the United States.

A. Authenticity

Federal Rule of Evidence 901 makes the "authentication or identification [a proposed

---

[1]The portion of the United States's complaint that survived the Langbords' Motion to Dismiss includes a declaratory judgment count, wherein the United States seeks a declaration that the Coins are government property.  The Court will resolve issues related to the declaratory judgment count in a separate order.

exhibit] . . . a condition precedent to admissibility" and deems the requirement "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Importantly, the proponent need not conclusively prove that a piece of evidence is authentic; "[a]ll that is required is a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be." McQueeney v. Wilmington Trust Co., 779 F.2d 916, 928 (3d Cir. 1985) (internal quotation marks omitted). Thus, though authenticity is a condition precedent to admissibility, "[t]he burden of proof for authentication is slight." Id.

### 1. Ancient Documents

The majority of events giving rise to the United States's forfeiture claim occurred between 1933 and 1947. As such, the United States urges the Court to deem the large majority of its documentary evidence authentic under the Federal Rule of Evidence 901(b)(8), commonly known as the ancient document rule. The rule provides that a proponent meets its slight burden of proof so long as a document "(A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered." Fed. R. Evid. 901(b)(8).

Under this rule, the United States seeks to introduce certified copies of documents it obtained from the United States Mint, the National Archives and Records Administration ("National Archives"), the Federal Reserve Bank of New York, the American Numismatic Society Library, Connecticut State Library, the Federal Bureau of Prisons, and the United States Department of the Treasury Library. (See Doc. 148.) The Langbords do not challenge the documents' age or that they were recovered from places where authentic documents would likely

be.  Rather, the Langbords contend that, with respect to many of the documents, the United States has not met its threshold burden of establishing that the documents' condition casts no suspicion on their authenticity.

The primary basis for the Langbords' objection is that the documents are neither signed by their authors nor, if letters, paired with signed letters to indicate they were ever sent or received.  These fact, they contend, renders each of the unsigned documents too suspicious to qualify as prima facie authentic on its own, and must be accompanied by some extrinsic evidence in order to be deemed authentic as an ancient document.

The Court agrees that the available Third Circuit precedent suggests that importance of extrinsic evidence under certain circumstances, but finds sufficient evidence in the Government's proposed exhibits to conclude that the majority of the unsigned documents meet the authenticity threshold.  Unlike more typical ancient documents, these documents, though unsigned, have been kept in the custody of the federal government, the State of Connecticut, or the American Numismatic Society library.  The Langbords have cast no doubt on the ability of these institutions to keep records; nor have they "put forward so much as a hint that these documents have been tampered with in any way."[2]  Parsons v. Celotex Corporation, C.A. No. CV 478–319, slip op. at 3 (S.D. Ga. Aug. 27, 1980) (quoted approvingly in Threadgill, 928 F.2d at 1376).  Although a lone unsigned letter found by a layperson in a decedent's desk drawer might require

_____

[2]That the National Archives does not possess a complete set of correspondence sent to the Philadelphia mint from 1914 through 1956 does not cast sufficient doubt upon the records that the National Archives does, in fact, possess.  As the Langbords themselves acknowledge, the National Archives record-keeping responsibilities were clarified in 1950.  One could reasonably conclude that any incompleteness of records created before or near that time logically follows from unclear record-keeping regulations, rather than suggest that the National Archives lacked (or lacks) the ability to retain the documents it received during that period.

some further extrinsic proof of authenticity, documents stored by governmental agencies with other documents of the same kind, discussing the same subject matter, and lacking any hint of suspicion qualify as prima facie authentic.

The Langbords' argument that many ancient documents in this case were prepared in anticipation of related criminal and civil forfeiture proceedings does not require a different conclusion.[3]  While some courts have expressed that the ancient document rule makes sense because "such evidence is less likely to be affected by the forces generated by the litigation since they are made in a context where there is less reason to fear a lack of candor, distortion, whether conscious or unconscious, or even deliberate falsehood affected the statements made," Compton v. Davis Oil Co., 607 F. Supp. 1221, 1229 (D. Wyo. 1985), a broad policy underlying the rule need not apply to every document that meets the rule's delineated criteria.  "Although the rule requires that the document be free of suspicion, that suspicion does not go to the content of the document but rather to whether the document is what it purports to be . . . ." United States v. Kairys, 782 F.2d 1374, 1379 (7th Cir. 1986) (cited approvingly in Threadgill, 928 F.2d at 1376). Whether the document's contents are trustworthy, accurate, or complete does not bear upon authenticity, but "upon the weight to be accorded the evidence." Kairys, 782 F.2d at 1379. Requiring courts to ignore the ancient document rule's three requirements and make determinations based on whether a document was prepared with similar litigation in mind would require courts to assess a document's trustworthiness or bias, a task inappropriate when resolving

---

[3]Indeed, to the extend that the challenged documents are United States Secret Service reports, "there is an assumption that public officials perform their duties properly, and without motive or interest than to submit accurate and fair reports." United States v. Versaint, 849 F.2d 827, 831-2 (3d Cir. 1988); See also Clark v. Clabaugh, 20 F.3d 1290, 124 (3d Cir. 1994).

threshold authenticity questions.

But though the majority of the documents meet all three requirements of the ancient document rule, a hint of uncertainty does appear in a few of the Government's proposed exhibits. Perhaps because of the documents' age, many of the records seem to have been "copied" manually. The Langbords complain especially of two manually transcribed potential copies of a 1933 telegram (United States's Proposed Exhs. 134 & 266) and an alleged copy of a statement that the Government attributes to Israel Switt, but which does not bear his signature (United States's Proposed Ex. 239). In addition, the many unsigned documents bearing the word "COPY" or marked as signed either with type-written letters or a stamped image bear similar indicia of uncertainty.[4] As the Third Circuit has explained, "the point of a Rule 901(b)(8) inquiry is to determine whether the documents in question are, in fact, what they appear to be." Threadgill v. Armstrong World Industries, Inc., 928 F.2d 1366, 1376 (3d Cir. 1991). Thus, when an indication that the document has been recreated manually appears on the face of the document, the Langbords challenge that the United States has not put forth any evidence to establish that these documents are what the Government asserts they appear to be: accurate reproductions of missing originals.

In order to attribute the contents of these unsigned manual copies to their supposed authors—e.g., demonstrate that a manually reproduced document should be treated as if it were

---

[4]The Court has identified these proposed exhibits as falling within one of the aforementioned problematic categories: 117, 119 (page 1) , 127 (letter marked "COPY"), 133–37, 188, 198, 200, 202, 221 (enclosures only), 233 (Charles P. Rump's unsigned statement), 233A, 237 (last page), 238 (last page), 240 (except March 21, 1944 letter from Helen C. Moore, a signed version of which appears at 123), 266 (attachments marked "COPY", except March 21, 1944 letter from Helen C. Moore), 274 (attachments stamped "signed by"), 285 (attachment), 305–307.

the 1933 telegram itself—the Government must establish that the copies are accurate reproductions of originals. In all but a few instances (where, for example, a signed copy also appears among the proposed exhibits), they have not produced sufficient extrinsic evidence to overcome the marks of uncertainty that appear on the documents' faces, and thus they have not established prima facie authenticity of the documents as accurate copies of originals. But the marks suggesting that the documents were manually created does not prevent the United States from introducing them; they just must do so under slightly different terms. Although the United States has not provided sufficient evidence to suggest that the manual copies accurately reflect originals—and are, therefore, the originals' equivalents—they have established that these documents were manually created more than 20 years ago and now comprise part of archival government files related to the 1933 Double Eagle. Defined in this way, the documents qualify as prima facie authentic. Whether the contents of the documents are accurate—that is, whether they actually reflect now missing originals such that the contents can be attributed to the document's supposed author—is a separate question that the parties may contest before the jury.

### 2. Government's Challenges to Langbords' Proposed Exhibits' Authenticity

The Government challenges the authenticity of the majority of the Langbords' proposed exhibits on the grounds that the Langbords have not provide proof of authenticity. The Langbords respond that they have provided the Government with record custodian certificates for 52 of those exhibits. To the extent that the certificates appear authentic at trial, the Court will deem the documents prima facie authentic under Rule 902(11) (business record must be "accompanied by a written declaration of its custodian"). (See Langbord Proposed Exs. 8, 10–23, 25–29, 31–44, and 46–63.) Eight more of the proposed exhibits appear to be self-

authenticating official publications or periodicals covered by Rule 902(5) and (6). ( See

Langbord Proposed Exs. 2, 3, 64–67, and 150.)  The three photographs taken by the Langbords'

counsel's paralegal might properly be authenticated through her testimony under Rule 901(b)(1).

(See Langbord Proposed Exs. 45, 68, 69.)   If the Government will not stipulate to the

authenticity of those documents the Langbords state they received from the Government, the

Langbords can either obtain the appropriate certifications or limit their use to cross-examination

purposes as they suggest.

*B. Relevance and Prejudice*

This section of the Court's Memorandum Opinion explains its evidentiary rulings

premised upon Federal Rules of Evidence 401, 402, 403, and 404.  Rule 402 provides that "[a]ll

relevant evidence is admissible"; Rule 401 defines relevant evidence as evidence having "any

tendency to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence."  A piece of

relevant evidence might be deemed inadmissible nonetheless if its "probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

the jury."  Fed. R. Evid. 403.  Finally, Rule 404(b) states that "[e]vidence of other crimes,

wrongs, or acts is not admissible to prove the character of a person in order to show action in

conformity therewith," but that evidence of bad acts offered for any other purpose that also meets

Rule 403's balancing test can be admitted.  In conducting this Rule 404(b) analysis, the court

"must balance the actual need for that evidence in view of the contested issues and other

evidence available to the [proponent]."  United States v. Sriyuth, 98 F.3d 739, 748 (3d Cir.

1996); United States v. Scarfo, 850 F.2d 1015, 1019 (3d Cir. 1988) (same).  With these rules in

mind, the Court addresses the categories of proposed exhibits to which the Langbords raised an objection, followed by the categories to which the Government raised an objection.

### 1. *Barnard* Decision

Contained within the United States's proposed exhibits are documents related to United States v. L. G. Barnard, a 1947 case in the Western District of Tennessee. There, the United States sought replevy of one 1933 Double Eagle from collector L. G. Barnard. Judge Boyd made factual findings that the Philadelphia Mint had "not receive[d] a license from the Secretary of the Treasury" to issue any 1933 Double Eagles, that "[t]he weight of the bullion resulting from the melting of all 1933 Double Eagles held by the Philadelphia Mint was the same as the weight of the coin prior thereto," and therefore that the 1933 Double Eagle at issue "was taken from the Philadelphia Mint illegally, upon substitution of a Double Eagle of another year, so that its loss would not be detected in weighing." (Gov't Proposed Ex. 1-A at 2-3.)

The Langbords object to the introduction of Judge Boyd's factual findings and legal opinion on the grounds that no exception to the hearsay rule provides for the introduction of judicial opinions or factual findings.[5] (Doc. No. 153 at 28.) The Government responds that these documents are not, in fact, hearsay because it does not intend to introduce them for the truth of the matter; the Government instead asserts "they are set forth to show that Israel Switt, and any other purchaser or holder of 1933 Double Eagles subsequent to the Barnard decision,

---

[5]The Langbords' broad objection also seems to include Government's Proposed Exhibits 119 and 127. As for Proposed Exhibit 119, the Court determines that the first page, which references the Barnard case, is inadmissible because, as a non-public document, it does not provide Israel Switt or his family notice of anything. All other documents that make up Proposed Exhibit 119 are admissible as they do not refer to the Barnard case and meet the remaining requirements for admissibility, as this Memorandum Opinion explains. For the reasons explained below, the Court deems Proposed Exhibit 127 presently inadmissible.

was on notice that the government alleged the property was stolen." (Doc. No. 162, at 21-22.) The Langbords label this strategy a ruse because the Government fails to provide any evidence that Switt knew about the <u>Barnard</u> decision—in fact, the Langbords claim, the case's publicity was limited to a brief July 1947 New York Times article appearing on page 23 with more than myriad short news stories and obituaries and a 1948 Numismatist paragraph-long story on page 50. Thus, the argument goes, "there is no evidence, and no reasonable basis for a jury to conclude, that Israel Switt or his heirs—all of whom were living in Philadelphia when the articles were published—actually saw either of these minor stories," and the Government should not be allowed to introduce the <u>Barnard</u> decision for the purposes of proving notice.

If the Government seeks to introduce the <u>Barnard</u> findings of fact and judicial opinion for their truth, the Court finds no hearsay issue with the documents—like many of the United States's proposed exhibits, the documents were created more than 20 years ago, are in conditions that create no suspicion concerning their authenticity, and were found in the National Archives collection in Georgia, qualifying them as an ancient document under Rule 901(b)(8) and therefore as a "statements in ancient documents" for hearsay purposes pursuant to Rule 803(16).

But this conclusion does not end the admissibility inquiry. Rule 403 requires courts to balance the probative value of a particular piece of relevant evidence against any undue prejudice that the evidence might spark and to exclude the evidence if the undue prejudice substantially outweighs the probative value. Fed. R. Evid. 403. Judicial findings of fact or conclusions of law pose a serious risk to the fairness of the judicial process because "they would likely be given undue weight by the jury" and "creat[e] a serious danger of unfair prejudice." <u>Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.</u>, 505 F. Supp. 1125, 1186 (E.D. Pa. 1980). Beyond

that, introducing legal conclusions made sixty-four years ago by a judge who considered different evidence might muddle the issues in the present case and require a forceful instruction about the relationship, or lack thereof, between that case and this one.  See id.  Because the United States seems to possess nearly all of the evidence that Judge Boyd considered in 1947 and those documents are admissible as ancient documents, the absence of necessity for this evidence tips the closely balanced scale against its admission as stand-alone substantive evidence.

Turning back to the United States's proposed resolution—to admit the Barnard opinion and factual findings for notice purposes only—the Court concludes that, despite the lack of direct evidence that Switt or his relatives ever learned of the Barnard decision, the decision's existence has a tendency to make Switt's or his relatives' notice of the potential illegality of possessing 1933 Double Eagles at least somewhat more probable, such that the Barnard documents meets Rule 401's relevancy threshold.  A plethora of proposed admissible evidence demonstrates the extent of Switt's dealing in gold coins and his questioning by the Secret Service about 1933 Double Eagles.  A fair inference may be drawn that, although an average Philadelphian may not have received notice of the Barnard decision, Switt, with as much to gain or lose from it as anyone, would have been made aware of it through one channel or another.

That said, based on the Rule 403 analysis performed above, introducing the Barnard factual findings and opinion for purposes other than to demonstrate notice, or extensively recounting the factual or legal conclusions that Judge Boyd drew, would subject the Langbords to undue prejudice.

Finally, the Court is mindful that David Tripp and Eric Rauchway, the United States's experts, relied upon these documents for their truth, and not their notice potential.  Rule 703

governs the disclosure of evidence relied upon by experts and prohibits experts from discussing otherwise inadmissible evidence unless the Court "determines that [the evidence's] probative value in assisting the jury to evaluate the expert's opinion substantially outweighs [its] prejudicial effect." Here, the <u>Barnard</u> opinion and factual findings are historical accounts that Tripp and Rauchway used, along with other historical documents and accounts, to reach the conclusion that the 1933 Double Eagles were stolen. The factual findings and legal conclusion are of the type of historical evidence which experts typically rely upon in reaching expert opinions. Because the weight of the historical evidence supporting the conclusion that the Coins were stolen, balanced against the dearth suggesting the Coins left the Mint through authorized channels, undergirds both expert opinions, Tripp and Rauchway may refer to the documents during their testimony, and they will be admitted as exhibits. They may not, however, stress that in a legal action similar to the instant dispute, a judge made a determination favorable to the government upon consideration of substantially similar evidence. The Court will give the jury a cautionary instruction to ensure that the jury does not place undue weight on Judge Boyd's legal opinion and counsel is requested to promptly submit a proposed instruction on this point.

### 2. 1934 Switt Gold Hoarding Case

The United States seeks admission of documents related to a second case: <u>United States v. 98 Twenty Dollar United States Gold Coins lately in the possession of Israel W. Switt</u> (hereinafter "Switt case"), wherein the Government sought and obtained forfeiture of coins seized from Switt's person in 1934 because, in possessing them, he violated the Gold Reserve

Act of 1934.[6]  The Langbords claim that the Switt case documents are irrelevant, highly

prejudicial, and laden with hearsay.  The Court addresses the hearsay argument later in this Order

but here concludes that the documents appropriately go to Switt's knowledge of the

repercussions from breaking the gold laws and provide evidence of a motive to conceal his

possession of the ten 1933 Double Eagles presently at issue.

Because the proposed evidence centers on Switt's prior bad acts, the Court must assess

"first, whether the evidence is logically relevant, under Rules 404(b) and Rule 402, to any issue

other than the defendant's propensity to commit the crime; and second, whether under Rule 403

the probative value of the evidence outweighs its prejudicial effect."  United States v.

Himelwright, 42 F.3d 777, 781 (3d Cir. 1994) (citing United States v. Sampson, 980 F.2d 883,

886 (3d Cir. 1992).  Federal Rule of Evidence 404(b) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character
> of a person in order to show that he acted in conformity therewith.  It may,
> however, be admissible for other purposes, such as proof of motive, opportunity,
> intent, preparation, plan, knowledge, identity or absence of mistake or accident.

Rule 404(b) is a rule of inclusion, rather than exclusion.  United States v. Scarfo, 850 F.2d 1015,

1019 (3d Cir. 1988).  Although the Third Circuit has expressed concern that the motive for

---

[6]In this 1937 action, the district court ordered the forfeiture of $2,000 in gold coin
consisting of 98 (pre-1933) Double Eagles and four Single Eagles (ten dollar gold pieces).  In his
factual findings, Judge Maris wrote:
> The gold coins in question were seized by agents of the Government from Switt's
> person as he was about to board a train from Philadelphia to Baltimore where he
> planned to meet a dealer in old gold coin with whom he had previously done
> business.  He had taken the gold from his safe deposit box in Philadelphia and it
> was his intention to put it in a box in Baltimore or return it to Philadelphia.  He
> stated he planned ultimately to turn the gold in to the Treasury. . . . Switt admitted
> that he knew of his duty to deliver up these gold coins.
(Gov't Proposed Ex. 168.)

introducing such evidence often comprises both "an urge to show some other consequential fact as well as to impugn [a person's] character," United States v. Jemal, 26 F.3d 1267, 1272 (3d Cir.1994) (internal quotation marks omitted), when the proponent of bad acts evidence "clearly articulate[s] how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged," he or she has proffered evidence that tends to prove a fact besides character. Himelwright, 42 F.3d at 781. That does not end the inquiry, however. Once the proponent articulates a permissible purpose under Rule 404(b), the court must weigh the probative value of the evidence against its potential to cause undue prejudice under Rule 403. Jemal, 26 F.3d at 1272.

The Government contends that Switt case the documents show "Switt was on notice that the government would seize stashes of gold coins and forfeit them for his failing to have turned them in" and that he had a "motive in later concealing the ten 1933 Double Eagles at issue in this case." (Doc. No. 162, at 19, 20.) Both of these reasons are persuasive. The Switt case stems from Switt's breach of the Gold Reserve Act of 1934 and concerns the possession of ninety-eight Double Eagles, while this case centers on the alleged violation of 18 U.S.C. § 641 and concerns the possession of ten Double Eagles. But, in both instances, application of the separate laws relate to the concealment of high-value Double Eagles. The Switt case documents, particularly Switt's statement to Agent McDevitt and Switt's testimony before the court, provide potential evidence of knowledge, motive and intent and would fairly support an inference that Switt was aware of the laws related to the possession of gold coins and that possession of gold coinage, particularly Double Eagles, was unlawful under certain circumstances. The documents have a proper evidentiary purpose since they speak directly to motive, knowledge, intent and the

absence of mistake or accident.

The Swit case documents also raise an additional permissible inference related to additional potential § 641 violations. As discussed above, they are relevant and probative of Israel Switt's, and perhaps his wife's, mental state and potential motive to conceal the 1933 Double Eagles from 1937 until his death in 1990 and her death in 1985. Moreover, as discussed below, the Government seeks to tender several pieces of evidence that might reasonably be viewed as suggesting that Joan Langbord had knowledge of the Gold Pieces during and after the probate process and concealed that knowledge until after the sale of the Fenton coin. That her father had been convicted previously for a crime arising from the possession of pre-1933 Double Eagles, if testimony concerning related circumstances is sufficiently suspicious, also potentially supports this an inference of knowledge and concealment. After all, documents indicate that upon his arrest in 1937 Switt told law enforcement officials that he had retrieved the ninety-eight Double Eagles from his safe deposit box in Philadelphia (Gov't Ex. 168), possession of which eventually passed to Joan Langbord.

As a permissible purpose for the Switt documents' introduction plainly exists, the Court must weigh their probative value as to motive and knowledge against the danger of unfair prejudice. The fact that so many of the facts giving rise to this forfeiture action occurred between 1933 and 1947 heighten these documents' probative value. The Government has incredibly limited access to individuals who might have spoken with Switt about his knowledge of whether it was legal to possess the 1933 Double Eagles, or his potential motives for concealing his possession of them. After all, the majority of Switt's contemporaries are long since deceased. Only the claimant Langbords, with interests obviously very divergent from the Government's,

will offer testimony about their relative. As a result, any documentary evidence that tends to prove a fact central to a 18 U.S.C. § 641 violation is highly probative. Although the Court certainly understands that some level of prejudice will arise from the introduction of the Switt case documents, this prejudice is not unfair. It is clearly understood that the evidence, while relevant and germane, is admissible only for a limited purpose. We fully intend to caution the jury that they may not consider the evidence for the purposes of determining Switt's character or whether he possessed a propensity for criminality and solicit counsel's input in the formulation of an appropriate instruction.

### 3. Documents Regarding the Decision Not to Prosecute Switt

The Langbords seek to exclude two proposed exhibits that explain why the United States did not prosecute Israel Switt, despite the evidence they amassed suggesting that he was likely involved in the theft of the 1933 Double Eagles from the Mint in one way or another. Government Proposed Exhibit 279, a December 18, 1944 letter from Agent Fred Gruber of the Secret Service to the U.S. Attorney, summarizes the Secret Service's findings; Government Proposed Exhibit 276, which contains a February 6, 1945 letter in response, explains that the statute of limitations barred Switt's prosecution. According to the Langbords, "[t]here is no probative value in a decision *not to prosecute* Mr. Switt, . . . nor is there any probative value to the fact that the Secret Service sought such a prosecution." (Doc. No. 154-1, at 21.) The United States responds that the documents should be admitted because, after hearing testimony and seeing documentary evidence regarding the case against Switt, the jury will want to know the conclusion to the story. Indeed, a jury might fairly conclude that the absence of a prosecution is evidence of the limited value of the evidence accumulated by the Secret Service. As all

16

experienced advocates well understand, the failure to answer a logical and natural question, as well as the failure to explain why certain investigative actions were not taken, is frequently paramount in a jury's determinations. The Government's presentation of its reasons for deciding not to prosecute Switt are indeed relevant and germane. As it is essential in providing a full contextual understanding of historical events, the United States is permitted to present evidence that a prior United States Attorney decided not to prosecute Switt for statute of limitations reasons after receiving documents explaining Switt's likely involvement in the 1933 Double Eagle theft.[7]

### 4. Other 1933 Double Eagles Seized in the 1940s and 1950s

The Secret Service undertook considerable efforts to determine how the nine 1933 Double Eagles circulating in the 1940s and 1950s were released from the Mint. They made detailed reports recounting the facts they gathered during their investigation—including a widely accepted conclusion that George McCann was the likely thief—and their attempts to reacquire the coins. The Langbords argue that the fate of these other coins and the Government's threat of prosecution that prompted other collectors to surrender the coins "is not probative of how the Langbords' Coins left the Mint, is unduly prejudicial, and will be confusing to the jury." The Court disagrees.

As to relevance, the number of 1933 Double Eagles in the market and the information gathered by the Secret Service about their provenance support the inference of theft in the

---

[7]The Court is mindful that a letter from the U.S. Attorney might, in some circumstances, qualify as a legal opinion. The implication apparent from the letter, however, is not couched as a legal opinion, but as a strategic or discretionary choice. Thus, its inclusion does not run afoul of the principle that neither lay nor expert witnesses can testify to a legal conclusion. See infra Section II.B.7.

following ways: (1) the investigators concluded that all of the 1933 Double Eagles of which they were aware entered circulation in 1937, just before the time at which they were to be melted into bullion, suggesting a single theft rather than random authorized release; (2) the investigators concluded that all of the 1933 Double Eagles spread from a single source—Israel Switt—an unlikely occurrence if the Coins were accidentally or haphazardly released from the Mint; (3) that Switt had at one point possessed all of the 1933 Double Eagles in circulation, which the Secret Service concluded were stolen, suggests that the ten Gold Pieces subject to forfeiture in this case were also stolen; and (4) some of the Government's proposed exhibits relating to other 1933 Double Eagles demonstrate that Switt had knowledge of the fates of these circulating coins, the United States's contention that the coins were illegal to possess, and the United States's successful reacquisition of all the coins of which the Government was aware, giving rise to both motive and knowledge inferences.

Even if the documents are probative, the Langbords contend, they are unduly prejudicial and will confuse the jury. Again, the Court disagrees. Though the four relevant inferences raised above may reduce the Langbords' chance of success in this matter, such prejudice is not undue. And the jury will not easily confuse the Secret Service's conclusions regarding theft of nine coins that the Government reacquired more than a half century ago with the determinations they must make regarding whether the ten 1933 Double Eagles in this case were stolen, or possessed with knowledge that they were stolen, from the Mint. To the extent that, through the documents, the Secret Service expresses an opinion about the legality of possessing the coins, the Court can alleviate any potential confusion or the risk that the jury will give that determination undue weight with a curative instruction. Again, we welcome a proposed instruction.

*5. Documents Regarding Other Thefts from the Mint*

The Government proposes several exhibits related to thefts from the Mint that occurred prior to 1937, some of which attribute the theft to George McCann, the head cashier. The Langbords cry foul, claiming that previous thefts are irrelevant and that any evidence regarding McCann goes to his propensity to commit further theft, not to any legitimate inference. This evidence of prior theft fits into one or both of these categories: it is either (1) evidence that prior thefts occurred; and/or (2) evidence that McCann committed the thefts.

The first type of documents is plainly relevant and not unduly prejudicial. Whether a past theft occurred certainly tends to show that another theft might have occurred, taking advantage of the same security weaknesses, for example.[8] The risk of a jury confusing the theft of 1928 gold coins with the 1933 Double Eagles in this case is minimal, and can certainly be clarified by counsel during the trial. The second type, exposing McCann's involvement in the theft, requires an analysis under Rule 404(b). Although the evidence does relate to McCann's character, it also tends to show that McCann had an opportunity to steal the 1933 Double Eagles based on his work at the Mint and that if he participated in the removal of the Double Eagles from the Mint, it was not the result of a mistake or accident on his part. Both of these are legitimate purposes under Rule 404(b), and the documents' probative value on these two points far outweighs the risk of any prejudice that the Langbords' might experience. Moreover, upon request, the Court will caution the jury not to evaluate the bad acts evidence introduced for its tendency to show

---

[8]As for the documents that refer to Charles P. Rump, to the extent that any insinuation exists that Rump could have been involved in the theft of the Gold Pieces that the Langbords possessed prior to 2004, those documents are relevant for opportunity and lack of mistake or accident, much like the documents referring to McCann. If no one contends that Rump was involved in the alleged theft of the Gold Coins, the documents are not offered for propensity.

propensity to commit additional bad acts.

### 6. Probate and Safe Deposit Box Exhibits

The Langbords also contend that exhibits related to the probate of Elizabeth and Israel Switt's estates and the safe deposit box in which Joan Langbord claims to have discovered the 1933 Double Eagles are "wholly irrelevant to central question[s] to be decided," and substantially more prejudicial than probative. (Doc. No. 153 at 25–28.) According to the Government (and seemingly undisputed by the Langbords), the probate documents demonstrate that the executors of neither Elizabeth nor Israel Switt's estates declared the Coins or the safe deposit box in which the Coins were discovered for probate or tax purposes. The Government argues that the probate documents are highly relevant to the issue of knowing and unlawful concealment, an element of the crime underlying the forfeiture count. See 18 U.S.C. § 641; § 981(a)(1)(C). The Langbords counter that neither Joan, nor David, nor Roy, but rather Stanton Langbord, a son and a sibling who is not a party in this action, bore responsibility for ensuring that the Coins' existence was documented when those estates went through probate, such that the documents do not bear on whether the parties in this action knew of or concealed the Double Eagles.

As an initial matter, only in rare instances is direct evidence available to establish a person's state of mind. Proof of knowledge or intent is typically inferred from conduct and attendant circumstances. The evidence that the Government intends to introduce regarding the safe deposit box closely bears on the probate documents' potential relevance. According to the United States, Joan Langbord, leased the safe deposit box in 1996, six years after her father Israel, and eleven years after her mother Elizabeth, had died. (See Gov't Proposed Ex. 318.) Adding to the inference of knowing concealment, the Government points out that although state

law requires a representative of the Commonwealth or bank to be present when opening a safe deposit box owned, or co-owned, by a decedent, none of the exhibits proposed by either side reveal that Joan Langbord complied with this requirement when she inventoried the box and claims she discovered the Coins. These additional pieces of information cast the probate documents in a slightly different light and make their relevance as to concealment clear: If Joan herself leased the safe deposit box and she frequently accessed the safe box once she leased it,[9] a fair inference can be made that she knew of the Double Eagles and concealed them from the Government because she knew them to be illegal to possess. If the box indeed contained items of which the Langbord Claimants were unaware, one could infer that one of the Switts concealed the Coins from their family members, a set of facts supporting the inference of knowing and intentional concealment as well as the absence of accident or mistake. Depending upon the presentation of the evidence at trial, it might also be fairly inferred that the Langbord Claimants themselves gained knowledge of the Double Eagles and then concealed the Coins from the Government, also suggesting that the Langbords knew the coins were illegal to possess. Introducing the evidence for these reasons is permissible under Rule 404(b), and although evidence of potential wrongdoing may prejudice the Langbords, the prejudice is not undue—indeed, the potential wrongdoing tends to establish intentional concealment and knowledge that the Gold Pieces were stolen and speaks directly to two elements of the criminal charge underlying the forfeiture count.

*7. Legal Opinions by Treasury Department in the 1940s*

---

[9]Indeed, she accessed the box containing the Gold Pieces on July 29, 2002, the day before the Fenton coin was sold at auction. (Govt Proposed Ex. 318.)

The Langbords contest the admission of three additional documents prepared by Treasury Department attorneys regarding the United States's effort to repossess 1933 Double Eagles in the 1940s. Dated May 4, 1944, a memorandum from Treasury Department General Counsel Joseph J. O'Connell, Jr. explains the possible legal mechanisms by which the United States could reacquire the nine known 1933 Double Eagles in circulation at that time. (Gov't Proposed Ex. 228). The second document, written by Mr. O'Connell on April 28, 1945 to Secret Service Chief Frank Wilson, explains that private citizens in possession of these coins could be prosecuted for receiving stolen property (one of the many suggestions in the previous memo). (Gov't Proposed Ex. 275). The final document to which the Langbords object on these grounds is a January 5, 1946 memo from Treasury Department Assistant General Counsel Norman O. Tietjens to the Justice Department that outlines the expected testimony and evidence in the Barnard trial. (Gov't Proposed Ex. 127.) According to the Langbords, these documents present legal conclusions in a way that usurps the function of the Court to instruct the jury on the law.

Generally, neither an expert witness nor a lay person may give testimony that amounts to a legal conclusion. Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006); Hogan v. American Telephone & Telegraph, 812 F.2d 409, 411–12 (8th Cir. 1987) (lay opinion is not helpful if couched as legal conclusion); Christiansen v. National Savings and Trust Co., 683 F.2d 520, 529 (D.C. Cir.1982) ("lay legal conclusions are inadmissible in evidence"). But the Government does not seek to introduce these exhibits in order to improperly influence the jury. Rather, it contends that the documents are admissible if the Langbords contend, as they have in the past, that United States has held inconsistent positions regarding whether the 1933 Double Eagles in circulation were lawfully released.

Should the Langbords call into question the United States's legal stance regarding the status of the 1933 Double Eagles, the Court will permit the introduction of Government Proposed Exhibits 228 and 275.  These two documents express broad opinions about the state of the law without analyzing the specific evidence that the Government may present to the jury in this case. As such, neither document contains an "ultimate legal opinion" or is calculated to improperly sway the jury.  See United States v. Newman, 49 F.3d 1, 7 n.8 (1st Cir. 1995).  A limiting instruction, therefore, can sufficiently mitigate against any risk that the jury will give undue weight to the lawyer's opinion.  See Bensen v. American Ultramar Ltd., No. 92-4420, 1996 WL 422262, at *12–13 (S.D.N.Y. July 29, 1996) (mentioning danger that when "the opinions are framed by lawyers, . . . a jury may see [the lawyers] as experts instructing them on the law.").  If the Government arrives at the view that the presentation of evidence at trial has made these documents relevant, it should advise the Court outside of the presence of the jury and obtain a ruling in advance of presenting the documents or posing document-related questions.

Proposed Exhibit 127, on the other hand, includes reference to specific evidence that the Government also seeks to introduce in this case, without significantly buttressing to the United States's assertion that it has held a consistent position as to the legality of possessing a 1933 Double Eagle from 1933 onward.  A less senior Treasury Department official wrote Proposed Exhibit 127 and did so *between* the dates when the more senior official wrote Proposed Exhibits 228 and 275.  In other words, its marginal relevance and cumulative nature lessen its probative value; but its specificity and greater overlap with the facts of this case amplify the extent to which it may confuse or usurp the functions of the jury.  Accordingly, the Court concludes that the document is presently inadmissible.

*8. Providing Context Regarding Current Controversy*

The United States moves to limit the introduction of the background information that the Langbords' perceive as necessary to fairly convey to the jury how the Coins came to be in the United States's possession. The Langbords wish to introduce evidence that they "came forward seeking to discuss some kind of agreement, that the Coins were made available and transferred to the government for the purposes of authentication and without the Langbords giving up any rights, and that, having authenticated the Coins many months later, Mint counsel advised the Langbords that the government would retain the Coins." (Doc. No. 161 at 6.) According to the Langbords, this information is "critical" so that "the jury has an accurate and contextual understanding of the circumstances surrounding the transfer of possession of the Coins," "to rebut any arguments that the Langbords were improperly withholding the Coins," and "to ensure that the jury does not misunderstand or give any weight to the fact that the Coins are currently in the government's possession." (Doc. No. 161, at 6.) The United States counters that the Langbords "reservation of rights" and the Mint's decision to retain the coins have "no bearing on this case," which turns on whether the Coins were stolen or embezzled from the Mint. (Doc. No. 152 at 14.) But perhaps because it acknowledges that the jury needs some background, the United States's list of facts that it intends to prove that the Langbords simply "surrendered" the Gold Pieces in September 2004. (Doc. No. 151-15, at ¶241.)

In order to ensure that the jury has a basic understanding of the facts giving rise to this case, the Court concludes that the Langbords may briefly introduce evidence regarding their turning over the Double Eagles to the Mint and the Mint's decision not to return them. But their submissions shall be limited, providing only basic contextual information and shall not include

any reference to the possessory or ownership interest they claim to have had prior to turning over the Gold Pieces (although they may discuss possession, they may not draw any legal conclusions from it).

Nor may the Claimants make any reference to this Court's conclusion that the United States violated the Langbords' procedural rights, as this legal determination does not provide *useful* background information or bear upon whether the Coins were stolen or embezzled from the Mint. The Court can think of no purpose for introducing evidence concerning this Court's determination of the Mint's improper actions to a jury empaneled before this Court other than to unduly prejudice the United States. And the supposed presumption of ownership from undisturbed possession, which the Langbords incorrectly attribute to the Court, confuses the issue. Notably, the Court held only that the Langbords' continuous possession gave rise to a possessory interest that conferred upon them a set of due process rights, not any presumption of rightful ownership. (Compare the Court's Opinion, Doc. No. 108, at 19; with the Langbords' mischaracterization of it, Doc. No. 153-1, at 26.)[10] Moreover, unless and until the Langbords concede forfeitability but contest forfeiture on the grounds that they are innocent owners, their possessory interest in the Gold Pieces as of 2004 bears no relevance to whether the United States has established that the Coins are the proceeds of illegal activity and are therefore subject to forfeiture.

### 9. Small Denomination Coin Letters

The United States also seeks an order excluding letters written by the Mint in 1933 and

---

[10]This holding was central to the resolution of the summary judgment motion and the failure of the sophisticated litigants before this Court to appreciate the fundamental nature of this ruling is difficult to comprehend.

1934 regarding its tracking of small denomination coins. Nine of the twelve exhibits refer to 1913 nickels, for which the Mint changed the stamp design in 1913 but could not aid in the procurement of one design or the other because the nickels were not segregated by design. (Langbord Proposed Exs. 27, 34, 36–39, 41, 43 & 55.) One exhibit refers to 1922 one-cent pieces and indicates that the pennies were not segregated by year. (Langbord Proposed Ex. 44.) Another refers to 1934 half dollars and reports that "we have no definite program covering the coinage of half dollars during the calendar year." (Langbord Proposed Ex. 45.) The final letter does not specify a particular coin, but broadly states that "the Government does not keep coins segregated by years." (Langbord Proposed Ex. 56.) The Langbords wish to introduce this evidence to buttress Roger Burdette's expert opinion that "the Mint did not attribute special importance to the date on a coin." (Burdette Report at 10 & n.17.) The Government argues that the documents are irrelevant because they refer to coins of appreciably lesser value and do not refer to gold coins, let alone Double Eagles from a particular year.

To assess the relevance of these documents, the Court turns to Rule 401, which instructs that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Although the Court finds little probative value in letters regarding small denomination coins minted 20 years before the ten 1933 Double Eagles that the Government seeks to forfeit, Rule 401's low threshold supports their admission. The United States contends that this limited probative value is outweighed by the "unreasonable danger of confusing the issues or misleading the jury." (Doc. No. 152 at 16.) The Court disagrees: the differences between pennies, nickels, half dollars and $20 gold pieces, and the

span of years between the dates that the small denomination coins were minted and 1933 are not difficult to comprehend or accentuate during examination. Accordingly, the Court concludes that, even under Rule 403's balancing test, the Langbords' proposed exhibits regarding how the Mint tracked its coin production are admissible. Whether the practice applied to 1933 Double Eagles and the weight to be accorded the evidence are matters for the jury.

*10. 2007 Mint Website Printout*

Next, the Government contends that the Langbords should not be permitted to introduce a page printed from the Mint's website in 2007 that lists the 1933 Double Eagle among "Circulating Coins." The Langbords assert that the Government's "admission" weakens the Government's argument that the Mint never lawfully issued 1933 Double Eagles, and is therefore relevant under Rule 401. According to the United States, the hyperlink associated with this information linked to a story about the "Fenton coin," which, in fact, was monetized in 2002 as part of a settlement agreement resulting from litigation similar to the instant case. (Doc. No. 151, at 17 n.1.) In response, the Langbords provide a series of additional screenshots showing that the hyperlinked page in turn hyperlinked to four pictures, none of which were of the Fenton coin. (Doc. No. 161, at 9 n.5.) No matter what the Mint meant when it advertised the 1933 Double Eagle as circulating, it did not limit its description to a specific coin monetized in 2002, and the statement potentially qualifies as an admission such that the hearsay rule does not bar its admission pursuant to Rule 801(d)(2)(A). See Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish, 648 F. Supp. 2d 805, 806 n.2 (E.D. La. 2009) (finding printout from defendants' website the "admissible as a party-opponent's own statement"); TIP Sys., LLC v. SBC Operations, Inc., 536 F. Supp. 2d 745, 756 n.5 (S.D. Tex. 2008) (same); Perfect 10, Inc. v.

Cybernet Ventures, Inc., 213 F. Supp. 2d 1146, 1155 (C.D. Cal. 2002) (same).

*11. Post-1933 Gold Laws and Regulations*

The Government also challenges the Langbords' proposed exhibits related to post-1933 laws and regulations regarding the possession of gold coins, arguing that they lack relevance to the regulations in effect. The Langbords respond that they only intend to introduce those exhibits to rebut any insinuation by the United States that it is illegal to possess 1933 Double Eagles, even if they were released through authorized Mint channels. In the Court's view, the Government has not yet attempted such an assertion, but if it does, and only then, will this Court resolve the admissibility of Proposed Exhibits 66 and 75. If the Claimants believe the Exhibits have become relevant, they are directed to raise their intention to pose questions in this area to the Court outside the hearing of the jury. At that time, the parties should be prepared to address the central question of whether the evidence to date in this action establishes that 1933 Double Eagles were monetized such that they may fairly be termed "coins," an issue central to whether Exhibits 66 and 75 apply to the Gold Pieces at issue here.

*12. Completeness of Government Records*

The Langbords present three proposed exhibits that they contend tend to show the incompleteness of government records. Proposed Exhibits 64 and 65 are printouts from the National Archives website, and Proposed Exhibit 45 is two photographs of a correspondence log from which several pages have been removed. The United States object to this evidence on the ground that it is "presumably Claimants' backdoor way" of arguing that the records are incomplete and that the Langbords have not listed any witnesses capable of testifying about these documents. Regarding the United States's seeming contention that the documents are irrelevant

or prejudicial, the Court concludes otherwise. All three documents make it slightly more probable that the records the Government relies upon are not complete, thereby bolstering the Langbords' contention that such records could not lead to a conclusive opinion as to whether the Gold Pieces left the Mint through authorized channels. As for the United States's argument that no witnesses will be available to testify about these documents, the Court leaves their presentation up to the Langbords, but finds both website printouts prima facie authentic under Rule 902(5), which provides that "publications purporting to be issued by public authority" are self-authenticating, and non-hearsay under Rule 801(d)(2)(D), which provides that a statement is not hearsay if offered against a party "by his agent or servant concerning a matter within the scope of his agency or employment, (and is) made during the existence of the relationship."[11]

### 13. Treasury Room Drawing and Picture

Next, the United States objects to the Langbord Proposed Exhibits 138 and 139, which the Langbords have identified as a photograph and drawing of the "Treasury Cash Room." The Langbords claim that these documents are admissible under Rule 703 because their expert, Roger Burette, relied upon them to bolster his opinion that the ten 1933 Double Eagles could have left the Mint through means other than theft. According to Burdette, these documents show that the cash room, in which individuals could purchase new coins in-person, was open to the public and

---

[11]Because the United States represents the interest of the people in this action, the Court considers any agency of the Executive Branch an agent of the United States under Rule 801(d)(2)(D). See United States v. American Tel. & Tel. Co., 461 F.Supp. 1314, 1333–34 (D.D.C. 1978) (United States was plaintiff in civil antitrust suit, not Department of Justice, where United States was listed plaintiff and such suits were typically instituted by United States rather than a particular branch of government); c.f. United States v. Van Griffin, 874 F.2d 634, 638 (9th Cir. 1989) (where relevant and competent section of the government charged with conduct related to case was department charged with the development of rules for highway safety, that department's statements qualify as admissions).

that Treasury employees had access to the coins kept there. Because these exhibits will aid the jury in understanding what value to assign to Burdette's opinion, the Court finds them admissible under Rule 703. As Langbords point out, though the images depict the room as it was in 1975,[12] Mr. Burdette plans to testify that the layout is substantially similar to the 1933 layout, with which he is familiar. The Government is, of course, permitted to argue that the jury should assign them a lesser weight based on the date discrepancy, but it does not make the exhibits inadmissible.

### 14. Miscellaneous Government Objections

Finally, the Government argues that the Langbords cannot introduce their Proposed Exhibits 95 and 97, the 1947 Regulations for the Transaction of Business at the Mints, Assay Office, and the Bullion Depositories of the United States, and a description of coin redemption procedures at the Mint during the 1930s, respectively. The Government's objection to Proposed Exhibit 97 lacks merit. As the Langbords point out, the Government proposes to introduce the same document as an attachment to a memorandum from William Dowling to Frank Burke, numbered Gov't Proposed Exhibit 296. Without the memorandum cover-page proposed by the Government, the document the Langbords seek to introduce has unclear relevance; but once the document is contextualized, the Government would be hard pressed to articulate why its own proposed exhibit lacks relevance. The Government's objection to the introduction of the Langbord Proposed Exhibit 95, however, is persuasive. Because the regulations set forth in Proposed Exhibit 95 became effective on December 1, 1947, the Langbords' contention that the

---

[12]The Government objects to the photograph's and drawing's introduction on the grounds that the documents bear no date. (Doc. No. 152, at 25.) The Langbords clarify that the dates for the photograph and drawing are available at the website shown on the bottom of Proposed Exhibit 138.

1947 version of the regulation is as likely to be accurate as the 1918 version contained in the Government's proposed exhibits holds no water. Despite the fact that 1933 falls closer to 1947 than 1918, the 1918 regulations were effective in 1933, unless superceded by another set of regulations before 1933, while the 1947 regulations would not become effective for fourteen more years. Accordingly, the Court concludes that the Langbord Proposed Exhibit 95 does not bear upon the issues presented in this case and is not admissible as direct evidence or for the purposes of cross-examining Government expert David Tripp, unless Mr. Tripp suggests that the 1918 regulations remained in effect past 1947, or something similar.

*C. Hearsay*

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R .Evid. 801(c). Rule 801 prohibits the admission of an out-of-court statement offered to prove the truth of the matter asserted because

> the statement is inherently untrustworthy: the declarant may not have been under
> oath at the time of the statement, his or her credibility cannot be evaluated at trial,
> and he or she cannot be cross-examined.

United States v. Pelullo, 964 F.2d 193, 203 (3d Cir. 1992). There are two ways to overcome a potential hearsay problem: First, the proponent can rely on the statement nor for the truth of the matter asserted, but for another purpose. Second, there exist many exceptions to the hearsay rule which deem particular pieces of evidence sufficiently reliable to come into the record for their truth, despite their out-of-court nature.

*1. Ancient Document Hearsay Exception*

Whether a particular piece of evidence crosses the authenticity threshold by virtue of the ancient document rule has a significant impact on a related inquiry: whether the out-of-court statements therein are admissible, despite being hearsay. Federal Rule of Evidence 802 provides that "[h]earsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress." Rule 803, in turn, sets out a number of exceptions to this rule, including that "[s]tatements in ancient documents." Fed. R. Evid. 803(16). Courts and scholars agree that this exception renders admissible statements made by the document's author about which the author had personal knowledge. Rule 805, however, adds a slight twist by providing that "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules"—that is, a hearsay exception must exist to cover each level of hearsay contained within a document.

The interplay between Rules 803(16) and 805 gives rise to a debate between scholars, courts, and here, between the United States and the Langbords. "One position is that a separate hearsay exception must apply to each layer of hearsay contained within the ancient document to warrant admission of the specific statement into evidence." Hicks v. Charles Pfizer & Co. Inc., 466 F. Supp. 2d 799, 806 (E.D. Tex. 2005) (citing United States v. Bronislaw Hajda, 135 F.3d 439, 444 (7th Cir. 1998) ("[I]f the [ancient] document contains more than one level of hearsay, an appropriate exception must be found for each level"); Columbia First Bank, FSB v. United States, 58 Fed. Cl. 333, 338 (Fed. Cl. 2003) ("Rule 805 would be superfluous" if all levels of hearsay were admitted under Rule 806(13))); see also United States v. Stelmokas, No. 92-3440, 1995 WL 464264, at *6 (E.D. Pa. Aug. 2,1995). Other courts have admitted multiple levels of

hearsay within ancient documents under Rule 803(16).  See Murray v. Sevier, 50 F. Supp. 2d 1257, 1264 n.6 (M.D. Ala. 1999) (interviewee's statements reported in a newspaper article admissible under Rule 803(16)), vacated on other grounds by Murray v. Scott, 253 F.3d 1308 (11th Cir. 2001); Gonzales v. North Twp. of Lake County, 800 F. Supp. 676, 681 (N.D. Ind. 1992) ("As the newspaper articles in Exhibit C are well more than twenty-years old, the statements contained within are admissible into evidence . . . ."), rev'd on other grounds, 4 F.3d 1412 (7th Cir. 1993)); Ammons v. Dade City, 594 F. Supp. 1274, 1280 n.8 (M.D. Fla. 1984) (admitting newspaper articles to prove the existence of a street paving program in 1925 without inquiry into the double hearsay issue); see also John W. Strong et al., McCormick on Evidence § 323 (5th ed. 2003) ("The more common tendency appears to be to admit newspaper articles over 20 years old without the proper inquiry.").

The Court need not choose sides in a vacuum.  Following the Eastern District of Texas's 2005 decision in Hicks, Professor Michael H. Graham, in supplementing Wright & Miller's Federal Practice and Procedure, drew this conclusion:

> Hicks is incorrect. The text, underlying purpose, and rationale of Rule 803(16) each supports a broad interpretation. Rule 80[3](16) simply says, "statements in a document," not "statements in a document made on personal knowledge of the documents creator."  Thus, a newspaper article over twenty years old reporting any event is admissible even if the article states that information was received from third parties, i.e., the context of the article is not solely within the personal knowledge of the creator or creators of the document.  Realistically, any requirement that the proponent of the ancient document must establish the personal knowledge of the creator of the document as to all matters contained therein would effectively emasculate Rule 803(16)'s utility as it did in Hicks. Hicks is thus incorrect both as a textual matter and a matter of policy and should not be followed.

Wright & Miller's Federal Prac. & Proc. § 7057, Rule 803(6): Statements in Ancient Documents

(2010). The Court finds fault in Professor Graham's conclusion that <u>Hick</u>'s requires all ancient documents' authors to have personal knowledge of the facts they record; as the Langbords note, hearsay within an ancient document would be admissible if any one of the many hearsay exceptions applied. But Graham's reasoning is nonetheless persuasive. The ancient document hearsay exception recognizes the difficulty in finding witnesses that made statements more than 20 years prior, and that even an imperfect but relatively contemporaneous recollection by the document's author of the second-party statement would likely be more accurate than a 20-year-old memory. Moreover, although not always the case (as is true with every rule application), the second-party is as unlikely as the ancient document's author to have spoken with an eye toward litigation 20 years in the future, a consistently cited rationale for the existence of the ancient document rule. The arguments made in favor of requiring a different hearsay exception for all but the document itself—primarily focused on the danger of reading Rule 805's multiple-hearsay rule out of existence—miss the mark. Rule 803(16) provides a broad hearsay exception that applies to any level of hearsay within an ancient document. That is, even following Rule 805's mandate that a court examine each level of hearsay independently, Rule 803(16) supplies the grounds by which each level within an ancient document becomes admissible. Accordingly, the Court rejects the Langbords' contention that any but the first level of hearsay within an ancient document requires its own hearsay exception. The Government need only authenticate a document under Rule 901(b)(8) in order for the statements therein to be admissible to prove the truth of the matter asserted.[13]

---

[13]The Langbords also argue that some of the Government's proposed exhibits—namely various Mint legers and process records—are not admissible as ancient documents because no direct evidence exists to prove that the declarants had personal knowledge of the information

## 2. Government's Hearsay Objections

The Government contends that two of the exhibits that the Langbords intend to introduce—Proposed Exhibit 74, an excerpt from a draft of expert David Tripp's report, and Proposed Exhibit 76, George Hunter's final report authenticating the Gold Pieces—qualify as inadmissible hearsay. The Langbords respond that they intend to introduce Proposed Exhibit 74 only to impeach Mr. Tripp if his testimony conflicts with his earlier report, a perfectly appropriate use of the draft document. As for George Hunter's final report, the Langbords claim that it qualifies as a report setting forth "matters observed pursuant to duty imposed by law as to which matters there was a duty to report," under rule 803(8)(B). Hunter's authenticating report, say the Langbords, was prepared pursuant to a contract such that, despite his status as a non-government-employee, his report still qualifies as a public report under Rule 803(8)(B). Although not bound by any cited precedent, the Court concludes that an individual performing the limited task of authenticating the Gold Pieces was sufficiently supervised by the Mint for his report to qualify under the public record exception to the hearsay rule. See United States v. Davis, 826 F.Supp. 617, 621–22 (D.R.I. 1993).

### D. Expert Witness Testimony

#### 1. Eric Rauchway

The Langbords contend that a large portion of expert Eric Rauchway's report "directly

---

they recorded. The Langbords do not articulate this problem as one of inadmissible hearsay, though they point the Court toward cases dealing exclusively with hearsay issues. Instead, they seemingly contend instead that the lack of personal knowledge casts some suspicion on the documents' authenticity. The Court rejects this argument for two reasons: First, it relies on a set of cases that have incorrectly interpreted the ancient document hearsay exception. Second, it questions the truthfulness or accuracy of the documents-matters beyond the threshold authenticity inquiry under the ancient document rule. See Kairys, 782 F.2d at 1379.

usurp both the jury's quintessential function in determining how to weigh the evidence presented and how much weight to give particular forms of evidence, as well as the Court's function in guiding the jury—through instructions—as to the relevant considerations in making those assessments." (Doc. No. 156-1, at 4–5.) Professor Rauchway, a historian expert, focuses on how historians use documents and theories to draw conclusions. The Langbords do not object to Professor Rauchway's discussion of the gathering of historical evidence or the differences between primary and secondary sources. Rather, they complain that his opinions about how to evaluate contradictory sources and how to assess the hypotheses and conclusions that the Langbords' experts put forth go too far.

The Court is sensitive to the pitfalls of this type of expert testimony. Rarely are experts called upon to sort through pieces of historical information that, when taken one at a time, are relatively easily understood—especially when compared to the less accessible subject matters about which experts frequently opine. But the United States correctly notes that evaluating historical sources in a more technical manner falls outside of "the common knowledge of the average juror." United States v. Davis, 397 F.3d 173, 179 (3d Cir. 2005). And to the extent that Professor Rauchway can explain to jurors how, in his opinion, a historian embracing accepted methods would evaluate the information, he provides testimony that requires specialized knowledge and that will assist the trier of fact. Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d. Cir. 2008).

Some of Professor Rauchway's written opinion skirts a fuzzy line, however, and the Court takes this opportunity to note that, while he will be permitted to testify about his own methods in reaching a conclusion and about why historians accept and endorse those methods,

Professor Rauchway may not tell the jury how it should or must make those same determinations. A historian may be able to reach a particular conclusion when a jury, faced with the same information but required to apply the preponderance standard, may not. And Federal Rule of Evidence 704 provides that "an expert witness is prohibited from rendering a legal opinion." Berckeley Inv. Group, 455 F.3d at 217. On this basis, the Court previously explained that "if the witness avoids drawing legal conclusions, courts will permit expert legal testimony which 'sheds light on activities not within the common knowledge of the average juror.'" (Doc. No. 96, at 16 (quoting United States v. McDade, No. 92-249, 1995 WL 476230, at *3 (E.D. Pa. Aug. 7, 1995).) Although Professor Rauchway draws a historical, not a legal, conclusion regarding whether the Mint authorized issuance of 1933 Double Eagles, in order to avoid juror confusion, he may not refer to the legal burden of proof on direct examination.

### 2. Roger Burdette

The Langbords' numismatic expert, Roger Burdette, was formerly a member the Citizens Coinage Advisory Committee (CCAC), appointed by the Secretary of the Treasury. Because of this litigation and his work for the Langbords, he was required to resign his post for ethical reasons. The United States contends that "neither party should refer to Burdette's ethics issue, his former participation on the CCAC, or his resignation from the CCAC during the trial" (Doc. No. 151, at 5), presumably because the United States alerted Burdette to the ethical issue, forcing him to chose between testifying for the Langbords and maintaining his membership, and the jury might conclude that the United States employed an unfair litigation tactic in doing so.

The Court does not find the reasons that Burdette resigned from CCAC relevant to his ability to present an expert opinion in this matter and the Langbords shall not raise the issue

during Burdette's direct examination. They may, however, present his former membership as one of his expert qualifications. If the United States challenges Burdette's competence on the grounds that he is no longer a member of CCAC, Burdette can certainly explain the circumstances of his resignation to the jury.

*E. Jury Instructions*[14]

The Langbords propose three jury instructions about the adverse inferences the jury may draw from the Government's unconstitutional decision to keep the Gold Pieces without instituting forfeiture proceedings. Two of the three proposals lack any legal basis, and the third focuses on the Government's motives for its improper conduct, a matter wholly irrelevant to whether the Coins are the product of a theft or embezzlement.

First, the Langbords contend that "the exclusionary rule and its restorative and prophylactic purposes fully apply in the forfeiture context." (Doc. No. 155-1, at 5 (citing United States v. $92,422.57, 307 F.3d 137, 142 n.1 (3d Cir. 2002) for the proposition that "the Fourth Amendment's exclusionary rule applies to forfeiture cases").) They cite Supreme Court and other precedent holding that the Fourth Amendment's exclusionary rule applies to forfeiture cases because "a forfeiture proceeding is quasi-criminal in character." One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 700 (1965). Even assuming that such a rule remains in effect,[15] their argument meets two insurmountable hurdles: first, the exclusionary rule does not

---

[14]This Order addresses only the proposed jury instructions in Claimants' Pretrial Motion #3 for Jury Instructions Based on the Government's Violation of the Langbords' Constitutional Rights (Doc. No. 155).

[15]The application of the exclusionary rule to civil forfeiture proceedings has been called into question. See United States v. Marrocco, 578 F.3d 627, 642 (7th Cir. 2009) (Easterbrook, C.J., concurring) (citing INS v. Lopez-Mendoza, 468 U.S. 1032 (1984); United States v. Janis,

apply to civil forfeiture cases in which the claimant disputes the criminality of owning the object of the forfeiture action; second, the Langbords do not request that the Gold Pieces be excluded under the rule, but ask for an adverse inference jury instruction, a remedy that no authority supports.

Consider the two possible forfeiture cases where the alleged underlying crime is possession of contraband: In the first and more typical, there exist two relevant pieces of property: (a) property that is illegal to possess but which the government unconstitutionally seized; and (b) property that the government contends qualifies as an instrumentality or the proceeds of the alleged possession crime, but which itself is not illegal to possess—i.e., "derivative contraband." In these cases, the government seeks to forfeit derivative contraband, e.g., the car that a defendant used to transport drugs, and to do so, seeks to introduce evidence of the per se contraband. The second type of case, in which the government seeks to forfeit the property that gave rise to the possession crime, e.g., the drugs themselves, is exceedingly rare. After all, most people would not file a claim in a civil forfeiture action seeking to repossess per se contraband, like drugs, the possession of which would subject the individual to criminal penalties a second time. Id. at 699. Only where a claimant can admit possession, but challenge the government's contention that the property is per se contraband will that claimant appear and contest the forfeiture.

The Plymouth Sedan Court evinced a clear understanding of the distinction between these two types of forfeiture cases. It explicitly granted certiorari to consider whether the exclusionary

_____

428 U.S. 433 (1976)).

39

rule applies to civil forfeiture proceedings with two pieces of property and ultimately concluded

that it did. This holding makes sense: In a derivative contraband forfeiture, a claimant may rely

on the exclusionary rule to prevent the government from introducing the per se contraband. If

successful, he will maintain possession of the derivative contraband because the government

cannot prove that it was an instrumentality or proceeds of a possession crime. The application of

the exclusionary rule does not make sense when only one piece of property is at issue—that is,

where the subject of the forfeiture and the piece of evidence that a claimant seeks to exclude are

one in the same. When the claimant argues that it is legal to possess the property, he will likely

rely on the fact of possession to establish ownership and attempt to retain the property.[16] If the

exclusionary rule applied to this type of case, it would allow the claimant to prevent the United

States from introducing evidence of possession, but would simultaneously defeat the claimant's

ownership assertion. By limiting its holding to the more typical derivative contraband forfeiture

case, Plymouth Sedan implicitly recognized that the exclusionary rule cannot logically apply to a

forfeiture proceeding designed to adjudicate whether an object is per se contraband.

Perhaps realizing that their possession of the Coins undergirds their ownership claim, the

Langbords do not urge the Court to apply the exclusionary rule here. Instead, they request an

adverse inference jury instruction. The Court's extensive research has not revealed any authority

for instructing the jury to consider the Government's seizure of the Coins when assessing

whether the Coins are forfeitable. The exclusionary rule operates behind closed doors, keeping

---

[16]When discussing the Government's objections to the Langbords' proposed evidentiary
presentation, the Court concluded that the Langbords may not draw legal inferences regarding the
effect their possession of the Coins had on their ownership interest. The recognition that their
previous possession of the Coins provides them with the necessary basis to contest the Coins'
forfeiture does not change that ruling.

out the evidence obtained in violation of a litigant's rights without unduly prejudicing the Government's case. To highlight the Government's improper conduct to a jury, while allowing the Langbords to take advantage of the evidence the exclusionary rule would keep out, finds no legal or logical support.

The Langbords also urge the Court to give an adverse inference instruction based on spoliation principles. According to the Langbords, the First Circuit's decision in Nation-Wide Check Corp. v. Forest Hills Distributors, Inc., 692 F.2d 214, 218 (1st Cir. 1982) supports this theory. In Nation-Wide, a man left a jewel with a jeweler, who subsequently failed to return it. When the man sued, the jeweler claimed to have lost the jewel, making an accurate determination of the jewel's value impossible. The court instructed the jury to presume that the jewel was among the "best" jewels when determining damages. Drawing on nominal similarities between Nation-Wide and the forfeiture matter at hand—the Langbords, like the party in Nation-Wide, turned over valuables to a second party, and the second party refused to return them, prompting a law suit— the Langbords request an instruction telling the jury to presume that when the Mint did not return the Coins, it effectively admitted that it could not meet its burden of proof in a forfeiture action. But an adverse spoliation inference makes up for the missing or damaged evidence, holding the destroying party accountable. Here, there is no missing evidence; all ten 1933 Double Eagles still exist. The spoliation inference request is completely unfounded.

Lastly, the Langbords ask the Court to instruct the jury about the inferences they may draw from evidence tending to show a consciousness of guilt. Specifically, they compare the United State's decision to keep the coins to a criminal defendant's decision to fabricate a statement to avoid criminal liability. In Government of the Virgin Islands v. Lovell, 378 F.2d

41

799 (3d Cir. 1967), the Third Circuit held that a fabricated statement was "'receivable against [the defendant] as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit.'"  Id. at 806 (quoting II Wigmore on Evidence § 278(2) at 120 (3d ed.)).  Whether a criminal defendant behaves in a way that suggests his guilt—*the* central question raised by a criminal case—has absolutely nothing to do with whether the Government here perceived its forfeiture case to be weak or strong.  The Government need not establish that it possessed a particular state of mind to prevail, and what Mint officials perceived their legal obligations to be in 2004, when deciding to keep the Coins, is completely irrelevant.  Again, the Langbords attempt to stretch a legal theory past its bounds with no logical or legitimate basis.

The Langbords alternatively ask the Court to instruct the jury as to how the Government came into possession of the Coins.  This Order previously set forth the amount of background information that the Court will permit the parties to introduce through documents and testimony.  As stated, the Langbords will not be permitted to discuss either the unlawful nature of the Government's seizure or draw inferences regarding any ownership interest that the Langbords believe their prior possession of the Coins suggests.

III.    CONCLUSION

An appropriate order follows.