IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROY LANGBORD, et al., | : | |
|     Plaintiffs, | : | |
| | : | |
|     v. | : | |
| | : | |
| UNITED STATES DEPARTMENT OF | : | |
| THE TREASURY, et al., | : | |
|     Defendants. | : | CIVIL ACTION |
| _____ | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | No. 06-5315 |
|     Third-Party Plaintiff, | : | |
| | : | |
|     v. | : | |
| | : | |
| TEN 1933 DOUBLE EAGLE GOLD PIECES, | : | |
|     Third-Party Defendant-in-rem. | : | |
| | : | |
| _____ | : | |

Legrome D. Davis, J.                                August 29, 2012

MEMORANDUM

I.     Introduction

This case concerns the rightful ownership of ten (10) gold coins minted by the United

States Government here in Philadelphia almost eighty years ago.  The coins in dispute, produced

by the Philadelphia Mint in 1933, are $20 gold pieces known as "Double Eagles."  Famed

sculptor Augustus Saint-Gaudens designed the Double Eagles at the behest of President

Theodore Roosevelt, and the coins are still considered among the most beautiful ever crafted by

our country.

According to the Government, no 1933 Double Eagles were ever lawfully issued to the

public; the vast majority were melted down and formed into gold bars following the Gold Reserve Act of 1934.  Nevertheless, some managed to escape the Mint.  In the 1940s, the Secret Service traced the leak to George McCann, a Philadelphia Mint cashier, and Israel Switt, a coin dealer and the proprietor of a local antique store.

In 2002, the only '33 Double Eagle then known to exist, a coin once possessed by King Farouk of Egypt, sold at auction for over $7 million dollars.  According to Joan, Roy, and David Langbord, the Claimants in this matter, they then discovered in August of 2003 ten (10) more of these precious coins buried at the bottom of a family safe deposit box.  Joan Langbord is Joan Switt Langbord, the daughter of Israel Switt.  Roy and David are his grandsons.  The Langbords eventually notified the Government of their find, and this litigation followed.  In essence, both parties want the coins.

Following a lengthy trial, a jury unanimously found that the disputed 1933 Double Eagles were forfeit to the United States Government.  In the instant motions, the Claimants challenge this verdict and at the same time contend that the verdict mooted a related declaratory judgment claim, which the Government brought to quiet title to the coins.  The motions are now ripe for disposition.

As explained herein, we deny the Claimants' motions in their entirety.  We also declare that the coins in question were not lawfully removed from the United States Mint and, as a matter of law, remain the property of the United States.

2

II.     Factual Background and Procedural History[1]

    A.     The Disappearance of the Double Eagles, Placed in Historical Context

When Franklin D. Roosevelt took office on March 4, 1933, four years after the 1929 stock market crash ushered in the Great Depression, the nation was in dire straits.  (Tr. 209, at 38-70).  Between 1930 and 1933, about five thousand (5,000) banks went out of business, and many depositors lost everything.  (Id.).  Amid this crisis, people began to lose faith in paper currency.  They ran to the banks in droves, demanding their money in gold – something tangible with an intrinsic value that might survive through troubled times.  (Id.).

Within twenty-four hours of taking office, Roosevelt proclaimed a "bank holiday," which effectively closed every bank in the country and banned the payout of gold coins.[2]  (Tr. 209, at 43-45).  This first "bank holiday" lasted for four (4) days, from March 6 through March 9, 1933.  (Id.; Tr. 209, at 52, 55; Tr. 212, at 112).  With his proclamation, Roosevelt hoped to stop gold hoarding and stem the tide of gold – our nation's wealth – that had been rushing out of the

--------

[1]Because Claimants move for judgment as a matter of law (JMOL) pursuant to Federal Rule of Civil Procedure 50, seeking to upset a unanimous adverse jury verdict, they bear a heavy burden.  We may grant Claimants' motion only if, viewing the evidence in the light most favorable to the Government and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which the jury may reasonably find that the 1933 Double Eagles are subject to forfeiture.  See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).  We craft the following factual narrative with this in mind.
    We cite extensively to the trial transcripts, which we abbreviate according to their docket numbers: **207** = July 7, 2011; **208** = July 8, 2011 AM; **209** = July 8, 2011 PM; **210** = July 11, 2011 AM; **211** = July 11, 2011 PM; **212** = July 12, 2011 AM; **213** = July 12, 2011 PM; **214** = July 13, 2011; **215** = July 14, 2011 AM; **216** = July 14, 2011 PM; **217** = July 15, 2011; **218** = July 18, 2011 AM; **219** = July 18, 2011 PM; **220** = July 19, 2011 AM; **221** = July 19, 2011 PM; **222** = July 20, 2011; and **229** = November 10, 2011 (motion hearing).

[2]According to the proclamation, "banking institutions" were forbidden from paying out gold coins, but the Mint was not explicitly mentioned as a "banking institution."  (Tr. 212, at 114).

country's banks.  (Tr. 209, at 43-45).  The President went so far as to threaten to make people's

names public if they failed to return their gold.[3]  (Id.).  As expected, gold started flowing back

into the country's coffers; returning one's gold was viewed as an act of patriotism.  (Tr. 209, 43-

47, 62).  All of this was front page news around the nation, including in Philadelphia.  (Tr. 209,

at 56-57, 62).  Subsequent proclamations and orders tightened the government's control on gold

well beyond March 9th.  (Tr. 209, at 46-50; Tr. 212, at 119).

      Nonetheless, the Philadelphia Mint continued producing coins, including the 1933

Double Eagles that are the subject of this suit.  (Tr. 209, at 77).  In fact, the '33 Double Eagles

were made *only* at the Philadelphia Mint; no other Mint struck these coins.[4]  (Tr. 208, at 144).  In

layman's terms, a "Double Eagle" is a $20 gold coin.  And $20 was a lot of money back in 1933.[5]

All told, the Philadelphia Mint created 445,500 1933 Double Eagle gold coins.  (Tr. 208, at 133-

34; G-337).  Because gold was a "sacred material" and represented the wealth of America, the

---

[3]On March 8, 1933, the Federal Reserve Bank made it known that the government would publish the names of those individuals who had withdrawn their gold from banks.  (Tr. 213, at 5).

[4]It took much exacting effort for the Mint to manufacture these Double Eagle coins. First, the melting and refining department produced gold ingots having a purity of exactly 0.900 fine (21.6 carat gold).  These ingots were then rolled into long noodles, annealed (reheated), and cut into gold discs having the proper size and shape.  Automatic scales then filtered out the overweight and underweight discs–each Double Eagle weighs 1.075 ounces, give or take 1/1000th of an ounce.  After another annealing, the discs were milled to put ridges on the edges of the coins.  3-D steel dies then stamped the desired image into the gold discs.  The coins were then re-weighed, visually inspected for defects, and sent off to the coining department where they were counted by hand and put into bags.  Each bag contained 250 Double Eagles (representing a face value of $5,000) and weighed 268.75 ounces.  (Tr. 208, at 144-58).

[5]The Government's experts opined that $20 in 1933–the face value of a single Double Eagle–is the equivalent of $2,000 today.  (Tr. 208, at 144; Tr. 218, at 37-38).  However, one of the Government's experts conceded that the conversion could be done in a number of different ways, some of which would show a present value lower than $2,000.  (Tr. 218, at 40-42).

Mint kept meticulous records on its gold coins. (Tr. 208, at 134). And, according to the Government's primary expert David Tripp,[6] many of the Mint's records from the relevant time frame still exist in their entirety today.[7] (Tr. 208, at 162-75).

Much of the trial testimony focused on the Philadelphia Mint cashier and the records he kept. The Mint cashier is, for all practical purposes, the "gatekeeper" of the coins. (Tr. 208, at 132). He is the last stop, so to speak, before the Mint's coins go out into the real world. (Id.). In 1933, the Philadelphia Mint cashier was a Mr. Powell, and his assistant was a Mr. Ott. During this period of time, someone in the cashier's office–presumably Powell and/or Ott–tracked the movement of coins, including 1933 Double Eagles, into and out of the office. They did so using two complementary documents - the "cashier's daily settlement" and the "cashier's daily statement." (Tr. 208, 162-75, 181, 196-98).

The daily settlement reflects the cashier's end-of-day accounting of the money in his control. (Tr. 208, at 196-98). Important to this case, the daily settlement is segregated into three (3) categories of coins: one for the current year's production, i.e., 1933 Double Eagles; one for

---

[6]Tripp literally wrote the book on the 1933 Double Eagle. (Tr. 208, at 90-93). By his estimation, Tripp has spent "the better part of 10 years of [his] life" researching the coin. (Tr. 208, at 94-98).

[7]The Claimants vigorously disputed the reliability of the Mint's records, pointing to, among other things, Secret Service reports from 1937 concerning a missing bag of 1928 Double Eagles. In these reports, some individuals characterized the Mint's record keeping methods as obsolete, inadequate, and lax. (Tr. 214, at 28-29, 39-46). However, Tripp noted that several years later, the Secret Service was able to conclude that the 1933 Double Eagles–the subject of this dispute–were stolen based on the same set of records. (Tr. 214, at 41-42, 44). Moreover, these Secret Service reports concerned the state of the Mint's *vault* records, not the *cashier's* records on which the Government primarily relied. The fact that the Mint's vault records were "untidy" and unsophisticated did not change Tripp's conclusion because he looked at how all the documents fit together and corroborated each other. (Tr. 210, at 82-84; Tr. 213, at 132-38).

prior years' coins; and one for circulated coins (for example, coins that had been in commerce but later came back to the Mint as worn). (Id.). The daily settlement is a handwritten,[8] unsigned document.[9] (Tr. 213, at 165, 179). The daily statements, on the other hand, are typed and signed, but they do not reflect the dates of the coins. (Tr. 213, at 165; 214, at 21-22). In addition to tracking gold coins, the cashier's records tracked such minutiae as a three (3) cent payout to a customer who evidently received his money in the form of two (2) 1932 pennies and one (1) 1933 penny. (Tr. 209, at 9-25). As should be apparent, the records are exquisitely detailed.

Relying primarily on the cashier's daily settlements and statements, Tripp reconstructed the day-to-day movement of the 1933 Double Eagles. (Tr. 209, at 26-36).[10] Using these two documents in tandem, along with other Mint records,[11] Tripp figuratively followed the coins

---

[8]The Government's forensic accountant Wayne Geisser opined that a ledger is not necessarily less reliable just because it is handwritten. (Tr. 217, at 51).

[9]Tripp admits that he has seen no written rule or regulation requiring the Mint cashier to keep records having this level of detail, e.g., records tracking coins by date. (Tr. 213, at 177-79). Regardless, these records do, in fact, exist. Furthermore, Mint employees were held personally responsible for missing money, which would have given the cashier an incentive to keep detailed records accounting for every last dollar. (Tr. 208, at 180).

In addition, Tripp conceded that he could not be sure that the daily settlements were audited. (Tr. 213, at 179). However, by rule, the Mint cashier's holdings were to be audited at least once a month, and Tripp believes such an audit would have likely entailed looking at both the daily settlements and the daily statements. (Tr. 213, at 179, 182-85).

[10]In conducting his analysis, Tripp did not see any mistakes in the cashier's daily statements or settlements. (Tr. 209, at 37).

[11]In forming his opinion, Tripp also relied upon the Mint's daily process books, which detail the coining department's physical production of the coins; delivery books, which record the delivery of coins to the cashier; assay transmittal and report sheets; and basement vault records, among other things. (Tr. 208, at 117-18; Tr. 210, at 40-42). According to Tripp, the records fit together like a jigsaw puzzle, dovetailing with each other to paint a complete picture. (Tr. 209, at 113-17).

6

around the Mint every day from January of 1933 through November of 1934.  (Id.; Tr. 209, at

113-17).  By doing so, Tripp accounted for each and every one of the 445,500 1933 Double

Eagles and showed that *not a single '33 Double Eagle was issued to the public*.  (Tr. 210, at 39).

Specifically, the 445,500 1933 Double Eagles were delivered to the cashier in ten (10)

installments, the first on March 15, 1933 and the last on May 19, 1933.[12]  (Tr. 210, at 34-40, 69-

71).  And remember, Roosevelt's first "bank holiday" forbidding the payout of gold coins took

effect on March 6th, nine (9) days before the first shipment of '33 Double Eagles to the

Philadelphia Mint cashier.  (Tr. 209, at 100-03).  What's more, the Mint did not continue

shipping gold coins to the Federal Reserve Banks after March 6th.  (Tr. 209, at 103-05).

The vast majority of the '33 Double Eagles–445,000 to be exact–were subsequently

sealed in a basement vault on June 27, 1933.  (Tr. 210, at 40-42, 69-71).  The remaining 500

coins were in the cashier's control at one point or another.  Of these 500, 446 were reserved and

put into a locked pyx box for the annual assay.[13]  (Tr. 210, at 43-51, 69-71).  Of these 446, nine

(9) were actually destroyed in the annual assay, which took place between February 14 and 15,

1934.  (Id.).  The other 437 coins were returned from the assay to the Mint's basement vaults on

February 20, 1934.  (Id.).  Twenty (20) of the '33 Double Eagles were also destroyed between

March and May of 1933 in conjunction with the so-called special assays.  (Tr. 210, at 51-55, 69-

71; see also G-337).  That left thirty-four (34) coins in the cashier's office.  However, records

---

[12]The eight (8) intervening deliveries took place on March 20, March 24, April 7, April
11, April 26, April 27, May 8, and May 15).  (Tr. 210, at 34-40; G-337).

[13]An "assay" is the method by which the purity of the gold in the coins is tested.  The
assay process destroys the coins.

reflect that all these coins were moved to a basement vault on February 2, 1934.[14]  (Tr. 210, at

55-56, 69-71).  Several months later, in October of 1934, the Mint sent two (2) '33 Double

Eagles to the Smithsonian.  The Smithsonian confirmed receipt of the coins, which remain there

to this day.  (Tr. 210, at 60-64, 69-71).

So, as of October of 1934, the Mint's basement vaults housed 445,469 1933 Double

Eagles–the 445,000 originally sealed in the vault, plus the 437 returned from the annual assay,

plus the 34 returned from the cashier, minus the 2 sent to the Smithsonian.  (See G-337).  The

other 29 coins had been destroyed during the various assays.  (Id.).  Finally, pursuant to the Gold

Reserve Act of 1934,[15] the Mints were authorized to begin melting their general stock of gold

coin as of August 4, 1934.  (Tr. 209, at 95-97).  That included, of course, the '33 Double Eagles

held in the Philadelphia Mint's vault.  The Mints started melting gold shortly thereafter, and the

entire process took about two-and-a-half years to complete.[16]  (Id.).  Because Tripp could account

---

[14]From May 19, 1933, the last delivery of '33 Double Eagles to the cashier, to December
29, 1933, both the basement holdings (445,000 coins) and office holdings (34 coins) of 1933
Double Eagles remained constant, reflecting that no '33 Double Eagles left the Mint through
authorized channels during this period of time.  (Tr. 210, at 57-59).

When the Secret Service interviewed the vault custodian in the 1940s, he denied
receiving the 34 '33 Double Eagles on February 2, 1934 (Tr. 213, at 124-29).  However, he
admitted that the receipt for these coins was in his handwriting.  (Id.).

[15]The Gold Reserve Act of January 30, 1934, which nationalized gold, required gold
coins to be withdrawn from circulation, melted, and formed into gold bars.  (Tr. 209, at 49-50,
68-69).

[16]Mint regulations permitted a one-ounce-per-thousand variance in melting down gold
coins.  Therefore, with over 445,000 ounces of '33 Double Eagles to melt, the melt could have
been short by over 300 coins without violating the regulations.  (Tr. 215, at 52).  However, the
Claimants presented no evidence to show that (1) the melt actually was short, much less short by
several hundred coins; (2) even if the melt was short, the shortage was due to missing Double
Eagles; or (3) even if the shortage was due to missing Double Eagles, that those missing coins
could have left the Mint through authorized, legal channels.

for all of the '33 Double Eagles and none were ever authorized for release, Tripp concluded that no '33 Double Eagles–including the coins in this case–could have been obtained through legitimate means.  (Tr. 208, at 119-22; Tr. 211, at 149-52).

Wayne Geisser, the Government's other expert witness and a forensic accountant, corroborated Tripp's analysis and conclusions.  (Tr. 217, at 38-39).  Like Tripp, Geisser determined that the cashier's records from 1933 and 1934 were reliable.  In particular, Geisser found a "seamless" connection between the records of the coining department, to the "coins executed log," to the cashier.  (Tr. 217, at 100-01).  And like Tripp, Geisser found it possible to track all the 1933 Double Eagles and conclude that none had been issued by the cashier to the public.  (Tr. 217, at 66-76).  In Geisser's words, there is a "closed circle" to account for each of the coins (from the coining department, to the cashier, to the vault); all of the components balance out perfectly.  (Tr. 217, at 86-89, 102; G-337).  Even the Claimants' own expert conceded that the cashier's daily settlement and the cashier's daily statement "absolutely line up" from a mathematical standpoint.  (Tr. 221, at 46-47).

The Claimants attacked the Government's case on several fronts.  First, the Claimants constructed a "window of opportunity" spanning March and April of 1933 during which the Philadelphia Mint cashier might have dispensed 1933 Double Eagles to the public.  As noted *supra*, Roosevelt's first "bank holiday" banned the payout of gold coins as of March 6, 1933, and subsequent orders extended this restriction.  However, a March 6th letter from the Treasury to the Director of the Mint reflected that the President's ban did not prohibit the deposit of gold and the

usual payment therefor.[17]  (Tr. 209, at 80).  Additionally, on March 7th–the very next

day–Assistant Treasury Secretary Douglas sent a telegram to the Mints authorizing them to issue

gold coin or bars in exchange for gold bullion.[18]  (Tr. 209, at 88-91; Tr. 212, at 105).  Some of

the Mint's subsequent responses to customers' inquiries reflected the Mint's understanding that

gold-for-gold exchanges were permitted, even post-March 6th, while other correspondence

suggested that no gold could be issued pursuant to the President's ban.  (Tr. 209, at 83; Tr. 212,

at 17-50; Tr. 219, at 18-24).  In other words, the Mint arguably gave mixed signals in response to

requests for gold during this time period.  Tripp testified to his belief that these gold-for-gold

exchanges were limited to industrial purposes, but he admitted that the March 7th telegram does

not explicitly contain such a limitation.  (Tr. 209, at 91; Tr. 212, at 18; Tr. 213, at 44-47, 51-52,

56).  In contrast, Claimants' expert Roger Burdette found no "industrial purposes only" condition

on the aforementioned gold-for-gold exchanges.  (Tr. 219, at 23).

On March 15, 1933, about a week after the March 7th telegram purporting to authorize

gold-for-gold transactions at the Philadelphia Mint, the first group of 1933 Double Eagles was

delivered to the cashier.  (Tr. 209, at 100-03).  Thus, as of March 15th, the cashier had a bag of

---

[17]Tripp interpreted this exception to permit the Mint to continue paying customers for scrap gold with a check, but did not authorize gold-for-gold transactions.  (Tr. 209, at 81; Tr. 212, at 125-26).  The Director of the Mint relayed the Treasury's message to the individual Mint superintendents but eliminated the word "usual," thereby informing the Mints that the President's proclamation "does not prohibit the deposit of gold and the payment therefor."  (Tr. 209, at 82; Tr. 212, at 127-28).

[18]According to Tripp, this authorization ran contrary to the other regulations and documents from this time period, and Tripp could not place the March 7th telegram in any sort of context.  As a result, Tripp was uncomfortable relying on this "orphan" document.  (Tr. 212, at 15; Tr. 216, at 35-39).

several hundred 1933 Double Eagles in his office.[19]  (Tr. 212, at 21; Tr. 213, at 91-99).  In

Claimants' eyes, this opened the "window of opportunity" for the '33 Double Eagles to leave the

Mint legitimately.[20]

This window, if it existed, definitively shut early the next month.  On April 5, 1933,

Roosevelt, losing patience with people who insisted on hoarding gold, issued another

proclamation ordering the holdouts to return their gold by a specific date.[21]  (Tr. 209, at 47-48).

On April 12th, Assistant Treasury Secretary Douglas informed the Mint that issuing gold coin or

bars in exchange for gold bullion was *not* authorized under the President's April 5th order, and

that gold may only be issued under permit authorized by the Secretary of the Treasury.  (Tr. 209,

at 94-95).  The records confirm that post-April 12th, the Philadelphia Mint paid out no gold coins

at all, even for industrial purposes.  (Id.).  Not even power players with friends in high places, so

to speak, could get their hands on a '33 Double Eagle.[22]  (Tr. 210, at 93-117, 137-66; Tr. 214, at

―――――――――――――――――

[19]Tripp testified that the cashier likely would have kept these valuable gold coins in his office vault.  (Tr. 213, at 91-99).

[20]According to Tripp, the "window of opportunity" opened, if at all, no earlier than March 30, 1933, because the cashier could not have paid out any 1933 Double Eagles prior to receiving the results of the assay confirming the purity of the coins.  The report for the first assay was dated March 29, 1933.  (Tr. 209, at 106-11; Tr. 216, at 40).

[21]The President's order contained several exceptions, including one for coin collectors (exempting gold coins having a recognized special value) and one for legitimate industrial uses. (Tr. 213, at 7-9).  The coin collector exception carried though Roosevelt's subsequent orders and was incorporated into the Gold Reserve Act.  (Tr. 213, at 9).  Tripp opined that the 1933 Double Eagle would not have qualified for the exception because it was still in production and would be struck in the hundreds-of-thousands.  (Tr. 209, at 64-65).  Even the Claimants' expert admitted that the '33 Double Eagle was nothing special at the time it was manufactured.  (Tr. 220, at 48-49).

[22]For example, the State of Connecticut tried and failed to obtain a '33 Double Eagle through authorized channels to add to its State Library collection.  The American Numismatic

109-12).

In the end, Tripp admitted on cross examination that there was a small "window of opportunity" during which gold coin was authorized to be released from the Philadelphia Mint. (Tr. 212, at 20). And many gold coins did, in fact, leave the Mint during this period of time. (Tr. 209, at 92-93; Tr. 210, at 87-92; Tr. 213, at 17, 29-30).[23] But as Tripp correctly noted, the Mint records reflect that *no 1933 Double Eagles were part of those transactions*.[24] (Tr. 209, at 92-93; Tr. 210, at 87-92). Geisser also concluded that the gold coins that left the Mint after the March 6th proclamation were *not 1933 Double Eagles*. (Tr. 217, at 38-39, 95). Even Claimants' expert Joseph Nelson admitted that he saw *no evidence* of a 1933 Double Eagle ever being released by the cashier. (Tr. 221, at 52). In other words, hypothetically speaking, perhaps '33 Double Eagles *could* have left the Mint and reached the public legitimately, through authorized channels, but Mint records reflect that *none actually did*.[25] In fact, in all of Tripp's research over the past

_____

Society (ANS) could not get one either, despite having a direct line to the Secretary of the Treasury. (Tr. 210, at 93-117, 137-66).

[23]These gold coins released to the public included Double Eagles, but not 1933 Double Eagles. On March 9th, the cashier paid out $3,000 in circulated Double Eagles. This took place prior to the first delivery of '33 Double Eagles to the cashier on March 15th. On March 16th, the cashier paid out $140 in circulated Double Eagles. However, at that point in time, the '33 Double Eagle special assay coins had just been sent out for testing. Finally, on March 17th, $40 in prior year Double Eagles were sent to the Smithsonian. (Tr. 209, at 92-93; Tr. 216, at 47-48).

[24]A Mint bookkeeper named Earl Loser reached the same conclusion many decades ago after analyzing the Mint records in conjunction with different litigation involving a '33 Double Eagle. (Tr. 210, at 87-92; Tr. 213, at 29-30).

[25]Claimants' expert Roger Burdette opined that the '33 Double Eagles could have left the Philadelphia Mint through legitimate and proper channels. Burdette based his opinion on his understanding that (1) the cashier released gold coins on a routine basis during this period and over the past century–it was the normal practice of the Mint; (2) Mint records reflect that the cashier dispensed gold coins during the period spanning March 7, 1933 to April 12, 1933; (3) the

decade, he did not come across any evidence that 1933 Double Eagles were distributed by the Government to anyone, and Tripp never saw any document in which the Treasurer authorized the cashier to issue a '33 Double Eagle.  (Tr. 216, at 30-33).

Tripp also acknowledged that, during the so-called "window of opportunity," the requests for gold coin, as reflected on the Mint's deposit sheets, do not match the actual payouts, as recorded on the cashier's daily statement and settlement.  (Tr. 213, at 36).  Stated differently, Mint records reveal that customers asked for more gold than the Mint actually paid out during the relevant time frame.  But Tripp explained this discrepancy by pointing out that the Mint may have paid customers in something other than gold coins (a check, for example), even though the customers specifically asked for gold.  (Id.; Tr. 216, at 44).  The Mint's regulations support Tripp's interpretation.[26]

To buttress their "window of opportunity" theory, Claimants attempted to undermine the reliability of the Mint's records, in particular the cashier's daily settlement and statement.  For example, the Mint cashier apparently breached protocol by taking all of the '33 Double Eagle assay coins out of a single bag instead of taking samples from each delivery.  (Tr. 210, at 72-75; Tr. 213, at 99-112; Tr. 219, at 54-56).  But Tripp testified that the cashier's shortcut did not change his analysis and ultimate conclusion because the records account for each '33 Double

_____

cashier had a substantial number of '33 Double Eagles under his direct control during this period; and (4) the Mint itself was simply conducting "business as usual" during the relevant time frame, regardless of the President's orders.  (Tr. 218, at 137-38).  Even assuming the foundations for Burdette's opinion are solid, they show at most that a '33 Double Eagle could have lawfully left the Mint as a theoretical matter.  But in reality, Mint records indicate that this did not happen.

[26]Specifically, the Mint paid for bullion by check, except where cash or (gold) bars, *if available*, were requested.  (Tr. 216, at 44).

13

Eagle, even the ones improperly selected by the cashier for assay. (Tr. 210, at 75). Claimants also stressed that the cashier's records were not externally audited as often as Mint regulations required. (Tr. 221, at 29-32). For example, the first recorded audit in 2003 took place in November. (Id.; Tr. 214, at 75-76; Tr. 217, at 171, 179-83). But audit or not, the numbers and arithmetic on the cashier's settlement and statement match-up perfectly, which Claimants' expert conceded is a plus when it comes to reliability. (Tr. 221, at 46-47). In addition, Mint records reflect that only four (4) 1933 Eagles[27]–not Double Eagles–left the Mint through authorized channels, but approximately twenty (20) to thirty (30) of these coins trade in today's coin marketplace. (Tr. 214, at 103-04; Tr. 219, at 57). But this does not necessarily mean that the Mint kept shoddy records. It could also reflect that the '33 Eagles left through the back door. (Tr. 214, at 105-06).

The parties also hotly contested the issue of the cashier's "unclassified counter cash." "Unclassified counter cash" was essentially a cash register. The cashier tracked this money separate and apart from his other holdings. And as its name suggests, this particular pot of money was not broken-down by denomination and year in the cashier's records. During his deposition, Tripp stated that this counter cash could have included gold coins. (Tr. 213, at 67-70). But upon further reflection, Tripp changed course. Because the Mint had always treated gold as a class apart, and the cashier's daily settlements and statements had special categories for gold coins, Tripp determined that the cashier would not have put gold coins in his unclassified

---

[27]An "Eagle" is a $10 gold coin–half of a Double Eagle, figuratively speaking.

14

counter cash.  (Tr. 213, at 63-64).  Mint records support this conclusion, but inferentially.[28]

What's more, even if counter cash could have included gold coins, the jury saw no evidence that

the cashier did in fact mingle the very valuable $20 1933 Double Eagle coins with the pennies in

his figurative cash register.[29]  (Tr. 217, at 101).

 Finally, Claimants' expert Roger Burdette posited a theory that forty-three (43) 1933

Double Eagles were taken from production before the '33 Double Eagles were counted, and these

43 coins were mixed-in with the '32 Double Eagles, perhaps in the cashier's office.  (Tr. 219, at

31-45).  Burdette formulated his theory by reading between the lines of a 1945 memo revealing a

discussion between Philadelphia Mint officials.  (Id.).  The memo concerned 458.1 ounces of

extra gold coins that the Mint mutilated at the end of 1932.  (Id.).  Burdette testified that the Mint

turned this 458.1 ounces of mutilated gold into 43 unaccounted for '33 Double Eagles in order to

make-up for 43 damaged '32 Double Eagles.  (Id.).  However, the memo does not actually say

this.  (Tr. 220, at 24-28, 35).  The memo does not even say "forty-three coins," but rather says

"forty-three pieces."  (Tr. 219, at 41).  While "pieces" could mean "coins" to those in the

---

[28]Tripp admitted that he has not seen any documents definitively stating that counter cash did not include gold coins.  (Tr. 213, at 81-82).  However, a comparison between the Mint's 1933 annual report and the Philadelphia Mint's daily records could lead one to conclude that counter cash comprised silver coins but not gold.  (Tr. 216, at 77-80).  Also, when gold was revalued on January 31, 1934, the Mint records reflect a corresponding increase in total gold holdings but not counter cash holdings.  (Id.).  This is consistent with Tripp's position that counter cash did not contain gold coins.

[29]On cross examination, the Claimants elicited testimony from Tripp to the effect that Israel Switt had brothers who also did business at the Philadelphia Mint in 1933, perhaps hoping the jury would believe that one of Switt's brothers lawfully obtained the '33 Double Eagles from the cashier.  (Tr. 214, at 125-30).  But the Mint records undermine this theory.  For example, Tripp testified that there is no indication in any Mint records that Switt's brothers received gold coins from the Mint in 1933.  (Tr. 216, at 62-67).

industry, such an interpretation would make little sense in the context of the memo.  Specifically, "forty-three pieces" was given as an answer to the question, "how many pieces does this 458.1 ounces represent?"  (Id.).  A Double Eagle weighs just over an ounce, so 458.1 ounces would represent over four-hundred (400) coins, not just 43.  (Tr. 219, at 83, 90-93).

The Government also cast doubt on Burdette's credibility.  For example, in February of 2009, in reference to this litigation, Burdette posted the following message on a coin collectors' online forum: "I can muster all the hearsay, innuendo, assumption, gossip, rumor, illusion and insinuation you want to obfuscate the facts.  And I can do it at only 300 dollars an hour, too."[30] (Tr. 219, at 82).  Burdette also admitted to calling the Government's actions in this case a "witch hunt."  (Tr. 220, at 61).

At bottom, the Mint records reflect that no '33 Double Eagles lawfully left the Mint and found their way into the public's hands through legitimate channels.  As both Tripp and Geisser opined, the records account for the movement of each and every one of these coins from birth (coining) to death (melting).

B.   The Secret Service Investigation

Despite what the records say, we know that a number of '33 Double Eagles escaped from the Mint.  After all, ten (10) of these coins ended-up in Joan Switt Langbord's safe deposit box

---

[30]Burdette claimed he was being sarcastic.  (Tr. 219, at 82).  In August of 2008, Burdette also posted the following in a thread entitled *Okay, you fellow lawyers, what if Izzy Switt videotaped a dying declaration telling his story of his 1933 saints*: "Hmm.  Now if Izzy died while trying to swallow one of the 1933s, and his last gasping breath were videotaped by his daughter and three off-duty Secret Service agents now living in Florida as he related how he got the coins from a cashier's window at the Philadelphia Mint in March 1933 for face value and kept them because he was a coin collector and they were highly desirable pieces of unusual numismatic significance – a Saturday Night Live scene."  (Tr. 219, at 72-74).

on 6th and Chestnut.  Although the existence of these particular ten (10) coins came to light only recently, the Government has been tracking down '33 Double Eagles for decades.

In 1944, a columnist for the New York Herald Tribune named Ernest Kehr noticed that Stack's, a New York City auction house, was advertising a coin collection said to include a '33 Double Eagle.  (Tr. 210, at 171-81).  Curious, Kehr wrote to the Government hoping to ascertain the rarity of this coin.  The Treasury Department responded that no Double Eagles for 1933 had been received in the Treasurer's office, so consequently none were paid out.  (Tr. 210, at 181).  Kehr's inquiry sparked a Secret Service investigation that would ultimately generate a huge case file on the '33 Double Eagles.  (Tr. 210, at 181-86).

According to Tripp, the Secret Service focused on determining (1) whether the '33 Double Eagles were genuine or counterfeit; (2) if genuine, how the coins had gotten out of the Philadelphia Mint; (3) who had possession of the Double Eagle(s); and (4) the source of the coins.  (Tr. 211, at 14).  After much digging, the Secret Service concluded that the '33 Double Eagles were genuine; the coins left the Mint through unauthorized channels; the "inside source" of the coins was George McCann,[31] the cashier of the Philadelphia Mint from 1934 to 1940; and the sole "outside source" was Israel Switt, Joan Langbord's father and Roy and David Langbord's grandfather.[32]  (Tr. 211, at 14-15).  Tripp independently reviewed the Secret Service

_____

[31]In 1940, McCann was arrested for embezzling silver coins and served time in prison for that offense.  (Tr. 211, at 15).  We instructed the jury that they may consider McCann's conviction only as it may bear on the method of theft that was alleged to have occurred at the Mint and the opportunity for McCann to steal these particular coins.  (Tr. 222, at 34).

[32]At the time, Switt owned an antique store near the Mint here in Philadelphia.  (Tr. 218, at 55-56).  Joan Langbord has worked at the store her whole life, and the family stills runs the business today.  (Tr. 217, at 224-25).  Switt himself handled the coin-related aspects of the business.  (Tr. 217, at 227; Tr. 218, at 55).

file and came to the same conclusions.  (Tr. 211, at 15).

To start, the Secret Service seized the coin up for auction at Stack's.  Stack's gave the agents the name of another man, Max Berenstein, who worked a few blocks away and also had a '33 Double Eagle.  The Secret Service seized that coin as well.  (Tr. 211, at 15-16; Tr. 214, at 136-37).  They then took the coins to the New York Assay Office, which examined them and found them to be genuine '33 Double Eagles.  (Id.).

Next, to determine whether the '33 Double Eagles left the Mint through authorized channels, the Secret Service contacted the United States Treasury and reviewed the Philadelphia Mint's records–many of the same records that Tripp and Geisser analyzed.  (Tr. 211, at 16-27).  In the end, the Secret Service opined that the evidence "indicates rather conclusively that no [1933 Double Eagles] were legally circulated with the exception of the two . . . forwarded by the Cashier of the Philadelphia Mint to the Curator of the Smithsonian Institute as of October 2, 1934."  (Tr. 211, at 98).

To find the source of the coins, the Secret Service conducted many interviews of coin dealers and collectors.  In one such interview, Philadelphia coin dealer James Macallister told the Secret Service that, starting in February of 1937, he had purchased five (5) 1933 Double Eagles, all from Israel Swift, for $500 apiece.[33]  (Tr. 211, at 27-63).  This was a huge sum of money in

---

[33]Macallister paid for the coins by check.  Prior to the Secret Service investigation, some buyers of the '33 Double Eagles exhibited the coins openly and advertised their interest in magazines.  (Tr. 215, at 97-105).  Of course, at the time of these transactions, the Secret Service had not yet launched its investigation.  Therefore, the coin community may not have known about the cloud hanging over the title to 1933 Double Eagles.  (Tr. 215, at 101).

1937.[34]  To put it in perspective, consider that the top ten highest prices realized at auction during the 1930s for any American coin ranged from $650 to $1,250.  (Tr. 211, at 30-31).  So, Switt was charging–and getting– top-dollar for four-year-old domestic coins.

Macallister also told the Secret Service that Switt had been arrested in 1934 carrying a bag of approximately $2,000 in gold coins through Philadelphia.  (Tr. 211, at 36-45).  As a result, Switt was questioned regarding a potential violation of the 1934 Gold Reserve Act.  During the civil case that followed, Switt admitted he knew about the Gold Reserve Act and forfeited all the coins to the Government.[35]  (Id.).

When the Secret Service interviewed Switt, he claimed he first started buying '33 Double Eagles in February of 1937, and that he had sold nine (9) of the coins: five (5) to Macallister, two (2) to Ira Reed; and two (2) to Abe Kosoff, all coin dealers.  (Tr. 211, at 45-51).  According to Switt, he could not specifically remember where he obtained the coins, but he acquired them in different collections he purchased at various times.  In addition, Switt told agents that he did not know George McCann and had never obtained gold coins from or through a U.S. Mint employee

---

[34]The Government's expert Eric Rauchway, a historian who focuses on the Great Depression and economic policy, opined that $500 in 1937 would translate to approximately $30,000 today.  (Tr. 218, at 37-38).
    Also, Tripp found it interesting that Switt was able to sell each coin to Macallister for the same high price over a period of time.  To Tripp, this reflected Switt's knowledge that he had cornered the market on '33 Double Eagles–if another source existed, one would expect the competition to drive the price down.  (Tr. 211, at 31-32).

[35]We instructed the jury that they may consider Switt's prior civil forfeiture proceedings only so far as such proceedings may bear on Switt's knowledge or awareness that, under certain circumstances, the possession of Double Eagles was illegal, as well as how that knowledge may relate to the Government's suggestion of concealment in this case.  In other words, did the prior adjudication give Switt a motive to conceal the '33 Double Eagles that are the subject of this suit?  (Tr. 222, at 33-34, 51).

19

in Philadelphia or elsewhere.[36]   (Id.).  Swiit also changed his story about the circumstances

surrounding his 1934 arrest.  In particular, Swiit had originally claimed to own the coins he was

hauling through the city.  Ten years later, Swiit said he had been transporting the coins on behalf

of someone else.  (Tr. 211, at 58-59).  Their investigation led the Secret Service to conclude that

Swiit, along with his business partner Edward Silver, was the sole outside source for all the

known '33 Double Eagles.[37]  (Tr. 211, at 99).

Turning now to the inside source, George McCann assumed the role of Philadelphia Mint

cashier in March of 1934.  Therefore, McCann might have had access to the 437 '33 Double

Eagles that came back to the Mint from the annual assay in February of 1934, as well as the 34

coins that had been moved into a basement vault earlier that same month.  (Tr. 211, at 52-54).

The Secret Service interviewed McCann, as well as other Philadelphia Mint employees,

regarding the disappearance of the '33 Double Eagles.  (Tr. 211, at 85-99).  McCann essentially

pointed the finger at other Mint workers who might have stolen the coins, but McCann did not

suggest that the Double Eagles went out through legitimate channels.  (Tr. 211, at 87-92).  The

---

[36]The Claimants questioned the authenticity of Swiit's statement.  Tripp admitted on cross examination that he has never seen a statement actually signed by Swiit.  Instead, the document that exists today bears the label COPY and the notation "(signed) Israel Swiit."  (Tr. 215, at 32-36).

[37]Like Swiit, Silver denied knowing McCann, but Mint employees contradicted this assertion.  (Tr. 211, at 71-73).  What's more, in 1936, McCann, who made about $2,400 a year as Mint cashier, had deposited nearly $10,000 and later lied about it.  McCann's pattern of deposits apparently matched-up quite well with withdrawals from the Swiit-Silver bank account.  (Tr. 211, at 80-82).

The Secret Service asked the U.S. Attorney General about criminally prosecuting Swiit, but the Attorney General responded that the statute of limitations had run out.  (Tr. 211, at 112-14).  The Secret Service learned about this statute of limitations problem early on in the investigation.  (Tr. 215, at 37-40).  We allowed the jury to hear about the Attorney General's legal determination solely for context and instructed them accordingly.  (Tr. 222, at 34-35).

agents caught McCann in multiple lies and eventually concluded that he was the inside source of the coins. (Tr. 211, at 94-99). According to the Secret Service, McCann had embezzled the coins or taken them through a fraudulent breach of trust. (Tr. 211, at 99).

As noted *supra*, the Secret Service went to great lengths to recover any '33 Double Eagle it could find. (Tr. 211, at 114-22). When pressed, most people returned their coins to the Government. (Id.). However, three collectors–T. James Clarke, James Stack, and L.J. Barnard–decided to fight. (Id.). Barnard litigated his case in the Western District of Tennessee and lost. In that lawsuit, Judge Boyd held that the '33 Double Eagle in question had been stolen or taken through a fraudulent breach of trust from the Philadelphia Mint, so the United States Government had lawful title to the coin.[38] (Id.). The Barnard decision was well-publicized in, e.g., the New York Times and the Numismatist, a coin-focused magazine. (Tr. 211, at 123-26). By 1952, the Government had recovered all of the 1933 Double Eagles known to exist at the time.[39] (Tr. 211, at 127-31). The Government destroyed these coins in 1956. (Tr. 211, at 131).

Based on his review of the documents, Tripp opined that the instant ten (10) '33 Double Eagles were not lawfully issued from the Philadelphia Mint. All the known Double Eagles that

---

[38]See United States v. Barnard, 72 F. Supp. 531 (W.D. Tenn. 1947). We instructed the jury that they could consider the Barnard decision for two narrow purposes: As potential support for Tripp's opinion in this case, and to the extent the decision created an inference of notice to Switt that the '33 Double Eagles were stolen. (Tr. 222, at 31-33). We expressly forbade the jury from deferring to Judge Boyd's long-ago determination in deciding this case. (Tr. 222, at 32).

[39]Claimants intimated that former Treasury Secretary William Woodin may have been the source of the '33 Double Eagles. As reflected in a Secret Service report from 1944, Steven Nagy, an authority on coins, linked at least five (5) Double Eagles to Woodin, a well-known coin collector. (Tr. 214, at 156-57). But the Secret Service dispelled this theory. Woodin's coin collection passed to his wife, who died in 1941. The collection, sold intact to F.C.C. Boyd, contained no '33 Double Eagles. (Tr. 216, at 58-59). Moreover, no one–not even Nagy–ever claimed to have acquired a '33 Double Eagle from Woodin. (Tr. 216, at 59).

left the Mint could be traced back to Switt, and nothing indicates that a single '33 Double Eagle went out the front door through legitimate channels.  (Tr. 211, at 149-52).

    C.    <u>Eleven More Coins</u>

At the time the Secret Service interviewed Switt in the 1940s, he claimed to have no more '33 Double Eagles in his possession.  (Tr. 211, at 45-51).  However, in the early 1970s, Switt asked his friend Harry Forman, a big-time coin dealer, whether Forman had a customer for a '33 Double Eagle.  (Tr. 217, at 239-44).  Switt did not admit that he had one of these coins, but said he thought he knew where he could get one.  (<u>Id</u>.).  In addition, Switt insisted that Forman sell the coin to a non-U.S. buyer.  (Tr. 217, at 241-44).  As Forman tells it, he told Switt that he did not want to get involved.  Switt replied that the coins were legitimate, explaining that he traded 1931 Double Eagles for the 1933's at the Federal Reserve.  (Tr. 217, at 244-47).  Remember, Switt had previously told the Secret Service that he could not recall where he got the coins but had acquired them in various collections.

In 1977, Switt called his grandson Roy Langbord and asked Roy to do him a favor. Specifically, Switt asked Roy to find out the value of a 1933 $20 gold piece.  (Tr. 218, at 9-10). Switt did not tell Roy why he wanted this information, nor did he say whether he had one of these coins.  (<u>Id</u>.).  Switt suggested that Roy check on the price with Stack's in New York City. (Tr. 218, at 11).  Roy did so, but the coin was not listed in the auction house's price guide.  Roy testified that he then asked a Stack's representative about the coin's value.  The representative replied that '33 Double Eagles were not publicly traded, but he would estimate the value at about $250,000.  (Tr. 218, at 12-14).  Roy called Switt that night and passed along the information. (<u>Id</u>.).

In the meantime, one 1933 Double Eagle had escaped to Egypt.  In 1944, King Farouk purchased the coin from Max Mehl, a Texas coin dealer, for $1,575.  (Tr. 211, at 55-58).  The Egyptian government sought and obtained an export license for this '33 Double Eagle about two (2) weeks before the Secret Service started searching for the coins.  This particular specimen, like all the others, traced back to Switt.  (Tr. 211, at 132-38).  The U.S. Government eventually intervened but could not persuade the Egyptians to return the coin to the United States.  (Id.).

In 1995, Stephen Fenton, an English coin dealer, purchased a '33 Double Eagle for approximately $200,000 in a collection of coins originating from King Farouk.  Fenton reached out to a dealer in the United States, who brought the matter to the U.S. Government's attention.  (Tr. 211, at 138-40).  The dealer became a confidential informant for the Government and, pretending to have a buyer, convinced Fenton to bring the coin to the United States in February of 1996.  The Secret Service seized the coin from Fenton in New York City, and protracted litigation ensued.  (Id.).  In the end, the Government, realizing that it had improvidently issued an export license for the Farouk coin many years prior, settled the case.  Fenton and the Government agreed to sell the coin at auction and split the proceeds evenly.[40]  (Tr. 211, at 140-43).

The auction was widely publicized–the New York Times ran a full-page advertisement on the coin.  (Tr. 211, at 144-45).  Roy Langbord saw the ad in the Times and noticed that it mentioned his grandfather, Israel Switt.  Roy then called his mother, Joan Langbord, and told her what he had seen (Tr. 218, at 15, 18, 19).  Recalling his 1977 conversation with his grandfather, Roy asked his mother whether Switt had some of these coins left.  (Tr. 218, at 19).  She essentially brushed-off his inquiry.  (Id.).  Undaunted, Roy continued to call his mother from time

---

[40]Tripp helped write the auction catalog for the Fenton coin.

to time, asking if she had found anything.  (Tr. 218, at 68-69).

According to bank records, Joan Langbord visited her safe deposit box[41] on July 29, 2002, *the day before* the Fenton '33 Double Eagle went up for auction.[42]  (Tr. 217, at 206).  On July 30, 2002, the Fenton coin fetched $7,590,020, almost twice the world record for any coin ever sold at auction.  (Tr. 211, at 140-43).  The Government insisted that $20–the coin's face value–be added to the sale price so that the Treasurer could officially issue the coin.  (Tr. 211, at 144-45).

On June 27, 2003, about a year after the auction, Joan Langbord visited Box 442 once again.  (Tr. 217, at 205-07).  The corresponding entry on this box's sign-in card appears to show two signatures, Joan Langbord's and someone else's.  (Id.).  Although Roy Langbord was the only other authorized signatory on this safe deposit box (Tr. 217, at 205, 228), Roy denied ever accessing the box and claimed the second signature was not his.  (Tr. 218, at 68).

A couple of months later, on August 14, 2003, Box 442 was drilled open.  (Tr. 217, at 207-09).  Bank records give no reason for this action.[43]  According to her testimony, Joan Langbord then found a little grey bag in the bottom of the box.  She opened the bag and saw a gold coin like the one that had sold at auction the previous year.  (Tr. 218, at 59-60; Tr. 220, at 98-99).  Langbord then called her husband and her son Roy and told them of her discovery.  (Id.).

Roy testified that he came to Philadelphia a few days later.  When he opened the bag, Roy found ten (10) 1933 Double Eagles, among other coins.  (Tr. 218, at 61).  Cognizant of the

---

[41]The box at issue is Number 442.  (Tr. 217, at 205-09).  Joan Langbord (and Switt prior to her) leased numerous safe deposit boxes at the 6th and Chestnut branch of Wachovia Bank.  (Tr. 217, at 191-93).  The bank has changed hands–and names–many times over the years.

[42]Langbord claimed to visit the box each year to look for jewelry for a regular customer.

[43]Joan Langbord testified that the box had to be drilled open because it was warped.

24

controversy surrounding the Fenton coin, Roy sought legal advice.  (Tr. 218, at 62-63).  Roy

eventually notified the U.S. Government that his family had these coins.  (Tr. 218, at 65).  The

Government took physical possession of the coins for purposes of authenticating them.  (Tr. 218,

at 66).  This litigation ensued, with both parties claiming to be the rightful owner of these

valuable coins.

 When asked to explain how the '33 Double Eagles managed to make their way into the

bottom of her safe deposit box, Joan Langbord pled ignorance.  Langbord claimed she did not

know who put the '33 Double Eagles in the box or how her mother or father had obtained the

coins.  (Tr. 217, at 228-29; Tr. 220, at 100).  Langbord also testified that she never went into the

safe deposit boxes with her mother, and that she did not know anything about the 1933 Double

Eagle until she saw the newspaper ad mentioning her father in 2002.  (Tr. 217, at 233; Tr. 220, at

93-94).  What's more, Langbord never probated the safe deposit boxes after her parents died.

(Tr. 218, at 24; Tr. 220, at 107-08).  Despite admitting that she looked into Box 442 many times

over the years,[44] including the day before the Fenton coin auction, Langbord asked the jury to

believe that she never knew about the coins until 2003, a year after the only publicly known '33

Double Eagle sold for millions.  (Tr. 220, at 107).

 The jury was not impressed.  After hearing two weeks of testimony, the jury returned a

unanimous verdict for the Government, finding that the Government had proven its claim of

forfeiture of the 1933 Double Eagle coins.  (Tr. 222, at 56-58).  Claimants now challenge that

verdict on two grounds.  In brief, Claimants contend that (1) no reasonable jury could have found

---

 [44]Langbord estimated eight (8) to twelve (12) visits to the box.  (Tr. 217, at 230).  In
Langbord's deposition, she testified that she went into the box so often "to remember [her]
mother" and "for sentimental reasons."  (Tr. 217, at 232).

that the coins were stolen or otherwise removed from the Mint unlawfully, with the requisite

*mens rea*, and (2) the Government failed to prove a violation of 18 U.S.C. § 641, the criminal

statute underlying this forfeiture action, on or after September 1, 1948, the effective date of that

statute.  Claimants also argue that the jury's verdict has mooted the Government's declaratory

judgment claim, which the Government brought to quiet title to the coins.  For the reasons that

follow, we deny Claimants' motions and declare that the disputed 1933 Double Eagles were not

lawfully removed from the United States Mint and accordingly remain the property of the United

States as a matter of law.

III.     Legal Analysis

         A.     Our Highly Deferential Review of the Jury's Verdict

         Claimants move for judgment as a matter of law (JMOL) pursuant to Federal Rule of

Civil Procedure 50 and bear the heavy burden associated therewith.  Rule 50 permits us to grant

the motion only if "a reasonable jury would not have a legally sufficient evidentiary basis to find

for the [prevailing] party," here, the Government.  Fed. R. Civ. P. 50(a)(1).  In this case, we may

set aside the verdict only if, viewing the evidence in the light most favorable to the Government

and giving it the advantage of every fair and reasonable inference, there is insufficient evidence

from which a jury may reasonably find that the 1933 Double Eagles are subject to forfeiture.  See

Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).  In making our

determination, we may not weigh the evidence, pass judgment on the credibility of witnesses, or

substitute our perceived version of the facts for the jury's version.  Pitts v. Delaware, 646 F.3d

151, 155 (3d Cir. 2011); Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 190 (3d Cir.

1992).  Rather, we seek only to ascertain whether "the record is 'critically deficient of the

minimum quantum of evidence' upon which a jury could reasonably base its verdict." <u>Pitts</u>, 646

F.3d at 155 (citation omitted).  Needless to say, "[i]t is only on rare instances that a jury's verdict

in a civil case should be overturned."  <u>Id.</u> at 152.  This is not one of those rare instances.

      B.     <u>The Statutory Basis for the Government's Forfeiture Claim</u>

     The Government brought its civil forfeiture claim *in rem* against the ten (10) 1933

Double Eagles surrendered by the Langbords pursuant to the Civil Asset Forfeiture Reform Act

of 2000 ("CAFRA"), specifically 18 U.S.C. § 981.  Under Section 981(a)(1)(C), "[a]ny property,

real or personal, which constitutes or is derived from proceeds traceable to . . . any offense

constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a

conspiracy to commit such offense" is "subject to forfeiture to the United States."

     In turn, 18 U.S.C. § 1956(c)(7)(D), a definitional subsection of the money laundering

statute, provides that "the term 'specified unlawful activity' means . . . an offense under . . .

section 641 (relating to public money, property, or records) . . .", among many other things.

Closing the loop, Section 641 makes it clear that:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use
> of another, or without authority, sells, conveys or disposes of any record, voucher,
> money, or thing of value of the United States or of any department or agency
> thereof, or any property made or being made under contract for the United States
> or any department or agency thereof; or
>
> Whoever receives, conceals, or retains the same with intent to convert it to his use
> or gain, knowing it to have been embezzled, stolen, purloined or converted--
>
> Shall be fined under this title or imprisoned not more than ten years, or both . . . .

18 U.S.C. § 641.

     As Claimants correctly observe, Congress passed Section 641 in 1948, fifteen years after

the minting of the '33 Double Eagles.  <u>See</u> Act of June 25, 1948, Pub. L. No. 80-772, ch. 31, 62 Stat. 683, 725; <u>see also</u> 62 Stat. at 862 (providing that "[t]his Act shall take effect September 1, 1948.").  Under CAFRA, "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture."[45]  Civil Asset Forfeiture Reform Act of 2000, Pub. L. No. 106-185, § 2, 114 Stat. 202, 205-06 (codified at 18 U.S.C. § 983(c)(1)).  We instructed the jury accordingly.  (Tr. 222, at 36-38).

      C.    <u>The Jury Could Reasonably Find That the Coins Were Taken With the Requisite Criminal Intent</u>

In <u>Morissette v. United States</u>, 342 U.S. 246 (1952), handed down four years after Section 641's enactment, the Supreme Court definitively established that all of the various prongs of Section 641 have a criminal intent requirement.  <u>See id.</u> at 265-70 & n.28 (finding "no other purpose in the 1948 re-enactment than to collect from scattered sources crimes so kindred as to belong in one category.  Not one of these had been interpreted to be a crime without intention and no purpose to differentiate between them in the matter of intent is disclosed.").  The <u>Morissette</u> Court stressed that "[t]he 1948 Revision was *not* intended to create new crimes but to recodify those then in existence" and failed to see any "suggestion that a guilty intent was not a part of each crime now embodied in § 641."  <u>Id.</u> (emphasis added).

Not surprisingly, the jury in this case heard no testimony from anyone who was actually present at the Mint when the '33 Double Eagles first disappeared so many years ago – all the primary actors who might have told that tale have passed away.  But that certainly does not doom

---

[45]Federal civil forfeiture law had formerly required the Government to show only probable cause that the property was subject to forfeiture.  <u>See</u> H.R. Rep. No. 106-192, at 11-13 (1999).

the Government's case because "explicit evidence is not required to support a finding of specific intent." United States v. Piekarsky, Nos. 11–1567, –1568, 2012 WL 2217035, at *12 (3d Cir. June 18, 2012) (precedential).  Indeed, "a jury may draw inferences of subjective intent from evidence of the defendant's objective acts, and from circumstantial evidence."  Id.  In other words, a jury may divine *mens rea* from the totality of the circumstances.  See id.  Realistically speaking, it may often be impossible to prove specific intent any other way.  See United States v. Berrigan, 482 F.2d 171, 189 n.39 (3d Cir. 1973) ("While *mens rea* is certainly within one's control it is not subject to direct proof; it is proved by circumstantial evidence only.  More important, it is not subject to direct refutation.  It is the subject of inference and speculation.").

Against this backdrop, the Claimants argue that there was insufficient evidence that the disputed '33 Double Eagles were knowingly stolen or embezzled from the Philadelphia Mint, as opposed to issued properly and with authorization, e.g., during the so-called "window of opportunity" between March 7 and April 12, 1933, or perhaps paid out by someone who made an honest mistake.  We disagree.  The Government presented substantial evidence from which the jury could–and did–properly infer criminal intent.

We laid out the evidence in detail, *supra*, and at this point a summary will suffice.  To begin, the Government's evidence, presented primarily through the testimony of experts David Tripp and Wayne Geisser, established that Philadelphia Mint records accounted for all 445,000-plus '33 Double Eagles from the day they were struck until the day they were melted.  Relying heavily on the Mint cashier's daily statements and settlements, Tripp and Geisser tracked the location of the coins each and every day throughout the relevant time frame in 1933 and 1934. The vast majority of the Double Eagles never left the basement vault.  Several hundred went out

for testing, and some of these were destroyed in the assay process.  The unused assay coins were sent back to the Mint and down to the vault in February of 1934.  The cashier moved his remaining coins into the vault that same month.  Finally, in October of 1934, two '33 Double Eagles were transferred from the Philadelphia Mint to the Smithsonian, as proven both by a receipt for the coins and by their existence at the Smithsonian today.  The coins in the vault were ultimately melted down and turned into gold bars following the Gold Reserve Act of 1934.

In other words, the Mint records definitively refute Claimants' speculation that a '33 Double Eagle–much less ten (10) or more of the coins–were either lawfully paid out between March and April of 1933 or dispensed by the Mint through innocent mistake.  The Mint meticulously tracked the '33 Double Eagles, and the records show that no such transaction occurred.  What's more, this absence of a paper trail speaks to criminal intent.  If whoever took or exchanged the coins thought he was doing no wrong, we would expect to see some sort of documentation reflecting the transaction, especially considering how carefully and methodically the Mint accounted for the '33 Double Eagles.  The jury saw no record of a legitimate '33 Double Eagle release, and from this lack of documentation one may reasonably infer that the responsible party appropriated the coins in secret, knowing full well the wrongfulness and illegality of his actions.

In sum, Tripp and Geisser accounted for all of the '33 Double Eagles, and none were ever authorized for release.  As such, both experts concluded that no '33 Double Eagles–including the coins in this case–could have been obtained legitimately.  We see no error in the jury crediting the testimony of the Government's experts over the Claimants'.  Furthermore, the Mint records–what they show, as well as what they don't–constitute strong circumstantial evidence

that the coins were stolen or embezzled by someone with a guilty mind.  This evidence alone, taken in the light most favorable to the Government, shows that no coins were lawfully removed from the Mint via authorized exchange, honest mistake, or otherwise.

But of course there is much more.  According to Tripp (and the Secret Service before him), each of the '33 Double Eagles that are known to have made it into the marketplace can be traced back to Israel Switt.  When the Secret Service interviewed Switt in the 1940s, Switt denied having obtained any gold coins from the Philadelphia Mint (or any Mint, for that matter). Instead, Switt claimed he acquired the '33 Double Eagles in various collections he purchased at different times.  But according to Harry Forman, Switt's personal friend, Switt later claimed to have traded for the '33 Double Eagles at the Federal Reserve.  Switt also told the Secret Service that he had no more of the coins, yet (1) Switt later asked Forman if he knew of an out-of-the-country buyer for a '33 Double Eagle; (2) Switt enlisted his grandson to figure out the value of a '33 Double Eagle; and (3) ten more of the coins ended-up in the family's safe deposit box.

Additionally, in their original investigation, the Secret Service compared Switt's bank statements to those of George McCann, the Philadelphia Mint cashier from 1934 to 1940, and found thousands of dollars worth of deposits into McCann's bank account that corresponded with similar withdrawals from the Switt-Silver account.  And, the Secret Service determined that McCann was the likely inside source of the '33 Double Eagles; as Mint cashier, McCann had the opportunity to abscond with the coins, and McCann's conviction for stealing other coins from the Mint shows that he knew how to pull it off.

Given the evidence, a reasonable jury could find that the '33 Double Eagles were knowingly stolen or embezzled from the Mint.  For example, a jury could reasonably conclude

that Switt and McCann worked together to steal the coins, and Switt paid McCann for his efforts; Switt then sold some of the '33 Double Eagles to other coin dealers but still had more coins stashed away; Switt lied to the Secret Service about how he obtained the coins and whether he had any more; and years later, still concealing the coins, Switt began to test the waters regarding the market for a '33 Double Eagle, not as an intellectual exercise but because he had some to sell.

Finally we come to the Langbords, the Claimants in this matter.  Joan Langbord has been involved in the family business all her life.  In 2002, her son Roy called her after reading a New York Times article on the Fenton coin auction, an article that mentioned his grandfather Israel Switt.  Roy asked if Switt had kept any more of the coins, but Joan brushed him off.  Then, the day before the auction, Joan looked into her safe deposit box–the very box containing the disputed Double Eagles, a box she admitted to accessing many times over the years.  The Fenton '33 Double Eagle sold for over $7 million dollars.  Roy continued to hound his mother about the Double Eagles, and voilà, ten more of these valuable gold coins appear.

While Joan Langbord maintained that she knew nothing about the '33 Double Eagles before discovering them at the bottom of her safe deposit box in 2003, a jury could reasonably believe otherwise.  For example, the evidence supports an inference that Joan Langbord knew her father had stolen the coins and hidden them in the family's safe deposit box; she found the coins well before the Fenton '33 Double Eagle went up for auction and continued to conceal them; her son Roy also knew of the questionable provenance of 1933 Double Eagles, at least after reading the New York Times piece in 2002; and the Langbords decided to reveal the coins to the Government only after learning of their immense monetary value, hoping to cash-in like Stephen Fenton did.

In sum, the evidence of criminal intent in this case–with respect to both the original theft and a subsequent concealment of the coins–is far from "critically deficient."  Pitts, 646 F.3d at 155.  Rather, the jury heard more than sufficient evidence, albeit primarily circumstantial, that the disputed '33 Double Eagles were taken from the Mint and squirreled away by Swift and the Langbords with the requisite criminal intent to satisfy 18 U.S.C. § 641.  Thus, we cannot cast aside the jury's verdict on this basis.

      D.      <u>The Government Was Not Required to Prove That the Coins Were Stolen After September 1, 1948</u>

The Claimants also fault the Government for failing to present evidence that the '33 Double Eagles were stolen or embezzled from the Mint after September 1, 1948, the effective date of 18 U.S.C. § 641.  The argument proceeds as follows.  Congress enacted Section 641 in 1948.  None of the earlier-enacted statutes involving stolen government property that were rolled into Section 641 were made a basis for forfeiture under or through 18 U.S.C. § 981(a)(1)(C) (which provides for forfeiture of property tied to offenses constituting "specified unlawful activity") or 18 U.S.C. § 1956(c)(7) (which defines "specified unlawful activity" to include an offense under Section 641).  These provisions provide the only statutory basis for the forfeiture claim in this case.  Accordingly, the Government was not permitted to prove or rely on a violation of one of Section 641's precursor statutes as a basis for its forfeiture claim.  Essentially, Claimants argue that CAFRA simply cannot capture pre-1948 theft or embezzlement of U.S. Government property.  As we explain, this argument is unavailing.

At bottom, this is an issue of statutory interpretation.  And as in all exercises of statutory interpretation, our inquiry here begins "with the language of the statute itself."  <u>Caraco Pharm.</u>

Labs., Ltd. v. Novo Nordisk A/S, 132 S. Ct. 1670, 1680 (2012).  The relevant section of CAFRA

provides for forfeiture of "[a]ny property . . . which constitutes or is derived from proceeds

traceable to . . . any offense *constituting* 'specified unlawful activity' (as defined in section

1956(c)(7) of this title) . . . ."  18 U.S.C. § 981(a)(1)(C) (emphasis added).  For its part, Section

1956(c)(7)(D) defines "specified unlawful activity" to mean, among other things, "an offense

*under* . . . section 641 (relating to public money, property, or records) . . . ." (emphasis added).

Therefore, our task here is to determine whether, pursuant to CAFRA, an offense, e.g., the theft

of the 1933 Double Eagles from the Philadelphia Mint, constitutes "specified unlawful activity"

under Section 641, even though the criminal conduct occurred prior to that Section's enactment.

We conclude that it does.

       The proper scope of the forfeiture provision at issue turns on the words "constituting" and

"under."  These words can be defined many ways and therefore draw their meanings from their

context.  See Ardestani v. I.N.S., 502 U.S. 129, 135 (1991); see also Kucana v. Holder, 130 S.

Ct. 827, 835-36 (2010) (observing that "[t]he word 'under' is chameleon.").  And in some

contexts, the words sweep quite broadly.  See Caraco, 132 S. Ct. at 1683-84 (recognizing that

several of the Court's decisions support giving "under" a broad meaning).  For example, in

Blackman v. District of Columbia, the D.C. Circuit held that "the phrase 'an action or proceeding

. . . under the [IDEA]' . . . includes not only an action alleging the IDEA as its statutory basis but

also a section 1983 action brought to enforce the FAPE right granted by the IDEA."  456 F.3d

167, 176-77 (D.C. Cir. 2006).  In other words, "under [Statute X]" does not necessarily foreclose

reliance on related Statute Y.

       Here, some dictionary definitions of the word "under" arguably support the narrow

34

interpretation advocated by Claimants.  For example, in certain circumstances, "under" might

mean "subject to the authority, control, guidance, or instruction of," "within the group or

designation of," "required by," "in accordance with," or "bound by."  Merriam-Webster's

Collegiate Dictionary 1363 (11th ed. 2005); Webster's Third New International Dictionary

(2002).  However, other definitions go the Government's way.  The Oxford English Reference

Dictionary (2d ed. rev. 2002) defines "constitute" as "be equivalent or tantamount to."  Id. at 308.

The same dictionary defines "under" as "classified or subsumed in."  Id. at 1567.

     Under these broader definitions, CAFRA would reach the fruits of a pre-1948 theft or

embezzlement (or other "equivalent" crimes) if the operative crime was "classified or subsumed

in" Section 641.  And, according to the Supreme Court, Section 641 did not "create new crimes,"

but rather "recodif[ied] those then in existence."  Morissette, 342 U.S. at 265-70 & n.28.  Since

Section 641 did nothing but "collect from scattered sources crimes so kindred as to belong in one

category," id., the 1948 re-codification necessarily "classified or subsumed" conduct that was

already criminal.  While the words–and number–of the statute changed, the conduct criminalized

did not.[46]  Therefore, according to this reading of the interlocking forfeiture and definitional

provisions, the original theft of the '33 Double Eagles from the Mint in the 1930s would serve as

a basis for forfeiture of the coins under CAFRA.

     Viewing the statutory language in context, as we must, we are convinced that the

Government's broader reading is the correct one.  To see why, it is helpful to understand a bit

---

[46]For example, a 1909 statute which was ultimately incorporated into 18 U.S.C. § 641 criminalized embezzling, stealing, or purloining the property of the United States, or concealing such property knowing it to have been embezzled, stolen, or purloined.  Act of Mar. 4, 1909, ch. 321, §§ 47, 48, 35 Stat. 1088, 1097-98.

about CAFRA's genesis.  The Civil Asset Forfeiture Reform Act of 2000 did not come about

overnight.  Rather, the "bill represent[ed] the culmination of a 7-year effort to reform our

Nation's civil asset forfeiture laws."  146 Cong. Rec. H2040, H2046 (Apr. 11, 2000) (statement

of Rep. Henry Hyde).  In enacting CAFRA, Congress was primarily concerned with making

"federal civil forfeiture procedures fair to property owners."  H.R. Rep. 106-192, at 11; see also

114 Stat. at 202 (designating CAFRA as an Act "[t]o provide a more just and uniform procedure

for Federal civil forfeitures, and for other purposes.").

However, CAFRA also greatly expanded the reach of civil forfeiture by adding "specified

unlawful activity" (as defined in the money laundering statute) to the list of predicate offenses

resulting in forfeiture.  Pub. L. No. 106-185, § 20, 114 Stat. at 224.  As explained in a House

Report accompanying a prior version of the bill:

> Current law limits civil forfeiture to certain enumerated federal crimes, and by
> doing so excludes a number of federal crimes that frequently generate criminal
> proceeds.  Because [the bill] makes civil forfeiture procedures fair, and civil
> forfeiture generally should be available to combat federal crimes, it makes sense
> to extend the availability of forfeiture to these other crimes.  Rather then simply
> making civil forfeiture available for all federal crimes, some of which do not
> generate criminal proceeds, the bill would amend sections 981(a)(1) and 982(a)(2)
> of title 18 to extend proceeds forfeiture (both civil and criminal) to the crimes
> enumerated in the money laundering statute, 18 U.S.C. S 1956(c)(7).
>
> By providing for forfeiture of the proceeds of these offenses, the bill ensures that
> the government will have a means of depriving criminals of the fruits of their
> criminal acts without having to resort to the RICO and money laundering
> statutes–provisions which currently permit forfeiture of criminal proceeds but also
> carry higher penalties–in cases where it is unnecessary to do so or where the
> defendant is willing to enter a guilty plea to the offense that generated the
> forfeitable proceeds but not to the RICO or money laundering offense.

H.R. Rep. No. 105-358, at 35 (1997); see also United States v. Black, 526 F. Supp. 2d 870, 878

(N.D. Ill. 2007) (explaining that one goal of CAFRA was to extend federal forfeiture law so as to

encompass crimes that frequently generate criminal proceeds) (citation omitted).

In other words, in amending the forfeiture laws, Congress did not intend to "enfeeble federal civil forfeiture efforts." H.R. Rep. No. 105-845, at 50-51 (1999). To the contrary, since the amendments made civil forfeiture proceedings fairer, Congress decided to make civil forfeiture "an even stronger tool of law enforcement against criminals" by broadening the kinds of criminal activity that would lead to forfeiture. Id.; see also 146 Cong. Rec. S1753, S1760-61 (Mar. 27, 2000) (recognizing that the compromise bill that eventually became CAFRA gave "law enforcement new, but measured, authority" and "broadly extend[ed] the government's authority to forfeit criminal proceeds under the civil asset forfeiture laws."); 146 Cong. Rec. at H2047 (likewise observing that the compromise bill "contains a number of provisions addressing the needs of the Justice Department and State and local law enforcement," e.g., by "increasing the availability of . . . the civil forfeiture of the proceeds of crimes.").

All this tends to show that Congress deliberately cast a wide net in CAFRA and consequently used the words "constituting" and "under" in their broad sense.[47] After all, CAFRA was designed to–and did–significantly expand the universe of crimes for which forfeiture could be had. In doing so, Congress tied the "specified unlawful activity" resulting in forfeiture to the crimes enumerated in the money laundering statute *because those were the crimes that commonly generated criminal proceeds*, not out of any desire to limit the forfeiture statute's reach. And the

---

[47]Admittedly, we doubt that Congress, when drafting or passing CAFRA, ever considered the specific circumstances giving rise to this particular dispute between the Government and the Langbords. In other words, Congress most likely lacked any specific intent as to whether CAFRA would permit the United States to take back property stolen from it in the 1930's, more than sixty (60) years prior to the Act, based on criminal conduct that was subsequently re-codified in a new statutory section many decades ago.

embezzlement or theft of Government property epitomizes the type of crime Congress passed

CAFRA to cover, regardless of how long ago the embezzlement or theft occurred.

Moreover, we are not surprised that the definitional provision says "an offense under . . .

section 641," not "an offense under . . . section 641 or any of the prior statutes that criminalized

the same conduct which were re-codified in section 641." Defining the conduct in this manner,

i.e., by referencing the number of the statute then (and still) in-force, is the most natural and

straightforward way to do things. In our view, it does not reflect any conscious decision by

Congress to exclude pre-1948 theft or embezzlement of Government property from CAFRA's

ambit. Simply put, Congress had no need to refer to the prior statutes because Section 641 rolled

them all into one; Section 641 covered it all.

Relatedly, a long-established "canon of construction directs a court to look to the

'mischief and defect' that the statute was intended to cure" in interpreting the law. Elliot Coal

Mining Co. v. Director, Office of Workers' Comp. Programs, 17 F.3d 616, 631 (3d Cir. 1994);

see also Smith v. Townsend, 148 U.S. 490, 494 (1893) ("It is well settled that where the language

of a statute is in any manner ambiguous, or the meaning doubtful, resort may be had to the

surrounding circumstances, the history of the times, and the defect or mischief which the statute

was intended to remedy."). As Judge Calabresi recently and aptly observed, "texts must always

be read in context, and context includes not only the whole of the statute . . . , but also the

'mischief' the law was enacted to address. This is not the same as legislative history." United

States v. Aleynikov, 676 F.3d 71, 82 (2d Cir. 2012) (Calabresi, J., concurring).

Here, the CAFRA Congress sought to solve two problems. First, the prevailing forfeiture

laws were procedurally unfair. Second, and more pertinent to the interpretive question at hand,

38

the law was substantively too narrow because it did not cover many crimes that usually generated criminal proceeds.  It goes without saying that this broad class of crimes–the crimes CAFRA was intended to reach–includes stealing or embezzling Government property.  Considering the mischief CAFRA was intended to cure, we find it hard to believe that Congress would have drawn a largely artificial distinction between pre-1948 theft or embezzlement and post-1948 theft or embezzlement when the only difference is one of nomenclature, not substance.  See Morissette, 342 U.S. at 265-70 & n.28; see also Chappell v. United States, 270 F.2d 274, 276 (9th Cir. 1959) (noting that Section 641 only made changes "necessary to effect the consolidation" of the prior laws).

We also find support for the Government's preferred interpretation in CAFRA's retroactivity clause.  As a general matter, "statutory retroactivity has long been disfavored." Monoson v. United States, 516 F.3d 163, 166 (3d Cir. 2008) (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 268 (1994)).  However, Congress can override this default rule by speaking clearly to the issue.  Thus, "[w]hen a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach.  If Congress has done so, of course, there is no need to resort to judicial default rules" such as the presumption against retroactivity.  Id.  By speaking clearly, Congress conveys that it "has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits."  Id. (citation omitted).

Here, Congress defined CAFRA's "Effective Date" such that the "Act and the amendments made by [the] Act *shall* apply to *any* forfeiture proceeding commenced on or after

39

the date that is 120 days after the date of the enactment of [the] Act." Pub. L. No. 106-185, § 21, 114 Stat. at 225 (codified at 8 U.S.C. § 1324 (note)) (emphasis added).[48] This language allows no exceptions and leaves no room for interpretation: CAFRA applies to each and every forfeiture proceeding commenced on or after August 23, 2000, regardless of when the underlying conduct–here, the theft or embezzlement of the Double Eagles–took place. In fact, CAFRA's effective date provision closely tracks language that the Supreme Court in <u>Landgraf</u> viewed as determinative on the retroactivity question. <u>See</u> <u>Landgraf</u>, 511 U.S. at 259-60 ("Had Congress wished [the statute] to have such a determinate meaning, it surely would have used language comparable to [the following] . . . : that the new provisions 'shall apply to all proceedings pending on or commenced after the date of enactment of this Act.'").

Our sister courts have similarly held that CAFRA reaches criminal activity that occurred prior to the Act. <u>See</u>, <u>e.g.</u>, <u>United States v. All Assets Held at Bank Julius Baer & Co., Ltd.</u>, 571 F. Supp. 2d 1, 9-10 (D.D.C. 2008) ("The language of CAFRA clearly expresses Congress's intent that it apply retroactively . . . . The CAFRA provisions at issue are tied to the effective date of the Act and the timing of the forfeiture proceedings brought in court, and not to the timing of the predicate criminal acts underlying the forfeiture action."); <u>United States v. All Funds on Deposit in Dime Sav. Bank of Williamsburg Account No. 58-400738-1 in the Name of Ishar Abdi and Barbara Abdi</u>, 255 F. Supp. 2d 56, 61-62 (E.D.N.Y. 2003) ("CAFRA, by its terms, 'shall' apply to all forfeiture cases commenced on or after August 23, 2000 . . . . Had Congress wanted to exclude from CAFRA's reach cases that are commenced after the effective date of the Act but

_____

[48]Since CAFRA was enacted on April 25, 2000, it took effect on August 23, 2000. No one disputes that the instant forfeiture proceeding commenced after the Act's effective date.

where the underlying fraudulent conduct occurred prior to the effective date of the Act, it could

have done so.  Since it did not, and since there is nothing ambiguous in the statute's language

concerning its reach or applicability, there is no need to conduct the <u>Landgraf</u> retroactivity

analysis."); <u>United States v. Real Property Identified as: Parcel 03179-005R</u>, 287 F. Supp. 2d 45,

53-55 (D.D.C. 2003) ("It would stretch the bounds of logical reasoning to conclude that Congress

was unaware that any civil forfeiture case commenced shortly after the effective date of the Act

would, by necessity, be based on activities that occurred prior to the effective date of the Act.")

(internal quotation marks and brackets omitted).

  And, even if CAFRA's plain language reflects any ambiguity as to whether the Act

encompasses pre-2000 conduct, we see extra-textual evidence that Congress deliberately gave

CAFRA an expansive temporal scope.  <u>See</u> <u>Monoson</u>, 516 F.3d at 166 (recognizing that "even in

the absence of a clear command, whether a statute may be applied prospectively or

retrospectively might be answered by applying the principles of statutory interpretation to the text

of the new law.").

  In particular, a prior version of the forfeiture bill would have included a "no retroactivity"

clause.  <u>See</u> H.R. Rep. No. 105-358, at 12-13, 56 (explaining that "changes to the substantive

forfeiture statutes, such as those that expand forfeiture to apply to offenses for which forfeiture

has not previously been available as a remedy, would apply to offenses occurring on or after the

effective date.").  As we know, the bill Congress actually passed contains no such language.  To

the contrary, CAFRA applies to *all* forfeiture actions commenced on or after a specific date.

This is compelling evidence that Congress considered and rejected any notion of limiting

CAFRA according to the date of the predicate offense.

Congress's express authorization to apply CAFRA retroactively to past crimes leads us to believe that Congress intended for its words to sweep broadly, temporally speaking.  Read in this context, the phrase "any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)" is most naturally interpreted to capture the theft or embezzlement of Government property that occurred prior to the 1948 re-codification of the aforementioned crimes.  As discussed *supra*, CAFRA applies retroactively to past criminal conduct.  And in explicitly authorizing retroactive forfeiture, Congress put no time limit on how far back CAFRA could reach.  We see nothing to suggest that Congress intended to impose the arbitrary date restriction urged by the Langbords.  Under the Langbords' interpretation of the statute, a thief who stole from the Government on August 31, 1948 *would not* forfeit the fruits of his crime, while a thief who stole the next day *would*, even though (1) the two thieves committed the same crime (as held by Morissette), and (2) neither thief had any notice of the potential forfeiture (because CAFRA would not come about for another fifty years or so).  It is highly implausible that Congress intended such a perverse result.

For all these reasons, we hold that "any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title) . . . .", 18 U.S.C. § 981(a)(1)(C), includes the pre-1948 theft or embezzlement of United States Government property.  The Government was not required to prove a violation of 18 U.S.C. § 641 on or after September 1, 1948.  Therefore, to the extent the jury based its verdict on a finding that the disputed '33 Double Eagles were stolen from the Philadelphia Mint in the 1930s, the verdict is consistent with the civil forfeiture statute.

The Claimants contend that this interpretation of CAFRA would run counter to the principle that forfeiture statutes should be narrowly construed against the Government.  See, e.g.,

42

United States v. Charles D. Kaier Co., 61 F.2d 160, 162 (3d Cir. 1932) ("The power to condemn or to declare a forfeiture must be found in the statutes, and such statutes must be pursued with reasonable strictness."); United States v. $493,850.00 in U.S. Currency, 518 F.3d 1159, 1169 (9th Cir. 2008) (observing that it is "well-established that forfeiture statutes are strictly construed against the government.") (citation and internal quotation marks omitted). But this is not a hard-and-fast rule; it is merely a canon of construction which, like other such canons, may or may not help us discern a statute's meaning depending on the circumstances. See United States v. Union Bank For Sav. & Inv. (Jordan), 487 F.3d 8, 21-22 (1st Cir. 2007).

In a case such as this, in which we are called upon to determine whether CAFRA's "specified unlawful activity" provision covers a particular crime, the strict construction canon has little to say. As detailed *supra*, Congress passed CAFRA in part to significantly *expand* the list of crimes which would lead to forfeiture. To do so, Congress referenced the definition of "specified unlawful activity" in the already-existing money laundering statute. An overly narrow interpretation of the new predicate offenses would be in tension with Congress's desire to broaden the scope of civil forfeiture.

Third Circuit jurisprudence is in accord. In United States v. Vampire Nation, 451 F.3d 189 (3d Cir. 2006), the court held that the criminal forfeiture statute covers general mail fraud. Id. at 199-201. In doing so, the court rejected a "restrictive view" of the statute which would permit criminal forfeiture only for mail fraud carried out against financial institutions. Id. at 200. In adopting the broader interpretation, the Third Circuit relied on the legislative history of CAFRA, which reflected Congress's intent "to expand the availability of criminal forfeiture to the comprehensive list of crimes referenced in 18 U.S.C. § 1956(c)(7), which list includes

43

general mail fraud, not only mail fraud perpetrated against a financial institution." Id. at 200-01. Tellingly, the Vampire Nation court did not address the canon of strict construction in its analysis of the forfeiture statutes.  See also United States v. Day, 524 F.3d 1361, 1374-77 (D.C. Cir. 2008) (likewise interpreting a forfeiture statute broadly–and without reference to the strict construction canon–in light of CAFRA's legislative history).

What's more, even if Claimants' interpretation of the forfeiture statute was correct and CAFRA required the Government to prove a violation of Section 641 on or after September 1, 1948, the Government presented evidence sufficient to sustain the jury's verdict.  For example, the Government adduced evidence that Israel Switt concealed the '33 Double Eagles, knowing them to be stolen, long after 1948.  Such concealment constitutes an independent offense under 18 U.S.C. § 641.

As detailed above, the evidence, taken in the light most favorable to the Government, shows the following.  The Secret Service interviewed Switt in the 1940s, at which time he denied having any more '33 Double Eagles.  Switt knew the coins were stolen, perhaps because he stole them himself (with the help of George McCann) or was aware of the 1947 Barnard decision holding that a '33 Double Eagle–traced back to Switt–had been unlawfully removed from the United States Mint.  Despite being on notice that the coins had been stolen or embezzled from the Mint, Switt nevertheless expressed an interest in selling a '33 Double Eagle in the 1970s. Remember, Switt asked his friend and prolific coin dealer Harry Forman whether he had a client who might be interested in one of the coins.  Switt specified that the sale had to take place outside of the United States, and it takes no great leap of imagination to figure out why: Switt knew the Government was seizing the coins as stolen.  Also, in 1977, Switt asked his grandson

Roy Langbord to find out the price of a '33 Double Eagle.  Roy went to Stack's in New York

City, learned that 1933 Double Eagles were not publicly traded, and passed along the information

to his grandfather.  Years later, Switt's daughter Joan Langbord "discovered" ten (10) of the

coins in her family's safe deposit box.   This evidence is sufficient for a jury to find that Switt

illegally concealed the disputed '33 Double Eagles well after 1948, knowing them to be stolen

from the United States Government, in violation of 18 U.S.C. § 641.

   Claimants appear to argue that, to prove concealment under Section 641, the Government

must show that *both* the theft or embezzlement *and* the subsequent concealment took place on or

after September 1, 1948.  For support, the Claimants cite various authorities that say essentially

the same thing: to prevail on a concealment theory, the Government must prove both that the

property was stolen and that the person concealing the property knew it was stolen.  See, e.g.,

United States v. Golomb, 811 F.2d 787, 792-93 (2d Cir. 1987).  This is not particularly

controversial.  In fact, we instructed the jury in accordance with this understanding.  (Tr. 222, at

46-48).  However, it is also not particularly relevant to the question at hand.  In other words,

simply because the Government must prove both theft and concealment with knowledge of the

theft *does not* mean that the theft had to occur post-September 1, 1948.

   And Section 641 undoubtedly criminalizes the post-1948 concealment of the fruits of a

pre-1948 theft.  To reach this conclusion, we need look no further than the statute itself.  First, 18

U.S.C. § 641 is written in the alternative: "Whoever embezzles, steals, purloins, or knowingly

converts [Government property] . . . *or* Whoever receives, conceals, or retains the same . . ."

commits a crime under Section 641.  Therefore, concealment alone constitutes a violation of the

statute if the concealment occurred on or after September 1, 1948, regardless of when the original

45

theft took place.

Second, recall that the Act of June 25, 1948 collected similar crimes under a new heading, Section 621 of Title 18 of the U.S. Code.  In fact, it did nothing more.  Because the old statutes were no longer necessary, the Act repealed them.  Pub. L. No. 80-772, § 21, 62 Stat. at 862-68.  But, not wanting to leave a gap in coverage, Congress explicitly provided that "[a]ny rights and liabilities now existing under [the repealed statutes] shall not be affected by this repeal."  62 Stat. at 862.  As such, both theft and concealment were crimes both before[49] and after 1948.  The Act made no substantive changes to the law or a criminal's liability thereunder.

Claimants proposed interpretation of Section 621 is contrary to this congressional command.  Under Claimants' theory, the pre-1948 concealment of the fruits of a pre-1948 theft would constitute a crime, even after Section 621's enactment.  Similarly, the post-1948 concealment of the fruits of a post-1948 theft would also constitute a crime under Section 621.  Yet the post-1948 concealment of the fruits of a pre-1948 theft would not.  According to Claimants' reading of the law, the 1948 Act would affect "rights and liabilities" in a way Congress sought to avoid.  This severely undermines Claimants' position on this issue.

To summarize, we hold that CAFRA, in particular 18 U.S.C. § 981(a)(1)(C), applies retroactively to the pre-1948 theft or embezzlement of Government property.  Therefore, the Government need not prove that the ten (10) 1933 Double Eagles in suit were stolen or embezzled on or after September 1, 1948.  To the extent the jury found for the Government based

---

[49]As mentioned *supra*, note 46, embezzling, stealing, or purloining the property of the United States, or concealing such property knowing it to have been embezzled, stolen, or purloined, was a federal crime as far back as 1909.  The pertinent provisions–Sections 47 and 48 of the Act of Mar. 4, 1909–ultimately became 18 U.S.C. §§ 100 and 101, respectively, which were subsequently consolidated in 18 U.S.C. § 641 in 1948.

on a pre-1948 theft or embezzlement of the coins, the jury's verdict was not in error.  We also

conclude that Section 641 criminalizes the post-1948 knowing concealment of Government

property stolen prior to September 1, 1948.  Therefore, to the extent the jury found for the

Government based on a post-1948 concealment of the stolen '33 Double Eagles, the jury's

verdict was proper.

      E.     <u>The Government's Declaratory Judgment Claim</u>

      Notwithstanding the favorable jury verdict on its forfeiture claim (Count I), the

Government seeks a declaratory judgment (Count II) that the disputed Double Eagles were not

lawfully removed from the United States Mint and accordingly remain the property of the United

States as a matter of law.  (Doc. No. 134, ¶ 98).  Claimants oppose such a declaration, contending

that it would improperly infringe on the province of the jury.  Relatedly, Claimants also argue

that the jury's verdict resolved the question of title to the disputed Double Eagles and therefore

mooted the Government's declaratory judgment claim.

      As explained herein, Claimants' arguments do not persuade us.  While the jury's verdict

dictates the outcome of the declaratory judgment claim, the verdict does not moot the claim.

And, since we make our declaration solely on the basis of facts necessarily (although implicitly)

found by the jury, we do not tread on the jury's toes or undermine its verdict in any respect.

Furthermore, a declaratory judgment in this case serves the valuable purpose of efficiently

settling and clarifying the relative legal rights of the Government and the Claimants with respect

to the disputed coins.  Therefore, we declare that:

> The disputed Double Eagles were not lawfully removed from the United States
> Mint and accordingly, as a matter of law, they remain the property of the United
> States, regardless of (1) the applicability of CAFRA to the disputed Double

Eagles, (2) Claimants' state of mind with respect to the coins, or (3) how the coins came into Claimants' possession.

As a general matter, the Declaratory Judgment Act gives courts broad discretion to entertain a declaratory judgment claim.  In its current form, the Act provides that:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought . . . .

28 U.S.C. § 2201(a).

The Supreme Court has made it clear that "district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act." Wilton v. Seven Falls Co., 515 U.S. 277, 282 (1995).  And, in deciding whether a declaration is proper under the circumstances, we are to give the Act "a liberal interpretation." United States v. Pa. Dep't of Envtl. Res., 923 F.2d 1071, 1074-75 (3d Cir. 1991).  And, even more than that, the Third Circuit has cautioned that a court should "decline to adjudicate a declaratory judgment action over which it has jurisdiction . . . *only* . . . if it determines that issuing a declaratory judgment would serve *no useful purpose*." Aluminum Co. of Am. v. Beazer East, Inc., 124 F.3d 551, 560 (3d Cir. 1997) (emphasis added) (citations omitted).

Here, we find great utility in making the aforementioned declaration because it quiets title to the disputed Double Eagles to an extent the jury's verdict did not.  See United States v. City of Las Cruces, 289 F.3d 1170 (10th Cir. 2002) (holding that a declaratory judgment action is an appropriate vehicle for the United States Government to quiet title to disputed property).  In essence, the declaration concerns a different–and broader–set of legal rights than the narrow question decided by the jury, which was simply whether the Government had proven its claim of

forfeiture of the 1933 Double Eagles.

Of course, courts have the power to decide only cases or controversies, not hypothetical questions.  U.S. Const. art. III, § 2; 28 U.S.C. § 2201(a) (declaratory judgment permissible only in "a case of actual controversy.").  But the line between the two is often blurry, particularly in the declaratory judgment context.  As Justice Murphy perceived many years ago (not long after the '33 Double Eagles disappeared from the Mint, in fact):

> The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case where there is such a controversy.  Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273 (1941).  In other words, the inquiry is fact-dependent and case-specific.

Here, Claimants concede that "the jury's verdict requires that the Court rule in the government's favor on the declaratory judgment claim."  (Tr. 229, at 5; see also Doc. No. 228, at 2 ("The parties are in agreement that the jury's verdict requires a judgment in favor of the government with respect to Count II.")).  However, Claimants argue that there is no controversy "of sufficient immediacy and reality" to warrant a declaration in this case because the jury's verdict in favor of the Government on the forfeiture count mooted the declaratory judgment claim.  We disagree.

A controversy becomes moot if "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  Powell v. McCormack, 395 U.S. 486, 496-97

49

(1969).  The Supreme Court has said that "[t]he burden of demonstrating mootness is a heavy

one."  County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (citation and internal

quotations marks omitted).  Claimants have not met their heavy burden here.

First, a live controversy still exists in this case because, despite the jury verdict, the

contours of the legal relationship between the Government, the Langbords, and the disputed

Double Eagles remain undefined.  The declaratory judgment solves this problem.  See S. Region

Indus., Realty v. Roberts, 10-cv-271, 2011 U.S. Dist. LEXIS 64525, at *15-16 (W.D.N.C. May

10, 2011) (concluding that claims for declaratory relief presented actual controversy because "a

declaratory judgment may be beneficial to define and clarify the legal rights of the parties"

following a jury's general determination).  For instance, the jury found forfeiture under CAFRA,

but the jury never decided whether CAFRA applied in the first instance.  That is a legal

determination for the Court.  So, the declaratory judgment claim is not moot even though

CAFRA's "relation back" provision retroactively vests title to the coins in the United States.  See

18 U.S.C. § 981(f) (providing that "[a]ll right, title, and interest in property [subject to forfeiture]

shall vest in the United States upon commission of the act giving rise to forfeiture . . . .").  While

the jury settled title under the forfeiture statute, the verdict reveals nothing about the relative

priority of the Government's and the Langbords' competing claims to the coins independent of

CAFRA.

Also, the jury heard much evidence reflecting what Swift and the Langbords knew–or,

according to Claimants, did not know–about whether the coins were stolen.  In contrast, the

declaration sought by the Government does not turn on the Langbords' state of mind with respect

to the origin of the Double Eagles.  Because the declaratory judgment claim concerns a different

50

legal relationship than the one passed-upon by the jury, the claim is not moot.  Cf. Powell, 395

U.S. at 497 ("Where one of the several issues presented becomes moot, the remaining live issues

supply the constitutional requirement of a case or controversy.").

Second, the controversy between the Langbords and the Government is not moot because

the parties disagree over whether CAFRA–the basis for the Government's forfeiture claim and

the jury's verdict–applies to these Double Eagles stolen long ago.  While we have determined

that CAFRA does, in fact, apply, we recognize that others might disagree.  Under these unusual

circumstances, we think the controversy remains sufficiently "immediate" and "real" to justify

our declaration.  See Maryland Casualty, 312 U.S. at 273.

In relevant respects, the situation we face is analogous to one addressed by the Third

Circuit in ACandS, Inc. v. Travelers Casualty & Surety Co., 435 F.3d 252 (3d Cir. 2006).  In

ACandS, the district court below affirmed an arbitration award and dismissed a related

declaratory judgment claim as moot.  Id. at 257-58.  The district court reasoned that, because the

arbitration award was valid, the declaratory judgment claim (which would settle a subsidiary

issue that would matter only if the award was vacated) was unnecessary and therefore moot.  Id.

at 261.  In an opinion by then-Judge Alito, the Third Circuit reversed the district court and

vacated the arbitration award.  Id. at 257-58, 261.  In doing so, the ACandS court chastised the

district court for dismissing the declaratory judgment claim as moot.  Id. at 261 (holding that the

declaratory judgment claim "should not have been held to be moot.").

We take that lesson to heart here.  As discussed *supra*, we have concluded that the civil

forfeiture statute, particularly 18 U.S.C. § 981(a)(1)(C), applies to the disputed Double Eagles.

Nevertheless, we understand from ACandS that we should not dismiss the Government's

51

declaratory judgment claim as moot on an assumption that higher authorities will agree with our interpretation.  See also Occidental Life Ins. Co. of Cal. v. Nichols, 216 F.2d 839, 840-42 (5th Cir. 1954) (state court judgment on appeal did not moot related federal declaratory judgment claim because "a real controversy still exists as long as the [losing party] has a chance to reverse that judgment.").

Claimants also worry that the Government's requested declaration "would impermissibly interfere with the province of the jury."  Squires v. Bonser, 54 F.3d 168, 174 (3d Cir. 1995).  Not so.  As correctly recognized by Claimants, the jury's verdict necessarily, although implicitly, answers the factual question embedded within the Government's declaratory judgment claim: the coins were "not lawfully removed from the United States Mint."  This is so because to prevail on either a theft or concealment theory, the Government had to prove the '33 Double Eagles were stolen or embezzled from the Mint.  (Tr. 222, at 42-48).  Since the Government won on the forfeiture claim, the jury must have found that the coins were "not lawfully removed" from the Mint.  The principle of jury supremacy binds us to that finding.  See Roebuck v. Drexel Univ., 852 F.2d 715, 717 (3d Cir. 1988).  It also makes it unnecessary for us to conduct any additional fact finding to resolve the Government's declaratory judgment claim.  See Collins v. Foster, 07-20526, 2009 U.S. Dist. LEXIS 122724, at *1-4 (S.D. Fla. Dec. 23, 2009) (entering declaratory judgment predicated on jury verdict).  Since we base our declaration solely on the facts found by the jury, the declaratory judgment is not "at variance with the jury's findings" in this case.  Id. Just the opposite.

Coming finally to the merits of the claim, it is well-established that a *bona fide* purchaser from a thief gets nothing.  Underhill Coal Mining Co. v. Hixon, 652 A.2d 343, 346 (Pa. Super.

Ct. 1994) (quoting Linwood Harvestore, Inc. v. Cannon, 235 A.2d 377, 380 (Pa. 1967)). "This is so because a converter has no title . . . and thus can convey nothing to a *bona fide* purchaser for value." L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc., 777 A.2d 1090, 1095 (Pa. Super. Ct. 2001). This general principle of property law governs priority of title, regardless of how valuable the contested property may be. See Erisoty v. Rizik, No. 93-cv-6215, 1995 WL 91406, at *1, 9 (E.D. Pa. Feb. 23, 1995) (Rendell, J.) (applying principle to dispute over "'Winter,' an eighteenth century masterpiece painted by Corrado Giaquinto."). The coins in this case merit no exception. See Barnard, 72 F. Supp. at 532-33 (opining with respect to a similar '33 Double Eagle that "[s]ince this gold piece was stolen or, through fraudulent breach of trust, taken from the Philadelphia Mint, the . . . purchaser . . . took the [coin] subject to the defects in its title and this is true, even though the property was acquired in good faith, for a valuable consideration and without notice of any infirmity of title. He cannot maintain ownership in such property against one who has been deprived of it by theft or other illegal act. This principle of law is . . . well settled . . . .").

Here, as noted *supra*, the jury verdict dictates that the '33 Double Eagles-in-suit were stolen or embezzled from the Mint. Therefore, as the true owner of the stolen coins, the United States of America–as property owner, not prosecutor–has superior title vis-a-vis the Claimants even if the Langbords (or Israel Switt before them) happen to be *bona fide* purchasers for value of the '33 Double Eagles. Hence our declaration that:

> The disputed Double Eagles were not lawfully removed from the United States Mint and accordingly, as a matter of law, they remain the property of the United States, regardless of (1) the applicability of CAFRA to the disputed Double Eagles, (2) Claimants' state of mind with respect to the coins, or (3) how the coins came into Claimants' possession.

IV.     <u>Conclusion</u>

For the aforementioned reasons, Claimants' motions (Doc. Nos. 194, 206) are denied, and the Government's motion (Doc. No. 224) is granted.  We will enter judgment for the United States on both Counts I (forfeiture) and II (declaratory judgment) accordingly.  The Clerk of Court is directed to close this matter for statistical purposes.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.